**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | | |
|---|---|---|
| KEITH SETH, *et al.*, | ) | |
| Individually and on behalf of a class | ) | |
| of similarly situated persons, | ) | |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| MARY LOU MCDONOUGH, | ) | |
| In her official capacity as | ) | |
| Director of the Prince George's County | ) | |
| Department of Corrections, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants-Respondents. | ) | |

**APPENDIX OF EXHIBITS FOR CLASS ACTION COMPLAINT AND PETITION
FOR WRITS OF HABEAS CORPUS**

# Exhibit Index

| | |
|---|---|
| Exhibit 1 | Seth Declaration |
| Exhibit 2 | Smith Declaration |
| Exhibit 3 | Bunch Declaration |
| Exhibit 4 | John Doe No. 1 Declaration |
| Exhibit 5 | John Doe No. 2 Declaration |
| Exhibit 6 | John Doe No. 3 Declaration |
| Exhibit 7 | John Doe No. 4 Declaration |
| Exhibit 8 | John Doe No. 5 Declaration |
| Exhibit 9 | Declaration #9 |
| Exhibit 10 | Declaration #10 |
| Exhibit 11 | Declaration #11 |
| Exhibit 12 | Declaration #12 |
| Exhibit 13 | Declaration #13 |
| Exhibit 14 | Declaration #14 |
| Exhibit 15 | Declaration #15 |
| Exhibit 16 | Declaration #16 |
| Exhibit 17 | Declaration #17 |
| Exhibit 18 | Declaration #18 |
| Exhibit 19 | Declaration #19 |
| Exhibit 20 | Declaration #20 |
| Exhibit 21 | Declaration #21 |
| Exhibit 22 | Declaration #22 |
| Exhibit 23 | Declaration #23 |
| Exhibit 24 | Declaration #24 |
| Exhibit 25 | Declaration #25 |
| Exhibit 26 | Declaration #26 |
| Exhibit 27 | Declaration #27 |
| Exhibit 28 | Schellner Declaration |
| Exhibit 29 | Glenn Declaration |
| Exhibit 30 | Meyer Declaration |
| Exhibit 31 | Meyer Curriculum Vitae |
| Exhibit 32 | Benninger Declaration |
| Exhibit 33 | Benninger Curriculum Vitae |
| Exhibit 34 | Haney Declaration |
| Exhibit 35 | Haney Curriculum Vitae |
| Exhibit 36 | CDC Guidelines for Correctional Settings |

# EXHIBIT 1

Consent given

## **Declaration of Keith Seth**

I, Keith Seth, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1. I provided the information below in response to a standard set of questions read to me over the telephone by Ariel Schneller on April 8, 2020 and then in response to follow-up questions on April 17, 2020. At the conclusion of the first conversation, my declaration was read to me and I confirmed its accuracy based on my own knowledge and observations. At the conclusion of the follow-up conversation, I provided more information that was read back to me and I swore under the penalty of perjury as to the accuracy of that information.

2. My name is Keith Seth. I am a resident of Prince George's County

3. I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County in Housing Unit H-17. I have been detained at the facility since late January, 2020. During this time, I have observed the following conditions and can make the following representations.

4. I have a cellmate. My cell is approximately eight feet by eight feet. My bunk is directly below my cellmate's bunk and when we are both on our beds we are about four feet from each other.

5. I have not seen any staff or detainees clean any parts of the unit. The only cleaning I have seen is inmates sweeping the floors.

6. I have been to the medical unit in the past. It has ten beds in a common area and some isolation cells (about 8 of them).

Consent given

7. Inmates have not been provided any personal protective equipment besides one mask we received April 6.  We have not been provided any sanitation equipment such as hand sanitizers, disinfectants, or liquid soap.  The one exception is that detainees with access to funds can buy soap from the Commissary.  The soap is delivered once a week.  A bar lasts about two or three days.

8. I have chronic bronchitis. I've probably had it since I was about 6 years old. When my bronchitis is triggered, it comes down on me hard. Last year I was in the hospital for a week straight because I couldn't breathe.

9. Starting April 6, we have been ordered not to leave our cell except for one hour a day. For the two weeks prior to that I had already been experiencing shortness of breath and coughing.  Since the jail started 23-hour-a-day lockdown, there has been bad ventilation that makes it harder to breathe. I am not getting good air circulation in the cell and my coughing continues.  I am coughing up mucus, my chest hurts, and I woke up this morning with a bloody nose.

10. Around April 4, I asked to get into the medical unit but they make you pay $4 for the form and I don't have money for that.  I am losing my sense of taste, I have hot chips that I eat and do not taste the hotness. It feels like my taste buds are numb.  For a week I had diarrhea.

11. Around April 6, I decided I should probably go to the medical unit.  But I decided not to ask because I do not have the money for the form and I spoke to somebody in my unit who had just returned from the medical unit, where he was sent for coughing and a fever. After three days he came back and told me that it was overcrowded and that he did not receive any care, he was just kept alone in a room by himself and received no medicine.

Consent given

He said the smell was very bad. Another guy I know lost his sense of taste and his stomach hurt, but medical sent him back. I know one guy who had a fever and they kept him for three days and sent him back.  If you don't have a fever, they are not doing anything.

12. On April 8, the person in the cell next to me had to go to the medical unit because he was sneezing, shaking, and sweating.  I was just talking to him the day prior, and when I was talking with him I was within a foot of him.  I did not know that I was being unsafe in talking to him so closely because I have not been told by anybody to stay away from other inmates.  The only information I received is to stay six feet away from the officer's desk. I have no received no information about how to protect myself from the Coronavirus.

13. I have been diagnosed as bipolar. I had just started taking my medicine again. I'm supposed to be talking to a psychiatrist but I haven't seen her since we've been locked down. Being stuck in a cell for all but one hour a day makes me want to go crazy.  I feel like I do not have enough time; during that one hour of rec I have to shower, clean my cell, and call my family.

14. I feel like I am going to go crazy. I'm thinking about suicide. This is my first time being locked up. I'm thinking a lot of bad things. I just want to get home to get the medical help I need.

This declaration was orally sworn by telephone to Ariel Schneller, by Declarant 7 on April 8, 2020 and April 17, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have confirmed the foregoing in its entirety to Declarant 7 on April 17, 2020 and that he has sworn to the truth of its contents.


  __/S/ Ariel Schneller
Ariel Schneller
Assistant Public Defender

Consent given

April 17, 2020

# EXHIBIT 2

**Declaration of David Smith**

I, David Smith, solemnly affirm under the penalty of perjury that the contents of the following paper are true:

1)  I provided the information below in response to a set of questions read to me over the telephone by Lia Rettammel on April 11, 2020.  All responses are based on my own knowledge and observations.

2)  My name is David Smith.  I am a resident of Prince George's County. I am 26 years old.

3)  I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-9.  I have been detained at the facility since March 2020.  During this time, I have observed the following conditions and can make the following representations.

4)  I have bronchitis, which makes me high risk for COVID-19.  I have been fortunate to not have personally experienced any symptoms of COVID-19 up to this point.

5)  I got dizzy before.  I had a heat flashes but they didn't check me that night, so I wouldn't know if my temperature was high. Yes I have [requested medical care], but I didn't receive any medical care.  They told me that they had checked my temperature 5 hours ago and I was ok. The CO called to the nursing station and the nurses said that.

6)  I have noticed other people in my unit getting sick, they just took another dude out of here about a day ago and he hasn't been back.  He had a fever and they said he was throwing up.

7)  I have a cellmate. I think the unit holds 100 but I think there are 84 people in here now. There are 6 guards each day. We are sometimes told to stay more than 6 feet apart, but not always.

8) We have rec time one hour per day.  Sometimes they threaten to take it away. During rec time we have to do everything in one hour.  We only get one hour to use the phone, to clean our cells, to call our families, to call our lawyers, to shower.  All of our services are cut off, I can't go to the gym, I can't get a haircut.

9) The jail gave us little facemasks one time. But they don't change them. I know they collect bacteria. That's all they did—that and put us on lockdown.

10) Soap is provided through the commissary.  I have access to soap, but I know of people who don't. I don't have access to liquid soap, or hand sanitizer.  I don't have access to gloves, I know they have them, I don't think they would give them to me if I asked for them, they are only for the detail. I have access to paper towels and Spray 9, but only for the hour that I have to come out of my cell.

11) There are 12 phones in my unit, but we are only allowed to use 6. People are 3 feet apart when they are using them. The phone is not getting wiped down between people using it.

12) The jail has given us really nothing in terms of information about the coronavirus, just wash our hands sometimes.

13) I am afraid of getting coronavirus. It's psyching me out a lot, I start to get panicky and think I have symptoms. A lot of us are [panicky].

14) I tried to file a grievance because the CO put the trays on the floor.  I told the CO that it was unsanitary and against the health code.  I asked to grieve it, the Sergeant was already on the unit.  The zone commander, told me it wasn't a grievable issues.  I asked the Sergeant to come here, he told me I was being disruptive, and he said I was going to the hole.  Then they changed it and said I was just getting a 72 hour ticket.  I told him if he was going to give me a 72 hour

ticket, I would grieve him for refusing me a grievance, and we ended up neutral I didn't file it, and he didn't give me the ticket.

15) I read the inmate handbook and I think they are violating a lot of the handbook rules.

    i.  They can't give me medical services because they have the medical unit locked down.  I take medication and they haven't consulted me to change the medication because I don't like the side effects it gives me.

    ii.  Other people contacted sick call for other reasons, but we were told by the COs that if it's not nothing relating to Corona not to write to medical.

    iii.  I can't get mental health treatment because the mental health people won't see me.

    iv.  The mission statement says they are supposed to protect us from disease, maintain a sanitary environment (they don't clean the showers, wipe the hand rails or nothing); I can't go to the law library.

    i)  The handbook also says they encourage for financial reasons, signature bonds, pretrial, it says we endorse it with proper screening.  They said everybody is going in front of one judge and the judge is saying they don't think the coronavirus is adequate reason for people to get released. They are saying no for no reason.

    ii)  If I try to ask for a grievance I know they are going to turn it against me.

Under penalty of perjury, I, Lia Rettammel, Esq., swear that the above substance of this declaration was orally shared by David Smith on April 11, 2020 over the telephone, since in-person meetings are not currently possible due to the COVID-19 epidemic.

*/S/*
Lia Rettammel, Esq.
Assistant Public Defender
April 11, 2020

# EXHIBIT 3

**Declaration of Mario Burch**

I, Mario Burch, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.

1) I provided the information below in response to a standard set of questions read to me over the telephone by Brandon Ruben on April 10, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is Mario Burch. I am thirty-four years old.  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-8. I have been detained at the facility since March 2020.  During this time, I have observed the following conditions and can make the following representations.

4) I have a cellmate.  My cell is approximately ten feet long by six feet wide.  My bunk is directly below my cellmate's bunk, and when we are both on our beds we are within three feet of each other. I spend twenty-three hours a day in my cell with my cellmate, including meals. When we go out for one hour of recreation it is sometimes difficult to stay six feet away from each other.

5) On April 8, 2020, after I had been here for over two weeks, the jail finally gave me a mask. It's like a nurse's mask; it feels thin. The jail directed us to put it on and to not come to the desk without it. The guards sometimes tell us to wear it when we come out of our cell. The other inmates use the masks only sometimes. Some have thrown them on the floor, like they didn't even care about them. The jail told me that my mask won't be replaced, even if it gets lost, torn,

1

or dirtied.  The guards and the staff have different masks; they have masks that are like a painter's mask. I am quite sure the staffs' masks work better.

6) The jail takes our temperatures twice per day. You put your head in the slot of the cell, like a dog, and they scan our foreheads. I feel like an animal. The jail sometimes uses gloves when they take our temperature, but they do not clean the scanner between uses. I think they write our temperatures down on a clipboard.

7) I currently have one bar of soap that I received from the jail when I came in. When you run out of soap, the jail might give you a small bar or might not give you anything. I know a couple of people who do not have any soap and are using only water to try and wash themselves. Beside the soap and some toothpaste, I have no other product to clean myself.

8) When I use the telephones I am very close to other people. I have not seen the jail wipe down or clean the telephones.

9) I have not seen anyone clean or sanitize any surfaces in my housing unit.

10) I went to the medical unit to receive a physical approximately two weeks ago. The medical unit had around ten beds and one or two nurses. When I was in the medical unit, I was unable to remain six feet apart from the other inmates. I was right beside them. None of the nurses had masks at that time.

11) If an inmate puts in a sick call they have to pay money in order to go to the infirmary.

12) I have never had my pulse oxygen level checked.

13) There are currently hungry inmates eating out of trash cans because we are being provided very little food or food that is cold and inedible.

2

14) I have not yet filed a grievance at the jail. It's hard to get a grievance form from the correctional officers because the officers are afraid that you are going to write them up. People have asked for grievance forms for COVID issues but they did not get them.

15) I am extremely scared of contracting the virus because it is getting crowded and a lot of people are coming in and out of the jail. I am worried about being in here because it is not a safe place to be. I believe the jail is handling the pandemic poorly because the guards do what they want to do when they want to do it and they do not help us consistently. You have to keep asking and pressing buttons in your cell to get answers from the correctional officers.

16) Overall, I feel that there is nothing being done for us and that we are in a terrible situation. I don't feel the jail staff has been taking COVID seriously because they don't tell the inmates anything, they don't wipe surfaces down, and they don't provide us anything aside from the mask.

This declaration was orally sworn to by Mario Burch on April 10, 2020 because the Upper Marlboro Detention Facility is currently not permitting in-person visits.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to Mario Burch on April 10, 2020 and that he has sworn to the truth of its contents.


/S/ Brandon Ruben
Brandon Ruben, Esq.
Assistant Public Defender
April 10, 2020

3

# EXHIBIT 4

**Declaration of John Doe #1**

I, John Doe #1, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Stanford Fraser on April 9, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is John Doe #1.  I am a resident of Prince George's County.

3) I have acute asthma and allergies. I've recently experienced shortness of breath, some headaches, and light nausea.

4) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-10. I have been detained at the facility since March [redacted], 2020.  During this time, I have observed the following conditions and can make the following representations:

5) In the last 10 days at least six individuals have been removed from my housing unit because they were experiencing symptoms of the coronavirus, including my bunkmate.

6) Detainees were provided masks yesterday, April 8, 2020. I was told by Correctional staff that inmates will only be provided with one mask.

7) Correctional officers do not always wear masks either.  Some officers wear them and some officers do not.

8) Phone use (the only way to contact the outside world, including my attorney) occurs with no social distancing.  In my unit the phones are approximately a foot to a foot and a half apart

1

from each other.  It is regularly the case that each phone is in use at the same time. The phones

are occasionally washed between uses.

9)  Medical staff are not changing their gloves in between taking detainees temperture.

Yesterday, I requested a nurse to change their gloves before taking my temperture, the nurse

declined my request.

10) Detainees have not been provided any sanitizing products. There is no hand sanitizer

available for detainees. The only exception is that detainees with access to funds can buy soap

from the Commissary for approximately $4 per body wash and $2 for bar soap.  The soap is

delivered once a week.

This declaration was orally sworn by telephone to Stanford Fraser, by John Doe #1 on April 9,
2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.
Under penalties of perjury, I declare that I have read the foregoing in its entirety to John Doe #1
on April 9, 2020 and that he has sworn to the truth of its contents.

      //s//
_____
Stanford Fraser
Assistant Public Defender
April 9, 2020

2

# EXHIBIT 5

**Declaration of John Doe #2**

I, John Doe #2, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Christina Meiring on April 7, 2020 & continuing on April 9, 2020.  At the conclusion of the conversations, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is John Doe #2.  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County and I have been held since January [redacted], 2020.  I am currently detained in Housing Unit H-17. During this time, I have observed the following conditions and can make the following representations.

4) On March 19th, a judge gave the jail's Pre Trial Services unit (PTR) the option to release me on GPS monitoring (home detention).  My family immediately contacted PTR to confirm my address.  My attorney also sent PTR a copy of my charging documents on March 19th.  My family and my attorney have been contacting PTR regularly, but they have not yet reviewed my case and haven't made a decision.

5) Many people in my unit have been feeling sick.  I have been stuffy and spitting up brown mucus.  I am particularly concerned because I have a history of severe asthma.  I was diagnosed with asthma about ten years ago.  A couple of years ago I had to be hospitalized for two nights and put on a breathing machine.  I went down to medical about a week ago and told them I have asthma and have been having trouble breathing.  It took about two weeks from the time I told the staff I had a problem until I was taken to the medical unit.

1

6)  Detainees in my unit have only recently been provided masks.  The detainees in my unit received them on approximately April 6th.  The masks that were provided are the disposable paper kind, but we are not being given replacement masks, we have to continue to use the same mask without any way to sanitize the mask.  We have been given no other personal protective equipment.  When we are on cleaning detail, we do have access to gloves and paper towels.  We are also given a spray cleaner, I do not know what is in it.

7)  The staff have recently begun taking everyone's temperature twice a day using a forehead thermometer.  No one is able to go to medical unless they register a temperature of over 100 on the thermometers.  However, we are concerned that the thermometers run low, and aren't catching everyone who has a fever.  Many people who have symptoms of a fever, are not reading over 100.

8)  About a week ago, three or four detainees were taken from this unit to the medical unit and didn't return.  We believe that they have the virus.   Another detainee left the unit approximately April 4th or 5th.  He had been throwing up and had a high fever.  On the morning of April 6th, another detainee registered a very high fever and was taken to the medical unit.  I didn't share a cell with him, but I've had contact with him, playing cards and stuff.

9)  We have not been told much about the virus by the staff.  The correctional officers did tell us to stay six feet away and cover our mouths.  Recently our unit has been put into lockdown.  We are in our cells all day except for one hour.  That hour is staggered and only ten detainees are allowed out at a time.

10) Some of the correctional officers wear masks, some don't.  None of them wear gloves.

11)  The staff do not appear to be cleaning more often than before, but they have told the detainees to clean more.  Overall, the unit is no more or less clean that usual.

2

12) It's very hot in the cells.  For the 23 hours we are in our cells a day, the cell door is kept closed.  There is no noticeable air circulation, and the rest of the unit is very hot as well.  The staff keeps the door to the recreation yard propped open.

13) I do have soap that I purchased from commissary.  I don't have access to hand sanitizer.

14) There have been no new detainees added to the unit in the last few days.  This is unusual. We believe that they aren't adding anyone else to the unit because there have been a number of positive cases in H-10.

15) I have been told that detainees are no longer working in the kitchen to prepare food, all of the food is being prepared by correctional officers.  I believe it is because one or more detainees who had been preparing food has tested positive.


This declaration was orally sworn by telephone to Christina C. Meiring, Esq., by John Doe #2 on April 9, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to John Doe #2 on April 9, 2020 and that he has sworn to the truth of its contents.

/s

_____
Christina C. Meiring, Esq.
Assistant Public Defender
April 9, 2020

3

***On April 17, 2020, John Doe #2 provided the following information
as an addendum to his original declaration:***

I, John Doe #2, certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

16) My name is John Doe #2.  I am a resident of Prince George's County, Maryland.

17) I am currently incarcerated at the Prince George's County Jail in Upper Marlboro, Maryland.

18) I initially gave a declaration about the conditions at the jail on April 9.  This is an addition to that declaration.

19) I have not been feeling very well recently.  My nose has been stuffy and I can't breathe well.  I felt feverish on Monday, but they took my temperature and said it was only 98 degrees.  I don't think the temperature scanner is accurate though.  I think it reads too low.

20) Because the temperature scanner showed my temperature was normal, the nurse told me, "you're alright," and wouldn't let me go to medical or get a COVID-19 test.  I told them that I need medical attention, and they said there aren't enough beds in medical, it's full over there.

21) I'm having trouble breathing, but they won't even give me an inhaler.  I'm having shortness of breath.  I've asked for an inhaler, but the nurse told me she won't give me an inhaler unless I'm having an asthma attack.  Even though I have severe asthma, the jail has not appeared to do anything to specially monitor me.

4

22) We're still on lockdown for 23 hours per day.  Which means I'm on lockdown with my cellmate.  He is having symptoms too.  He lost his senses of smell and taste, but they still won't even test us.  They just make us stay in our small cells together all day.

23) The Court has authorized my release to Pretrial Services.  But I haven't been released yet. My attorney and my family say that they have been calling and calling Pretrial Services, and they've been getting the run-around.  It seems like they're not actually reviewing my case.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by John Doe #2 on April 17, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to John Doe #2 on April 17, 2020, and he confirmed its accuracy to me.*

_____cg_____
Claire Glenn, Esq.
April 17, 2020

# EXHIBIT 6

**Declaration of John Doe #3**

I, John Doe #3, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1)  I provided the information below in response to a standard set of questions read to me over the telephone by Cristina Najarro on April 9, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2)  My name is John Doe #3.  I am a resident of Prince George's County.

3)  I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-11B, and I have also been housed in the Medical Unit. I have been detained at the facility since March [redcated], 2020.  During this time, I have observed the following conditions and can make the following representations.

4)  When I first entered the Detention Center, I was placed in the Medical Unit. I have numerous medical issues, including neck and back issues, I walk with a cane, and I am currently having kidney issues, including blood in my urine. I was moved from the Medical Unit about halfway through my thirty-day incarceration, and I do not know why, but it may be because it was getting more crowded in the Medical Unit.

5)  Since being moved from the Medical Unit, I have put in requests for additional medical care, but I have not gone back to the Medical Unit. I have only been receiving medication for my ongoing issues.

6)  I am currently experiencing cold symptoms, such as coughing and sneezing. I try to stay in my cell as much as possible to avoid getting others sick. However, I do have a cellmate that I cannot stay away from.

1

7) Since returning from the Medical Unit, I have not had my temperature checked at all.

8) I was given one mask at the jail, and one bar of soap when I arrived. I do not have access to hand sanitizer or wipes. The correctional officers have gloves, but they also do not have access to sanitizer. I do not see the unit being cleaned more frequently because of Coronavirus.

9) I have been receiving information about the Coronavirus from one correctional officer at the Detention Center. He has given us some information about how to protect ourselves.

10) There are six phones on my unit. Usually, three to four phones are being used at a time, and people are standing very close to each other. The phones are not cleaned or wiped down after use.

11) Everyone is concerned about the Coronavirus. I am very worried and I am already sick now. I am just trying to stay away from people and isolate myself.

This declaration was orally sworn by telephone to Cristina Najarro, Esq., by John Doe #3 on April 9, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to John Doe #3 on April 9, 2020 and that he has sworn to the truth of its contents.


___/s/_____
Cristina Najarro, Esq.
Assistant Public Defender
April 9, 2020

2

# EXHIBIT 7

Consent given

### Declaration of John Doe #4

I, John Doe #4, solemnly affirm under the penalty of perjury that the contents of the

following paper are true:

1) I provided the information below in response to a set of questions read to me over the

telephone by Lia Rettammel on April 10, 2020.  All responses are based on my own knowledge

and observations.

2) My name is John Doe #4.  I am a resident of Baltimore County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's

County.  I am currently detained in Housing Unit H-9.  I have been detained at the facility since

December [redacted], 2019.  During this time, I have observed the following conditions and can

make the following representations.

4) I have been fortunate to not have personally experienced any symptoms of COVID-19 up

to this point.  However, I have seen 3 inmates leave on this unit so far, and not come back. I do

not know where they went. One was across the hall 3 or 4 days ago, he went to medical, his stuff

is still in his cell. The guy across the way—his cell was within 5 feet of our cell.

5) After the guy across the hall went to medical. We went on a 23 hour lock down, they

gave us Spray 9 and paper towels.  They did not direct us on how to use it.

6) My cell mate went to medical at 8 o'clock last night and he hasn't come back.  He was

not feeling well he had a headache and stomach ache.  When my cellie left last night, the staff

did not do anything to disinfect my cell.  I am waiting to get rec-time because that is the only

time I can get cleaning supplies. My rec time changes, I was getting it at 1:30 in the morning,

yesterday I got it at 11 AM, my cellie didn't come out he didn't leave the cell all day.  He had 2

Consent given

trays of food in the cell when he left last night at 8 PM.  I still have both trays in my cell because I can't throw it away until I have rec time.

7)   The unit is on lock down so you can't interact.  You can go outside but you can't play basketball, you can't play cards, they only let out 10 people at a time. They are taking our temperature twice a day.

8)   We received masks several days ago, which we are told by the CO's to wear when we come out.  We have not been reissued new masks since the initial masks. We were not trained in how to place the masks on our faces. We have never been given gloves.

9)   They are staggering the number of inmates that are out.  I can't tell if they are disinfecting the unit between times that inmates are let out of their cells.

10) I purchased my soap from the commissary, the bar lasts about every other week.  We sometimes have hot water in the cell—it goes in and out. We have been told to wash our hands often.

11) They are telling us not to go into other people's doorways or put your face into the slots, they are telling us not to get too close to one another.

12)   When we are out on rec time, inmates are practicing social distancing.  When you're not on the phone it's easy to distance yourself, but because you're only allowed out for one hour, everyone is trying to make phone calls. They put tape on every other phone—but people ripped it off.  When people are staggering phones, they are about 2 feet apart. It's up to you to wipe down phones between people—you can use Spray 9 and paper towels.

13) There are 2 correctional staff on each shift, last night there were 3 but they were training on the overnight shift. The staff wear a mask, and wear gloves, they do arm band checks every shift. I am not aware of whether the staff is getting their temperature checked. They are different

Consent given

CO's every shift and every day. As of this moment I am looking over at the desk and neither CO

has a mask on.  They are doing the temperatures now.

14) We are definitely scared.  It's really bad being locked up.  But it's really bad when you

can't get come out of a cell for 23 hours I'm really scared now because my cellie has been sick.

You can't really talk to your family at 1 o'clock in the morning, my kids are asleep. I am

washing my hands frequently, wiping the phones down before I use it, and keeping my distance

right now.

Under penalty of perjury, I, Lia Rettammel, Esq., swear that the above substance of this
declaration was orally shared by John Doe #4 on April 10, 2020 over the telephone, since in-
person meetings are not currently possible due to the COVID-19 epidemic.


/s/
Lia Rettammel, Esq.
Assistant Public Defender
April 10, 2020

# EXHIBIT 8

**Declaration of John Doe #5**

I, John Doe #5, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Robin Salter on April 9, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is John Doe #5.  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-8.  I have been detained at the facility since March [redacted], 2020.  During this time, I have observed the following conditions and can make the following representations:

4) I have been diagnosed with asthma, bronchitis, and seasonal allergies.  I am approximately 6 feet 3 inches tall and weigh 285 pounds, which I believe makes my BMI greater than 40.

5) Due to Covid-19, the jail has turned off the air conditioning in the units to prevent the spread of COVID-19 through recycled air.  Without circulation in my cell, I have difficulty breathing which causes me wheeze.  I must sleep on my side to be able breath appropriately.

6) Detainees in the unit were not provided masks or other personal protective equipment such as gloves until Monday, April 6, 2020.  I have heard many people coughing on the unit and, in the last two weeks, have observed more people going to the medical unit than was typical prior to that. Usually four to six people go to Medical Unit per day – and not always the same

people.  When people return from the Medical Unit, their masks may be on or off.  There is no consistency.

7)  Prior to Tuesday, April 7th, 2020, there was no meaningful social distancing occurring in my unit.  As of late, the staff has started to stress the issue of social distancing.

8)  I am locked in my cell 23 hours a day with one hour of recreation time.

9)  Other inmates deliver food trays directly to the cell without gloves or other appropriate personal protection equipment.

10) While recreational time has now been divided, there can only be approximately 10 people out for recreation at any given time.  During this time, people play games around a table with each other and are frequently within six feet of each other.  Other than the division of recreational time, no efforts has been made towards encouraging or ordering social distancing.

11) While speaking to my attorney on April 9th, another inmate located two phones away started coughing.  I stopped my conversation and told him to put on his mask.

12) Correctional officers do not always wear masks either.  At the time of this call on April 9th, Officer Zander is not wearing a mask at all.  Correctional officers put their masks on when they leave the command desk to go into the hallway but other than that they do not wear masks during their shift.

13) Earlier this week, a Correctional Officer, whom I believe name is Gamble, told inmates in the unit that there are approximately 77 cases of coronavirus in the jail.

14) Phone use (the only way to contact the outside world, including my attorney) occurs with no social distancing.  In my unit the phones are approximately a foot to a foot and a half apart from each other.  It is regularly the case that each phone is in use at the same time.  People

2

waiting in line for the phone are not told to social distance and do not stay more than six feet apart from each other.  The phones are not cleaned between uses.

15) The only time surfaces and areas are cleaned down is when sanitation comes and inmates are locked down.  During the day, as people circulate within the housing unit, no steps are taken to wipe down shared surfaces.

16) Detainees have not been provided any personal protective equipment (such as masks or gloves) or any sanitizing products (such as soap or hand sanitizer) on a regular basis.  On Monday, April 6, 2020, I was given a one-time disposable mask for continuous use. The masks was not replaced until Tuesday, April 14th.

17) Inmates with access to funds can buy soap from the Commissary for approximately $4 per bar.  However, we are only allowed to purchase one bar per week.  Since I shower daily, the soap is used quickly and barely last to the end of the week.

18) I fear that I will contract COVID-19 at the jail.

This declaration was orally sworn by telephone to Robin Salter, Esq., by John Doe #5 on April 9, and April 15, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to John Doe #5 on April 15, 2020 and that he has sworn to the truth of its contents.

_____

Robin Salter, Esq.
Assistant Public Defender
April 15, 2020

3

# EXHIBIT 9

**Declaration of [Declarant #9]**

I, [Declarant #9], certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

1. My name is [Declarant #9].  I am a resident of Prince George's County.

2. I am currently incarcerated at the Prince George's County Jail in Upper Marlboro, Maryland.  I have been detained here since January [redacted], 2020.  I contracted the COVID-19 Coronavirus while detained at the jail and have since tested positive for the virus.

3. I have pre-existing conditions of asthma, a prior history of bronchitis, and a seizure disease.  Since contracting the virus, I have experienced symptoms of fever, sweats, fatigue, vomiting, headaches, body aches, heart palpitations and a weird taste in my mouth.

4. I first began to experience symptoms on Wednesday, March 25, 2020, when I started to have a bad headache.  At that time, I was detained in Housing Unit 9 (H9), in cell number [redacted] with a cellmate.  By Thursday, March 26, I was sweating profusely, vomiting, and too weak to get out of my cell.  I told my cellmate that something was wrong and asked him to tell the correctional officers (COs) that I needed medical attention.  But when my cellmate asked the COs for help, they didn't listen.  The COs said I was "playing," and that I would "be alright."

5. Because the COs refused to help me, I had to wait until the next shift, eight hours later.  After shift change, the new COs were afraid to come near me after they heard about my symptoms.  They told another inmate to put on a glove, come into my cell, and touch it to my forehead.  So the other inmate did as he was told.  He came in and touched my

1

forehead, which was hot and very sweaty.  When the inmate showed the COs the glove soaked in my sweat, they finally let me go to sick call.

6.  When they first brought me to sick call, the nurse took my temperature and my temperature was 101.2 degrees.  When I told the nurse about my symptoms, she said, "oh, you've been here a long time, Mr.[Declarant #9], you've been here too long to catch the virus."  I kept trying to tell her that something serious was going on, but she wouldn't listen, and just kept saying, "oh, Mr. [Declarant #9] you've been here too long to catch it, you're not going to catch it."  She gave me two Tylenols, and sent me back to H9.

7.  Between Thursday, March 26, and Saturday, March 28, I was brought back and forth between H9 and the medical unit every day.  On Friday, I went once.  On Saturday, I went three times that day.  The first time, I saw the nurse.  The second time, I saw the male doctor.  And the third time, I saw the nurse and she called the female doctor, who told her to keep me in the medical unit.  It costs $4 each time you go to sick call.  Each time I came to sick call, they would take my temperature and send me back to H9.  I started getting Tylenol regularly on the housing unit.  I kept trying to tell the jail staff that my body was over-heating and I was having serious symptoms, but no one would take me seriously.  Sometimes I was too weak to even get out of bed.

8.  During this time that I was having symptoms and going back and forth to the medical unit, the jail still did not provide me with a mask or gloves or any supplies for cleaning or sanitizing.  They just sent me back to the housing unit without anything to protect myself or other inmates.  I decided to self-quarantine as much as possible and only left my cell to get my food trays.  No one told me to do this, I just did it because I was trying to protect everyone else as best I could.

9. While I was detained on H9, they never gave us information about the COVID-19 Coronavirus, how it spreads, or how we could protect ourselves.  I learned about the virus from talking to other inmates and from the news.  I saw on the news that you're not supposed to gather in groups or be close to other people.  So when they told me to line up for medicine, I wouldn't get in line.  I would sit at the table and wait for the line to die down.  When the COs saw me do this, they yelled at me to get in line, and when I refused, they sent me to my cell as punishment.

10. While I was detained on H9, protective gear such as gloves and masks and sanitizing products were never provided to inmates.  We asked for gloves and they told us we couldn't have gloves; they told us we had to use our bare hands to clean our cells.  They also never gave us masks, but I didn't specifically ask for a mask because someone got sent to "the hole" over not getting a mask.  This guy on my unit asked for a mask and the COs said he couldn't have one, so he pulled the collar of his shirt over his face.  When he refused to take his shirt off of his face, they called in a signal and had him sent to the hole and I never saw him again.

11. On my third trip to the medical unit on Saturday, March 28, they finally moved me to the medical unit, where they detained me in isolation cell number [redacted].  Only after they moved me to the medical unit did they give me a thin paper mask.  I have had to use that same dirty little paper mask since then, as they have not yet given me a replacement.

12. I was in isolation cell number [redacted] between Saturday night on March 28 and Friday, April 3.

13. On Friday, April 3, they moved me to the ten-man cell of the medical unit, where I am currently detained in a single room with eight other individuals who have COVID-19.

Some of the other men in this cell were working on the kitchen unit, preparing the meals for the whole jail, when they first got sick.

14. When they moved us from the isolation cells to the ten-man cell, they forced us to clean our own isolation cells before leaving.  They gave us gloves, masks, and bleach for cleaning the toilets, sinks, and anything we touched.  They also forced me to clean other isolation cells, including isolation cell number [redacted], where the first COVID-positive woman had been detained.

15. In the medical unit, I was not able to use the phone until Saturday, April 4.  I had been asking all week to speak to my attorney, but they wouldn't let me out of the isolation cell to use the phone.  I couldn't communicate with anyone.  When I would ask to use the phone to call my attorney, the COs acted like it was a joke and would laugh at me.

16. Then when they moved me to the ten-man cell on Friday, April 3, I tried to use the phone that's in our cell.  But my PID number had been shut off, so I couldn't make any calls.

17. The jail is simply not protecting any of us.  They tell us to be clean with soap and hygiene, but they don't give us any hygiene products.  It took four or five days before they gave me a hygiene kit in the medical unit.  Before then, I had no soap, toothbrush, toothpaste, or deodorant to keep myself clean.  I asked them many times, but the COs would play with us and tell us we didn't need a hygiene kit.  Finally the nurse went to the Sergeant and told him what was going on, and the Sergeant got us our hygiene kits.  They gave us the hygiene kits for free because we're on the medical unit.  But on the housing unit, the hygiene kits cost about $9.

18. I also have not been allowed to use the shower since being moved to the medical unit.  I have not had a shower in nearly two weeks, not since Thursday, March 26.  Instead, I

have been forced to wash myself as best I can in a dirty, mildewed sink. In the isolation cell, I had a bar of soap for myself, but now in the ten-man cell I have to share the sink and bar of soap with the other men in here. We have been provided no liquid soap, no hand sanitizer, no disinfectant. Some of the men in here still have not been provided a toothbrush or toothpaste.

19. In the ten-man cell, we have asked for cleaning supplies. This cell is messed up. There's lint balls and tissues and paper towels on the floor. There are spiders and centipedes, one guy just killed another spider while I'm talking to you on the phone. And our trash is piled up in bags that they won't take away since we've been over here. The COs refuse to get close to us and they say that anything that goes in, can't come back out. They just gave us a spray bottle yesterday, but they won't give us anything else for cleaning.

20. In the medical unit, the COs also won't give us fresh water, juice, or ice. We are told if we are thirsty, we have to drink water from the dirty sink, even though we have no cleaning supplies to clean the sink and everyone has to use it to clean themselves. There's an orange water cooler in here with us, but it's empty because the COs refuse to fill it with ice and clean water.

21. Some guys on the unit seem to have the virus, but they are scared to get tested, because they don't want to get stuck in the medical unit like I am. They'd rather just let their bodies fight it off.

22. It feels like the COs look at us like we're going to die soon, so it doesn't matter how they treat us. If I survive this, I will have to live with this the rest of my life.

23. On Friday, April 3, my bond was paid. I want to be released. But they won't release me until they decide I'm no longer contagious.

5

24. I provided the foregoing information over the telephone to Claire Glenn.  On April 7,

2020, this declaration was read to me and I confirm its accuracy based on my own

knowledge and observations.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by* [Declarant #9] *on April 7, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to* [Declarant #9] *on April 7, 2020, and he confirmed its accuracy to me.*

       cg

Claire Glenn, Esq.
April 7, 2020

***On April 15, 2020, Declarant #9 provided the following information
as an addendum to his original declaration:***

I, [Declarant #9], certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

25. My name is [Declarant #9].  I am a resident of Prince George's County, Maryland.

26. I am currently incarcerated at the Prince George's County Jail in Upper Marlboro, Maryland.

27. I initially gave a declaration about the conditions at the jail on April 7.  But I wanted to give a second declaration because there have been ongoing issues in the way they treat us at the jail.

28. I am COVID-positive and was detained on the medical unit starting March 28.  April 11, seven of us who were COVID-positive and detained in the ten-person cell of the medical unit were moved to housing unit 6 (H6).

29. To my knowledge, there are seven of us with COVID on H6, three more with COVID who stayed behind in the ten-man cell in the medical unit, and four more who, as of April 11, were in the medical isolation cells with green stickers on their doors, which means they tested positive for COVID too (three men and one woman).  That's fourteen of us total.  There are also at least two others in isolation without green stickers on their doors. I heard that one of them refuses to take the test for COVID.  While we were leaving the medical unit, the COs were bringing two more inmates into the medical unit.  I do not know whether they have COVID or not.

30. I do not feel safe on H6.  They don't even have a CO in the housing unit with us.  There's a CO in a chair in the sally port and another CO in the command center bubble.  But if something were to happen to one of us, I don't know how long it would take to get

someone's attention or get medical attention.  There's a CO in the sally port right now, asleep in his chair.

31. We have call buttons in our cells that buzz and turn on a microphone that we can use to get the attention of the CO in the command center bubble.  But I have a seizure disease. If I were to have a seizure, I wouldn't be able to push the button.  No COs are in the housing unit, so no one would hear what was going on.  I'm afraid that if I have a seizure in here, no one will hear it and I will die.  The COs buzz into my cell to ask if I'm alright every hour or so.  They do this 24-hours per day, even when you're trying to sleep. Sometimes, you can call them back and let them know you're trying to sleep.  It depends on the CO though.  Sometimes they'll let you sleep and not buzz you for a few hours, other COs will keep buzzing you every hour.  In my opinion, this is not an adequate way for the jail to make sure we're safe and healthy.  On one hand, if I were to have a seizure, it could still be an hour or more before anyone knew that I needed medical attention.  On the other hand, this system interferes with my ability to get restful sleep.

32. They're not really doing anything to protect us in here.  When they moved me from medical to H6, they forgot to bring my medication over.  So I didn't get my seizure medication on time that first night.  I couldn't go to sleep, because I didn't feel right without my medication.  The next morning, they gave me my medication that I was supposed to take the night before.  They told me I should just take it in the morning instead, but that's not the right schedule for my dosage.  I don't feel comfortable when I'm not able to take my medication when I'm supposed to take it, I don't know how that might negatively impact my health.

8

33. Around 3:00am on April 12, a CO came in to bring us our breakfast trays.  At that time, [another inmate, redacted] told the CO he'd been having a bad nose bleed.  When I asked him about it, [redacted] shouted to me that it had been bleeding a while, for five to ten minutes. There was blood on the floor, blood in toilet paper, and [redacted] showed all of this to the CO.  The CO called the nurse, and the nurse said to just take care of it and clean everything up.  They didn't give [redacted] any medical attention.  The doctor has still never been down here, and talking to the nurses is like talking to a door knob – you just get no response.

34. On April 11, before I left the medical unit to go to H6, I asked the nurse to take my temperature with the thermometer that goes in your mouth.  At first, she refused to do it. I explained that I didn't want to have my temperature taken with the scanner thermometer, because it's not accurate.  The last time she took my temperature with the scanner, it said I had a temperature of 93.5 degrees, which just did not seem right.  So I made her do it over, and the second time, the scanner showed I had a temperature of 97.3 degrees. Which seemed more accurate, but I don't know.  Because of that, I just don't trust the scanner at all.  After I explained this, the nurse took my temperature with a thermometer in my mouth, and I got a reading of 98.3 degrees.

35. Everyone else in the ten-man cell saw all of this happen.  And so then everyone else said they wanted the thermometer that goes in your mouth too.  But the nurse was trying to rush out, she wanted to do our temperatures with the scanner.  She went and got the Sergeant, because we were complaining, and we told the Sergeant that we value our health and want reliable temperatures taken, since this is the only medical monitoring we're getting.  But the Sergeant said, look, the nurse "has kids."  Well, we have kids too.

And this is our health we're talking about.  They ended up saying we could either get our temperatures taken with the scanner, or not have our temperatures taken at all, even though the nurse had the mouth thermometer right there with her.  Some people got their temperatures taken with the scanner, some people refused on principle.  And at first, the nurse wasn't even going to give food trays to the guys who refused.

36. I have requested to see the doctor every day since Sunday, April 12, since I've been on H6.  The doctor has not come to H6 once since we've been moved here.

37. We still don't know when we're leaving either.  Not even my attorney has been told when I'm leaving.  One of the COs said that the new plan is that all of us who have been moved to H6 are going to be kept here for seven days.  But I haven't been able to get any confirmation of that with the doctor or any medical staff, and the COs don't always seem to know what's going on.  When I've asked the nurse, she simply won't respond to my questions.

38. In H6, there is also black mold in our cells.  There's mold on my door, on the ceiling of my cell, and on the wall by the sink in my cell.  There's mold that is black, and some that is green.  Other inmates on H6 have told me that there's mold in their cells as well, and I've seen the mold inside of one other inmate's cell.  We told one of the COs about the mold, but he is not very high-ranking, and I don't know if he's done anything.  I haven't been able to file a grievance.  I asked for a grievance form, but they won't give one to me.  Because they won't accept anything we've touched.  So we can't write mail, we can't write grievance forms, nothing like that.  If we complain, the CO says we can't have a grievance form and we have to wait until the Sergeant comes around.  But the Sergeant has never come onto our unit.  The only time I've seen a Sergeant since we've

been moved onto H6 is one time, when a Sergeant came into the command center bubble, and even then he said he wasn't the Sergeant for our zone, he was just checking on the COs.

39. I provided the foregoing information over the telephone to Claire Glenn.  On April 15, 2020, this declaration was read to me and I confirm its accuracy based on my own knowledge and observations.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by* [Declarant #9] *on April 15, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to* [Declarant #9] *on April 15, 2020, and he confirmed its accuracy to me.*

    cg
Claire Glenn, Esq.
April 15, 2020

# EXHIBIT 10

**Declaration of [Declarant #10]**

I, [Declarant #10], certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

1. My name is [Declarant #10].  I am a resident of Prince George's County, Maryland.

2. I am currently incarcerated at the Prince George's County Jail in Upper Marlboro, Maryland.  I have been detained here since September [redacted], 2019.  I contracted the COVID-19 Coronavirus while detained at the jail and have since tested positive.

3. I have pre-existing conditions of high blood pressure and seizures.

4. Before being moved to the medical unit, I was in housing unit 17 (H17), the work unit. We are the guys who work in the kitchen and the sanitation guys, who walk around and get the trash, mop the hallways, clean the staff bathrooms, etc.  The guys in the white uniforms, like me, work in the kitchen fixing food for the inmates and the officer dining room (ODR).

5. This outbreak has occurred on our unit, but the whole thing has been hush-hush.  When the kitchen workers were first exposed, I noticed guys starting to get sick one at a time. This was around March 29.  A couple days after that, guys start going to sick call three at a time with symptoms.  It costs $4 to go to sick call.  They started going to medical and some of them didn't come back.  Then medical started coming to our housing unit.  On Tuesday, March 31, they came and told everyone, "go to your cells, we're going to open the cells one floor at a time."  They made us line up back to front, with no space between us, and they took our temperatures one by one.  Everyone with a high temperature was pulled from the line, and everyone with a low temperature was sent back to their cell.  At

1

that time, I had a low temperature, so they kept me in the housing unit.  Still, they didn't

tell us why they were doing this.

6.   Then one day, we came to work, and there were buckets and a pile of rags waiting for us.

The kitchen manager said that we all had to wipe down the entire kitchen – all of the

handles, the tables, the break room, the handrails, the ovens, the freezers, everything.  At

the time, we didn't know what was going on.  No one told us why this was happening.

While we cleaned, we wore the gloves we prepare the food with, but they didn't give us

masks.  They didn't tell us why, they just gave us the buckets and rags and told us to

wipe down everything.  I believe that was on Wednesday, April 1.

7.   The whole time I was on the housing unit, they never distributed any protective supplies

or cleaning supplies.  The only people who had gloves and masks were the COs and the

nurses.  We asked for gloves and masks, but we were told we weren't allowed to have

them, that they were only for the staff, not for inmates.

8.   They never gave us any warning or any memorandum in our housing unit saying what

was going on, what Coronavirus is, what you can do to protect yourself, what the

symptoms are.  We never saw one memorandum in our whole housing block.  We were

never told to stay six to ten feet away from people.  Nothing.  Of course, every time

there's a change to the phone system or the commissary system, we get a memorandum.

But they never gave us a memorandum about Coronavirus.

9.   On Wednesday, April 1, and Thursday, April 2, I had a healthy temperature and no

symptoms.  But on Friday, April 3, I started to have symptoms.  I could feel aches in my

spine and kidneys, and my body had fevers and chills.  One minute I would feel like I'm

freezing, and the next I'm heating up and my forehead is sweating.  I also had diarrhea.

2

And when I would drink liquids, my eye sockets would hurt.  I started feeling shortness of breath.  My nose was running, and I had a terrible headache.  I told my cellmate, something is not right.  I know my body, I'm not feeling right.

10. At lunchtime on April 3, when they lined us up to take our temperatures, mine was 100 degrees.  I told the nurse I wasn't feeling right.  But she told me, "you'll be alright," and left.  At around 5:00 p.m. or 6:00 p.m., I started to have real difficulty breathing and my body was really aching and causing me a lot of pain.  They told me to hold on and wait until the medical staff returned at 9:00 p.m.  So I had no choice but to wait.  That evening, when the medical staff came back again to take everyone's temperature, mine was 104 degrees.  They made me step to one side, along with four other guys, and then we all went to the medical unit around 11:00 p.m.  They kept three of us, and sent two back to the housing unit.

11. At the medical unit, they put me in isolation cell number [redacted].  The isolation cell they put me in has mucus and blood dried all around the walls, 360 degrees.  I wish you could come and take pictures of it.  When I say mucus and blood on the walls, I mean it – thick yellow, some green, some yellow with red blood in it.  I can also tell someone was bleeding in that isolation cell, because there is blood all along the floor under the bed.  I could smell the bleach from where they cleaned the sink and toilet, but they didn't even mop the floor.  And I had to sleep in there and live in there.  I asked to be moved to a different isolation cell, but the COs told me, "you put yourself in this situation, so you need to deal with it."

12. For the first three hours, they made me sit in the isolation cell without any linens.  I kept asking for sheets and blankets, and I had to kick my cell door just to get their attention. I

3

told them that I was very cold and feeling very sick, and that I just wanted linens so I could go to bed.  Finally, after about three hours, they give me linens, but they were dirty. The sheets were stained with big yellow drool stains.  I asked for clean sheets, but they wouldn't give me new sheets.  So I put the stained end of the sheets toward the foot of my bed, so at least they wouldn't be near my face.

13. On Monday, April 6, they moved me to the ten-man cell in the medical unit.  When I left the isolation cell, they made me clean it.  They told me everything I had touched had to be sprayed down and wiped down.  So I did, even though they didn't give me gloves.

14. When they moved me out of the isolation cell to the ten-man cell, the COs also had me put my sheets in a red bag labeled "hazardous."  Then when I went over to the ten-man cell, they told me they weren't going to give me fresh sheets after all.  They made me come back and pull my dirty sheets back out of the red hazard bag, even though there was other contaminated stuff in there.  And those are the sheets I'm still sleeping in now.

15. When they moved me from the isolation cell, they gave me my first bar of soap since I'd been in the medical unit.  They also gave me my first fresh pair of drawers and t-shirt since Friday, but I haven't gotten fresh clothes since then.  I'm still wearing the same drawers and t-shirt since April 6.  It's embarrassing.  They won't let us shower, either. We have only one working sink, and I'm sharing it with everyone in here.  There are currently ten men in this cell, the maximum.  We've all got to take turns washing up in that one sink.   Although they gave me a bar of soap on April 6, I didn't get a toothbrush or toothpaste until April 9.  I requested it and requested it, but I didn't get it.  I didn't have any toothbrush or toothpaste between April 3 and April 9.  And now when I brush

my teeth, my gums bleed a lot.  I spit into the toilet, because there's so much blood when I brush my teeth.

16. We're in the medical unit, but there's nothing medical or sanitary about this.

17. In the ten-man cell, we don't have access to liquid soap or hand sanitizer or other sanitizing cleaning products.  All we have are little worn-out paper face masks.  They're light blue and very thin paper.  I've had the same facemask since Friday, and we're all breathing the same air.  We've asked to be able to clean the bathroom in the ten-man cell, and they did give us a spray bottle and paper towels, but they didn't even give us gloves, so we've had to clean it with our bare hands.  They also refuse to give us a broom, because they say we'd have to then keep the broom in our cell, because nothing that goes in can come out.  So there's dust and hair balls all around the floor in our cell.

18. I've had the same mask since Friday, April 3.  I've been coughing and sneezing into it, and it seems really dirty.  When the nurse came by on April 6, she told us to put our masks back on so she could give us our medication.  I asked for another mask, because I've been coughing and sneezing into mine so much.  But she told me I can't get another mask.  I've been wearing the same mask since the jail first gave it to me on April 3.

19. On April 8, I tried to wash my mask because it was getting so dirty.  I very gently washed it with soap and water in the palm of my hand.  I had to be very gentle, because otherwise it would tear apart.  I don't know if that sanitized the mask or not.

20. On April 8, I also started having a problem with my eye.  It was a large bump, about the size of a piece of corn, that grew large and started discharging into my eye.  It's red and very painful.  I asked the nurse to examine it when she came to bring our food trays and medicine, but she told me, "that's not my problem."  I asked for some antibiotics.  But

5

she said no, that I just needed to hold a washcloth to it and wait.  I asked for a clean

washcloth, but the nurse told me I couldn't have another washcloth.  I still haven't had

my eye examined, and the only washcloth I have is the one I use to clean my whole body

in the sink, since we don't have any access to showers.

21. The only medical attention I receive is getting my temperature checked every day.  They

haven't given me Tylenol, the only medication I've been receiving is my regular blood

pressure medication.  They've tried to give me my seizure medication too, but I've

refused it.  I've lost my spirit, sort of given up, being in this situation.  They have never

checked my pulse oxygen levels.  I don't know if my oxygen levels have been low or are

low now.  They have never checked my blood pressure, even though they know I take

blood pressure medication.

22. This morning, the nurse came to take our temperatures with the digital scanner

thermometer.  I told her I don't want my temperature taken with the scanner, it doesn't

seem very accurate.  I asked to have my temperature taken with the regular thermometer,

put under my tongue.  But the nurse refused.  So I didn't get my temperature taken today,

and at first, the nurse wouldn't give me a food tray either because I was being "difficult."

I asked for her name so I could report this to my lawyer, and after that, she came back,

gave me a food tray, and then slammed the door as she left.

23. When we really need something, the staff will open the door, and throw stuff at us

through the door.  It makes me feel like an animal.  There's also a pile of trash building

up inside of our unit, which they won't take away.  There are fumes from guys getting

sick in those trash bags, there's spit on top of it and in it, and the trash is just closed in

here with us.  I understand, I have a disease.  But it's not like I volunteered for this.

24. I haven't asked for a grievance form since I came to the medical unit. First, if you ask for a grievance form, they might not give you one at all. And second, if you even ask for a grievance form, they know you're trying to report them. I'm too afraid of retaliation by the COs to ask for a grievance form from in here. Things are bad enough as it is. The COs know that we don't want to go back to the isolation cells, because the conditions are so bad there. I'm afraid if I even ask for a grievance form, they'll just send me back to the isolation cell. I know I don't want to go back there.

25. There are going to be more people with the virus coming down to the medical unit. It's just a matter of time. There's going to be many more. This is just the beginning. Some people are trying to hide their symptoms, because they don't want to be punished in the medical unit. People are punished when they go to medical isolation, they're told "they put themselves in here." So a lot of people are just trying to tough it out, but it's spreading it. My cellmate was sneezing and coughing when I left him. I've seen people in the kitchen unit sneezing as they prepare food. I've seen some people pushing food carts and distributing trays without gloves. The COs have even taken over kitchen duty. On Thursday, April 2, they announced over the loud-speaker that we would be given notice when we could return to work. They told us it was because Coronavirus was spreading in the kitchen unit and they didn't know if the whole unit might be infected.

26. When I was still on the housing unit, and seeing guys leaving the kitchen unit for the medical unit, I called my son and told him what was going on. But after I told my son what was going on, the next time I tried to use my phone, it said the PID number didn't match. I checked my account, and there's money on my phone account. So they must have deactivated it. I wasn't able to use my phone for over a week. You were the first

7

person on the outside I could speak to, and that's only because another inmate let me use his phone account to talk to you about what's been going on in here.  Then they finally reactivated my phone account on April 9.

27. I'm trying to tell my story to make things better for the wave of people about to come through here, because there's going to be a wave of people, you better believe that.  I want to share any information I can to help.  Because the things we're going through are not right.  I want my voice to be heard.  Because this is not right.

28. I provided the foregoing information over the telephone to Claire Glenn.  On April 11, 2020, this declaration was read to me and I confirm its accuracy based on my own knowledge and observations.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by* [Declarant #10] *on April 11, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to* [Declarant #10] *on April 11, 2020, and he confirmed its accuracy to me.*

cg
Claire Glenn, Esq.
April 11, 2020

8

# EXHIBIT 11

**Declaration of [Declarant #11]**

I, [Declarant #11], certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

1.  My name is [Declarant #11].  I am a resident of Prince George's County.

2.  I am currently incarcerated at the Prince George's County Jail in Upper Marlboro, Maryland.  I have been detained here since March [redacted], 2020.  I contracted the COVID-19 Coronavirus while detained at the jail and have since tested positive for the virus.

3.  I have pre-existing conditions in that I am anemic.

4.  My symptoms first began at the end of March, and by March 31, I was feeling really bad. At that time, I was on housing unit 10 (H10) in cell number [redacted].  My symptoms were a headache, fever, chills, runny nose, and heavy sweating.

5.  That same day, I had a bond hearing.  I was given a $1,000 bond with the option of paying ten percent to the Court, and my bond was paid shortly after.  Although my symptoms were bad, I was scared to go to the medical unit, because I wanted to get out before they could lock me in isolation.

6.  When I still wasn't released by April 1, however, I was too sick and had to request a sick call.  It normally costs $4 to go to sick call.  They took my temperature, and my temperature was around 103 degrees.  They gave me Tylenol and a mask, but nothing else was done. They took me back to my housing unit and I just had to wait.

7.  I kept the mask they gave me in medical on my first sick call.  I brought it back to the cell with me.  They told me I could keep my mask, because they knew my roommate was in medical.  No other inmates on H10 had a mask.  I noticed that some of the officers started

1

wearing masks, but no masks were distributed to inmates.  No gloves were distributed either.  I didn't ask for a mask sooner, because I didn't know that my roommate was sick like that.  No one told me what was going on.

8. At some point, they posted a little poster on the wall about the Coronavirus, in Spanish and English, but I never read it.  It is up on the wall near the door where you enter H10. If you don't know it's there, you never would see it.  I didn't read it, because I didn't know it was there at first.  I didn't see it until I started leaving to go to sick call.  They didn't make any announcement or anything telling us about it, and the jail was being locked down more and more at that time.  It was like the jail was going through a state of panic, like they didn't know what to do and were trying to cover things up.

9. On April 2, I came back to the medical unit and my temperature was only 100 degrees. By then, my other symptoms were not as bad and I was feeling a little better.  I had been sweating really bad all night and I think I sweated out some of the fever.

10. I went back and forth from the medical unit three times before they finally took my symptoms seriously and put me in isolation.  The medical staff didn't take me seriously until my second visit on April 2.  I told them that my cellmate had been in the medical unit for six days.  That's when they looked into things and realized that my cellmate had tested positive, so they had to test me too.

11. On April 5, my test came back positive.  I now have to stay here for fourteen days, until they say I'm no longer contagious.

12. Until April 6, I was still wearing those same clothes I was sweating in, for five days. They didn't give me clean clothes until April 6, and they haven't allowed any of us to take a shower.

2

13. My cellmate on H10 had been moved into my cell, number [redacted], on March 24 or
    25.  Before that he was in cell number [redacted] with someone else, whom I haven't
    seen getting tested in medical.  My cellmate was feeling sick when they moved him, and I
    remember he first went to medical on March 26.  He went back and forth between
    medical for three days, twice every day, until they finally kept him on his second visit on
    March 28.

14. When I first got moved to the medical unit, they put me in isolation cell number
    [redacted].  At first, they didn't give me anything to clean myself with.  The only things I
    had in the isolation cell were a mask, a mattress, a blanket, two sheets, and a towel and
    washcloth.  They finally gave me a cup, toothbrush, toothpaste, and a bar of soap on
    April 3, sometime that night.

15. They gave me this soap in the medical unit, but on the regular housing units you have to
    buy soap from the commissary.  They give you three small bars when you come in, but if
    you need more, you have to buy it.  I don't know if it's antibacterial soap or not, it's just
    a bar of soap.

16. I'm was in the isolation cell until sometime in the morning of April 6.  I don't know what
    time, because they won't let anyone see the clock.  But sometime in the morning, they
    moved me to the ten-man cell in the medical unit.  There's eight of us in here, all washing
    out of the same sink.  Actually, now there's nine, while we were talking on the phone,
    they just added another guy.

17. In the medical unit, I have no access to liquid soap or hand sanitizer, and I haven't been
    able to use the shower to clean myself.  They only gave me a little paper facemask that

3

I've been using since my first visit to medical.  But I read in the newspaper that these little paper masks are no good for protecting against the virus

18. When they moved me from the isolation cell to the ten-man cell, they forced me to clean up my isolation cell first.  That was the only time they gave me gloves, to clean my isolation cell.  The isolation cells have mucus, feces, blood, old food, urine, spit, everything you can name on the walls.  They gave us paper towels and bleach to clean the isolation cells, and told us to wipe down the sink and toilet with that, and anything we had touched.  But everything else in there is the same.  Someone should come and take pictures of these cells, they're disgusting.

19. The ten-man cell is better, but it's still unsanitary.  It's dusty and there's spit on the walls.  There's spiders and other bugs.  It's nasty.  There's piles of dust under the beds.  It hasn't been cleaned since god knows when.  On April 6, they gave us a spray bottle with some water solution in it and paper towels to clean, but that's nothing to actually sanitize, it's useless.  My breathing was better in the isolation than it is in here.

20. Everybody in the ten-man cell is asking for something that we're not getting.  And we're in here because we have medical problems.  We're asking for bigger portions of food, but they say they can't do it or just ignore us.  We ask for fresh water and juice and Gatorade, but they've given us none of that.  Anything fresh, we don't get, and when our food trays come, the food is cold and stiff.  We ask for showers, but they say we can't take a shower.  They tell us to wash in the sink, but there's just one sink that all nine of us have to use.  They gave me one bar of soap, but not everyone in here with me even has a bar of soap.  Some guys don't have toothbrushes or toothpaste either, some say they haven't had a toothbrush or toothpaste in a week.  We've got the same clothes on for five or six days,

4

the same underwear for five or six days.  I'm still wearing the same drawers since Thursday, and they look nasty. They're turning black.

21. There's a pile of trash right now in the ten-man cell right next to the empty water cooler. It's supposed to be a water cooler for us, but it's empty.  They're scared to come and refill it, they're scared to even come and get the trash.  They treat us like animals, like they're afraid to come near us.  And anything they do give us, they throw to us like we're animals, like we're nothing.

22. My bond is paid and I want to be released.  They say I have warrants, but they won't serve me with the warrants, because I have Coronavirus.  So I just have to sit here and wait.  They haven't shut down my PID number, so I can still use the phone.  But there are other guys in here who have had their PID numbers shut down, so they can't even make phone calls.  They have to use my PID number to make a call.

23. I provided the foregoing information over the telephone to Claire Glenn.  On April 7, 2020, this declaration was read to me and I confirm its accuracy based on my own knowledge and observations.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by* [Declarant #11] *on April 7, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to* [Declarant #11] *on April 7, 2020, and he confirmed its accuracy to me.*

_____cg_____
Claire Glenn, Esq.
April 7, 2020

***On April 13, 2020, Declarant #11 provided the following information
as an addendum to his original declaration:***

I, [Declarant #11], certify under penalty of perjury that the following statement is true
and correct pursuant to 28 U.S.C. §1746.

24. My name is [Declarant #11].  I am a resident of Prince George's County, Maryland.

25. I am currently incarcerated at the Prince George's County Jail in Upper Marlboro,
    Maryland.

26. I initially gave a declaration about the conditions at the jail on April 7.  But I wanted to
    give a second declaration because there have been ongoing issues in the way they treat us
    at the jail.

27. On Saturday, April 11, they moved me from the medical ten-man cell to housing unit 6.
    They moved six other people too.  All seven of us have our own cells here on H6.  They
    have us spread out throughout the whole unit.

28. On Sunday, April 12, around 3:00am, my nose started bleeding.  I got up to get my
    breakfast tray and have my temperature taken, and my left nostril was feeling funny and I
    noticed it started to bleed.  My cell is very dry, and when I breathe in the dry air, it makes
    me feel short of breath.  When my nose started to bleed, I used my buzzer to call for help
    and told the CO what was going on.  The CO called me back maybe 20 or 30 minutes
    later, and told me the nurse said just to clean myself up, that I was "healing up."  I asked
    the CO, "healing up from what?" and the CO said "I don't know."  It didn't make sense
    to me.  I asked for the nurse's name, and the CO said he didn't know.  I asked for the
    CO's name, and he wouldn't give it to me.

29. Then around 5:30pm, the nurse came around, and I told the nurse that my nose was still
    bleeding.  I had been keeping a tissue stuffed up in my nose, and I pulled it out to show it

6

to her.  She ignored me, and just said, "let me take your temperature, let me take your temperature."  I kept asking her about my bleeding nose, I asked her if she saw the blood on my tissue and if she could do anything to help me.  And she just continued to ignore me.  I saw her write on her clipboard, "blood on tissue," or something like that, but she didn't even acknowledge me.

30. I complained to the CO about it, and he said that it was about to be my rec time anyways. So when they let me out for my rec time, I called you to tell you what had happened and that my nose was still bleeding.  That was around 7:00pm.  You told me that you would speak to your friend who is an ER doctor, and ask him what he thought about it.  You told me that you would call the nurses' station and also call me back if there was any sort of emergency.

31. Then around 8:30pm, the COs told me that you had called back and asked to speak to me. I told them that you're my attorney and they needed to let me out so I could call you back right away.  I told them that there's a client-lawyer privilege, and I have a right to be able to talk with you.  But the CO told me the paperwork says I only get to come out of my cell for one hour per day and nothing more, no matter what.  I tried to explain to them that when you called, it was because you really needed to speak to me right away.  I told them that they were violating my rights in not letting me speak to you.  But the COs said they couldn't let me out to talk to my lawyer, that it was against the rules, and I was going to have to wait until my one hour of rec time to talk to you.

32. Then this morning around 9:20am, they told me that you had called again and asked to speak to me.  But they still wouldn't let me out to speak to you.  Again, I told them that I needed to talk to you.  I tried to explain to them.  It wasn't until around 12:30pm that they

7

let me out for my one hour of rec and I could finally call you.  One hour of recreation time is all I get.  So if this phone call takes a long time, I might not have time to shower, clean my room, or call my grandma and my cousin.  I try to call my grandma every day. Whenever my hour is up, they're going to make me go in my room.  And if I don't go, they're going to call the ERT squad on me or cut my phone number off entirely.  The ERT is the emergency response team.  When they come in, it's six or seven very muscular guys, they come in and tell you to get on the ground.  And if you don't get on the ground fast enough, they spray you with pepper spray or grab you and slam you down to handcuff you.

33. It's like we're being punished for having this disease.  The way they treat everyone, I feel like we're being punished for having COVID-19.  There's no way they should be denying me the ability to speak to my attorney.  And the nurses that come in act like they don't want to deal with me, they don't want to get close to me, they don't want to treat me.  They just want to take my temperature and then get away as fast as possible.  I told one of them this morning, look, I just want you to do your job.

34. They've been giving me a Claritin pill, they never told me why.  I guess it has to do with my symptoms.  Sometime the nurses give it to me, sometimes they don't.  When they don't and I ask about it, they tell me they just forgot.  They started giving me Claritin when I first started having symptoms, before they tested me for COVID and before I tested positive, when they told me I didn't have COVID and it was something else.

35. Some of the guys in H6 with me have been on quarantine for almost fourteen days.  But we don't know what's going on.  We don't know the policy.  We don't know when we'll

be released, how long we have to stay here.  The medical staff and COs act like we don't have a right to know what's going on with our own bodies.  It's like we're lab rats.

36. They also haven't given us any cleaning supplies since we got to H6.  I also have been using the same sheets since April 2, and they have not been washed since then.  There's nothing to read – to bibles, no books.  It's like they're trying to drive us crazy in here, in solitary confinement.  There has been no psychologist or psychiatrist coming to see us either.  The only time someone comes in here is when it's time to eat.  The nurse will come in with the CO who brings our food.  Other than that, no one comes in here.

37. We don't have a clock, so it's hard for me to even know the exact time or know exactly how long things are taking.  But since they brought us to H6, I've also noticed that they call into my cell – it seems like every hour or thirty minutes or so – even when it's the middle of the night and I'm trying to sleep.  They'll call in and say, "Mr. [Declarant #11], Mr. [Declarant #11]," and wake me up and make me get up and buzz them back.  Then they say, "we're just checking to make sure you're ok."  It prevents me from getting any good rest.

38. I can't file a grievance about any of this, because they won't give us any paper or anything to write with.  And they've said anything that goes into our cells can't come back out, including paper.

39. I provided the foregoing information over the telephone to Claire Glenn.  On April 13, 2020, this declaration was read to me and I confirm its accuracy based on my own knowledge and observations.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by* [Declarant #11] *on*

9

*April 13, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to* [Declarant #11] *on April 13, 2020, and he confirmed its accuracy to me.*

_____cg_____

Claire Glenn, Esq.

April 13, 2020

# EXHIBIT 12

**Declaration of [Declarant #12]**

I, [Declarant #12], certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

1. My name is [Declarant #12].  I am a resident of Prince George's County, Maryland.

2. I am currently incarcerated at the Prince George's County Jail in Upper Marlboro, Maryland.  I have been detained here since January [redacted], 2020.  I contracted the COVID-19 Coronavirus while detained at the jail and have since tested positive.

3. I first began to experience symptoms on Thursday, March 26.  When my symptoms first began, I was in Housing Unit 10 (H10), in cell number [redacted] with a cellmate.  I was not moved to the medical unit until Saturday, March 28, despite ongoing symptoms.  On Thursday, I had a fever of 100 degrees during the first sick call.  Later that day, my fever increased to 101 degrees.  By Friday, my fever was 104.7 degrees.  But they just kept sending me back to the housing unit.  I went back and forth between the housing unit and the medical unit about five times between Thursday and Saturday.  It costs $4 for each sick call.

4. Throughout this time, I was experiencing chills, body aches, coughing, and fatigue, in addition to my fever.  On Thursday morning I was still able to go outside to the rec yard, but by later that day, my symptoms became so severe that I was too tired to even leave my cell.  When I wasn't at sick call, I just laid down.  The COs knew I was tired and weak, because every time they buzzed my cell door for me to go to sick call, they had to keep buzzing it because I couldn't get up in time to open my door otherwise.

5. When I went to sick call, the nurse would take my temperature and give me Tylenol.  She didn't do anything else.  I told the COs and the nurse that I was afraid I had Coronavirus.

1

I also told my cellmate about my symptoms and that I was fearful I had Coronavirus. I even asked another inmate to call my family for me, because I was so concerned that the COs and nurses kept sending me back and forth with my temperature so high, instead of looking into things further or sending me to the hospital. I asked the medical staff to let me go to the hospital and asked for them to give me something to document how high my temperature was, but they refused to give me any paperwork or send me to the hospital.

6. No one ever gave the inmates any information about what the Coronavirus is or how it spreads or how to protect ourselves. Some jail officials in white shirts came a couple weeks ago and said keep our hands clean and wash our hands, but that was it. They never gave us any other information. They never provided us with masks or gloves while on the housing unit, nor hand sanitizer or wipes. At the time, I didn't ask for those supplies, because I was ignorant as to how contagious the virus is and how long it lives. I didn't know I needed those things to protect myself. I was never told to stay six to ten feet away from other people.

7. Once I was moved to the medical unit, on Saturday, March 28, I was put in isolation cell number [redacted], which was not clean. It has feces and blood on the walls. The sink was stopped up too, so I couldn't really use the water.

8. I was in the isolation cell for five days before I was even given a wash cloth or a toothbrush. The CO told me that I didn't deserve a toothbrush because of the nature of my charges. He said he couldn't say what my charge was out loud, but that he knew it was bad and I didn't deserve hygiene supplies. Because of the feces in my cell, I didn't want to eat my food trays in there, and the CO just made fun of me and said I was being a cry-baby.

2

9. I was also in the isolation cell for five days before they gave me a mask.

10. In the medical unit, the nurses come three times per day to take our temperature, give us medications, and give us our food trays.  Other than this, we have not communication with the outside world.  In the isolation cell, there was no way for us to notify someone if we were having an emergency, except to get up and bang on the door and hope that someone could hear you.

11. On Friday, April 3, I moved over to the ten-man cell in the medical unit.  Before I left the isolation cell, they made me clean it.  They gave me gloves, some spray, and brown paper towels to wipe things down, but it was not a thorough cleaning and there was nothing to clean the germs that are airborne.  All of the germs are still in there.

12. In the ten-man cell, I still have my toothbrush and a bar of soap.  There is no liquid soap, no hand sanitizer, no gloves, no disinfectant spray.  I haven't had a shower since Thursday, March 26.  All we have to protect ourselves and to clean are little paper face masks, brown paper towels and a spray bottle with soap and water in it.

13. Before I was in H10, I was in H5, where there were a lot of guys with symptoms.  The guy in the cell next to me had bad symptoms that I could here.  I was lucky, because I was moved from H5 to H10 on Wednesday, March 25.  H5 is a disciplinary isolation unit, and I'm worried there's guys trapped there with symptoms who can't call for help or get medical attention.

14. I have seen lots of people coming back and forth between the medical unit and the housing units.  I think a lot of guys are having symptoms, but are fearful of being stuck in the medical unit on total lock-down.  They're more afraid of how they'll be treated in the medical unit than they are of their symptoms, so they downplay things so they can go

3

back to the housing unit where they have access to showers and phones and stuff like that.

15. I provided the foregoing information over the telephone to Claire Glenn.  On April 7, 2020, this declaration was read to me and I confirm its accuracy based on my own knowledge and observations.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by* [Declarant #12] *on April 7, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to* [Declarant #12] *on April 7, 2020, and he confirmed its accuracy to me.*

    cg
_____
Claire Glenn, Esq.
April 7, 2020

4

# EXHIBIT 13

**Declaration of [Declarant #13]**

I, [Declarant #13], solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Trish McDermott on April 6, 2020. On April 8, 2020, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant #13]. I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County. I am currently detained in Housing Unit H-8. I have been detained at the facility since March [redacted], 2020. During this time, I have observed the following conditions and can make the following representations.

4) Detainees in the unit were not provided masks until late on Monday night, on April 6, 2020. The only people to have personal protective equipment such as gloves are the cleaners. The Correctional Officers have masks. I have heard many people coughing on the unit and some people have been vomiting. When this happens, the person gets taken away, I am assuming they go to the Med unit.

5) Things at the jail are very tense. Everyone seems on edge. There very limited recreational time because the schedule is tight with testing temperatures. No one leaves the unit unless they are taken to medical unit.

6) While I have been told to socially distance from others, there are 50 to 55 people in my unit, and I was not able to maintain an adequate distance during the whole time I've been here.

1

Before they were letting the whole floor out at a time for recreation, but now it has been reduced to 10 people at a time.

7)   People use the phones (the only way to contact the outside world, including my attorney) with no precautions. The phones are not wiped down between callers.

8)   I have not noticed anything more than the regular cleaning in the jail, and there has been no further information from the jail on how best to protect ourselves. We find ourselves trying to get information from the news on what to do.

9)   I came in fairly recently, so I have a bar of soap, but many do not have adequate personal cleaning supplies. If you don't have money, you can't buy soap from commissary.

10)  I have asthma, and I am extremely worried about my exposure in the jail. I realize I am in a vulnerable population, and at heightened risk of serious illness from Covid-19.


This declaration was orally sworn by telephone to Trish McDermott, Esq., by [Declarant #13] on April 8, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant #13] on April 8, 2020 and that he has sworn to the truth of its contents.


_____//s//_____
Trish McDermott, Esq.
Assistant Public Defender
April 8, 2020

2

# EXHIBIT 14

**Declaration of [Declarant #14]**

I, [Declarant #14], solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1. I provided the information below in response to a standard set of questions read to me over the telephone by Adam Caldwell on April 7, 2020. At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2. My name is [Declarant #14]. I am a resident of Calvert County.

3. I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County. I am currently detained in Housing Unit H-16. I have been detained at the facility since January [redacted], 2020. During this time, I have observed the following conditions and can make the following representations.

4. As of yesterday I was provided a single use mask.

5. There is some social distancing occurring in my unit. Recreational time has now been divided into periods, and approximately 10 people out for recreational time at any given time for one hour per day. During this time, people watch television or use the phone. Games have been taken away. I share a cell and there are approximately 70 people on my unit. There seems to be more people on the unit than usual, and more staff.

6. Phone use (the only way to contact the outside world, including my attorney) occurs sometimes with no social distancing. In my unit the phones are approximately a few feet apart from each other. People waiting in line for the phone are told to social distance and stay more than six feet apart from each other. The phones are sometimes cleaned between uses.

7. Surfaces and areas in common areas are cleaned down by inmates. Guards clean their own desks. Inmates have been asked to clean areas more often.

8. Soap is available when requested. It costs about $1.79 per bar and is delivered once per week. A bar lasts about a week. If you can't afford soap, small bars are given out for free. Paper towels, sanitizer and cleaners are available upon request.

9. I've seen one person taken out of my unit (segregated) due to showing signs of COVID-19. Other people have shown symptoms of common colds.

10. I have asked for a grievance form but was refused.

This declaration was orally sworn by telephone to Adam J. Caldwell, by [Declarant #14] on April 7, 2020 because in-person meetings are not currently possible due to the COVID-19 pandemic.  Under penalties of perjury, I declare that I have confirmed the foregoing in its entirety to [Declarant #14] on April 7, 2020 and that he has sworn to the truth of its contents.


    /S/ Adam Caldwell
Adam J. Caldwell
Assistant Public Defender
April 7, 2020

# EXHIBIT 15

**Declaration of [Declarant #15]**

I, [Declarant #15], solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.

1) I provided the information below in response to a standard set of questions read to me over the telephone by Ariel Schneller on April 8, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant #15].  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-14. I have been detained at the facility since March [redacted], 2020.  During this time, I have observed the following conditions and can make the following representations.

4) I have a cellmate.  My cell is approximately ten feet long by six feet wide.  My bunk is directly below my cellmate's bunk and when we are both on our beds we are within six feet of each other.

5) We are not having our temperatures checked or being tested for Covid-19.

6) Detainees in the unit are provided one mask for personal use.  We were provided our masks two days ago.  I have heard many people coughing on the unit and in the last two weeks have observed more people going to the medical unit than was typical prior to that.

7) The unit has ordered that detainees only use every other phone.  Despite this, the people who are on the phone are still within one or two feet of each other.  During rec time, about four or five phones are in use at any point in time.  The phones are not cleaned between uses.

1

8)  The only time surfaces and areas are cleaned down is the beginning of each shift.  During the day, as people circulate within the housing unit, no steps are taken to wipe down shared surfaces.  The staff clean their own areas such as their command desks but I have not seen them clean any other areas during shifts.

9)  Detainees have not been provided any personal protective equipment besides the one mask we received two nights ago.  We have not been provided any sanitation equipment such as hand sanitizers, disinfectants, or liquid soap.  The one exception is that detainees with access to funds can buy soap from the Commissary for approximately $2.50 per bar.  The soap is delivered once a week.


This declaration was orally sworn to by [Declarant #15] on April 8, 2020 because the Upper Marlboro Detention Facility is currently not permitting in-person visits.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant #15] on April 8, 2020 and that he has sworn to the truth of its contents.


/S/ Ariel Schneller
Ariel Schneller, Esq.
Assistant Public Defender
April 8, 2020

2

# EXHIBIT 16

## Declaration of [Declarant #16]

I, [Declarant #16], solemnly affirm under the penalties of perjury and upon personal knowledge that the following is true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Jeff Campbell on April 8, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant #16].

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-14.  I have been detained at the facility since March [redacted], 2020.

4) I have chronic asthma.  I have had it since I was born.  I take medicine for it called Albuterol.  I requested that medicine when I got in the jail, but they haven't given it to me.

5) I have heard other people in the unit coughing and sneezing.  I estimate that there are 5 or 6 people who are coughing and sneezing often.  I have heard my cellmate sneeze.

6) We have been told to stay six feet away from other people, but it's very hard to do.  When we use the phones, other people using the phone are much closer than six feet.

7) The phones are wiped down every day, but they are not wiped down between each person who uses them.

8) You get two bars of soap when you get in here; everything else you have to buy.  We don't get liquid soap or hand sanitizer.  They just gave us face masks yesterday for the first time.  We don't get any gloves.  There are two spray bottles on the whole unit to share between about 80 people.  You have to ask for them, and they are always missing or being used.  I haven't been able to use a spray bottle the entire time I have been in this unit.

9) I come within six feet of nine guards every day.  All three on the shift come in your cell when they do count, and that happens three times a day.  There is no way to avoid having them come into your cell.

10) The unit does not seem clean to me.  We are not given bleach or proper chemicals to kill the germs.  We have asked for more cleaning supplies but we haven't gotten any.

11) They are still bringing people into the unit and moving people between units.  I am worried because they could be spreading the virus.

This declaration was orally sworn by telephone to Jeff Campbell, Esq. by **[Declarant #16]** on April 8, 2020 because in-person meetings are currently not possible due to the COVID-19 epidemic. Under penalties of perjury, I declare that I have read the foregoing in its entirety to **[Declarant #16]** on April 8, 2020 and that he has sworn to the truth of its contents.

  _/s/ Jeff Campbell_____
Jeff Campbell, Esq.
Assistant Public Defender
April 8, 2020

# EXHIBIT 17

**Declaration of [Declarant #17]**

I, [Declarant #17], solemnly affirm under the penalties of perjury and upon personal knowledge that the following is true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Jeff Campbell on April 8, 2020 and a follow-up conversation on April 9, 2020.  At the conclusion of the conversations, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant #17].  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-9.  I have been detained at the facility since January [redacted], 2020.

4) Two days ago I had a headache and felt like I had a fever, and I was sneezing.  I went to sick call.  They gave me headache medicine and Claritin and sent me back to the unit.  I asked to be tested for the virus, but they said they don't have any tests.  Last night I went to sick call again.  I had a fever and a headache.  They told me that my fever wasn't high enough, and that they would only test me if it got higher.  They told me to drink water and sent me back to the unit.

5) My cellmate has been coughing and sneezing.  They have us locked in 23 hours a day with 1 hour of recreation time.  There is no way for my cellmate and I to distance ourselves from each other.

6) I and other inmates have been asking for facemasks for weeks.  We finally got them for the first time three days ago.  Before that, some of us, including me, would put our shirts over our mouths to protect ourselves.  The guards told us to stop.  They told us that if we continued, they would send us to the hole.  We also tried to cover the slots in our cells with sheets.  The guards told us to take them off, and that they would send us to the hole if we didn't.

7) There are lots of people in the unit coughing and sneezing.  There have been four people who went to sick call and never came back.  In some cases, people on the unit have gone to sick call and been sent back, and then they go again and again, and we hear later on that they had the coronavirus.  The same people who later left and I heard they had the coronavirus, we had been playing spades with them at the tables just days before.  I have told my family that I love them because I feel sure I am going to get the virus in here.

8) A lot of people in the unit who are coughing and sneezing have said they are trying to suppress it because they don't want to go to the medical unit because of the way people there are being treated.

9) The guards only allow us to use disinfectant on the phone before we use it.  They say we cannot take it into our cells.

10) Guards have been passing out the food recently.  The guards who pass it out do not wear gloves or masks.  Two days ago when they gave me the food, I put the tray back out; I told them I refused to eat it because they weren't wearing gloves and I was worried they would get me sick. They did not

give me other food to eat.  Instead, they threatened to send me to the hole.  I had to eat from my commissary that day.

11) While I am speaking on the phone, I can reach out and touch the person closest to me.

12) I feel like a sitting duck in here.  I feel like I'm going to get sick and there's nothing I can do about it.

This declaration was orally sworn by telephone to Jeff Campbell, Esq. by [Declarant #17] on April 9, 2020 because in-person meetings are currently not possible due to the COVID-19 epidemic. Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant #17] on April 9, 2020 and that he has sworn to the truth of its contents.


  /s/ *Jeff Campbell*
Jeff Campbell, Esq.
Assistant Public Defender
April 9, 2020

# EXHIBIT 18

**Declaration of [Declarant 18]**

I, [Declarant 18], solemnly affirm under the penalty of perjury and upon personal knowledge that the contents of the following paper are true:

1)  I provided the information below in response to a set of questions read to me over the telephone by Sean Link on April 9, 2020.  In a follow-up conversation on April 12, 2020, this declaration was read back to me and I confirmed its accuracy based on my own knowledge and observations.

2)  My name is [Declarant 18].  I am 43 years old and a resident of Prince George's County.

3)  I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-9.  I have been detained at the facility since January [redacted], 2020.  During this time, I have observed the following conditions and can make the following representations.

4)  I have been fortunate to not have personally experienced any symptoms of COVID-19 up to this point.  However, I have noticed a number of other detainees who have experienced symptoms of the virus on the unit, including high temperatures, coughing, and shortness of breath.

5)  When people on my unit have experienced symptoms of the illness, their responses have varied.  Some sought out medical care; some did not.  From what I have seen and been told, the jail's medical unit does not have any coronavirus tests and are not performing any tests – they are simply taking people's temperatures and checking them for symptoms of COVID-19.  On the units, our temperature is taken twice each day, and if anyone on the unit has a temperature over a certain limit (I don't know what that number is), then they will be taken to the medical unit.

However, if detainees only display symptoms without a high temperature, they remain on the unit in general population.

6)   I am diabetic, which puts me at increased risk if I am exposed to the virus.

7)   Because I am diabetic, I am brought from my housing unit down to the medical unit frequently (3 times each day) for my regular check-ins and treatment with the medical staff. While there, I have seen that the medical unit (which used to have one side for males and one side reserved for females) is now full on both sides with only males.  They have removed the females from that side and, to my knowledge, every female is now on the female unit in general population.  Within the medical unit, there are some individuals placed in the limited number of isolation cells by themselves, and then the rest are being held together in the 2 larger shared areas (one on each of the sides that are normally divided between males and females).  There are 12 bunks in each shared area grouped closely together and without any sort of divider or other protective measures, and these bunks are all filled with men who have been taken to and held in the medical area due to their suspected coronavirus infection.

8)   Doctors, nurses, and jail staff have been provided with higher-quality masks with circular air filters built in.  They also have access to gloves and other protective equipment.

9)   Detainees in the unit have been provided with masks; however, they are a lower-quality variety and do not have these filters.  We were issued only one mask each, and had to re-use the same mask each day.  It is not possible to clean or wash these masks.  They are flimsy, and I feel like a t-shirt tied around my nose and mouth would be more effective as a safety measure. Detainees do not have access to any other personal protective equipment, such as gloves, liquid soap, or hand sanitizer. Soap bars remain available by purchasing them with commissary funds.

One bar of soap generally only lasts me a couple of days.  I have no access to hot water to wash my hands; the only water available to me is the cold water from my cell's sink.

10) It is almost impossible to have meaningful social distancing on my unit.  The unit itself is filled to capacity (with a few cells currently empty due the need for repairs).  I would guess that there are more than 95 people currently living on my unit.

11) I continue to have a cellmate living directly in close quarters with me for 23 hours of the day.

12) The policy concerning recreational time was changed this past Tuesday, April 7.  On my unit, each of us is now allowed out of our cell for only 1 hour each day, with 10-12 people out of their cells at a time.  During this time, people are frequently within six feet of each other, especially if they want to use the unit's small open-air, outdoor space during this brief window of time.  Outside of that one-hour recreational period each day or talking with our cellmate, we have lost all of our opportunities for socializing with other people.

13) Other than this new division of recreational time, no efforts have been made towards encouraging or ordering effective social distancing on my unit.  The only times that I have been told to stay at least 6 feet away from people were when I was in the medical unit for my regular diabetes check-ups.  That is also the only place where I have seen bulletins or brochures with information about COVID-19 and safety precautions.  While in the medical unit waiting for my appointment times, I have tried to read up on this information so that I can share it with all of the other people on my unit.  This information is not otherwise being shared with us or told to us.

14) People are no longer allowed to eat at the tables as we used to do.  We are given all of our meals in our cells.  Our meals remain extremely low in nutritional content – we are not receiving any fruit or any vitamin supplements, and the only vegetable we regularly receive is lettuce.

Beyond that, we are mostly fed white bread, white rice, and white potatoes – foods that have low nutritional value and can be harmful for people with diabetes (or who are at risk of diabetes).

15) Phone use (the only way to contact the outside world, including my attorney) occurs with insufficient social distancing.  In my unit, the 11 phones are approximately one to one-and-a-half feet apart from each other.  Every other phone in the line has now been taped down, so that it cannot be used.  However, the remaining 6 phones are regularly in use at the same time, which still leaves only about 2-3 feet of distance between each person.  The phones are not disinfected between uses; they are wiped down approximately every hour by staff when detainees' recreational times change.  In between each call, we wipe down the phones with our sleeves or whatever else is available.

16) During the day, as people circulate within the housing unit, no steps are taken to wipe down shared surfaces.  I sometimes see staff wiping down surfaces, but these are generally just the desks or other surfaces that the staff regularly use – not the ones we detainees interact with.

17) I am regularly in close contact with about 4 different correctional staff members each day.  This includes for pat-downs every time I am brought from my unit to the medical unit for a check-up or back again.  The staff members use gloves when performing these pat-downs, but I don't know if any other precautions are being taken.

18) All detainees who were previously on the work unit (performing work in the kitchen, delivering food to the different units, collecting trash from the different units, mopping and cleaning the facility, and other tasks) have now been quarantined to their cells for all but one hour a day, as well.  The correctional facility staff – who come in from and return to the community each day – are now responsible for all of these tasks.  I have been told that this

change was made after it was discovered that at least one of the detainees on the work crew had been infected with COVID-19.

19) The range of responses to this situation varies widely among both detainees and correctional staff members.  Some people are very fearful; some think it's all a joke.  But as a diabetic, I have to take this very seriously.  I wash my hands as often as I can, but I have no access to hot or warm water, and my only access to soap are the small bars I buy through the commissary.  Many of us are hyper-aware – not only of symptoms among ourselves, but also irregularities among our staff.  We notice when people are coughing, when people are out for a few days, when someone that we've never seen before is suddenly working on a shift.  We have no idea whether the staff have to have their temperatures checked, or whether any of them have had access to testing.  I'm paranoid about one of them passing the virus to us from the outside – or about them having already done it without anyone realizing it.  I do not think that we are being sufficiently protected from the risk of being infected during this pandemic.

[Declarant 18] was approved by the Court for release from custody through the Prince George's County Department of Corrections' home detention program on April 7, 2020; however, he remained in custody until April 10, 2020, when the county's Pretrial Services agency was able to process his case and release him into home detention.

This declaration was orally sworn by telephone to Sean Link, Esq., by [Declarant 18] on April 12, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic. Under penalty of perjury, I, Sean Link, Esq., declare that the above substance of this declaration was orally shared by [Declarant 18] on April 9, 2020 over the telephone, that I read the foregoing in its entirety to [Declarant 18] on April 12, 2020, and that he has sworn to the truth of its contents.

Sean Link, Esq.
Assistant Public Defender
April 12, 2020

# EXHIBIT 19

## Declaration of [Declarant #19]

I, [Declarant #19], solemnly affirm under the penalties of perjury and upon personal knowledge that the following is true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Jeff Campbell on April 8, 2020 and a follow-up conversation on April 9, 2020.  At the conclusion of the conversations, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant #19].  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County. I am currently detained in Housing Unit H-16.  I have been detained at the facility since January [redacted], 2020.

4) I have asthma, bronchitis, and sleep apnea.  Lately, I have been coughing and sneezing.

5) A lot of guys on our unit are coughing and sneezing.  I know of another person who has been complaining of headaches and shortness of breath.

6) I have been putting in for sick call but I haven't gotten any medical attention.  I first put in for sick call on March 23rd and I haven't heard anything.  The guards have told me that they're not bringing anyone down unless it's an emergency.  As of April 7, they didn't even have sick call slips available.

7) I have not been told to stay more than six feet away from other people.  It is not possible do stay more than six feet away from other people in here.

8) Starting about four days ago, they started limiting recreation time to only ten people at a time. But before that it was totally regular, one floor at a time, about forty people.  People would sit at the tables together and play cards and dominos.  People are still doing that, even now.  The only space limitation is that only five people can use the phone at once, out of the ten phones on the unit.  That started about four days ago.  But even still, people are only separated by a few feet when using the phones.  The phones are not cleaned between use unless we do it ourselves.

9) We got face masks for the first time about four days ago.  They're little paper masks, and we haven't gotten any replacements.  They haven't told us how to clean them or anything like that.  It is optional to wear them in the unit, but outside the unit we have to wear them.

10) The unit is no cleaner now than it was before the outbreak.  I do not feel like we are getting enough protection from the virus.

11) I have been asking the guards in the unit for grievance forms to file a grievance about the way the jail is handling the virus.  I have asked multiple times, but I have not been allowed to have a grievance form.

This declaration was orally sworn by telephone to Jeff Campbell, Esq. by **[Declarant #19]** on April 9, 2020 because in-person meetings are currently not possible due to the COVID-19 epidemic. Under penalties of perjury, I declare that I have read the foregoing in its entirety to **[Declarant #19]** on April 9, 2020 and that he has sworn to the truth of its contents.

_/s/ Jeff Campbell_
Jeff Campbell, Esq.
Assistant Public Defender
April 9, 2020

# EXHIBIT 20

**Declaration of [Declarant #20]**

I, [Declarant #20], solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Terea Williams on April 9, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant #20].  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-9. I have been detained at the facility since December [redacted], 2019 to the present time of this declaration being given.  During this time, I have observed the following conditions and can make the following representations.

4) I have been in H-9 during my entire time here at the jail.

5) I went to the medical unit about two weeks ago. While there I saw an inmate from the kitchen unit who was lying down in the bullpen. He had a mask on, was breathing very hard and his eyes were very red. I was only coming there for a toothache check. When I saw him I refused to go into the bullpen and the correctional officers kept telling me to go in there to wait to be checked. I refused medical treatment for my tooth pain so that I could get out of there as soon as possible.

6)  About three weeks ago, I noticed one of the inmates (nickname [redacted]) he was in the cell and didn't come out for four days straight. When he did come out of his cell, he looked like the guy that was in the medical unit (breathing hard and eyes were red). He was taken to medical unit and he never came back.

1

7)  In the middle of the night his cell was cleared out and all his stuff was bagged up and taken out of the unit.

8)  I then saw a Hispanic male in cell [redacted]—same thing, he was in his cell for days, not coming out and then he got called to medical days after and he never came back. His items were packed up and nothing was said to us as to why or what was going on.

9)  Another guy in cell [redacted, same cell as in paragraph 8]—was the same way, in his cells for days without coming out, called to medical, stuff packed up and nothing said to us.

10) We are only finding stuff out from the news, calling out to our families, and the correctional officers that actually care about us would tell us what was going on.

11) Last week (Monday, 3/30) the health department came here with the news and we were locked in our cells. We didn't get to communicate with them and they didn't tell us why they were there.

12) A few days later a correctional officer came into the unit and told us what was wrong; saying that the jail was being checked out due to the COVID-19.

13) Just this past Monday (4/6) we were given masks but no gloves.

14) Starting Monday we have been eating our meals inside of our cells.

15) Social distancing is not being practiced or strictly enforced. I can recall only one correctional officer mentioning about keeping space between us.

16) Spray and paper towels are left out but the correctional officers aren't themselves wiping phones off or mandating that the inmates wipe them off before or after calls.

17) During recreational time, only 10 people are allowed at a time; just starting this past Monday.

2

18) The correctional officers are wearing gloves but not all correctional officers have masks on. Correctional officers come in to do arm band checks and many times don't have their masks on.

19) New correctional officers have been trained to start working on the unit. Food trays are being handed out without masks and gloves on. When inmates complain the correctional officers basically tell the inmates they don't care.

20) There are inmates saying they can't smell or taste.

21) The past couple days my nostrils have been burning and my sense of taste is limited. I have allergies so I'm not sure if its sinus from my allergies or what is going on.


This declaration was orally sworn by telephone to Terea Williams, Esq., by [Declarant #20] on April 9, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant #20] on April 9, 2020 and that he has sworn to the truth of its contents.


*Terea Williams*
_____
Terea Williams, Esq.
Assistant Public Defender
April 9, 2020

3

# EXHIBIT 21

**Declaration of [Declarant #21]**

I, [Declarant #21], solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1)   I provided the information below in response to a standard set of questions read to me over the telephone by Trish McDermott on April 9, 2020.  At the conclusion of the conversation, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2)   My name is [Declarant #21].  I am a resident of Prince George's County.

3)   I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-9. I have been detained at the facility since October [redacted], 2019.  During this time, I have observed the following conditions and can make the following representations.

4)   There seems to be a flu or sickness spreading around the unit, for over 3 weeks now. The Officers in the unit aren't telling us information, and 4 people have left the unit and not returned. Two of the regular officers for the evening shift have not been seen for a few weeks.

5)   There are 82 people in my unit. Many of them are sick or have been sick. There is fear to disclose symptoms because you might be taken to the Medical Unit, where we know there are confirmed cases of Covid-19. Some people have asked for medication/treatment, medical exams, and have been told that what they have is not serious, or it's a cold.

6)   I was sick last week. My symptoms included coughing, sneezing, fever, chills, diarrhea, fatigue and decreased ability to taste or smell. The symptoms fluctuate, they can get worse and then get better, and then get worse again. I feel like I don't know when I am really better.

1

7)  My cell mate got sick first. He was taken to medical. They told him that he just had allergies, and then they brought him back and put him back in a shared cell with me. It didn't seem like allergies to him or me. Then I got sick.

8)  I am on cleaning detail, and have been for some time. My duties include cleaning up the unit and distributing food. When I got sick, I didn't want anyone else to get sick, so I took two days off work. I couldn't have worked anyway, I had high fever, chills and diarrhea. Then I returned to work and spent two days just handling trash. I then went back to distributing food in the unit – I took a break from handling food for 4 days total.

9)  Detainees in the unit are not provided masks or other personal protective equipment such as gloves.  I have heard many people coughing on the unit and in the last two weeks have observed more people going to the medical unit than was typical prior to that.  When people return from the medical unit, their masks are taken off of them.

10)  I am trying to social distance, and there is usually enough space in the unit to do it, except the phones. The phones are very close together. In my unit the phones are approximately a foot to a foot and a half apart from each other. As I talk to my attorney now I could reach out and touch two other people who are using the phones.

11) There are more cleaning supplies now than there used to be, and there are disinfectant materials by the phones, but it requires that everyone who uses the phone to clean up after themselves, and I'm not sure that is always the case. Personal soap is still part of commissary, but we are trying to help each other out where we can.

12)  Things have gotten a bit better this week, since we have finally gotten masks and gloves. However, I think this is too late. I feel like everyone in the unit is catching it. We aren't given any details about who has tested positive, and it seems like almost everyone is sick.

2

This declaration was orally sworn by telephone to Trish McDermott, Esq., by [Declarant #21] on April 9, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant #21] on April 9, 2020 and that he has sworn to the truth of its contents.


_____//s//_____

Trish McDermott, Esq.
Assistant Public Defender
April 9, 2020

3

# EXHIBIT 22

Consent given

### Declaration of [Declarant #22]

I, [Declarant #22], solemnly affirm under the penalty of perjury that the contents of the following paper are true:

1) I provided the information below in response to a set of questions read to me over the telephone by Lia Rettammel on April 10, 2020.  All responses are based on my own knowledge and observations.

2) My name is [Declarant #22].  I am a resident of Prince George's County.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County.  I am currently detained in Housing Unit H-9.  I have been detained at the facility since June [redacted], 2018.  During this time, I have observed the following conditions and can make the following representations.

4) I have been fortunate to not have personally experienced any symptoms of COVID-19 up to this point.

5) The jail is not be specific about the symptoms.

6) There have been quite a few people that have left.  When I got brought back to this unit, someone had just left.  Maybe 4-5 people that I know of. They didn't tell us why they left.  If I didn't know those people personally, and know they were sick, I would have never known.

7) They have us on 23/1 lockdown status.  We're locked down for 23 hours a day, and 1 hour for rec.  When we get rec changes, it depends on how quickly they get people done.  Today I got rec around now (10 AM), but it might be midnight or later. You can use the phones or clean my cell, watch TV, take shower.

Consent given

8) They are giving us Spray 9 cleaning solution.  They just give it to us, and I just douse my whole cell down with. I have a cell mate.  He has not had any symptoms, one day he said he wasn't feeling well, but that was only for an hour.

9) I have seen them cleaning the unit every day after 9:45 PM, the detail does it.  They use Spray 9 I hope they use bleach.

10) They gave us these basic flimsy masks about 3 days ago.  We are expected to use the same ones, I don't understand that. It's not mandatory that we wear them.  I guess they just gave it to us to say they did something.  It's not mandatory, some people still come out without them.  They don't give us any gloves, we can use them if we are cleaning our toilet but they don't hand out gloves on the regular.

11) I have plenty of soap, I had to buy it from commissary.  All my soap is antibacterial.  The soap bars last about a week. I do have hot water in the cell.  I wash my hands frequently.

12) They are trying to tell us to stay 6 feet away from other people and use every other phone but it's not mandatory.

13) There are 2 correctional staff on each shift. The staff wear a mask, when they are coming to the count.  Sometimes they wear masks when they sit at the desk.  We get our temperature checked 2out of 3 shifts.  I don't know if the CO's are getting their temperature checked.

14) I kind of feel scared and upset.  The first time I heard about it was from a CO, mostly everyone is upset, maybe a little fear going around too.

Under penalty of perjury, I, Lia Rettammel, Esq., swear that the above substance of this declaration was orally shared by [Declarant #22] on April 10, 2020 over the telephone, since in-person meetings are not currently possible due to the COVID-19 epidemic.


*/S/*
Lia Rettammel, Esq.

Consent given


Assistant Public Defender
April 10, 2020

# EXHIBIT 23

Consent given

## Declaration of [Declarant #23]

I, [Declarant #23], certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

1. My name is [Declarant #23], and I am a resident of Prince George's County.

2. I am currently incarcerated at the Prince George's County Jail in Upper Marlboro, Maryland.  I have been detained here since August [redacted], 2019.

3. I have pre-existing conditions of nerve damage in my right leg.

4. I first began to experience symptoms of covid-19 on Wednesday, March 28, 2020, when I started to not be able to smell or taste.  At that time, I was detained in Housing Unit 9 (H9), with a cellmate.  My cellmate has also not been able to taste or smell.  I sought medical attention on March 30th, 2020.

5. I would hit the call button and correctional officers would ignore me, when I attempted to notify them of my symptoms.  As a result, I then started to yell for a correctional officer to hear me.  The guards continued to ignore me.

6. It took eleven days for me to finally receive medical care, on April 8th, 2020.  When I did talk to a nurse, they told me that I will not receive a Covid-19 test, because I did not have a "fever", and my temperature was 98.9.  They prescribed 10 mg of Claritin and said that my symptoms are more consistent with the flu.

7. On Unit 9, there has been three confirmed cases of Covid-19.  Other people describe symptoms to the nurses, and the nurses say that those symptoms are more consistent with flu and not Covid-19.  There are about 80 people on my unit.

Consent given

8.  I do not think the guards care about us.  I repeatedly asked for medical attention and only received medical attention after another correctional officer finally allowed me to seek medical attention.

9.  When people, including myself, ask to file grievances about the conditions of the jail, we are told by correctional officers that we cannot have the grievance forms and sometimes to "shut up."

10. The ventilation system in the jail seems to not be functioning at times, causing it to be hot in the unit and in my cell.  Additionally, the vent in my cell has dust blowing out of the vents, and I have to continuously clean up the dust that comes through the vents.

11. I am unable to stay away from others since I have a cellmate.  When I use the phone, I am less than six feet away from another person who is on the phone.  Additionally, there is someone standing behind me who is waiting to use the phone when I am done.

12. There are about eighty people on my unit.  There are twelve phones in operation.  But, only seven phones can be used, since every other phone is supposed to be used to maintain distancing. To my knowledge, detail only cleans the phones once a day.

13. The only instructions that I received from correctional officers, regarding covid-19 prevention, is to stay six feet away from others. I was also given a mask on April 6, 2020.

14. I provided the foregoing information over the telephone to Marceliers Hewett II.  On April 10, 2020, this declaration was read to me and I confirm its accuracy based on my own knowledge and observations.

*Because the Prince George's County Detention Center in Upper Marlboro, Maryland, currently is not permitting in-person visits, this declaration was orally sworn to by* [Declarant #23] *on April 10th, 2020.  Under penalties of perjury, I declare that I read the foregoing in its entirety to* [Declarant #23] *on April 10th, 2020, and he confirmed its accuracy to me.*

2

Consent given

__/s/Marceliers Hewett II_____
Marceliers Hewett II, Esq.
April 10th, 2020

# EXHIBIT 24

**Declaration of [Declarant 24]**

I, [Declarant 24], solemnly affirm under the penalties of perjury and upon personal knowledge that the following is true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Jeff Campbell on April 10, 2020. At the conclusion of the conversations, this declaration was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant 24]. I am 26 years old.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County. I am currently detained in Housing Unit H-8. I have been detained at the facility since March [redacted], 2020.

4) I have asthma. Last Thursday or Friday I told the guard that my chest was hurting and they took me down to the medical unit. They hooked me to a machine to help get my breathing to normal. Then they sent me back to the unit.

5) I have been coughing. I am feeling pains and less ability to taste and smell.

6) They have given us paper masks. The guards tell us not to lose our masks because we can't get a replacement. They tell us not to come ask for one; they won't give us a replacement. Not all of the inmates in the unit wear their masks. Neither do the guards. I can see the guard right now and he isn't wearing his mask. The guards' masks are thicker than ours. Ours are flimsy paper, theirs are thicker.

7) It costs $4 to go to sick call. They take the people with money in their account first, so if you don't have money it can take a long time to go. If you don't have money, they debit your account so that it goes negative.

8) The guards take our temperature twice a day. They come to the cell and tell us to put our head in the slot. They measure the temperature and check off our name. I don't think they record the temperature or anything, just that it was okay. They do not clean the temperature reader between uses. They do not change their gloves between inmates.

9) I try to keep my cell clean, but it is difficult. They don't let us use bleach. I ask for spray-nine and the guards will say no. I use a rag and my hands to clean my cell. When I can find a way to sneak some spray-nine, I use that too.

10) The showers had not been cleaned from last Saturday until yesterday. Inmates were complaining. The guard said he would "scout out" a bottle of spray-9. Yesterday we got a bottle and inmates finally were able to clean the shower.

11) They say that we are practicing social distancing in here, but it does not seem that way to me. People are within six feet of each other all the time.

12) I have asked for a grievance so that I can file a grievance about the conditions in here and the way that a CO has treated me.  The guards keep telling me I have to wait until next shift.  I have been trying to file a grievance the last two days and still have not been given a form.

13) I am very afraid of getting the virus.  I am even more afraid because of my asthma, I think it could be very serious for me.

14) I don't like how the jail is handling the outbreak.  I feel like we can't get any information, and like we can't trust anything the guards tell us.  I don't think we are getting enough cleaning supplies, and I don't think it's clean enough in here.


This declaration was orally sworn by telephone to Jeff Campbell, Esq. by [Declarant 24] on April 10, 2020 because in-person meetings are currently not possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant 24] on April 10, 2020 and that he has sworn to the truth of its contents.


  _/s/ *Jeff Campbell*_____
Jeff Campbell, Esq.
Assistant Public Defender
April 10, 2020

# EXHIBIT 25

**Declaration of [Declarant #25]**

I, [Declarant #25], solemnly affirm under the penalty of perjury that the contents of the following are true:

1. I provided the below in response to questions my attorney, Elizabeth Tissot, read to me over the phone on April 9 and April 10, 2020. All responses are based on my own knowledge and observations.

2. My name is [Declarant #25]. I am a 28-year-old resident of Prince George's County. Currently, I am detained at the Upper Marlboro Detention Center in Prince George's County. I have been detained here since February [redacted], 2020.

3. I am housed in H-17, with about 85 other people. I share a room with a cellmate. We sleep in bunkbeds; I'm on the bottom and my cellmate is on the top. I would estimate that the top bunk is barely over two feet above the bottom bunk. The unit seems less full than it usually is, because a lot of people have been released due to the COVID-19 pandemic.

4. On any given day, I would guess about two to three correctional officers work in the unit at a time. They go through two or three shift changes a day. The correctional officers wear gloves and masks. Though they have told us that we should all stay six feet apart from the other inmates, the correctional officers definitely get within six feet of us. They come into our cells and touch us, grabbing our arms to see our wrist bands.

5. I have asthma, and while I don't need a rescue medication like an inhaler on a daily basis, when I get respiratory infections, I tend to get very sick. Last week, I felt really bad for two or three days. I had body aches, a runny nose, and what felt like fluid in my chest. I told one of the guards that I felt sick, and requested to go to the medical unit. About five to ten minutes later, a medical escort came to take me there. Once in Medical, someone I think

was a nurse took my temperature. It was 101 or 102. Despite this, I only remained in the medical unit for ten or 15 minutes. I was told to return to my cell and drink fluids. That was all. My oxygen levels were not checked.

6. I am not the only person in my unit to get sick. I've observed symptoms of what could be COVID-19 in pretty much the whole unit. Lots of guys walk around coughing. One of the guys in my unit had such a high temperature that the whole unit was talking about it. To my knowledge, only five or six guys have actually been quarantined in Medical. About a week ago, those guys were taken away and I haven't seen them since. I don't know what's happening to them in the medical unit, but I doubt they have access to ventilators. I also haven't heard of anyone being taken to the hospital.

7. Though the guards have been telling us to stay six feet apart from each other, they don't seem to take it that seriously. Staying six feet away is often not possible—when people are using the phones, for example. There are about ten phones in my unit and they are usually all in use at the same time. The phones are only about one feet away from each other. It's also impossible to stand six feet apart when waiting in line for meals. The procedure for getting meals has not changed at all. We all wait in a long line to take a tray from a stack of trays. The kitchen workers do wear gloves, hair nets, and a mouth guard, but I believe they've always done this.

8. Everyone in the unit was given a mask, less than a week ago, but it's one of those blue paper masks that is supposed to be disposable. We are not forced to wear the masks. Lots of inmates have simply thrown them away, and they were not given new masks. Wearing the masks is optional. We have not been given gloves, despite requesting them.

9.  We also haven't really been given any special cleaning supplies. I still buy bar soap from the commissary. Some of the guards will give you soap for free if you request it. There is something called Spray Nine, which I think is an antibacterial spray, that the guards will sometimes give inmates to use. We don't have free access to it.

10. I have not really observed any increase in cleaning or cleanliness. Sometimes the guards will tell the inmates to spray down the phones with Spray Nine, but this is not consistent. Generally, phones are not cleaned between uses, though individual inmates will do their best. As I was talking to my lawyer on the phone on April 10, 2020, I observed several guys finish phone calls, and the phones were not cleaned.

11. Lately, the guys in my unit have been given about two hours of recreation time a day. People still huddle together playing cards and chess. People are still close. We haven't been told *not* to do that. I have noticed that people haven't been playing sports like basketball lately, but that's not because contact sports were barred. We haven't really been given any new rules for our recreation time.

12. In addition to the masks, we have been getting twice daily temperature checks for a little over a week. For a while the nurses checking our temperatures would just use regular thermometers, with a disposable plastic sheath that would be changed between temperature checks. The nurses taking our temperatures wear gloves, but they do not change those gloves between temperature checks. The person getting their temperature checked basically gets their germs all over those gloves, breathing all over them, and the nurses do nothing about it.

13. Lately, the nurses have been doing temperature checks from a few feet away, with something that looks like a laser gun. I don't believe these thermometers are very accurate.

14. I don't feel as sick as I did last week, but I still don't feel one hundred percent. I feel stuffed up and congested, like there is fluid in my lungs. I feel dehydrated and am trying to drink as much water as possible.

15. I haven't filed any grievances, because the jail staff makes the process difficult. Some of the correctional officers give you a hard time about filing them, and it's difficult to get in touch with the Zone Commander—something you need to do to file a grievance. I also haven't requested an official sick call, though I have heard that it does cost about four dollars. If you want something like Tylenol, the jail staff is going to try to charge you four dollars.

16. I feel like we're being kept in the dark about how bad this pandemic is. We watch the news and hear stories from people on the outside, but the guards are not being honest about how many people within the jail are infected. In fact, to my knowledge they haven't told us anything about people being infected in the jail, though we know they are. I would guess at least six people from my unit alone, H-17, have gotten infected.

17. Obviously, everyone is scared of getting sick. There is no help in here. If you get sick, you might be done. It feels like no one working at the jail actually cares about us and our health.

*Under penalty of perjury, I, Elizabeth Tissot, Esq., swear that the above substance of this declaration was orally shared by* [Declarant #25] *on April 9 and April 10, 2020, over the telephone, since in-person meetings are not currently possible due to the COVID-19 epidemic.*

Respectfully submitted,

/s/ Elizabeth M. Tissot
Elizabeth M. Tissot
Attorney for Defendant
Assistant Public Defender
Courthouse, Suite 272-B
Upper Marlboro, MD 20772
(301) 952-2141
CPF: 1712140226

# EXHIBIT 26

Permission to share given

### Declaration of [Declarant #26]

I, [Declarant #26], solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1) I provided the information below in response to a standard set of questions read to me over the telephone by Cristina Najarro on April 10, 2020.  After this declaration was drafted, it was read to me and I confirmed its accuracy based on my own knowledge and observations.

2) My name is [Declarant #26], I am thirty-three years old.  I am a resident of Baltimore City.

3) I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County and I have been here since March [redacted], 2020. I am held pretrial on a violation of a protective order charge, with a maximum penalty of ninety days.  I am currently detained in Housing Unit H-17, which is known as the "work unit." We would work in the kitchens, handling food and going in and out of the other units at the jail. We are not doing food service now.

4) I am HIV positive. Over the past two weeks, I have had chills and fever, a slight cough, body pain and a sore throat. I requested a "sick call," to go to the Medical Unit for care. I requested that the week of March 30th and I was finally seen on April 9, 2020.

5) It costs $4 to go to a sick call. I can afford this, but not everyone in the jail can.

6) My oxygen was checked with a machine they put on my finger. I do not remember the exact number, but it was high, somewhere around 98%. I was told my case was not serious enough to have additional care, and that the Medical Unit is only seeing emergency cases.

7) I have been feeling dehydrated, but I have not been getting additional fluids or IV treatment. I was told to drink the water in the cells.

1

Permission to share given

8)  I have also noticed symptoms of COVID-19 in my cellmate, who has been coughing and saying that his chest was hurting.

9)  In the last week, my unit has made changes in response to COVID-19. For instance, until Monday of last week (April 6, 2020), people were sleeping on bunkbeds in the open recreation area. However, they were moved out into other cells on April 6th. Now, there are about fifty people on my unit, compared to probably about ninety people before.

10) I have been told to socially distance and stay more than six feet away from others. It is difficult because there are so many people. The COs have been trying to stagger people getting meals and medicine, but it is hard when everyone is waiting to get their medication.

11) The COs have also limited our rec time to one hour per day, with only ten people out of their cells at a time. This started early this week as well. It is still difficult because everyone wants to use the phones to get in touch with family members and lawyers, and the phones are only one foot apart. The COs do disinfect the phones between uses.

12) At the beginning of last week (April 6th week), on Sunday or Monday, the COs passed out masks to everyone and started doing temperature checks two times per day. They seem more responsive to people showing symptoms now than last week and before that.

13) I get soap for free, and I have also been given a face mask, the type that you get when you go to the doctor. It has so far not been replaced. I have access to gloves and disinfectants if I request them.

14) Some of COs are worried and take this situation seriously, while others do not seem to know a lot about it. Some of the COs snap at us and try to put this virus on the inmates, but we know that it can come in from them. They leave and go out into the world every day. They are

2

Permission to share given

putting us in jeopardy if they are not cautious. If we say something to them about wearing their masks, some of them will snap at us.

15) I do feel that the COs are mostly doing the best they can, considering the time and how quickly things have happened. They are just following the orders and protocols they are given.

16) I know that I was not sick when I first arrived in jail. I did not come onto this unit for at least two weeks after arriving, so if I am sick now, I got sick from someone in the jail.

17) I try to distract myself and I do not want to dwell on this COVID-19 situation all day. I have anxiety and I do get medication for it, so I do not want to make things worse for myself.

This declaration was orally sworn by telephone to Cristina Najarro, Esq., by [Declarant #26] on April 13, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant #26] on April 13, 2020 and that he has sworn to the truth of its contents.


___/s/_____
Cristina Najarro, Esq.
Assistant Public Defender
April 13, 2020

3

# EXHIBIT 27

Permission to share given

## Declaration of [Declarant #27]

I, [Declarant #27], solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1)  I provided the information below in response to a standard set of questions read to me over the telephone by Cristina Najarro on April 10, 2020.  After this declaration was drafted, it was read to me and I confirmed its accuracy based on my own knowledge and observations.

2)  My name is [Declarant #27], I am thirty-three years old.  I am a resident of Baltimore City.

3)  I am currently incarcerated at the Upper Marlboro Detention Center in Prince George's County and I have been here since March [redacted], 2020. I am held pretrial on a violation of a protective order charge, with a maximum penalty of ninety days.  I am currently detained in Housing Unit H-17, which is known as the "work unit." We would work in the kitchens, handling food and going in and out of the other units at the jail. We are not doing food service now.

4)  I am HIV positive. Over the past two weeks, I have had chills and fever, a slight cough, body pain and a sore throat. I requested a "sick call," to go to the Medical Unit for care. I requested that the week of March 30th and I was finally seen on April 9, 2020.

5)  It costs $4 to go to a sick call. I can afford this, but not everyone in the jail can.

6)  My oxygen was checked with a machine they put on my finger. I do not remember the exact number, but it was high, somewhere around 98%. I was told my case was not serious enough to have additional care, and that the Medical Unit is only seeing emergency cases.

7)  I have been feeling dehydrated, but I have not been getting additional fluids or IV treatment. I was told to drink the water in the cells.

1

Permission to share given

8)  I have also noticed symptoms of COVID-19 in my cellmate, who has been coughing and saying that his chest was hurting.

9)  In the last week, my unit has made changes in response to COVID-19. For instance, until Monday of last week (April 6, 2020), people were sleeping on bunkbeds in the open recreation area. However, they were moved out into other cells on April 6th. Now, there are about fifty people on my unit, compared to probably about ninety people before.

10) I have been told to socially distance and stay more than six feet away from others. It is difficult because there are so many people. The COs have been trying to stagger people getting meals and medicine, but it is hard when everyone is waiting to get their medication.

11) The COs have also limited our rec time to one hour per day, with only ten people out of their cells at a time. This started early this week as well. It is still difficult because everyone wants to use the phones to get in touch with family members and lawyers, and the phones are only one foot apart. The COs do disinfect the phones between uses.

12) At the beginning of last week (April 6th week), on Sunday or Monday, the COs passed out masks to everyone and started doing temperature checks two times per day. They seem more responsive to people showing symptoms now than last week and before that.

13) I get soap for free, and I have also been given a face mask, the type that you get when you go to the doctor. It has so far not been replaced. I have access to gloves and disinfectants if I request them.

14) Some of COs are worried and take this situation seriously, while others do not seem to know a lot about it. Some of the COs snap at us and try to put this virus on the inmates, but we know that it can come in from them. They leave and go out into the world every day. They are

2

Permission to share given

putting us in jeopardy if they are not cautious. If we say something to them about wearing their masks, some of them will snap at us.

15) I do feel that the COs are mostly doing the best they can, considering the time and how quickly things have happened. They are just following the orders and protocols they are given.

16) I know that I was not sick when I first arrived in jail. I did not come onto this unit for at least two weeks after arriving, so if I am sick now, I got sick from someone in the jail.

17) I try to distract myself and I do not want to dwell on this COVID-19 situation all day. I have anxiety and I do get medication for it, so I do not want to make things worse for myself.


This declaration was orally sworn by telephone to Cristina Najarro, Esq., by [Declarant #27] on April 13, 2020 because in-person meetings are not currently possible due to the COVID-19 epidemic.  Under penalties of perjury, I declare that I have read the foregoing in its entirety to [Declarant #27] on April 13, 2020 and that he has sworn to the truth of its contents.


___/s/_____
Cristina Najarro, Esq.
Assistant Public Defender
April 13, 2020

3

# EXHIBIT 28

### Declaration of Ariel Schneller

I, Ariel Schneller, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1) I am an Assistant Public Defender in the Prince George's County Office. I have been working in my current position for six months. In that time, I have represented approximately 400 clients. At any point in time I represent between fifty and eighty clients. Prior to working in the Prince George's County office, I worked as an Assistant Public Defender in New York City for five and a half years.

2) As a matter of procedure, if a defendant is held by the Court following his initial appearance on a matter, the typical mechanism for contesting his pretrial detention is to file a motion in the District Court seeking a reconsideration of bond. The Court can grant the motion and order a hearing, or it can deny the motion summarily with no reason given. After a defendant is denied release—either by a summary denial of their motion or after a hearing in front of a Judge—the defendant can either file another bond reconsideration motion[1] or can file a petition for habeas corpus in the Circuit Court.

3) The Office of the Public Defender in Prince George's County has compiled a spreadsheet of pretrial detainees in Prince George's County (hereafter "Spreadsheet A"). Every attorney in the office has been told to fill out information pertaining to their clients including, *inter alia*, whether a motion for reconsideration of bond has been filed for any particular client. We have also been told to indicate whether any further motions or petitions for release have been filed after the initial reconsideration of bond motion.

4) The spreadsheet is revised every week. Each week, clients who are released from the jail are taken off the list. These cases are compiled in a separate spreadsheet with all the same data fields as Spreadsheet A (the spreadsheet of people released is hereafter "Spreadsheet B").

5) On April 14, 2020, I analyzed both spreadsheets for the purposes of this declaration. The following is an analysis of cases in which, according to Spreadsheets A and B, the Office of the Public Defender has filed a motion for reconsideration of bond or a petition for habeas corpus between March 16, 2020 and April 8, 2020.

6) My methodology for putting together this declaration is as follows. I have reviewed the case history on Secure Case Search[2] for every case in which Spreadsheet A or Spreadsheet B indicates our office filed a bond motion.[3] I have also included three cases that did not appear on either spreadsheet but were brought to my attention by the attorney who filed the motions.

---

[1] This is rarely done in normal circumstances as Courts discourage relitigation of bond status after a Judge has previously ruled on the matter. Supplemental filings are typically reserved for situations in which new developments in the case occur that justify reapplying for relief.

[2] Secure Case Search is a portal available only to the Courts and litigants who have been approved to access the portal. It is essentially a database that provides access to all the information regarding a case that the Clerk's office records.

[3] I cannot affirm that the spreadsheet is an exhaustive list of all cases in which a motion was filed as each individual attorney is required to indicate in the spreadsheet if they filed a motion.

7) For each case, I have noted the date of filing of any motions to reconsider bond,[4] how many days it took for the Court to rule on the motion, whether the Court granted a hearing, and how many days it took from the date the Court granted the hearing for the hearing to occur. I have also recorded the result of the hearing and information regarding any subsequent motions or petitions for relief. I have divided the motions for reconsideration of bond into three categories: motions for misdemeanor cases,[5] motions for felony cases, and motions for defendants charged with violations of probation. Across all three of these categories I have aggregated and analyzed the cases in which a defendant was eventually released pursuant to a Court order. I have also aggregated information regarding petitions for writs of habeas corpus from Case Search.[6]

**Delay in Misdemeanor Cases**

8) There are 29 misdemeanor cases in the data set. In six of these cases, the Court summarily denied the initial motion for reconsideration of bond without a hearing. While most of the summary denials occurred within two days of filing, in two of the cases it took the Court thirteen days to summarily deny the motion.[7] In one case the Office of the Public Defender filed a supplemental motion seeking relief after denial of the initial motion. That motion has been pending with no action for six days.

9) In total there were 25 misdemeanor cases in which the Court ordered a hearing at some point, whether upon an initial motion or a supplemental filing.

10) In these 25 instances in which a hearing was ordered, the Court took an average of 4.46 days after the filing of the motion to order a hearing.

11) Once the Judge granted a hearing in these cases, the delay between the hearing being ordered and the hearing taking placed can be as much as eight days. On average, the delay between a hearing being ordered and the hearing actually occurring was 3.77, or basically 4, days.

---

[4] For most cases, I have used the filing date noted in Secure Case Search. However, occasionally the clerks do not input the date the motion was filed and only note when the motion was ruled on. In these cases, I have used the filing date input into the Spreadsheets by the attorney who filed the motion.

[5] Misdemeanor cases are cases in which the highest initially-charged crimes were misdemeanors or cases that began as felonies but were reduced to misdemeanors after the government dismissed the felony charges.

[6] Although the data held by the Case Search system is less robust than that of Secure Case Search, Case Search was used for information regarding the petitions for habeas corpus because habeas petitions are filed in Circuit Court and Secure Case Search does not work for Circuit Court cases.

[7] This is important because typically a Circuit Court will deny a petition for habeas corpus if there is a bond reconsideration motion pending. Accordingly, these delays in receiving a denial cause additional delays in seeking out further relief.

12) Thus, for defendants whose cases were reviewed at a bond hearing, the average duration from the date of the filing of the original bond reconsideration motion to the hearing occurring was 8.72, or almost nine days.[8]

## Felony Cases

13) The Office of the Public Defender has filed 20 motions for reconsideration of bond for defendants charged with felonies.  In twelve of these cases the initial motion was summarily denied without a hearing being ordered.  Of those twelve summary denials, three clients eventually received hearings and were released after the Office of the Public Defender filed a supplemental motion.  In seven cases the initial reviewing Judge ordered a hearing. In one case, a motion was filed four days ago and still has not been ruled on.

14) In the ten cases in which a hearing was ordered, an average of four days passed between the filing and the hearing being ordered.  Once the hearing was ordered, it took an average of 4.2 days for the hearing to occur.

15) On average, in cases in which a hearing was ordered the delay between the initial filing of the motion and the hearing occurring was 8.2 days.

## Violations of Probation

16) When a person is sentenced to probation and later accused of violating their probation, a Judge determines whether to release the person pending their Violation of Probation hearing. The Office of the Public Defender has filed motions for release for four defendants accused of violating their probation.  In one of them, after six days, the Judge ruled on the motion and released the defendant.

17) In the other three cases, there has been no ruling on the motion.  These motions have been pending for six, 13, and 21 days respectively.

## Habeas Corpus

18) The Office of the Public Defender has appealed seven summary denials of motions to reconsider bond via a petition for habeas corpus.

19) I have reviewed the petitions for habeas corpus in these cases (five of which I personally filed). In five of these cases, the petitioner challenged their detention based on the dangers posed to them in the jail by the COVID-19 virus, the illegality of indefinite pretrial detention given the court closures, and the violation of Due Process that occurs when a defendant is held without an evidentiary hearing.  *See United States v. Salerno*, 481 U.S. 739, 755 (1987).

20) Additionally, one of the petitioners noted the serious danger he faced if exposed to COVID-19 due to his sleep apnea, asthma, high blood pressure and obesity.

---

[8] Note that this is not equal to the sum of the average time it takes a Judge to order a hearing (4.46 days) and the average time it takes the hearing to occur (3.77 days).  This is because this number includes cases in which a defendant was initially denied a hearing and received one after a supplemental filing, and the time between the initial denial and the supplemental filing in these cases is not accounted for in the computation of the other two averages.

21) All seven petitions for habeas corpus were summarily denied without a hearing.

**People Who Have Been Released**

22) The data set included 53 people across the three categories of pretrial detainees (those facing misdemeanor charges, those facing felony charges, and those facing violations of probation). Of these 53 people, 18 were released after filing a motion.  Twenty-five defendants who filed motions have been denied relief and are still held in jail. There are ten cases in which either the Court has yet to rule on the motion or a hearing has been ordered but not yet taken place.

23) For the 18 people released after filing a motion, the average delay between filing the motion that was granted and the Judge ordering a hearing was 5.61 days. The average delay between the Judge ordering the hearing and the hearing occurring was 3.5 days. For people eventually released, the average delay between their initial motion being filed and their release was 9.5 days.[9]

Under penalty of perjury, I declare that the above statements are true based on my personal knowledge.

Sincerely,



Ariel Schneller
April 16, 2020

---

[9] As in footnote eight, this number is slightly higher than the sum of the average time it takes a Judge to order a hearing and the average time it takes an ordered hearing to occur. This is because of cases in which the hearing was ordered upon filing of a supplemental motion.  As explained in footnote eight, the time between the denial of the motion and the filing of the supplemental motion is not accounted for in the computation of the other two averages.

# EXHIBIT 29

**Declaration of Claire Glenn, Assistant Public Defender**

1. My name is Claire Glenn.  I work at the Maryland Public Defender's Office as an Assistant Public Defender in Prince George's County, Maryland.  I am a resident of Washington, D.C.

2. As an Assistant Public Defender, I represent people accused of crimes in Prince George's County who otherwise could not afford a lawyer.  I represent clients in both the District and Circuit Courts in Hyattsville and Upper Marlboro, Maryland.  Six of my clients are currently detained in the Prince George's County Detention Center awaiting trial.

3. Having represented clients detained at the jail, both before and after the outbreak of COVID-19, I can attest to the following facts:

4. Prior to the COVID-19 outbreak, I was assigned to represent people in their initial bond hearings at the jail approximately five times per month.  In this role, I would go to the jail with a list of clients at 9:00 a.m., walk from housing unit to housing unit to interview each of those clients, and then appear for bond hearings at 1:15 p.m.  For these bond hearings, I would appear with my client in the jail's mini-courtroom, both of us appearing over a large computer monitor in courtroom 261B in the District Court in Upper Marlboro.

5. Through bond hearings and regular visits to my incarcerated clients, I have become familiar with the jail, its layout, the various housing units, and their conditions.

6. The jail is shaped like a donut, with a courtyard in the middle, and one off-shoot hallway with additional housing units.  The housing units connected to this off-shoot hallway are known as "up the hill," because the off-shoot hallway is on an incline.

7. When you first enter the jail, there is a reception desk to your left, a waiting room to your right, and a security station directly ahead.  This security station is where the COs now do temperature scans.  The last time I had my temperature scanned, the CO did not appear to know how to use the scanner.  I was with several other attorneys, attempting to visit our clients.  The CO told us that she did not know how far the scanner was supposed to be from our foreheads.  When she scanned my forehead, the scanner lightly touched my face for much of the scan.  She did not clean the scanner in between scans of different people.  My scan, as well as the scans of several other attorneys, came back with the reading, "low."  The CO said that she did not know whether this meant our temperatures were low or the battery on the scanner was low.  She eventually gave up and let us all in, despite the fact that we had not received accurate temperature readings.

8. Once you pass through this first security station, you walk down an open-air hallway and into an atrium.  In the atrium, there is a second security station to your right, a stairway to

your left, the entrance to the prisoner areas of the jail straight ahead, and various doors to offices, the jail courtroom, the jail processing unit, and the IT offices.  The stairway leads up to the visiting booths for both attorneys and non-attorney visitors, including contact and non-contact visiting booths.  Prior to the Coronavirus, I would go upstairs to visit clients approximately once per week.

9.  When I am assigned to do initial bond hearings, I proceed through the second security station and then enter the prisoner areas of the jail.  To my right is the entrance to the processing unit, where prisoners wait to be processed in and out of the jail, and the jail's mini-courtroom.  As you proceed around the circular hallway, you pass the entrances to housing units 11B, 11A, 10, and 9 on your right.  The medical unit entrance is on your left.  Continuing on, you pass housing units 8 through 3 in descending order, as well as the kitchen and the gym.  After you pass housing unit 3, you can either turn left to complete the circle or turn right to go "up the hill" to housing units 1, 14, 15, 16, and 17.

10. Housing unit 1 is where all female prisoners are detained, with the exception of the medical unit.  All other housing units are for men and male-at-birth prisoners.  Housing units 5 and 6 are disciplinary isolation units.  Housing unit 6 is also used as a medical isolation over-flow unit, when the isolation cells in the medical unit are full.  Housing unit 8 is the initial housing unit, where prisoners are detained until they are cleared for tuberculosis.  Housing unit 11A is where juveniles are detained when they are not transported to a juvenile facility.  Housing unit 11B is a unit where people are detained when they have medical issues and health vulnerabilities, but the medical staff has determined they do not need to be housed in the actual medical unit.  This is also often where LGBTQ people are detained, particularly transgender and gender non-conforming people who were male at birth.  Housing unit 17 is the work unit.  Male prisoners that do not fit the above criteria are detained in housing units 7, 9, 10, 14, 15, and 16.  I'm not aware of any people presently detained in housing units 2, 3, or 4.  My understanding is that the mold got so bad in those housing units that they are no longer used at all.

11. Although the housing units are not identical, they all have similar layouts.  Generally, two correctional officers stand at a large desk against one wall, looking out towards the several dozen cells that wrap around the three remaining walls, one after the other.  In most housing units, cells wrap around the first and second floors.  The middle of the housing unit often includes several small tables with four stools each, all bolted to the floor, where people eat and play cards.  Many housing units also have plastic chairs where people can sit and watch television.  The phones are usually located against the wall near the correctional officers' desk, lined up with only about a foot or two of separation between them.  There also are usually about half a dozen showers in each housing unit, though usually there are a couple that have the least mold and the best water pressure that get the most use.

2

12. With the exception of the isolation units, most people are detained two per cell.  In some housing units, like housing units 8 and 17, there are not enough cells even when two people are detained in each cell.  In these housing units, some people must sleep on bunkbeds in the middle of the housing unit.  In these housing units, there are usually two or three dozen bunkbeds, set up in a tight grid with only a foot or two between beds.

13. The housing units have very poor circulation.  The jail struggles to regulate temperatures as a result, particularly during the winter and summer months.  In the winter months, for example, cells against outer walls will be freezing cold, while meeting rooms and attorney visiting booths will be so hot that sweat drips down my face and soaks through my clothing as I interview clients.  Most of the housing units also have large dark patches of mold that cover the ceilings and grow on the walls.  The air in the housing units is often very stale and musty.

14. As noted, the jail also has a "medical unit."  When you first enter the medical unit, there is a large holding cell with benches to your right, where people from other housing units who have requested a sick call sit together while waiting to be seen by the nurse.  There is also a nurses' station and several nurse offices.  To the left is the housing area of the medical unit.  The housing area is divided in two sides that roughly mirror each other, with a command center bubble in the middle.  Both sides contain a ten-person cell, which is an open cell with ten single beds lined up shoulder to shoulder in two rows.  Both sides also contain isolation cells.  Prior to the COVID-19 pandemic, the sides were roughly sex-segregated – one ten-person cell for male prisoners and one ten-person cell for female prisoners – although male prisoners would at times be detained in isolation cells on the "female side."

15. The jail generally is an unsanitary place, with grimey doors and handles that are frequently touched, and stains on the ceilings and walls.  Dust bunnies frequently tumble across the floors and accumulate in corners.  The places where people are detained in isolation – in the medical unit and housing units 5 and 6 – are particularly unsanitary.  The walls of the isolation cells frequently contain blood, feces, and mucus, and they smell horrible.  There are often unknown substances smeared across the cell door and window and crusted onto surfaces.

16. As a criminal defense attorney, I have a legal and ethical duty to communicate with my clients.  My clients, in turn, have constitutional rights to communicate with me.  Although my caseload can be a constraining factor, I work hard to stay in regular communication with all of my clients, particularly those who are incarcerated.  Prior to the COVID-19 pandemic, I would visit clients at the jail approximately once per week.  To visit my clients, I would sign in, provide my ID and client list to the receptionist, and proceed to the appropriate attorney visiting booth.

17. In response to the pandemic, the jail has severely limited my ability to communicate with my clients, even prohibiting me from speaking to certain clients entirely.  For example, one of my clients was not permitted to call me for the entire week that he was detained in an isolation cell in the medical unit awaiting his COVID-19 test results.  He was detained in the isolation cell starting on March 28, 2020, where his requests to speak to me were denied.  I was first denied my request to speak to him on March 31, 2020.  Between March 31, 2020, and April 4, 2020, I called the jail every day, multiple times per day, to request to speak to my client and complain when my requests were denied.  Each day, my calls would be transferred from jail official to jail official.  Sometimes I would be promised that my client would call soon, sometimes I would be told I could not speak to my client at all, with no end in sight.  One official at the jail even told me, untruthfully, that my client had been given access to a phone and simply did not want to call me.  Finally, on Saturday, April 4, I was told that I would only be permitted to communicate with my client if I came to the jail and agreed to be locked into his isolation cell with him.  Only after I agreed to come and be locked in my COVID-positive client's cell did the jail then change its mind and allow him to call me that afternoon.

18. If I hadn't attempted to call that client on March 31, I never would have known that he was symptomatic, being tested for COVID, and being denied access to any form of communication with me or his loved ones.  I suspect there are other individuals being detained in the medical unit isolation cells being denied any ability to communicate with their attorneys and loved ones and we simply don't know.

19. Because the jail is now on lock-down status, I have been notified by numerous COs and Shift Commanders that I am now only permitted to speak with my clients during their one hour of daily recreation time.  This policy forces my clients to choose between taking a shower, cleaning their cells, calling their loved ones, and speaking to their attorney.  In addition, even if my client foregoes all other options to speak to me in that one precious hour, a full hour is not always sufficient time to discuss everything I need to discuss with a client.  This policy has also presented problems when a client's one hour of recreation time is from midnight to 1am, when a client's one hour of recreation time falls during I time I am appearing in court over video conference, or when two of my clients have recreation at the same time.  On more than one occasion, I have had to prematurely end a phone call because my client's recreation time had expired and the COs were ordering him to his cell.  When this has happens, there is nothing I can do but wait until my client's next opportunity to resume our conversation, whenever that may be.

20. In order to communicate with an incarcerated client, I take the following steps: (1) look up which housing unit the client is in; (2) wait until after shift change and call that housing unit's desk; (3) request to speak to my client and provide my phone number to the correctional officer; (4) wait for that client to call me back.  About half of the time, my client will not call me, and I will call the housing unit back an hour or so later to ask about the delay.  Some correctional officers will tell me my client will be calling soon,

4

but most often, they will tell me that I cannot speak to my client until the next one-hour of recreation time, whenever that might be. Recently, attorneys in my office were notified that we now need to make requests to speak to our clients a day in advance, and that our clients will then be provided our phone numbers and call us during their recreation time the following day. To my knowledge, even attorneys who request a phone call a day in advance still often do not hear from their clients the following day.

21. Of course, this phone policy only works if my clients have working PID numbers with which to make calls. Numerous people have recently reported problems with their phone PID numbers, and some have only been able to speak to me by borrowing another person's PID number. Clients tell me they have complained and filed grievances, but the jail has responded to their complaints with incredulity and slowly if at all. Only when I have been notified and been able to contact the jail or when a conscientious correctional officer has stepped up to advocate for a person has anything been done, and many of my clients have gone weeks without having a working PID number to contact their attorney and loved ones. In addition, people who have used someone else's PID number because they had no other way to speak to me report being threatened by jail officials that they will be "thrown in the hole" and charged with telephone misuse.

22. Over the past month, I have had numerous conversations with clients detained at the jail and have taken declarations from seven different people detained at the jail. Those I have spoken with have uniformly reported that the jail has failed to provide them with information about what COVID-19 is, how it spreads, and how detained people can protect themselves. It has become clear to me that the jail's policies have been focused on keeping detainees in the dark, rather than keeping them safe.

23. The jail has also kept the public in the dark. As far as I am aware, the jail has not made a public statement regarding the conditions at the jail and the number of COVID-positive cases since announcing on April 4 that three detained people and one correctional officer had tested positive. Based on reports from people detained at the jail, there currently are well-over a dozen COVID-positive people detained at the jail. There are also many, many more people who are symptomatic, who the jail has refused to test or isolate. Based on the declarations I took, it is clear to me that the jail is actively ignoring and dismissing the serious symptoms of detainees in order to avoid having to quarantine them, test them, and acknowledge the true scale of this outbreak. For example, Declarants 1, 2, and 4, describe being symptomatic, but having their symptoms ignored or downplayed by correctional officers and medical staff for days before finally being moved to the medical unit. Declarant 3 describes how he had to self-identify as the cellmate of another COVID-positive person before his symptoms were taken seriously. The declarations also indicate that requests for hospitalization or even medical attention beyond a temperature scan have been routinely denied. It seems to me the jail is much more concerned with its public image than with the health and safety of my clients.

24. It has also become clear that the jail has adopted a policy of illegally detaining people for no other reason than that they have tested positive for the Coronavirus.  For example, [Declarant #1]'s bond was paid on April 3.  But the jail refused to release him until April 16.  In response to the Coronavirus pandemic, I filed two bond motions for [Declarant #1], and after those were denied, requested a bond review hearing for a third time.  At this third hearing, the Court granted [Declarant #1] a bond of $5,000 with the option of paying ten percent to the Court on April 1.  Because the courtroom clerk did not put the ten percent option into the computer system until two days later, [Declarant #1]'s bond could not be posted until April 3.  After he was not released on April 3, I called the jail.  Jail officials informed me that [Declarant #1] would not be released unless and until someone came to the jail to pick him up and verify that he would be taken to a place where he could quarantine.  Because his family is medically vulnerable, however, they could not pick up [Declarant #1] or house him, though they desperately wanted him home.  Over the next thirteen days, I spoke with multiple officials at the jail, as did the head of my office, and the jail refused to release [Declarant #1].  The jail also refused to provide a date certain on which [Declarant #1] would be deemed no longer contagious and would be released, thus his illegal detention appeared to be indefinite.  I filed an emergency petition for habeas corpus on April 14 in the Prince George's County Circuit Court.  On April 15, I was notified by chambers that the petition would not be heard until April 21.  I requested an earlier hearing date, but that request was denied by chambers.  On April 16, Deputy County Attorney Joseph Ruddy emailed the Court and me that [Declarant #1] had been released and the habeas petition was moot.  Upon his release, [Declarant #1] rode the bus to a friend's house where he was able to stay.  Had he been released on April 3, when he posted his bond and was still symptomatic, he would have sought treatment at a local hospital.

25. As another example, [Declarant #3] was given a bond which he promptly paid on March 31.  Unbeknownst to his attorney, however, he was COVID-positive, and so the jail continued to detain him and refused to serve him with his two outstanding warrants.  I only became aware of this issue because [Declarant #1] notified me.  I spoke to [Declarant #3], notified his attorney, and filed a motion for appropriate relief on his behalf on April 7, which was heard on April 9 after I begged the court to hear me although the motion had yet to be docketed by the Clerk's Office.  The Court ordered the jail to serve him, but it is my understanding that to date, [Declarant #3] has not been served with any paperwork.  The Commissioner appears to have held an initial appearance hearing at which [Declarant 3] was not present, and on April 14, the Court held a bond hearing at which he was not permitted to be present.  At this time, it is unclear when he may be served or be permitted to be present for a hearing.

26. At this point, I have spent hours on the phone with various employees and officials at the jail, complaining to them about the jail's conditions, the treatment of my clients, the limited access my clients have to phones and attorney communications, and the illegal detention of COVID-positive individuals.  I have also complained to the nurses and

correctional officers about the deficient medical attention my clients have received.  To my knowledge, no responsive actions have been taken.

27. To be clear, I have heard from my clients how kind some correctional officers have been in the face of this crisis.  I have also heard from my clients how cruel others have become.  Many of these cruelties have been attested to by incarcerated declarants.  Whether on 23-and-1 lockdown or in full isolation, my clients are more vulnerable now than ever to abuses of power.  While some of them have filed grievances, many have been too afraid of retaliation.  Others have had their requests for grievance forms denied by correctional officers.  I have also heard that some people put together a collective petition complaining about the conditions at the jail.  But to my knowledge, the jail has not responded to this petition.

28. My clients in different housing units report varying and inconsistent practices regarding cleaning, social distancing, personal protective equipment, and sanitation supplies.  This suggests to me that the jail does not have a clear, uniform safety protocol or that it is not being followed.  I am not aware of any public statements, written or oral, outlining what specific safety policies and procedures have been adopted in response to this pandemic.

29. Given these conditions, I have been working diligently to get as many of my clients released as possible, as soon as possible.  I have filed over 20 bond motions in response to the Coronavirus.  Throughout this pandemic, I have represented my own clients, as well as some of my colleagues' clients, in dozens of bond hearings in person and over video conference.  In my experience, the District Court has been slow to respond to this crisis, and has been overwhelmed with the number of defense attorneys' requests for bond hearings.

30. For example, I filed bond motions for three clients on March 16, 2020, in light of the Coronavirus pandemic.  On March 19, 2020, the Court held a hearing on those motions without notice to me or the jail, so neither the defendants nor their attorney were present.  The Court denied all three of my motions, though I do not know on what basis.  On March 20, I filed a second bond motion for each of those three clients.  Two of these motions were set for hearings on March 30, and then rescheduled to March 31 so that I could be present, at which point my clients were released by the Court.  One of these motions wasn't set for a hearing until April 1, at which point bond was revised and my client was released.  Thus, even for the clients that have been released from the jail, it has taken multiple filings and multiple weeks before the Court held a bond review hearing and granted release.

31. Many of my clients continue to be detained without bond or are awaiting release by the Pretrial Services Agency.  For example, one of my clients has the option of release to Pretrial Services.  After his arraignment on April 9, I called Pretrial Services to ask why he had not been released to their supervision and provide them with his verified address.

Pretrial Services informed me that they had never realized the Court had provided the option of release to their supervision, and so had not reviewed his case at all.  They then informed me that they would look into his case.  I called back on April 15 to follow-up, and Pretrial Services notified me that because this client had since tested positive for COVID-19, Pretrial Services will no longer release him to their supervision.  In addition, because this client is currently detained in an isolation cell at the medical unit, I have no way to communicate with him.  The jail refuses to let him call me, and today informed me that he will not be able to use the phone until he is moved out of the isolation cell at some unknown time in the future.

32. The Court has ordered Pretrial Services to supervise one of my other clients.  This is distinct from merely having the option of release to Pretrial Services, where Pretrial Services has discretion to release someone or not.  Despite the Court's order to Pretrial Services, my client remains in jail because he has a pending case in another county, and thus Pretrial Services refuses to release him.  Pretrial Services has informed me that it is their policy not to supervise individuals who have cases pending in other counties, even when ordered to do so by the Court.

33. Pretrial Services has also informed me that because they are so overwhelmed with the number of people the Court has ordered them to supervise, they have had to back-burner all those individuals with merely the "option" of release to Pretrial Services.

34. As another example, I have a client who has sarcoidosis and thus is very medically vulnerable.  He is currently detained because he cannot afford to pay at $500 bond.  I filed a bond motion for him on April 14.  Today, I was notified that his case is not scheduled for a hearing until April 22, more than a week after the motion was filed.

35. To my knowledge, all Covid-19 emergency bond-review motions filed by my office seek either release or a reduction in release conditions. To my knowledge, no Covid-19 emergency bond review motions filed by my office seek to change conditions of confinement at the Prince George's County Department of Corrections.

36. It has been difficult to take the declarations of my clients.  Clients have broken down sobbing on the phone with me.  When I read back a declaration to one client, he had to put the phone down and step away because he was so distraught.  Another client then picked up the phone, and told me the declarant needed time to compose himself before we could continue reviewing the declaration.  The declarant later explained to me that he was in shock hearing his words read back to him, in shock that the nightmare he has been living is a reality.

37. My clients are terrified.  I am terrified for them.  It is clear to me that there are many more COVID-positive people at the jail than the jail has publicly admitted.  It is clear to me that there are many more COVID-positive people at the jail than the jail has tested.  It

is clear to me that the image of security and order is more important to the jail than the safety, health, and bodily integrity of my clients.  It is clear to me that my COVID-positive clients are being treated like animals, that those who are tasked with caring for them are afraid to come anywhere near them, let alone provide them with the medical attention they need.

38. I have had anxious clients before.  Pending criminal litigation is anxiety-inducing for anyone.  But that is not what my clients fear.  My clients are afraid for their lives.  They are afraid that they are going to be infected.  They are afraid that they are going to be locked away indefinitely, without access to showers or telephones or fresh air, trapped in a room covered in blood, mucus, and feces.  They are afraid that they will be denied medical attention.  They are afraid that they will die.

39. In the face of these fears, it is difficult to tell a client again and again that the motion I filed is still pending, that they must wait a week or more before they can even have a hearing, that they likely will not even be present for the hearing over the television monitor, and I will have to call them back to tell them what ruling the Court made about the fate of their lives in their absence.


I declare under penalty of perjury that the foregoing is true and correct.




_____cg_____
Claire Glenn, Esq.
Assistant Public Defender
4990 Rhode Island Avenue, Room 345
Hyattsville, MD 20781
(240) 582-4202
claire.glenn@maryland.gov
CPF# 1902280002

# EXHIBIT 30

### Declaration of Dr. Jaimie Meyer

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

## I.      Background and Qualifications

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine.  I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut.  In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility.  Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the National Institute of Health ("NIH"), industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in hardware-secure facilities (jails and prisons) and in the community under supervision (probation and parole).  I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and other entities.  I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system.  My published writings include book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. I was paid $200 per hour for my time reviewing materials and preparing this declaration.

6. I have not testified as an expert at trial or by deposition in the past four years.

7. In addition to my knowledge, training, education, and experience in the field of prison healthcare and infectious diseases, and the resources relied upon by experts in infectious

1

diseases and prison health, I also reviewed specifically the Centers for Disease Control and Prevention ("CDC") guidance on management of COVID-19 in correctional facilities (available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html), the Bureau of Prisons (BOP) modified operations plan (available at https://www.bop.gov/coronavirus/covid19_status.jsp), the National Commission on Correctional Health Care ("NCCHC") materials on COVID-19 (available at https://www.ncchc.org/COVID-Resources), and the World Health Organization interim guidance on Preparedness, prevention and control of COVID-19 in prisons and other places of detention (available at http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1).

## II.    Profile of COVID-19 as an Infectious Disease[1]

8.   The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19.  The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces.  People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve.  In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet.  Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the general public.  Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer.  People in prison and jail will likely have even less access to these novel health strategies as they become available.

9.   Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[2]  Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver

---

[1] This whole section draws from Brooks J.  Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.
[2] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

disease, and diabetes, and older age.[3]  Death in COVID-19 infection is usually due to
pneumonia and sepsis.  The emergence of COVID-19 during influenza season means that
people are also at risk from serious illness and death due to influenza, especially when
they have not received the influenza vaccine or the pneumonia vaccine.

10. The care of people who are infected with COVID-19 depends on how seriously they are
ill.[4]  People with mild symptoms may not require hospitalization but may continue to be
closely monitored at home.  People with moderate symptoms may require hospitalization
for supportive care, including intravenous fluids and supplemental oxygen.  People with
severe symptoms may require ventilation and intravenous antibiotics. Public health
officials anticipate that hospital settings will likely be overwhelmed and beyond capacity
to provide this type of intensive care as COVID-19 becomes more widespread in
communities.

11. COVID-19 prevention strategies include containment and mitigation.  Containment
requires intensive hand washing practices, decontamination and aggressive cleaning of
surfaces, and identifying and isolating people who are ill or who have had contact with
people who are ill, including the use of personal protective equipment.  Jails and prisons
are totally under-resourced to meet the demand for any of these strategies.  As infectious
diseases spread in the community, public health demands mitigation strategies, which
involves social distancing and closing other communal spaces (schools, workplaces, etc.)
to protect those most vulnerable to disease.  Jails and prisons are unable to adequately
provide social distancing or meet mitigation recommendations as described below.

12. The time to act is now.  Data from other settings demonstrate what happens when
detention centers, jails and prisons are unprepared for COVID-19.  Recent outbreaks of
COVID-19 in jails in Chicago and New York demonstrate how easily the virus enters
facilities and rapidly spreads to detainees and staff when community epidemics are
widespread, even when the best possible infection preparedness plans are in place.

## III.   Heightened Risk of Epidemics in Jails and Prisons

13. The risk posed by infectious diseases in jails and prisons is significantly higher than in
the community, in terms of risk of transmission, exposure, and harm to individuals who
become infected. There are several reasons this is the case, as delineated further below.

14. Globally, outbreaks of contagious diseases are all too common in closed detention
settings and are more common than in the community at large.  There are numerous

---

[3] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan,
China: a retrospective cohort study.*  The Lancet (published online March 11, 2020),
https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[4] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of
Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention
(March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-
management-patients.html.

examples of infectious disease outbreaks in closed detention settings, including tuberculosis, measles, influenza, and HIV.

15. Prisons and jails are not isolated from communities.  Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities.  Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities.  People often need to be transported to and from facilities to attend court and move between facilities.  Prison health is public health.

16. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share bathrooms, showers, and other common areas, the opportunities for transmission are even greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing.  When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community.  For many in jail or prison, social distancing is a physical impossibility.  Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and contracting infectious diseases.

17. During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable.  Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings.  High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this often is not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

18. Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.  Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye shields.  Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak. Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

19. Disciplinary segregation or solitary confinement is not an effective disease containment strategy.  Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death.  In addition, if solitary confinement is a carceral facility's response to COVID-19, people who are ill will be deterred from reporting their symptoms, resulting in their increased risk of severe disease and death and ongoing spread to others.

20. People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[5] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

21. Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases. Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases.  This includes access to testing equipment, laboratories, and medications.

22. Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

23. As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.  Absenteeism also means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions.  As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

24. Prisons were designed to contain people, not diseases.  When even the most sophisticated hospital systems in this country have been overwhelmed by the COVID-19 pandemic, it will be impossible for prison health systems to contain it.  This is especially true when emergency preparedness plans are underdeveloped.  These risks have all borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths. Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed.  During

---

[5] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.   Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

## IV.    Risk of COVID-19 in the Prince George's County Correctional Center in Upper Marlboro ("Prince George's County Jail")

25. In making my assessment of the danger of COVID-19 in the Prince George's County Jail, I have reviewed 27 declarations by prisoners there describing the conditions of that facility, particularly as it related to the prevention and treatment of COVID-19.

26. Based on my review of these declarations, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that this facility is dangerously under-equipped and ill-prepared to prevent and manage the spread of COVID-19, which is already spreading throughout the jail.

27. One of the most critical infection control measures in correctional settings is to accurately identify people who are ill and medically isolate them from the general population.  The purpose of medical isolation is to ensure that people who are ill with COVID-19 receive adequate medical attention and that transmission of the disease to others is prevented. This is especially important in COVID-19 because the average person with COVID-19 infects 2-3 others including before symptoms develop, and likely more in highly congregate settings. According to the CDC, accurate identification of people with COVID-19 requires regular symptom screening and temperature checks.  The CDC recommends that people receive regular symptom screening and temperature checks on entry into a facility and throughout the course of detention when there has been a known exposure to someone who is ill.  People who have been exposed to COVID-19 but are not yet ill are supposed to be in quarantine where they can be closely monitored for symptoms.  In the Prince George's County Jail, quarantine is operationalized as a unit-wide 23-hour lockdown. Still, monitoring measures are being implemented in highly problematic ways in the Prince George's County Jail, according to the 27 declarations I reviewed.

   a.  Prisoners are completely deterred from reporting symptoms and some are "trying to hide their symptoms" because (1) there is a $4 charge for sick call; (2) at times no sick call slips are available; (3) prisoners have heard that conditions in medical isolation are poor; and (4) the disease is highly stigmatized by other inmates and staff.  Even for people who can report their symptoms and afford the cost of sick call, there is often a significant delay in obtaining a medical visit.  These delays are unacceptable and will result in ongoing transmission within housing units and high risk for complications of COVID-19 among those who are infected, including death.

   b.  While it does seem that temperature checks are being performed at least once daily in housing units where exposure has occurred, the ways in which they are

6

being done will only contribute to the spread of disease.  For example, inmates describe that the nurse does not change gloves between temperature checks and the thermometer is not cleaned between uses.  Some inmates are asked to put their faces up to a slot in the door to undergo temperature screening.  Given that this is a virus that can survive for days on inanimate surfaces, there is high likelihood that nurses' gloves, thermometer covers, and door slots are contaminated and can themselves be a vehicle for transmission from person to person.

c.  Several declarations also make clear that inmates who feel ill must make multiple and repeated requests before they receive medical attention.  If people are not being efficiently flagged for medical evaluation and isolation, they may experience progression of disease while continuing to transmit the virus to others in the general population.

28.  According to the CDC, infection prevention for COVID-19 requires no-cost access to soap and water for handwashing and frequent cleaning and disinfecting of high-touch surfaces with products containing bleach or at least 60% alcohol.  Prisoners' declarations reflect that soap is not being provided freely and is only available through the commissary and delivered weekly.  Indigent prisoners who are unable to afford soap are reportedly trading food trays to obtain soap, which is completely unacceptable from a health perspective.  Prisoners also have minimal access to clean and functioning sinks, even in the medical unit where there are individuals with COVID-19 infection.

29.  Prisoners in the Prince George's County Jail also have restricted access to materials for cleaning and disinfection and are provided only a spray bottle of water and a paper towel.  Although some prisoners have reported gaining access to Spray Nine, which is on the EPA's list of agents effective against COVID-19, it is only intermittently doled out by correctional officers and prisoners must clean without gloves.  Disinfecting products are also only allowed to be used, if it all, during the one hour in which quarantined inmates are allowed out of their cells.  Inconsistent access to hygiene and disinfection measures will result in widespread infection throughout the facility.

30.  Another key infection prevention strategy for COVID-19 involves social distancing, which can be nearly impossible in highly congregate correctional settings, especially when it is not well communicated or enforced.  Although prisoners' declarations suggest every other phone is "taped off" to encourage social distancing, this is essentially meaningless when phones are structurally placed so close together that inmates are still within an arm's reach of one another, and since phones are not always disinfected between users.  With only 1 hour per day to use phones, it may be hard to enforce social distancing since prisoners need to congregate to use this precious resource.  While 23-hour lockdown and staggered recreation may provide some social distancing measures, they are ineffective for infection prevention and control in the absence of other public health-oriented strategies and may be perceived as punishment.  They are particularly problematic when inmates are locked down in poorly ventilated spaces that are shared closely with others, which may contribute to disease transmission from people who are infected with COVID-19 but have not yet developed or reported symptoms.  Moreover, one declaration reflects the jail has turned off the air conditioning in its housing unit,

purportedly to prevent the spread of COVID-19 through recycled air. I am aware of no science that supports this. To the contrary, to prevent the spread of droplet-borne diseases, spaces should be well-ventilated, and air conditioning would promote air flow. In addition, un-air-conditioned spaces are unhealthy in their own right and can exacerbate other health conditions, including asthma. Lockdown can be important from a public health standpoint to enable social distancing during a pandemic but should be used only as a last resort and in a time-limited way (CDC recommends quarantines last no longer than 14 days) that is communicated clearly to the residents.  Staggered recreation is an evidence-based strategy for improving social distancing that is recommended by the CDC but is not useful to prevent the spread of disease if recreation is staggered with different individuals each day (i.e. different groups of 10).

31. Once someone develops symptoms suggestive of COVID-19, they require medical isolation.  This is distinct from disciplinary isolation because it involves ongoing medical attention and receipt of medical care; it should not be delivered in a way that is or can be perceived as being punitive.  A majority (80%) of people with COVID-19 infection will develop mild symptoms, including fever, nausea/vomiting/diarrhea, body aches, fatigue, cough, and headaches, and will be able to recover with supportive care (which involves rest, hydration, and acetaminophen as needed for fevers).  Although these symptoms are not technically life-threatening they may still be uncomfortable and require medical management.  Yet the declarations I reviewed suggest not even this minimal amount of care is being provided and, instead, prisoners are given Claritin- a decongestant that is entirely useless for COVID-19.

32. During the course of COVID-19 infection, approximately 20% of people will require hospitalization, 5% will require intensive care, and 1-2% will die.  Severe disease and complications are more likely in individuals with predisposing risk factors, including age, chronic lung disease, chronic liver disease, chronic kidney disease, pregnancy, and suppressed immune systems.  Prisoners in general and those specifically in the Prince George's County Jail are more likely than people in the general population to experience these conditions and are therefore more likely to experience severe disease and death from COVID-19.  Progression of respiratory symptoms in COVID-19 can be extremely rapid, within 24 hours, requiring hospitalization, so people in medical isolation need to be diligently monitored for clinical worsening.  Yet the prisoners' declarations in the Prince George's County Jail describe a lack of medical attention that is highly concerning and suggests that medical staff do not have the necessary staffing, training, or resources to identify when people require hospitalization.  Some nurses are described as focusing exclusively on taking temperatures of COVID-19 patients, while ignoring other medical issues (such as nosebleeds) that may be signs of complicated COVID-19 disease and warrant further evaluation. The delays in access to care that already exist in normal circumstances will only worsen during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.  This may result in preventable deaths and undue harm.

33. Medical isolation units should be hygienic and safe in a way that promotes health. In contrast, the prisoners describe unsafe isolation cells, at times without staff present inside the housing unit, and filthy living conditions, including dried blood and feces on walls

and floors of isolation cells.  Some describe not having access to clean sheets and one described having to pull his used sheets out of a red biohazard bag for reuse.  These conditions are not only inhumane but also unhealthy.  In addition to spread of COVID-19, people in these medical isolation units are therefore at risk of exposure to other diseases, including HIV and Hepatitis C.  Medical isolation seems like disciplinary segregation when people feel "like they're being punished for having COVID-19." These conditions deter other individuals from reporting symptoms for fear they may end up in isolation.

34. People who test positive for COVID-19 may be medically isolated in a cohort with other confirmed cases, which is appropriate per CDC guidance only when single isolation units are occupied.  Importantly, however, isolation should be time-limited and this time limit should be evidence-based and communicated clearly to residents.  The practice in the Prince George's County Jail of isolating COVID-19 patients for a uniform 14 days is inconsistent with CDC guidelines, which recommend that isolation end once at least 7 days have passed since symptoms first appeared, at least 3 days have passed without fever or the need for fever-reducing medications, and respiratory symptoms are improving.  Most COVID-19 patients will meet these criteria within 14 days but for those who require more time to meet criteria, there is the risk that they could be prematurely released from isolation to the general population and transmit the disease to others. Isolation end dates need to be clearly communicated to residents to avoid the perception that isolation is punitive.

35. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.  Some individuals' declarations in the Prince George's County Jail have reported delays in accessing life-saving treatment, including inhalers for asthma and medications for seizures.

36. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.  Failure to provide adequate mental health care, as when health systems in jails and prisons are taxed by COVID-19 outbreaks, as appears to be the case at the Prince George's County Jail, will result in poor health outcomes.  Moreover, mental health conditions are exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation. Anxiety will be especially high when people are unable to voice their concerns, as evidenced by the inmates' declarations in this case that they have been unable to file grievances because they were denied access to the appropriate forms or because they feared retaliation by the correctional officers.

## V.  Conclusion and Recommendations

9

37. For the reasons above, it is my professional judgment that individuals placed in the Prince George's County Jail are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness and even death.

38. As such, from a public health perspective, it is my opinion that the Prince George's County Jail should act immediately to comply with the CDC Guidelines on the management of COVID-19 in correctional facilities.

39. It is also my strong opinion that the jail should evaluate individuals for release in order to reduce the population of the jail, since this is likely the only feasible way for the jail to satisfy both social distancing requirements and adequately monitor and attend to the health of its inmates, who may become rapidly and severely ill with COVID-19.

40. This is more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes, mental health conditions) or older age. They are in even greater danger in these facilities, including a meaningfully higher risk of death. While the CDC suggests that individuals over age 65 are at the highest risk for COVID-19 severity and death, emerging data suggests even individuals over age 50 are at an increased risk for COVID-19 severity and death.

41. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for COVID-19 in this facility is a matter of days, not weeks. As of April 15, 2020, the surrounding Prince George County reports 2,409 confirmed COVID-19 cases and 80 related deaths. Declarations from inmates suggest at least 14 people have confirmed COVID-19, and a corrections officer has apparently informed inmates that there are 77 COVID-19 cases at the jail. This is likely a gross underestimate by at least three-fold because of misinformation, underreporting of symptoms, and limited testing opportunities. It is also highly likely that there are already other individuals (both staff and inmates) in the facility who are infected and have not yet developed symptoms. The time to act is now.

42. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting not only those individuals, but the health of the wider community.

I declare under penalty of perjury that the foregoing is true and correct.

April 16, 2020                                          _____
New Haven, Connecticut                                  Dr. Jaimie Meyer

# EXHIBIT 31

**CURRICULUM VITAE**

**Name:**          Jaimie P. Meyer, M.D., M.S.

**Education:**

| | |
|---|---|
| B.A. | Dartmouth College (Anthropology) 2000 |
| M.D. | University of Connecticut 2005 |
| M.S. | Yale School of Public Health (Biostatistics and Epidemiology) 2014 |

**Career/Academic Appointments:**

| | |
|---|---|
| 2005-08 | Intern and Resident, Internal Medicine, NY Columbia Presbyterian Hospital, New York, NY |
| 2008-11 | Clinical and Research Fellow, Infectious Diseases, Yale University, New Haven, CT |
| 2010-12 | Postdoctoral Fellow, Center for Interdisciplinary Research on AIDS, Yale School of Public Health, New Haven, CT |
| 2012-14 | Instructor, Infectious Diseases (AIDS Program), Yale School of Medicine, New Haven, CT |
| 2014-present | Assistant Professor, Infectious Diseases (AIDS Program), Yale School of Medicine, New Haven, CT |
| 2015-present | Clinical Assistant Professor, Division of Primary Care/Health Systems in Nursing, Yale School of Nursing, New Haven, CT |

**Clinical Positions Held & Other Employment:**

| | |
|---|---|
| 1999 | Spanish Medical Interpreter, Boston Children's Hospital, Boston, MA |
| 2000-01 | Research Assistant, UCSF Immunogenetics and Transplantation Laboratory, San Francisco, CA |
| 2010-12 | Infectious Diseases Attending (per diem), Hospital of Saint Raphael, New Haven, CT |
| 2009-15 | Infectious Diseases Clinician, York Women's Correctional Institution, Niantic, CT |
| 2015- | HIV Clinician, Nathan Smith Clinic, New Haven, CT |
| 2018- | Faculty, Contemporary Management of HIV, Clinical Care Options |

**Board and other Certifications:**

American Board of Internal Medicine, Internal Medicine, 2008, 2018
American Board of Internal Medicine, Infectious Diseases, 2010
American Board of Preventive Medicine, Addiction Medicine, 2018
DATA 2000 DEA X waiver to prescribe Buprenorphine, 2010
REMS Certified implanter and prescriber for Probuphine, 2016

**Professional Honors & Recognition**

| | |
|---|---|
| A) | <u>International/National/Regional</u> |
| 2018 | Selected as Early Career Reviewer, NIH Center for Scientific Review |
| 2017 | Doris Duke Charitable Foundation Scholar |

2016    Fellow, American College of Physicians
2016    NIH Health Disparities Loan Repayment Award Competitive Renewal
2016    Selected for AAMC Early Career Women Faculty Professional Development
Seminar
2014    NIH Health Disparities Loan Repayment Program Award
2014    NIDA Women & Sex/Gender Differences Junior Investigator Travel Award
2014    International Women's/Children's Health & Gender Working Group Travel Award
2014    Patterson Trust Awards Program in Clinical Research
2013    Thornton Award for Clinical Research
2011    Bristol Myers-Squibb Virology Fellows Award
2006    John N. Loeb Intern Award
2005    Connecticut State Medical Society Award
2005    American Medical Women's Association Citation
2000    Hannah Croasdale Senior Award, Dartmouth College
1998    Palaeopitus Senior Leadership Society Inductee, Dartmouth College

B)    <u>University</u>
2014    Fellow, Women's Faculty Forum Public Voices Thought Leadership Program

## PROFESSIONAL SERVICE

### Journal Service:
<u>Reviewer</u>
2012-present (In alphabetical order): *Addiction Sci and Clin Pract, Addictive Behav Reports, AIDS Care, AIMS Public Health, American Journal on Addictions, American Journal of Epidemiology, American Journal of Public Health, Annals Internal Medicine, BMC Emergency Medicine, BMC Infectious Diseases, BMC Public Health, BMC Women's Health, Clinical Infectious Diseases, Critical Public Health, Drug and Alcohol Dependence, Drug and Alcohol Review, Epidemiologic Reviews, Eurosurveillance, Health and Justice (Springer Open), International Journal of Drug Policy, International Journal of Prisoner Health, International Journal of STDs and AIDS, International Journal of Women's Health, JAIDS, JAMA Internal Medicine, Journal of Family Violence, Journal of General Internal Medicine, Journal of Immigrant and Minority Health, Journal of International AIDS Society, Journal of Psychoactive Drugs, Journal of Urban Health, Journal of Women's Health, Open Forum Infectious Diseases, PLoS ONE, Public Health Reports, University of Wisconsin-Milwaukee Research Growth Initiative, Social Science and Medicine, SpringerPlus, Substance Abuse Treatment Prevention and Policy, Women's Health Issues, Yale Journal of Biology and Medicine*

2019-present  Section Editor: Sex and Gender Issues, *Journal of the International Association of Providers of AIDS Care (JIAPAC)*

### Grant Service:
<u>Reviewer:</u>
2020         Doris Duke Charitable Foundation Physician Scientist Fellowship Award
2019         NIH RFA-DA-19-025 HEAL Initiative: Justice Community Opioid
             Innovation Network (JCOIN) Clinical Research Centers

### Professional Service for Professional Organizations

2016-present  Fellow, American College of Physicians

2

2016-present  Member, AAMC Group on Women in Medicine and Science (GWIMS)
2013-2016     Member, American College of Physicians
2013-present  Member, InWomen's Network, NIDA International Program
2011-present  Member, American Medical Women's Association
2011-present  Member, Connecticut Infectious Disease Society
2009-present  Member, American Society of Addiction Medicine
2008-present  Member, Infectious Disease Society of America
2005-present  Member, American Medical Association
2005-2008     Member, New York State Medical Society

**Yale University Service**

2019-present  Core Faculty, Program in Addiction Medicine
2017-present  Affiliated Faculty, Arthur Liman Center for Public Interest Law, Yale Law
              School
2016-present  Leadership Council, Women's Faculty Forum, Yale University
2015-2016     Steering Committee, US Health and Justice Course, Yale School of
              Medicine
2014-present  Yale Internal Medicine Traditional Residency Intern Selection Committee
2013-present  Women in Medicine at Yale Mentoring Program
2013-present  Women in Science at Yale Mentoring Program
2012-present  Affiliated Scientist, Center for Interdisciplinary Research on AIDS
2009-2011     Preclinical Clerkship Tutor, Yale School of Medicine

*Individual Mentorship*
2020          Zoe Sernyak, Yale University: Summer internship
2020          Caroline Wortman, Cornell University: Summer internship
2020          Chevaughn Wellington, Quinnipiac School of Medicine: Capstone Project
              Advisor
2019          Callie Ginapp, Yale School of Medicine: Research Mentor
2019          Alissa Haas, Yale School of Public Health (EMD): Research mentor
2019          Emily Bail, Yale School of Nursing: APRN Clinical mentor
2018          Camila Odio, Yale Internal Medicine Residency Program: Research
              mentor
2018          Zoe Adams, Yale School of Medicine: Research mentor
2018          Yilu Qin, Yale Primary Care Residency Program, HIV Training Track:
              Research mentor
2018          Kaitlin Erickson, Yale School of Nursing: APRN Clinical mentor
2017-2019     Emily Hoff, Yale School of Medicine: Research mentor, Thesis mentor
2017          Lindsay Eysenbach, Yale School of Medicine: Research mentor, Summer
              project on Syringe Service Program
2017          Megan Carroll, Yale School of Public Health: M.S. Thesis advisor
              (Biostatistics)
2016-2020     Britton Gibson, Yale School of Public Health and Quinnipiac School of
              Medicine: Research mentor
2016          Ronnye Rutledge, Yale School of Medicine: MHS Thesis advisor;
              awarded IDSA Education and Research Foundation 2015 Medical
              Scholarship and Yale School of Medicine Medical Student Research
              Fellowship; earned School and Departmental Honors for Thesis
2015          Kelsey Loeliger, Yale Schools of Medicine and Public Health: M.D./Ph.D.
              Dissertation committee

3

| 2014 | Javier Cepeda, Yale School of Public Health: Ph.D. Research advisor/mentor |
| 2014 | Audrey Fritzinger, Yale PA Program: Thesis advisor; Received Honors for thesis |
| 2014 | Cecilia Dumouchel, Yale College: Summer internship |
| 2014 | Joan Chi-How, Yale School of Medicine: Internship |
| 2014 | Michelle Fikrig, Oberlin College: Summer internship |
| 2014 | Madison Breuer, Southern Connecticut State University: Internship |

**Public Service**

| 2019 | Consultant on Medication Assisted Treatment in Prisons, Vermont Department of Corrections, Addiction Health Services |
| 2019 | Expert Witness for Women in Prison Briefing, U.S. Commission on Civil Rights |
| 2018 | Consultant for SAMHSA State Targeted Response-Technical Assistance Consortium to address the opioid crisis, American Academy of Addiction Psychiatry |
| 2017 | Consultant on HIV Care in Prisons, United Nations Office on Drugs and Crime |
| 2017 | Scientific Advisory Board, HIV Prevention and Treatment in Cis-Gendered Women, Gilead Sciences, Inc. |
| 2016 | Consultant on Women's Health, Female Offenders Unit, Federal Bureau of Prisons |
| 2002 | "Medicine as a Profession" Fellow, Soros Open Society Institute |
| 1999 | Volunteer Spanish Medical Interpreter, Boston Children's Hospital |
| 1998 | Honorary Service Fellow, Costa Rican Humanitarian Foundation |

**Research Support**
**Ongoing Research Support**
ACTIVE
Investigator Sponsored Award (M161462)    PI: Meyer      7/1/2017-6/30/2020    1.8 calendar
Gilead Sciences, Inc.  $81,151 (FY1 Directs)
*Delivering HIV Pre-Exposure Prophylaxis to Networks of Justice-Involved Women*
Description: To leverage risk networks of CJ-involved women as a means of delivering PrEP and to evaluate the acceptability and feasibility of strategically delivering PrEP to network members.

Clinical Scientist Development Award      PI: Meyer      7/1/17-6/30/20  3.0 calendar
Doris Duke Clinical Foundation      $149,959 (FY1 Directs)
*Developing and Testing the Effect of a Patient-Centered HIV Prevention Decision Aid on PrEP uptake for Women with Substance Use in Treatment Settings*
Description: 1) To adapt a patient-centered HIV prevention decision aid to women with substance use entering treatment for substance use disorders. 2) Building on findings from Aim 1, to pilot test the effect of the adapted decision-aid intervention on PrEP uptake among women with substance use entering treatment for substance use disorders.

1 R21 DA042702-01A1      PI: Meyer      8/1/2017–7/31/2020 (NCE)    1.20 calendar

4

NIH/NIDA        $129,673 (FY1 Directs)
*Prisons, Drug Injection and the HIV Risk Environment in Kyrgyzstan*
Description: We propose to generate qualitative data from interviews with prisoners and prison staff and triangulate it with quantitative data from MATLINK within an analytical HIV risk environment framework which aims to: 1. Describe the individual-environment interactions that shape within-prison drug-related HIV risk practices and health expectations post-release; and 2. Measure how within-prison risk and other factors within the prison environment mediate engagement with OAT both within prison and after release.

H79 TI080561        PI: Meyer      11/30/2018–11/29/2023 1.20 calendar
SAMHSA        $389,054 (FY1 Directs)
*CHANGE: Comprehensive Housing and Addiction Management Network for Greater New Haven*
We will expand and enhance the local implementation of a community infrastructure that integrates housing, behavioral health, and addiction treatment services for highly vulnerable populations at-risk for or living with HIV (PARLWH), by virtue of their involvement in criminal justice (CJ) systems and/or engagement in sex work. The target population for CHANGE is CJ-involved PARLWH in New Haven, Connecticut who experience co-occurring homelessness, psychiatric, and substance use disorders.

Pilot Project Award      mPI: Willie, Meyer    10/01/19-09/30/20     0.24 calendar
Center for Interdisciplinary Research on AIDS (CIRA)        $29,993
*Optimizing PrEP's Potential in Non-Clinical Settings: Development and Evaluation of a PrEP Decision Aid for Women Seeking Domestic Violence Services*
This Type II hybrid effectiveness-implementation study seeks to adapt an existing PrEP decision aid to intimate partner violence (IPV)-exposed women seeking domestic violence services at two major Connecticut service agencies.  This study will: provide support for a PrEP decision aid that addresses the HIV prevention needs of IPV-exposed women; use implementation science to increase PrEP uptake; include DV agencies in intervention development and implementation; and improve understanding of PrEP scale-up by addressing implementation factors in the community settings that serve IPV-exposed women.

R01 MH121991  mPI: Meyer, Sullivan  01/01/2020-11/30/2024      1.8 calendar
NIMH   $374,816 (FY1 Directs)
*Identifying Modifiable Risk and Protective Processes at the Day-Level that Predict HIV Care Outcomes among Women Exposed to Partner Violence*
The main purpose of this study is to understand how exposure to intimate partner violence (IPV) affects women's abilities to self-manage their HIV on a daily basis (i.e., adhere to antiretroviral medication), engage in longitudinal HIV care, and achieve and sustain viral suppression. The project aims to build awareness of the IPV-health association and inform strategies/resources to promote resilience.


**Completed Research Support**
K23 DA033858        PI: Meyer      7/1/2012 – 11/30/2017        9.0 calendar
NIH/NIDA        $153,529 (FY1 Directs)
*Evaluating and Improving HIV Outcomes in Community-based Women who Interface with the Criminal Justice System*

The major goal of this project is to inform, adapt and test an intervention that will improve HIV treatment outcomes for community-based women who interface with the criminal justice system, either after release from jail or during community supervision.

Patterson Trust Awards Program in Clinical Research          PI: Meyer          1/31/14-10/30/15
*Disentangling the Effect of Gender on HIV Treatment and Criminal Justice Outcomes*

Bristol Myers-Squibb HIV Virology Fellowship Award          PI: Meyer          9/1/11-6/30/13

NIMH T32 MH020031          PI: Ickovics          7/2/10-6/30/12
*Interdisciplinary HIV Prevention Training Program*, Yale University School of Epidemiology and Public Health, Center for Interdisciplinary Research on AIDS
Role: Research Scientist

NIAID T32 AI007517          PI: Quagliarello          6/30/09-7/1/10
*Training in Investigative Infectious Disease*, Yale University School of Medicine, Section of Infectious Disease
Role: Research Scientist

## Publications
### Peer-Reviewed Journals
Azar M, Springer S, **Meyer J,** Altice F.  A Systematic Review of the Impact of Alcohol Use Disorders on HIV Treatment Outcomes, Adherence to Antiretroviral Therapy and Health Care Utilization.  Drug and Alcohol Dependence 2010, 112: 178–193.  *PMID 20705402.  PMCID: PMC2997193*

**Meyer J**, Springer S, Altice F.  Substance Abuse, Violence, and HIV in Women: A Literature Review of the SAVA Syndemic.  Journal of Women's Health 2011, 20(7).  *PMID 21668380.  PMCID: PMC3130513*

Chen N, **Meyer J,** Springer S.  Advances in the Prevention of Heterosexual Transmission of HIV/AIDS among Women in the United States.  Infectious Disease Reports, Special Issue: Women and Infectious Diseases 2011; 3: e6.  *doi: 10.4081/idr.2011.e6.  PMID: 23745166. PMCID: PMC3671603*

**Meyer J,** Chen N, Springer S.  HIV Treatment in the Criminal Justice System: Critical Knowledge and Intervention Gaps.  AIDS Research and Treatment 2011; 2011:680617.  *PMID 21776379. PMCID: PMC3137962*

Springer S, Spaulding A, **Meyer J,** Altice F.  Public Health Implications for Adequate Transitional Care for HIV-Infected Prisoners:  Five Essential Components.  Clinical Infectious Disease 2011; 53(5): 469-479.  *PMID 21844030  PMCID: PMC3156144.*

Chen N, **Meyer J,** Bollinger R, Page K.  HIV Testing and Prevention Behaviors among Latinos in Baltimore City.  Journal of Immigrant and Minority Health.  2012 Jan 20 (Epub).  *PMID: 22262410.  PMCID: PMC3389229*

**Meyer J,** Qiu J, Chen N, Larkin G, Altice F.  Emergency Department Use by Released Prisoners with HIV: An Observational Longitudinal Study.  PLoS ONE 2012; 7(8): e42416.  *PMID: 22879972 PMCID: 3411742*

**Meyer J,** Qiu J, Chen N, Larkin G, Altice F.  Frequent Emergency Department Use among Released Prisoners with HIV: Characterization Including a Novel Multimorbidity Index.  Academic Emergency Medicine 13 JAN 2013; 20(1):79-88.  *PMID: 23570481 PMCID: 3623800.*

**Meyer J,** Wickersham J, Fu J, Brown S, Sullivan T, Springer S, Altice F.  Partner Violence and Health among HIV-Infected Jail Detainees.  International Journal of Prisoner Health 2013; 9(3): 124-141.  *DOI: 10.1108/IJPH-03-2013-0011. PMID: 24376468  PMCID: PMC3873166.*

Althoff A, Zelenev A, **Meyer J**, Fu J, Brown S, Vagenas P, Avery A, Cruzado J, Spaulding A, Altice F.  Correlates of Retention in HIV Care after Release from Jail: Results from a Multi-site Study.  AIDS and Behavior 2013 Oct;17 Suppl 2:156-70.  *PMID: 23161210.  PMCID:  3714328.*

Chen N, **Meyer J**, Avery A, Draine J, Flanigan T, Lincoln T, Spaulding A, Springer S, Altice F.  Adherence to HIV Treatment and Care among Previously Homeless Jail Detainees.  AIDS Behav. 2013 Oct;17(8):2654-66. doi: 10.1007/s10461-011-0080-2.  *PMID: 22065234.  PMCID: PMC3325326*

Williams C, Kim S, **Meyer J,** Spaulding A, Teixeira P, Avery A, Moore K, Altice F, Simon D, Wickersham J, Murphy-Swallow D, Ouellet L.  Gender Differences in Baseline Health, Needs at Release, and Predictors of Care Engagement among HIV-positive Clients Leaving Jail.  AIDS and Behavior 2013 Oct;17 Suppl 2:195-202 *PMID: 23314801 PMCID: PMC3758427*

Chitsaz E, **Meyer JP**, Krishnan A, Springer SA, Marcus R, Zaller N, Jordan AO, Lincoln T, Flanigan TP, Porterfield J, Altice FL.  Contribution of Substance Use Disorders on HIV Treatment Outcomes and Antiretroviral Medication Adherence Among HIV-infected Persons Entering Jail.  AIDS and Behavior 2013 Oct;17 Suppl 2:118-27. doi: 10.1007/s10461-013-0506-0  *PMID: 23673792.  PMCID: PMC3818019*

**Meyer J,** Althoff A, Altice F.  Optimizing Care for HIV-infected People who Use Drugs: *Evidence-Based Strategies for Overcoming Healthcare Disparities.*  Clinical Infectious Disease 2013 Nov; 57(9):1309-17. Epub 2013 Jun 23. *DOI: 10.1093/cid/cit427.  PMID: 23797288.  PMCID: PMC3792721*

**Meyer J,** Zelenev A, Wickersham J, Williams C, Teixiera P, Altice F.  Gender Disparities in HIV Treatment Outcomes Following Release From Jail: Results From a Multicenter Study.  American Journal of Public Health.  2014 Mar; 104(3): 343-41.  *NIHMS: 581757.  PMID: 24432878.  PMC3953795.*

7

**Meyer J,** Cepeda J, Wu J, Trestman R, Altice F, Springer S.  Optimization of HIV Treatment during Incarceration: Viral Suppression at the Prison Gate.  JAMA Internal Medicine.  2014 May;174(5):721-9.  *PMID: 24687044 PMCID: PMC4074594*

**Meyer J**.  Capsule Commentary on Pyra et al. Sexual Minority Status and Violence among HIV Infected and At-Risk Women.  Journal of General Internal Medicine 2014 May 3 [Epub ahead of print].  *DOI: 10.1007/s11606-014-2857-2.  PMID: 24793727.*

Boyd A, Song D, **Meyer J**, Altice F.  Emergency Department Use among HIV-Infected Released Jail Detainees.  J Urban Health. 2014 Oct 21. [Epub ahead of print] *PMID: 25331820.  PMC4338130*

**Meyer J,** Cepeda J, Springer S, Wu J, Trestman R, Altice F.  HIV in people reincarcerated in Connecticut prisons and jails: an observational cohort study. The Lancet HIV 1(2): e77 - e84, November 2014, Early Online Publication, 10 October 2014. *doi:10.1016/S2352-3018(14)70022-0.  NIHMS ID: 636511.  PMID: 25473651 PMCID: PMC4249702*

How J, Azar M, **Meyer J**.  Are Nectarines to Blame?  A Case Report and Literature Review of Spontaneous Bacterial Peritonitis Due to *Listeria monocytogenes*. Connecticut Medicine January 2015 79(1): 31-36.   *NIHMSID #65446; PMCID: PMC4423821.*

**Meyer, J. P.,** Moghimi, Y., Marcus, R., Lim, J. K., Litwin, A.H., and Altice, F. L. Evidence-Based Interventions to Enhance Assessment, Treatment, and Adherence in the Chronic Hepatitis C Care Continuum. Int J Drug Policy. 2015 May 17. pii: S0955-3959(15)00135-8. doi:10.1016/j.drugpo.2015.05.002  *NIHMS692116.  PMID:26077144*

**Meyer J,** Cepeda J, Taxman F, Altice F.  Sex-Related Disparities in Criminal Justice and HIV Treatment Outcomes: A Retrospective Cohort Study of HIV-infected Inmates. American Journal of Public Health:  2015 Sep;105(9):1901-10. doi: 10.2105/AJPH.2015.302687. Epub 2015 Jul 16. NIHMS677862.  PMID: 26180958. PMC4529767

**Meyer J,** Womack J, Gibson B.  Beyond the Pap Smear: Gender-Responsive HIV Care for Women.  Yale J Biol Med (Focus Issue: Sex and Gender Health). 2016 Jun; 89(2): 193–203.  PMCID: PMC4918880

Bernardo R, Streiter S, Tiberio P, Rodwin B, Mohareb A, Ogbuagu O, Emu B,  **Meyer J.** Photo Quiz: A Peripheral Blood Smear in a Ugandan Refugee.  Journal of Clinical Microbiology.  2017 December 55(12): 3313-3314.

Peasant C, Sullivan T, Weiss N, Martinez I, **Meyer J.**  Beyond the Syndemic: Condom Negotiation and Use among Women Experiencing Partner Violence.  AIDS Care. 2016 Sep 2:1-8. PMID: 27590004.  PMCID: PMC5291821.

Peasant C, Montanero E, Kershaw T, Parra G, Weiss N, **Meyer J**, Murphy J, Ritchwood T, Sullivan T.  An Event-Level Examination of Successful Condom Negotiation Strategies among Young Women.  J Health Psychology: 2017 Jan 1:1359105317690598. doi: 10.1177/1359105317690598. [Epub ahead of print]  PMID: 28810400. NIHMS 842344.  PMC5561508.

Peasant, C., Sullivan, T.P., Ritchwood, T.D., Parra, G.R., Weiss, N.H., **Meyer, J.P.** & Murphy, J.G. Words Can Hurt: The effects of physical and psychological partner violence on condom negotiation and condom use among college women in non-casual sexual partnerships. Women & Health: 2017 Apr 12:1-15.  PMID: 28402194.

**Meyer J**, Muthulingham D, El-Bassel N, Altice F.  Leveraging the U.S. Criminal Justice System to Access Women for HIV Interventions.   AIDS and Behavior 2017 Dec;21(12):3527-3548.  DOI: 10.1007/s10461-017-1778-6.  NIHMSID 878661.  PMID: 28534199.  PMC5699977.

Shrestha R, Karki P, Altice F, Huedo-Medina T, **Meyer J**, Madden L, Copenhaver M.  Correlates of willingness to initiate pre-exposure prophylaxis and the likelihood of practicing safer drug- and sex-related risk behaviors among high-risk drug users on methadone treatment.  Drug and Alcohol Dependence*: 2017 Apr 1;173:107-116. doi: 10.1016/j.drugalcdep.2016.12.023. Epub 2017 Feb 2.  PMID: 28214391.  PMCID: PMC5366273.

Wickersham J, Gibson B, Bazazi A, Pillai V, Pedersen C, **Meyer J,** El-Bassel N, Mayer K, Kamarulzaman A, Altice F.  Prevalence of HIV and sexually transmitted infections among cisgender and transgender women sex workers in greater Kuala Lumpur, Malaysia: Results from a respondent-driven sampling study. Sex Transm Dis. 2017 Nov;44(11):663-670.  PMID: 28708696.  NIHMSID 894660.  PMC5636657.

Vasquez L, Malinis M, **Meyer J.**  Emerging Role of *Actinomyces meyeri* in Brain Abscesses: A Case Report and Literature Review.  IDCases. 2017 Jul 20;10:26-29. doi: 10.1016/j.idcr.2017.07.007. eCollection 2017.  PMID: 28831384.  PMCID: PMC5554978.

Azbel L, Wegman M, Polonsky M, Bachireddy C, **Meyer J,** Sumskaya N, Kurmanalieva A, Dvoriak S, Altice F.  Drug injection within prison in Kyrgyzstan: elevated HIV risk and implications for scaling up opioid agonist treatments.  2018 Sep 10;14(3):175-187. doi: 10.1108/IJPH-03-2017-0016.  PMID: 30274558.  NIHMS951165.  PMCID: PMC6447033

Loeliger K, Altice F, Desai M, Ciarleglio M, Gallagher C, **Meyer J.**  Predictors of Linkage to HIV Care and Viral Suppression Levels Following Release from Jails and Prisons: A Retrospective Cohort Study.  Lancet HIV 2018 Feb;5(2):e96-e106.  DOI: http://dx.doi.org/10.1016/S2352-3018(17)30209-6.  PMID: 29191440 NIHMSID 924557.  PMC5807129.

Hoff E, Marcus R, Bojko M, Makarenko I, Mazhnaya A, Altice F, **Meyer J.**  The effects of opioid-agonist treatments on HIV risk and social stability: A mixed methods study of

women with opioid use disorder in Ukraine.  J Substance Abuse Treatment 83 (2017) 36–44.  NIHMS 914022.  PMC5726590.

Harada K, Heaton H., Chen J., Vazquez M, **Meyer J.**  Herpes zoster vaccine-associated Primary Varicella Infection in an Immunocompetent Host: Case Report and Literature Review.  BMJ Case Rep. 2017 Aug 22;2017. pii: bcr-2017-221166.  PMID: 28830902. NIHMS 913803.  PMC5624100.

Rutledge R, Madden L, Ogbuagu O, **Meyer J.**  HIV Risk Perception and Eligibility for Pre-Exposure Prophylaxis in Women Involved in the Criminal Justice System.  AIDS Care: 2018 Mar 11:1-8.  doi.org/10.1080/09540121.2018.1447079.  PMID: 29527934. NIHMSID 1502805  PMC6085161

Brinkley-Rubenstein L, Dauria E, Tolou-Shams M, Christopoulous K, Chan P, Beckwith C, Parker S, **Meyer J.**  The Path to Implementation of HIV Pre-exposure Prophylaxis for People Involved in Criminal Justice Systems.  Curr HIV/AIDS Rep. 2018 Apr;15(2):93-95. doi: 10.1007/s11904-018-0389-9.  https://doi.org/10.1007/s11904-018-0389-9. PMID: 29516265.  PMC5884709

**Meyer J,** Marcus R, Nowakowski E, Glass S, Canney T, Copenhaver M, Altice F.  PLUS PINK: Adaptation of an evidence-based HIV risk reduction intervention for justice-involved women in the community.  AIDS Education and Prevention: *Under revision.*

Odio C, Carroll M, Glass S, Bauman A, Taxman F, **Meyer J.**  Evaluating Concurrent Validity of Criminal Justice and Clinical Assessments among Women on Probation. Health and Justice, Special Issue: Complex Populations (2018) 6: 7. https://doi.org/10.1186/s40352-018-0065-6.  PMID: 29627964 PMCID: PMC5889765

Loeliger K, Altice F, Ciarleglio M, Rich K, Chandra D, Gallagher C, Desai M, **Meyer J.** An Observational Study of All-cause Mortality among People with HIV Released from an Integrated System of Jails and Prisons, 2007-2014.  The Lancet HIV 2018: Published Online September 6, 2018. http://dx.doi.org/10.1016/S2352-3018(18)30175-9.  Volume 5, Issue 11, November 2018, Pages e617-e628.  PMID: 30197101.  NIHMS 1506381. PMC6279524

Loeliger K, **Meyer J,** Desai M, Ciarleglio M, Gallagher C, Altice F**.**  Sustained Retention in HIV Care and Viral Suppression over Three Years Following Release from Jails and Prisons: A Retrospective Cohort Study.  PLoS Medicine 2018 Oct 9;15(10):e1002667. PMID: 30300351 PMCID: PMC6177126

Ranjit Y, Azbel L, Krishnan A, Altice F, **Meyer J.**  Evaluation of HIV risk and outcomes in a nationally representative sample of incarcerated women in Azerbaijan, Kyrgyzstan, and Ukraine.  AIDS Care: Published online 31 Jan 2019. https://doi.org/10.1080/09540121.2019.1573969  NIHMS1519524.  PMID: 30701981.

**Meyer J,** Isaacs K, El-Shahawy O, Burlew K, Wechsberg W.  Research on Women with Substance Use Disorders: Reviewing Progress and Developing a Research and

Implementation Roadmap.  Drug and Alcohol Dependence 2019 Apr 1;197:158-163. E-pub 21-FEB-2019.  Doi: 10.1016/j.drugalcdep.2019.01.017  NIHMSID1013474.  PMID: 30826625.  PMC6440852

Rhodes T, Azbel L, Lancaster K, **Meyer J.**  The becoming-methadone-body. On the onto-politics of health intervention translations.  Sociology of Health & Illness:  2019 Jul 16. doi: 10.1111/1467-9566.12978.  PMID: 31310008.

**Meyer J.**  The Sustained Harmful Health Effects of Incarceration for Women Living with HIV.  J Womens Health (Larchmt). 2019 Aug;28(8):1017-1018. doi: 10.1089/jwh.2019.7940. Epub 2019 Jul 29.  PMID: 31355697.

Olson B, Vincent W, **Meyer J,** Kershaw T, Sikkema K, Heckman T, Hansen N.  Depressive Symptoms, Physical Symptoms, and Health-Related Quality of Life among Older Adults with HIV.  Qual Life Res. 2019 Aug 24. doi: 10.1007/s11136-019-02271-0.  PMID: 31446515.

Hoff E, Adams Z, Dasgupta A, Goddard D, Sheth S, **Meyer J.**  Reproductive Health Justice and Autonomy: A systematic review of pregnancy planning intentions, needs, and interventions among women involved in US criminal justice systems.  J Women's Health: *Under revision*.

Qin L, Price C, Puglisi L, Rutledge R, Madden L, **Meyer J.**  Women's Decision-Making about PrEP for HIV Prevention in Drug Treatment Contexts.  J Int Assoc Provid AIDS Care. 2020;19:2325958219900091.  PMID: 31918605

Hoff E, Rutledge R, Gibson B, Price C, Gallagher C, Maurer K, **Meyer J.**  PrEP for Women across the Criminal Justice Continuum in Connecticut:  Implications for Policy and Practice.  J Corr Healthcare: *In press. NIHMS 1573821*

**Meyer J,** Franco-Paredes C, Parmar P, Yasin F, Gartland M.  COVID-19 and the Coming Epidemic in U.S. Immigration Detention Centers.  Lancet Infect Dis 2020 Published Online April 15, 2020 https://doi.org/10.1016/S1473-3099(20)30295-4.

**Manuscripts in Submission**
Muthulingham D, Clemons T, Marcus R, **Meyer J,** Yonkers K.  Pregnancy as Peril for Women with Addiction: Public Health, not Punishment.  AJPH: *Under review.*

Rich K, Loeliger K, Chandra D, Muthulingam D, Althoff K, Gallagher C, **Meyer J,** Altice F.  Elevated Mortality Risk after Release from Prisons and Jails: Implications for Targeting At-Risk Persons.  JAIDS: *Under review.*

Rich K, Eysenbach L, Joslin S, Marcus R, Brothers S, **Meyer J,** Altice F. Evaluation of a "One-Stop-Shop": An innovative treatment and prevention program that integrates harm reduction and primary care services for people who inject drugs.  J Urban Health*: Under review.*

Barber D, Kempner T, Pasalar S, Borne D, Eysenbach L, Quinn E, Rajabiun S, **Meyer J.** Effects of a Multisite Medical Home Intervention on Emergency Department Use among Homeless People with HIV.  J Healthcare Poor and Underserved*: Under review.*

**Manuscripts in Preparation**

**Meyer J**, Flash C, Gonzalez N, Pan A, Yuan Y, Rajabiun S.  The Intersecting Effect of Gender and Race on Housing and HIV Outcomes in a Multisite Medical Home Project. *To submit to AJPH.*

Culbert G, Azbel L, Bachireddy C, Kurmanalieva A, Rhodes T, Altice F, **Meyer J**.  A Qualitative Study of Diphenhydramine Injecting in Kyrgyz Prisons and Implications for Harm Reduction Efforts.  *To submit to Harm Reduction J.*

Hoff E, Adams Z, Hass A, Dasgupta A, Goddard D, Sheth S, **Meyer J.**  Reproductive Health Needs of Women at Risk of HIV in Connecticut.  *To submit to J Women's Health.*

**Meyer J,** Shrestha R, Shenoi S, Wickersham J, Altice F.  Potential and Challenges of Same Day PrEP for Key Populations.  *To submit to Lancet HIV.*

**Meyer J,** Price CR, Tracey D, Madden L, Elwyn G, Altice F.  Development and Efficacy of a PrEP Decision Aid for Women in Drug Treatment.  *To submit to JSAT*.

**Book Chapters**
**Meyer J,** Altice F.  HIV in Injection and Other Drug Users.  Somesh Gupta, Bhushan Kumar, eds. *Sexually Transmitted Infections* 2nd ed. New Delhi, India: Elsevier, 2012: 1061-80.  ISBN 978-81-312-2809-8.

**Meyer J,** Altice F.  Chapter 47, Treatment of Addictions: Transition to the Community.  Robert L. Trestman, Kenneth L. Appelbaum, Jeffrey L. Metzner, eds.  *Oxford Textbook of Correctional Psychiatry (Winner of the 2016 Guttmacher Award).*  Oxford University Press 2015.  ISBN 9780199360574.

Mohareb A, Tiberio P, Mandimika C, Muthulingam D, **Meyer J.**  Infectious Diseases in Underserved Populations.  Onyema Ogbuagu, Gerald Friedland, Merceditas Villanueva, Marjorie Golden, eds.  *Current Diagnosis and Treatment- Infectious Diseases*.  McGraw-Hill Medical 2016.

Shrestha R, McCoy-Redd B, **Meyer J.**  Pre-Exposure Prophylaxis (PrEP) for People Who Inject Drugs (PWID).  Brianna Norton, Ed.  *The Opioid Epidemic and Infectious Diseases.*  Elsevier 2019.

**Other Publications and Reports**
**Paul J** (maiden surname).  Bullous Pemphigoid in a Patient with Psoriasis and Possible Drug Reaction.  Connecticut Medicine 2004 Nov-Dec; 68(10):611-5.

**Meyer J** *for United Nations Office on Drugs and Crime.*  HIV and AIDS in Places of Detention.  A toolkit for policymakers, programme managers, prison officers, and health care providers in prison settings.  Vienna, Austria.

**Other Media Communications**
Gender differences in the treatment outcomes of HIV-infected jail detainees.  Outbreak News this Week, WTAN 1340 Clearwater. Interviewed by Robert Herriman [radio] Tampa, Florida, February 8, 2014.

Caring for Justice-Involved Women.  The Fortune Society Reentry Education Project Detailing Kit.  New York City Department of Health and Mental Hygiene.  October 2014.

"Safe" Sex with IUDs Is Not Safe Enough.  Ms. Magazine Online.  Posted December 8, 2014.  http://msmagazine.com/blog/2014/12/08/safe-sex-with-iuds-is-not-safe-enough/

Women's Health Behind Bars- Not so Black and Orange.  Huffington Post.  Posted December 18, 2014. http://www.huffingtonpost.com/jaimie-meyer/womens-health-behind-bars-not-so-black-and-orange_b_6308892.html

Opioid use in women is not just 'a fetus problem'.  Boston Globe.  Posted February 19, 2015.  http://www.bostonglobe.com/opinion/2015/02/19/opioid-use-women-not-just-fetus-problem/8tTFfEtn4mOJ1K75rxEXPI/story.html

Distinct Challenges Affect Women's HIV Treatment Outcomes After Jail.  NIDA Notes.  Posted May 12, 2015.  http://www.drugabuse.gov/news-events/nida-notes/2015/05/distinct-challenges-affect-womens-hiv-treatment-outcomes-after-jail

Caring for the dying, behind bars.  Boston Globe.  Posted online May 21, 2015; in print May 24, 2015.  http://www.bostonglobe.com/opinion/2015/05/21/caring-for-dying-inmates/WNispkkTY8MoI6zYP8tSRO/story.html

Video abstract.  AJPH Talks.  Posted online July 28, 2015. http://ajphtalks.blogspot.com/

**<u>Invited Conference Presentations & Published Abstracts</u>**
Adherence to HIV treatment and care among previously homeless jail detainees.  IAPAC HIV Treatment and Adherence Conference.  Miami, Florida.  May 2011.

Emergency Department Use by Released Prisoners with HIV.  Connecticut Infectious Disease Society Annual Symposium.  Orange, Connecticut.  May 2011.

Effects of Intimate Partner Violence on HIV and Substance Abuse in Released Jail Detainees.  5th Academic and Health Policy Conference on Correctional Health.  Atlanta, Georgia.  March 2012.

Frequent Emergency Department Use among Released Prisoners with HIV: Characterization Including a Novel Multimorbidity Index.  IDWeek: Infectious Diseases Society of America Annual Meeting.  San Diego, California.  October 2012.

Correlates of Retention in HIV Care after Release from Jail: Results from a Multi-site Study.  IDWeek: Infectious Diseases Society of America Annual Meeting.  San Diego, California.  October 2012.

Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study.  Conference on Retroviruses and Opportunistic Infections (CROI).  Atlanta, Georgia.  March 2013.

Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study.  Connecticut Infectious Disease Society Annual Meeting.  Orange, Connecticut.  May 2013.

Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study.  HIV Intervention and Implementation Science Meeting.  Bethesda, Maryland.  September 2013.

Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration.  Conference on Retroviruses and Opportunistic Infections (CROI).  Boston, Massachusetts.  March 2014.

Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration.  Connecticut Infectious Disease Society Annual Meeting.  Orange, Connecticut.  May 2014.

Gender Differences in HIV and Criminal Justice Outcomes.  College on Problems in Drug Dependence (CPDD).  San Juan, Puerto Rico.  June 2014.

Gender Differences in HIV and Criminal Justice Outcomes.  International Women's and Children's Health and Gender Working Group.  San Juan, Puerto Rico.  June 2014.

Violence, Substance Use, and Sexual Risk among College Women.  International Women's and Children's Health and Gender Working Group.  Phoenix, Arizona.  June 2015.

Evidence-Based Interventions to Enhance Assessment, Treatment, and Adherence in the Chronic Hepatitis C Care Continuum.  International Harm Reduction Conference.  Kuala Lumpur, Malaysia.  October 2015.

Beyond the Syndemic: Condom Negotiation and Use among Women Experiencing Partner Violence (Oral presentation).  CDC National HIV Prevention Conference.  Atlanta, Georgia.  December 2015.

An Event-level Examination of Successful Condom Negotiation Strategies among College Women.  International Women's and Children's Health and Gender Working Group.  Palm Springs, California.  June 2016.

Where rubbers meet the road: HIV risk reduction for women on probation (Oral presentation).  2017 Annual Meeting of the Society for Applied Anthropology.  Santa Fe, New Mexico. April 2017.

A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine.  International Women's and Children's Health and Gender Working Group.  Montreal, Canada.  June 2017.

Assessing Receptiveness to and Eligibility for PrEP in Criminal Justice-Involved Women. International Women's and Children's Health and Gender Working Group.  Montreal, Canada.  June 2017.

A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine.  NIDA International Forum.  Montreal, Canada.  June 2017.

Late breaker: Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons.  International AIDS Society (IAS) Meeting. Paris, France.  July 2017.

Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons (Oral presentation).  IDWeek: Annual Meeting of Infectious Diseases Society of America.  San Diego, CA.  October 2017.

The New Haven syringe services program.  2017 Connecticut Public Health Association Annual Conference.  Plantsville, CT.  October 2017.

Assessing Concurrent Validity of Criminogenic and Health Risk Instruments among Women on Probation in Connecticut.  11th Academic and Health Policy on Conference on Correctional Health.  Houston, TX.  March 2018.

From prison's gate to death's door: Survival analysis of released prisoners with HIV. 2018 Conference on Retroviruses and Opportunistic Infections (CROI).  Boston, MA. March 2018.

HIV and Drug Use among Women in Prison in Azerbaijan, Kyrgyzstan and Ukraine. NIDA International.  San Diego, CA.  June 2018.

Methadone Maintenance Therapy Uptake, Retention, and Linkage for People who Inject Drugs Transitioning From Prison to the Community in Kyrgyzstan: Evaluation of a National Program.  22nd International AIDS Conference.  Amsterdam, Netherlands.  23-27 July 2018.

HIV risk perceptions and risk reduction strategies among prisoners in Kyrgyzstan: a qualitative study.  22nd International AIDS Conference.  Amsterdam, Netherlands.  23-27 July 2018.

Service needs and access to care among participants in the New Haven Syringe Services Program (SA-15).  12th National Harm Reduction Conference.  New Orleans, LA.  October 2018.

Oral presentation: New Haven Syringe Service Program: A model of integrated harm reduction and health care services.  American Public Health Association (APHA) Annual Meeting.  San Diego, California.  November 2018.

PrEP Eligibility and HIV Risk Perception for Women across the Criminal Justice Continuum in Connecticut.  12th Academic and Health Policy on Conference on Correctional Health.  Las Vegas, Nevada.  March 2019.

Released to Die: Elevated Mortality in People with HIV after Incarceration.  2019 Conference on Retroviruses and Opportunistic Infections (CROI).  Seattle, Washington.  March 2019.

Impact of Trauma and Substance Abuse on HIV PrEP Outcomes among Women in Criminal Justice Systems. Symposium: "Partner Violence: Intersected with or Predictive of Substance Use and Health Problems among Women."  Behaviors across Diverse Populations: Innovations in Science and Practice, APA Collaborative Perspectives on Addiction Annual Meeting.  Providence, Rhode Island.  April 2019.

Uniquely successful implementation of methadone treatment in a women's prison in Kyrgyzstan.  11th International Women's and Children's Health and Gender (InWomen's) Group.  San Antonio, Texas.  June 2019.

Diphenhydramine Injection in Kyrgyz Prisons: A Qualitative Study Of A High-Risk Behavior With Implications For Harm Reduction.  2019 NIDA International Forum.  San Antonio, Texas.  June 2019.

Decision-Making about HIV Prevention among Women in Drug Treatment: Is PrEP Contextually Relevant?  14th International Conference on HIV Treatment and Prevention Adherence.  Miami, Florida. June 2019.

Punitive approaches to pregnant women with opioid use disorder: Impact on health care utilization, outcomes and ethical implications.  CPDD 81st Annual Scientific Meeting.  San Antonio, Texas.  June 2019.

How does methadone treatment travel? On the 'becoming-methadone-body' of Kyrgyzstan prisons.  Harm Reduction International.  Porto, Portugal.  May 2019.

Effects of a Multisite Medical Home Intervention on Emergency Department Use among Unstably Housed People with Human Immunodeficiency Virus.  Society for Academic Emergency Medicine (SAEM) New England Regional Meeting (NERDS).  Worcester, Massachusetts.  March 2019.

Preliminary Findings from a Novel PrEP Demonstration Project for Women Involved in Criminal Justice Systems and Members of their Risk Networks.  37th Annual Connecticut Infectious Disease Society Conference.  New Haven, Connecticut.  May 2019.

Decision-Making about HIV Prevention among Women in Drug Treatment: Is PrEP Contextually Relevant?  American College of Physicians (ACP) Connecticut Chapter Scientific Meeting.  Hartford, Connecticut.  October 2019.

Oral presentation: Decision-Making about HIV Prevention among Women in Drug Treatment: Is PrEP Contextually Relevant?  SGIM New England Regional Meeting.  Boston, Massachusetts.  November 2019.

Workshop presentation: Treatment of Women's Substance Use Disorders and HIV Prevention During and Following Incarceration.   Association for Justice-Involved Female Organizations Conference 2019.  Atlanta, Georgia.  December 2019.

Oral presentation: Can an interactive aid modify decisional preference for HIV pre-exposure prophylaxis (PrEP) among women seeking domestic violence services? description of a novel collaborative program and preliminary findings. National Conference on Health and Domestic Violence (NCHDV).  Chicago, Illinois.  March 2020.

Oral presentation: A Novel PrEP Demonstration Project for Justice-Involved Women and Members of their Risk Networks. 13th Academic and Health Policy Conference on Correctional Health. Raleigh, North Carolina.  April 2020.

Impact of Motherhood Identity on Women's Substance Use and Engagement in Treatment Across the Lifespan.  International Women's and Children's Health and Gender (InWomen's) Group.  Hollywood, Florida.  June 2020.

**Invited Lectures/Seminars**
**Yale School of Medicine Affiliated**
"HIV 101": Yale Affiliated Hospital Program, Greenwich Hospital Internal Medicine Residency Conference.  March 2011.

"Clostridium Difficile": Yale Affiliated Hospital Program, Greenwich Hospital Internal Medicine Residency Conference.  April 2013.

"Community-Acquired Infections."  Student Microbiology Workshop, Yale University School of Medicine.  September 2013.

"Hospital Associated Infections."  Student Microbiology Workshop, Yale University School of Medicine.  September 2014.

"Microbiology of the Central Nervous System."  Student Microbiology Seminar.  Yale University School of Medicine, Physician Associate Program.  October 2014.

"Fever of Unknown Origin": Yale Affiliated Hospital Program, Greenwich Hospital Grand Rounds.  January 2015.

"HIV and Women": Yale Affiliated Hospital Program, Greenwich Hospital Grand Rounds.  May 2015.

"Clinical Care of HIV+ Women."  Nathan Smith Clinic Lecture Series.  May 2015.

"Implicit Bias and incarceration."  Yale School of Medicine Pre-clinical clerkship seminar.  September 2015.

Incarceration and Health Disparities."  US Health and Justice course, Yale School of Medicine, Physician Assistant Program, and Yale School of Nursing.  November 2015.

"Fever of Unknown Origin": Yale Affiliated Hospital Program, Danbury Hospital Teaching Rounds.  January 2016.

"Management of Substance Use Disorders."  Yale Affiliated Hospital Program, Greenwich Hospital Teaching Rounds.  February 2016.

"Management of Substance Use Disorders."  Yale Affiliated Hospital Program, Bridgeport Hospital Resident Teaching Rounds.  June 2016.

"Clostridium Difficile Infection."  Yale Affiliated Hospital Program, Norwalk Hospital Resident Conference.  October 2016.

"Management of Substance Use Disorders."  Yale Affiliated Hospital Program, Bridgeport Hospital Resident Teaching Rounds.  November 2016.

"Mass Incarceration: Film and Panel Discussion."  Yale Department of Psychiatry, Psychiatry and Film Series.  December 2016.

"HIV 101."  Yale Affiliated Hospital Program, Bridgeport Hospital Noon Conference. May 2017.

"HIV in the Criminal Justice System."  Yale Affiliated Hospital Program, Danbury Hospital Noon Conference.  June 2017.

"Management of Substance Use Disorders."  Yale Affiliated Hospital Program, Norwalk Hospital Teaching Rounds.  October 2017.

"Management of Substance Use Disorders."  Yale Affiliated Hospital Program, Bridgeport Hospital Noon Conference.  March 2018.

"HIV prevention for justice-involved women."  Addiction Medicine Grand Rounds.  May 2018.

"Diagnosis and Management of Urinary Tract Infections."  Yale Affiliated Hospital Program, Norwalk Hospital Teaching Rounds.  November 2018.

"Bacteremia."  Yale Medicine Residency Program Resident Noon Conference.  March 2019.

"Clostridium Difficile."  Yale Affiliated Hospital Program, Norwalk Hospital Teaching Rounds.  October 2019.

Invited small group facilitator. "Taking a Substance Use History." Session delivered as a required component of the Interprofessional Longitudinal Clinical Experience (ILCE) course delivered to all first-year Yale medical, nursing and PA students. Yale School of Nursing. November 1, 2019.

**Non-Yale School of Medicine Affiliated**
"HIV and Addiction": Rhode Island Chapter of the Association of Nurses in AIDS Care, 7th Annual Education Day.  September 2010.

"Incarceration as Opportunity: Prisoner Health and Health Interventions": Yale College Class of 1960 Criminal Justice Symposium.  May 2013.

"Trends and obstacles associated with healthcare for incarcerated or recently incarcerated women."  Arthur Liman Public Interest Program, Yale Law School.  October 2015.

"Incarceration as Opportunity: Prisoner Health and Health Interventions."  New England AIDS Education Training Center, Dartmouth Geisel School of Medicine.  April 2016.

"Trends in HIV Prevention: Integration of Biomedical and Behavioral Approaches."  Connecticut Advanced Practice Registered Nurse Society Annual Meeting.  April 2016.

"Topics in Infectious Diseases."  Evolutionary Medicine course, Frank H. Netter School of Medicine, Quinnipiac University.  October 2016.

"Optimizing the HIV Care Continuum for People Who Use Drugs: Strategies to Address Health Disparities."  Clinical Directors Network Webinar.  January 2017.

"HIV prevention for justice-involved women."  Frank H. Netter School of Medicine Faculty Seminar Series.  March 2018.

Plenary: "Intersection of the HIV and Opioid Epidemics."  CCO Annual HIV and Hepatitis Symposium: Regional Workshops and Annual Update 2018.  Washington, DC.  April 2018.

"HIV prevention and treatment for women involved in criminal justice systems."  CT HIV/AIDS Identification and Referral task force (CHAIR), Center for Interdisciplinary Research on AIDS (CIRA).  Yale School of Public Health.  May 2018.

Discussant: "Research on Women who Use Drugs: Knowledge and Implementation Gaps and A Proposed Research Agenda."  Workshop on Women in Addictions Ten Years On, College of Problems on Drug Dependence.  San Diego, CA.  June 2018.

"PrEP Awareness among Special Populations of Women and People who Use Drugs."  Clinical Directors Network Webinar.  October 2018.

Panelist and Expert Witness: "An Analysis of Women's Health, Personal Dignity and Sexual Abuse in the US Prison System."  US Commission on Civil Rights, Briefing on Women in Prison: Seeking Justice Behind Bars.  Washington, DC.  February 2019.

Faculty: "A Grassroots Approach to Weed out HIV and HCV in Special OUD Populations" (Live Webcast).  CME Outfitters.  September 2019.

"PrEP in Special Populations: PrEP in People who Inject Drugs."  New England AIDS Education Training Center Annual Primary Care Conference.  Hartford, CT.  March 2020.

# EXHIBIT 32

**Declaration of Kristen A. Benninger, M.D.**

**Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:**

1. **Background and Qualifications**

   A. I am Dr. Kristen A. Benninger, a physician hospitalist with Johnston Health of Smithfield, North Carolina, a managed entity of the University of North Carolina Health Care system. I am board certified in Family Medicine since 2018. I completed my medical residency in Family Medicine at the University of North Carolina in Chapel Hill, North Carolina, in 2018.

   B. After graduation from medical residency, I started employment with the University of North Carolina Department of Family Medicine in Chapel Hill, North Carolina as a Clinical Assistant Professor of Family Medicine. In this role, I was contracted to work with the North Carolina Department of Public Safety for a period of one year as a physician in Central Prison Healthcare Complex in Raleigh, NC. Central Prison is a men's close-custody prison which serves as the admission point into prison for many adult male felons; it has the capacity to hold 1104 incarcerated persons. Central Prison houses special populations, including death row and safekeepers. It is the main medical and mental health center for male offenders in North Carolina and contains 120 inpatient hospital beds and 216 mental health beds.[1]

   C. At Central Prison, I served as a hospitalist physician, managing healthcare for incarcerated persons admitted to the inpatient medical ward. I also served as a physician in the Central Prison Urgent Care center, handling urgent and emergent medical and mental health issues and processing safekeeper inmates from local jails into prison. I spent a brief period of time as well providing medical consults to the mental health unit and training to provide routine and chronic care to inmates in the housing units.

   D. I currently work full-time as a hospitalist physician, providing care to hospitalized inpatients at both Johnston Memorial Hospital in Smithfield, North Carolina, a community hospital with 179 medical/surgical beds, and Johnston Health Clayton in Clayton, North Carolina, a community hospital with 50 medical/surgical beds. I provide care to patients on our floor units, in our intermediate care unit, and in our intensive care unit. I have been guided in management of patients infected with COVID-19 and have been involved in their care clinically.

---

[1] North Carolina Department of Public Safety. New prison medical facilities. Retrieved April 15, 2020, from https://www.doc.state.nc.us/DOP/health/new_facilities.html.

1

E. My curriculum vitae includes a full list of my qualifications, experience, and licensure and it is attached as Exhibit A.

2. **Infectious Profile of COVID-19**

A. **Nomenclature**. COVID-19, also known as SARS-CoV-2 (severe acute respiratory syndrome coronavirus 2) or 2019-nCoV, is a novel coronavirus which emerged in Wuhan, China in late 2019.

B. **Viral Reach**. The first case of COVID-19 in the United States is reported to be confirmed on January 20, 2020.[2] COVID-19 has now been designated as a worldwide pandemic. As of April 16, 2020, the WHO reports a minimum of 1,991,562 confirmed cases of COVID-19 reaching almost every country on Earth, with greater than 130,000 reported deaths total.[3] **The state of Maryland has 11,572 confirmed cases as of April 17, 2020. Prince George's County has more cases (2,966) than any other county in Maryland at this time.[4]**

C. **Mode of transmission**. Research suggests that the COVID-19 virus is stable for several hours to days in aerosols and on surfaces. It is most likely, therefore, that the virus is transmitted via the following mechanisms:

    i. Direct human-to-human contact, i.e. shaking hands, kissing, direct contact with oral secretions, etc.;

    ii. Indirect contact, including through fomites, which are surfaces contaminated with viral particles;

    iii. Aerosols, defined as a suspension of liquid droplets in the air or in a gas. While this likely qualifies the virus to be transmitted via droplets suspended in air (i.e. droplets created via sneezing, coughing, etc.), it is yet unclear whether the virus is transmitted in an airborne fashion.

D. **Infectivity**. The incubation period of COVID-19, defined as the time between being infected with the virus and beginning to have symptoms of the virus, is thought to range from one to fourteen days, with a median of five days.[5] Persons infected with

---

[2] Holshue M.P.H., Michelle L., et. al. (2020). First case of the 2019 novel coronavirus in the United States. *New England Journal of Medicine*, *382*, 929-936.

[3] Coronavirus disease 2019 (COVID-19): Situation Report – 87. (2020, April 16). World Health Organization. Retrieved April 17, 2020 from https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200416-sitrep-87-covid-19.pdf?sfvrsn=9523115a_2.

[4] MD COVID-19 data dashboard. (Last updated 2020, April 17). Maryland.gov. Retrieved April 17, 2020 from https://coronavirus.maryland.gov/datasets/md-covid-19-data-dashboard.

[5] Q&A on coronaviruses (COVID-19). (2020, April 8). World Health Organization. Retrieved April 15, 2020 from https://www.who.int/news-room/q-a-detail/q-a-coronaviruses#:~:text=The%20%"incubation%20period ",more%20data%20become%20available..

the SARS-CoV-2 virus likely have the potential to shed and transmit the virus while asymptomatic.[6] This data is important because it implies that persons infected with COVID-19 can likely infect other persons for up to fourteen days before they even show symptoms of the virus.

E. **General guidelines for management of infectivity**. The following protocols are generally accepted for the managed goal of prevention of viral transmission.
    i.    Prevention of direct transmission:
        i.    **Frequent and routine handwashing with soap and clean water, liquid hand soap preferred when possible.**
        ii.    Alcohol-based hand sanitizers may be effective in helping prevent spread, however regular handwashing is preferred.
    ii.    Prevention of indirect transmission (through "fomites"):
        i.    **Frequent touch surfaces should be properly and routinely disinfected.** These surfaces include, but are not limited to: door knobs and handles, handrails, tables, beds, chairs, washroom surfaces, cups, dishes, cutlery, trays, pens, pencils, phones, office supplies, clothing.
    iii.    Prevention of droplet/aerosol transmission.
        i.    **During this pandemic, we are recommending a social distancing standard of six feet, which is important to help slow the spread of the virus.**[7] Community mitigation strategy nationally has included school and workplace closures, cancellation of mass gatherings, and shelter-in-place orders. Social distancing has been shown to be beneficial in reducing rates of infection, hospitalization, critical care, and death in pandemic situations.[8]
        ii.    Droplet transmission can be reduced with the use of personal protective barriers, such as face masks and gloves. **CDC has recommended wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain**, especially in areas of significant community-based transmission.

---

[6] van Doremalen Ph.D., Neeltje, et. al. (2020). Aerosol and surface stability of SARS-CoV-2 as compared with SARS-Cov-1. *New England Journal of Medicine, 382*, 1564-1567.

[7] Recommendation regarding the use of cloth face coverings, especially in areas of significant community-based transmission. (2020, April 3). Centers for Disease Control and Prevention. Retrieved April 14, 2020 from https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[8] Walker Patrick GT, et. al. (2020, March 26). Report 12 – The global impact of COVID-19 and strategies for mitigation and suppression. Imperial College of London, MRC Centre for Global Infectious Disease Analysis. Retrieved 15 April 2020 from https://www.imperial.ac.uk/mrc-global-infectious-disease-analysis/covid-19/report-12-global-impact-covid-19/.

        i.      Cloth face coverings should fit snugly but comfortably against the side of the face, be secured with ties or ear loops, include multiple layers of fabric, allow for breathing without restriction, be able to be laundered and machine dried without damage or change to shape.

        ii.     Cloth face masks should be laundered before each daily use.

        iii.    Cloth face coverings should not be placed on anyone who is having trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the mask without assistance.[9]

    iii.   Surgical masks and N95 respirators are in short supply and are to be reserved for healthcare professionals and medical first responders.[10] This includes staff in correctional facilities who have direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases.

    iv.   **Eye protection, gloves, and gowns are recommended for staff performing temperature checks.** When performing temperature checks on multiple individuals, a clean pair of gloves should be used for each individual and the thermometer should be thoroughly cleaned between each check. If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check.[11]

F.  **Symptomology and treatment modalities**

    i.   **Severe, and most worrisome, symptoms of COVID-19 generally include, but are not limited to: fever, cough, difficulty breathing or shortness of breath, persistent pain or pressure in the chest, new confusion or inability to arouse, significant fatigue, bluish lips or face.[12] Approximately 20% of infected persons require treatment**

---

[9] Use of cloth face coverings to help slow the spread of COVID-19. (2020, April 13). Centers for Disease Control and Prevention. Retrieved April 14, 2020 from https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html

[10] FAQ: Methods of disease transmission. Mt. Sinai Hospital, Ontario, Canada. Retrieved April 14, 2020 from https://eportal.mountsinai.ca/Microbiology/faq/transmission.shtml.

[11] Interim guidance on management of Coronavirus disease 2019 (COVID-19) in correctional and detention facilities. (2020, April 9). Centers for Disease Control and Prevention. Retrieved April 14, 2020 from https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#Table1.

[12] Symptoms of Coronavirus. (Last reviewed 2020, April 17). National Institutes of Health. Retrieved April 14, 2020 from https://www.nih.gov/health-information/coronavirus.

**and/or hospitalization for severe symptoms, including oxygen supplementation. Persons experiencing this category of symptoms are recommended to seek emergent medical care.** Treatment modalities are limited but include:

    i.   Supportive care, which includes oxygen supplementation and mechanical ventilatory support if needed. **Persons infected with COVID-19 who are hypoxic (requiring oxygen supplementation) can decompensate relatively rapidly, sometimes requiring mechanical ventilation at an emergent pace. With the high infectivity of COVID-19, it is far safer for the patient and provider when the act of intubation is undertaken in a controlled, timely, and non-urgent fashion.**

    ii.   Medications such as remdesivir (antiviral), hydroxychloroquine (*a.k.a.* Plaquenil) and chloroquine (both immunosuppressants), and azithromycin (antibiotic) are being researched for use in severe COVID-19, however there is not evidence at this time to support improved outcomes with these medications, nor has the U.S. Food and Drug Administration approved any medications or therapeutics for use in COVID-19.[13] Furthermore, accessibility to these medications is limited and supply has been variable.

    iii.   The use of convalescent plasma, collected from individuals who have recovered from COVID-19, contains antibodies to the virus and is being studied for use as a treatment modality. Although promising, convalescent plasma has not been shown yet to be a safe and effective treatment for COVID-19 and is not at present approved by the U.S. Food and Drug Administration for use.[14]

    iv.   **There is not a vaccine for the virus at this time and we do not anticipate a vaccine to be available in the immediate future** as it takes time to develop and test vaccines prior to FDA approval and mass distribution.

  ii.   Less severe symptoms include, but are not limited to: sore throat, myalgias (muscle aches), nasal congestion, rhinorrhea (runny nose), diarrhea, loss of smell or taste.[4] Approximately 80% of infected persons are able to manage their symptoms without hospitalization, however quarantine is recommended.

---

[13] Information for clinicians on investigational therapeutics for patients with COVID-19. (2020, April 13). Centers for Disease Control and Prevention. Retrieved April 14, 2020 from https://www.cdc.gov/coronavirus/2019-ncov/hcp/therapeutic-options.html.

[14] Recommendations for investigational COVID-19 convalescent plasma. (2020, April 13). U.S. Food and Drug Administration. Retrieved April 14, 2020 from https://www.fda.gov/vaccines-blood-biologics/investigational-new-drug-ind-or-device-exemption-ide-process-cber/recommendations-investigational-covid-19-convalescent-plasma.

G. **Morbidity/mortality**. **We can estimate the mortality rate of COVID-19 and it is exceptionally high compared to other common seasonal viruses.** Limitations of the data include limited ability to perform testing on asymptomatic patients, and a lag time of up to 30 days between infectivity and mortality.

    i.    Per data published on April 10, 2020, the mortality rate related to COVID-19 in Maryland is 2.2%. On the national level, the mortality rate is 3.2%. The national mortality rate translates to 320 deaths in 10,000 cases.

    ii.    For comparison purposes, seasonal influenza in 2018-2019 is estimated to have caused 34,157 deaths with a total of approximately 35.5 million cases, leading to a mortality rate of approximately 0.09%, or 9 deaths in 10,000 cases.

    iii.    Although the mortality rate of COVID-19 is likely somewhat lower than what is listed secondary to limitations of the data, preliminary statistics currently show a national mortality rate of COVID-19 that is almost 35 times the mortality rate of seasonal influenza.

H. **Risk factors**.

    i.    While we have limited information regarding specific risk factors for COVID-19, it has been generally accepted that **persons with serious underlying medical conditions – including HIV, asthma, chronic lung disease, serious heart conditions, immunocompromise, obesity (BMI, or body mass index, greater than 40 (*Exhibit B*)), diabetes, end-stage renal disease on hemodialysis, and liver disease – and persons 65 years of age and older, are at increased risk of severe illness and death from COVID-19.**[15]

    ii.    Preliminary data suggest that African-Americans are suffering from more severe illness related to COVID-19 at higher rates than other races in the United States. More research is needed, but these disparities are thought to be related to underlying pre-existing health disparities.

I. **Pandemic preparedness.**

    i.    Hospitals and healthcare systems across the nation have been diligently preparing for management of the COVID-19 pandemic over the past one to two months, while federal, state, and local government entities have been providing guidance and regulations for containment. Given lessons learned from past pandemics, it was anticipated based on the viral profile of COVID-19 that many of our healthcare entities will be overwhelmed by this pandemic, and several have been. Different cities and states seem to be experiencing their peaks at different times. Maryland's number of new

---

[15] Coronavirus disease 2019 (COVID-19): Groups at higher risk for severe illness. (Last reviewed 2020, April 17). Centers for Disease Control and Prevention. Retrieved April 14, 2020 from https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

daily cases saw a large jump on April 7, 2020 and it has remained steadily elevated since.[4]

ii.   In my experience working as a hospitalist at a community hospital, our administration has provided a significant amount of guidance and education to medical staff over the past six weeks in regards to: ensuring appropriate personal protective equipment and guidance on how and when to use it, as well as working with imminent shortages of PPE; determining whether a patient has concern for COVID-19 and criteria for testing, again especially in light of shortages of available tests; common diagnostic imaging and laboratory abnormalities in COVID-positive patients; concerning signs and symptoms of the virus; recommended management of COVID-19 with supportive care and mechanical ventilation. Guidance sometimes changes daily or multiple times daily and we do not have a lot of data yet to support various treatment regimens. In many hospitals, administration has created complex and thorough logistical plans in regards to ventilator accessibility, PPE conservation, balancing COVID-19 and non-COVID-19 patients geographically within the hospital, and maximizing negative-pressure airspace. **Preparation, planning, and communication of necessary information to staff, patients, and families has been essential to providing a coordinated and effective response.**

3. **Correctional facilities are at uniquely increased risk for poor outcomes during a pandemic.**

   A. I make the declarations below using a combination of general knowledge of correctional health facilities and the references listed within this document in relation to testimony I have reviewed of the incarcerated in Prince George's County jail facility.

   B. **Congregate environments are a set-up for rapid spread of virus**.
      i.   Jails and prisons are congregate environments in which incarcerated persons are necessarily required to live, work, eat, and recreate in shared spaces. Incarcerated persons are reliant on staff to provide them with food, hydration, clean clothing, sanitation products, and appropriate and timely medical care. Incarcerated persons within a facility share an air supply and typically live in small, close quarters, often with one or more inmates in a shared cell.
      ii.  **Many correctional health facilities across the nation are seeing rapid outbreaks in COVID-19 cases.** Recommendations in place to help contain of COVID-19 include social distancing. Social distancing refers to

the recommendation to avoid close contact and remain at least six feet apart from other persons.

iii. Even with social distancing guidelines in place in our communities nationwide to reduce the rate of viral spread, **the rate of COVID-19 infections has risen rapidly across the nation and is accompanied by an alarming mortality rate**. Containing this virus has been difficult in the community and it is almost impossible in correctional health settings given the congregate environment.

iv. Social distancing is near impossible in a correctional health environment as human movement into, out of and within correctional facilities is frequent and essential to provide adequate staffing of the facility, food and hydration for inmates, clean spaces, and attention to inmate's legal and medical needs. Jails over prisons, in particular, have high inmate turnover rates related to arrest and detainment.[10]

v. There are many reports from inmates, including I5 ¶7, 21 ¶10, 18¶7, 21 ¶10, Bunch Decl. ¶10, 25 ¶7, 27 ¶10 that indicate policies or conditions in the Prince George's County jail facility either deter or do not allow for social distancing.

    a. Inmates are provided telephones that are spaced less than six feet apart. Telephones should ideally be spaced greater than six feet apart to encourage social distancing, especially if inmates are restricted to using the phone to only one hour daily.

    b. Inmates in the housing unit are reported to be standing within six feet of each other when waiting in line for their medications. Many correctional health facilities have worked to transition to KOP (keep-on-person) policy for medications to avoid this issue, and this should be encouraged.

    c. Housing units are seemingly filled to capacity and inmates report short distances between cells (less than six feet) and that it is nearly impossible to remain more than six feet from other inmates. Most inmates have cellmates and beds are within six feet from each other. When beds are close together, it is recommended that inmates sleep foot to head, head to foot.

    d. Within the medical unit, inmates are "unable to remain six feet apart from the other inmates," given limited space.

C. **Inmates' high-risk status**. Inmates are higher risk at baseline than the general population for having more severe complications from COVID-19 because they are disproportionately more likely to be afflicted with medical chronic conditions, be obese, and be African-American. In addition, they are more susceptible to mental health complications, especially during this pandemic, because they are more likely to have mental health comorbidities and pandemics and isolation can increase feelings of anxiety and depression.

i.  **Chronic medical conditions**. The prison and jail population in America has been shown to be more likely than the general population to have chronic medical conditions and infectious diseases such as HIV, hepatitis and tuberculosis. Using data from the 2011-12 National Inmate Survey (NIS-3), an estimated 40% of state and federal prisoners and jail inmates reported having a current chronic condition while about half reported ever having a chronic medical condition.[16] Persons with chronic medical conditions are at higher risk for more severe complications when infected with COVID-19.

ii.  **Obesity**. In 2011-12, the majority of prisoners (74%) and jail inmates (62%) were overweight, obese, or morbidly obese. Obesity rates have only increased since 2011-12 so it is likely these percentages are even higher now. Persons with obesity are at higher risk for more severe complications when infected with COVID-19.

iii.  **Disproportionate number of African-American inmates**. Data from the Prison Policy Initiative, compiled from the 2010 Census, shows that black persons make up 29% of Maryland's population but 68% of the prison/jail population.[17] Preliminary data shows that African-Americans are at higher risk for more severe complications when infected with COVID-19.

iv.  **Mental health comorbidities**. The mentally ill are overrepresented in correctional settings at estimated rates ranging from two to four times the general population.[18] Stressors particular to a pandemic – such as social isolation, limited contact with family and friends, reduction in physical activity, anxiety about infection, increased financial pressure related to job loss, and grief related to death of friends and family members – can all act to increase feelings of depression and anxiety, and thereby increase risk of suicidal behavior. Stressors related to a pandemic while in jail or prison – such as feelings of being treated inhumanely, anxiety about delays in medical care, anger and frustration at inadequate treatment, feeling financially stressed about medical copays and the cost of necessary hygiene items – can all act to increase feelings of depression and anxiety as well.

v.  During this pandemic, inmate reports, including 25 ¶4-5, 27¶4, show that inmates with medical conditions that put them at increased risk of infection and disease, are not being cared for appropriately. Mental health risk is discussed in more detail below.

---

[16] Maruschuk, Laura M., et. al. (Revised 2016). Special report: Medical problems of state and federal prisoners and jail inmates, 2011-12. *Bureau of Justice Statistics*.

[17] Maryland profile. Prison Policy Initiative. Retrieved April 14, 2020 from https://www.prisonpolicy.org/profiles/MD.html.

[18] Al-Rousan, Tala et al. (2017). Inside the nation's largest mental health institution: A prevalence study in a state prison system. *BMC Public Health, 17*(342).

a. An inmate with asthma, a high-risk condition, was experiencing shortness of breath and waited two weeks for medical evaluation.

b. An inmate with HIV, a high-risk condition for infection, especially if he has a low CD4 count, was experiencing fever, cough and signs of infection. He reports waiting ten days for medical evaluation.

c. An inmate with asthma requested an albuterol inhaler at intake into the jail, but has not yet received one. Asthmatics should have access to albuterol as needed.

D. **Inadequate sanitation.** For inmates who must be incarcerated, it is essential that they are provided with adequate supplies to practice proper hygiene and sanitation in an effort to support containment of COVID-19. Housing unit cells are often very minimalist and an inmate's toilet is often in the same shared space as his bed, property, clothing, and hygiene items.

    i. Housing cells, communal recreation areas, washrooms, visitation rooms, staff quarters should all be sanitized regularly.

    ii. Effective sanitation requires provision of appropriate cleaning supplies, including gloves (when cleaning toilets), soap and/or adequate cleaning solution, clean water, and paper products or clean towels.

    iii. If cleaning rags are used, they should be cleaned frequently.

    iv. Body fluids should absolutely be cleaned from any surfaces.

    v. Communal telephones should be sanitized between each use.

    vi. Frequent touch surfaces should be cleaned routinely, at least daily and sometimes multiple times daily when indicated.

    vii. Inmates should have access to soap and clean water at all times to allow for frequent handwashing. Liquid hand soap preferred.

    viii. Clean clothing, including underwear, and wash towels, and/or a means to launder these items, should be provided.

    ix. Adequate personal hygiene, including showering and teeth-brushing, is important as well.

    x. General sanitation guidelines should be followed, such as regular removal of trash.

    xi. Sanitation supplies are essential during a pandemic so cost should not be placed as a barrier.

    xii. There are proper ways to effectively clean and sanitize, and if a facility designates that an inmate must clean his own space, he should be given specific supervision on how to do so.

    xiii. There are a concerning number of inmate reports, including 12 ¶7-8 and 12, 11 ¶18-20, 10 ¶11 and 13-14, 9 ¶17-19, 10 ¶14, 11 ¶13, 13 ¶9, 14 ¶8, Seth Decl. ¶11, 15 ¶7-8, Smith Decl. ¶10-11 and 15, John Doe No.2 ¶9, 18 ¶6 and 9, 23 ¶12, Bunch Decl. ¶9. 25 ¶9-10 indicating that conditions are not

in accordance with recommended hygiene and sanitation standards.
Inmate reports include:

i. Telephones and shared surfaces (frequent touch surfaces) within the housing units not being cleaned or sanitized between each use, or cleaning solution not available to use for sanitation by inmates. A few inmates, however, do report that there is a "detail" group of inmates who are designated for regular cleaning of the shared spaces one to three times daily.

ii. Inmates are not being provided with basic hygiene items (i.e. toothbrush or toothpaste) or soap unless they pay for it through the commissary, implying that indigent inmates are not being provided with sufficient means to protect themselves from the COVID-19 virus. A few inmates report that they have been given soap at intake or have otherwise received soap for free. Inmates in medical isolation are experiencing significant delays, up to a week, in receiving hygiene items and soap. Inability to access soap is inappropriate during a pandemic.

iii. Inmates in the H-6 isolation unit have not been given any cleaning supplies to clean their cells.

iv. An inmate's dirty, used linens came in contact with dirty, used linens from other inmates and he was advised to re-use these contaminated linens without laundering. These linens are considered contaminated and should be laundered prior to re-use.

v. Medical isolation cells are reported to have a significant amount of body fluids on the walls, including "mucous, feces, blood, old food, urine, spit", "around the walls, 360 degrees." For hygiene purposes, no inmate should be confined to a cell with body fluids on the walls. Body fluids are considered biohazardous waste and should be cleaned appropriately.

vi. Inmates in medical isolation have gone more than five days without showering, clean clothes, or washcloths.

vii. Ten inmates together in group quarantine in the medical unit are without access to a shower and are cleaning themselves using one communal bar of soap and sink without access to gloves for the minimal cleaning products they have been given.

viii. Jail staff are refusing to remove trash from the group quarantine cell in the medical unit, leading to bug infestation.

E. **Proper personal protective equipment is often not available, utilized inappropriately, or is not being enforced**. It should be acknowledged that the United States in general has struggled with a shortage of personal protective equipment (PPE) and there is a strong movement toward conservation of PPE.

Guidelines in regards to adequate PPE use have changed multiple times over the past six weeks.

    i. Personal protective equipment (PPE) includes a recommendation for face masks, ideally double-layered cloth, for all inmates and staff when within six feet of others or when in shared spaces.

    ii. Cloth face masks should be laundered before each daily use.

    iii. Surgical masks and N95 respirators are thought to be adequately effective as well against droplet transmission of virus, however because of PPE shortages, they are being reserved for healthcare professionals and medical first responders; this includes staff in correctional facilities who have direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases.

    iv. Eye protection, gloves, and gowns are recommended for staff performing temperature checks. When performing temperature checks on multiple individuals, a clean pair of gloves should be used for each individual and the thermometer should be thoroughly cleaned between each check. If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check.

    v. When cleaning toilets or surfaces contaminated with body fluids, gloves should be used.

    vi. Food handlers should be wearing masks and gloves when handling food.

    vii. Enforcement of face masks in a correctional facility setting may be difficult and you will find variable levels of enforcement among staff. Without consistent compliance of face mask use, the risk of droplet transmission of COVID-19 is dramatically increased, compromising the safety of inmates and staff.

    viii. There are a concerning number of inmate reports, including 1 0 ¶18-19, Smith 9-10, Doe 1 ¶10, Doe 2 7, 18 ¶9, 21, Doe 4 ¶13, 22 ¶10, 24 ¶6, Bunch ¶5, indicating that appropriate personal protective equipment is not being used, or is not being used properly. Inmate reports include:

        i. Inmates are being required to clean their cells daily without gloves, although some report glove availability for cleaning toilets. Gloves should be used for toilets or surfaces contaminated with body fluids. Many inmates report they have been refused gloves.

        ii. Inmates have been issued "paper" masks, but paper masks can become contaminated in time and need replacement. In a hospital setting, we obtain replacement surgical masks after five days, or earlier if the mask is visibly soiled, broken, or known to be contaminated. Inmates are being told that masks will not be replaced, even if they get lost, torn, or soiled.

        iii. There does not seem to be uniformity with correctional staff use of masks. "Some officers wear them and some do not." Ideally, all

correctional staff should be wearing masks when within six feet of any other person, staff or inmate.

iv. Meal tray delivery is occurring without masks or gloves, which is not in accordance with food handling guidelines. An inmate was threatened to not receive his food tray when he addressed this violation.

v. Prior to inmates being administered masks, they report using their shirt in a mask fashion. These inmates were threatened with segregation housing and in some cases administered segregation for trying to protect themselves.

F. **Prompt medical attention and triage to evaluate for COVID-19 is essential, however delays in medical care in correctional facilities are all too common**. In my clinical experience, persons infected with COVID-19 have the ability to rapidly decompensate from a respiratory standpoint once showing symptoms, sometimes requiring mechanical ventilation at an emergent pace. Hypoxia, or decreased oxygenation, is a significant concern with COVID-19. Symptoms indicating decompensation can include: fever, cough, difficulty breathing or shortness of breath, persistent pain or pressure in the chest, new confusion or inability to arouse, significant fatigue, bluish lips or face. Persons experiencing these symptoms are recommended to seek emergent medical care without delay. When patients oxygenation by non-invasive means (i.e. nasal cannula, facemask, etc.) cannot adequately provide the patient with sufficient oxygen, we recommend mechanical ventilation (intubation). **With the high infectivity of COVID-19, it is far safer for the patient and provider when the act of intubation is undertaken early and in a controlled, timely, and non-urgent fashion.** One of the more common and concerning complaints in correctional health facilities, however, is delay in medical care, which can ultimately compromise the inmate's quality of care, contribute to increase in morbidity and mortality, and cause increased healthcare costs to the system.

i. Delays in care are an ongoing concern in correctional health settings, and I anticipate that these routine delays will only be exacerbated in the setting of a pandemic.[19][20] **In the setting of COVID-19, delays in medical care can cost inmates their lives as we have seen relatively rapid respiratory decompensation in patients. Delays in medical care in the correctional environment often present in many forms**, including but not limited to:

---

[19] Hurst JD MDiv MA, Ashley, et. al. (2019). Deliberate indifference: Inadequate health care in U.S. prisons. *Annals of Internal Medicine. 170,* 563–564.

[20] Prison health care costs and quality: How and why states strive for high-performing systems. (2017 October). Pew Charitable Trusts. Retrieved April 14, 2020 from https://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

a. Multi-step sick call protocols;
b. The financial cost of sick call;
c. Complexity of chronic medical conditions, which becomes especially difficult to coordinate care in facilities with frequent inmate turnover;
d. Comorbid substance abuse and mental health issues that complicate medical symptomatology, especially in the setting of substance or medication withdrawal upon entry to jail;
e. Staff apathy related to inmate concerns;
f. Desire among staff members to limit interaction with acutely or chronically infected individuals out of fear;
g. Insufficient staff and inmate training related to acute and chronic healthcare issues;
h. Limited physician availability and access to physician care;
i. Limited access to medications. Oftentimes, an inmate cannot receive his chronic medications until a physician arrives to the facility which may only be as frequently as once per week;
j. Inadequate staffing of correctional officers to provide inmate transport as needed to medical facilities within and outside of the correctional facility;
k. Safety and institutional policies (i.e. lockdowns, segregational housing) that impede and delay inmate access to medical care;
l. Lack of uniform quality-of-care standards and oversight programs regulating quality of medical care in the correctional health setting;
m. Budget constraints which translate to reduced delivery of healthcare;
n. A fragmented system of electronic medical record systems across the nation that make it difficult to facilitate obtaining medical histories and providing continuity of care.

ii. There are a number of inmate reports, including 12 ¶3-4, 10 ¶9-10, Seth ¶4 and 6, Doe 1 ¶5 and 7, 18 ¶5, 19 ¶5-6, 23 ¶4-6, Bunch ¶11, 25 ¶5, 27 ¶7, indicating that barriers are in place to medical triage, or inmates are not being triaged in a timely or adequate fashion. Inmate reports include:

a. Placing a sick call requires a $4 copay, including for symptoms concerning for COVID-19. Eliminating barriers to medical care, for example sick call copays, when an inmate has symptoms concerning for a pandemic virus should be considered in the interest of public health.

b. Multiple inmates with symptoms concerning for COVID-19 report significant delays, up to 10 days, between placing a "sick call" form and receiving a medical evaluation. This is inappropriate; these inmates should be evaluated promptly in the interest of containment and adequate care.

14

c. Inmates with symptoms concerning for COVID-19, but without fever, are not undergoing medical evaluation. Fever is not present in 100% of COVID-19 cases, and sometimes fever temporarily remits. If an inmate has a constellation of symptoms concerning for COVID-19, it seems appropriate for him to be further evaluated by a medical provider.

d. Multiple inmates with symptoms concerning for COVID-19, including fever, are being transferred between the medical and housing unit multiple times, residing in the housing unit and going out to the recreation yard while febrile, significantly increasing the transmission of virus to staff and other inmates. These inmates ultimately tested positive for the virus.

e. An inmate who ultimately tested positive for COVID-19 reported symptoms, including "difficulty breathing." His medical evaluation was delayed for approximately five hours until he was transferred to the medical unit. Another reported such significant fatigue that he "couldn't get out of bed … but no one would take me seriously." These are symptoms that need to be handled urgently.

f. An inmate who was febrile and symptomatic for COVID-19, and ultimately tested positive, was told falsely that he could not have COVID-19 because he had been residing in the facility for more than two weeks, and sent back to his housing unit.

g. Inmates with symptoms concerning for COVID-19, including fever and respiratory symptoms, in a congregate facility with known COVID-19 and minimal containment efforts, are not being routinely evaluated for hypoxia. These inmates should have a full set of vital signs to evaluate for stability and hypoxia (reduced oxygen levels). Hypoxia requires oxygen supplementation and is one of the most urgent indicators of decompensation with COVID-19.

h. An inmate with symptoms concerning for COVID-19, who ultimately tested positive, was complaining of diaphoresis, vomiting, and weakness. His transfer to medical was delayed eight hours because the correctional officer "didn't believe him." The oncoming correctional officer on the next shift directed another inmate to put on a glove and hold it to the sick inmate's forehead to check for sweat. It is inappropriate to have someone who is not medically trained personnel to take part in triaging a sick inmate, especially when it requires exposing themselves to body fluids of an infected person, regardless of whether gloves were involved.

i. An inmate with asthma, a high-risk condition, was experiencing shortness of breath and waited two weeks for medical evaluation.

j.  An inmate with HIV, a high-risk condition for infection, especially if he has a low CD4 count, was experiencing fever, cough and signs of infection. He waited ten days for medical evaluation.

k.  An inmate with an infectious eye lesion was denied evaluation by a medical provider. He was advised to use an unsanitary washcloth as a warm compress.

l.  On April 7, inmate reports no sick call slips are available. Inmates are being advised that medical is only handling COVID-19 concerns, and not routine care, implying that inmates do not have access to medical care for non-COVID-19 issues.

m.  An indigent inmate with infectious symptoms reports he is unable to request medical evaluation because he does not have the sick call fee.

G.  **Proper medical triage, care and quarantine, with close monitoring, is required for cases of COVID-19 without indications for hospitalization.** Not every infected COVID-19 patient requires inpatient hospitalization. Patients who do not require oxygen supplementation or additional treatment absolutely need to quarantine but may not need inpatient hospital services. Effective quarantine of inmates who are infected with COVID-19 but not severely enough to require hospitalization is complicated given the inmate's regular reliance on interaction with staff throughout the day for basic needs such as food, drink, clean laundry; and for medical needs while ill, such as routine temperature, blood pressure, heart rate, and oxygen saturation checks, medication administration, etc. Unfortunately, mandated quarantine may lead to increased staff apathy and unwillingness to care for inmates appropriately given the staff's increased risk of obtaining COVID-19 in interacting with infected or possibly infected inmates. **In correctional health facilities, inmates infected with COVID-19 should ideally be quarantined in a separate single cell with solid walls (i.e. not bars) and solid doors that close fully.** Alternative options are recommended if this is not feasible, but this is the ideal, and other options will lead to increased transmission of the virus. **It is essential that quarantined inmates have the ability to notify staff in case of emergency, and that they are being monitored closely, as persons infected with COVID-19 can decompensate quickly from a respiratory standpoint.** Staff should minimize their in-person interactions with inmates when possible, as we know that increased length of exposure leads to increased transmission, but medical care should *not* be compromised because of that. Furthermore, quarantining COVID-infected persons should not be a contraindication to release from jail or prison if the person is willing and able to quarantine safely at home.

i.  There are inmate reports, including 10 ¶20 and 22, 9 ¶20 and 23, 6-8, indicating that inmates infected with COVID-19 are not being quarantined effectively or monitored closely. Inmate reports include:

i. Inmates in quarantine may not have access to fresh, clean drinking water. They have one "mildewy" sink to share, but the water source is questionable as there is a water cooler nearby which staff have not refilled, reportedly out of fear. Hydration is very important to people when they are sick; the body needs more fluids than it otherwise would. Inmates should have access to clean hydration at all times.

ii. A COVID-positive inmate who is being housed in a unit with call bells, rang the call bell to reach correctional staff and no one responded. Inmates are afraid that they will be unable to notify correctional staff in the event of an emergency.

iii. Two COVID-positive inmates with paid bonds are being held in quarantine until "they are no longer contagious." There is zero contraindication to releasing COVID-positive inmates so long as they can safely quarantine at home and are willing to do so, and wear a mask while transferring from the correctional facility to home.

iv. Inmates in quarantine have indicated that their temperatures are being checked, but not their oxygen levels. While there is no specific guideline for frequency of oxygen monitoring, hypoxia (low oxygen levels) is the greatest risk of COVID-19. If a COVID-positive patient is being quarantined in a medical facility, I feel it's standard of care to be checking oxygen levels regularly.

H. **Incapacitation of correctional facility staff**. Correctional health staff will likely be infected at increased rates above the public, similar to the incarcerated, given their close proximity to inmates and each other, leading to the risk of significant reduction in correctional facility staff as staff members become ill and are either admitted to the hospital or required to quarantine themselves at home. This reduction will very likely and significantly compromise the security of both persons in custody and the correctional officers responsible for supervising inmates in a system that is already massively overwhelmed with inmates and understaffed on a chronic basis. **Thoughtful and careful reduction in the number of inmates can help to decrease the burden on the jail and prison system.**

I. **Sharing and provision of knowledge and training during a pandemic is essential, but doesn't seem to be happening consistently**. Knowledge and training is essential to maximize positive health outcomes. Inmates and correctional facility staff should be receiving training on signs and symptoms of COVID-19, including what symptoms are most worrisome. Guidance should be given on adequate personal protective equipment and how to don and doff PPE appropriately. Guidelines should be clearly established for effective quarantining, adequate sanitation, expedition of medical attention when appropriate, and managing the day-to-day responsibilities of

the facility with a reduced number of staff. **It cannot be stressed enough that staff knowledge and training on COVID-19 and management strategies in congregate environments is essential during a pandemic to limit morbidity and mortality and reduce anxiety and panic.**

i. There are multiple reports by inmates, including 11 ¶6 and 11, 10 ¶5-6, 8 and 17, 9 ¶19. Seth ¶9, 15 ¶7-8, Smith ¶11 and 14, 18 ¶16, 20 ¶15 and 19, 2 3 ¶12, 25 ¶11,27 ¶14-15 that indicate that either the *jail staff* are either not being trained properly in regards to *containment* of COVID-19, or are not following recommended guidelines. These reports include:

   i. Inmates have not consistently been informed that they should socially distance, remaining six feet apart from other persons at all possible times, including during recreation time.

   ii. Placing uneaten meal trays on the floor of a cell. Meal trays should not be placed on the floor.

   iii. Meal tray delivery is occurring without masks or gloves. Food handlers should be wearing masks and gloves when handling food.

   iv. Inmates being required to clean the kitchen, a shared space within six feet of each other, without masks. I strongly feel that inmates should be wearing masks within six feet of each other given the known prevalence of COVID-19 within the facility, the fact that sanitation and PPE guidelines have not been followed, and especially in the setting of cleaning a known contaminated unit (as multiple inmates working in the kitchen were reported to be positive for COVID-19).

   v. Inmates being directed and required to clean known contaminated surfaces without training in contamination management.

   vi. Telephones and shared surfaces (frequent touch surfaces) within the housing units not being cleaned or sanitized between each use, or cleaning solution not available to use for sanitation by inmates.

   vii. Correctional staff have advised inmates in the quarantine unit that any items that go into quarantine cannot come back out, including trash. There is not a contraindication to removing trash. It should be removed regularly and discarded appropriately within contamination guidelines.

   viii. Concern by the inmates in variability among correctional officers regarding policy: "Some of the COs are worried and take this situation seriously, while others do not seem to know a lot about it. … They are putting us in jeopardy if they are not cautious." Policies should be carried out with consistency among supervising staff to minimize transmission of COVID-19.

ii. There are multiple reports by inmates, including 11 ¶9, 9 ¶6, 19 ¶9 that indicate that either the *jail staff* are either not being trained

properly in regards to *evaluation or management* of COVID-19, or are not following recommended guidelines.

    i.    Inmates with symptoms concerning for COVID-19, including fever and respiratory symptoms, in a congregate facility with known COVID-19 and minimal containment efforts, are not being evaluated for hypoxia. Inmates in medical isolation who are infected with COVID-19 are receiving temperature checks three times daily but not vital signs. In a medical setting, obtaining regular vital signs is standard of care, to evaluate for hemodynamic stability and hypoxia (reduced oxygen levels). **Fever is a symptom of COVID-19, but hypoxia is the life-threatening concern.**

    ii.    An inmate with symptoms which could be concerning for COVID-19, including fever, in a congregate facility with known COVID-19 and minimal containment efforts, is being told that he does not have COVID-19 without testing because he has been in the facility for two weeks. It is not accurate to say that the inmate could not have COVID-19.

    iii.    There are multiple reports by inmates, including 11 ¶12, that indicate that the *inmates* are either not receiving information about COVID-19, or are being restricted from information about COVID-19. These reports include:

        1.    Inmates are not being informed of jail policies regarding COVID-19. They have not received information in writing or verbally regarding COVID-19 or prevention strategies. They have not received guidance regarding social distancing.

        2.    Inmates are restricted from watching television news related to the nature of solitary confinement. Inmates do not have sufficient source of updated information regarding COVID-19.

    iii.    Inmates report signage regarding COVID-19, but only in the medical facility, where it can thereby only be viewed once inmates are symptomatic. Posting signage in the housing units should strongly be considered.

J.  **Mental health is just as important as physical health**. Incarcerated persons are at significantly higher risk of mental health issues. When you add in the stressors of incarceration, a public health pandemic, and solitary confinement – such as limited contact with family and friends, social isolation, reduction in physical activity, anxiety about infection, increased financial pressure related to job loss and cost of medical copays and hygiene items, grief related to death of friends and family members, feelings of being treated inhumanely, anxiety about delays in medical care, anger and frustration at inadequate medical treatment or delays in care – it becomes especially important that we tend to inmates' mental health and encourage a shared

sense of humanity to help prevent worsening of mental health with poor outcomes. In addition, we know that solitary confinement has effects on many inmates, including anxiety, panic, insomnia, paranoia, aggression, and depression.[21] **Efforts to help improve mental health include encouragement of contact with family via telephone or video chat if possible (in-person visitation has been limited in most facilities), availability of psychology/psychiatry staff as appropriate, and ensuring that inmates are receiving their prescribed psychiatric medications.**

i.   Per inmate declarations 12 ¶9 and 13-14, 11 ¶21, 10|14, 9 ¶2 1, 11 ¶13,1 3 ¶5, Seth ¶5, Smith ¶8 and ¶15, 17 ¶8, Doe 1 ¶9, and Bunch ¶4, I have concern that there has not been sufficient acknowledgement of or attention to the inmates' mental health under the stressors of pandemic and confinement.

    i.   It seems that all inmates have essentially been placed on lockdown with twenty-three hours of solitary confinement daily for an indefinite period of time.

    ii.  Psychologists/psychiatrists have not been made available. One inmate stated, "I can't get mental health treatment because the mental health people won't see me."

    iii. Books, reading material, and general entertainment are unavailable twenty-three hours a day. Phone calls to family and attorneys, and television are very limited and must be fit into the one hour of recreational time allowed for daily (which time also must include showering, cleaning, exercising, etc.).

    iv.  Inmates isolated in the medical unit cannot make telephone calls or receive visitation. While visitation is understandable in the setting of social distancing, telephone use and contact with family has traditionally been one of the highest priorities for inmates.

    v.   An inmate reports unwillingness to take his anti-seizure medication while in quarantine because, "I've lost my spirit, sort of given up, being in this situation."

    vi.  Inmates are hesitant to report COVID-19 symptoms because they do not want to deal with the further isolation of the medical unit. Other than three brief nursing visits daily in medical isolation, inmates "have no communication with the outside world." Setting up a system which deters inmates from reporting symptoms is dangerous from a containment standpoint.

    vii. Inmates are not receiving information about COVID-19, which can cause increased anxiety. One inmate reported, "Things are getting hostile here because people feel completely shut off, completely in the dark."

---

[21] Weir, Kirsten. (2012). "Alone, in 'the hole.'" *American Psychological Association: Monitor on Psychology*, 43(5), 54.

    viii.    Inmates report inhumane actions on the part of correctional staff, such as staff throwing items into their quarantine cell, staff fearing the inmates who are quarantined, and staff being advised to "put their head through the slot" for temperature checks, for which the inmates feel like "animals."

    ix.    One inmate was told he didn't deserve hygiene items because of the nature of his crime and was called a "cry-baby." This is inappropriate.

    x.    Additionally, inmates are unable to access the law library, having significant difficulty and pushback filing grievances regarding their concerns, and are unable to access medical services for non-emergent issues, which all contributes to anxiety and unrest.

K. **Reduction in number of infections in custody will lead to reduction in overall morbidity/mortality in custody**.

    i.    We cannot change the infectivity or morbidity/mortality profile of the virus without additional interventions such as a targeted vaccine and more effective medications which we do not currently have. These developments often take time and will not likely be produced in the immediate future.

    ii.    Given the limitations of congregate environments in addition to budget constraints, inadequate sanitation, overpopulated correctional health facilities, and chronic understaffing, we cannot reasonably expect to prevent the COVID-19 virus from entering into or spreading within correctional facilities using social distancing and even quarantining. We are already seeing COVID-19 spread into correctional facilities across the nation and in the Maryland prison system and once it is in a particular facility, the number of cases rises rapidly.[22]

    iii.    **We can, however, reduce the number of infected persons in custody by reducing the number of persons in custody.** Selectively releasing inmates who are high risk for morbidity/mortality and inmates who are low risk to society will have a high probability of reducing the number of infections and deaths in custody. Persons considered at highest risk of complications from infection are persons with serious underlying medical conditions – including HIV, asthma, chronic lung disease, serious heart conditions, immunocompromise, obesity (BMI > 40), diabetes, end-stage renal disease on hemodialysis, and liver disease – and persons 65 years of age and older. Preliminary data is also showing an increased risk associated with African-American race, although this is likely related to underlying health disparities associated with race in America.

---

[22] Jackson, P. (2020, April 9). Maryland confirms 57 coronavirus cases in state prison system, more than tripling in five days. *The Baltimore Sun*. doi: https://www.baltimoresun.com/coronavirus/bs-md-57-coronavirus-cases-maryland-prisons-20200409-f5jma73d3jdxbjgt653ahm3yve-story.html

L. **In summary, managing a COVID-19 outbreak will prove to be especially difficult, and even dangerous, in correctional facilities** given limited ability to adequately quarantine; poor sanitation practices; insufficient personal protective equipment for staff and inmates; routine delays in medical care and attention for a virus that can cause rapid respiratory decompensation; an inmate population who is higher risk than the general population for multiple reasons (chronic medical conditions, obesity, race); an expected reduction in available custody staff to enforce and provide protections for the inmates; and, inadequate pandemic preparation with lack of training and knowledge of staff and inmates related to COVID-19 precautions and symptomology. Medical recommendations always take risk versus benefit into consideration. In this time of national public health crisis, it is clear that the health risks we are levying on select citizens by keeping them incarcerated absolutely outweigh the benefit to society by keeping them incarcerated. As a physician and health provider, I strongly recommend supporting the protection of inmates during this public health crisis of COVID-19; by supporting inmate health, we are supporting public health.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: April 17, 2020

      Cary, North Carolina

Kristen A. Benninger, M.D.

# EXHIBIT 33

# Kristen A. Benninger, M.D.

Phone: (469) 667-9282  Email: kristen.a.benninger@gmail.com

## EDUCATION

**Family Medicine Residency**                                                          **July 2018**
University of North Carolina Hospitals                                          Chapel Hill, NC

**M.D., Medical Degree**                                                                  **May 2015**
Drexel University College of Medicine                                          Philadelphia, PA

**Post-Baccalaureate Studies**                                                        **May 2009**
University of Maryland at College Park                                        College Park, MD
*Pre-Medical coursework*

**Bachelor of Arts, Sociology**                                                       **May 2002**
University of Texas at Austin                                                            Austin, TX
*Major: Sociology, Minor: Women's Studies*

## LICENSURE/CERTIFICATIONS

ACLS, PALS, BLS for Healthcare Providers, *Active*                                        Aug. 2018
DEA license, Federal Drug Enforcement Administration, *Active*                   Dec. 2019
Board certification, American Board of Family Medicine, #1090917794, *Active*   Jul. 2018
Physician License, North Carolina Medical Board, #2018-00906, *Active*          Apr. 2018
Lean Six Sigma, Yellow Belt Certification                                                        Aug. 2015
National Provider Identifier (NPI) #1770960072                                             May 2015

## PRESENT POSITION

**UNC JOHNSTON HEALTHCARE, Smithfield, NC**                          **Jan. 2020 – Present**
Hospitalist
- *Johnston Hospital, Smithfield, NC*
- *Clayton Hospital, Clayton, NC*

## PREVIOUS PROFESSIONAL EXPERIENCE

**UNIVERSITY OF NORTH CAROLINA, Chapel Hill, NC**          **Sep. 2018 – Jan. 2020**
Clinical Assistant Professor, Family Medicine
- *Central Prison Healthcare Complex, Hospitalist & Urgent Care Provider*
- *UNC Hospitals Observation Unit, Hospitalist*
- *UNC Hospitals Family Medicine Inpatient Teaching Service, Attending*
- *UNC Family Medicine Center, Urgent Care Provider*
- *Chatham Hospital, Hospitalist*

**SUMMIT HEALTH, Various Locations in PA/NJ/DE**              **Jun. 2011 – Nov. 2012**
Health Screener

**UNIVERSITY OF MARYLAND SCHOOL OF MEDICINE, Baltimore, MD**  **Aug. 2008 – Jul. 2010**
Growth & Nutrition Clinic Coordinator
Children's HealthWatch Quality Control Manager

**CIRCUIT COURT FOR HOWARD COUNTY, Ellicott City, MD**     **Mar. 2007 – Aug. 2008**
Calendar and Information Management Technician

**PLANO MUNICIPAL COURT, Plano, TX**                              **Sep. 2001 – Oct. 2006**
    Municipal Court Supervisor
    Senior, Systems Support Coordinator / Special Projects
    Municipal Court Clerk II


## TEACHING RECORD

**UNIVERSITY OF NORTH CAROLINA, Chapel Hill, NC**
Attending (Teaching) Physician, Family Medicine                  **Sep. 2018 – Jan. 2020**
- *Central Prison Healthcare Complex, Hospitalist & Urgent Care Provider, Raleigh, NC*
- *UNC Hospitals Observation Unit, Hospitalist*
- *UNC Hospitals Family Medicine Inpatient Teaching Service, Attending*
- *UNC Family Medicine Center, Urgent Care Provider*
- *Chatham Hospital, Hospitalist, Siler City, NC*

Faculty Advisor, Community Service and Care of the Underserved Scholarly   **Nov. 2018 – Jan. 2020**
Concentration Program

Faculty Teacher, Vital signs, *Camp Cardiac* (Medical students)           **July 2019**


## PUBLICATIONS

"Improving Diabetic Retinal Screening at an Academic Family Medicine Practice: A Longitudinal Project to Improve Patient Care and Resident Education," co-author, submission for Society of Teachers of Family Medicine (STFM) 2018 Annual Spring Conference.


## PRESENTATIONS

"Prison Medicine"                                                 Feb. 2020
Presenter, Johnston Hospital didactics teaching

Interdisciplinary Morbidity and Mortality (M&M)                  Jan. 2018
Co-presenter, UNC residency-wide interdisciplinary M&M conference

*UNC Family Medicine Residency Didactics Teaching*
"Sleeping & Eating: Year One; The Good, Bad, Ugly and Weird"      Apr. 2017
"5 w.o. with Fever and Irritability: Case Presentation on Septic Hip in an Infant"   Dec. 2016
"QUASI: 28F with Sore Throat and Malaise (DVT prophylaxis)"       Sep. 2016
"14 m.o. with Rash and Fever: Case Presentation on Hand, Foot and Mouth Disease"   May 2016
"Tobacco Cessation Interventions at the Primary Care Visit"       Feb. 2016
"Insomnia"                                                        Oct. 2015


## PROFESSIONAL ORGANIZATIONS

Academic Consortium on Criminal Justice Health, *member*          **2019 – Present**
American Association of Family Practice, *member*                 **2015 – Present**

# EXHIBIT 34

## DECLARATION OF DR. CRAIG W. HANEY, PH.D.

I, Craig W. Haney, declare as follows:

1.    I am a Distinguished Professor of Psychology and UC Presidential Chair at the University of California, Santa Cruz, located in Santa Cruz, California, where I engage in research applying social psychological principles to legal settings including the assessment of the psychological effects of living and working in institutional environments, especially the psychological effects of incarceration. I have a Ph.D. in psychology and a J.D. degree, both awarded by Stanford University. I was a co-founder and co-director of the UC Criminal Justice & Health Consortium – a collaborative effort of researchers, experts and advocates from across the University of California system working to bring evidence-based health and healthcare solutions to criminal justice reform in California and nationwide.

2.    I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations on jail- and prison-related issues. Those agencies and organizations include the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the United States Department of Justice, the Department of Health and Human Services (HHS), the Department of Homeland Security, and the White House (under both the Clinton and Obama Administrations). In 2012, I testified as an expert witness before the Judiciary Committee of the United States Senate in a hearing that focused on the use and effects of solitary confinement and was appointed as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[1]

3.    I have been asked by attorneys at Civil Rights Corps who represent inmates at the Prince George's County Jail, Maryland to opine about the likely psychological impact of practices, procedures, and conditions that have been implemented by jail administrators and line staff to respond to the COVID-19 Pandemic and to recommend appropriate responses to the crisis.

4.    I have been provided with descriptions of jail practices and procedures that are currently being implemented at the Prince George's County Jail, and declarations from inmates providing further details about how they are being affected by the steps that jail staff have recently taken.

---

[1] For example, see *Brown v. Plata,* 563 U.S. 493 (2011).

5. It is my expert opinion that the Prince George's County Jail should urgently modify their current practices and procedures and instead implement the Center for Disease Control (CDC) guidelines. Moreover, it is likely that, even if these guidelines are implemented, there are certain groups of people whose safety the jail cannot guarantee. These inmates should be transferred to home confinement. Appropriate precautions must be taken to ensure that these prisoners are released safely, have access to housing, and to medical care.

6. COVID-19 is a serious, highly contagious disease and has reached pandemic status. At least 1,789,985 people around the world have received confirmed diagnoses of COVID-19 as of April 12, 2020, including 533,378 people in the United States. At least 109,822 people have died globally as a result of COVID-19 as of April 12, 2020, including 20,601 in the United States.[2] These numbers are predicted by health officials to continue to increase, perhaps exponentially. For example, the CDC has estimated that as many as 214 million people may eventually be infected in the United States, and that as many as 21 million could require hospitalization[3].

7. As of April 7, 2020, Prince George's County was reported have the highest number of reported COVID-19 cases in the entire state of Maryland.[4] On April 12, 2020, the state of Maryland had 7694 reported COVID-19 cases, and suffered 206 related deaths (higher than the District of Columbia and Virginia combined.[5] On March 30, 2020, Maryland Governor Larry Hogan ordered all Maryland residents

---

[2] Johns Hopkins Coronavirus Resource Center, https://coronavirus.jhu.edu. See, also, World Health Organization, *Coronavirus disease (COVID-19) Outbreak*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019; and Center for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[3] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, N.Y. TIMES (Mar. 18, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html

[4] See John Henry, Prince George's County Now Leads MD in Confirmed Coronavirus Cases, *WUSA.com*, April 7, 2020,
https://www.wusa9.com/article/news/health/coronavirus/prince-georges-count-now-leads-maryland-in-confirmed-coronaviru-cases/65-22715898-5d0b-4b19-b764-5f6b9a9591f8.

[5] Coronavirus Live Updates, *WUSA.com*.
https://www.wusa9.com/article/news/health/coronavirus/prince-georges-count-now-leads-maryland-in-confirmed-coronaviru-cases/65-22715898-5d0b-4b19-b764-5f6b9a9591f8

"to stay in their homes or places of residences" except for certain essential activities, like obtain necessary supplies or seeking medical treatment.[6]

8.      COVID-19 is a novel virus. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has immunity. Currently, the most effective ways to control the virus are to use preventive strategies, including social distancing, in order to maximize our healthcare capacity for a manageable number of patients. Otherwise, healthcare resources will be overwhelmed and the Pandemic will worsen.

9.      Social distancing presents serious challenges for everyone in every part of our society, but nowhere more than in penal institutions, where living conditions are unusually sparse and prisoners necessarily live in unescapably close quarters with one another.

10.     Moreover, jails and prisons are already extremely stressful environments for the persons confined in them.[7] They can be psychologically and medically harmful in their own right, rendering prisoners unusually vulnerable to stress-related and communicable diseases. Formerly incarcerated persons suffer higher rates of certain kinds of psychiatric and medical problems.[8] Incarceration leads to higher

---

[6] Order of the Governor of the State of Maryland, No. 20-03-30-01, at 2-3 (Mar. 30, 2020), available at https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-FOURTH-AMENDED-3.30.20.pdf.

[7] Much of this evidence is summarized in several book-length treatments of the topic. For example, see: Haney, C., *Reforming punishment: Psychological limits to the pains of imprisonment.* Washington, DC: American Psychological Association (2006); Liebling, A., & Maruna, S. (Eds.), *The effects of imprisonment.* Cullompton, UK: Willan (2005); and National Research Council (2014). *The Growth of Incarceration in the United States: Exploring the Causes and Consequences.* Washington, DC: The National Academies Press. In addition, there are numerous empirical studies and published reviews of the available literature. For example, see: Haney, C., Prison effects in the age of mass incarceration. *Prison Journal, 92,* 1-24 (2012); Johns, D., Confronting the disabling effects of imprisonment: Toward prehabilitation. *Social Justice, 45(1),* 27-55.

[8] E.g., see: Schnittaker, J. (2014). The psychological dimensions and the social consequences of incarceration. *Annals of the American Association of Political and Social Science, 651,* 122-138; Turney, K., Wildeman, C., & Schnittker, J., As fathers and felons: Explaining the effects of current and recent incarceration on major depression. *Journal of Health and Social Behaviour, 53(4),* 465-481 (2012). See, also: Listwan, S., Colvin, M., Hanley, D., & Flannery, D., Victimization, social support, and psychological well-being: A study of recently released prisoners. *Criminal Justice and Behavior, 37(10),* 1140-1159 (2010).

rates of morbidity (illness rates) and mortality (i.e., it lowers the age at which people die).[9]

11.    Prisons and jails in general lack the operational capacity to address the needs of persons in custody in a crisis of COVID-19's magnitude. These facilities are ill-equipped to provide incarcerated persons with ready access to cleaning and sanitation supplies, or to assure that staff sanitize all surfaces during the day. Inmates are surrounded by and enveloped in hard metal surfaces, precisely the kind on which the COVID-19 virus lives longest.

12.    Most correctional facilities already operated at or beyond the limits of their capacities to provide effective mental health or medical care long before the COVID-19 Pandemic began. It is unlikely that they will be able to rapidly increase their capacity in light of the challenges now faced by mental health and medical professionals in society at large. Thus, the ability of correctional facilities to gain access to ICU beds and ventilators in surrounding community hospitals may be extremely limited, especially when hospitals are already overtaxed by the current Pandemic.

13.    Because the demand for such services in this crisis will only grow, already scarce treatment resources will be stretched even more. Correctional facilities that do not act immediately to reduce their inmate populations will be faced with the likelihood that COVID-19 will spread rapidly throughout, overburdening the jails' medical care resources and impacting surrounding community hospitals, resulting in likely deaths.

14.    The fact that Prince George's County has suffered the highest number of COVID-19 cases in the state of Maryland underscores this concern.

15.    It is my understanding from the documents that I have reviewed that the Prince George's County Jail has implemented a form of generally housing unit "lockdowns" and also solitary-type confinement for some prisoners in response to the COVID-19 Pandemic. Prisoners are now confined to their cells for approximately 23 hours a day. General population cells house two prisoners in a very small space. The cells (where prisoners now sleep, eat, and defecate in the

---

[9] E.g., see: Binswanger, I., Stern, M., Deyo, R., et al., Release from prison: A high risk of death for former inmates. *New England Journal of Medicine, 356*, 157-165; Massoglia, M. Incarceration as Exposure: The Prison, Infectious Disease, and Other Stress-Related Illnesses. *Journal of Health and Social Behavior, 49(1),* 56-71; and Massolglia, M., & Remster, B., Linkages Between Incarceration and Health. *Public Health Reports, 134*(Supplement 1), 85-145 (2019); and Patterson, E. (2013). The dose-response of time served in prison on mortality: New York state, 1989-2003. *American Journal of Public Health, 103(3),* 523-528.

presence of another) are approximately 60 square feet in dimension. They contain two bunks, stacked atop one another. Prisoners are typically given only one hour of out-of-cell time, during which they can recreate (in groups of 10), make any social and legal phone calls, and shower before being returned to their small cells.

16.     During this limited one hour of out-of-cell time, prisoners crowd together to use the limited shared resources. They crowd together in the small area of outdoor space that affords them sunlight, and also when they have access to phones (since this is the only way for them to have immediate contact with the outside world). As a result, they are unable to maintain the recommended six feet of social distancing. Moreover, they are not being provided with adequate face masks, so they are unprotected when they come in such close contact with one another. In addition, like most prisons and jails, the Prince George's County Jail is ill-equipped to provide prisoners with ready access to cleaning and sanitation supplies, or to assure that staff sanitize all surfaces during the day. Yet prisoners are surrounded by and enveloped in hard metal surfaces, precisely the kind on which the COVID-19 virus lives longest. In addition, prisoners are denied access to liquid soap and effective alcohol-based disinfectants and hand sanitizers, which are recommended as effective for use against COVID-19 in free society.

17.     Furthermore, like all prisons and jails, the Prince George's County Jail has only limited means of protecting incarcerated persons from contact with staff who regularly enter the facility after having been in the outside world. Staff members are at risk of having contracted COVID-19 and then transmitting it to all those inside the institutions, including prisoners and other staff.

18.     In addition, any inmate who shows symptoms of COVID-19 is tested and place alone in medical isolation cells. It has been reported that the cells unsanitary and that many have feces, blood, and mucus on the walls. The only human contact that a prisoner has in a medical isolation cell is with a nurse who brings food trays and Tylenol. Prisoners are prohibited from leaving these cells for any reason— which means they cannot use telephones or shower during the entire period they are confined there. On average, the Jail keeps prisoners between two to five days in these isolation cells.

19.     If a prisoner tests positive for COVID-19, he is moved to a 10-person quarantine cell. Although prisoners in quarantine can use the telephone, they cannot leave the unit for any other reason, including to take a shower. Prisoners are kept for two weeks in these units, and go without showers for the entire time. In addition, because Jail staff do not enter the quarantine unit to clean it, there are insects, dirt, and trash accumulating inside them. Staff does not fill the water cooler in the unit, so prisoners must drink from the sink.

20.     These procedures are inappropriate, ill-conceived, and counter-productive for several reasons. In fact, they could very likely exacerbate rather than limit or alleviate the spread of COVID-19.[10] For one, general population housing units essentially have been turned into onerous lockdown units, which greatly increase the psychological stress under which prisoners live, potentially leading to mental and physical deterioration, interpersonal conflicts, and self-harm and suicidality. The fact that prisoners are double-celled during these lockdowns does not mitigate the negative effects of their essentially around-the-clock in-cell confinement. In fact, double-celling may exacerbate these effects because of the interpersonal tensions and stressors that such unavoidably close around-the-clock contact generates.

21.     The Prince George's County Jail lockdown units are now being in ways that are essentially identical to the solitary confinement-type housing that has been shown to place prisoners at significant risk of grave harm (including damage that is permanent, even fatal). Thus, there is a large literature on the adverse psychological and physical effects of the kind of isolation to which Prince George's County Jail prisoners are now being subjected to. This literature establishes a range of damaging consequences that come about when prisoners and others are subjected to the kinds of conditions that now prevail throughout this facility.

22.     Specifically, lockdowns and solitary confinement subject prisoners to a separate set of very serious harmful effects, ones that significantly undermine their mental and physical well-being and risk doing far more harm than good. The scientific literature on the harmfulness of solitary confinement in jails and prisons is now widely accepted and the research findings are consistent and alarming.[11]

---

[10] It is important to note that "shelter in place" or "stay at home" orders are not remotely the same thing as "lockdown" or "solitary confinement" as the latter are practiced in the Prince George's County Jail. Jail prisoners are locked in cells the size of a very small bathroom or a parking space, where they are confined essentially around-the-clock, without access to cell phones or other electronic devices (that persons sheltering in place are using to remain social connected and engaged), even more limited access to cleaning and disinfectant materials, reduced medical and psychological services on which they are completely dependent, and drastic reductions in personal property. Few if any persons in free society are subjected to restrictions remotely this onerous.

[11] These many studies have been carefully reviewed in a number of publications. For example, see: K. Cloyes, D. Lovell, D. Allen & L. Rhodes, Assessment of psychosocial impairment in a super-maximum security unit sample, *Criminal Justice and Behavior, 33*, 760-781 (2006); S. Grassian, Psychiatric effects of solitary confinement. *Washington University Journal of Law & Policy, 22*, 325-383 (2006); C. Haney, Restricting the use of solitary confinement. *Annual Review of Criminology, 1*, 285-310 (2018); C. Haney & M. Lynch, Regulating prisons of the future: The psychological consequences of solitary and supermax confinement. *New*

This research has led a number of professional mental and physical health-related, legal, human rights, and even correctional organizations to call for severe limitations on the degree to which solitary confinement is employed—specifically limiting when, for how long, and on whom it can be imposed.[12]

23.     Although the adverse effects of isolated confinement are widespread, and jeopardize the physical and psychological well-being of everyone exposed to them, this is especially true for prisoners with pre-existing mental health conditions. They are particularly likely to decompensate, suffer worsening depression, and even engage in self-harming and suicidal behavior in response to social isolation.

24.     For these reasons, psychologically vulnerable prisoners should be excluded from all forms of prison isolation (i.e., lockdowns and solitary confinement). This is particularly true for prisoners with serious mental illness, including major affective disorders (like bipolar disorders and major depressive disorder), schizophrenia, and other psychotic disorders.[13] If they cannot be, then they must be given access to enhanced psychological services. Yet, based on my many years of studying correctional systems and practices across the country, I know that ameliorative measures such as increased treatment and out of cell time will be among the first things that are suspended as the prison system diverts staff to address emergencies (such as the Pandemic). I am told that all or most of the mental health treatment and programming in the Prince George's County Jail has been suspended, including that the Jail has eliminated already infrequent out-of-cell contacts and needed confidential treatment and out-of-cell time. This means that mentally ill prisoners are at grave risk of decompensation, particularly those with serious mental illness.

---

*York Review of Law & Social Change, 23*, 477-570 (1997); and P. Smith, The effects of solitary confinement on prison inmates: A brief history and review of the literature, in Michael Tonry (Ed.), *Crime and Justice* (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[12] For a list of these organizations and their specific recommendations, see: Haney, C. (2018) Restricting the use of solitary confinement. *Annual Review of Criminology, 1*, 285-310; Haney, C., Ahalt, C., & Williams, B., et al. (2020). Consensus statement of the Santa Cruz summit on solitary confinement. *Northwestern Law Review*, in press.

[13] The category of "serious mental illness" is not defined in the DSM-V, but it is commonly understood to include at least these categories of mental illness. The National Institute of Mental Health defines "serious mental illness" as "as a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities." National Institutes of Mental Health, Mental Illness, https://www.nimh.nih.gov/health/statistics/mental-illness.shtml (last visited Apr. 16, 2020).

25.    In addition, the kind of onerous lockdown the Prince George's County Jail has imposed may lead to the COVID-19 virus going undetected. The lockdown decreases the interactions that prisoners have with correctional and healthcare staff members, compromising the latter's ability to identify symptoms. Moreover, the even more onerous conditions that the Prince George's County Jail imposes on prisoners who placed medical isolation likely serve as a disincentive for inmates to report their own symptoms. Prisoners understandably do not want to be placed in insect-infested, dirty cells where they will spend two weeks without access to telephones or showers.

26.    Finally, it is possible that the extraordinary added stress of social isolation under these especially onerous conditions—in general population "lockdown," in medical isolation cells, and in quarantine—are so extreme that the will operate to depress prisoners' immune systems and render them even more vulnerable to COVID-19 virus, and less able to combat it if and when they contract it.[14]

27.    In light of these facts and this panoply of very serious, well-established risks, it is my professional opinion that the Prince George's County Jail must urgently tale steps to implement the CDC guidelines without resort to preemptive lockdown procedures.

27.    In addition, even if the CDC guidelines are implemented, the Jail should take all feasible steps to significantly reduce the population of prisoners confined. Every prisoner who can be safely be released must be. Moreover, jail personnel must assist in ensuring that those prisoners are safely released, have access to housing, and to appropriate medical care in the community.

28.    It is also my opinion that, unless immediate measures are taken to implement the CDC guidelines for responding to the COVID-19 Pandemic, and to significantly reduce the population of persons housed in the Prince George's County Jail needless suffering and loss of life are likely to occur.

29.    With respect to lockdown procedures, I urgently recommend that the Prince George's County Jail cease to employ general, preemptive lockdowns, wherein prisoners are combined to their cells. Instead, the Jail should institute such

[14] Dhabhar, F. S. (2014). Effects of stress on immune function: The good, the bad, and the beautiful. *Immunologic Research*, 58(2), 193–210. https://doi.org/10.1007/s12026-014-8517-0. In addition, as Louise Hawkley summarized, a "growing body of research suggests that people who are socially isolated hav increased rates of hypertension, chronic cardiovascular diseases such as heath disease and stroke, and early mortality." Hawkley, L. (2020). Social isolation, loneliness, and health, in Jules Lobel & Peter Scharff Smith (eds.), *Solitary confinement: Effcts, practices, and pathways toward reform* (pp.185-198). New York: Oxford University Press, p. 195. Thus, in addition to the effects of stress, social isolation makes people less healthy in general, and likely more susceptible to pathogens such as COVID-19.

lockdowns only where medically necessary to resolve discrete issues, such as sanitizing dorms or contact tracing of an infected prisoner. If the Prince George's County Jail resorts to these lockdowns, it should do so in a reasonably time-limited manner and communicate that time-limit to the prisoners who are affected. Moreover, if lockdowns are employed, the Jail should ensure inmates' access to resources to protect their mental health, such as reading material and adequate access to phones, and Jail staff should regularly communicate with and monitor the physical and mental health of prisoners who are on lockdown.

30.     In addition, as I stated above, I believe that the Jail must avoid the use of lockdown procedures with prisoners who suffer pre-existing mental health conditions unless they are absolutely necessary. If psychologically vulnerable prisoners must go on lockdown, the Jail should ensure that the lockdown is as brief as reasonably possible, and that these prisoners are provided with *enhanced* psychological services while they are on lockdown.

30. With respect to the Jail's medical isolation procedures, to mitigate the psychological stress of isolation, I urgently recommend that medical isolation cells be kept sanitary and that prisoners isolated in them are given access to adequate personal hygiene supplies, clean water, changes of clothes, and reading material. To the extent feasible, medically isolated prisoners should also be given reasonable access to phones. Prisoners should remain in isolated for the shortest amount of time reasonably possible to satisfy the CDC guidelines. Finally, medically isolated prisoners should be checked regularly by Jail staff and given regular access to psychological services. These steps are critical for all prisoners. They are particularly critical for psychologically vulnerable prisoners.

31. It is my opinion that, unless these steps are taken to end general, preemptive lockdowns and mitigate the psychological stress of temporary lockdowns and medical isolation procedures, prisoners will face grave dangers to their mental and physical health.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2020 at Santa Cruz, California.

Craig W. Haney
_____
DR. CRAIG W. HANEY, PH.D.

# EXHIBIT 35

CURRICULUM VITAE

Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

home address:        317 Ocean View Ave.
                     Santa Cruz, California 95062
phone:               (831) 459-2153
fax:                 (831) 425-3664
email:               psylaw@ucsc.edu

PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |

1

| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

## HONORS AWARDS GRANTS

| 2020 | Finalist, Stockholm Prize in Criminology (for "outstanding achievements in criminological research or for the application of research results by practitioners for the reduction of crime and the advancement of human rights"). |
| 2018 | Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections"). |
| 2016 | Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council. |
| | Psychology Department "Most Inspiring Lecturer" |
| 2015 | University of California Presidential Chair (2015-2018 Term) |
| | Martin F. Chemers Award for Outstanding Research in Social Science |
| | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
| | President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen). |
| | Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council. |
| | Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof] |
| 2014 | Distinguished Faculty Research Lecturer, University of California, Santa Cruz. |
| 2013 | Distinguished Plenary Speaker, American Psychological Association Annual Convention. |
| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |

Invited Expert Witness, United States Senate, Judiciary Committee.

2011    Edward G. Donnelly Memorial Speaker, University of West Virginia Law School.

2009    Nominated as American Psychological Foundation William Bevan Distinguished Lecturer.

Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors).

2006    Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>).

Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>).

"Dream course" instructor in psychology and law, University of Oklahoma.

2005    Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz.

Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient).

Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley).

2004    "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz.

National Science Foundation Grant to Study Capital Jury Decision-making

2002    Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000      Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999      American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997      National Science Foundation Grant to Study Capital Jury Decision-making.

1996      Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995      Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994      Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992      Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

1991      Alumni Association Teaching Award ("Favorite Professor")

1990      Prison Law Office Award for Contributions to Prison Litigation

1989      UC Mexus Award for Comparative Research on Mexican Prisons

1976      Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School

| 1975-76 | Law and Psychology Fellow, Stanford Law School |
|---|---|
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

## UNIVERSITY SERVICE AND ADMINISTRATION

| 2010-2016 | Director, Legal Studies Program |
|---|---|
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

WRITINGS AND OTHER CREATIVE ACTIVITIES <u>IN PROGRESS</u>

Books:

<u>Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace</u> (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.


PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

<u>Books</u>

2020    <u>Criminality in Context: The Psychological Foundations of Criminal Justice Reform</u>. Washington, DC: American Psychological Association Books.

2014    <u>The Growth of Incarceration in the United States: Exploring the Causes and Consequences</u> (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006    <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>, Washington, DC: American Psychological Association Books.

2005    <u>Death by Design: Capital Punishment as a Social Psychological System</u>. New York: Oxford University Press.


<u>Monographs and Technical Reports</u>

1989    <u>Employment Testing and Employment Discrimination </u>(with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

Articles in Professional Journals and Book Chapters

2020    "Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), Solitary Confinement: Effects, Practices, and Pathways to Reform (129-152). New York: Oxford University Press.

"Continuing to Acknowledge the Power of Dehumanizing Environments: Responding to Haslam, et al. (2019) and Le Texier (2019)" (with Philip Zimbardo), American Psychologist, 75(3), 400-402.

2019    "Afterword," in Robert Johnson, Condemned to Die: Life Under Sentence of Death (pp. 136-141). Second Edition. New York: Routledge.

"Changing correctional culture: Exploring the role of U.S.-Norway exchange in placing health and well-being at the center of U.S. prison reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), American Journal of Public Health, in press.

2018    "Restricting the Use of Solitary Confinement," Annual Review of Criminology, 1, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), Law & Policy, in press.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. Journal of General Internal Medicine, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), The Criminalization of Mental Illness (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," Crime and Justice, 47, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), Psychology, Public Policy, and Law, 24, 326-346.

2017        "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," <u>Punishment and Society</u>, <u>19</u>, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), <u>Torture and Its Definition in International Law: An Interdisciplinary Approach</u> (pp.139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, <u>International Journal of Prisoner Health</u>, <u>13</u>, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), <u>International Journal of Prisoner Health</u>, <u>13</u>, 41-48.

2016        "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), <u>The Prison Journal</u>, <u>96</u>, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book <u>Moral Disengagement: How People Do Harm and Live With Themselves</u>, by A. Bandura], <u>PsycCRITIQUES</u>, 61(8).

2015        "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), <u>Law & Social Inquiry</u>, <u>40</u>, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books (in press).

"Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

"Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011    "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), <u>Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors</u> (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), <u>Michigan State Law Review</u>, 2011, 573-608.

2010    "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" <u>Connecticut Public Interest Law Review</u>, <u>9</u>, 139-196.

"Hiding From the Death Penalty," <u>Huffington Post</u>, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in <u>Sentencing and Justice Reform Advocate</u>, <u>2</u>, 3 (February, 2011).

2009    "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), <u>Law and Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>, <u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," <u>University of Missouri-Kansas City Law Review</u>, <u>77</u>, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

2008    "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," <u>Golden Gate Law Review</u>, <u>37</u>, 131-173.

"Preface," D. Jones (Ed.), <u>Humane Prisons</u>. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment</u> (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," <u>DePaul Law Review</u>, <u>53</u>, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), <u>Analyses of Social Issues and Public Policy (ASAP)</u>, <u>4</u>, 1-22.

"Abu Ghraib and the American Prison System," <u>The Commonwealth</u>, <u>98 (#16)</u>, 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review.

2002    "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), Taking Psychology and Law into the Twenty-First Century (pp. 35-59). New York: Kluwer Academic/Plenum Publishing.

"Science, Law, and Psychological Injury: The Daubert Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., The Handbook of Psychological Injury (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001    "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), Treating Adult and Juvenile Offenders with Special Needs (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), Undoing Time (pp. 245-256). Boston, MA: Northeastern University Press.

2000      "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999      "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998      "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American</u> <u>Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997      "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, <u>America's Experiment with Capital Punishment</u>: <u>Reflections on the Past, Present, and Future of the Ultimate Penal Sanction</u>. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), <u>Law and Human Behavior</u>, <u>21</u>, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" <u>Studies in Law, Politics, and Society</u>, <u>16</u>, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," <u>Santa Clara Law Review</u>, <u>35</u>, 547-609. [Reprinted in part in David Papke (Ed.), <u>Law and Popular Culture</u>, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993      "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," <u>Law and Human Behavior</u>, <u>17</u>, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

1992      "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-195.

1991      "The Fourteenth Amendment and Symbolic Legality: Let Them Eat

Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988        "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

1986        "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984        "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983        "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982        "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>,

17

191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), Law and American History: Cases and Materials. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) Introduction to Criminal Justice: A Sociological Perspective. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), The Analysis of Judicial Reform.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," Industrial Relations Law Journal, 5, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), Polygraph, 11, 185-199.

1981      "Death Qualification as a Biasing Legal Process," The Death Penalty Reporter, 1 (10), pp. 1-5. [Reprinted in Augustus: A Journal of Progressive Human Sciences, 9(3), 9-13 (1986).]

1980      "Juries and the Death Penalty:  Readdressing the Witherspoon Question," Crime and Delinquency, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979      "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings," Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, Revisita de Psicologia Social, 1, 95-105 (1986).]

1973   "Social Roles, Role-Playing, and Education" (with P. Zimbardo),
The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45.
[Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For
Our Times. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E.
and Hunt, R. (Eds.) Current Perspectives in Social Psychology.
Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P.
Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine,
April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.),
Psychology Is Social:  Readings and Conversations in Social
Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and
P. Zimbardo), International Journal of Criminology and Penology,
1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry,
Robert (Eds.) Examining Deviance Experimentally. New York:
Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience.
Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of
Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-
lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977;
Johnston, Norman, and Savitz, L. Justice and Corrections. New
York: John Wiley, 1978; Research Methods in Education and Social
Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern
Sociology. British Columbia:  Open Learning Institute, 1980; Ross,
Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and
Abuse of Human Resources of Prison. Toronto:  Butterworth's 1981;
Monahan, John, and Walker, Laurens (Eds.), Social Science in Law:
Cases, Materials, and Problems. Foundation Press, 1985: Siuta,
Jerzy (Ed.), The Context of Human Behavior. Jagiellonian
University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social
Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield
Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), Menschenversuche
(Experiments with Humans). Frankfurt, Germany: Suhrkamp
Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P.
Zimbardo).  Naval Research Reviews, 1-17. [Reprinted in Aronson,
E. (Ed.) Readings About the Social Animal. San Francisco: W.H.
Freeman, 1980; Gross, R. (Ed.) Key Studies in Psychology. Third
Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), Basic
Themes in Law and Jurisprudence. Anderson Publishing, 2000.]

MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC
MEETINGS AND RELATED SETTINGS (SELECTED)

2019   "The Recent History of Corrections in Norway and the United
States," Plenary Address, Justice Reinvestment Summit, Salem, OR,
February.

"The Dimensions of Suffering in Solitary Confinement," Plenary
Address, Washington College of Law at American University,
Washington, DC, March.

"Implementing Norwegian Correctional Principles to Change Prison
Culture in Oregon Prisons," Invited Address, Oregon Department of
Corrections Leadership Team, Salem, OR, June.

"Humanizing American Jails and Prisons," Center for Court
Innovation, International Summit, New York, NY, June.

"From the Stanford Prison Experiment to Supermax Prisons and
Back Again: Changing the Narrative in Criminal Justice Reform,"
Invited Address, Norwegian Correctional Academy, Oslo, Norway,
September.

Plenary Address, "Perspectives on Solitary Confinement,"
Northwestern University Law Review Symposium, Chicago, IL,
November.

2018   "The Art and Science of Capital Mitigation," Federal Death Penalty
Training Conference, Atlanta, Georgia, June.

"From Eastern State Penitentiary to Supermax Prisons," Safe
Alternatives to Segregation Conference, Vera Institute of Justice,
Philadelphia, PA, June.

Plenary Address, "Advancing Prisoners' Rights Through Law and Psychology," Denver Law Prisoners' Advocates Conference, University of Denver Sturm College of Law, Denver, CO, October.

"In Praise of Positivism in the Age of 'Fake News' and 'Alternative Facts,'" Research Frontiers Conference, Santa Cruz, CA, October.

2017    "Neuroscience in Policy: Solitary Confinement in California," Law & Neuroscience Conference, San Francisco, CA, February.

"In My Solitude: The Detrimental Effects of Solitary Confinement on the Brain," Exploratorium-Fisher Bay Observation Gallery, San Francisco, CA, February.

"Brief History of Correctional Reform in the United States," Community Corrections Partnership/Smart on Crime Community Forum, Santa Cruz Civic Auditorium, May.

"Reducing and Eliminating the Use of Solitary Confinement in Irish Prisons," Joint Conference with the Irish Prison Service, Department of Justice, and Irish Penal Reform Trust, Dublin, Ireland, June.

"The Emerging Consensus on When, for How Long, and On Whom Solitary Confinement Should Ever Be Imposed," Leadership, Culture and Managing Prisons: Knowledge Exchange between the USA and Europe (LEADERS), Trinity College, Dublin, Ireland, June.

"Sykes and Solitary: The Transformation of the Penal Subject in the Devolution from a 'Society of Captives' to Supermax Prisons," Power and Authority in Modern Prisons: Essays in Memory of Gresham Sykes Workshop, Centre for Prison Research, Cambridge University, Cambridge, England, September.

"Context Is Everything: The Social Psychology of Imprisonment," Joint USA/Scandinavian Correctional Exchange Program, Oslo, Norway, September.

2016    "The Culture of Punishment," American Justice Summit, New York, January.

22

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: Coleman and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015  "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S.,

National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014    "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013    "Isolation and Mental Health," Michigan Journal of Race and Law Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012    "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011    "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye

on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008 "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007 "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006 "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005        "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004        "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003    "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002        "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001        "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000   "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999   "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

31

1998       "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997       "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996       "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995       "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994          "Mitigation and the Social Genetics of Violence: Childhood
              Treatment and Adult Criminality," Invited Address, Conference on
              the Capital Punishment, Santa Clara Law School, October, Santa
              Clara.

1992          "Social Science and the Death Penalty," Chair and Discussant,
              American Psychological Association Annual Convention, San
              Francisco, CA, August.

1991          "Capital Jury Decisionmaking," Invited panelist, American
              Psychological Association Annual Convention, Atlanta, GA, August.

1990          "Racial Discrimination in Death Penalty Cases," Invited
              presentation, NAACP Legal Defense Fund Conference on Capital
              Litigation, August, Airlie, VA.

1989          "Psychology and Legal Change: The Impact of a Decade," Invited
              Address to Division 41 (Psychology and Law), American
              Psychological Association Annual Convention, New Orleans, LA.,
              August.

              "Judicial Remedies to Pretrial Prejudice," Law & Society
              Association Annual Meeting, Madison, WI, June.

              "The Social Psychology of Police Interrogation Techniques" (with R.
              Liebowitz), Law & Society Association Annual Meeting, Madison,
              WI, June.

1987          "The Fourteenth Amendment and Symbolic Legality: Let Them Eat
              Due Process," APA Annual Convention, New York, N.Y. August.

              "The Nature and Function of Prison in the United States and
              Mexico: A Preliminary Comparison," InterAmerican Congress of
              Psychology, Havana, Cuba, July.

1986          Chair, Division 41 Invited Address and "Commentary on the
              Execution Ritual," APA Annual Convention, Washington, D.C.,
              August.

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

34

1975          "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.


SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2016-present     Editorial Consultant, <u>Translational Issues in Psychological Science</u>.

2015-present     Editorial Consultant, <u>Criminal Justice Review</u>.

2014-present     Editorial Board Member, <u>Law and Social Inquiry</u>.

2013-present     Editorial Consultant, <u>Criminal Justice and Behavior</u>.

2012-present     Editorial Consultant, <u>Law and Society Review</u>.

2011-present     Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present     Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present     Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present     Editorial Consultant, <u>Journal of Offender Rehabilitation</u>.

2004-present     Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003        Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

2000-present     Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues)

1997-present     Editorial Board Member (until 2004), Consultant, <u>Psychology, Public Policy, and Law</u>

1991             Editorial Consultant, Brooks/Cole Publishing

1989             Editorial Consultant, <u>Journal of Personality and Social Psychology</u>

| | |
|---|---|
| 1988- | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985 | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-1985 | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |
| 1993-present | <u>Psychology, Public Policy, and Law</u>, Editorial Consultant |

<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on
      Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute,
      "Effects of Incarceration on Children, Families, and Low-Income Communities"
      Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom
      (USCIRF). Evaluation of Immigration and Naturalization Service Detention
      Facilities, July, 2004-2005.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant
      on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of
      Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs
      designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of
      legislative and budgetary proposals concerning the detention of undocumented
      persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's
      Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the
      Constitution, Civil Rights, and Property Rights (Senators Brownback and
      Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in
      the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy
      Task Force," member providing written policy recommendations to the
      California legislature concerning overcrowding crisis in the California
      Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice,
      "Correctional Excellence" Program, providing instruction concerning conditions
      of confinement and psychological stresses of living and working in correctional
      environments to mid-level management corrections professionals, May, 2004-
      2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice,
      Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of
Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety,
August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint
Working Group with Senator James Webb and Congressional Staffs, 2011
Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special
Rapporteur on Torture Concerning the Overuse of Solitary Confinement,
New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the
Constitution, Civil Rights, and Human Rights Hearing on Solitary
Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and
Consequences of the High Rate of Incarceration in the United States,
2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public
officials at Pew Research Center, Congressional staff, and White House staff
concerning policy implications of The Growth of Incarceration in the United
States: Exploring the Causes and Consequences (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy
Council on formulation of federal policy concerning use of segregation
confinement, 2015.


PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION


Hoptowit v. Ray [United States District Court, Eastern District of Washington,
1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of
conditions of confinement at Washington State Penitentiary at Walla Walla for
United States Department of Justice.

Wilson v. Brown (Marin Country Superior Court; September, 1982, Justice
Burke).  Evaluation of effects of overcrowding on San Quentin mainline
inmates.

Thompson v. Enomoto (United States District Court, Northern District of
California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of
conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989). Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990). Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities. [See Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014)].

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# EXHIBIT 36

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of **March 23, 2020**.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the following CDC website periodically for updated interim guidance: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

## In this guidance

- Who is the intended audience for this guidance?
- Why is this guidance being issued?
- What topics does this guidance include?
- Definitions of Commonly Used Terms
- Facilities with Limited Onsite Healthcare Services
- COVID-19 Guidance for Correctional Facilities
- Operational Preparedness
- Prevention
- Management
- Infection Control
- Clinical Care of COVID-19 Cases
- Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons
- Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

## Who is the intended audience for this guidance?



This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.



## Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. **At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**

## What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

√   Operational and communications preparations for COVID-19

√   Enhanced cleaning/disinfecting and hygiene practices

√   Social distancing strategies to increase space between individuals in the facility

√   How to limit transmission from visitors

√   Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

√   Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

√   Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited

√   Healthcare evaluation for suspected cases, including testing for COVID-19

√   Clinical care for confirmed and suspected cases

√   Considerations for persons at higher risk of severe disease from COVID-19

## Definitions of Commonly Used Terms

**Close contact of a COVID-19 case**—In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

**Cohorting**—Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19**—Community transmission of COVID-19 occurs when individuals acquire the disease through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing cases inside their walls. Facilities should consult with local public health departments if assistance is needed in determining how to define "local community" in the context of COVID-19 spread. However, because all states have reported cases, all facilities should be vigilant for introduction into their populations.

**Confirmed vs. Suspected COVID-19 case—**A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms. A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results. If test results are positive, a suspected case becomes a confirmed case.

**Incarcerated/detained persons—**For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting where these guidelines are generally applicable. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e, detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical Isolation—**Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials (detailed in guidance below). In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion.

**Quarantine—**Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility.

**Social Distancing—**Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication.

**Staff—**In this document, "staff" refers to all public sector employees as well as those working for a private contractor within a correctional facility (e.g., private healthcare or food service). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators.

**Symptoms—**Symptoms of COVID-19 include fever, cough, and shortness of breath. Like other respiratory infections, COVID-19 can vary in severity from mild to severe. When severe, pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood. Monitor the CDC website for updates on these topics.

## Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails usually employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of confirmed and suspected COVID-19 cases and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with confirmed and suspected COVID-19 cases. Facilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic.

## COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections can be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness**. This guidance is intended to help facilities prepare for potential COVID-19 transmission in the facility. Strategies focus on operational and communications planning and personnel practices.

- **Prevention.** This guidance is intended to help facilities prevent spread of COVID-19 from outside the facility to inside. Strategies focus on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals).

- **Management.** This guidance is intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission. Strategies include medical isolation and care of incarcerated/detained persons with symptoms (including considerations for cohorting), quarantine of cases' close contacts, restricting movement in and out of the facility, infection control practices for individuals interacting with cases and quarantined contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas visited by cases.

## Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

### Communication & Coordination

√   **Develop information-sharing systems with partners.**

- o   Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before cases develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.

- o   Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.

- o Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
- o Where possible, put plans in place with other jurisdictions to prevent confirmed and suspected COVID-19 cases and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.
- o Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.

√ **Review existing pandemic flu, all-hazards, and disaster plans, and revise for COVID-19.**

- o Ensure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases. (Medical isolation and quarantine locations should be separate). The plan should include contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for details regarding individual medical isolation and quarantine locations (preferred) vs. cohorting.
- o Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care.
- o Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
- o Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the epidemiologic context changes.

√ **Coordinate with local law enforcement and court officials.**

- o Identify lawful alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission.
- o Explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak.

√ **Post signage throughout the facility communicating the following:**

- o **For all:** symptoms of COVID-19 and hand hygiene instructions
- o **For incarcerated/detained persons:** report symptoms to staff
- o **For staff:** stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.
- o Ensure that signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

## Personnel Practices

√ **Review the sick leave policies of each employer that operates in the facility.**

- o Review policies to ensure that they actively encourage staff to stay home when sick.
- o If these policies do not encourage staff to stay home when sick, discuss with the contract company.
- o Determine which officials will have the authority to send symptomatic staff home.

√ **Identify staff whose duties would allow them to work from home. Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of COVID-19 transmission.**

- o Discuss work from home options with these staff and determine whether they have the supplies and technological equipment required to do so.

- o Put systems in place to implement work from home programs (e.g., time tracking, etc.).

√ **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.

- o Allow staff to work from home when possible, within the scope of their duties.

- o Identify critical job functions and plan for alternative coverage by cross-training staff where possible.

- o Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.

- o Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

√ **Consider offering revised duties to staff who are at** higher risk of severe illness with COVID-19**.** Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

- o Facility administrators should consult with their occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to COVID-19.

√ **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza cases in a facility can speed the detection of COVID-19 cases and reduce pressure on healthcare resources.

√ **Reference the Occupational Safety and Health Administration website for recommendations regarding worker health.**

√ **Review** CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer.

## Operations & Supplies

√ **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility.**

- o Standard medical supplies for daily clinic needs

- o Tissues

- o Liquid soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

- o Hand drying supplies

- o Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)

- o Cleaning supplies, including EPA-registered disinfectants effective against the virus that causes COVID-19

- o   Recommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when face masks are acceptable alternatives to N95s.
- o   Sterile viral transport media and sterile swabs to collect nasopharyngeal specimens if COVID-19 testing is indicated

√ **Make contingency plans for the probable event of PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**

- o   See CDC guidance optimizing PPE supplies.

√ **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty.

√ **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)

- o   Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

√ I**f not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit tested for any respiratory protection they will need within the scope of their responsibilities.**

√ **Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.** See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with COVID-19 cases or their close contacts.

## Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission.

## Operations

√ **Stay in communication with partners about your facility's current situation.**

- o   State, local, territorial, and/or tribal health departments
- o   Other correctional facilities

√ **Communicate with the public about any changes to facility operations, including visitation programs.**

√ **Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.**

- o Strongly consider postponing non-urgent outside medical visits.

- o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **Implement lawful alternatives to in-person court appearances where permissible.**

√ **Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for respiratory symptoms.**

√ **Limit the number of operational entrances and exits to the facility.**

## Cleaning and Disinfecting Practices

√ **Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced.**

√ **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.

- o Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

- o Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

- o Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

- o Labels contain instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use.

√ **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**

√ **Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.**

## Hygiene

√  **Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**

√  **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signage throughout the facility, and communicate this information verbally on a regular basis.** Sample signage and other communications materials **are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

   o  **Practice good cough etiquette:** Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.

   o  **Practice good** hand hygiene**:** Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

   o  **Avoid touching your eyes, nose, or mouth without cleaning your hands first.**

   o  **Avoid sharing eating utensils, dishes, and cups.**

   o  **Avoid non-essential physical contact.**

√  **Provide incarcerated/detained persons and staff no-cost access to:**

   o  **Soap—**Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing.

   o  **Running water, and hand drying machines or disposable paper towels for hand washing**

   o  **Tissues** and no-touch trash receptacles for disposal

√  **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

√  **Communicate that sharing drugs and drug preparation equipment can spread COVID-19 due to potential contamination of shared items and close contact between individuals.**

## Prevention Practices for Incarcerated/Detained Persons

√  **Perform pre-intake screening and temperature checks for all new entrants. Screening should take place in the sallyport, before beginning the intake process,** in order to identify and immediately place individuals with symptoms under medical isolation. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

   o  **If an individual has symptoms of COVID-19** (fever, cough, shortness of breath):

   ▪  Require the individual to wear a face mask.

   ▪  Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.

   ▪  Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)

   ▪  Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.

- o **If an individual is a** close contact **of a known COVID-19 case (but has no COVID-19 symptoms):**
  - ▪ Quarantine the individual and monitor for symptoms two times per day for 14 days. (See Quarantine section below.)
  - ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.

√ **Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

- o **Common areas:**
  - ▪ Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)
- o **Recreation:**
  - ▪ Choose recreation spaces where individuals can spread out
  - ▪ Stagger time in recreation spaces
  - ▪ Restrict recreation space usage to a single housing unit per space (where feasible)
- o **Meals:**
  - ▪ Stagger meals
  - ▪ Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
  - ▪ Provide meals inside housing units or cells
- o **Group activities:**
  - ▪ Limit the size of group activities
  - ▪ Increase space between individuals during group activities
  - ▪ Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
  - ▪ Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out
- o **Housing:**
  - ▪ If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
  - ▪ Arrange bunks so that individuals sleep head to foot to increase the distance between them
  - ▪ Rearrange scheduled movements to minimize mixing of individuals from different housing areas
- o **Medical:**
  - ▪ If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.
  - ▪ Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

√ **Communicate clearly and frequently with incarcerated/detained persons about changes to their daily routine and how they can contribute to risk reduction.**

√ **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**

√ **Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility.**

√ **Provide** up-to-date information about COVID-19 **to incarcerated/detained persons on a regular basis, including:**

  o Symptoms of COVID-19 and its health risks

  o Reminders to report COVID-19 symptoms to staff at the first sign of illness

√ **Consider having healthcare staff perform rounds on a regular basis to answer questions about COVID-19.**

## Prevention Practices for Staff

√ **Remind staff to stay at home if they are sick.** Ensure that staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

  o In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).

  o Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis, including:**

  o Symptoms of COVID-19 and its health risks

  o Employers' sick leave policy

  o **If staff develop a fever, cough, or shortness of breath while at work:** immediately put on a face mask, inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

  o **If staff test positive for COVID-19:** inform workplace and personal contacts immediately, and do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly.

  o **If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-quarantine at home for 14 days and return to work if symptoms do not develop. If symptoms do develop, follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **If a staff member has a confirmed COVID-19 infection, the relevant employers should inform other staff about their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act.**

  o Employees who are close contacts of the case should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

√ **When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.**

√ **Ask staff to keep interactions with individuals with respiratory symptoms as brief as possible.**

## Prevention Practices for Visitors

√ **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

   o Staff performing temperature checks should wear recommended PPE.

   o Exclude visitors and volunteers who do not clear the screening process or who decline screening.

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.**

√ **Provide visitors and volunteers with information to prepare them for screening.**

   o Instruct visitors to postpone their visit if they have symptoms of respiratory illness.

   o If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

   o Display signage outside visiting areas explaining the COVID-19 screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

√ **Promote non-contact visits:**

   o Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors.

   o Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.

   o Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

√ **Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.**

   o If moving to virtual visitation, clean electronic surfaces regularly. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)

   o Inform potential visitors of changes to, or suspension of, visitation programs.

   o Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).

   o If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation would be done in the interest of incarcerated/detained persons' physical health and the health of the general public. However, visitation is important to maintain mental health.

If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them. See above suggestions for promoting non-contact visits.

√ **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

## Management

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

### Operations

√ **Implement alternate work arrangements deemed feasible in the** Operational Preparedness **section.**

√ **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.**

   o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to appropriately isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case).** Subsequently in this document, this practice is referred to as **routine intake quarantine**.

√ **When possible, arrange lawful alternatives to in-person court appearances.**

√ **Incorporate screening for COVID-19 symptoms and a temperature check into release planning.**

   o Screen all releasing individuals for COVID-19 symptoms and perform a temperature check. (See Screening section below.)

      ▪ If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

      ▪ If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

      ▪ Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

√ **Coordinate with state, local, tribal, and/or territorial health departments.**

- o When a COVID-19 case is suspected, work with public health to determine action. See Medical Isolation section below.

- o When a COVID-19 case is suspected or confirmed, work with public health to identify close contacts who should be placed under quarantine. See Quarantine section below.

- o Facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See Facilities with Limited Onsite Healthcare Services section.

## Hygiene

√ **Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility.** (See above.)

√ **Continue to emphasize practicing good hand hygiene and cough etiquette.** (See above.)

## Cleaning and Disinfecting Practices

√ **Continue adhering to recommended cleaning and disinfection procedures for the facility at large.** (See above.)

√ **Reference specific cleaning and disinfection procedures for areas where a COVID-19 case has spent time (below).**

## Medical Isolation of Confirmed or Suspected COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities with Limited Onsite Healthcare Services, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that COVID-19 cases will be appropriately isolated, evaluated, tested (if indicated), and given care.**

√ **As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.**

√ **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

- o Provide medical care to cases inside the medical isolation space. See Infection Control and Clinical Care sections for additional details.

- o Serve meals to cases inside the medical isolation space.

- o Exclude the individual from all group activities.

- o Assign the isolated individual a dedicated bathroom when possible.

√ **Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters.** Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

√ **Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.** Cohorting should only be practiced if there are no other available options.

- o If cohorting is necessary:
  - **Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.**
  - Unless no other options exist, do not house COVID-19 cases with individuals who have an undiagnosed respiratory infection.
  - Ensure that cohorted cases wear face masks at all times.

√ **In order of preference, individuals under medical isolation should be housed:**
- o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
- o Separately, in single cells with solid walls but without solid doors
- o As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.
- o As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.
- o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
- o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.
- o Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above arrangements
  (NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative.

√ **If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)
- o Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.
- o Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.

√ **Custody staff should be designated to monitor these individuals exclusively where possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility to the extent possible.

√ **Minimize transfer of COVID-19 cases between spaces within the healthcare unit.**

√ **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- o **Cover** their mouth and nose with a tissue when they cough or sneeze

- o **Dispose** of used tissues immediately in the lined trash receptacle

- o **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

√ **Maintain medical isolation until all the following criteria have been met. Monitor the CDC website for updates to these criteria.**

**For individuals who will be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ▪ The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart

**For individuals who will NOT be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ▪ At least 7 days have passed since the first symptoms appeared

**For individuals who had a confirmed positive COVID-19 test but never showed symptoms:**

- o At least 7 days have passed since the date of the individual's first positive COVID-19 test **AND**

- o The individual has had no subsequent illness

√ **Restrict cases from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.**

- o If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning.

## Cleaning Spaces where COVID-19 Cases Spent Time

**Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note—these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.**

- o Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.

- o Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).

√ **Hard (non-porous) surface cleaning and disinfection**

- o If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

- o For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.

  - ▪ Consult a list of products that are EPA-approved for use against the virus that causes COVID-19. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

  - ▪ Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:

    - ‐ 5 tablespoons (1/3rd cup) bleach per gallon of water or

    - ‐ 4 teaspoons bleach per quart of water

√ **Soft (porous) surface cleaning and disinfection**

- o For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

  - ▪ If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

  - ▪ Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and are suitable for porous surfaces.

√ **Electronics cleaning and disinfection**

- o For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.

  - ▪ Follow the manufacturer's instructions for all cleaning and disinfection products.

  - ▪ Consider use of wipeable covers for electronics.

  - ▪ If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

√ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

√ **Food service items.** Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ Laundry from a COVID-19 cases **can be washed with other individuals' laundry.**

- o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.

- o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

- o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

- o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

√ **Consult** cleaning recommendations above **to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.**

## Quarantining Close Contacts of COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective quarantine, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored.**

√ **Incarcerated/detained persons who are close contacts of a** confirmed or suspected COVID-19 case **(whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (see CDC guidelines).**

- o If an individual is quarantined due to contact with a suspected case who is subsequently tested for COVID-19 and receives a negative result, the quarantined individual should be released from quarantine restrictions.

√ **In the context of COVID-19, an individual (incarcerated/detained person or staff) is considered a close contact if they:**

- o Have been within approximately 6 feet of a COVID-19 case for a prolonged period of time OR
- o Have had direct contact with infectious secretions of a COVID-19 case (e.g., have been coughed on)

Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

√ **Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.**

- o Provide medical evaluation and care inside or near the quarantine space when possible.
- o Serve meals inside the quarantine space.
- o Exclude the quarantined individual from all group activities.
- o Assign the quarantined individual a dedicated bathroom when possible.

√ **Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually.** Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

- o If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 should be placed under medical isolation immediately.
- o If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.
- o Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to a COVID-19 case). Under this scenario, avoid mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine.

o If at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.

√ **If the number of quarantined individuals exceeds the number of individual quarantine spaces available in the facility, be especially mindful of those who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)

√ **In order of preference, multiple quarantined individuals should be housed:**

   o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

   o Separately, in single cells with solid walls but without solid doors

   o As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions

   o As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door

   o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

   o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.

   o As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.

   o Safely transfer to another facility with capacity to quarantine in one of the above arrangements

(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

√ **Quarantined individuals should wear face masks if feasible based on local supply, as source control, under the following circumstances** (see PPE section and Table 1):

   o If cohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals).

   o If quarantined separately, individuals should wear face masks whenever a non-quarantined individual enters the quarantine space.

   o All quarantined individuals should wear a face mask if they must leave the quarantine space for any reason.

   o Asymptomatic individuals under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear face masks.

√ **Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties** (see PPE section and Table 1).

   o Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear PPE.

√ **Quarantined individuals should be monitored for COVID-19 symptoms twice per day, including temperature checks.**

   o If an individual develops symptoms, they should be moved to medical isolation immediately and further evaluated. (See Medical Isolation section above.)

   o See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of COVID-19 cases.

√ **If an individual who is part of a quarantined cohort becomes symptomatic:**

   o **If the individual is tested for COVID-19 and tests positive:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

   o **If the individual is tested for COVID-19 and tests negative:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period.

   o **If the individual is not tested for COVID-19:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

√ **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

√ **Quarantined individuals can be released from quarantine restrictions if they have not developed symptoms during the 14-day quarantine period.**

√ **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ **Laundry from quarantined individuals can be washed with other individuals' laundry.**

   o Individuals handling laundry from quarantined persons should wear disposable gloves, discard after each use, and clean their hands after.

   o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

   o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

   o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

## Management of Incarcerated/Detained Persons with COVID-19 Symptoms

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that suspected COVID-19 cases will be effectively isolated, evaluated, tested (if indicated), and given care.**

√ **If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.**

√ **Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask and should be placed under medical isolation immediately. Discontinue the use of a face mask if it inhibits breathing. See Medical Isolation section above.**

√ **Medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated.** Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well.

√ **If testing is indicated (or if medical staff need clarification on when testing is indicated), contact the state, local, tribal, and/or territorial health department. Work with public health or private labs as available to access testing supplies or services.**

  o If the COVID-19 test is positive, continue medical isolation. (See Medical Isolation section above.)

  o If the COVID-19 test is negative, return the individual to their prior housing assignment unless they require further medical assessment or care.

## Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

√ **Provide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.**

  o Consider having healthcare staff perform regular rounds to answer questions about COVID-19.

  o Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

√ **Implement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms.** See Screening section for a procedure to safely perform a temperature check.

√ **Consider additional options to intensify social distancing within the facility.**

## Management Strategies for Staff

√ **Provide clear information to staff about the presence of COVID-19 cases within the facility, and the need to enforce social distancing and encourage hygiene precautions.**

  o Consider having healthcare staff perform regular rounds to answer questions about COVID-19 from staff.

√ **Staff identified as close contacts of a COVID-19 case should self-quarantine at home for 14 days and may return to work if symptoms do not develop.**

  o See above for definition of a close contact.

  o Refer to CDC guidelines for further recommendations regarding home quarantine for staff.

# Infection Control

Infection control guidance below is applicable to all types of correctional facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with confirmed or suspected COVID-19 cases.

√ **All individuals who have the potential for direct or indirect exposure to COVID-19 cases or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.**

- o Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.

- o Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

√ **Staff should exercise caution when in contact with individuals showing symptoms of a respiratory infection.** Contact should be minimized to the extent possible until the infected individual is wearing a face mask. If COVID-19 is suspected, staff should wear recommended PPE (see PPE section).

√ **Refer to PPE section to determine recommended PPE for individuals persons in contact with confirmed COVID-19 cases, contacts, and potentially contaminated items.**

## Clinical Care of COVID-19 Cases

√ **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**

- o If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

- o The initial medical evaluation should determine whether a symptomatic individual is at higher risk for severe illness from COVID-19. Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

√ **Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.**

√ **Healthcare staff should evaluate persons with respiratory symptoms or contact with a COVID-19 case in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the suspected case is wearing a face mask.**

- o If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.

√ **Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).**

√ **The facility should have a plan in place to safely transfer persons with severe illness from COVID-19 to a local hospital if they require care beyond what the facility is able to provide.**

√ **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible.**

## Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

√ **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases.**

- o Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95s) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program.
- o For PPE training materials and posters, please visit the CDC website on Protecting Healthcare Personnel.

√ **Ensure that all staff are trained to perform hand hygiene after removing PPE.**

√ **If administrators anticipate that incarcerated/detained persons will request unnecessary PPE, consider providing training on the different types of PPE that are needed for differing degrees of contact with COVID-19 cases and contacts, and the reasons for those differences (**see Table 1). **Monitor linked CDC guidelines in Table 1 for updates to recommended PPE.**

√ **Keep recommended PPE near the spaces in the facility where it could be needed, to facilitate quick access in an emergency.**

√ **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they have with COVID-19 cases and their contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**

- o **N95 respirator**

See below for guidance on when face masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols from a COVID-19 case.

- o **Face mask**
- o **Eye protection—**goggles or disposable face shield that fully covers the front and sides of the face
- o **A single pair of disposable patient examination gloves**

Gloves should be changed if they become torn or heavily contaminated.

- o **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - ▪ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with the individual. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - ▪ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, care activities where splashes and sprays are anticipated, and high-contact patient care activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

√ **Note that shortages of all PPE categories are anticipated during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category can be found on CDC's website:**

- o **Guidance in the event of a shortage of N95 respirators**
  - ▪ Based on local and regional situational analysis of PPE supplies, **face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
- o **Guidance in the event of a shortage of face masks**
- o **Guidance in the event of a shortage of eye protection**
- o **Guidance in the event of a shortage of gowns/coveralls**

**Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response**

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19 | – | ✓ | – | – | – |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | – | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | – |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | – | ✓ | ✓ | ✓ | ✓ |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | ✓** | | ✓ | ✓ | ✓ |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | ✓ | – | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |

\*   If a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating into the facility's general population, face masks are not necessary.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

√ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

   o *Today or in the past 24 hours, have you had any of the following symptoms?*

      ▪ *Fever, felt feverish, or had chills?*

      ▪ *Cough?*

      ▪ *Difficulty breathing?*

   o *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*

√ **The following is a protocol to safely check an individual's temperature:**

   o Perform hand hygiene

   o Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves

   o Check individual's temperature

   o **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned routinely as recommended by CDC for infection control.

   o Remove and discard PPE

   o Perform hand hygiene

# EXHIBIT 37