**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KEITH SETH, *et al.*, | ) | |
| Individually and on behalf of a class | ) | |
| of similarly situated persons, | ) | |
| | ) | |
|     Plaintiffs-Petitioners, | ) | |
| | ) | Case No. |
|          v. | ) | |
| | ) | |
| MARY LOU MCDONOUGH, | ) | |
| In her official capacity as | ) | |
| Director of the Prince George's County | ) | |
| Department of Corrections, | ) | |
| | ) | |
| | ) | |
|     Defendant-Respondent. | ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

## PRELIMINARY STATEMENT

There is currently an uncontrolled outbreak of COVID-19 at the Prince George's County Jail ("the Jail"). The Jail[1] is accelerating this outbreak, creating an unacceptable risk that the people imprisoned there will contract the disease and that those who do will become seriously ill or die.[2] It has ignored the guidance of public health officials. For example, the Jail charges money for bars of soap (and limits prisoners to one bar per week); some prisoners trade their meals for it, and some go without it for days at a time. The Jail does not, as public health experts recommend, sanitize common surfaces or enact meaningful social distancing.

Those who test positive for the disease fare no better: patients with COVID-19 can decompensate quickly, but the Jail barely monitors COVID-positive prisoners. Instead, it holds them in unsanitary cells where trashbags overflow with spit and vomit because corrections staff are afraid to enter the cell to remove them. The walls of medical isolation cells are covered in feces, mucus, and blood.

Prisoners observe sick people everywhere: coughing, shaking, sweating, and struggling to breathe. "I feel like everyone in the unit is catching it," one said. "[I]t seems like almost everyone is sick." Ex. 10, Decl. 10 ¶12.[3] Medical care is inaccessible, even for those with symptoms of COVID-19. Sick call costs $4, and those who cannot afford it go without medical treatment. Prisoners who do request medical care often wait a week or more before anyone responds.

---

[1] Since Defendant McDonough is being sued in her official capacity, "Defendant McDonough" and "the Jail" are used interchangeably in this motion.

[2] The majority of Named Plaintiffs and class members are pretrial detainees, but some are held post-conviction. Plaintiffs seek to certify a class for both categories.

[3] The numbered exhibits cited in this memorandum are attached to Plaintiffs' Complaint. The lettered exhibits are attached to Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction.

Prisoners with COVID-19 symptoms—fever, chills, shortness of breath, diarrhea—who seek medical care are told by the medical staff to return to general housing because they are not sick enough, or because the Medical Unit is full. This happens even to those with medical conditions (like asthma, chronic bronchitis, and HIV) that make them more vulnerable to COVID-19.

Named Plaintiffs and putative class members are already in danger. Six of the Named Plaintiffs have pre-existing conditions that make them especially vulnerable to severe illness and death if they are infected. Five of them have symptoms of COVID-19. They—along with approximately 600 other prisoners—are trapped in a Jail that endangers the sick. Absent this Court's intervention, many will suffer and some will die.

In addition, although the Jail has refused to adopt basic measures to slow the outbreak within its walls, the Jail refuses to release COVID-positive prisoners until it deems them no longer contagious, even when it has no legal authority to hold them (because, for example, they have paid bail). One prisoner who tested positive for COVID-19 on the same day that he paid his bail was illegally held for fourteen days.

These conditions violate Named Plaintiffs' and putative class members' rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. They seek emergency relief under 42 U.S.C. § 1983 to bring the Jail's conditions in line with basic public health standards. Plaintiffs also ask this Court under § 1983 to enjoin Defendants McDonough from illegally detaining COVID-positive prisoners. In addition, a subclass of medically vulnerable prisoners (the "Medically Vulnerable Subclass) ask this Court to release them under 28 U.S.C. § 2241 because the Jail is too dangerous for them to remain there.

## STATEMENT OF FACTS

### I.      There Is a Current COVID-19 Outbreak at the Prince George's County Jail

There is an ongoing outbreak of COVID-19 at the Prince George's County Jail ("the Jail").[4]

As many as 77 prisoners may have confirmed cases. Compl. ¶ 77. According to Dr. Jaimie Meyer,

an infectious disease expert and assistant professor at Yale Medical School, this is likely "a gross

underestimate by at least three-fold." Ex. 30,[5] Meyer Decl. ¶ 41.[6] If Dr. Meyer is correct, then

COVID-19 has already infected nearly half of the Jail's approximately 600 prisoners.

COVID-19 is highly infectious. Compl. ¶¶ 27-29. Up to sixteen percent of those who contract

it will suffer severe illness. Ex. 30, Meyer Decl. ¶ 9. In the United States, the mortality rate is 3.2

percent. Ex. 32, Benninger Decl. ¶ 2(G). Twenty percent of those who contract COVID-19 will

need hospitalization, and five percent will need intensive care. *Id*. ¶ 2(F). Those who survive may

suffer long-term damage to the heart, liver, and lungs. Compl. ¶ 34. Certain preexisting

conditions—including asthma, chronic lung disease (like bronchitis), heart disease, and diabetes

intensify the risk of severe illness and death. *Id.* ¶ 35.

The Prince George's County Department of Corrections reported its first case of COVID-19

on March, 30, 2020. Compl. ¶ 68. In an interview with the *Washington Post*, Defendant DOC

Director Mary Lou McDonough said she was certain that more would follow. "I expect we'll have

---

[4] The Jail is also sometimes referred to as the "Prince George's County Detention Center" or the "Upper Marlboro Detention Center."

[5] All exhibits referenced in this motion are attached to the Complaint.

[6] Expert declarations are included from Dr. Meyer, as well as Dr. Kristen Benninger, a hospitalist who is currently treating patients for COVID-19 and has experience as a prison physician, and Dr. Craig Haney, a psychology professor and expert in prison isolation. *See* Ex. 30 (Meyer Declaration); Ex. 31 (Meyer Curriculum Vitae); Ex. 32 (Benninger Declaration); Ex. 33 (Benninger Curriculum Vitae); Ex. 34 (Haney Declaration); Ex. 35(Haney Curriculum Vitae). Each expert assessed the conditions at the Jail based on multiple prisoners' declarations, which are also included as exhibits to the Complaint. Exs. 1–27.

more before this is over," McDonough said, comparing jails to "cruise ships without the views or the amenities." *Id.* ¶ 69.  "A jail is a pretty transitory place," she continued. "People are close together. You're all breathing the same air." *Id.* ¶ 69.  Four days later, on April 3, three prisoners and a corrections officer tested positive for COVID-19. *Id.* ¶ 71.

The DOC has not since disclosed the number of COVID-19 cases at the Prince George's County Jail. But the people imprisoned there have observed its spread. Plaintiffs are aware of cases in at least half of the Jail's ten adult housing units. *Id.* ¶ 76. Every day, prisoners see evidence of illness: people sick and coughing, or reporting to medical and not coming back. *Id.* ¶ 76 n. 52; *id.* ¶ 130 n. 75. One prisoner said, "I have told my family that I love them because I feel sure I am going to get the virus in here." Ex. 17, Decl. 17 ¶ 7.

## II.     The Jail Has Failed to Adopt Measures to Prevent the Spread of COVID-19.

### A.  The Jail Disregards the CDC's Guidance on Containing COVID-19.

In jails and prisons, COVID-19 is both more likely to spread and more likely to result in severe illness and death when it does. *See* Ex. 30, Meyer Decl. ¶¶ 13–24; Ex. 32, Benninger Decl. ¶ 3; Compl. ¶ 59-67. Recognizing this risk, on March 23, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") issued guidance for correctional facilities to "reduce the risk of transmission and severe disease from COVID-19." *See* Ex. 36, U.S. Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (March 23, 2020), at 2. This guidance includes "detailed recommendations" about preventing transmission, including hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine.

The Jail has disregarded nearly all of the CDC's recommendations. Prisoners do not have liquid soap, which the CDC states should be provided to them at no cost. Ex. 36, CDC at 10; *but see*

Compl. ¶ 84. The jail charges money for bars of soap, and it only allows prisoners one bar each week. *Id.* ¶ 85. Prisoners who cannot afford it have no soap at all, although some trade their food to get it. *Id.* ¶ 86. Jail staff do not regularly clean or sanitize shared amenities or surfaces, including the phones inmates must use to call their families and lawyers. *Id.* ¶ 87-88; *but see* Ex. 36, CDC at 9 (stating that jail staff should "clean and disinfect surfaces and objects that are frequently touched in common areas several times each day.").[7]

The CDC recommends that corrections facilities "[c]reate and test communications plans to disseminate critical information to incarcerated/detained persons, staff, etc. as the pandemic progresses." Ex. 36, CDC at 5. But the jail has not provided prisoners with information about COVID-19, its symptoms, or how to protect themselves from it. Compl. ¶ 81.

In the general population housing units, the jail has not enacted (or explained) effective social distancing measures, which require "increasing the space between individuals," ideally by at least six feet, and decreasing the frequency of contact between them. Ex. 36, CDC at 4. Prisoners are deprived of the opportunity to socially distance—regularly remaining less than six feet apart from their cellmates, prisoners in other cells, prisoners using phones, and guards taking the count. Compl. ¶¶ 93-96. Since jail staff has not informed prisoners about what social distancing entails, many have no idea that they should be keeping their distance from one another. Plaintiff Keith Seth, upon learning about the recommended six feet of distancing from his attorney, realized that he had been within a foot of a sick prisoner earlier that day:

> "Earlier today the person in the cell next to me had to go to the medical unit because he was sneezing, shaking, and sweating.  I was just talking to him yesterday, and when I was talking with him I was within a foot of him.  I did not know that I was being unsafe in talking to him so closely because I have not been told by anybody

---

[7] *See* Ex. 30, Meyer Decl. ¶ 29 ("Inconsistent access to hygiene and disinfection measures will result in widespread infection throughout the facility.").

to stay away from other inmates.  The only information I received is to stay six feet away from the officer's desk.

Ex. 1, Seth Decl. ¶ 9.

The Jail's limited attempts at social distancing measures are markedly careless: the Jail has staggered prisoners' recreation in groups of 10, but the same group of prisoners does not always take recreation together each day. Compl. ¶ 99. Thus, infected prisoners can infect a new set of other prisoners at recreation each day, and then those prisoners can infect still more. *Id.* ¶ 100; *see* Ex. 30, Meyer Decl. ¶ 30 (noting that while staggered recreation can be an effective social distancing strategy, it is "not useful to prevent the spread of disease if recreation is staggered with different individuals each day (i.e. different groups of 10).").

When prisoners show symptoms of COVID-19, Jail staff do not (as the CDC recommends) place them in medical isolation. *See* Ex. 36, CDC Guidance at 10 ("As soon as an individual shows symptoms of COVID-19, they . . . should be immediately placed under medical isolation in a separate environment from other individuals").[8] Instead, once seen by medical staff, symptomatic prisoners are often sent back to their cells in general housing, where they will inevitably infect others. Prisoners have visited the medical unit with fevers, shortness of breath, coughing, chills, headaches, and fluid in the chest, and medical staff have sent them back to their housing units with Claritin[9] or Tylenol. Compl. ¶¶ 101-03. Some prisoners—including those who later tested positive for COVID-19—have been sent back and forth between the medical unit and general housing as often as four or five times. *Id.* ¶¶ 105-17; *but see* Ex. 36, CDC Guidance at 15 ("Keep the

---

[8] Ex. 30, Meyer Decl. ¶ 27 ("One of the most critical infection control measures in correctional settings is to accurately identify people who are ill and medically isolate them from the general population.").

[9] Ex. 30, Meyer Decl. ¶ 31 (observing that "prisoners [at the Jail] are given Claritin – a decongestant that is entirely useless for COVID-19").

[symptomatic] individual's movement outside the medical isolation space to an absolute minimum.").

In early April, the jail began twice daily temperature checks for prisoners. *Id.* ¶ 122. But the checks are not conducted in every housing unit. *Id.* And as implemented, even this practice is an opportunity for infection. The temperature reader is not cleaned between uses, and the medical staff do not change their gloves. *Id.*[10] Even when prisoners do have a fever, jail staff may fail to quarantine them. Compl. ¶¶ 124-26. One prisoner, who suffers from high blood pressure and seizures, was told to remain in general housing despite having a fever. Ex. 11, Decl. 11 ¶¶ 9–10. By early evening, he "started to have real difficulty breathing." *Id.* But he was told to wait for the next temperature check at 9:00 pm. *Id.* By then, his temperature was 104 degrees. *Id.* He later tested positive for COVID-19. *Id.* ¶ 2.

When a prisoner tests positive for COVID-19, the CDC recommends that every person who has been within six feet of that prisoner be placed in quarantine for fourteen days. Ex. 36, CDC at 14. But the jail has failed even to inform prisoners who have had close contact with a positive case—even when the infected person was the prisoner's cellmate. Compl. ¶ 129. Nor do they disinfect cells where COVID-positive prisoners have lived. *Id.* ¶ 130.

### B. The Limited Containment Methods Adopted by the Jail Are Ineffective and Counterproductive.

Instead of implementing the CDC's recommendations to prevent COVID-19, the Jail has resorted to methods of its own. Its principle strategy has been to implement a universal, preemptive

---

[10] Ex. 23, Benninger Decl. ¶ 2(E) ("When performing temperature checks on multiple individuals, a clean pair of gloves should be used for each individual and the thermometer should be thoroughly cleaned between each check."); Ex. 30, Meyer Decl. ¶ 27(b) ("[T]here is high likelihood that nurses' gloves, thermometer covers, and door slots are contaminated and can themselves be a vehicle for transmission from person to person.").

lockdown of all prisoners. Compl. ¶ 132. Prisoners are confined to their cells 23 hours per day. *Id*. ¶ 133. They have one hour of out-of-cell time. *Id*. ¶ 134.  This hour (which may be at 1:30 am or some other odd hour) is prisoners' only chance to shower, go outside, or use the phones to call their attorneys or their families (if they are awake). *Id*.; *see* Ex. 7, John Doe No. 4 Decl. ¶ 14 ("You can't really talk to your family at 1 o'clock in the morning, my kids are asleep."). The lockdown appears to have no end date short of the pandemic's end. Compl. ¶ 136.

The CDC does not recommend preemptive lockdowns.[11] Rather, it recommends that housing units "quarantine in place" when there is "contact with a case from the same housing unit" and that all quarantines—including this sort—last for just 14 days. Ex. 36, CDC at 19. Public health experts warn that preemptive lockdowns like that at Prince George's County Jail are both ineffective and counterproductive at preventing the virus's spread. Instead, consistent with the CDC Guidance, these experts recommend that lockdowns be time-limited and used only as necessary for quarantine or contact tracing.[12]

---

[11] Instead, the CDC's social distancing guidance includes suggestions like "[r]earranging seating in the dining hall so that there is more space between individuals," and "[c]onsider[ing] alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out." Ex. 36, CDC at 11.

[12] Ex. 30 , Meyer Decl. ¶ 30 ("Lockdown can be important from a public health standpoint to enable social distancing during a pandemic but should be used only as a last resort and in a time-limited way (CDC recommends quarantines last no longer than 14 days) that is communicated clearly to the residents"); David Cloud, Dallas Augustine, Cyrus Ahalt and Brie Williams, *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional Settings*, Amend 3 (Apr. 9, 2020), *available at* https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf  [hereinafter  *"Medical Isolation—Not Solitary"*] ("Corrections officials should only require people on an entire housing unit to stay in their cells ("Lockdown") if medical professionals determine a symptomatic persons resides or works on that unit or contract tracing flags a confirmed or suspected case. In this event, time-limitations must be clearly communicated to residents and staff."); Ex. 34, Haney Decl. ¶ 29 ("[T]he Jail should institute … lockdowns only where medically necessary to resolve discrete issues, such as sanitizing dorms or contact tracing of an infected prisoner. If the [Jail] resorts to these lockdowns, it should do so in a reasonably time-limited manner and communicate that time-limit to the prisoners who are affected.").

Indeed, on lockdown, as a structural matter, opportunities for infection abound. Most prisoners live with cellmates in poorly ventilated cells. *Id*. ¶ 143. Even prisoners in different cells are less than six feet apart. *Id*. Thus, perversely, the lockdown policy—especially in combination with the jail's failure to medically isolate those with symptoms of COVID-19—traps prisoners in close proximity to people who may be sick. *Id.* ¶ 144; *see* Ex. 36, CDC at 19 (warning that quarantining prisoners together "could transmit COVID-19 from those who are infected to those who are uninfected."); Ex. 30, Meyer Decl. ¶ 30 (stating that sustained lockdowns are "particularly problematic when inmates are locked down in poorly ventilated spaces that are shared closely with others, which may contribute to disease transmission from people who are infected with COVID-19 but have not yet developed or reported symptoms.").

For example, Plaintiff John Doe No. 2, who has severe asthma for which he has previously been hospitalized, is locked down with his cellmate, who has lost his sense of smell and taste (a symptom of COVID-19). Compl. ¶ 145; *see also, e.g.* Ex. 17, Decl. 17 ¶ 6 ("My cellmate has been coughing and sneezing. They have us locked in 23 hours a day. . . . There is no way for my cellmate and I to distance ourselves from each other."); Ex. 7, John Doe No. 4 Decl. ¶ 14 ("[I]t's really bad when you can't get come out of a cell for 23 hours I'm really scared now because my cellie has been sick.").

The Jail's preemptive lockdown is counter-productive in other ways as well. Because prisoners' one hour of out-of-cell time is their only chance to call their attorneys and families, they congregate by the phones (which are rarely, if ever, cleaned).[13] *Id*. ¶ 146. The lockdown also

---

[13] Ex. 30, Meyer Decl. ¶ 30 (observing that under the Jail's preemptive lockdown policy, "[w]ith only 1 hour per day to use phones, it may be hard to enforce social distancing since prisoners need to congregate to use this precious resource"); Ex. 34, Haney Decl. ¶ 16 ("During th[e] limited one hour of out-of-cell time [under the Jail's preemptive lockdown policy], prisoners crowd together

"decreases the interactions that prisoners have with correctional and healthcare staff members, compromising the latter's ability to identify symptoms," further ensuring that infected prisoners will remain in general population where they can spread the virus. Ex. 34, Haney Decl. ¶ 25.[14]

### III.    The Jail's Conditions Increase the Risk of Severe Illness and Death.

The conditions at the Prince George's County Jail not only amplify the risk of infection. They also greatly increase the risk that prisoners who are infected with COVID-19 will suffer serious illness, permanent physical damage, and death.

Prisoners whom the Jail decides to test for COVID-19[15] are moved to Medical Unit's isolation cells, where they remain for two to five days, awaiting their test results. Compl. ¶ 167. The walls of the cells are covered in feces, mucus, and blood. *Id*. Prisoners there are not allowed to shower. *Id*. ¶ 170. They cannot change their clothes, even when they are soaked in sweat. *Id*. They are often denied soap and a toothbrush. *Id*. They have no access to phones, so they cannot contact their families or their attorneys. *Id*. ¶ 171.

Once a prisoner tests positive for COVID-19, he is moved into a 10-man cohorted isolation[16] cell for COVID-positive prisoners in the Medical Unit or to a isolation cell in Housing Unit 6 (H-

---

to use the limited shared resources. . . . As a result, they are unable to maintain the recommended six feet of social distancing.").

[14] *See Medical Isolation—Not Solitary*, *supra* note 12, at 2 (warning that "preemptively placing entire units on 'lockdown' for indefinite amounts of time" will likely mean that "interactions with correctional staff an healthcare staff often become less frequent and people with symptoms may go undetected").

[15] As described above, this does not include every prisoner with symptoms of the virus; many symptomatic prisoners are not medically isolated or even evaluated by medical staff, let alone tested. *See supra* at 6–7.

[16] "Cohorted isolation" is the practice of medically isolating prisoners with symptoms or confirmed cases of COVID-19 together. The CDC recommends that cohorting "should only be practiced if there are no other options." Ex. 36, CDC at 19.

6). *Id.* ¶ 174. The 10-man cell is filthy. *Id.* ¶ 175. For fear of contracting COVID-19, corrections officers will not remove the overflowing trash bags, which are filled with vomit and spit. *Id.* Sick prisoners—who may be vomiting, sweating, and have diarrhea and high fevers—lack access to basic hygiene products. *Id.* ¶ 177. Many do not have soap. *Id.* Some have not had toothbrushes for over a week. *Id.* They are still not allowed to shower (which means that some go without bathing for more than two weeks). *Id.* All of the sick men share a single, mildewed sink. *Id.* Prisoners may go five or six days without being able to change their clothes or underwear. *Id.*

These conditions have consequences. As Dr. Meyer explains,

> "Medical isolation units should be hygienic and safe . . . . In contrast, the prisoners describe unsafe isolation cells, at times without staff present inside the housing unit, and filthy living conditions, including dried blood and feces on the walls and floors of isolation cells. Some describe not having access to clean sheets and one described having to pull his used sheets out of a red biohazard bag for reuse. These conditions are not only inhumane but also unhealthy. In addition to spread of COVID-19, people in these medical isolation units are therefore at risk of exposure to other diseases, including HIV and Hepatitis C."

Ex. 30, Meyer Decl. ¶ 33.[17]

Moreover, medical and mental health experts warn that punitive isolation conditions can cause prisoners to downplay their symptoms to avoid them.[18] At the Prince George's County Jail,

---

[17] *See* Ex. 32, Benninger Decl. ¶ 3 (observing that the isolation cells "are not in accordance with recommended hygiene and sanitation standards, as prisoners report they have a significant amount of body fluids on the walls, including 'mucous, feces, blood, old food, urine, spit', 'around the walls, 360 degrees'"); *Id.* ¶ 3(D) ("Body fluids should absolutely be cleaned from any surfaces.").

[18] Ex. 30, Meyer Decl. ¶ 31 ("The[] conditions [in the isolation units] deter other individuals from reporting symptoms for fear they may end up in isolation."); Ex. 34, Haney Decl. ¶ 25 ("[T]he even more onerous conditions that the Prince George's County Jail imposes on prisoners who are placed in medical isolation likely serve as a disincentive for inmates to report their own symptoms. Prisoners understandably do not want to be placed in insect-infested, dirty cells where they will spend two weeks without access to telephones or showers."); *Medical Isolation—Not Solitary*, *supra* note 12, at 2 ("Fear of being placed in solitary will deter people from reporting symptoms to correctional staff. Experts and advocates are deeply concerned that incarcerated people, many of whom will go to great pains to avoid solitary confinement . . . will not come forward with symptoms of COVID-19 because they do not want to be placed in such conditions.").

prisoners regularly do this. Compl. ¶ 169; Ex. 12, Decl. 12 ¶14 (stating that many prisoners are "more afraid of how they'll be treated in the medical unit than they are of their symptoms."). This "result[s] in their increased risk of severe disease and death and ongoing spread to others." Ex. 30, Meyer ¶ 19; *see Medical Isolation—Not Solitary*, *supra* note 12, at 2 ("Th[e] avoidance of reporting symptoms of illness [to avoid punitive isolation conditions] will not only accelerate the spread of infection within facilities, but also increase the likelihood of prisoner deaths due to lack of treatment.").[19]

The Jail also provides inadequate medical monitoring of sick prisoners in isolation. People in medical isolation for suspected COVID-19 should be "diligently monitored for clinical worsening." Ex. 30, Meyer ¶ 32. This is necessary because "[p]rogression of respiratory symptoms in COVID-19 can be extremely rapid." *Id.*; *see* Ex. 32, Benninger Decl. ¶ 2(F) ("[P]ersons infected with COVID-19 have the ability to rapidly decompensate from a respiratory standpoint once showing symptoms, sometimes requiring mechanical ventilation at an emergent pace.").

But prisoners in the medical isolation cells and cohorted isolation are barely monitored at all. Contact with medical staff (or any other staff) is limited to a nurse that briefly visits approximately three times each day to take temperatures, give medications, and deliver food. Compl. ¶ 172.[20] The prisoners in these cells do not know how they would get help in a medical emergency. *Id.*; *see* Ex.

---

[19] To avoid deterring prisoners from reporting their symptoms, experts recommend that medical isolation not replicate the punitive conditions of disciplinary solitary confinement. For example, prisoners in isolation should have free access to reading material, outdoor exercise, and phones. *See Medical Isolation—Not Solitary*, *supra* note 12, at 2, 4; *see* Ex. 34, Haney Decl. ¶ 30.

[20] *See* Ex 30, Meyer Decl. ¶ 32 ([T]he prisoners' declarations in the Prince George's County Jail describe a lack of medical attention that is highly concerning and suggests that medical staff do not have the necessary staffing, training, or resources to identify when people require hospitalization."); *see also id.* ¶ 19 ("[I]solation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death.").

12, Decl. 12 ¶ 9 (stating that, in the isolation cells, "there was no way for us to notify someone if we were having an emergency, except to get up and bang on the door and hope that someone could hear you"). In H-6, cells are equipped with buzzers, but they do not always seem to work. *Id.* ¶ 180-81. A prisoner who is isolated for COVID-19 in H-6 said:

> "I have a seizure disease.  If I were to have a seizure, I wouldn't be able to push the button.  No COs are in the housing unit, so no one would hear what was going on. I'm afraid that if I have a seizure in here, no one will hear it and I will die. . . . They're not really doing anything to protect any of us in here."

Ex. 9, Decl. 9 ¶¶ 31–32.

Sick prisoners who remain in general population (there are many) also lack access to adequate medical care. Requesting medical attention ("sick call") costs $4, which some cannot afford. Compl. ¶ 150. Some housing units have run out of sick call slips entirely. *Id.* Prisoners who make a sick call may wait a week or more before they are seen. *Id.* ¶ 157.[21] Jail staff have told prisoners that medical care is reserved for emergencies and that the Medical Unit is full. *Id.* ¶ 156; Ex. 5, John Doe No. 2 Decl. ¶ 20 ("I told them that I needed medical attention [for COVID-19 symptoms], and they said there aren't enough beds in medical, it's full over there.").

Prisoners—including those with pre-existing conditions that increase their risk of complications and death—routinely visit the medical unit with clear symptoms of COVID-19 and are told to return to their housing units. *Id.* ¶¶ 103-18. In one representative example, a prisoner with HIV made a sick call because he had a fever, body pain, a cough, and a sore throat. Ex. 26, Decl. 26 ¶ 4. Medical staff did not see him until ten days later; they then told the prisoner that his case "was not serious enough to have additional care," and that "the Medical Unit is only seeing

---

[21] Ex. 32, Benninger Decl. ¶ 3(F) ("In the setting of COVID-19, delays in medical care can cost inmates their lives as we have seen relatively rapid respiratory decompensation in patients.").

emergencies." *Id.* ¶¶ 4–6. These barriers to medical care further increase the risk that prisoners infected with COVID-19 will become severely ill and die.[22]

The cost of sick call and the Medical Unit's reputation for not assisting prisoners with symptoms of COVID-19 has led some high-risk, symptomatic prisoners to forego care. Compl. ¶¶ 149-53. For example, Plaintiff Seth, who has chronic bronchitis for which he was hospitalized last year, has had symptoms of COVID-19 since late March. Ex. 1, Seth Decl. ¶ 9. He is currently coughing up mucus and has shortness of breath. *Id.* ¶ 9. He recently had diarrhea, and he has lost his sense of smell and taste. *Id.* ¶ 10. On April 17, he woke up with a nosebleed.[23] *Id.* ¶ 9. But Mr. Seth has not made a sick call because he does not have the $4 to pay for it. *Id.* ¶ 10. He has also heard that the Medical Unit will not do anything to help: "I know one guy who had a fever and they kept him for three days and sent him back. Another guy I know lost his sense of taste and his stomach hurt, but medical sent him back." *Id.* ¶ 11.

Medical care for anything other than COVID-19—including underlying health conditions like asthma and bronchitis—has stalled or stopped. Jail staff has told prisoners that they cannot receive medical care because the Medical Unit is locked down. *Id.* ¶ 158. Prisoners who have made sick calls that were not about COVID-19 have been told by corrections officers "that if it's nothing relating to Corona not to write to medical." *Id.* ¶ 159. And many prisoners have been unable to obtain or change their medications—including prisoners with pre-existing conditions like asthma. *Id.* ¶ 161. As Dr. Meyer warns: "Failure to provide individuals adequate medical care for their

---

[22] Ex. 30, Meyer Decl. ¶ 32 (stating that the barriers to adequate care in the Jail, including the cost of sick call and delayed care, "may result in preventable deaths and undue harm").

[23] Nosebleeds may be "signs of complicated COVID-19 disease." Ex 30, Meyer Decl. ¶ 32.

underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected." Ex. 30 ¶ 35.

Prisoners' mental health is also at great risk. Dr. Craig Haney, a psychologist and expert on prison isolation, has concluded that the punitive isolation methods that dominate the Jail's approach to COVID-19 "greatly increase the psychological stress under which prisoners live, potentially leading to mental and physical deterioration, interpersonal conflicts, and self-harm and suicidality." Ex. 34, Haney Decl. ¶ 20.[24] As Dr. Haney explains, "The Prince George's County Jail lockdown units are now being used in ways that are essentially identical to the solitary confinement-type housing that has been shown to place prisoners at significant risk of grave harm (including damage that is permanent, even fatal)." Ex. 34, Haney Decl. ¶ 21.[25] Moreover, the Jail has discontinued mental health services.[26] This places prisoners with mental illness who are isolated "at grave risk of decompensation." Ex. 34, Haney Decl. ¶ 24.[27] These policies also threaten

---

[24] *See also Medical Isolation—Not Solitary*, *supra* note 12, at 3 ("Research shows that keeping people socially isolated in a closed cell without a meaningful opportunity to communicate with family, friends, and loved ones or to participate in exercise, education, and rehabilitative programming (solitary confinement) causes immense, and often irreparable, psychological harm."); Ex. 32, Benninger Decl. ¶ 3(J) ("I have concern that there has not been sufficient acknowledgement of or attention to the inmates' mental health under the stressors of pandemic and confinement.").

[25] Ex. 34, Haney Decl. ¶ 20 ("The fact that prisoners are double-celled during these lockdowns [in the general housing units] does not mitigate the negative effects of their essentially around-the-clock in-cell confinement. In fact, double-celling may exacerbate these effects because of the interpersonal tensions and stressors that such unavoidably close around-the-clock contact generates.").

[26] Ex. 30, Meyer Decl. ¶ 36 ("People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.").

[27] Even in less extreme forms of isolation than those imposed at the Jail, the CDC Guidance recommends efforts to mitigate the mental health consequences of any necessary medical isolation. *See, e.g.*, Ex. 36, CDC at 12 ("[I]f group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons."); *id.* at 13 ("Consider increasing incarcerated/detained persons' telephone privileges to promote mental health."); *id.* at 13–14 (recommending that, since "visitation is important to maintain mental

physical harm; "the extraordinary added stress of social isolation under these especially onerous conditions" may "depress prisoners' immune systems and render them even more vulnerable to COVID-19 virus, and less able to combat it if and when they contract it." Ex. 34, Haney Decl. ¶ 26; *see also* Ex. 30, Meyer Decl. ¶ 36 ("Failure to provide adequate mental health care . . . as appears to be the case at the Prince George's County Jail, will result in poor health outcomes.).

## IV.     The Jail Maintains a Policy of Overdetention for COVID-19 Positive Inmates

 "Prisons and jails are not isolated from communities,"[28] and Prince George's County is the "epicenter of [the COVID-19 epidemic in] the state." Compl. ¶ 44. It is therefore critical that the Jail control the COVID-19 outbreak within its walls to protect people outside of them.

The Jail has not done this. As described above, it has flouted the most basic public health recommendations to prevent the virus's spread. However, the Jail has instituted its own method of infection control: it detains people with COVID-19 even when it has no legal authority to do so. Specifically, the Jail refuses to release COVID-positive prisoners who have paid bail until it deems them non-contagious. Compl. ¶ 183. Accordingly, one prisoner who paid his bond on April 3, 2020—but tested positive for COVID-19 on the same day—was illegally imprisoned in the cohorted isolation cell in the Jail for fourteen days. *Id.* ¶ 184. Had he been released when he paid his bond on April 3rd, he would have sought treatment for COVID-19 at a local hospital. *Id.* ¶ 186.

## ARGUMENT

Plaintiffs seek a temporary restraining order (TRO) and preliminary injunction to address unconstitutional conditions of confinement at the Prince George's County Jail, as well as the Jail's

---

health," if visitation is suspended, "facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them."). The Jail has done none of this.

[28] Ex. 30, Meyer Decl. ¶ 15; *see id.* (explaining the negative health implications of COVID-19 outbreaks within prisons upon surrounding communities).

policy of unlawfully detaining COVID-positive prisoners. To obtain a TRO or a preliminary injunction, Plaintiffs must show the following: (1) Plaintiffs are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in Plaintiffs' favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, (2008); *Montgomery v. Hous. Auth. of Bal. City*, 731 F. Supp. 2d 439, 441 (D. Md. 2010). Plaintiffs satisfy all four requirements on both claims.

## I.     A Temporary Restraining Order Should Issue to Address the Jail's Unconstitutional Conditions.

In recent weeks, federal district courts have granted temporary restraining orders to remedy constitutionally inadequate conditions that increase the threat of COVID-19, ordering jails to comply with the CDC Guidance and take other necessary measures to protect prisoners from infection, serious illness, and death.[29] Because the conditions in the Prince George's County Jail create a substantial risk of serious future harm to the prisoners' health, this Court should do the same.

### A. Plaintiffs Are Likely to Succeed on the Merits of Their Eighth And Fourteenth Amendment Claims.

The Eighth and Fourteenth Amendments prohibit state actors from exposing incarcerated people to conditions of confinement that threaten their health and safety. *Helling v. McKinney*, 509 U.S.

---

[29] *See, e.g.*, Ex. A, Order (Doc. 48), *Banks v. Booth*, 1:20-cv-849 (D.D.C. Apr. 19, 2020) (granting temporary restraining order to Plaintiffs and putative class of prisoners at the D.C. jail); Ex. B, Order (Doc. 12), *Cameron v. Bouchard*, No. 2:20-cv-10949-LVP-MJH, at 4-7 (E.D. Mich. Apr. 17, 2020) (granting temporary restraining order to Plaintiffs and putative class of pretrial and post-conviction prisoners at the Oakland County Jail); Ex. C, Order (Doc. 40), *Valentine v. Collier*, No. 4:20-CV-1115 (S.D. Tex. Apr. 16, 2020) (granting temporary restraining order to Plaintiffs and putative class of prisoners at geriatric prison); Ex. D, Order (Doc. 25), *Swain v. Junior*, No. 1:20-cv-21457-KMW, at 2-5 (S.D. Fla. Apr. 7, 2020) (granting temporary restraining order to Plaintiffs and putative class of putative class of pretrial and post-conviction prisoners at Metro West Detention Facility in Miami, Florida).

25, 33 (1993); *see Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (stating that prison officials must "take reasonable measures to guarantee the safety of the inmates"). While the Eighth Amendment secures the right of people convicted of a crime to be free from exposure to serious harm, *Helling*, 509 U.S. at 33, the Due Process Clause of the Fourteenth Amendment affords at least as much protection to pretrial detainees, *City of Revere v. Mass. General Hosp.*, 463 U.S. 239, 244 (1983).

Under these Amendments, an official is liable if she displays "deliberate indifference" to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering" to someone detained, which includes "exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33 (1993). In the Fourth Circuit, the same deliberate indifference test that applies to convicted prisoners applies to pretrial detainees as well, and it includes both objective and subjective components.[30] *See Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (explaining this standard); *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992) (applying the deliberate indifference standard to pretrial detainees). Here, there is a substantial risk of harm, and both the objective and subjective deliberate indifference tests are satisfied.

### 1.   The Jail's Conditions Create a Substantial Risk of Serious Harm.

To meet the objective component of the deliberate indifference standard, a detainee must show that he faces "a substantial risk of . . . serious harm resulting from the prisoner's unwilling exposure

---

[30] After the U.S. Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), some circuits have concluded that pretrial detainees need not prove the subjective component of the deliberate indifference standard. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 33–35 (2d Cir. 2017). However, the Fourth Circuit has not yet addressed the question of whether *Kingsley* alters the deliberate indifference inquiry for pretrial detainees. Therefore, at present, pretrial detainees must satisfy both the objective and subjective components to prevail. *See Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *8 (D. Md. Apr. 3, 2020).

to the challenged conditions." *Shakka*, 71 F.3d at 166.[31] Plaintiffs easily do so. COVID-19 is highly communicable, and the Jail's conditions have amplified its spread. Compl. ¶¶ 27-29, 79-147. There is already a severe outbreak of COVID-19 at the Prince George's County Jail: nearly half of its approximately 600 prisoners may already be infected. *Id.* ¶¶ 68-78.[32] And the harm Plaintiffs face is serious. In the United States, the mortality rate is 3.2 percent. Ex. 32, Benninger Decl. ¶ 2(G)(i). Twenty percent of those infected with COVID-19 will need hospitalization, and five percent will need intensive care. Ex. 30, Meyer Decl. ¶ 31; Ex. 32, Benninger Decl. ¶ 2(F). Survivors may suffer long-term physical damage. Compl. ¶ 34.

Because of the Jail's conditions, there is also a substantial risk that infected prisoners will become seriously ill, suffer long-term physical damage, and die. Symptomatic and COVID-positive prisoners and are not adequately monitored for signs of serious illness, and the medical

---

[31] Since Plaintiffs' claims involve inadequate medical treatment, and since a subclass of them is medically vulnerable due to pre-existing conditions, Plaintiffs could also frame these claims in terms of "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *9 (assessing medically vulnerable detainees' conditions claim through this lens). However, since the Jail's dangerous conditions include both failures in medical care and other basic safety precautions and imperil prisoners both with and without pre-existing conditions, Plaintiffs' claims are best characterized as a challenge to conditions that create a substantial risk of "serious illness and needless suffering." *Helling*, 509 U.S. at 33. Regardless, "'[w]hether one characterizes the treatment received by [the prisoner] as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard.'" *Id.* at 32 (quotations omitted).

[32] The high risk of COVID-19 infection in the Jail alone is sufficient to create a significant risk of serious harm, regardless of whether that harm has or will affect all of the prisoners exposed to it. *See Helling*, 509 U.S. at 33 (stating that the Eighth Amendment "required a remedy" where prisoners were crowded with others who had infectious diseases, even where "it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed"); *id.* ("We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery."); *see also* Ex. E, Order (Doc. 23) *Malam v. Adduci*, No. 20-10829, at 29 (E.D. Mich. Apr. 6, 2020) ("In the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a generalized risk is a "substantial risk" of catching the COVID-19 virus for any group of human beings in highly confined conditions.").

attention they do receive is limited or misguided. *Id.* ¶¶ 105-18, 148-57, 167-82. Meanwhile, the Jail's many barriers to care "will result in ongoing transmission within housing units and high risk for complications of COVID-19 among those who are infected, including death." Ex. 30, Meyer Decl. ¶ 27(a); Compl. ¶¶ 149-66.

At baseline, prisoners with certain pre-existing conditions are in greater danger from COVID-19, "including a meaningfully higher risk of death." Ex. 30, Meyer Decl. ¶ 40.[33] The Jail's conditions have intensified these risks. Jail staff do not specially monitor these prisoners to protect them from infection, and when they show symptoms of COVID-19, they are regularly turned away from care. Compl. ¶¶ 154, 173; *see* ¶¶ 106-11, 126-27, 151-53, 157. The Jail is also failing to provide medical care for anything other than COVID-19, including long-term chronic conditions (like asthma). *Id.* ¶¶ 158-61. As a result medically vulnerable prisoners are at even greater risk of serious illness and death.[34]

Other conditions at the Jail further enhance the risk the virus poses to all prisoners. Medical isolation cells are unsanitary: there is feces and mucus on the walls. Thus, "[i]n addition to spread

---

[33] *See Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *11 ("For individuals in high risk categories such as Petitioners, the available data shows that the death rate for those with COVID-19 is between 15 percent and 20 percent.").

[34] *See* Ex. 30, Meyer Decl. ¶ 35 ("Failure to provide individuals adequate medical care for their chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected."); Ex. 32, Benninger Decl. ¶ 3(C) ("During this pandemic, inmate reports . . . show that inmates with medical conditions that put them at increased risk of infection and disease, are not being cared for appropriately"); *see also Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *11 ("[T]he Court finds a major deficiency in the lack of any procedures to address the heightened risk to detainees with certain medical conditions. . . . For individuals in high risk categories such as Petitioners, the available data shows that the death rate for those with COVID-19 is between 15 percent and 20 percent. While adequate treatment for Coreas's condition would necessarily require separation from, or at least minimization of contact with, other detainees, Respondents have taken no general or specific steps to meet this medical need for distancing, whether by providing Coreas with his own cell and otherwise distancing him from other detainees.").

of COVID-19, people in these medical isolation units are therefore at risk of exposure to other diseases, including HIV and Hepatitis C." Ex. 30, Meyer Decl. ¶ 33. Prisoners are locked down in poorly ventilated cells for 23 hours per day with symptomatic cellmates, "contribut[ing] to disease transmission." *Id.* ¶ 30. Prisoners both in lockdown and medical isolation are denied access to basic accommodations to mitigate psychological stress, and the Jail has halted mental health services entirely. This is already inflicting grave harm to prisoners' mental health[35] and may "depress prisoners' immune systems and render them even more vulnerable to COVID-19 virus, and less able to combat it if and when they contract it." Ex. 34, Haney Decl. ¶ 26.

These conditions satisfy the objective test. *See* Ex. B, Order (Doc. 12), *Cameron v. Bouchard*, No. 2:20-cv-10949-LVP-MJH, at 3 (E.D. Mich. Apr. 17, 2020) ("It cannot be disputed that COVID-19 poses a serious health risk to Plaintiffs and the putative class," which included all pretrial detainees at the Oakland County Jail).[36] Indeed, a court in this district has so found in much less extreme circumstances than these. In *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020), the court found that detainees at two different ICE facilities had shown a substantial risk of serious harm, even though there were no confirmed cases on COVID-19 at those facilities. *Id.* at *9-10; *see also Jones v. Wolf*, No. 20-CV-361, 2020 WL 1643857, at *9 (W.D.N.Y. Apr. 2, 2020) (finding that the risk of COVID-19 in an immigration detention facility satisfied the objective factor even through there were no reported cases there).[37]

---

[35] *See, e.g.*, Compl. ¶ 14 (stating that Mr. Seth, who is on 23-hour lockdown and no access to mental health services, has bipolar disorder).

[36] *See also, e.g.*, Ex. C, Order (Doc. 40), *Valentine v. Collier*, No. 4:20-CV-1115, at 1 (Apr. 16, 2020) (finding that Named Plaintiffs representing a class of prisoners "face[d] a high risk of serious illness or death from exposure to COVID-19").

[37] In other factual contexts, courts have found that far more attenuated dangers than the immediate threats here could satisfy the objective test. *See, e.g.*, *Helling*, 509 U.S. at 35 (affirming circuit court's holding that second-hand smoke posed an unreasonable risk of serious harm to a prisoner's

Here, an outbreak is already in progress. And the Jail has intensified the risks of COVID-19 by (for example) suspending mental health care and exposing prisoners to extreme psychological distress through the use of punitive lockdowns and isolation conditions. *See* Ex. F, Order (Doc. 27), *Doe v. Barr*, 20-cv-2141-LB (Apr. 12, 2020), at 16 (finding that "petitioner's other diagnoses of chronic PTSD and depression compound his susceptibility" to a COVID-19 infection); *see id.* at 6–7 (detailing evidence that mental illness can depress the immune response and lead to an increased risk of infections). Further, although Plaintiffs' claims address the risk of harm imposed by the sum total of the Jail's inadequate conditions, some of the Jail's conditions may independently create a substantial risk of serious harm. *See, e.g.*, *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019*), as amended* (May 6, 2019) (finding that conditions wherein prisoners spent "between 23 and 24 hours a day 'alone in a small . . . cell' with 'no access to congregate religious, education, or social programming'—pose[d] a 'substantial risk' of serious psychological and emotional harm.") (quotations omitted); *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (finding deliberate indifference where a prisoner was forced to live in a feces-covered cell for three days).

To address the objective component, courts must also "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency

---

future health); *Johnson v. Epps*, 479 Fed. App'x 583, 590-91 (5th Cir. 2012) (finding that prison policy under which prisoners use unsterilized barbering instruments, which could expose them to communicate diseases, posed an unreasonable risk of future harm), *Brown v. Bargery*, 207 F.3d 863, 865, 867-68 (6th Cir. 2000) (finding that improperly installed prison bunks that created a danger that inmates could slide off of them and onto the concrete floor, as well as protruding anchor bolts "which could potentially cause an injury," could constitute a risk to their future health under the objective prong); *DeGidio v. Pung*, 920 F.2d 525, 527, 529 (8th Cir. 1990) (affirming district court's conclusion that a "serious risk to the inmates' health existed where a prison had an inadequate response to a tuberculosis outbreak even though [o]nly a few infected individuals develop active tuberculosis" and the rest are asymptomatic).

to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36. Society has deemed the risk

posed by COVID-19 intolerable: there have been unprecedented changes to American life to avoid

it. Compl. ¶¶ 38-40.

### 2. Defendants Knew of and Disregarded the Excessive Risk to Prisoners' Health and Safety Posed by COVID-19, Particularly Absent Appropriate Precautions.

To satisfy the subjective component of deliberate indifference, a plaintiff must show that prison

officials "kn[ew] of and disregard[ed] an excessive risk to [the plaintiff's] health or safety."

*Farmer v. Brennan,* 511 U.S. 825, 837 (1994). "[T]he test is whether the [prison officials] kn[ew]

the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet

they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quotations

omitted).

Defendants knew the dangers imposed by COVID-19. When the Jail reported its first case of

COVID-19 on March 30, 2020, Defendant McDonough publicly predicted that this number would

grow, specifically citing the challenges of containing a virus in a jail. Compl. ¶¶ 69-70 (Defendant

McDonough comparing jails to "cruise ships without the views or the amenities," observing that

"[a] jail is a pretty transitory place" where "[p]eople are close together" and "breathing the same

air," and that she "expect[ed]" more cases of COVID-19 in the Jail); *see Makdessi v. Fields*, 789

F.3d 126, 141 (4th Cir. 2015) (stating that when a particular danger has been "expressly noted by

prison officials," this can prove that official's actual knowledge under the subjective test).[38]

---

[38] The Prince George's County Department of Corrections has also tweeted about COVID-19, often noting the very facts that make the Jail's conditions so dangerous. *See, e.g.*, Prince George's County Department of Corrections (@PGCorrections), Twitter (Apr. 8, 2020, 12:32 PM), https://twitter.com/PGCorrections/status/1247925269765197830 ("Having a chronic disease like diabetes can put you at higher risk for severe illness from viruses. See our attached fact sheet about caring for yourself, managing your diabetes, and COVID-19."); *Id.* (Apr. 6, 2020, 10:04 AM), https://twitter.com/PGCorrections/status/1247163379954974720 (posting pictures of a "social distancing farewell lunch" at which corrections officers are clearly less than six feet apart); *Id.*

Aside from this, the risks imposed by Defendants' failures are obvious (especially during an active outbreak). It is not challenging to predict the grim results of denying prisoners soap, neglecting to sanitize common surfaces, locking medically vulnerable prisoners in cells with symptomatic cellmates for 23-hours per day, and failing to monitor and treat symptomatic prisoners during a pandemic. *See Porter*, 923 F.3d at 348, 361 ("[A]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.") (quotations omitted); *Makdessi*, 789 F.3d at 136 (stating that subjective test can be satisfied where the risk of harm "was so obvious that it had to have been known"). Moreover, the CDC's Guidance for correctional and detention facilities, issued on March 23, 2020, explicitly warns of the specific dangers COVID-19 imposes in these institutions. Ex. 36, CDC Guidance at 2 (describing "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors," and advising that "[c]onsistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19").[39]

Defendants disregarded this risk. They failed to implement the CDC Guidance on almost every score. [40] *See* Ex. B, *Cameron*, No. 2:20-cv-10949-LVP-MJH, at 3 (finding that Plaintiffs and putative class of prisoners at a jail were likely to succeed on their Eighth and Fourteenth

---

(Apr. 6, 2020, 9:05 AM), https://twitter.com/PGCorrections/status/1247148491631140867 (warning that "the coronavirus can cause stress, fear, and anxiety," and posting a flyer with "things you can do to help," including "exercise," "talk[ing] with people you trust about how you are feeling," and "call[ing] loved ones just to say hi").

[39] The CDC Guidance also warns that "[i]ncarcerated/detained persons and staff may have medical conditions that increase their risk of disease from COVID-19," and provides a link to a list of those conditions. Ex. 36, CDC at 2.

[40] The CDC Guidance warned about the likely effects of certain ill-advised policies the Jail has adopted. *See* Ex. 36, CDC at 2 ("Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation").

Amendment claims where the jail "ha[d] not imposed even the most basic safety measures recommended by heath experts, the Centers for Disease Control and Prevention, and Michigan's Governor to reduce the spread of COVID-19 in detention facilities"). The predictable result of the Jail's conditions is the proliferation of an outbreak in a facility that is also failing to meet infected prisoners' medical needs. Under these circumstances, Plaintiffs have satisfied the subjective factor and shown deliberate indifference.

### B.  Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief

Without this Court's relief, Plaintiffs will suffer irreparable harm for two reasons. First, "the denial of a constitutional right . . . constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). Second, the Jail's conditions subject Plaintiffs to an increased risk that they will contract COVID-19 and that they will suffer serious illness, physical damage, and death if they do. This, of course, is irreparable harm as well.[41]

### C.  The Balance of Equities and the Public Interest Favor the Requested Relief

The balance of equities favors Plaintiffs. Plaintiffs face infection and sickness in a Jail that cannot protect them; they seek this injunction to avoid serious illness, long-term physical damage, and death. The Jail need only comply with basic public health measures. The relief that Plaintiffs seek is also in the public interest. The Jail is not an isolated environment. Uncontrolled infection within the Jail risks the health and safety of every person connected directly or indirectly to the many correctional officers, healthcare workers and others who enter and leave the Jail environment

---

[41] *See, e.g.*, Ex. B, *Cameron*, No. 2:20-cv-10949-LVP-MJH, at 3 (finding that prisoners at a jail would suffer irreparable harm absent an injunction because "they face a heightened risk of contracting this life-threatening virus simply as incarcerated individuals and even more so without the imposition of these cautionary measures"); *see also Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *13 (finding that, if there were any COVID-19 cases in the immigration facilities at issue, it would find that petitioners faced "a significant risk of death or serious illness," and that this constitutes irreparable harm).

every day. *See* Ex. 30, Meyer Decl. ¶ 15 ("Prison health is public health."); Ex. 32, Benninger

Decl. ¶ 3(L) ("[B]y supporting inmate health, we are supporting public health."). Therefore, any

remedy that will protect the Plaintiffs benefits the wider community.[42]

## II.  A Temporary Restraining Order Should Issue to Enjoin the Jail's Unlawful Detention Policy.

When the basis for a person's detention has ended, she is entitled to release. Therefore,

Plaintiffs ask this Court to enjoin the Prince George's County Jail from detaining COVID-positive

prisoners who are legally entitled to release. Compl. ¶¶ 183-87. Plaintiffs satisfy all four factors

necessary for the grant of a temporary restraining order. *See Winter*, 555 U.S. at 20.

Plaintiffs are likely to succeed on the merits. Pretrial detainees have a liberty interest in paying

bail and being released after paying bail.[43] And post-trial detainees "clearly [have] a Fourteenth

Amendment right to be released from service of a sentence upon expiration of its unequivocal

term." *See Perkins v. Peyton*, 369 F.2d 590, 592 (4th Cir. 1966); *see also Foucha v. Louisiana*,

504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty

protected by the Due Process Clause."). Thus, the government infringes on an individual's due

process rights when it continues to detain a person after the legal basis for detention has ended.

---

[42] *See Ortuno v. Jennings,* 2020 U.S. Dist. LEXIS 62030, 14 (N.D. Ca. April 8, 2020); ("The public interest in promoting public health is served by efforts to contain further spread of COVID-19, particularly in detention centers, which typically are staffed by numerous individuals who reside in nearby communities."); *Castillo v. Barr*, No. CV2000605TJHAFMX, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020) ("[T]he emergency injunctive relief sought, here, is absolutely in the public's best interest. The public has a critical interest in preventing the further spread of the coronavirus. An outbreak at Adelanto would, further, endanger all of us.").

[43] *See Steele v. Cicchi*, 855 F.3d 494, 502 (3d Cir. 2017) (identifying a "constitutionally protected liberty interest in exercising [a] bail option, once bail had been set") (quotations omitted)); *Lynch v. City of New York*, 335 F. Supp. 3d 645, 654 (S.D.N.Y. 2018) ("Plaintiffs have identified a liberty interest in paying bail once it is fixed and in being released once bail is paid.").

Courts have analyzed overdetention claims in terms of substantive due process. *See, e.g.*, *Lynch v. City of New York*, 335 F. Supp. 3d 645, 653 (S.D.N.Y. 2018).[44] An infringement of an individual's substantive due process rights violates the Fourteenth Amendment when it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, (1998)). In a "custodial situation," "deliberate indifference" can satisfy this standard. *Cty. of Sacramento*, 523 U.S. at 851, 852. Deliberate indifference requires showing that "defendants actually knew of and disregarded a substantial risk of serious injury to the detainee." *Young v. City of Mount Ranier*, 238 F.3d 567, 576 (4th Cir. 2001).

Here, Defendants are responsible for effectuating prisoners' release. They are surely aware that detainees who post bail are entitled to release, and that a convicted prisoner is entitled to release when her sentence expires. Subjecting prisoners to as many as 14 additional days in jail because they are COVID-positive constitutes deliberate indifference. *See Hawkins*, 195 F.3d at 738; *White by White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) (stating that when an official "[chooses] to ignore the danger" of constitutional violations, this amounts to deliberate indifference).

The remaining three factors for a temporary restraining order are also met. Constitutional violations constitute irreparable harm, as do deprivations of liberty. *See Ross*, 818 F.2d at 1135; *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 711 (D. Md. 2016) ("[B]ecause the harm is loss of liberty,

---

[44] Some courts assess pretrial detainees' claims under the Fourth Amendment and post-conviction detainees' claims under the Eight Amendment. *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015) (conducting Fourth Amendment analysis on claim from a plaintiff "kept in custody for a new purpose after she was entitled to release"); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (applying Eighth Amendment analysis to an overdetention claim). The Fourth Circuit has not explicitly prescribed a constitutional framework for overdetention claims. However, *Perkins* suggests that in this circuit, the Fourteenth Amendment applies. *See Perkins*, 369 F.2d at 592. Regardless, Plaintiffs would also prevail under the Fourth and Eighth Amendment analysis.

it is quintessentially the kind of harm that cannot be undone or totally remedied through monetary relief"). The balance of equities favor relief; the Jail has many options for resolving the risks of releasing COVID-positive prisoners. Indeed, hospitals "release" such individuals every day. But Plaintiffs risk being detained while sick with COVID-19 in a facility that is dangerously ill-equipped to treat them. Finally, the requested relief is in the public interest, as it requires Defendants to comply with basic liberty protections.

If the Jail is concerned about the release of COVID-positive prisoners into the community, the CDC Guidance recommends that it "contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning." CDC Guidance at 17. For infectious prisoners, this transition may be challenging, and the Jail should develop an appropriate solution. Illegal detention in squalid conditions is not that solution. This Court should grant relief.

### III. This Court Should Order Release of the Medically Vulnerable Subclass of Pretrial Detainees Under 28 U.S.C. § 2241

The Jail is in the midst of an uncontrolled outbreak of COVID-19.[45] The members of the Medically Vulnerable Subclass—all of whom are pretrial detainees not convicted of any crime—each have medical conditions that worsen the effects of COVID-19.[46] For them, exposure to COVID-19 brings a meaningfully higher risk of permanent organ damage and death.[47] The Jail

---

[45] Ex. 30, Meyer Decl. ¶ 26 ("[I]t is my professional judgment that this facility is dangerously under-equipped and ill-prepared to prevent and manage the spread of COVID-19, which is already spreading throughout the jail.").

[46] *See* U.S. Centers for Diseases Control, "People Who Are At High Risk [for severe illness from COVID-19]," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last reviewed Apr. 15, 2020).

[47] Ex. 30, Meyer Decl. ¶ 40 ("[I]ndividuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes, mental health conditions) or older age. . . are in even greater danger in [correctional/detention] facilities,

has no plan to protect these prisoners. Compl. ¶¶ 154, 173, 174. Like all prisoners at the Jail, they are locked down with symptomatic cellmates, denied medical care (even COVID-19 symptoms), and, once infected, isolated in unsanitary conditions where they are almost never monitored. *See, e.g.*, *id.* ¶¶ 106-11, 126-27, 151-53, 157. These conditions are dangerous for everyone; for medically vulnerable prisoners, even more so.[48]

COVID-19 can escalate rapidly,[49] and many vulnerable prisoners are already sick. For example, six of the Named Plaintiffs have pre-existing conditions that make them especially vulnerable to severe illness and death if they are infected with COVID-19. Five of them have symptoms of COVID-19. *Id.* ¶¶ 14, 15, 17, 18, 19, 21.

Defendants cannot remedy the Jail's many failures in time to protect these prisoners' lives. Therefore, their continued detention is unconstitutional, and this Court should release them

---

including a meaningfully higher risk of death."); *see Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *11 ("For individuals in high risk categories such as Petitioners, the available data shows that the death rate for those with COVID-19 is between 15 percent and 20 percent.").

[48] Ex. 30, Meyer Decl. ¶ 27(a) (stating that the Jail's delays in medical care "will result in . . . a high risk for complications of COVID-19 among those who are infected, including death"); *id.* ¶ 31 (finding that "not even th[e] minimal amount of [medical] care" is being provided to prisoners who are sick with COVID-19); *Id.* ¶ 32 (stating that, given the disease's rapidly progression, "people in medical isolation [for COVID-19] need to be diligently monitored for clinical worsening," but prisoners' accounts demonstrate "a lack of medical attention that is highly concerning and suggests that medical staff do not have the necessary staffing, training, or resources to identify when people require hospitalization"); *id.* (observing that the Jail's nurses appear to "ignor[e] . . . medical issues . . . that may be signs of complicated COVID-19 disease); *id.* ¶ 35 (stating that the Jail's "[f]ailure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality."); Ex. 32, Benninger Decl. ¶ 9 ("[I]nmates with medical conditions that put them at increased risk of infection and disease, are not being cared for appropriately.").

[49] Ex. 30, Meyer Decl. ¶ 32 ("Progression of respiratory symptoms in COVID-19 can be extremely rapid."); *see* Ex. 34, Benninger Decl. ¶ 3 ("In my clincal experience, persons infected with COVID-19 have the ability to rapidly decompensate from a respiratory standpoint once showing symptoms, sometimes requiring mechanical ventilation at an emergent pace.").

pursuant to a writ of habeas corpus under 28 U.S.C. § 2241.[50] In recent weeks, multiple federal courts have done this where there was no other way to protect imprisoned people's rights (and lives) from COVID-19.[51]

If this Court is not inclined to release the Medically Vulnerable Subclass as a whole, it can, as other federal courts have, order Defendants to produce a list of the members of that subclass and any other information this Court requires to make appropriate determinations as to them. *See, e.g.*, Ex. B, *Cameron v. Bouchard*, No. 2:20-cv-10949-LVP-MJH, at 7 (E.D. Mich. Apr. 17, 2020) (ordering Defendants to "[p]romptly provide Plaintiffs and the Court with a list of all individually who are in the Medically Vulnerable Subclass . . . which includes their location, charge and bond status," and "a list of any individuals in the Medically Vulnerable Subclass who Defendants object to releasing and the basis for that objection"); Ex. D, *Swain v. Junior*, No. 1:20-cv-21457-KMW,

---

[50] Because the Medically Vulnerably Subclass members are pretrial detainees, they may bring this action under § 2241. *In re Wright,* 826 F.3d 774, 782 (4th Cir. 2016) (explaining that prisoners in . . . pre-conviction custody . . . or other forms of custody that are possible without a conviction are able to take advantage of § 2241 relief) (quotations omitted).

[51] *See, e.g.*, Ex. E, Order (Doc. 23), *Malam v. Adducci*, 20-10829, at 39-40 (releasing immigration detainee under § 2241 because, given the "risk and severity of irreparable harm to the Petitioner and the weight of public health evidence," release was "the only reasonable option"); *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *5-6, 9 (M.D. Pa. Mar. 31, 2020) (finding that conditions of confinement at an immigrant detention facilities created serious risks for medically vulnerable detainees where, as here, there were unsanitary conditions, prisoners were forced to buy their own soap and share cleaning supplies, the facilities did not provide information on COVID-19 prevention, and detainees shared cells with other inmates who showed symptoms of COVID-19); *Basank v. Decker*, 20 Civ. 2518 (AT), 2020 WL 1481503, at *4-6 (S.D.N.Y. Mar. 26, 2020) (ordering release of ten immigration detainees with underlying medical conditions including diabetes, heart disease, obesity, and asthma because it could not ensure social distancing and had not taken specific steps to protect medically vulnerable detainees, although, in contrast to this case, the ICE detention facility was providing soap and hand sanitizer and substantially increased cleaning); *see also Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *12-13 (stating that the court would release the medically vulnerable immigration detainees under § 2241 if there were any cases of COVID-19 at the facilities that held them and ordering the facilities to certify that they have obtained and will administer tests for COVID-19 for all symptomatic detainees).

at 2-5 (S.D. Fla. Apr. 7, 2020) (ordering Defendants to file, within two days, a list of Medically Vulnerable Subclass Members under seal and to also "file a notice describing the measures being employed to protect these individuals from the risk of COVID-19.").[52]

## IV.    Additional Interim Remedies Are Available to This Court.

Courts of equity operate with flexibility, especially in emergencies of great consequence.  "The horizon of risk for COVID-19 in this facility is a matter of days, not weeks." Ex. 30, Meyer Decl. ¶ 41. Therefore, this Court may need to pursue interim remedies to protect prisoners from serious harm while it considers their constitutional claims. First, this Court can transfer prisoners to home detention or another appropriate facility if necessary to protect their rights under the Eighth and Fourteenth Amendments. Second, this Court can release members of the Medically Vulnerable Subclass on non-monetary bond while it considers their habeas petition under § 2241.

### A.  This Court Has and Should Exercise the Authority to Transfer Prisoners to Home Detention or Another Appropriate Facility to  Remedy the Constitutional Violations or Protect Prisoners From Additional Constitutional and Physical Harms.

Plaintiffs ask this Court to order Defendants to remedy the conditions at the Prince George's County Jail so that they do not impose a substantial risk of serious harm on the people imprisoned there. However, as the CDC and other experts recognize, it may be impossible to carry out some of these measures and to protect certain vulnerable prisoners without transferring at least some prisoners.[53] Accordingly, Plaintiffs ask this Court to order that, to the extent Defendants cannot

---

[52] In addition, as described below, this Court has and should exercise the authority to release members of the Medically Vulnerable Subclass on non-monetary bond pending the outcome of their habeas petition. *See infra* at 33–35.

[53] *See* Ex. 36, CDC at 23 (stating that facilities should "ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms," and [i]f the facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital"); *id.* at 16 (noting that if its medical isolation recommendations are infeasible, a prison should "[s]afety transfer individual[s] to another facility with [the recommended] medical isolation capacity"); *see also* Amend at 3

remedy the substantial risk of serious harm to certain prisoners, it transfer them to home detention or another appropriate facility.[54] Another federal court recently recognized this solution for protecting prisoners in a jail that cannot adequately address the risk of COVID-19. *See* Ex. G, *Gray v. Cty. of Riverside* (Doc. 191), 5:13-cv-0444-VAP-OPx, at 4 (C.D. Cal., Apr. 14, 2020) (stating that if the jail "is unable to implement adequate social distancing within its existing jail facilities and take other necessary steps to decrease the risk of infection, this Court has the authority to order the transfer of prisoners to different facilities.").

Indeed, courts have previously transferred prisoners where necessary to protect their Eighth Amendment rights. For example, in *Plata v. Brown*, No. C01-1351 TEH, 2013 WL 3200587 (E.D. Cal. June 24, 2013), the court addressed the presence of "cocci" infections at two California prisons. Cocci infections are asymptomatic for 60 percent of people, but it "can also result in serious illness and, in the most extreme cases, death." *Id.* at *2. The court found that the prisons' measures to abate the threat of cocci were inadequate to avoid a substantial risk of serious harm to certain high-risk inmates, and, accordingly, failure to transfer these groups of prisoners would "result in deliberate indifference under the Eighth Amendment." *Id.* at 10. Other courts have also

---

("Prisons, jails, and other places of detention that are not able to comply with ethical standards of quarantine and medical isolation in the COVID-19 pandemic should urgently implement strategies to release or transfer people to locations that have the capacity to meet community standards of medical care"); *see also* ABA Standards for Criminal Justice, 23-6.2(c) (3d ed. 2011) ("A prisoner who requires care not available in the correctional facility should be transferred to a hospital or other appropriate place for care."); Ex. 30, Meyer Decl. ¶ 39–40 (recommending, among other things, that "the jail should evaluate individuals for release in order to reduce the population of the jail" particularly "individuals with preexisting conditions").

[54] Depending on its current capacity, Defendants may be able to transfer some prisoners to the Prince George's County Community Release Center.

ordered transfers to remedy or avoid Eighth Amendment violations.[55] If necessary to avoid a substantial risk of serious harm to some or all prisoners, this court should do the same.[56]

**B. This Court Has and Should Exercise the Authority to Release Medically Vulnerable Subclass Members on Non-Monetary Bond Conditions Pending Review of Their Request for Habeas Relief Under § 2241.**

A federal court has the authority to grant bail to habeas petitioners who are properly before it.

*See United States v. Perkins*, 53 F. App'x 667, 669 (4th Cir. 2002) (explaining the standard "[t]o prevail on a motion for release on bail in a habeas case"); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (describing "the authority of the federal courts to grant bail to habeas petitioners"); *Bolante v. Keisler*, 506 F.3d 618, 620 (7th Cir. 2007) ("Inherent judicial authority to grant bail to persons who have asked for relief in an application for habeas corpus is a natural incident of habeas corpus, the vehicle by which a person questions the government's right to detain him."). Pursuant

---

[55] *See, e.g.*, *Reaves v. Dep't of Corr.*, 392 F. Supp. 3d 195, 200, 210 (D. Mass. 2019) (concluding that transfer a quadriplegic state prisoner convicted of first degree murder to a non-Department of Corrections facility where he could receive adequate care was the appropriate remedy for his Eighth Amendment claims challenging his inadequate medical care); *United States v. Wallen*, 177 F. Supp. 2d 455, 458, 459 (D. Md. 2001) (ordering transfer of a pretrial detainee because of the Court's "grave[] concern[s] that [his] Fifth Amendment rights [against deliberate indifference to his serious medical needs] may have been violated and, more importantly, that those rights may be at continued risk if he [were] returned to [the jail]"); *Johnson v. Harris*, 479 F. Supp. 333, 338 (S.D.N.Y. 1979) (ordering the transfer of a severely diabetic prison to a facility that could meet his medical needs as a remedy for Eighth Amendment violations).

[56] Transfers to restrictive home detention do not constitute "prisoner release order[s]," which are prohibited under the Prison Litigation Reform Act (PLRA) absent certain conditions. *See* 18 U.S.C. § 3626(a)(3); *see Gray* (Doc. 191), 5:13-cv-0444-VAP-OPx, at 4-5 ("[N]othing in the PLRA prohibits a district judge from ordering the transfer of prisoners in response to violations of their constitutional rights . . . nor would it prohibit the Court from ordering the Sheriff to use his authority . . . to transfer prisoners"); *Reaves*, 404 F. Supp. 3d at 522–23 (finding that transfer of a prisoner to a facility outside of the Department of Corrections where his medical needs could be met did not constitute a "prisoner release order" under the PLRA); *Plata*, 2013 WL 3200587, at *8 (N.D. Cal. 2013) (noting Defendants' concession that a transfer out of a prison to correct a constitutional violation was not a "prisoner release order").

to this authority, if this Court does not immediately release members of the Medically Vulnerable Subclass under § 2241, it should release some or all of them on non-monetary bond.

Release on bond pending habeas is appropriate where the petitioner can "show that his petition presents a substantial constitutional claim upon which he has a high probability of success, and that extraordinary circumstances warrant his release." *Perkins*, 53 F. App'x at 669. Circuit courts have defined "extraordinary circumstances" to mean that "the grant of bail [is] necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226 (quotations omitted). *See Abdullah v. Bush*, 945 F. Supp. 64, 67 (D.D.C. 2013), *aff'd sub nom. Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014) (same); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (same).

Extraordinary circumstances exist here.[57] The Medically Vulnerable Subclass seeks habeas relief because if they do not receive it, there is an unacceptable risk that they will become seriously ill and die. Rapid removal from the jail is necessary "to make the habeas remedy effective" because, with further delay, medically vulnerable prisoners may suffer the severe illness, physical damage, and death they seek habeas to avoid. *Mapp*, 241 F.3d at 226.[58]

Based on these considerations, a federal court for the District of Massachusetts has released (and continues to release) numerous civil immigration detainees on non-monetary bond conditions while their class action habeas petition based on a detention center's failure to protect them from the spread of COVID-19 is pending. *See* Ex. H, Order (Doc. 64), *Savino v. Souza*, No. 20-10617-

---

[57] Plaintiffs have already described above, why they are likely to succeed on the merits. *See supra* at 17–25. And a constitutional challenge to jail conditions that imperil prisoners' health and safety is surely "substantial." *Perkins*, 53 F. App'x at 669.

[58] *Cf. Johnson v. Marsh*, 227 F.2d 528, 529-32 (3d Cir. 1955) (finding that a district court had the power to grant of bail pending habeas where the petitioner, "an advanced diabetic, was, under conditions of confinement, rapidly progressing toward total blindness," comparing this authority to a judge's power to issue a "stay of execution" while a petition is pending).

WGY, 2020 WL 1703844, at *8–9 (Apr. 8, 2020). Finding "extraordinary circumstances" in "this nightmarish pandemic," the court opted to "diligently entertain[] bail applications while the petitions for habeas corpus are pending." *Id.* at *9. On April 15, 2020, the Court denied the government's request to stay the releases. In its Order, the Court explained: "We are in the midst of a pandemic unprecedented in our lifetime. . . . [T]he Court will continue, on an individual basis, to work through the difficult issues of bail in the present crisis. . . . Moreover, compelling issues of individual, institutional, and community health preclude the luxury of a stay." Doc. No. 86 at 1-3 (Apr. 15, 2020) (docket text).

Other courts have also found that the risks imposed by COVID-19 warranted release on bond while a habeas action was pending.[59] Given the severe and unavoidable risks to the Medically Vulnerable Class, this Court can and should act quickly to do the same.

---

[59] *See Avendano Hernandez v. Decker*, No. 20-CV-1589 (JPO), 2020 WL 1547459, at *3 (S.D.N.Y. Mar. 31, 2020) (releasing § 2241 habeas petitioner challenging unconstitutional conditions of confinement—"specifically, continued risk of exposure to COVID-19"—because his continued detention would expose him to the infection he seeks habeas relief to avoid and, thus, "immediate[] release [wa]s necessary to 'make the habeas remedy effective'") (quoting *Mapp*, 241 F.3d at 230); Ex. I, Order (Doc. 507-1), *Jimenez v. Wolf*, No. 18-10225-MLW,  at 3-4 (D. Mass. Mar. 26, 2020) (concluding that release of habeas petitioner on bail was "necessary to … make the habeas remedy effective" because "we're living in the midst of a coronavirus pandemic," "being in a jail enhances risk," and "[i]f the petitioner is infected and dies …. [t]he habeas remedy will be ineffective").

Respectfully submitted on April 21, 2020,

By s/Elizabeth Rossi
    Elizabeth Rossi
    Bar No. 19616
    Katherine Chamblee-Ryan
    *application to the Bar of this Court pending*
    Olevia Boykin
    *application forthcoming*
    Ryan Downer
    *application pending*
    CIVIL RIGHTS CORPS
    1601 Connecticut Ave. NW, Suite 800
    Washington, D.C. 20009
    katie@civilrightscorps.org
    610-931-7715

    Attorneys for Plaintiffs