## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

| | | |
|---|---|---|
| KEITH SETH, *et al.*, | ) | |
| Individually and on behalf of a class | ) | |
| of similarly situated persons, | ) | |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| MARY LOU MCDONOUGH, | ) | |
| In her official capacity as | ) | |
| Director of the Prince George's County | ) | |
| Department of Corrections, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants-Respondents. | ) | |

## APPENDIX OF EXHIBITS FOR EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# **Index of Exhibits**

| | |
|---|---|
| Exhibit A | Order. *Banks v. Booth,* 1:20-CV-8849 (D. D. C. Apr. 19, 2020) |
| Exhibit B | Opinion and Order. *Cameron v. Bouchard,* 20-19049 (E.D. Mich. Apr. 17, 2020) |
| Exhibit C | Preliminary Injunction Order. *Valentine v. Collier,* 4:20-CV-1115 (S.D. Tex. Apr. 16, 2020) |
| Exhibit D | Order. *Swain v. Junior,* 1:20-CV-21457 (S.D. Fla. Apr. 7, 2020) |
| Exhibit E | Order. *Malam v. Adducci,* 20-10829 (E.D. Mich. Apr. 6, 2020) |
| Exhibit F | Order. *Doe v. Barr,* 20-CV-2141 (N.D. Cal. Apr. 12, 2020) |
| Exhibit G | Minute Order. *Gray v. Cty. Of Riverside,* 5:13-CV-0444 (C.D. Cal. Apr. 14, 2020) |
| Exhibit H | Order. *Savino v. Souza,* 20-CV-10617 (D. Mass. Apr. 4, 2020) |
| Exhibit I | Memorandum and Order. *Jimenez v. Wolf*, C.A. No. 18-10225 (D. Mass. Mar. 26, 2020) |

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EDWARD BANKS, et al.,<br>　　　Plaintiffs<br><br>　　v.<br><br>QUINCY L. BOOTH, *et al.*,<br>　　　Defendants | Civil Action No. 20-849(CKK) |

## ORDER
(April 19, 2020)

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 19th day of April, 2020, hereby

ORDERED that Plaintiffs' [5] Motion for a Temporary Restraining Order is GRANTED IN PART AND DENIED IN PART. Specifically, the Court ORDERS the following relief:

In light of the medical surveillance and monitoring that is occurring currently in the quarantine units, Defendants shall ensure that the triage process associated with sick call requests on the non-quarantine units is expedited and reflects appropriate sensitivity to the wide variety of symptoms associated with COVID-19 disease. Correctional officers and other staff who are in contact with inmates should ensure that the medical staff are promptly informed about inmates who present with symptoms of COVID-19 and medical staff should respond to the housing unit on an expedited basis. Any inmate grievances that include allegations of delay in medical assessment should be prioritized and submitted to the DOC medical director immediately. Additionally, in light of the fact that the DOC is relying on inmates to self-report symptoms of COVID-19, Defendants shall provide better documentation as to the dates and times of sick calls and urgent care calls, the inmates' reported symptoms, the dates and times the inmates are seen by medical professionals, and the outcomes to allow for better tracking of the response to inmates' complaints of COVID-19 symptoms.

If the Defendants are not already doing so, they shall that ensure that cell restrictions are appropriately monitored, tracked, and corrective action is undertaken on an expedited basis if warranted.

In instances in which inmates are transferred from the intake unit to a different unit before the 14-day quarantine period expires, Defendants shall ensure that appropriate housing, surveillance and monitoring is afforded to the inmate in the receiving unit.

Defendants shall consult with public health professionals regarding strategies that can be implemented to strengthen the COVID-19-related education program for both staff and inmates. Moreover, Defendants shall explore appropriate supports that can be provided on an expedited basis to both staff and inmates who are living and working in an extremely stressful and high-risk environment and are at substantial risk of exposure.

Defendants shall conduct additional staff training on the use of the non-touch, infrared thermometers consistent with manufacturer guidelines and provide guidance to staff regarding what to do when thermometers produce results that appear on their face to be inaccurate.

Defendants shall take immediate steps to provide consistent and reliable access to legal calls, personal telephone calls, daily showers, and clean clothing and clean linens to all inmates on isolation status.

Defendants shall ensure appropriate and consistent implementation of social distancing policies by addressing limitations in current staffing levels, supervisory oversight of line staff, and provide enhanced education related to the importance of social distancing.

Defendants shall communicate clear expectations, in writing, to correctional staff about the types of PPE required to perform the various supervision and operational functions that are conducted throughout the facility, including the PPE they should expect to be given on each shift for each specific category of post assignment; the proper donning, doffing and disposal of the PPE; and an explanation of the related rationale. Clear communication to staff regarding differences in risk exposures and providing consistent PPE over time could help lower anxiety levels among staff.

In addition, Defendants shall also ensure that all PPE issued is properly fitted. For example, N95 respirators must be properly fitted to ensure that they provide the intended protection. During the site visits that amici conducted, none of the correctional staff who were wearing N95 respirators in isolation units reported that they had been fitted for the respirators.

Defendants shall ensure that all DOC staff receive instruction on the proper disposal of PPE, and appropriate and accessible receptacles for immediate disposal must be readily available. During the site visits, amici observed that receptacles for disposal of PPE were not accessible on a consistent basis, including to staff assigned to isolation units at the CTF.

There is a critical need for the defendants to strengthen the environmental health and safety program at both the CDF and the CTF. It is recommended that the DOC immediately retain a registered sanitarian to oversee the environmental health and safety programs at both facilities and provide training so that cleaning tools and products are used properly. A registered sanitarian should bring the appropriate knowledge, oversight, and quality control necessary to mitigate at least some of the critical public health concerns that are evident in both facilities.

In addition to engaging a sanitarian, supervisory correctional staff must ensure that housing unit staff properly manage the work performed by the inmate detail workers. In order to accomplish that goal, correctional staff and detail workers require guidance from a sanitarian trained to oversee the facility's environmental health program.

In addition to engaging a sanitarian, the defendants shall consider contracting for professional cleaning services on the non-secure side of the facility at least until a sanitarian is hired to bolster the existing environmental health and safety program at both facilities. Additionally, proper cleaning supplies that have been sanitized regularly shall be immediately provided to each unit, and a schedule for cleaning common areas and cells shall be established and enforced.

Defendants shall reduce the extent to which common spaces encourage inmates to congregate in close quarters (e.g., around a single television in a small enclosed area, or next to one another in order to use telephones that are mounted closer than six feet apart). The

effectiveness of this strategy would increase if Defendants were to consistently apply their stated policy of allowing no more than small groups of inmates out of their cells at any given time. Whatever strategies Defendants adopt, increased active and direct supervision will be required by both housing unit correctional officers and the midlevel managers responsible for overseeing and supporting the correctional officers assigned to housing units. Enforcing social distancing standards as a public health measure is a new responsibility for correctional staff and they must be supported as they adjust to this new role. Moreover, Defendants shall assess whether any additional security staff are needed to provide appropriate supervision, on a unit-by-unit basis, taking into consideration the layout of the housing units, the number of inmates housed on the units, and the security designation of the unit, in order to enforce social distancing policies.

      Finally, Defendants shall ensure that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters.

      As relief, the Court has adopted in general the recommendations set out by the amici in their final report. The Court has not set out each detail in the report which supports these recommendations. However, the Court expects Defendants to address those specific deficiencies set out in the final report, which support the recommendations, and to rectify those deficiencies.

      **SO ORDERED.**

                                 /s/

                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAAL CAMERON, RICHARD BRIGGS,
RAJ LEE, MICHAEL CAMERON, and
MATTHEW SAUNDERS, individually and
on behalf of all others similarly situated,

                  Plaintiffs,                  Civil Case No. 20-10949
                                                        Honorable Linda V. Parker

v.

MICHAEL BOUCHARD, CURTIS D. CHILDS,
and OAKLAND COUNTY,

                  Defendants.
_____/

## **OPINION AND ORDER**

On this date, Plaintiffs filed a putative class action complaint, raising grave

concerns about the conditions in the Oakland County Jail in the face of the novel

coronavirus (COVID-19) pandemic. Plaintiffs are Oakland County Jail pretrial or

convicted detainees. Plaintiffs seek to represent a class of all current and future

Oakland County Jail (hereafter also "Jail") detainees, as well as the following sub-

classes:

> • The First Subclass ("Pre-trial Subclass") is defined
> as "All current and future persons detained at the
> Oakland County Jail during the course of the
> COVID-19 pandemic who have not yet been
> convicted of the offense for which they are
> currently held in the Jail."

- The Second Subclass ("Post-conviction Subclass") is defined as "All current and future persons detained at the Oakland County Jail during the course of the COVID-19 pandemic who have been sentenced to serve time in the Jail or who are otherwise in the Jail as the result of an offense for which they have already been convicted."

- The Third Subclass ("Medically-Vulnerable Subclass") is defined as: "All members of the Jail class who are also over the age of fifty or who, regardless of age, experience an underlying medical condition that places them at particular risk of serious illness or death from COVID-19 …."

Plaintiffs also filed an emergency motion for temporary restraining order ("TRO") in which they ask the Court to order (a) the release of members of the Medically-Vulnerable Subclass pending briefing and argument and (b) the undertaking of certain measures to improve hygiene and safety at the Jail.

Having reviewed Plaintiffs' Complaint and pending motion, the Court is granting at this time Plaintiffs' request for a TRO requiring Defendants to utilize the measures set forth below to improve hygiene and safety at the Jail.[1]  The Court is without sufficient information to rule on Plaintiffs' request to release all members of the Medically-Vulnerable Subclass and is scheduling a hearing to

---

[1] The Court is not imposing all of the measures requested by Plaintiffs and will discuss those measures that are omitted with the parties during the hearing scheduled *infra*.

address that request.  The Court has considered the following factors in deciding

whether to issue the TRO:

> (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay.

*Ohio Republic Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008).

The Court finds that Plaintiffs are likely to succeed on the merits of their

claim alleging that jail conditions violate their Eighth and Fourteenth Amendment

rights.  Plaintiffs' allegations reflect that Oakland County has not imposed even the

most basic safety measures recommended by health experts, the Centers for

Disease Control and Prevention, and Michigan's Governor to reduce the spread of

COVID-19 in detention facilities.  It cannot be disputed that COVID-19 poses a

serious health risk to Plaintiffs and the putative class.[2]

Plaintiffs also are likely to suffer irreparable harm absent an injunction, as

they face a heightened risk of contracting this life-threatening virus simply as

incarcerated individuals and even more so without the imposition of these

cautionary measures.  Entering an injunction requiring Defendants to adopt the

safety precautions set forth below poses no harm to them other than potentially

---

[2] A spread of the virus among incarcerated persons also poses a grave risk of harm to the jail employees with whom they interact.

3

increased costs and energy, which are insufficient to justify a denial of Plaintiffs'

motion. *See Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*,

945 F.2d 150, 154 (6th Cir. 1991). "[I]t is always in the public interest to prevent

the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich.*

*Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

Accordingly,

**IT IS ORDERED** that Defendants shall as soon as practicable, or at least

within ten (10) days of this Opinion and Order, undertake the following minimum

measures:

> (1)  Ensure that each incarcerated person receives, free of
> charge: (a) an individual supply of liquid hand soap and
> paper towels sufficient to allow regular hand washing
> and drying each day, and (b) an adequate supply of
> disinfectant hand wipes or disinfectant products effective
> against the COVID-19 virus for daily cleanings;
>
> (2)  Ensure that all incarcerated people have no-cost
> access to hand sanitizer containing at least 60% alcohol
> where permissible based on security restrictions;
>
> (3)  Provide access to showers and clean laundry,
> including clean personal towels on a regular basis, but at
> a minimum on a weekly basis;[3]
>
> (4)  Ensure that, to the fullest extent possible, all Jail staff
> wear personal protective equipment, including masks,

---

[3] At the hearing, the Court will address whether it should set forth a specific
frequency for these items after weighing regular Jail practices and any information
reflecting the need for more frequency during the COVID-19 pandemic.

when interacting with any person or when touching surfaces in cells or common areas;

(5)  Ensure, to the fullest extent possible, that all Jail staff wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol both before and after touching any person or any surface in cells or common areas.  Consider allowing staff to carry individual sized bottles while on duty;

(6)  Establish protocol through which an incarcerated person may self-report symptoms of COVID-19 infection and to evaluate those symptoms, including temperature monitoring;

(7)  Conduct immediate testing for anyone displaying known symptoms of COVID-19;

(8)  Provide adequate spacing of six feet or more between people incarcerated, to the maximum extent possible, so that social distancing can be accomplished;

(9)  Ensure that individuals identified as having COVID-19, with symptoms of COVID-19, or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, mental health services, reading materials, phone and video calling with loved ones, communications with counsel, and personal property (to the extent reasonable and necessary to the inmate's physical and mental well-being).  Such individuals shall remain in quarantine and wear face masks when interacting with other individuals until they are no longer at risk of infecting other people;

(10)  Respond to all COVID-19 related emergencies (as defined by the medical community) within an hour;

(11)  Provide sufficient disinfecting supplies, without cost, so incarcerated people can clean high-touch areas or

items (including, but not limited to, phones and headphones) between each use;

(12)  Effectively communicate to all people incarcerated, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

(13)  Train all staff regarding measures to identify inmates with COVID-19, measures to reduce transmission, and the Jail's policies and procedures during this crisis (including those measures contained in this Order);

(14)  Refrain from charging medical co-pays before treatment is provided to those experiencing COVID-19-related symptoms, including testing;[4]

(15)  Waive all charges for medical grievances during this pandemic until further order of the Court[5];

(16)  Cease and desist (a) all use of punitive transfers or threats of transfers to areas of the jail that have higher infection rates (or any other form of threat involving increased exposure to infection) for any infraction whatsoever; and (b) all retaliation in any form, against class members who raise concerns either formally or informally about the health and safety conditions in the Jail.[6]

---

[4] The Court will consider at the hearing whether co-pays may be charged if payment is not required before treatment or testing.

[5] The Court will address at the hearing whether charges for medical grievances should be allowed if payment is not required before a grievance is accepted and addressed.

[6] At the hearing, the Court will address Plaintiffs' request for an injunction restraining Defendants from taking "all punitive measures … against class

6

**IT IS FURTHER ORDERED**, that Defendants shall take the following

measures in preparation for the TRO hearing:

> (1)  Promptly provide Plaintiffs and the Court with a list
> of all individuals who are members of the Medically-
> Vulnerable Subclass as defined in paragraph 94 of
> Plaintiffs' Complaint, which includes their location,
> charge and bond status; and,

> (2)  Promptly thereafter provide Plaintiffs and the Court
> with a list of any individuals in the Medically-Vulnerable
> Subclass who Defendants object to releasing and the
> basis for that objection.

**IT IS FURTHER ORDERED** that the parties shall appear before the

undersigned for a telephonic conference call **on Monday, April 20, 2020 at 11:00**

**a.m.**, and for a telephonic hearing **on Friday, April 24, 2020 at 11:00 a.m.**  For

both the conference and hearing, Counsel shall call the Court's toll-free conference

line at 1-888-808-6929 and use Access Code 8141695.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

 Dated: April 17, 2020

---

members who decline to engage in labor on the grounds that such labor represents
a threat to their health and safety or the health and safety of other class members."

# EXHIBIT C

United States District Court
Southern District of Texas

**ENTERED**

April 16, 2020

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| LADDY CURTIS VALENTINE, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-1115 |
| | § | |
| BRYAN COLLIER, *et al*, | § | |
| | § | |
| Defendants. | § | |

## PRELIMINARY INJUNCTION ORDER

This matter came for hearing before the Court on April 16, 2020, upon the Application of

Plaintiffs Laddy Curtis Valentine and Richard Elvin King, individually and on behalf of those

similarly situated, for injunctive relief. At the hearing, the Court heard testimony from Plaintiffs'

witnesses and argument from counsel for both parties. The Court notes that the Defendants chose

to present no live testimony to controvert Plaintiffs' evidence. After consideration of the Class

Action Complaint, the attached evidence, the testimony and evidence at the April 16, 2020 hearing,

and any arguments of counsel, the Court finds that Plaintiffs are substantially likely to succeed on

the merits of the underlying litigation; that, in the absence of a preliminary injunction, Plaintiffs

will suffer immediate irreparable injury for which there is no adequate remedy at law, in that they

will face a high risk of serious illness or death from exposure to COVID-19; that the issuance of a

preliminary injunction will not inflict greater or undue injury upon those restrained or third parties;

and the issuance of a preliminary injunction order will serve the public interest and maintain the

status quo. The Court further finds the relief below is narrowly drawn, is consistent with Center

for Disease Control (CDC) guidelines, extends no further than necessary to correct the harm the

Court finds requires preliminary relief, and is the least intrusive means necessary to correct the

harm the Court finds requires preliminary relief. The Court has given substantial weight to any adverse impact on public safety and the operation of the criminal justice system caused by the preliminary relief and shall respect the principles of comity in tailoring this preliminary relief. *See* 18 U.S.C. § 3626(a)(2).

Plaintiffs' Application for a Temporary Restraining Order is therefore **GRANTED** as a preliminary injunction, and it is **ORDERED**, pursuant to Federal Rule of Civil Procedure 65, that all Defendants, their agents, representatives, and all persons or entities acting in concert with them are enjoined as follows:

- Provide Plaintiffs and the class members with unrestricted access to hand soap and disposable hand towels to facilitate handwashing.

- Provide Plaintiffs and the class members with access to hand sanitizer that contains at least 60% alcohol in the housing areas, cafeteria, clinic, commissary line, pill line, and laundry exchange.

- Provide Plaintiffs and the class members with access to tissues, or if tissues are not available, additional toilet paper above their normal allotment.

- Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants in sufficient quantities to facilitate frequent cleaning, including in quantities sufficient for each inmate to clean and disinfect the floor and all surfaces of his own housing cubicle, and provide new gloves and masks for each inmate during each time they are cleaning or performing janitorial services.

- Provide all inmates and staff members with masks. If TDCJ chooses to provide inmates with cotton masks, such masks must be laundered regularly.

- Require common surfaces in housing areas, bathrooms, and the dining hall to be cleaned every thirty minutes from 7 a.m. to 10 p.m. with bleach-based cleaning agents, including table tops, telephones, door handles, and restroom fixtures.

- Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television controls, books, and gym and sports equipment.

- Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic. In the alternative, test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available.

- Limit transportation of Pack Unit inmates out of the prison to transportation involving immediately necessary medical appointments and release from custody.

- For transportation necessary for prisoners to receive medical treatment or be released, CDC-recommended social distancing requirements should be strictly enforced in TDCJ buses and vans.

- Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic; (ii) information on how inmates can protect themselves from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, all signage must be posted in every housing area and above every sink.

- Educate inmates on the COVID-19 pandemic by providing information about the COVID-19 pandemic, COVID-19 symptoms, COVID-19 transmission, and how to protect oneself from COVID-19. A TDCJ staff person must give an oral presentation or show an educational video with the above-listed information to all inmates, and give all inmates an opportunity to ask questions. Inmates should be provided physical handouts containing

COVID-19 educational information, such as the CDC's "Share Facts About COVID-19" fact sheet already in TDCJ's possession.

- TDCJ must also orally inform all inmates that co-pays for medical treatment are suspended for the duration of the pandemic, and encourage all inmates to seek treatment if they are feeling ill.

- TDCJ must, within three (3) days, provide the Plaintiffs and the Court with a detailed plan to test all Pack Unit inmates for COVID-19, prioritizing those who are members of Dorm A and of vulnerable populations that are the most at-risk for serious illness or death from exposure to COVID-19. For any inmates who test positive, TDCJ shall provide a plan to quarantine them while minimizing their exposure to inmates who test negative. TDCJ must also provide a plan for testing all staff who will continue to enter the Pack Unit, and for any staff that test positive, provide a plan for minimizing inmates' exposure to staff who have tested positive.

The Defendants have not sought a bond and the Court finds and holds that no security need be posted. *See* Fed. R. Civ. P. 65(c); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all." (internal quotation marks omitted)); *see also A.T.N. Indus., Inc. v. Gross*, 632 F. App'x 185, 192 (5th Cir. 2015) (holding that, under Rule 65(c), a court may elect to require no security at all as the amount it considers to be proper).

The Court will issue a memorandum and order setting forth the grounds for this preliminary injunction.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 16th day of April, 2020.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:20-cv-21457-KMW**

ANTHONY SWAIN, et al.,

      Plaintiffs,

v.

DANIEL JUNIOR, et al.,

      Defendants.

_____/

### ORDER GRANTING IN PART PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

**THIS MATTER** is before the Court on Plaintiffs' Motion for Temporary Restraining Order (DE 3). Defendants oppose the motion. To obtain either a temporary injunction or a preliminary injunction, a party must demonstrate that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). Based on the Court's review of the record, relevant case law, and the Parties' representations during the telephonic status conferences held April 6, 2020 and April 7, 2020, Plaintiffs have met that standard.

Accordingly, after consultation with the Parties, and for the reasons cited at the telephonic status conferences held April 6, 2020 and April 7, 2020 with all Parties present, it is **ORDERED and ADJUDGED** that Plaintiffs' Motion for Temporary Restraining Order (DE 3) is **GRANTED IN PART** as follows:

1.      It is **ORDERED** that by **April 9, 2020**, Defendants shall file under seal a list of all individuals who are currently detained at Metro West Detention Facility and who meet any of the criteria in paragraph three. This list shall be filed under seal to protect the confidential health information of those individuals and shall remain under seal pending further order by this Court.

2.      It is further **ORDERED** that by **April 9, 2020**, Defendants shall file a notice describing the particular measures being employed to protect these individuals from the risk of COVID-19.1

3.      The list of individuals shall include all of those currently detained at Metro West Detention Facility who meet any of the following criteria:

- Are 60 years of age or older;
- Have chronic respiratory disease, including lung disease, moderate to severe asthma, or chronic obstructive pulmonary disease (e.g. bronchitis or emphysema);
- Have heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease;
- Have chronic liver or kidney disease (including hepatitis and conditions requiring dialysis);
- Have diabetes;
- Have epilepsy;
- Have diagnosed hypertension;

---

1 One of the lists required under Paragraph 1 or 2 shall be filed with the Court by **6:00 PM on April 9, 2020** and the other shall be filed by **midnight on April 9, 2020**.

- Have a compromised immune system (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease);

- Have sickle cell disease; and/or

- Are or have been pregnant within the last two weeks.

4. It is further **ORDERED** that Defendants shall take the following actions at the Metro West Detention Center:

- Effectively communicate to all people incarcerated at Metro West Detention Center, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

- To the maximum extent possible considering Metro West Detention Center's current population level, provide adequate spacing of six feet or more between people incarcerated at Metro West so that social distancing can be accomplished;

- Ensure that each incarcerated person receives, free of charge: (1) an individual supply of soap, preferably liquid as recommended by the CDC, sufficient to allow frequent hand washing each day, (2) hand drying machines, or disposable paper towels as recommended by the CDC, and individual towels, sufficient for daily use (3) an adequate supply of disinfectant products effective against the virus that causes COVID-19 for daily cleanings; and (4) an adequate supply of toilet paper sufficient for daily

use;

- Provide reasonable access to showers and to clean laundry;

- Require that all MDCR staff wear personal protective equipment, including masks, and gloves when physically interacting with any person and require that, absent extraordinary or unusual circumstances, a new pair of gloves is worn each time MDCR staff touch a different person; and require all inmate workers who are cleaning facilities or preparing food to follow this same protocol;

- Require that all MDCR staff regularly wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol;

- Ensure access to proper testing for anyone displaying known symptoms of COVID-19 in accordance with CDC guidelines;

- Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined, with continued access to showers, mental health services, phone calling with family, and communications with counsel; individuals identified as having COVID-19 or having been exposed to COVID-19 shall not be placed in cells normally used for disciplinary confinement absent emergency circumstances;

- Respond to all emergency (as defined by the medical community) requests for medical attention as soon as possible;

- Provide sufficient disinfecting supplies consistent with CDC recommendations in each housing unit, free of charge, so incarcerated

4

people can clean high-touch areas or any other items in the unit between each use;

- Waive all medical co-pays for those experiencing COVID-19-related symptoms; and

- Waive all charges for medical grievances during this health crisis.

5.     This Temporary Order is valid for a limited period of 14 days or until further order of this Court, or until Defendants demonstrate that they have substantially complied with this Order. The Court's ruling is subject to change based on a more fully developed record at preliminary injunction proceedings.

6.     For purposes of this Order, the Court accepted the allegations in the Complaint and its attachments as true without briefing or evidentiary submissions by Defendants; this Order does not make a finding of wrongdoing on the part of any defendant and no defendant has waived any defenses to this action.

7.     If Defendants have not yet been served in accordance with Federal Rule of Civil Procedure 4, Plaintiffs shall immediately provide a copy of this Order to Defendants.

8.     A telephonic hearing on Plaintiff's Emergency Motion (DE 3) for Preliminary Injunction is **SET** for **April 21, 2020 at 1:00 PM**.

9.     Defendants shall file a response (not exceeding 35 pages) to Plaintiff's Emergency Motion (DE 3) by **April 16, 2020 at 5:00 p.m.** Defendants need not file responses to any other pleading or motions until further order of the Court. Plaintiffs may file a reply by **April 20, 2020 at 12:00 p.m.**

**DONE AND ORDERED** in chambers in Miami, Florida, this <u>7th</u> day of April, 2020.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# EXHIBIT E

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Janet Malam,

                    Petitioner,

v.

Rebecca Adducci, *et al.*,

                    Respondents.

Case No. 20-10829

Judith E. Levy
United States District Judge

Mag. Judge Anthony P. Patti

_____/

## AMENDED OPINION AND ORDER GRANTING IN PART PETITIONER'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER [2][1]

This is an emergency petition challenging Janet Malam's mandatory detention pursuant to 8 U.S.C. § 1226(c) because of danger posed to her by the COVID-19 pandemic. Petitioner claims that her continued detention violates her Fifth Amendment rights by exposing her to substantial risk of illness and death. She requests a temporary restraining order (TRO) requiring that Respondents release her on her

---

[1] On April 6, 2020 the Court amended its April 5, 2020 Order to include additional terms of supervision.

own recognizance and refrain from re-detaining her for the pendency of her immigration proceedings.

For the foregoing reasons, the Court GRANTS IN PART this emergency application for relief.

## BACKGROUND

Petitioner Janet Malam, born in the United Kingdom, is a lawful permanent resident. (ECF No. 1, PageID.3.) She was legally admitted to the United States in 1967 at the age of four and is now fifty-six years old. (*Id.*) Petitioner has been detained since March 4, 2020, in the Calhoun County Correctional Facility[2] in conjunction with removal proceedings at the Detroit Immigration Court. (*Id.*) She brings suit against the following Respondents: Rebecca Adducci, the Detroit District Director of United

---

[2] The parties each refer to the Calhoun County Correctional Facility with different terminology. *See Jail/Corrections Division*, Calhoun County, https://www.calhouncountymi.gov/departments/sheriffs_office/jail.php (last visited Apr. 5, 2020) ("Calhoun County Correctional Facility"); *Detention Facilities*, U.S. Immigrations and Customs Enforcement, https://www.ice.gov/detention-facility/calhoun-county-correctional-center (last visited Apr. 5, 2020) ("Calhoun County Correctional Center"); *Calhoun County Jail*, Google Maps, at https://www.google.com/maps/place/Calhoun+County+Jail/@42.3166565,-85.1757947,15z/data=!4m2!3m1!1s0x0:0x4f8faa7bcca370c4?sa=X&ved=2ahUKEwiR wvHM3NHoAhUQmHIEHWeUCl4Q_BIwCnoECA4QCA (last visited Apr. 5, 2020) ("Calhoun County Jail"). The Court will refer to Petitioner's current place of detention as the Calhoun County Correctional Facility or CCCF.

States Immigration and Customs Enforcement (ICE); Matthew Albence, Deputy Director of ICE; Chad Wolf, Acting Secretary of the U.S. Department of Homeland Security; William Barr, Attorney General of the United States; ICE; and Heidi Washington, Director of the Michigan Department of Corrections (MDOC). (*Id.*)

Petitioner alleges that she suffers from a number of health conditions, including: multiple sclerosis; bipolar disorder; pain; anemia; essential primary hypertension; hypothyroidism; chronic obstructive pulmonary disease; fibromyalgia; mild cognitive impairment; carpal tunnel syndrome; severe major depressive disorder; opioid addiction; nicotine dependence; and polyneuropathy. (ECF No. 1, PageID.7.) According to Petitioner's extensive medical records, these diagnoses are current and accurate as of March 3, 2020. (ECF No. 1-4, PageID.31.)

Because Petitioner has committed two or more crimes involving moral turpitude, her detention is mandatory pursuant to 28 U.S.C. § 1226(c).[3] On March 30, 2020, Petitioner filed a petition requesting

_____

[3] Petitioner does not specify the nature of these crimes in either her petition or this application. In their response to Petitioner's application for a temporary restraining order, Respondents note that Petitioner's charge of removal is based on a 2003 Michigan state conviction of Larceny from the Person, Mich. Comp. Laws § 750.737, a 2008 conviction of Larceny $100 or Less in violation of a Taylor City,

emergency relief in either one of two forms: a writ of habeas corpus or an injunction "ordering Defendants to immediately release [Petitioner], with appropriate precautionary public health measures, on the grounds that her continued detention violates the Due Process Clause [of the Fifth and Fourteenth Amendments]." (*Id.* at PageID.17.) Petitioner simultaneously filed an Application for Temporary Restraining Order requesting that the Court order Petitioner's release during the pendency of her immigration proceedings due to the substantial risk to her health posed by COVID-19 as a result of Petitioner's continued detention in the enclosed group environment endemic to the Calhoun County Correctional Facility. (ECF No. 2.)

For the reasons stated below, the Court GRANTS Petitioner's application for a temporary restraining order requiring her immediate release from detention for the duration of the COVID-19 State of Emergency in Michigan or until further Court order.

**LAW AND ANALYSIS**

---

Michigan ordinance, a 2009 conviction of Retail Fraud in violation of a City of Flat Rock, Michigan ordinance, a 2011 conviction of Attempted Simple Larceny in violation of a City of Tyler, Michigan ordinance, and a 2012 conviction of Retail Fraud 3rd Degree $200 or less in violation of a City of Southgate, Michigan ordinance. (ECF No. 11-1, PageID.192.)

## I.    Jurisdiction

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress." *Hamama v. Adducci,* 912 F.3d 869, 874 (6th Cir. 2018) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). All courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhgras AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). A court must determine whether it has jurisdiction before deciding a cause of action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

Petitioner pleads that "[t]he Court has subject matter jurisdiction over this case pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution; 28 U.S.C. § 1331 (federal question); 28 U.S.C. §1651 (All Writs Act); and 28 U.S.C. § 2241 (habeas corpus)." (ECF No. 1, PageID.5.) The Court has jurisdiction to adjudicate Petitioner's claims under 28 U.S.C. § 2241. Moreover, even if

Petitioner's claims could not be heard under 28 U.S.C. § 2241, 28 U.S.C.
§ 1331 provides an independent source of jurisdiction.

### A. 28 U.S.C. § 2241 Jurisdiction

28 U.S.C. § 2241 provides a district court with jurisdiction over
petitions for habeas corpus where a petitioner is "in custody in violation
of the Constitution or laws or treaties of the United States." 28 U.S.C. §
2241(c)(3). *See INS v. St. Cyr*, 533 U.S. 289, 298 (2001) (recognizing 28
U.S.C. § 2241 as a jurisdictional statute). For over 100 years, habeas
corpus has been recognized as the vehicle through which noncitizens may
challenge the fact of their detention. *See Chin Yow v. U.S.¸* 208 U.S. 8, 13
(1908) ("Habeas corpus is the usual remedy for unlawful imprisonment.")
In 2001, the Supreme Court recognized the continued viability of the writ
in cases involving the detention of noncitizens: "§ 2241 habeas corpus
proceedings remain available as a forum for statutory and constitutional
challenges to post-removal-period detention." *Zadvydas v. Davis*, 533
U.S. 678, 688 (2001). In 2018, the Court ruled on the merits of a habeas
petition challenging the validity of pre-removal detention. *Jennings v.
Rodriguez,* 138 S. Ct. 830 (2018).

Respondents claim, citing *Luedtke v. Berkebile*, that the Court lacks jurisdiction to grant habeas relief because 28 U.S.C. § 2241 "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013). Though the Supreme Court has left as an open question "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement," *Boumedienne v. Bush*, 553 U.S. 732, 792 (2006), the Sixth Circuit, conversely, has held that "a § 2241 habeas petition is not the appropriate vehicle for challenging the conditions of . . . confinement." *Velasco v. Lamanna*, 16 F. App'x 311, 314 (6th Cir. 2001). In 2018, the Sixth Circuit reiterated this holding, affirming a district court that dismissed a § 2241 petition raising an Eighth Amendment challenge to subpar prison conditions because such a claim must be brought in a civil-rights action such as one under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Solano-Moreta v. Fed. Bureau of Prisons*, No. 17-1019, 2018 WL 6982510 (6th Cir. Sep. 24, 2018); *but see Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ("Habeas corpus tests not only the fact but also the form of detention.") (internal citation

7

omitted); *Roba v. U.S.*, 604 F.2d 215 (2d Cir. 1979) (holding that § 2241 petition may be used to challenge conditions of confinement).

The Respondents argue that "there is no dispute that Petitioner brings a challenge to the conditions of her confinement." (ECF No. 11, PageID.175.) On its face, the application appears to concern Petitioner's conditions of confinement. Petitioner titles her claim for relief: "Freedom from Cruel Treatment and Conditions of Confinement." (ECF No. 1, PageID.16.) But Petitioner may nonetheless bring her claim under 28 U.S.C. § 2241 because she seeks immediate release from confinement as a result of there being no conditions of confinement sufficient to prevent irreparable constitutional injury under the facts of her case.

Supreme Court and Sixth Circuit precedent support the conclusion that where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas. In *Nelson v. Campbell*, the Supreme Court held that a death-row inmate's challenge to the method of his upcoming execution constituted a challenge to the conditions—not the fact or duration—of his execution, and therefore his claim fell outside the "core"

of habeas corpus. 541 U.S. 637, 644-45 (2004). However, the Court speculated that if the challenged method "were a statutorily mandated part of the lethal injection protocol, or if as a factual matter petitioner were unable or unwilling to concede acceptable alternatives," there would be a "stronger argument that success on the merits, coupled with injunctive relief, would call into question the death sentence itself," bringing the claim into the core of habeas corpus. *Id.* at 645. In *Adams v. Bradshaw*, the Sixth Circuit relied on *Nelson* to uphold habeas jurisdiction over a claim where a petitioner challenged the method of his execution but did not concede that any acceptable alternative existed. 644 F.3d 481, 483 (6th Cir. 2011) ("Adams has not conceded the existence of an acceptable alternative procedure. . . . Thus, Adams's lethal-injection claim, if successful, could render his death sentence effectively invalid.") Here, Petitioner has not conceded the existence of acceptable alternative conditions of her confinement; her Fifth Amendment claim, if successful, would render her continued detention invalid.

In contrast to this case, claims which the Sixth Circuit has held noncognizable in habeas are those in which the petitioner seeks relief other than release from custody: *See Solano-Moreta*, 2018 WL 6982510,

at *1 (seeking transfer); *Luedtke v. Berkebile*, 704 F.3d 465, 465–66 (6th Cir. 2013) (challenge to lack of compensation and conditions of work performed in prison); *Hodges v. Bell*, 170 F. App'x 389, 390 (6th Cir. 2006) (seeking amelioration of conditions or transfer to mental health facility); *Sullivan v. United States*, 90 Fed. App'x 862, 862 (6th Cir. 2004) (seeking medical treatment in prison); *Lutz v. Hemingway*, 476 F.Supp. 2d 715, 718 (E.D. Mich. 2007) (seeking restoration of mail privileges in prison); *see also Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004) (seeking transfer). Indeed, in *Preiser v. Rodriguez*, the Supreme Court distinguished conditions of confinement claims from claims seeking immediate or speedier release. 411 U.S. 475, 500 (1973) (distinguishing habeas case seeking good-time credits from § 1983 conditions of confinement cases on the grounds that "none of the state prisoners in those cases was challenging the fact or duration of his physical confinement itself, and none was seeking immediate release or a speedier release from that confinement—the heart of habeas corpus.")

Although Petitioner here titles her claim for relief "Freedom from Cruel Treatment and Conditions of Confinement," her Petition is a challenge to the continued validity of her confinement, regardless of its

10

conditions. Petitioner argues that the only adequate relief is her release

from confinement. As Petitioner explains,

> [S]ocial distancing and hygiene measures [are] Janet's only
> defense against COVID-19. Those protective measures are
> exceedingly difficult, if not impossible, in the environment of
> an immigration detention center, where Janet shares toilets,
> sinks, phones, and showers, eats in communal spaces, and is
> in close contact with the many other detainees and officers.

(ECF No. 1, PageID.16.) At the Court's March 31, 2020 status conference

for this case, counsel for Respondents conceded that social distancing

between prisoners of at least six feet would be impossible at the Calhoun

County Correctional Facility. This concession supports the conclusion of

multiple doctors and public health experts: that "[t]he only viable public

health strategy available is risk mitigation. . . . [T]he public health

recommendation is to release high-risk people from detention, given the

heightened risks to their health and safety" (ECF No. 6-1, PageID.87

(Declaration of Infectious Disease Epidemiologist Joseph Amon)); the

only way to "prevent serious illness including death" in ICE facilities is

to "release all people with risk factors." (ECF No. 20-3, PageID.374

(Declaration of Dr. Robert B. Greifingert).)

11

In this case, Petitioner does not take issue with the steps taken at the Calhoun County Correctional Facility to mitigate the risk of detainees contracting COVID-19. Rather, she says that no matter what steps are taken, due to her underlying serious health conditions, there is no communal holding facility where she could be incarcerated during the Covid-19 pandemic that would be constitutional. Petitioner's claim must therefore be considered as a challenge to the continued validity of confinement itself. Accordingly, Petitioner's claim is properly brought under 28 U.S.C. § 2241, and the Court has jurisdiction.

## B. 28 U.S.C. § 1331 Jurisdiction

Even if the Court were to lack jurisdiction under 28 U.S.C. § 2241, the Fifth Amendment provides Petitioner with an implied cause of action, and thus 28 U.S.C. § 1331 would offer an independent source of jurisdiction.

28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Petitioner properly framed her pleading as a civil rights action "[i]n the alternative." In addition to her request for a writ of habeas corpus, Petitioner requests "injunctive relief

12

ordering Defendants to immediately release Janet, with appropriate precautionary public health measures, on the grounds that her continued detention violates the Due Process Clause." (ECF No. 1, PageID.17.) She titles her single claim for relief "Violation of Fifth Amendment Right to Substantive and Procedural Due Process (Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement." (*Id.* at PageID.16.)

Should Petitioner's habeas petition fail on jurisdictional grounds, the Fifth Amendment provides Petitioner with an implied cause of action, and accordingly 28 U.S.C. 1331 would vest the Court with jurisdiction. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court first upheld the proposition that the Constitution itself provided an implied cause of action for claims against federal officials. 403 U.S. at 388. In 2017, the Supreme Court held that federal courts should not extend a *Bivens* remedy into new contexts if there exist any "special factors counseling hesitation." *Ziglar v. Abassi*, 137 S.Ct. 1843, 1857 (2017). However, there is no corresponding limitation on the Constitution as a cause of action to seek injunctive or other equitable relief. *See Ziglar*, 137 S. Ct. at 1862 (declining to extend

*Bivens* to conditions of confinement claim, but noting that "Respondents . . . challenge large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners. To address those kinds of decisions, detainees may seek injunctive relief."). Instead, there is a "presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Hubbard v. E.P.A.*, 809 F.2d 1, 11 (D.C. Cir. 1986) (citing *Bivens*, 403 U.S. at 404 (Harlan, J., concurring)). Indeed, "the power of the federal courts to grant equitable relief for constitutional violations has long been established." *Mitchum v. Hurt*, 73 F.3d 30, 35 (3d Cir. 1995). Here, Petitioner seeks only injunctive and declaratory relief. Accordingly, she may bring her claim directly under the Fifth Amendment, and the Court has jurisdiction to hear the claim under 28 U.S.C. § 1331.

At oral argument, counsel for Respondent raised the question of whether the United States may be entitled to sovereign immunity if Petitioner brought this case under the Fifth Amendment. Sovereign immunity does not apply in this instance, and even if it did, it has been statutorily waived. Federal courts may exercise the traditional powers of equity in cases within their jurisdiction to enjoin violations of

14

constitutional rights by government officials. In *Ex Parte Young*, the Supreme Court first articulated the principle that state government officials may be sued for acting unconstitutionally, even if an ensuing injunction would bind the state. 209 U.S. at 123. In *Philadelphia Co. v. Stimson*, the Supreme Court recognized the applicability of that principle to suits against federal officials. 223 U.S. 605, 620 (1912) ("in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process"). More recently, the Supreme Court affirmed this principle in *Dalton v. Specter*: "sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally or beyond his statutory powers.'" 511 U.S. 462, 472 (1994) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949)). In *Malone v. Bowdoin*, the Court called this principle the "constitutional exception to the doctrine of sovereign immunity." 369 U.S. 643, 647 (1962). Petitioner here raises a constitutional challenge to her detention as the result of actions taken by Respondent Adducci, a federal officer. Sovereign immunity does not apply.

15

Even absent this constitutional exception, the Administrative
Procedure Act (APA) provides a statutory waiver to any defense of
sovereign immunity. 5 U.S.C. § 702 provides that:

> An action in a court of the United States seeking relief other
> than money damages and stating a claim that an agency or
> an officer or employee thereof acted or failed to act in an
> official capacity or under color of legal authority shall not be
> dismissed nor relief therein be denied on the ground that it is
> against the United States or that the United States is an
> indispensable party.

In 2013, the Sixth Circuit recognized that this waiver extends beyond
suits brought under the APA:

> [W]e now join all of our sister circuits who have done so in
> holding that § 702's waiver of sovereign immunity extends to
> all non-monetary claims against federal agencies and their
> officers sued in their official capacity, regardless of whether
> plaintiff seeks review of "agency action" or "final agency
> action" as set forth in § 704.

*Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 673 (6th Cir. 2013); *see
also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)
("The APA's waiver of sovereign immunity applies to any suit whether
under the APA or not."). ICE is a federal agency, of which Respondent
Adducci is an officer or employee thereof. Petitioner challenges

Respondent's actions made in her official capacity. Accordingly, the APA provides a statutory waiver of sovereign immunity.

### C. Petitioner's Status as a Noncitizen

Petitioner's status as a noncitizen who is undergoing removal proceedings does not affect the Court's jurisdiction to hear this case. Although several statutes limit a district court's authority to hear cases in the immigration context, none apply here, as set forth below.

28 U.S.C. § 1252(b)(9) provides that judicial review of:

> all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter [including §§ 1225 and 1226] shall be available only in judicial review of a final order under this section.

28 U.S.C. § 1252(b)(9). Petitioner does not have a final order of removal. In *Jennings v. Rodriguez*, the Supreme Court held that 1252(b)(9) did not strip jurisdiction from courts to hear challenges to detention pending removal because detention was not an action taken to remove a noncitizen from the United States. 138 S. Ct. 830, 841 (2018). Petitioner challenges her continued detention; accordingly, 28 U.S.C. § 1252(b)(9) does not strip this Court of jurisdiction.

8 U.S.C. § 1226(e) bars federal court review of any discretionary decision made by the Attorney General regarding detention, release, bond, or parole in an immigration case. However, in *Demore v. Kim*, 123 S. Ct. 1708, 1713–14 (2003), the Supreme Court held that § 1226(e) did not prevent noncitizens from raising constitutional challenges to mandatory detention under § 1226(c). Petitioner here raises a Fifth Amendment challenge to her continued mandatory detention under § 1226(c); thus, § 1226(e) does not prevent this Court from exercising jurisdiction.

Finally, 8 U.S.C. § 1252(f), titled "Limit on Injunctive Relief," provides that:

> [N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). But as the Supreme Court recognized in *Reno v. Amer.-Arab Anti-Discrim. Comm.*, "this ban does not extend to individual cases." 525 U.S. 471, 481–82 (1999). Petitioner seeks individual relief.

Therefore, 8 U.S.C. § 1252(f) does not affect this Court's jurisdiction to enter injunctive or declaratory relief.

## II. Proper Habeas Respondent

Petitioner names as Respondents: Rebecca Adducci, the Detroit District Director of ICE; Matthew Albence, Deputy Director; Chad Wolf, Acting Secretary of the U.S. Department of Homeland Security; William Parr, Attorney General of the United States; U.S. Immigration and Customs Enforcement; and Heidi Washington, Director of the Michigan Department of Corrections. Only Respondent Rebecca Adducci is properly named with respect to the petition for a writ of habeas corpus.

"Historically, the question of who is 'the custodian,' and therefore the appropriate respondent in a habeas suit, depends primarily on who has power over the petitioner and . . . on the convenience of the parties and the court." *Roman v. Ashcroft*, 340 F.3d 314, 319 (6th Cir. 2003) (citing *Henderson v. INS*, 157 F.3d 106, 122 (2d Cir. 1998)). In *Roman*, the Sixth Circuit held that for habeas petitions in immigration contexts, "the INS District Director for the district where a detention facility is located 'has power over' alien habeas corpus petitioners." *Id.* at 320. The court, in finding that the Attorney General was not a proper respondent

for a noncitizen's habeas claim and that a habeas claim could properly have only one respondent, reiterated 28 U.S.C. § 2243's requirement that a writ of habeas corpus "shall be directed to *the* person having custody of the person detained." *Id.* at 321. Michigan only has one ICE District, located in Detroit. *See Enforcement and Removal Operations Field Offices*, https://www.ice.gov/contact/ero. Accordingly, Rebecca Adducci, the Detroit District Director, is the proper Respondent for Petitioner's request for a writ of habeas corpus.

## III. Petitioner's Application for a Temporary Restraining Order

Petitioner, along with her complaint, filed an emergency application for a temporary restraining order. (ECF No. 3.) In determining whether to grant such an order, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met,

20

but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted). "[P]reliminary injunctions are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). Nonetheless, each of the four factors weighs in Petitioner's favor, and the Court grants Petitioner's motion for a temporary restraining order.

## A. Irreparable Harm

Petitioner is likely to experience irreparable injury absent an injunction, both in the form of loss of health or life, and in the form of an invasion of her constitutional rights.

### 1. Loss of Health or Life from COVID-19

The ongoing COVID-19 pandemic creates a high risk that absent an injunction by this Court, Petitioner will suffer irreparable harm in the form of loss of health or life as a result of contracting the COVID-19 virus.

On March 22, 2020, the Governor of Michigan issued the following statement: "The novel coronavirus (COVID-19) is a respiratory disease

that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine or antiviral treatment for this disease." Executive Order, No. 2020-20 (Mar. 22, 2020).

Since March 4, 2020, the date of Petitioner's detention at the Calhoun County Correctional Facility, the exceptionally dangerous nature of the COVID-19 pandemic has become apparent. On March 10, 2020, the Governor of Michigan announced the state's first two cases of COVID-19 and simultaneously declared a State of Emergency. Executive Order, No. 2020-4 (Mar. 10, 2020). The number of new cases then began to grow exponentially. As of April 5, 2020, there are now 15,718 confirmed cases of COVID-19 and 617 known related deaths, with 238 confirmed cases within the Michigan Department of Corrections system specifically. *See* *Coronavirus*, Michigan.gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163-520743--,00.html. COVID-19 has a high risk of transmission, and the number and

rate of confirmed cases indicate broad community spread.[4] Executive
Order, No. 2020-20 (Mar. 22, 2020). Nationally, ICE detention facilities
across our country are experiencing the same thing. As of April 4, 2020,
ICE has confirmed at least 13 cases of COVID-19 among immigration
detainees and 7 cases among detention facility employees and personnel.
*ICE Guidance on COVID-19*, U.S. Immigration and Customs
Enforcement, https://www.ice.gov/coronavirus (updated Apr. 4, 2020 at
8:00pm).

On March 23, 2020, the Centers for Disease Control and Prevention
(CDC) acknowledged that correctional and detention facilities "present[]
unique challenges for control of COVID-19 transmission among
incarcerated/detained persons, staff, and visitors." *Interim Guidance on
Management of Coronavirus Disease 2019 (COVID-19) in Correctional
and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020),

---

[4] Indeed, since the time of Respondent's brief, the numbers have continued to
grow. Respondent reported that, as of April 3, 2020, Calhoun County alone had 25
cases. (ECF No. 11, PageID.169) By the time the Court held oral argument later that
day, that number had grown to 31, with 1 reported death. On April 5, the date of this
Order, the number of confirmed cases is now 42, with 1 reported death. *Coronavirus*,
https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html.

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-
detention/guidance-correctional-detention.html. [Hereinafter "CDC
Guidance 3/23/2020"]. Specifically, the CDC noted that many detention
conditions create a heightened risk of danger to detainees. These include:
low capacity for patient volume, insufficient quarantine space,
insufficient on-site medical staff, highly congregational environments,
inability of most patients to leave the facility, and limited ability of
incarcerated/detained persons to exercise effective disease prevention
measures (e.g., social distancing and frequent handwashing). *Id.*

Though the CDC has recommended public health guidance for
detention facilities, and though the Calhoun County Correctional Facility
has indeed implemented measures designed to prevent spread of the
disease, these measures are inadequate to sufficiently decrease the
substantial likelihood that Petitioner will contract COVID-19. As prison
officials are beginning to recognize around the country, even the most
stringent precautionary measures—short of limiting the detained
population itself—simply cannot protect detainees from the extremely
high risk of contracting this unique and deadly disease. For example, on
April 1, 2020, the Rikers Island jail complex's chief physician

acknowledged that "infections are soaring" despite the facility's "following Centers for Disease Control and Prevention guidelines and having moved mountains to protect our patients." Miranda Bryant, *Coronavirus Spread at Rikers is a 'Public Health Disaster', Says Jail's Top Doctor*, The Guardian (Apr. 1, 2020), https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster. In the immigration context specifically, despite Respondents' argument that the federal government has effectively incorporated appropriate and effective precautions, medical experts at the Department of Homeland Security have warned that detention confinement creates a "tinderbox scenario" where rapid outbreak is extremely likely, and extremely likely to lead to deadly results as resources dwindle on an exponential level. Catherine E. Shoichet, *Doctors Warn of 'Tinderbox Scenario' if Coronavirus Spreads in ICE Detention*, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.

Petitioner is 56 years old and suffers from the following conditions, almost all of which place her at an increased risk of a dire outcome from

25

contracting the COVID-19 virus: multiple sclerosis, bipolar disorder, anemia, essential primary hypertension, hypothyroidism, chronic obstructive pulmonary disease, fibromyalgia, severe major depressive disorder, opioid addition, and polyneuropathy. (ECF No. 1-4, PageID.31.) *See* Centers for Disease Control, *Groups at Higher Risk for Severe Illness*, (Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (noting that "people of all ages with underlying medical conditions are at higher risk for severe illness, particularly if the underlying medical conditions are not well controlled"). Additionally, Respondents have confined Petitioner in an environment where she "shares toilets, sinks, phones, and showers, eats in communal spaces, and is in close contact with the many other detainees and officers." (ECF No. 1, PageID.16.) Petitioner's involuntary interaction with purportedly asymptomatic guards who rotate shifts is also a significant exposure factor. *How COVID-19 Spreads*, CDC (April 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-

covidspreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2
Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html.[5]

These are many of the conditions that the CDC has identified as being particularly likely to increase COVID-19 transmissions in detention facilities. CDC Guidance 3/23/2020. For these reasons, Petitioner's confinement at the Calhoun County Correctional Facility renders her substantially likely to contract COVID-19, and Petitioner's severe health conditions render her substantially likely to suffer irreparable harm or death as a result.

Respondents focus on one particular issue: whether Petitioner is more likely to contract COVID-19 if released than if she remains confined in their jail. Respondents acknowledge that "there is a health risk posed by COVID-19 and that Petitioner is in the category of people identified to be at higher risk for serious health consequences if she contracts COVID-

---

[5] On April 3, 2020, after Petitioner filed her emergency application for a temporary restraining order, the CDC updated its guidance in light of new evidence of asymptomatic transmission of COVID-19 to recommend that all individuals wear cloth face coverings "in public settings where other social distancing measures are difficult to maintain." *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, CDC (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

27

19." (ECF No. 11, PageID.178.) Respondents also acknowledge that Petitioner "does not have to wait until she has COVID-19 to claim that the precautions taken to reduce exposure were insufficient." (*Id.* at PageID.179.) Indeed, the crux of Respondents' argument is not that COVID-19 does not pose a deadly threat to Petitioner if contracted. Rather, Respondents' argument relies on the proposition that Petitioner does not have a substantial risk for *exposure* at the Calhoun County Correctional Facility, and her risk of exposure in the community may be greater. (*Id.* at PageID.178.)

To this end, Respondents posit the following: Petitioner has not established that she has either been exposed to COVID-19, or that her exposure is "imminent," because there are currently no cases in the facility in which she is detained "and only 25 cases in the surrounding county."[6] (ECF No. 11, PageID.179.) Additionally, Respondents argue that their facility has implemented "numerous precautions to reduce the risk of exposure and spread of COVID-19,"[7] and that even if Petitioner is

---

[6] Hours later, due to the exponential nature of COVID-19's spread, this statistic was already out of date. *See supra* fn.2.

[7] Specifically, Respondents note that the ICE and CCCF precautions are as follows: tracking the disease, screening incoming detainees, isolating and testing

at a "generalized risk" of contracting COVID-19, that does not mean that she is at a "substantial risk" for purposes of her constitutional claim. (*Id.* at PageID.179-180, citing *Wooler v. Hickman Cty.*, 377 Fed. Appx. 502, 505 (6th Cir. 2010)).

Respondents' arguments fail to address the stark reality of this particular global public health crisis. In the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a "generalized risk" *is* a "substantial risk" of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as Petitioner within the CCCF facility. In acknowledgment of this simple truth, both the United States Attorney General and the Governor of Michigan have issued independent directives to consider early release for detainees who do not pose a public safety risk, as minimizing crowded populations is the only known way to mitigate spread of this pandemic. *Prioritization of*

---

symptomatic detainees, quarantining detainees who test positive, screening incoming staff, suspending in-person social visitation and limiting professional visitation to non-contact, increasing sanitation, educating all staff and detainees, providing detainees with toilet paper, personal soap, and disinfectants, and increasing hand-washing stations. (ECF No. 11, PageID.172.)

*Home Confinement as Appropriate in Response to COVID-19 Pandemic*, Att'y Gen. (Mar. 26, 2020); Executive Order, No. 2020-29 (COVID-19) (Mar. 26, 2020). Moreover, Petitioner's risk of contracting COVID-19 outside of Respondents' custody has no bearing on whether they have exposed her to the likelihood of irreparable harm. Though the Court commends Respondents for the steps they have taken to prevent spread of the disease, as prisons and courts around the country are beginning to recognize, such measures are insufficient to stem deadly prison outbreaks. *See, e.g.*, *New York City Board of Correction Calls for City to Begin Releasing People From Jail as Part of Public Health Response to COVID-19*, N.Y.C. Bd. of Corr. (Mar. 17, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/2020.03.17%20-%20Board%20of%20Correction%20Statement%20re%20Release.pdf (arguing that, despite the "heroic work" of Department of Correction and Correctional Health Services staff "to prevent the transmission of COVID-19 in the jails and maintain safe and humane operations, the City must drastically reduce the number of people in jail right now and limit new admissions to exceptional circumstances."). Even the Calhoun County Correctional Facility's additional measure of screening incoming

shift workers for high temperatures is insufficient to stem the spread of disease, as COVID-19 spreads asymptomatically. *How COVID-19 Spreads*, CDC (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-

covidspreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html.

Accordingly, the Court concludes that Petitioner's continued confinement at the Calhoun County Correctional Facility exposes her to a substantial risk of contracting COVID-19, which due to her specific underlying health conditions exposes her to a substantial risk of irreparable harm to her health or life.

### 2. Violation of Constitutional Rights

Petitioner's Fifth Amendment claim triggers a finding that Petitioner will suffer irreparable harm absent an injunction. Petitioner alleges that in "subjecting Janet to detention conditions that amount to punishment and that fail to ensure her safety and health," Respondent is "subjecting [her] to a substantial risk of serious harm, in violation of [her] rights under the Due Process Clause." (ECF No. 1, PageID.17.) The alleged violation of a constitutional right is sufficient for a court to find

31

irreparable harm. *See Overstreet v. Lexington-Fayette Urban Cty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Covino v. Patrissi*, 967 F.2d 73, 77; *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984) ; *see also Rhinehart v. Scutt*, 408 F. App'x 510, 514 (6th Cir. 2018) (suggesting that allegation of "continuing violation of . . . Eighth Amendment rights" would trigger a finding of irreparable harm). Below, the Court finds Petitioner is likely to succeed on the merits of this Fifth Amendment claim. Accordingly, "no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

## B. Likelihood of Success on the Merits

Petitioner is likely to succeed on the merits of her claim that her continued confinement during the COVID-19 pandemic violates her Fifth Amendment rights.

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend.

V. The protection applies to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). As it pertains to Petitioner, the Due Process Clause prohibits the government from imposing torture or cruel and unusual confinement conditions on non-convicted detainees. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt."). This type of Fifth Amendment claim is analyzed "under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).

Eighth Amendment claims require a showing of deliberate indifference, *see Farmer v. Brennan*, 511 U.S. 825, 835 (1994), which has both an objective and a subjective component. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

1. Objective Component

The objective component is satisfied by showing that, "absent reasonable precautions, an inmate is exposed to a substantial risk of

serious harm." *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016) (citing *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 Fed.Appx. 354, 361 (6th Cir.2013)). Respondents argue that the precautions they have taken at the Calhoun County Correctional Facility combined with the lack of a confirmed outbreak of COVID-19 at the facility show that Petitioner is unable to demonstrate she is at substantial risk of serious harm. (ECF No. 11, PageID.180.) Instead, Respondents argue that Petitioner merely has a "generalized risk" of contracting COVID-19, which is insufficient to prevail on a Fifth Amendment constitutional claim. (*Id.*) But as noted above, in Petitioner's case, a generalized risk is a substantial risk.

As the Supreme Court explained in *Helling v. McKinney*, "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." 509 U.S. 25, 33 (1993). "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Id.* "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening

condition in their prison on the ground that nothing yet had happened to them." *Id.*

Respondents attempt to distinguish this case from *Helling* on the grounds that the Petitioner in *Helling* alleged a sufficiently imminent danger from "actual exposure to high levels of cigarette smoke because his former cellmate was a five-pack a day smoker." (ECF No. 11, PageID.179 (citing *Helling*, 509 U.S. at 29).) Respondents argue that "Petitioner has not established that she either has been exposed to COVID-19, or that her exposure is "imminent."" (*Id.*) But as the above analysis regarding the risk of irreparable injury to Petitioner demonstrates, the Respondents grievously underestimate the seriousness of the risk to Petitioner, in spite of precautionary measures and despite the lack of confirmed CCCF outbreak to date. The ever-growing number of COVID-19 outbreaks in prisons and detention facilities,[8] despite a range of precautionary measures, demonstrates that

---

[8] *See, e.g.*, Ted Rod Roelofs, *Coronavirus Cases Surge in Michigan's Crowded Prisons*, Bridge (Mar. 27, 2020), https://www.bridgemi.com/michigan-government/coronavirus-cases-surge-michigans-crowded-prisons; *Oregon Inmate in Salem Tests Positive for COVID-19, the First in the State Prison System*, SalemReporter (Apr. 3, 2020), https://www.salemreporter.com/posts/2168/oregon-inmate-in-salem-tests-positive-for-covid-19-the-first-in-the-state-prison-system (noting outbreak despite precautionary measures); Ames Alexander and Jessica

the risk of a COVID-19 outbreak in Respondent's facility is significant.
Nor, given the percentage of asymptomatic COVID-19 cases and the
virus' incubation period of up to fourteen days, can Respondents
reasonably assert, as they do, that there are no COVID-19 cases in CCCF;
they can only allege that there are no confirmed cases. By the time a case
is confirmed, it will almost certainly be too late to protect Petitioner's
constitutional rights. Petitioner, so long as she remains detained, is
therefore exposed to a substantial risk of serious harm.

## 2. Subjective Component

The subjective component is demonstrated by showing that "(1) the
official being sued subjectively perceived facts from which to infer a
substantial risk to the prisoner, (2) the official did in fact draw the
inference, and (3) the official then disregarded that risk." 819 F.3d at
915–16 (citing *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir.
2014)). "Because government officials do not readily admit the subjective

---

Banov, *In NC Prisons, Five Employees and Four Inmates Have Now Tested Positive for COVID-19*, Charlotte Observer (Apr. 1, 2020), https://www.charlotteobserver.com/news/coronavirus/article241675886.html;
Alexandra Kelley, *Louisiana Prison Records Third Inmate Death as a Result of the Coronavirus*, The Hill (Apr. 1, 2020), https://thehill.com/changing-america/well-being/prevention-cures/490839-louisiana-prison-records-third-inmate-death-as-a.

component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence. . . . " *Richko,* 819 F.3d at 916 (citing *Dominguez v. Corr. Med. Servs*., 555 F.3d 543, 550 (6th Cir. 2009)). Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Respondents concede the COVID-19 risk to Petitioner: "The government does not dispute that there is a health risk posed by COVID-19 and that Petitioner is in the category of people identified to be at higher risk for serious health consequences if she contracts COVID-19." (ECF No. 11, PageID.178.) Rightfully so: the above analysis pertaining to the risk of irreparable harm reveals that the substantial risk to Petitioner is obvious. *Farmer*, 511 U.S. at 842.

Respondents instead argue that Calhoun County Correctional Facility's precautionary measures preclude a finding of deliberate indifference because government officials cannot be said to have disregarded the risk to Petitioner. As noted above, officials at the Calhoun County Correctional Facility have taken a range of precautionary measures to protect against a potential outbreak. (*See*

ECF No. 11-3.) But as Plaintiff's pleadings and the above analysis regarding irreparable injury demonstrate, even with these precautionary measures, in light of Petitioner's underlying health conditions, she is not ensured anything close to "reasonable safety." *Farmer*, 511 U.S. at 844. (*See* ECF No. 6-3, PageID.112 (Declaration of Doctor Golob stating, "[V]ulnerable people, people over the age of 50 and people of any age with lung disease . . . living in an institutional setting . . . are at grave risk of severe illness and death from COVID-19."); ECF No. 6-1, PageID.87 (Declaration of Infectious Disease Epidemiologist Joseph Amon, stating "The only viable public health strategy available is risk mitigation. . . . [T]he public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety.").) Based on the record before the Court, the only reasonable response by Respondents is the release of Petitioner; any other response demonstrates a disregard of the specific, severe, and life-threatening risk to Petitioner from COVID-19.

For the same reasons, Petitioner's continued detention cannot "reasonably relate[] to any legitimate government purpose." *Bell v. Wolfish*, 441 U.S. 520, 536-39 (1979) (holding that pretrial detention not

reasonably related to a legitimate government purpose must be considered punishment and therefore contrary to the Fifth Amendment). In their response, Respondents do not directly address the justification for Petitioner's continued detention. The Court notes that Petitioner is in civil detention pending removal proceedings pursuant to 28 U.S.C. § 1226(c). Petitioner faces significant risk of death due to COVID-19; accordingly, her continued confinement at the Calhoun County Correctional Facility is both unrelated and contrary to the government purpose of carrying out her removal proceedings.

Both the objective and subjective components are met; Petitioner has shown a likelihood of success on the merits. The Court reiterates that at this early stage in the litigation, Petitioner need not show a certainty of success on the merits. Indeed, "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199*, 467 F.3d at 1009 (6th Cir. 2006). Given the risk and severity of irreparable harm to Petitioner and the weight of public health evidence indicating release

as the only reasonable option under these facts, Petitioner has met her current burden with respect to the merits of her claim.

Respondents nonetheless cite to some authority that release is an inappropriate remedy for Petitioner's claim. *See Glaus v. Anderson,* 408 F.3d 382, 387 (7th Cir. 2005) (noting release is not among the proper remedies for Eighth Amendment deliberate indifference claims, which are limited to injunctive relief for proper treatment and damages); *Heximer v. Woods*, No. 08-14170, 2018 WL 1193368, at *2 (E.D. Mich. Mar. 8, 2018) (noting that "release from custody is not an available remedy for a deliberate indifference claim."). As explained above, Petitioner has shown a likelihood of success on the merits of her claim that given the extraordinary nature of the COVID-19 pandemic, no set of possible confinement conditions would be sufficient to protect her Fifth Amendment rights. Release from custody represents the only adequate remedy in this case, and it is within this Court's broad equitable power to grant it. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.")

40

### 3. Qualified Immunity

In its supplemental brief, Respondents note that to the extent Petitioner brings a civil rights case, Respondents are entitled to assert a defense of qualified immunity. (ECF No. 19, PageID.317.) Qualified immunity is unavailable as a defense in cases seeking injunctive relief. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (noting that qualified immunity defense is not available in "suits against individuals where injunctive relief is sought in addition to or instead of damages"); *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982) (describing qualified immunity as "immunity from suits for damages"). Because Petitioner here seeks only declaratory and injunctive relief, qualified immunity does not apply.

## C. Balance of Equities and Public Interest

When the government opposes the issuance of a temporary restraining order, as Respondents do here, the final two factors—the balance of equities and the public interest—merge, because "the government's interest is the public interest." *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The public interest favors Petitioner's release because of the risk that Petitioner's constitutional rights will be deprived absent an injunction. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir.1994).

Additionally, Petitioner's release will protect public health. Given the highly unusual and unique circumstances posed by the COVID-19 pandemic and ensuing crisis, "the continued detention of aging or ill civil detainees does not serve the public's interest." *Basank,* 2020 WL 1481503, at *6; *see also Fraihat v. U.S. Imm. and Customs Enforcement*, 5:19 Civ. 1546, ECF No. 81-11 (C.D. Cal. Mar. 24, 2020) ("the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19"); *Castillo v. Barr*, CV-20-00605-TJH (C.D. Cal. 2020). Protecting public health and safety is in the public interest. *See Neinast v. Bd. Of Trustees*, 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).

Respondents argue that public interest favors Petitioner's continued detention because "the public interest in enforcement of the

United States' immigration laws is significant." (ECF No. 11, PageID.187 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant.")).

Respondents point to only one immigration law that will see continued enforcement by denying relief to Petitioner. That law is 8 U.S.C. § 1226(c), and it authorizes Petitioner's continued detention. But as set forth above, Petitioner's continued detention is in violation of the United States Constitution, to which 8 U.S.C. § 1226(c) must give way.

The enforcement of the remainder of U.S. immigration laws against Petitioner will continue unabated should the Court grant Petitioner relief. A hearing on Petitioner's request for cancellation of removal is scheduled for April 14, 2020. (ECF No. 11, PageID.170). Respondents do not argue that Petitioner's release will jeopardize her appearance at that hearing, nor do they argue that Petitioner's release will undermine her removal from this country, should Petitioner's defense fail and should conditions allow such removal.

43

The public interest and balance of equities demand that the Court protect Petitioner's constitutional rights and the public health over the continued enforcement of a detention provision that, as applied to Petitioner, is unconstitutional. The remaining factors counsel granting Petitioner relief.

Because all four factors weigh in favor of issuing emergency injunctive relief, Petitioners motion for a temporary restraining order is granted.

## IV. Conclusion

For the reasons stated above, Petitioner's Application for a Temporary Restraining Order is GRANTED IN PART. Respondent Adducci is ORDERED to release Petitioner on April 6, 2020 on her own recognizance. Petitioner will be subject to the following restrictions: Petitioner is subject to fourteen days of home quarantine; Petitioner must comply with all Michigan Executive Orders; and Petitioner must appear at all hearings pertaining to her removal proceedings. Respondents may impose other reasonable nonconfinement terms of supervision.

Respondents are further RESTRAINED from arresting Petitioner for civil immigration detention purposes until the State of Emergency in

44

Michigan (related to COVID-19) is lifted or until further Court Order stating otherwise.

The Temporary Restraining Order will expire on April 17, 2020, at 6:30 p.m. No later than April 10, 2020, at 12:00 p.m., Respondents must show cause why this Order should not be converted to a preliminary injunction. Petitioner may file a response no later than April 16, 2020, at 12:00 p.m.

IT IS SO ORDERED.

Dated: April 6, 2020          s/Judith E. Levy
Ann Arbor, Michigan       JUDITH E. LEVY
                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 6, 2020.

                                s/William Barkholz
                                WILLIAM BARKHOLZ
                                Case Manager

# EXHIBIT F

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

JOHN DOE,

    Plaintiff,

  v.

WILLIAM P. BARR, et al.,

    Defendants.

Case No. 20-cv-02141-LB

**ORDER GRANTING PETITIONER'S
MOTION FOR TEMPORARY
RESTRAINING ORDER**

Re: ECF No. 6

**INTRODUCTION**

  The petitioner, a citizen of Haiti and a lawful permanent resident of the United States, is in

removal proceedings based on his conviction for second-degree robbery.[1] He finished his state

sentence and has been in the custody of the U.S. Immigration and Customs Enforcement ("ICE")

at Yuba County Jail since April 15, 2019.[2] He has not had a bond hearing. He has medical issues

— chronic post-traumatic stress disorder ("PTSD"), depression, and latent tuberculosis — and

given the COVID-19 pandemic and his conditions of confinement at Yuba County Jail, he

petitions under 28 U.S.C. § 2241 for his release or, alternatively, a bond hearing within seven days

---

[1] Pet. – ECF No. 1. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations
are to the ECF-generated page numbers at the top of documents.

[2] Notice of Custody Determination, Ex. C to Pet. – ECF No. 1-2 at 13.

before an Immigration Judge ("IJ"). He also moved for a temporary restraining order ("TRO") to

obtain the same relief.[3] After full briefing and a hearing on April 9, 2020, the court grants the

petitioner's motion for a TRO and orders his release.

## STATEMENT[4]

### 1.   COVID-19

The World Health Organization has designated COVID-19 a global pandemic.[5] The state of

California has declared a state of emergency, and the President has declared a national

emergency.[6] Our courthouses are mostly closed to in-person business, and counties have

implemented shelter-in-place orders that require social distancing and the closing of schools and

businesses.[7] These are extraordinary times.[8]

---

[3] Pet. – ECF No. 1; Mot. – ECF No. 6.

[4] In part because this is a TRO, the court overrules the government's objections to the evidence submitted with the petitioner's reply brief. Opp'n – ECF No. 16 at 11 n. 5; Objs. – ECF No. 22; *see Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm"). The severity of COVID-19 is undisputed. The information about the petitioner's community support is helpful and cannot be reasonably disputed.

[5] World Health Organization, *WHO Director-General's opening remarks at media briefing* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited April 10, 2020).

[6] Proclamation of State Emergency (Mar. 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf (last visited Apr. 10, 2020); Proclamation No. 994, 85 F3d. Reg. 15,337), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited Apr. 10, 2020).

[7] *See United States v. Daniels*, No. 19-cr-00709-LHK (NC), Order – ECF No. 24 at 3–4 (N.D. Cal. Apr. 9, 2020); *see* Statewide "Shelter in Place" Order Replaces Yuba-Sutter directive, https://yubanet.com/regional/statewide-shelter-in-place-order-replaces-yuba-sutter-directive/ (last visited Apr. 10, 2020); Mervosh, Lu, & Swales, *See Which States and Cities Have Told Residents to Stay at Home* (Apr. 7, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html (last visited Apr. 10, 2020).

[8] *In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mc-71055-TSH, 2020 WL 1307109, at *1(N.D. Cal. Mar. 19, 2020).

United States District Court
Northern District of California

1    COVID-19 spreads "easily and sustainably" from person to person, infected people can spread

2    it (even if they are asymptomatic), and COVID-19 can survive on surfaces for days.[9] It spreads

3    even faster when it is in confined spaces, such as cruise ships, aircraft carriers, and prisons.[10]

4        There is no approved vaccine to prevent infection.[11] Instead, to control the virus, the CDC (the

5    Centers for Disease Control and Prevention) recommends that people stay at least six feet away

6    from each other (a practice called "social distancing"), stay at home, wash their hands often,

7    disinfect surfaces, and cover their mouths and nose with a cloth face cover when around others.[12]

8        "[J]ails and prisons present extraordinarily dangerous conditions for the spread of the virus."

9    *United States v. Daniels*, No. 5:19-cr-00709-LHK (NC), Order – ECF No. 24 at 5–7 (N.D. Cal.

10   Apr. 9, 2020) (citing articles and cases and taking judicial notice of information on the U.S.

11   Bureau of Prisons' website).[13]

12       The CDC has determined that certain persons are more susceptible to being infected with

13   COVID-19.[14] These include people who are 65 and older, people who live in a nursing home or

14   other long-term care facility, people who are homeless, and people of all ages with underlying

15

16   [9] Ctrs. For Disease Control & Prevention, *How COVID-19 Spreads* (Apr. 2, 2020),
     https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-
17   spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-
     ncov%2Fabout%2Findex.html (last visited Apr. 10, 2020).
18
     [10] *Ortuño v. Jennings*, No. 3:20-cv-02064-MMC, Order – ECF No. 28 at 3–4 (N.D. Cal. Apr. 8, 2020);
19   *Daniels*, No. 5:19-cr-00709-LHK (NC) – ECF No. 24 at 4–5.

20   [11] Ctrs. For Disease Control & Prevention, *How to Protect Yourself & Others,*
     https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 10.
21   2020).

22   [12] Ctrs. For Disease Control & Prevention, *Social Distancing, Quarantine, and Isolation* (April 4,
     2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last
23   visited Apr. 10, 2020); Ctrs. For Disease Control & Prevention, *How to Protect Yourself & Others*
     (April 8, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html
24   (last visited Apr. 10, 2020).

     [13] *See also* Mot. – ECF No. 6-1 at 12–15 (describing the risks and collecting authorities on the point).
25   This factual issue matters because the government argues that the risk is speculative (and that it is safer
     to be incarcerated), in support of an argument that the petitioner lacks standing. *See* Opp'n – ECF No.
26   16 at 18. The government's fact assertions are unsubstantiated, and the evidence is to the contrary.

27   [14] Ctrs. For Disease Control and Prevention, *Groups At Risk For Severe Illness* (April 2, 2020),
     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last
     visited Apr. 10, 2020).

28

United States District Court
Northern District of California

1   medical conditions, particularly if not well controlled, including the following: people with

2   chronic lung disease or moderate to severe asthma, people who have hypertension or serious heart

3   conditions, people with severe obesity (with a body-mass index of 40 or higher), people with

4   diabetes, people with chronic kidney disease undergoing dialysis, people with liver disease, and

5   people who are immunocompromised (including from cancer treatment, smoking, bone marrow or

6   organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of

7   corticosteroids and other immune-weakening medications).[15]

8

9   **2.   The Petitioner**

10      The petitioner is a citizen of Haiti who came to the United States in July 2005, when he was

11  16, after he witnessed Haitian police officers' beheading his parents.[16] In 2007, he became a

12  lawful permanent resident based on an approved Special Immigrant Juvenile Status petition.[17] He

13  initially lived in a foster home but ultimately moved to California, went to school, connected with

14  many family members who live in the U.S. (including his cousins in East Oakland), and met (in

15  2009) and married (in 2012) his wife, a U.S. citizen.[18] They have lived together since 2010.[19]

16      The petitioner pleaded no contest in December 2011 to second-degree robbery, in violation of

17  Cal. Penal Code § 211, with enhancements for bodily injury and use of a weapon, and was

18  sentenced to three years for the robbery with a consecutive seven years for the enhancements.[20]

19  (The weapon was a BB gun that the petitioner used to hit the person he robbed.[21]) He has no other

20

21  _____

    [15] *Id.*

22  [16] Pet. – ECF No. 1 at 6 (¶ 22); Petitioner's Decl., Ex. F to Morales Decl. – ECF No. 1-2 at 23–24 (¶¶
    11–18); Lovedel Decl. – ECF No. 16-1 at 5 (¶ 12).

23
    [17] Pet. – ECF No. 1 at 6 (¶ 22); Rabinovich Decl. – ECF No. 1-4 at 2 (¶ 3); Lovedel Decl. – ECF No.
24  16-1 at 5 (¶ 12).

25  [18] Pet. –ECF No. 1 at 6–7 (¶¶ 24–25); Petitioner's Decl., Ex. F to Morales Decl. – ECF No. 1-2 at 24–
    26 (¶¶19–31); Wife's Decl., Ex. H to Morales Decl. – ECF No. 1-2 at 67 (¶ 2).

26  [19] Wife's Decl., Ex. H to Morales Decl. – ECF No. 1-2 at 67 (¶ 2).

27  [20] Pet. – ECF No. 1 at 7 (¶ 26); DHS Record, Ex. D to Morales Decl. – ECF No. 1-2 at 17–18.

    [21] Petitioner's Decl., Ex. F to Morales Decl. – ECF No. 1-2 at 27 (¶ 35).
28

United States District Court
Northern District of California

criminal history.[22] He served eight years of his ten-year sentence (slightly less than the ordinary 85% because of good-time and educational-merit credits) and was released from Folsom State Prison on April 15, 2019.[23] His declaration in support of his application for adjustment of status describes his activities at Folsom, including obtaining his high-school diploma, vocational training in electronics, mental-health treatment, reconnecting to the spiritual practice (called Ifa) of his father, learning and then teaching guitar, performing with a band, and charitable work.[24] He apparently had no disciplinary violations at Folsom.[25] A psychological assessment of him includes a review of his prison records, confirms his mental-health diagnosis and his extensive (and successful) educational, therapeutic, and charitable activities.[26]

The petitioner has been in ICE custody since April 15, 2019 and has not had a bond hearing.[27]

A G4S security officer — a company that contracts with ICE — groped the petitioner on at least two separate legal visits in San Francisco between September and December 2019.[28] The petitioner and several other victims reported the assault to the San Francisco Police Department

---

[22] *See* Pet. – ECF No. 1 at 7 (¶¶ 26, 28); Rabinovich Decl. – ECF No. 1-4 at 2 (¶ 3); DHS Record, Ex. D to Morales Decl. – ECF No. 1-2 at 17–18.

[23] Rabinovich Decl. – ECF No. 1-4 at 2 (¶ 3).

[24] Petitioner's Decl., Ex. F to Morales Decl. – ECF No. 1-2 at 28–32 (¶¶ 40–71). Ifa is a practice focused on building a "character of humility and compassion." *Id*. at 30 (¶ 56).

[25] *See id.* at 31 (¶ 69).

[26] In the psychological evaluation (credited by the IJ), the psychologist reviewed prison records reflecting the diagnosis of chronic PTSD, depression, anxiety, and symptoms that included sleeplessness and nightmares. Shidlo Decl., Ex. G to Morales Decl. – ECF No. 1-2 at 39 (¶¶ 14–22). The records show the petitioner's participation in therapy, religious programs, a band, and college and electronics courses. *Id.* (¶ 15). An annual review at Folsom notes that the petitioner did not engage in any cell violence or predatory behavior toward inmates or staff. *Id.* (¶ 16). The records reflect all of the petitioner's programming and describe him as a role model, a motivated student, disciplined, reliable, and hardworking, with the "right attitude for employment." *Id.* at 40–41 (¶¶ 17–22). The assessment synopsizes the petitioner's background and experiences (including the crime), describes the tests that the psychologist administered, confirms the diagnosis of PTSD and Depressive Disorder NOS, finds him credible, finds that he presented a low risk of violence, and opines that with good mental-health treatment, the petitioner is likely to function successfully, both socially and vocationally. *Id.* at 41–53 (¶¶ 23–63).

[27] Pet. – ECF No. 1 at 6 (¶ 21); Rabinovich Decl. – ECF No. 1-4 at 4 (¶ 8).

[28] Rabinovich Decl. – ECF No. 1-4 at 3 (¶ 7).

United States District Court
Northern District of California

("SFPD"), which investigated the assault.[29] SFPD Sergeant-Inspector Antonio Flores signed a

Form I-918 Supplement, U Nonimmigration Status Certification, certifying him as a victim of the

qualifying crimes of Abusive Sexual Contact and Sexual Assault, and reflecting the petitioner's

cooperation and truthful information.[30] This allows the petitioner to file for a U visa.[31]

The petitioner has been diagnosed with chronic PTSD, depression, and latent tuberculosis.[32]

He has nightmares, usually about his parents' death, and experiences fear, anxiety, tightness in his

chest, and trouble sleeping.[33]

One article describes PTSD as — in addition to a chronic psychiatric illness — a "somatic

condition, such that patients with PTSD have been found to have a biological alterations in several

primary pathways involving the neuroendocrine and immune systems."[34] Mira Zein, M.D.,

M.P.H., who is a Clinical Assistant Professor at Stanford University School of Medicine,

Department of Psychiatry and Behavioral Sciences, describes how depression, stress, and PTSD

affect the immune system.[35] "Growing evidence demonstrates that PTSD, anxiety/stress, and

depression can lead to decreased immune response and increased risk of infections."[36] These

illnesses are "linked with elevated stress levels," which can impact immune responses.[37]

"Depression, anxiety, and PTSD have all been found to directly stimulate production of pro-

inflammatory cytokines, as well as downregulate cellular immunity leading to increased risk of

---

[29] *Id.*

[30] *Id.*; Supp. B, U Nonimmigrant Status Certification, Ex. C to Morales Decl. – ECF No. 1-3 at 50–53.

[31] Rabinovich Decl. – ECF No. 1-4 at 3 (¶ 7).

[32] Pet. – ECF No. 1 at 2 (¶ 1), 9 (¶ 33), 26 (¶ 75); Shidlo Decl., Ex. G to Morales Dec. – ECF No. 1-2 at 36 (¶ 2); *see also* Zein Decl., Ex. AA to Morales Supp. Decl. – ECF No. 19-1 at 7–9.

[33] Petitioner's Decl., Ex. F to Morales Decl. – ECF No. 1-2 at 28–29 (¶¶ 40–54).

[34] Neigh & Ali, *Co-Morbidity of PTSD and Immune System Dysfunction: Opportunities for Treatment*, Curr. Opin. Pharmacol. (Author Manuscript) (Aug. 1, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4992603/pdf/nihms805030.pdf

[35] Zein Decl., Ex. AA to Morales Third Decl. – ECF No. 19-1. M.P.H. is a Master's Degree in Public Health.

[36] *Id.* at 5.

[37] *Id.* at 7.

United States District Court
Northern District of California

acute and prolonged infection, and delayed wound healing."[38] She concludes that weakened immunity due to mental-health disorders can put detainees "at increased risk of contracting and suffering from more severe forms of COVID-19."[39]

Carlos Franco-Paredes, M.D., M.P.H., D.T.M.H., who is an Associate Professor of Medicine at the University of Colorado Department of Medicine, Division of Infectious Diseases, describes COVID-19 risks at immigration detention centers.[40] "The physical and emotional trauma that detainees and asylum seekers experience can weaken their immune systems, resulting in increased risk of severe manifestations of infections."[41] Other countries have identified people with "severe psychiatric illness" as a group at "high risk of dying [from COVID-19] regardless of their age."[42]

The petitioner also suffers from latent tuberculosis.[43] Initially, he described his medical condition thusly: "it is unclear how the novel coronavirus will interact with" the petitioner's latent tuberculosis.[44] Subsequently, he submitted additional information.[45] Tuberculosis, like COVID-19, is a respiratory disease.[46] George Martinez, M.D., who conducted the petitioner's medical examination for his immigration proceedings, did not specify a definite relationship between latent tuberculosis and COVID-19, given that the virus is still new to healthcare professionals.[47] One observational study studied the relationship of tuberculosis and COVID-19 in 36 confirmed COVID-19 patients.[48] It found that "individuals with latent or active TB [Tuberculosis] may be

---

[38] *Id.*

[39] *Id.* at 9.

[40] Franco-Paredes Decl., Ex. S to Morales Decl. – ECF No. 1-3 at 78–90. D.T.M.H. is a diploma in tropical medicine and hygiene.

[41] *Id.* at 81.

[42] *Id.* at 82.

[43] Pet. – ECF No. 1 at 26 (¶ 75); Rabinovich Decl. – ECF No. 1-4 at 7 (¶ 24).

[44] Pet.– ECF No. 1 at 26 (¶ 75) (citing Rabinovitch Decl. – ECF No. 1-4 at 7 (¶ 24)).

[45] Mot. – ECF No. 26. Given the nature of the proceedings, and for the reasons described above, the court considers the additional submission.

[46] Chen Study, Ex. A to Rabinovich Decl. – ECF No. 26-1 at 12.

[47] Rabinovich Decl. – ECF No. 1-4 at 7 (¶ 24).

[48] Chen Study, Ex. A to Rabinovich Decl. – ECF No. 26-1 at 6, 9–10.

United States District Court
Northern District of California

more susceptible to SARS-CoV-2[49] infection."[50] It also found that "COVID-19 disease progression may be more rapid and severe" in those with latent or active tuberculosis.[51] It identified "tuberculosis history (both of active TB and latent TB) [as] an important risk factor for SARS-CoV-2 infection."[52] The study noted that its findings are limited because it is based on a low number of cases.[53]

If he is released, the petitioner has said that he will live with his wife in Oakland, California.[54] In her declarations, the petitioner's wife describes their close relationship, his relationship with her son and other children in the family, his creativity and support, his rehabilitation, and her need for his support given her health issues.[55] She identifies her two-bedroom apartment in Oakland as their residence, describes how they will be able to practice social distancing, and describes the substantial precautions she follows to ensure her health, such as washing her hands, wearing a mask and gloves outside, immediately washing her clothes when she returns to her home, cleaning frequently, and washing her hands frequently.[56]

Because the petitioner is on County parole, he will have access to robust mental-health, educational, job-training, and job-placement services.[57]

---

[49] SARS-COV-2 is the virus for COVID-19. World Health Org., *Naming the coronavirus (COVID-19) and the virus that causes it,* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited Apr. 11, 2020).

[50] Chen Study, Ex. A to Rabinovich Decl. – ECF No. 26-1 at 11.

[51] *Id.*

[52] *Id.* at 5–6.

[53] *Id.* at 12. The study has not been peer-reviewed, given that it was posted on March 16, 2020.

[54] Rabinovich Decl. – ECF No. 1-4 at 8 (¶ 30).

[55] *See* Wife's Decl., Ex. H to Morales Decl. – ECF No. 1-2 at 67–71 (¶¶ 2–29); Wife's Decl., Ex. BB to Morales Third Decl. – ECF No. 19-1 at 19 (¶¶ 3–4).

[56] *See* Wife's Decl., Ex. BB to Morales Third Decl. – ECF No. 19-1 at 19 (¶¶ 2–5).

[57] Letter, Ex. CC to Morales Third Decl. – ECF No. 19-1 at 22–31. Alameda County is resource-rich for those on County supervision.

United States District Court
Northern District of California

### 3.   Immigration Proceedings

The petitioner's conviction is an aggravated felony, which means that he is removable under

§ 273(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1227(a)(2)(A)(iii).[58] The petitioner advanced two claims for relief from removal: an adjustment

of status (based on an approved spousal visa) and protection under the Convention Against

Torture.[59] On February 13, 2020, the Immigration Judge ("IJ") denied the application for relief

and ordered the petitioner removed to Haiti.[60] The IJ "observed the [petitioner's] demeanor and

analyzed his testimony for consistency, specificity, and persuasiveness" and found his testimony

"plausible, believable, candid, and generally consistent."[61] "After considering the totality of the

evidence and weighing all the relevant factors," the IJ found the petitioner "credible and

accord[ed] his testimony full evidentiary weight," and also found credible the testimony of the

petitioner's wife and the examining psychologist (summarized above).[62]

On March 2, 2020, the petitioner timely appealed to the Board of Immigration Appeals.[63]

There is no briefing schedule, and the timeline for a decision is anywhere from six months to over

a year.[64]

As mentioned above, the petitioner has said that he will apply for a U visa.[65]

United States District Court
Northern District of California

---

[58] Pet. – ECF No. 1 at 7 (¶ 28); Notice to Appear, Ex. A to Morales Decl. – ECF No. 1-2 at 6.

[59] Pet. – ECF No. 1 at 7–8 (¶ 29); *see also* IJ Order, Ex. L to Morales Decl. – ECF No. 1-3 at 32–42.

[60] IJ Order, Ex. M to Morales Decl. – ECF No 1-3 at 42.

[61] *Id.* at 34.

[62] *Id.* at 36 (summarizing the psychologist's diagnoses, the strong family relationships, and the petitioner's wife's need for support from her husband, given her own ailments, and also finding other witnesses credible).

[63] Pet. – ECF No. 1 at 8 (¶ 32); Notice of Appeal, Ex. M to Morales Decl. – ECF No 1-3 at 44.

[64] Rabinovich Decl. – ECF No. 1-4 at 3 (¶¶ 5–6).

[65] *Id.* (¶ 7).

ORDER – No. 20-cv-02141-LB               9

### 4.  The Conditions of Confinement at Yuba County Jail

The petitioner's housing unit is detained in "Pod C," a large open space in the basement, housing 50 people, and divided into an upstairs and a downstairs.[66] The detainees sleep downstairs, in an open room with beds about three to four feet apart.[67] The upstairs has a communal dining area, the commissary, and an exercise space.[68] There are phones and bathrooms upstairs and downstairs.[69] There are six sinks in the pod, and one has hot water for food preparation.[70] The sinks have push-button faucets that stay on for only a short time and require repeated pressing to complete a handwashing.[71] The detainees have three meals a day, served communally, at tables that seat six people, and some eat on their cots because there are not enough spaces in the dining room.[72]

Until March 19, 2020, according to the petitioner, no jail employee cleaned inside the pod, though detainees cleaned occasionally (possibly weekly) and had to ask a guard for cleaning supplies (kept in a locked closet).[73] Before March 19, 2020, detainees could obtain soap only by buying it at the commissary, and they could not buy hand sanitizer.[74] Starting on March 20, 2020, jail officials began distributing small bars of soap that disintegrate quickly, allow only a couple of hand washes, and did not always allow distribution to all detainees.[75] There are no masks for detainees, but some (not all) staff members have masks now.[76]

---

[66] *Id*. at 4 (¶¶ 10–12).

[67] *Id.* (¶ 12).

[68] *Id*.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 5 (¶ 13).

[73] *Id.* (¶ 14)).

[74] *Id*. (¶ 15).

[75] Rabinovich Decl. – ECF No. 19-2 at 2 (¶ 4).

[76] *Id.* at 2–3 (¶ 6).

1   According to the government, the jail can house 210 detainees.[77] Since March 11, 2020 (the

2   date that the World Health Organization declared COVID-19 a global pandemic), ICE's

3   Enforcement and Removal Operations is "taking affirmative steps to reduce the number of

4   detainees" at Yuba County Jail and has reduced the population (from 168 to 150) by 10 percent.[78]

5   As of April 2, 2020, there are 150 detainees at Yuba, 140 male and 10 female.[79] The number of

6   detainees can fluctuate based on book-ins and releases.[80] ICE is assessing detainees at intake,

7   placing any detainees with COVID-19 symptoms in quarantine (and testing them), and thereafter

8   providing appropriate treatment.[81]As of April 9, 2020, there are no suspected or confirmed cases

9   of COVID-19 at Yuba.[82] The jail has "increased sanitation frequency and provides sanitation

10  supplies including disinfectants, sanitizer, and soap in every housing unit," and the "administration

11  is encouraging both staff and the general staff population to use these [hygiene] tools often and

12  liberally."[83] It has suspended in-person visits and limited professional visits to noncontact visits.[84]

13  It screens all staff and vendors for body temperature when they enter the facilities.[85] It provides

14  education to staff and detainees on the importance of hand-washing and other hygiene measures.[86]

15  It has "identified housing units for the quarantine of patients who are suspected of or test positive

16  for COVID-19" (after the assessment and monitoring protocols that apply during intake).[87]

17

18  [77] Lovedel Decl. – ECF No. 16-1 at 4 (¶ 7).

19  [78] Id.

    [79] Id.

20  [80] Id. The petitioner replies to this point by pointing to increased book-ins and a resulting increased

21  population of detainees. Reply – ECF No. 19 at 6–7; Zukin Decl., Ex. H to Morales Decl. – ECF No.
    19-1 at 118–120 (¶¶ 4–8).

22  [81] Moon Decl. – ECF No. 16-2 at 5–6 (¶¶ 8–10).

23  [82] See Moon Decl. – ECF No. 16-2 at 6 (¶ 12) ("As of March 26, 2020 there are zero suspected cases
    of COVID-19 in the Yuba County Jail and zero confirmed cases"); Lovedel Decl. – ECF No. 16-1 at 5

24  (¶ 11). The respondent said at the April 9, 2020 hearing that this remains the case.

    [83] Moon Decl. – ECF No. 16-2 at 6 (¶ 14).

25  [84] Id. (¶ 15).

26  [85] Id. (¶ 16).

27  [86] Id. at 7 (¶ 18).

    [87] Id. (¶ 19).

28

United States District Court
Northern District of California

### 5. Procedural Background

In his § 2241 petition, the petitioner challenges the conditions of his confinement (based on his inability to address his medical vulnerabilities through CDC-recommended measures such as social distancing and using cleaning products) and claims that his continued detention violates (1) his substantive due-process right under the Fifth Amendment to the U.S. Constitution to be detained in a safe situation, free from punitive conditions of confinement, and (2) his procedural due-process right to a bond hearing under the Fifth Amendment.[88]

The court granted the petitioner's unopposed motion to proceed pseudonymously.[89] The court held a hearing on the TRO on April 9, 2020.[90]

### STANDARD OF REVIEW

A TRO preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary-injunction application. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). A TRO is an "extraordinary remedy" that the court should award only when a plaintiff makes a clear showing that it is entitled to such relief. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

The standards for a TRO and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A movant must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. The irreparable injury must be both likely and immediate. *Id*. at 20–21. "[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

---

[88] *Id*. at 29–30 (¶¶ 83–90).

[89] Order – ECF No. 10; Statement of Non-Opposition – ECF No. 9.

[90] Mot. – ECF No. 6; Opp'n – ECF Nos. 16, 17; Reply – ECF No. 19; Minute Entry – ECF No. 23.

United States District Court
Northern District of California

Before *Winter*, the Ninth Circuit employed a "sliding scale" test that allowed a plaintiff to prove either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) [ ] serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999) (citation omitted). In this continuum, "the greater the relative hardship to [a movant], the less probability of success must be shown." *Id*. After *Winter*, the Ninth Circuit held that although the Supreme Court invalidated one aspect of the sliding scale approach,[91] the "serious questions" prong of the sliding scale survived if the plaintiff satisfied the other elements for preliminary relief. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Thus, a preliminary injunction may be appropriate when a movant raises "serious questions going to the merits" of the case and the "balance of hardships tips sharply in the plaintiff's favor," provided that the other elements for relief also are satisfied. *Id*. at 1134–35.

## ANALYSIS

The government argues that (1) the petitioner cannot challenge the conditions of his confinement in a § 2241 petition seeking immediate release, (2) the petitioner did not exhaust his administrative remedies, (3) the petitioner lacks standing because any injury is speculative, and (4) the petitioner does not establish his entitlement to a TRO.[92] These arguments are not persuasive.

First, the court can address the petitioner's challenges to the conditions of confinement in a § 2241 petition. *See, e.g.*, *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No. 38 at 4 (N.D. Cal. Apr. 8, 2020); *Bent v. Barr*, No. 4:19-cv-06123-DMR, 2020 WL 1812850, at *2–3 (N.D. Cal. Apr. 9, 2020) (collecting cases); *see Lopez-Marroquin v. Barr*, No. 18-72922, Order (9th Cir. Apr. 9, 2020) (construing immigration detainee's COVID-19-related request for release under the All Writs Act as a 28 U.S.C. § 2241 petition and remanding to district court for consideration).

---

[91] The Supreme Court in *Winter* rejected the Ninth Circuit's holding that "the 'possibility' of irreparable harm was sufficient, in some circumstances to justify a preliminary injunction." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Instead, the *Winter* Court held that "plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Id*. (emphasis in original).

[92] Opp'n – ECF No. 16 at 15–24.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Second, for habeas claims, exhaustion of administrative remedies is prudential, not

2   jurisdictional. *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). A court "may require

3   prudential exhaustion when: (1) agency expertise makes agency considerations necessary to

4   generate a proper record and reach a proper decision; (2) relaxation of the requirement would

5   encourage the deliberate bypass of the administrative scheme; and (3) administrative review is

6   likely to allow the agency to correct its own mistakes and to preclude the need for judicial

7   review." *Id.* (*citing Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007)). "Nonetheless, a court

8   may waive the prudential exhaustion requirement if administrative remedies are inadequate or not

9   efficacious, pursuant of administrative remedies would be a futile gesture, irreparable injury will

10  result, or the administrative proceedings would be void." *Id.* (citation and quotation omitted).

11      Waiver of the prudential exhaustion requirement is appropriate here. Courts have entertained

12  similar COVID-19 claims under habeas jurisdiction without mentioning prudential exhaustion. *See*

13  *Bent*, 2020 WL 1812850 at *5–6 (collecting cases addressing habeas challenges). Also, the

14  petitioner's claim of entitlement to a bond hearing is based on the Fifth Amendment (as opposed

15  to being grounded in a statutory entitlement), and thus exceeds the jurisdiction of the immigration

16  courts and the BIA. *See Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KSx), Order – ECF No. 17

17  at 10 (C.D. Cal. April 1, 2020) (waiving prudential exhaustion in a case with similar facts about

18  the conditions of confinement). In addition, the petitioner suffers continued harm from the lack of

19  a bond hearing, and given his health issues, irreparable injury results from his continued detention.

20  *See Jimenez v. Wolf*, No. 5:19-cv-07996-NC, Order – ECF No. 25 at 3–4 (N.D. Cal. Mar. 6, 2020)

21  (waiving the prudential-exhaustion requirement for similar reasons).

22      Third, the petitioner has standing. The risk of injury is not speculative. The petitioner

23  submitted uncontested statements from public-health experts about the risks in jails, prisons, and

24  detention centers. The risks are serious, even without a confirmed case of the virus in this

25  detention center. *See Bent*, 2020 WL 1812850 at *3–4. The weight of authority supports the

26  conclusion that detainees have standing. *See, e.g.*, *id.* at *3 ("[g]iven the exponential spread of the

27  virus, the ability of COVID-19 to spread through asymptomatic individuals[,] . . . effective relief

28  for [petitioner] and other detainees may not be possible if they are forced to wait until their

ORDER – No. 20-cv-02141-LB          14

1    particular facility records a confirmed case") (collecting cases); *Ortuño*, No. 3:20-cv-02064-

2    MMC, ECF No. 38 at 3 (where petitioners have not contracted COVID-19, standing is still met

3    because of how rapidly the disease can spread in a confined space); *see also Castillo v. Barr*, No.

4    5:20-cv-00605-TJH (AFMx), 2020 WL 1502864, at *4–5 (C.D. Cal. Mar. 27, 2020) (standing

5    based on similar facts); *see also Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877 (9th

6    Cir. Mar. 24, 2020) (sua sponte ordering the petitioner released (and his removal stayed) pending

7    final disposition by the court "[i]n light of the rapidly escalating public health crisis, which public

8    health authorities predict will especially impact immigration detention centers."

9                                             *       *       *

10       Fourth, as discussed in the next sections, the petitioner has satisfied the four TRO factors: (1) a

11   likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of equities

12   tips in favor of the petitioner, and (4) an injunction is in the public interest.

13

14   **1.   Likelihood of Success on the Merits**

15       The petitioner has two claims: (1) a substantive due-process claim under the Fifth Amendment

16   that his conditions of confinement — in light of his heightened risk to COVID-19 — amount to

17   punishment, and (2) a procedural due-process claim under the Fifth Amendment because he has

18   been in ICE custody for a year and has not had a bond hearing.[93]

19   **1.1 Substantive Due-Process Claim**

20       The petitioner has at least raised a serious question that his continued detention poses risks that

21   exceed the government's needs to ensure his presence at immigration proceedings, in violation of

22   his substantive due-process rights under the Fifth Amendment.

23       Because the petitioner is a civil detainee, his confinement is unconstitutional under the Fifth

24   Amendment if his conditions of confinement "amount to punishment." *Bell v. Wolfish*, 441 U.S.

25   520, 535 (1979); *Jonas v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at

26   535); *accord Bent*, 2020 WL 1812850 at *4; *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No.

27

28   ────────────
     [93] Pet. – ECF No. 1 at 29–30 (¶¶ 83–90).

United States District Court
Northern District of California

38 at 4; *Castillo*, 2020 WL 1502864 at *3. "[P]unitive conditions may be shown (1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, . . . or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jonas*, 393 F.3d at 932 (citations and quotation marks omitted). The government's legitimate, non-punitive interests include ensuring a detainee's presence at immigration proceedings. *See id.* (ensuring a detainee's presence at trial); *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No. 38 at 4 (immigration proceedings).

The issue here is whether, in light of the petitioner's health, his detention is excessive in relation to the government's interest in securing his presence at immigration proceedings. The evidence is undisputed that those with respiratory ailments are more susceptible to being infected by COVID-19, and the petitioner's other diagnoses of chronic PTSD and depression compound his susceptibility. His risk is heightened because detainees at Yuba County jail live in close quarters, cannot practice social distancing, do not have masks, and do not have access to adequate disinfecting and cleaning supplies.

Courts have found that similar conditions of confinement do not meet the constitutional standard for at-risk civil detainees. *See, e.g.*, *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No. 38 at 6–7 (petitioners with diabetes and asthma; detainees are in close quarters, do not have masks, and cannot meaningfully practice social distancing); *Bent*, 2020 WL 1812850 at *2, 5–6 (petitioner with asthma, hypertension, and pre-diabetes; inadequate soap, sanitizer, and cleaning supplies; resulting inability — despite efforts to encourage social distancing — to implement the CDC's social-distancing guidelines; "public health experts make clear that an outbreak in confined spaces is potentially devastating") (collecting cases); *Castillo*, 2020 WL 1502864, at *5 (detainees cannot maintain a six-foot distance and were "put into a situation where they are forced to touch surfaces touched by other detainees, such as with common sinks, toilets, and showers;" noted the risks of infection in immigration facilities, given the rotation of facility guards and staff); *Hernandez*, No. 5:20-cv-00617-TJH (KSx), Order – ECF No. 17 at 1, 5–6, 13 (petitioner with hypertension and multiple medical ailments; similar conditions of confinement); *Basank v.*

1   *Decker*, 20-cv-2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26 2020) (inability to

2   maintain social distancing to protect high-risk detainees shows a likelihood of success on the

3   merits).

4       In sum, the petitioner has at least shown a serious question that his continued detention

5   exceeds the government's legitimate interest in assuring his appearance in immigration

6   proceedings. (The court addresses flight risk and danger to the community in section 2, below.)

7       **1.2 Procedural Due-Process Claim**

8       Because he has not had a bond hearing (despite a year in ICE custody), the petitioner has

9   shown that he is likely to succeed on the merits of his procedural due-process claim.

10      A person who (like the petitioner) commits an aggravated felony may be detained in

11  immigration proceedings, and the statutory scheme does not provide for a bond hearing or limit

12  the length of detention. *See* 8 U.S.C. §§ 1226(a), (c); *Jennings v. Rodriguez*, 138 S. Ct. 830, 844,

13  846 (2018) ("§ 1226(c) does not on its face limit the length of the detention it authorizes.");

14  *Jimenez v. Wolf*, No. 5:19-cv-7996-NC, 2020 WL 510347, at *2 (N.D. Cal. Jan. 30, 2020). Still,

15  the Fifth Amendment "entitles aliens to the due process of law in deportation proceedings."

16  *Demore v. Kim*, 538 U.S. 510, 523 (2003). When confinement continues past a year, courts are

17  wary of continued custody absent a bond hearing. *Gonzalez v. Bonnar*, No. 3:18-cv-05321-JSC,

18  2019 WL 330906, at *3 (N.D. Cal. Jan. 26, 2019) (collecting cases). Courts apply the three-factor

19  balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to evaluate the constitutionality of the

20  detention. *See, e.g.*, *Jimenez*, 2020 WL 510347 at *3 The three factors are (1) the private interest

21  affected by the official action, (2) the risk of an erroneous deprivation of such interest through the

22  procedures used, and the probable value of any additional procedural safeguards, and (3) the

23  government's interest, "including the function involved and the fiscal and administrative burdens

24  that the additional or substitute procedural requirements would entail." *Mathews*, 424 U.S. at 334–

25  35.

26      First, there is no briefing schedule for the BIA appeal, and the uncontested timeline is

27  anywhere from another six months to over a year. Given the petitioner's detention for almost a

28  year to date, and the likelihood of six months to a year in the future, the length of detention

United States District Court
Northern District of California

1  supports the conclusion that the petitioner's private interest militates in favor of his claim that the

2  denial of a bond hearing violates his procedural due-process rights under the Fifth Amendment.

3  *Gonzalez*, 2019 WL 330906, at *5; *Jimenez*, 2020 WL 510347 at *3.

4      Second, the other factors weigh in the petitioner's favor. The probable value of a hearing

5  (given the lack of any bond hearing) is high. And while there is an important government interest

6  in securing the petitioner's presence at any removal, the procedural due-process inquiry is about

7  holding a bond hearing to assess whether the alien represents a flight risk or a danger to the

8  community. *Jimenez*, 2020 WL 510347 at *3.

9

10  **2.  Remaining TRO Elements**

11      The first element is irreparable harm. Continued detention and exposure to health-threatening

12  conditions establish this element. *Sessions*, 872 F.3d at 994 (unconstitutional detention is

13  irreparable harm); *Bent*, 2020 WL 1812850 at *6 (health issues establish irreparable harm to the

14  petitioner's health and safety); *Ortuño*, No. 3:20-02064-MMC, Order – ECF No. 38 at 8 (same).

15      The second and third elements — the balance of equities and whether an injunction is in the

16  public interest — merge. *Bent*, 2020 WL 1812850 at *7. The public's interests are containing

17  COVID-19, securing the petitioner's appearance in his immigration proceedings, and preventing

18  any danger to the community. *Id.*; *Ortuño*, No. 3:20-cv-02064-MMC, ECF No. 38 at 8. Under the

19  circumstances here, the balance of equities and the public interest weigh in favor of release.

20      The petitioner cannot meaningfully protect himself at Yuba County jail from the risks of his

21  custody. *Ortuño*, No. 3:20-cv-02064-MMC, ECF No. 38 at 8; *Bent*, 2020 WL 1812850 at *7.

22  Injunctive relief that prevents the further spreading of the virus and allows social distancing is in

23  the public's interest. *Ortuño*, No. 3:20-cv-02064-MMC, ECF No. 38 at 8 ("the public interest in

24  promoting public health is served by efforts to contain the further spread of COVID-19,

25  particularly in detention centers"); *Bent*, 2020 WL 1812850 at *7 (collecting cases); *Castillo*, 2020

26  WL 1502864 at *6 ("[t]he public has a critical interest in preventing the further spread of the

27

28

United States District Court
Northern District of California

coronavirus").[94] By living with his wife, the petitioner will be able to protect himself and others through social distancing and the other hygienic measures that the CDC recommends.

As to the risk of flight and danger to the community, the global pandemic is changing behavior and the way courts assess risk of flight and community safety. *See Bent*, 2020 WL 1812850 at *7 (collecting cases). The petitioner has substantial ties to the community and every incentive to comply with the conditions of his supervision, given the alternative of custody and the attendant dangers to his health there. He has a parole officer and considerable community resources, as discussed above, which means he has the supervision necessary to secure his appearance at immigration proceedings and ensure the safety of the community. His underlying crime is serious. But the record of his confinement shows his substantial rehabilitation. The IJ also found the petitioner to be plausible, believable, candid, and consistent, and the psychological evaluation of the petitioner confirmed his good behavior, his low risk of violence, and the likelihood that he will function successfully, both socially and vocationally.[95] Also, the court's conditions of release address any concern about flight risk and safety of the community.

In sum, given the petitioner's combination of medical issues (chronic PTSD, depression, and latent tuberculosis), the COVID-19 pandemic, the conditions of confinement at Yuba County jail, the irreparable harm to the petitioner, the balance of equities, and the public interest, the court grants the TRO and, as relief, orders the petitioner's release.

## CONCLUSION

The court grants the petitioner's motion for a TRO and orders his immediate release from custody.

The petitioner must reside with his wife in Oakland (at the address that she provided in her declaration), and he must shelter in place unless otherwise directed by his parole officer. What that

---

[94] Social distancing and sheltering in pace are the means to prevent the spread of the virus and not overwhelm the health-care system. Siobhan Roberts, *Flattening the Coronavirus Curve* (Mar. 27, 2020), https://www.nytimes.com/article/flatten-curve-coronavirus.html.

[95] IJ Order, Ex. M to Morales Decl. – ECF No. 1-3 at 34; Shidlo Decl., Ex. G to Morales Decl. – ECF No. 102 at 39–53 (¶¶ 14–63).

United States District Court
Northern District of California

1    means is that pending further order of the court or the permission of his parole officer, the

2    petitioner may leave home only to obtain medical care, meet with his parole officer (as directed),

3    meet with his attorneys, appear at any immigration proceedings, or to obey any order issued by the

4    immigration authorities. While on release, he must not violate any federal, state, or local law. The

5    petitioner's parole officer may impose additional conditions or modify these conditions — when it

6    is appropriate to do so — to allow the petitioner to engage in gainful activity. His attorneys must

7    file any modified conditions on the docket.

8         Within two business days, the parties must confer about and submit a proposed schedule for

9    the court's issuing a preliminary injunction. Ordinarily, that would require the government to

10   show cause why the court should not issue a preliminary injunction, and the petitioner to thereafter

11   file a response, and the government to file a reply.

12

13        **IT IS SO ORDERED.**

14        Dated: April 12, 2020

15                                                         _____

16                                                         LAUREL BEELER
                                                           United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:13-cv-0444-VAP-OPx | Date | April 14, 2020 |
| Title | *Quinton Gray v. County of Riverside* | | |

Present: The Honorable    VIRGINIA A. PHILLIPS, CHIEF UNITED STATES DISTRICT JUDGE

| CHRISTINE CHUNG | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    (IN CHAMBERS) MINUTE ORDER GRANTING "EMERGENCY MOTION TO ENFORCE CONSENT DECREE" [DKT. 177]

On April 6, 2020, Plaintiff Quinton Gray ("Plaintiff") filed a document captioned "Emergency Motion[1] to Enforce Consent Decree." ("Motion," Dkt. 177). Pursuant to this Court's April 8, 2020 Minute Order, (Dkt. 182), Defendant County of Riverside ("Defendant") opposed the Motion on April 10, 2020 ("Opp.," Dkt. 183). After considering all papers submitted in support of, and in opposition to, the Motion, as well as the arguments advanced during the telephonic hearing on April 13, 2020, the Court GRANTS the Motion.

In 2016, the Parties entered into a Consent Decree "to ensure the provision of constitutional health care and to ensure non-discrimination for inmates with disabilities in the Riverside County Jails." (Dkt. 173 ¶ 1). The plaintiff class includes three distinct subclasses: the medical subclass, which comprises "[a]ll prisoners who are now, or will in the future be, subjected to the medical care policies and practices of the Riverside

---

[1] The Court notes that an "Emergency Motion" is procedurally improper. Plaintiff should have filed an ex parte application to shorten time for hearing on a motion, in conformance with Local Rule 7-19. In the interests of justice, the Court will treat Plaintiff's Motion as though it had been filed properly.

Jails"; the mental health subclass, which comprises "[a]ll prisoners who are now, or will in the future be, subjected to the mental health care policies and practices of the Riverside Jails"; and the disability subclass, which comprises "all prisoners who are now, or will be in the future, subjected to policies and practices of the Riverside jails regarding specialized or sheltered housing for prisoners due to their mobility impairments and need for assistive devices, and the provision and confiscation of accommodations for prisoners with mobility impairments[.]"  (Dkt. 173 ¶ 3).

The Parties to the Consent Decree negotiated a Remedial Plan, which "is designed to meet the minimum level of health care necessary to fulfill Defendant's obligations under the Eighth and Fourteenth Amendments, as well as to ensure non-discrimination against inmates with disabilities in the areas addressed by the Plan, as required by the ADA and Section 504 of the Rehabilitation Act."  (Dkt. 173 ¶ 9).  In light of the coronavirus ("COVID-19") pandemic[2], "Plaintiffs seek to enforce the Consent Decree by requiring the County to submit a plan to the Court to implement the Governor's order for physical distancing for all Californians housed in the jails and to provide sanitation and other essential services generally accepted as necessary in correctional facilities to provide for the basic health needs of incarcerated people." (Motion at 3-4).

As Defendant argues, the Consent Decree specifies a dispute resolution process which provides that the Parties first conduct negotiations to resolve informally matters in dispute, then, if they are unable to resolve the dispute, to request that the Relevant Court experts evaluate the issue and prepare a report.  Following preparation of this report, if the parties still are unable to resolve the issue, they may request mediation with Judge Raul Ramirez.  Only after having mediated are the parties to file a motion for relief with this Court.  (Dkt. 173 ¶¶ 26–29).  Here, the parties have conducted the first two steps, but have not yet mediated.  Nevertheless, "[g]iven the urgent nature of the proceedings, Plaintiffs request the Court modify the Consent Decree to allow for urgent appeal for enforcement directly to the Court."  (Motion at 17 n.2).

---

[2] The pandemic has caused unprecedented disruption to daily life.  On March 13, 2020, the President of the United States declared a National Emergency in response to the Coronavirus Disease- 2019 ("COVID-19") pandemic pursuant to the National Emergencies Act (50 U.S.C. § 1601, et seq.).  California Governor Gavin Newson has declared a state of emergency in response to the COVID-19 outbreak and, in his March 19, 2020 Executive Order N-33-20, "require[d] physical distancing to keep Californians at least six feet apart at all times and to prepare hospitals and health care workers for the coming surge in cases."  (Motion at 2).

The Court finds good cause to modify the Consent Decree to permit appeal to this Court. "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. . . . A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law."" *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383–84 (1992). The party seeking modification need not prove the change in circumstance was "unforeseen and unforeseeable" at the time of entering into the consent decree, but "[o]rdinarily, . . . modification should not be granted where a party relies upon events that *actually were anticipated* at the time it entered into a decree." *Id.* at 385 (emphasis added). Here, clearly, the emergency resulting from the pandemic constitutes a "significant change in circumstances" that was not actually foreseen at the time the parties entered into the Consent Decree. *Id.* at 383.

The parties therefore meet the standard to modify the Consent Decree to permit appeal to this Court. In light of the urgency of the matter, the Court orders a two-track dispute resolution mechanism. The Parties are to proceed with mediation before Judge Ramirez on April 17, 2020, or an earlier date, if possible. (*See* Opp. at 10). The Court simultaneously assumes jurisdiction to enforce the Consent Decree to the extent specified in this Order.

The Court next turns to Defendant's obligations under the Consent Decree. Plaintiff seeks to enforce the Consent Decree's mandate to "meet the minimum level of health care necessary to fulfill Defendant's obligations under the Eighth and Fourteenth Amendments," (Dkt. 173 ¶ 9), by ensuring that Defendants implement the physical distancing recommendations made by the Court's experts, (*see* Dkt. 178, Ex. J, Allen Expert Report, ¶¶ 9-10, 14-16; Dkt. 178, Ex. K, Gage Expert Report, ¶¶ 5-10.). Plaintiff argues that the County has several options available to limit the spread of the disease within the jails, including transferring prisoners to new, currently empty, John J. Benoit Detention Center ("JJBDC") in Indio, California; relocating particularly vulnerable prisoners; and even release people to allow for physical distancing. (Motion at 4). At the hearing, Defendant did not have information regarding conditions in the existing county jail facilities, insisted that moving prisoners to a newly completed, empty jail in Indio was not feasible, and admitted that it had not researched alternative housing options such as recreation centers, halfway houses, and hotels. Rather than having created a plan to safeguard those most vulnerable to the COVID-19 virus, Defendant conceded that it has not conducted an analysis of its own records to identify particularly vulnerable prisoners. It also has not conducted an analysis of its jail population to determine whether there are any low-level offenders who might be eligible for early release.

Despite Defendant's insistence that conditions in the Riverside County jails are compliant with public health recommendations regarding social distancing, its counsel lacked information to respond to the Court's questions regarding the ability to maintain 6 feet distance between all prisoners in the jail, at all times, its plan for doing so, the size of cells and dormitories, and the number of prisoners per room.

Defendant failed to provide satisfactory information about the feasibility of transfer of prisoners to other jail or non-jail facilities, including transfers of prisoners currently confined in crowded jails to the new, empty, John J. Benoit Detention Center ("JJBDC") in Indio, California. The County states that it is "not-yet-ready to be populated" but provides no details as to why. (Opp. at 13). The County stated at the hearing that the facility was completed in February 2020, but maintained that it is not yet ready for prisoners. In their papers and at the hearing, Defendant argued that "[t]he Sheriff's Department is currently in the midst of a ninety day 'transition period' of the facility to determine whether any issues arise that will need to be resolved before JJBDC can be populated with inmates." (Dkt. 183-4, "Graves Decl." ¶ 4). The County states that the technology used in the JJBDC facility differs from that of other County facilities, but did not explain, in its papers or at the hearing, why this would prevent the transfer of inmates in an emergency situation. (Graves Decl. ¶ 5).

Should the County be unable to implement adequate social distancing within its existing jail facilities and take other necessary steps to decrease risk of infection, this Court has the authority to order the transfer of prisoners to different facilities. Under California law, the Sheriff has the authority to relocate prisoners to respond to emergency situations:

> In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them.

Other courts, including the Superior Court for the County of Sacramento County, already have ordered the Sheriff to use its authority under Cal. Gov't Code § 8658 to respond to the coronavirus emergency. *See* Order Authorizing Sacramento County Sheriff's Department to Grant Release (Cal. Super. Ct., Sac. Cty., Mar. 25, 2020).

Defendant argues that the Prison Litigation Reform Act ("PLRA") precludes this Court from ordering the release of prisoners. Even assuming this is true, nothing in the

PLRA prohibits a district judge from ordering the transfer of prisoners in response to violations of their constitutional rights, as the district court did in *Brown v. Plata*, 2013 WL 3200587, No. C01-1351 TEH (N.D. Cal. June 24, 2013), nor would it prohibit the Court from ordering the Sheriff to use his authority under § 8658 to transfer prisoners.

"[A]n order to transfer any single inmate out of a prison to correct the violation of a constitutional right" where a "transfer was necessary for the inmate to obtain appropriate medical care" is not a "prisoner release order," but rather a transfer. *Plata v. Brown*, 2013 WL 3200587 at *8. The same is true of "a policy that would result in transfer of a large group of inmates." *Id.* Indeed, several potential courses of action qualify as "transfer" for the purposes of the PLRA. Relocation to halfway houses, for example, is a "transfer" rather than "release." The PLRA defines a "residential reentry center" as a form of "prerelease custody." See 18 U.S.C. § 3624(g)(2)(B) ("A prisoner placed in prerelease custody pursuant to this subsection who is placed at a residential reentry center shall be subject to such conditions as the Director of the Bureau of Prisons [(BOP)] determines appropriate."). Ninth Circuit case law assumes that a person in a "residential reentry center" is a "prisoner" and subject to BOP control. *See, e.g.*, *Bottinelli v. Salazar*, 929 F.3d 1196, 1200 (9th Cir. 2019) (citing 18 U.S.C. § 3624(c)(1) as "requiring that the BOP, 'to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term' in prerelease custody").

In *Plata v. Brown*, the court declined to decide which standard governs the court's review of such requests for transfer, finding that the *Plata* plaintiffs could satisfy the most burdensome standard. That standard "would require [them] to demonstrate that the [transfer] policy must be enforced because failure to do so would result in deliberate indifference under the Eighth Amendment." *Id.* at *10. The Court makes no determination here as to whether Plaintiff has met this standard, but notes that the County's recitation of "aggressive and swift" measures it has taken in response to COVID-19, *none* of which concern jails, suggests that the County's failure to act to protect inmates does indeed constitute deliberate indifference. (Opp. at 16). The County's assurances that it has provided unlimited free soap to prisoners and advised prisoners to remain physically distant—without establishing that it is physically possible to do so—is unlikely to be sufficient to defeat a claim of deliberate indifference (or sufficient to defeat the request to transfer prisoners for health reasons).

In sum, Defendant has failed to demonstrate that it is currently taking adequate precautions to protect the health of the prisoners in the county jails. Plaintiff's request that Defendant be required "to submit a plan to the Court to implement the Governor's order for physical distancing for all Californians housed in the jails" (Motion at 3-4), is therefore GRANTED.

Plaintiffs are instructed to submit a proposed order detailing the findings and outstanding questions from the April 13, 2020 hearing no later than 4:00 p.m. on April 15, 2020.  Prior to submission to the Court, Plaintiff shall share the proposed order with Defendant, who may approve the it as to form and content or submit objections to Court thereafter.

**IT IS SO ORDERED.**

# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                               )
MARIA ALEJANDRA CELIMEN SAVINO, )
JULIO CESAR MEDEIROS NEVES,     )
and all those similarly situated, )
                               )
              Petitioners,      )
                               )          CIVIL ACTION
       v.                       )          NO. 20-10617-WGY
                               )
STEVEN J. SOUZA, Superintendent of )
Bristol County House of Corrections )
in his official capacity,       )
                               )
              Respondent.       )
_____ )


YOUNG, D.J.                                   April 8, 2020

**MEMORANDUM & ORDER**

**I.   INTRODUCTION**

     This habeas petition reflects the petitioners' dire
personal circumstances and legal grievances.  Yet it also speaks
to the shared anxieties of a world brought to its knees by the
pandemic of the novel coronavirus, dubbed COVID-19.  It reaches
the Court at an especially grim moment.[1]  The petitioners are
civil immigration detainees who say they are held in tight
quarters and unable to keep safe distance from others who may --

_____

     [1] See Sarah Westwood, Surgeon General: This Week Will Be
Like a 'Pearl Harbor' and '9/11' Moment, CNN (Apr. 5, 2020 1:25
pm), https://www.cnn.com/2020/04/05/politics/jerome-adams-
coronavirus/index.html.

and with time, inevitably will -- carry the highly contagious
virus. They demand release or implementation of social
distancing and other hygienic practices recommended by
infectious disease experts.

Pending before this Court are their petition for a writ of
habeas corpus, their motion for class certification, and their
motion for a preliminary injunction. The Court is not yet ready
to rule on the underlying habeas petition or the motion for a
preliminary injunction. Rather, the Court ALLOWS the motion for
class certification, with slight modification, and takes this
opportunity to explain its reasoning with respect to bail. For
the health and safety of the petitioners -- as well as the other
inmates, staff, and the public -- the Court will expeditiously
consider bail for appropriate detainees.

**A.  Factual Background**

The named petitioners are two of approximately 148
individuals (the "Detainees") detained by Immigration and
Customs Enforcement ("ICE") on civil immigration charges and
held at the Bristol County House of Corrections ("BCHOC") in
North Dartmouth, Massachusetts. Pet. Writ Habeas Corpus
("Pet.") ¶ 1, ECF No. 1; Opp'n Mot. TRO ("Opp'n"), Ex. A, Aff.
Sheriff Thomas H. Hodgson ("Hodgson Aff.") ¶ 6(o), ECF No. 26-1.[2]

---

[2] Though Sheriff Hodgson's affidavit, dated March 29, 2020,
states that there are 148 ICE detainees in the BCHOC, the

The Detainees are held in two on-site facilities: ninety-two are
in a separate ICE facility called the C. Carlos Carreiro
Immigration Detention Center ("Carreiro"), and the rest are
housed in a portion of the BHCOC called "Unit B" together with
non-immigration pre-trial detainees.  Id.; Pet. ¶ 1; Opp'n 2.[3]

Since February, the respondent ("the government") asserts,
the medical team and administration of BCHOC "have instituted
strict protocols to keep inmates, detainees and staff safe and
take all prudent measures to prevent exposure to the COVID- 19
infection."  Hogdson Aff. ¶ 5.  Entrance into the facilities by
outsiders is now generally prohibited; attorneys, clergy, and
staff are "medically screened prior to entrance by questions
relating to COVID-19 symptoms and by body temperature
assessment."  Id. ¶ 6(a)-(d).  Inmates and detainees who are
over 60-years-old or are immuno-compromised "are being specially
monitored."  Id. ¶ 6(k).  In addition:

> All housing units are sanitized no less than three
> times per day.  Fresh air is constantly circulated by
> opening windows and utilizing handler/vents throughout
> the day.  All feeding is done inside the housing or

---

government provided the Court (in a submission dated April 1,
2020) with a list of 147 names received from ICE that it
represented as a complete roster of ICE detainees at BCHOC.  The
Court expects that this discrepancy be cleared up quickly.

[3] The government explains that "[o]nly detainees who have
been classified by ICE as high risk, typically based upon
violent behavior (and not in any way related to COVID-19), are
housed with non-immigration pre-trial inmates, but this is not
in the general population."  Opp'n 2.

[3]

cells and inmates do not congregate for meals in the
main dining hall.  Outside recreation is done as usual
daily except that it is now done on split schedule to
prevent close inmate-to-inmate contact.

Id. ¶ 6(f).  According to BCHOC's medical director, Dr. Nicholas

J. Rencricca, "we are doing all that we can to reduce the risk

of a COVID-19 outbreak within BCHOC."  Aff. Nicholas J.

Rencricca, MD, PhD ¶ 24.  As of April 8, 2020, "there have been

no inmates or immigration detainees who have presented with, or

have tested positive for, COVID-19" at BCHOC, though one "unit

intake nurse tested positive for COVID-19" and she last showed

up to work on March 24.  Decl. Debra Jezard ¶ 8; Def.'s Input

Apr. 8 List 1, ECF No. 58.

    The Detainees dispute much of this.  They allege, for

instance, that "BCHOC facilities lack adequate soap, toilet

paper, and medical resources and infrastructure to address the

spread of infectious disease or to treat people most vulnerable

to illness."  Pet. ¶ 70.  They also state that "[h]ygiene is . .

. unavailable and unavailing under the[ir] conditions," id. ¶ 6,

and that they "are unaware of any meaningful safety measures

enacted by Defendants since the inception of this crisis," id. ¶

28.  Their "confinement conditions are a tinderbox," the

Detainees warn, "that once sparked will engulf the facility."

Id. ¶ 29.  Yet there are important aspects of the Detainees'

allegations that are substantially undisputed.  Chief among
these is the challenge of social distancing in BCHOC.

The Centers for Disease Control and Prevention ("CDC")
states that "COVID-19 spreads mainly among people who are in
close contact (within about 6 feet) for a prolonged period," and
therefore recommends that everyone practice "social distancing"
-- even among those with no symptoms, since the virus can be
spread by asymptomatic people.  CDC, Social Distancing,
Quarantine, and Isolation (reviewed Apr. 4, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/social-distancing.html (last accessed Apr. 6, 2020).  The
CDC thus advises that everyone "[s]tay at least 6 feet (2
meters) from other people."  Id.  The CDC has issued guidance
specifically for prisons and detention centers that beat the
same drum.  CDC, Interim Guidance on Management of Coronavirus
Disease 2019 (COVID-19) in Correctional and Detention
Facilities, at 4 (Mar. 23, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-
correctional-detention.pdf ("Although social distancing is
challenging to practice in correctional and detention
environments, it is a cornerstone of reducing transmission of
respiratory diseases such as COVID-19."); id. ("Social
distancing is the practice of increasing the space between
individuals and decreasing the frequency of contact to reduce

the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic).").

The Detainees assert that they "find it impossible to maintain the recommended distance of 6 feet from others" and they "must also share or touch objects used by others." Pet. ¶ 67. They specifically allege that their beds "are situated only 3 feet apart" and that "[m]eals are inadequate and eaten in close quarters." Pet. ¶ 68. Indeed, the government has provided the Court with photos of the sleeping quarters in the facility and this appears to be an accurate description.[4] In one unit the "cell size" is listed as 30 feet by 10 feet (300 square feet), and the photo shows three bunk beds (sleeping six people) lining the wall. Other images supplied include a photo labeled "Bunk Area" that shows a large room packed with rows of bunk beds. None appears to enjoy anything close to six feet of isolation. One of the named petitioners, Mr. Neves, avers that he "is being held in the same room as 49 other people," that his "bed is too close to other people," and that he is "not able to

---

[4] The government protests that "not every bed is filled and the minimal distance is believed to be between ends, not the long sides of beds." Def.'s Suppl. Br. 9 n.6, ECF No. 41. The CDC's guidelines are concerned with people, not furniture, so the Court does not see what bearing the government's distinction (whether the beds are measured from their length or width) has upon the safety of the Detainees.

[ 6 ]

engage in 'social distancing.'"  TRO Mem., Ex. 8, Decl. Julio
Cesar Medeiros Neves ¶¶ 4-6, ECF No. 12-8.

The COVID-19 global pandemic threatens all of us.  Yet
"[t]he combination of a dense and highly transient detained
population presents unique challenges for ICE efforts to
mitigate the risk of infection and transmission."  Opp'n, Ex. 2,
Memorandum from Enrique M. Lucero, ICE, to Detention Wardens &
Superintendents 1 (Mar. 27, 2020), ECF No. 26-2.  As the Supreme
Judicial Court of Massachusetts recently explained in reference
to statewide correctional facilities, including BCHOC,
"correctional institutions face unique difficulties in keeping
their populations safe during this pandemic."  Committee for
Pub. Counsel Servs. v. Chief Justice of the Trial Court, No.
SJC-12926, 2020 WL 1659939, at *3 (Mass. Apr. 3, 2020).  Indeed,
BCHOC's medical director acknowledged the obvious fact "that a
prison setting poses particular challenges from an infectious
disease standpoint," while asserting that "the risk of infection
is tempered by the degree of control we have over access to the
facility."  Renricca Aff. ¶ 21.

The Detainees have provided affidavits from two physicians
who have recently visited Detainees on site.  Dr. Nathan
Praschan of Massachusetts General Hospital states that "[t]he
best-known methods of preventing infectious spread," such as
"social distancing, frequent hand washing, and sanitation of

[7]

surfaces . . . are unavailable to . . . [these] detainees, who sleep, eat, and recreate in extremely close quarters and do not have access to basic hygienic supplies." Decl. Dr. Nathan Praschan ¶ 9. Dr. Matthew Gartland of Brigham and Women's Hospital avers that "based on my own experience visiting Bristol County House of Corrections, I do not believe that . . . [these] detainees, can be adequately protected from the virus that causes COVID-19. This is based on a lack of private sinks or showers and inadequate hand soap supplies, and hand sanitizers, as well as inadequate allowance for social distancing, screening for symptoms and exposure to the virus, testing of individuals with symptoms, and appropriate quarantine and isolation facilities." Decl. Dr. Matthew Gartland ¶ 16.

**B. Procedural History**

The Detainees filed a habeas petition as a putative class action in this Court on March 27, 2020. Pet. The petition asserts two claims: (1) violation of due process as a result of confinement in conditions "that include the imminent risk of contracting COVID-19," id. ¶¶ 98-105; and (2) violation of section 504 of the Rehabilitation Act for failure to provide reasonable accommodations, in the form of protection against COVID-19, to Detainees with medical conditions, id. ¶¶ 105-116.

On the same day, the Detainees filed a motion for a temporary restraining order ("TRO"), ECF No. 11, and a motion

for class certification, ECF No. 13.  As these motions refer
only to the due process claim, the Detainees do not seek a TRO
or class certification for their claim under the Rehabilitation
Act.  See Mem. Supp. Mot. Temporary Restraining Order ("TRO
Mem."), ECF No. 12; Mem. Supp. Pls.' Mot. Class Cert. ("Class
Cert. Mem."), ECF No. 14; Reply Resp.-Def.'s Opp'n Mot. TRO
("Pet'rs' Reply") 16 n.6.  The Government has opposed both
motions.  See Opp'n; Def.'s Suppl. Br., ECF No. 41.

The Court held an initial hearing on March 30, 2020,
converting the motion for a TRO into a motion for a preliminary
injunction.[5]  ECF No. 27.  At the next hearing, on April 2, 2020,
the Court provisionally certified five subclasses and took the
other matters under advisement.  Electronic Clerk's Notes, ECF
No. 36; see Order, ECF No. 38 (listing twelve members of first
subclass).  The following day, the Court held another hearing at
which it was informed that the Government voluntarily agreed to
release six members of the first subclass.  The Court deemed the
case moot as to those individuals, ordered release on bail under
certain conditions for three other members of the subclass,[6] and

_____

[5] All hearings in this matter have been held remotely by
video conference in light of the danger posed by COVID-19.

[6] The bail order was as follows:

The Court grants bail to Henry Urbina Rivas, Robson
Maria-De Oliveira, and Jervis Vernon pending
resolution of the habeas corpus petition, upon all

[9]

either denied bail without prejudice or continued the matter for
the rest of the subclass.  Order, ECF No. 44.  The Court
notified the parties that it would consider bail for fifty
additional detainees, id. ¶ 6, and later set a schedule for
considering those fifty individual bail applications at a rate
of ten per day beginning on April 7, 2020.  Order, ECF No. 46.
It has since ordered bail for several more Detainees.  See ECF
Nos. 54-55.

---

bail conditions deemed appropriate and imposed by ICE,
and the following additional terms and conditions as
to each of them: (a) release only to an acceptable
custodian; (b) such custodian will pick the releasee
up outside the facility by car; (c) releasee will be
taken from the facility to the place of residence
previously identified to ICE (ICE shall notify the
state and local law enforcement authorities about
their presence and the[] details of their bail
status); (d) releasees are to be fully quarantined for
14 days from date leaving facility to the residence;
(e) during and after the 14-day quarantine, releasees
will remain under house arrest, without electronic
monitoring, and shall not . . . leave the residence
for any reason save to attend immigration proceedings
or attend to their own medical needs should those
needs be so severe that they have to go to a doctor's
office or hospital (in which case they shall notify
ICE as soon as practicable of their medical
necessity); (f) releasees are not to be arrested by
ICE officers unless: (i) upon probable cause a warrant
is issued by a United States Magistrate Judge or
United States District Judge that they have violated
any terms of their bail, or (ii) there is a final
order of removal making them presently removable from
the United States within two weeks. The Court may, sua
sponte or on motion of the parties, modify or revoke
the bail provided herein.

Order ¶ 2, ECF No. 44.

[10]

## II. ANALYSIS

This opinion tackles three issues.  First, the Court
rejects the government's argument that the Detainees lack
Article III standing because their risk of injury is too
speculative.  Next, the Court certifies a general class of
Detainees for their due process claim of deliberate indifference
to a substantial risk of serious harm.  Though there are indeed
pertinent and meaningful distinctions among the various
Detainees, there is a common question of unconstitutional
overcrowding that binds the class together.  Nor, contrary to
the government's assertion, is there a statutory bar to class
certification in this case.  Finally, the Court explains its
rulings and authority in ordering bail for certain Detainees.

### A. Article III Standing

To satisfy constitutional standing in federal court, a
habeas petitioner (like other litigants) "must have suffered, or
be threatened with, an actual injury traceable to the defendant
and likely to be redressed by a favorable judicial decision."
Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v.
Continental Bank Corp., 494 U.S. 472, 477 (1990)).  The
government argues the Detainees' "claims of future injury are
hypothetical" and "conjectural" because "crowding in and of
itself does not cause COVID-19 infection if none in the group
has contracted COVID-19."  Opp'n 15.

[11]

The Court disagrees.  The Supreme Court has held that
"future injuries" may support standing "if the threatened injury
is certainly impending, or there is a substantial risk that the
harm will occur."  Department of Commerce v. New York, 139 S.
Ct. 2551, 2565 (2019) (quoting Susan B. Anthony List v.
Driehaus, 134 S. Ct. 2334, 2341 (2014)).  In this moment of
worldwide peril from a highly contagious pathogen, the
government cannot credibly argue that the Detainees face no
"substantial risk" of harm (if not "certainly impending") from
being confined in close quarters in defiance of the sound
medical advice that all other segments of society now
scrupulously observe.[7]  See TRO Mem., Ex. 1, Decl. Alan S.
Keller, M.D. ¶ 10, ECF No. 12-1 ("[T]he risk of COVID-19
infection and spread in immigration detention facilities,

---

[7] Amazingly, the government appears to make this argument.
At the April 2 hearing, the government emphasized that no
Detainee or inmate in BCHOC has yet tested positive for COVID-19
and argued that "if the Court starts from the position that the
Court's goal here is to reduce the concentration of inmates it
has jumped past the presence, or non-presence, of the virus to
an assumption that the virus is present and therefore we're
going to do everything we can to increase social distancing."
In a later filing the government reiterated the point: "It is
ICE's position, for the record, that release of none of the
listed individuals is required for either their safety or the
safety of the remaining civil detainee population at BCHOC."
Defs.' Input Regarding Apr. 7 List 1, ECF No. 50.  Yet the
government's quarrel is not with the Court but with the vigorous
recommendations of infectious disease experts worldwide,
including in the federal government, to maximize social
distancing.

including Bristol County, is extremely high."). This risk of injury is traceable to the government's act of confining the Detainees in close quarters and would of course be redressable by a judicial order of release or other ameliorative relief.

Accordingly, the Court rules that the Detainees easily meet Article III's standing requirements.

**B.   Class Certification**

The Detainees moved to certify the following proposed class: "All civil immigration detainees who are now or will be held by Respondents-Defendants at the Bristol County House of Corrections (BCHOC) and the C. Carlos Carreiro Immigration Detention Center ("Carreiro") in North Dartmouth, Massachusetts." Class Cert. Mem. 9. At the hearing on April 2, 2020, the Court declined to certify the class as proposed but provisionally certified five subclasses. Electronic Clerk's Notes, ECF No. 36.[8] The Court does not now revisit that

---

[8] The Court described the five provisionally certified subclasses as follows:
Group 1: Detainees with no criminal record and no pending criminal charges.
Group 2: Detainees with medical conditions recognized under the CDC guidelines as heightening their risk of harm from COVID-19 and who have minor, non-violent criminal records or minor, non-violent criminal charges pending.
Group 3: Detainees without the medical conditions of Group 2 but who likewise have minor criminal records or minor, primarily non-violent criminal charges pending.
Group 4: Detainees with pending criminal charges against them for violent crimes, either in the United States or abroad.

[13]

provisional ruling.[9]  Yet it does, for the reasons given below,

now certify the general class as proposed by the Detainees,

albeit excluding those not yet in custody.

**1.   Bar on Classwide Injunction in Immigration Matters**

The government first argues that the proposed class cannot

be certified because 8 U.S.C. § 1252(f)(1) bars courts (other

than the Supreme Court) from enjoining or restraining the

"operation" of immigration enforcements actions except in their

application to "an individual alien against whom proceedings

under such chapter have been initiated."  Opp'n 9.  The

government cites dicta from <u>Reno</u> v. <u>American Arab Anti-</u>

<u>Discrimination Comm.</u> indicating that classwide injunctive relief

───────────────

<u>Group 5</u>: Detainees with criminal convictions for violent
crimes, either in the United States or abroad.

[9] The government argues, without citation to authority, that
"Rule 23(c)(5) requires that there be a class first before
subclasses are created."  Def.'s Suppl. Br. 8.  The Court has
found only one judicial opinion seemingly endorsing that view,
<u>Sprague</u> v. <u>General Motors Corp.</u>, 133 F.3d 388, 399 n.9 (6th Cir.
1998) (en banc), while the Eleventh Circuit disagrees, <u>Klay</u> v.
<u>Humana, Inc.</u>, 382 F.3d 1241, 1261–62 (11th Cir. 2004).  <u>See</u> 3
William B. Rubenstein, <u>Newberg on Class Actions</u> § 7:29 n.1 (5th
ed. 2019) (citing circuit split); Scott Dodson, <u>Subclassing</u>, 27
Cardozo L. Rev. 2351, 2389 (2006) (concluding that "the best
interpretation" of Fed. R. Civ. P. 23 allows subclasses to be
certified in the absence of a valid general class).  The First
Circuit recently suggested that "[t]he commonality standard
might also be satisfied in some cases by certifying subclasses."
<u>Parent/Professional Advocacy League</u> v. <u>City of Springfield</u>, 934
F.3d 13, 29 n.15 (1st Cir. 2019) (citing Mark C. Weber, <u>IDEA</u>
<u>Class Actions After Wal-Mart v. Dukes</u>, 45 U. Tol. L. Rev. 471,
498–500 (2014)).  In any case, because the Court now certifies
the general class, the question is academic.

is simply not available in immigration cases.  525 U.S. 471,
481-82 (1999) (describing § 1252(f) as "prohibit[ing] federal
courts from granting classwide injunctive relief against the
operation of [8 U.S.C.] §§ 1221-1231").  Thus, the government
appears to argue, the Court cannot certify this class now
because it will not later be able to provide classwide relief.

Yet section 1252(f) says nothing about declaratory relief,
which the Detainees expressly request here in addition to
injunctive relief.  Pet. 24.  Accordingly, this provision does
not bar declaratory relief and therefore poses no obstacle to
class certification.  See Reid v. Donelan, 390 F. Supp. 3d 201,
226 (D. Mass. 2019) (Saris, C.J.); Rodriguez v. Marin, 909 F.3d
252, 256 (9th Cir. 2018); Alli v. Decker, 650 F.3d 1007, 1014
(3d Cir. 2011).  Seeking to avoid this conclusion, the
government cites a Sixth Circuit decision for the proposition
that declaratory relief may be the "functional equivalent" of a
prohibited classwide injunction.  Opp'n 11 (quoting Hamama v.
Adducci, 912 F.3d 869, 880 n.8 (6th Cir. 2018)).  The Sixth
Circuit opinion was issued after three Justices argued to the
contrary in Jennings v. Rodriguez, 138 S. Ct. 830, 876 (2018)
(Breyer, J., dissenting), but before three other Justices
agreed, see Nielsen v. Preap, 139 S. Ct. 954, 962 (2019)
(plurality opinion).  With six Justices of the current Supreme
Court now on record stating that section 1252(f) does not bar

[15]

declaratory relief, and because that is the better reading of the statute, the Court adheres to that view.  <u>See</u> <u>Reid</u>, 390 F. Supp. 3d at 226; <u>Reid</u> v. <u>Donelan</u>, No. 13-30125-PBS, 2018 WL 5269992, at *7-8 (D. Mass. Oct. 23, 2018) (Saris, C.J.).

This is not to suggest that injunctive relief will be categorically unavailable in this case.  <u>See</u> <u>Marin</u>, 909 F.3d at 256 (allowing a classwide injunction when all members of the class were individuals against whom detention proceedings had been initiated, in accordance with the exception contained in section 1252(f)(1)).  Nor does the Court intimate that it will eventually provide any relief at all, since it has not yet reached the merits.  At this class certification stage, it is enough to establish that the Court <u>could</u> provide a classwide remedy in the form of a declaratory judgment or injunctive relief.  Having established that, the Court rejects the government's argument that section 1252(f) precludes class certification.

**2.   The Requirements of Rule 23**

"To obtain class certification, the plaintiff must establish the four elements of [Fed. R. Civ. P.] 23(a) and one of several elements of Rule 23(b)."  <u>Smilow</u> v. <u>Southwestern Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 38 (1st Cir. 2003) (citing <u>Amchem Prods., Inc.</u> v. <u>Windsor</u>, 521 U.S. 591, 614 (1997)). Rule 23(a) permits class certification only if:

[16]

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to establishing these four elements, the
Detainees must satisfy one of Rule 23(b)'s categories.  The
Detainees rely on Rule 23(b)(2), Class Cert. Mem. 16-17, which
permits class certification when "the party opposing the class
has acted or refused to act on grounds that apply generally to
the class, so that final injunctive relief or corresponding
declaratory relief is appropriate respecting the class as a
whole."  Fed. R. Civ. P. 23(b)(2).

Since numerosity and adequacy appear well-founded, the
government challenges only the commonality and typicality of the
proposed class.  Opp'n 13 ("The proposed class lacks uniformity
and the Plaintiffs are not representative of the proposed class
members.").  Though commonality and typicality are distinct
elements under Rule 23(a), the Supreme Court has repeatedly
recognized that they "tend to merge."  Wal-Mart Stores, Inc. v.
Dukes, 564 U.S. 338, 349 n.5 (2011) (quoting General Tel. Co. of
Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).  Indeed, the
government attacks both commonality and typicality with the same
set of arguments.  The gist of the government's contention on

[17]

this score is that the various detainees are not "similarly situated" because they "are of different ages and all present different levels of health at this time."  Opp'n 12. Furthermore, the government points out that some detainees are subject to statutorily mandated detention while others are not, and that "each detainee presents a different risk of flight and/or public safety threat if released."  Id.  Accordingly, the Court treats commonality and typicality together.

To establish commonality under Rule 23(a)(2), one common question is enough.  Wal-Mart, 564 U.S. at 359.  "A question is common if it is 'capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  Parent/Professional Advocacy League v. City of Springfield, 934 F.3d 13, 28 (1st Cir. 2019) (quoting Wal-Mart, 564 U.S. at 350).  It is not critical whether common "questions" are raised; the decisive factor is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  Id. (quoting Wal-Mart, 564 U.S. at 350).

The Detainees frame the common question as follows: "Whether the conditions of confinement at Bristol County Immigration Detention Facilities, under the current conditions and in light of the COVID-19 pandemic, render class members'

[18]

confinement a punishment that violates constitutional

standards." Class Cert. Mem. 18-19. Here, as is typical in the

Rule 23 commonality inquiry, "proof of commonality necessarily

overlaps with [the Detainees'] merits contention." Wal-Mart,

564 U.S. at 352. Accordingly, the Court now discusses the

merits of the Detainees' constitutional claim, but only to the

extent necessary to decide the class certification question.

See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S.

455, 466 (2013) ("Merits questions may be considered to the

extent -- but only to the extent -- that they are relevant to

determining whether the Rule 23 prerequisites for class

certification are satisfied.").

When the government "so restrains an individual's liberty

that it renders him unable to care for himself, and at the same

time fails to provide for his basic human needs -- e.g., food,

clothing, shelter, medical care, and reasonable safety -- it

transgresses . . . the Due Process Clause." DeShaney v.

Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989).

The due process guarantee of the Constitution obliges the

government "to refrain at least from treating a pretrial

detainee with deliberate indifference to a substantial risk of

serious harm to health." Coscia v. Town of Pembroke, 659 F.3d

37, 39 (1st Cir. 2011) (citing City of Revere v. Massachusetts

Gen. Hosp., 463 U.S. 239, 244 (1983) & Farmer v. Brennan, 511

[19]

U.S. 825, 835 (1994)).  "Proof of deliberate indifference
requires a showing of greater culpability than negligence but
less than a purpose to do harm," id. (citing Farmer, 511 U.S. at
835), "and it may consist of showing a conscious failure to
provide medical services where they would be reasonably
appropriate," id. (citing Estelle v. Gamble, 429 U.S. 97, 104
(1976)).  "To show such a state of mind, the plaintiff must
provide evidence that the defendant had actual knowledge of
impending harm, easily preventable, and yet failed to take the
steps that would have easily prevented that harm."  Leite v.
Bergeron, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting Zingg v.
Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (further citation
and internal quotation marks omitted).  "This standard,
requiring an actual, subjective appreciation of risk, has been
likened to the standard for determining criminal recklessness."
Id. at 53 (quoting Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st
Cir. 1999)).  Courts generally apply the same standard for civil
immigration detainees as for pre-trial detainees.  See E. D. v.
Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019) (stating that "the
legal rights of an immigration detainee [are] analogous to those
of a pretrial detainee" and collecting cases of other circuits).

With this legal background in mind, it is understandable
why the government highlights the differences among the
Detainees.  For example, it may be easier for Detainees who are

at heightened risk of harm from COVID-19 to prove the "substantial risk of serious harm" prong of the inquiry than it will be for healthier Detainees who lack special risk factors. Detainees with a serious criminal background might have a tougher time demonstrating that the government could "have easily prevented that harm" by releasing them on bond, for instance.  Indeed, these very considerations guided the Court in provisionally certifying five separate subclasses.

Upon reflection, however, the Court determines that the admittedly significant variation among the Detainees does not defeat commonality or typicality.  At bottom, a common question of law and fact in this case is whether the government must modify the conditions of confinement -- or, failing that, release a critical mass of Detainees -- such that social distancing will be possible and all those held in the facility will not face a constitutionally violative "substantial risk of serious harm."  Farmer, 511 U.S. at 847.  Crucial to the Court's determination is the troubling fact that even perfectly healthy detainees are seriously threatened by COVID-19.  To be sure, the harm of a COVID-19 infection will generally be more serious for some petitioners than for others.  Yet it cannot be denied that the virus is gravely dangerous to all of us.

Consider recent data from the CDC.  In a sample of COVID-19 patients aged 19 and older with no underlying health conditions

or risk factors, approximately 7.2-7.8% were hospitalized
without requiring admission to the Intensive Care Unit ("ICU"),
and an additional 2.2-2.4% were hospitalized in the ICU,
totaling 9.6-10.4%.  If the pool is restricted to patients
between the ages of 19 and 64, all with no underlying health
conditions reported, approximately 6.2-6.7% were hospitalized
without admission to the ICU, and an additional 1.8-2.0%
required the ICU, for a total hospitalization rate of 8-8.7%.
The rates of hospitalization and ICU admittance are
significantly higher for those with underlying health
conditions.[10]  Since COVID-19 is highly contagious and the
quarters are close, the Detainees' chances of infection are
great.  Once infected, taking hospitalization as a marker of
"serious harm," it is apparent that even the young and otherwise
healthy detainees face a "substantial risk" (between five and
ten percent) of such harm.

Likewise, the "deliberate indifference" part of the
inquiry, which asks whether the government "disregards th[e]

---

[10] See Nancy Chow et al., CDC COVID-19 Response Team,
Preliminary Estimates of the Prevalence of Selected Underlying
Health Conditions Among Patients with Coronavirus Disease 2019 —
United States, February 12–March 28, 2020, 69 Morbidity &
Mortality Weekly Report 382, 382-84 (Apr. 3, 2020),
https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.  It
must be emphasized that this data is partial and preliminary.
See id. at 384-85 (listing six limitations on the report's
findings).

[22]

risk by failing to take reasonable measures to abate it,"
Farmer, 511 U.S. at 847, is apt to generate a common answer for
the entire class of Detainees.  The question is not so much
whether any particular Detainee should be released -- a matter
as to which the various individuals are surely differently
situated.  Rather, the question is whether the government is
taking reasonable steps to identify those Detainees who may be
released in order to protect everyone from the impending threat
of mass contagion.  Nor does it matter how the density of
Detainees is reduced.  Transfer to less crowded facility,
deportation, release on bond, or simply declining to contest
lawful residence -- any of these methods would effectively
minimize the concentration of people in the facility.  This
affords the government greater flexibility and minimizes the
differences among the various Detainees.

The case law supports a finding of commonality for class
claims against dangerous detention conditions, even when some
detainees are more at risk than others.  For example, the Ninth
Circuit affirmed class certification for an Eighth Amendment
challenge to inmate medical care policies, explaining that
"although a presently existing risk may ultimately result in
different future harm for different inmates -- ranging from no
harm at all to death -- every inmate suffers exactly the same
constitutional injury when he is exposed to a single statewide

[ 23 ]

[department of corrections] policy or practice that creates a
substantial risk of serious harm." Parsons v. Ryan, 754 F.3d
657, 678 (9th Cir. 2014). Similarly, the Fifth Circuit affirmed
class certification of all prisoners in an overheated prison,
despite the variations in health and risk among prisoners,
because the prison authority's "heat-mitigation measures . . .
were ineffective to reduce the risk of serious harm to a
constitutionally permissible level for any inmate, including the
healthy inmates." Yates v. Collier, 868 F.3d 354, 363 (5th Cir.
2017). Here, too, even the otherwise healthy Detainees face a
substantial risk of serious harm from COVID-19. The commonality
analysis of Parsons and Yates is persuasive and has been
approvingly cited by the First Circuit. See
Parent/Professional, 934 F.3d at 28 n.14. Accordingly, the
Court rules that the commonality and typicality prongs of the
Rule 23(a) analysis are satisfied.

Before certifying the class, the Court pauses to consider
the uniformity of remedy required by Rule 23(b)(2). See Wal-
Mart, 564 U.S. at 360 (holding that "Rule 23(b)(2) applies only
when a single injunction or declaratory judgment would provide
relief to each member of the class. It does not authorize class
certification when each individual class member would be
entitled to a different injunction or declaratory judgment
against the defendant."). Thus, the Court may certify the class

only if it would be entitled to an "indivisible" remedy.  Id.
The Court concludes that a uniform remedy would be possible in
this case, whether in the form of declaratory relief or
(depending on the proper reading of 8 U.S.C. § 1252(f), as
alluded to above) an injunction ordering the government to
reduce crowding of Detainees.  Cf. Brown v. Plata, 563 U.S. 493,
502 (2011) (affirming classwide injunction of "court-mandated
population limit" in state prisons to remedy Eighth Amendment
violations due to "severe and pervasive overcrowding").

    Thus, the requirements of Rule 23 are met and the Court
certifies the general class as proposed by the Detainees, with
one caveat: The Court declines to include those who "will be
held," Class Cert. Mem. 9, but are not yet in custody.  Although
the government has not declared that it will not admit more
detainees to BCHOC during this health crisis, it has agreed to
notify the Court before doing so.  Tr. Hr'g 25, ECF No. 48.  The
Court sees no need to include possible future detainees in this
class.  Moreover, since the situation is rapidly evolving and
future detainees may well be subject to different confinement
conditions than those now obtaining, it may be that the named
representative cannot "fairly and adequately protect the
interests" of those future detainees.  Fed. R. Civ. P. 23(a)(4);
cf. Amchem, 521 U.S. at 625-26 (holding that differences between

[ 25 ]

currently injured and not-yet-injured members of proposed class
defeated adequacy requirement).

**C.  The Court's Inherent Authority to Order Bail**

The Court now turns to explain its decision to order bail
for several Detainees and to consider bail applications for
others.  The First Circuit has explained "that a district court
entertaining a petition for habeas corpus has inherent power to
release the petitioner pending determination of the merits."
Woodcock v. Donnelly, 470 F.2d 93, 94 (1st Cir. 1972) (per
curiam).  Such authority may be exercised in the case of "a
health emergency," where the petitioner has also demonstrated a
likelihood of success on the merits.  Id.  For example, Woodcock
approvingly cited Johnston v. Marsh, in which the Third Circuit
affirmed the decision of the district court granting bail to a
habeas petitioner who, "as an advanced diabetic, was, under
conditions of confinement, rapidly progressing toward total
blindness."  227 F.2d 528, 529-32 (3d Cir. 1955).  In Mapp v.
Reno, the Second Circuit held that "the federal courts have the
same inherent authority to admit habeas petitioners to bail in
the immigration context as they do in criminal habeas case."
241 F.3d 221, 223 (2d Cir. 2001).  A court considering bail for
a habeas petitioner "must inquire into whether 'the habeas
petition raise[s] substantial claims and [whether] extraordinary
circumstances exist[] that make the grant of bail necessary to

[ 26 ]

make the habeas remedy effective.'"  Id. at 230 (alterations in
original) (quoting Iuteri v. Nardoza, 662 F.2d 159, 161 (2d Cir.
1981)).

Other courts, including another session of this Court, have
recently relied on Mapp to order bail for habeas petitioners who
were civil immigration detainees at risk due to the COVID-19
pandemic.  See Avendaño Hernandez v. Decker, No. 20-CV-1589
(JPO), 2020 WL 1547459, at *2-4 (S.D.N.Y. Apr. 1, 2020); Jimenez
v. Wolf, Civ. A. No. 18-10225-MLW, Memorandum & Order ("Jimenez
Order"), ECF No. 507 (D. Mass. Mar. 26, 2020) (Wolf, J.).  As
expressed during the hearing on April 3, the Court follows these
precedents in construing its authority to order bail for habeas
petitioners under the reigning "exceptional circumstances,"
Glynn v. Donnelly, 470 F.2d 95, 98 (1972), of this nightmarish
pandemic.  Like Judge Wolf in Jiminez and Judge Oetken in
Hernandez, this Court ruled that bail was appropriate for some
Detainees on the basis of Mapp and its First Circuit analogues.[11]

---

[11] The First Circuit in Glynn stated that bail should not be
ordered without "a clear case" on both the law and the facts,
and that "Merely to find that there is a substantial question is
far from enough," 470 F.2d at 98, and Woodcock indicated that a
finding of likelihood of success on the merits may be needed,
470 F.2d at 94.  This contrasts with Mapp, which required only
(apart from the presence of extraordinary circumstances) that
the petitioner raise "substantial claims."  241 F.3d at 230.
Yet, as Judge Wolf observed, the First Circuit cases were
dealing with a state prisoner convicted of a crime and for that
reason insisted upon a higher standard, see Glynn, 470 F.2d at
98, whereas here "the Mapp test or something similar or perhaps

Additionally, the Court follows the light of reason and the expert advice of the CDC in aiming to reduce the population in the detention facilities so that all those who remain (including staff) may be better protected.  In this respect, the Supreme Judicial Court of Massachusetts has articulated sound principles: "[T]he situation is urgent and unprecedented, and . . . a reduction in the number of people who are held in custody is necessary," but "the process of reduction requires individualized determinations, on an expedited basis, and, in order to achieve the fastest possible reduction, should focus first on those who are detained pretrial who have not been charged with committing violent crimes."  <u>Committee for Pub. Counsel Servs.</u>, 2020 WL 1659939, at *9.[12]  The Court will proceed in a similar fashion in diligently entertaining bail applications while the petitions for habeas corpus are pending.

---

less is appropriate."  <u>Jimenez</u> Order, Ex. 1, at 1-2, ECF No. 507-1.  This Court agrees, though it makes little difference because the Detainees released on bail would also satisfy a more exacting standard.

[12] With respect to federal prisons, Congress responded to the pandemic by expressly authorizing the Bureau of Prisons to exceed the statutory maximum period of home confinement if the Attorney General makes a finding of "emergency conditions," CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020), and the Attorney General has now found such an emergency.  <u>See</u> Memorandum of Attorney General William Barr to Director of Bureau of Prisons (Apr. 3, 2020), https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

**III. CONCLUSION**

The motion for class certification is <u>ALLOWED</u>.  The Court now certifies the following class: "All civil immigration detainees who are now held by Respondents-Defendants at the Bristol County House of Corrections and the C. Carlos Carreiro Immigration Detention Center in North Dartmouth, Massachusetts." The named petitioners in this action, Maria Alejandra Celimen Savino and Julio Cesar Medeiros Neves, are appointed class representatives.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LILIAN PAHOLA CALDERON JIMENEZ      )
AND LUIS GORDILLO, ET AL.,          )
individually and on behalf of all   )
others similarly situated,          )
                                    )
        Petitioners-Plaintiffs,     )
                                    )
            v.                      )    C.A. No. 18-10225-MLW
                                    )
CHAD WOLF, ET AL.,                  )
                                    )
        Respondents-Defendants.     )

<u>MEMORANDUM AND ORDER</u>

WOLF, D.J.                                     March 26, 2020


        Attached is a transcript of the decision, issued orally on

March 25, 2020, granting the Motion for Immediate Interim Release

of Class Member Salvador Rodriguez-Aguasviva (Docket No. 500).


UNITED STATES DISTRICT JUDGE

Case 1:18-cv-10225-MLW   Document 507-1   Filed 03/26/20   Page 1 of 7
Case 8:20-cv-01028-PX   Document 3-2   Filed 04/21/20   Page 134 of 140

1

```
                              * * * * *

  1

  2          THE COURT:  I'm going to decide this matter, and I will

  3     explain my decision.  The transcript will be a record of the

  4     decision and you must order it.  It's possible I'll write this

  5     up, but I do think this is an urgent matter and I should tell

  6     you my decision, so I will.

  7          First, I've concluded for the reasons described by the

  8     Second Circuit in Mapp v. Reno, 241 F. 3d 221 at 230, a 2001

  9     Second Circuit case, that District Courts do have the power to

03:23 10     order the release of immigration detainees on bail.  I don't

 11     think that the REAL ID Act alters that fundamental authority.

 12          As I said earlier, I believe that the Glynn v. Donnelly

 13     case, the First Circuit case, 470 F.2d 95, 98 is

 14     distinguishable in a material respect.  In Glynn, the First

 15     Circuit did hold that in certain extraordinary circumstances a

 16     District Court could release a detained petitioner before the

 17     petition was decided on the merits.  It created a higher

 18     standard or stated a higher standard than the Second Circuit in

 19     Mapp.  In Glynn, the petitioner was somebody who had been

03:24 20     convicted of a crime.  I believe his appeal had been denied,

 21     and then he was petitioning for habeas corpus, but he had no

 22     presumption of innocence.

 23          In this case, it's important to remember we're talking

 24     about a civil detainee, somebody who has never been charged,

 25     let alone convicted of any crime.  And I think that the Mapp
```

1      test or something similar or perhaps less is appropriate.  As I

2      said, the Mapp test where the court in Mapp said -- I don't

3      know -- somebody perhaps didn't mute their phone because,

4      unless I'm hearing the court reporter, there's something

5      clicking, banging.

6          But the court in Mapp said the court considering a habeas

7      petitioner's fitness for bail must inquire into whether the

8      habeas petitioner raises substantial claims and whether

9      extraordinary circumstances exist to make the grant of bail

03:25 10   necessary to make the habeas remedy effective.  And I would add

11     to that that, even if those requirements are met, the court

12     would have to be satisfied that the petitioner would not be a

13     danger to the community, reasonably assured that the petitioner

14     would not be a danger to the community or not would flee if

15     released on reasonable feasible conditions.

16         I do find, without expressing any prediction of how the

17     merits will be resolved, that a substantial claim or question

18     is raised by the petitioner's habeas petition.  The initial

19     description by ICE of the reason for his detention -- well, the

03:26 20   reason for his detention sent to petitioner's counsel in an

21     email was that in effect -- well, that he was likely to be

22     unable -- the petitioner was likely to be unable to receive an

23     approved I-601A because he did not appear at his removal

24     hearing.  He was ordered removed in absentia.  The essence of

25     this, the way it was stated initially indicated that ICE was

Case 1:18-cv-10225-MLW   Document 507-1   Filed 03/26/20   Page 3 of 7
Case 8:20-cv-01028-PX   Document 3-2   Filed 04/21/20   Page 136 of 140

3

1    under the impression or misimpression that the petitioner is

2    ineligible for an I-601A.

3        While I've commended Mr. Lyons and Mr. Charles on many

4    things they've done, since June 2018, I have found ICE has

5    repeatedly failed to understand its own regulations as I held

6    in 2018.  And I learned, to my dismay, in the fall of 2019,

7    when the witness responsible for much of the national program

8    for many years testified that he didn't understand -- he didn't

9    realize there was a regulation that required that everybody

03:28 10   detained more than six months had to be interviewed.  It would

11   be sadly consistent with the pattern in this case if ICE

12   misunderstood whether somebody who failed to appear for a

13   removal hearing was ineligible for an I-601A.

14       And indeed it appears that ICE's position has evolved and

15   they don't take that position anymore.  Mr. Lyons has

16   articulated in his declaration other reasons for the detention,

17   but there is the question of whether those reasons were in his

18   mind when he decided to detain the petitioner or whether the

19   affidavit that appears to have been drafted by a lawyer has

03:29 20   rationalizations that weren't part of the decisionmaking

21   process at issue.  That's an issue that I may need to hear

22   testimony on.  I also -- but I do think that there's a

23   substantial question, a substantial claim.

24       In addition, I find that extraordinary circumstances exist

25   that make the grant of bail necessary to make the habeas

Case 1:18-cv-10225-MLW   Document 507-1   Filed 03/26/20   Page 4 of 7
Case 8:20-cv-01028-PX   Document 3-2   Filed 04/21/20   Page 137 of 140

4

1    effective, to make the habeas remedy effective.  To be blunt,

2    we're living in the midst of a coronavirus pandemic.  Some

3    infected people die; not all, but some infected people die.  If

4    the petitioner is infected and dies, the case will be moot.

5    The habeas remedy will be ineffective.

6        And being in a jail enhances risk.  Social distancing is

7    difficult or impossible.  Washing hands repeatedly may be

8    difficult.  There is, it appears not to be disputed, one

9    court -- one Plymouth County jail employee who has been

03:31 10   infected, and there's a genuine risk that this will spread

11   throughout the jail.  Again, the petitioner is in custody with

12   people charged with or convicted of crimes.  He's not been

13   charged or convicted of anything.

14       I've also considered what I ordinarily consider in making

15   or reviewing bail decisions in criminal cases.  There's no

16   contention that the petitioner will be dangerous to any

17   individual or the community if he's released on reasonable

18   conditions.

19       ICE does contend that he would be a risk of flight.  That

03:32 20   is based on the fact that he missed one immigration hearing at

21   which his removal was ordered and apparently did not tell ICE

22   of his change of address.  And he is facing a serious risk of

23   being removed.  He may not prevail on the habeas petition.  And

24   if he does, he may not get a provisional waiver.

25       However, there's no indication that the petitioner has

Case 1:18-cv-10225-MLW   Document 507-1   Filed 03/26/20   Page 5 of 7
Case 8:20-cv-01028-PX   Document 3-2   Filed 04/21/20   Page 138 of 140

5

1    anyplace to go.  Being among other people, say, in a homeless

2    shelter is very dangerous, like being in a jail.  There's no

3    indication that he has any relatives or others who might take

4    him in other than his wife.  And I am ordering that he live

5    with his wife in Lawrence, Massachusetts; that he stay in their

6    residence, except if there is a medical need for him to leave;

7    and, unless it's a genuine emergency, he would need the

8    permission of ICE to leave.  And he is to be on electronic

9    monitoring, so if he leaves the residence when he hasn't been

03:33 10    authorized to leave, ICE would know that and, if appropriate,

11    could come back to me to revoke his release.

12        In addition, there are certain equities that favor the

13    release of the petitioner.  He's now been detained since

14    September 4, 2019.  On January 27, the motion was filed to

15    enjoin his removal.  As I indicated in the course of the

16    argument, with the assent of petitioner's counsel, class

17    counsel, ICE has repeatedly been given extensions of time to

18    respond to the motion.

19        On January 31, 2020, the parties filed a joint motion to

03:35 20    give ICE until February 14 to confer, and then on February 13,

21    the respondents filed an unopposed motion for an extension of

22    time to file their opposition until February 20, which I

23    allowed.  Then I was asked not to schedule a hearing in this

24    case until after March 25 because Mr. Lyons would not be

25    available from March 10 to 24.  I accommodated that.  And I was

Case 1:18-cv-10225-MLW   Document 507-1   Filed 03/26/20   Page 6 of 7
Case 8:20-cv-01028-PX   Document 3-2   Filed 04/21/20   Page 139 of 140

6

1    told that local counsel, Ms. Piemonte, would be on trial until

2    April 6.  On March 19 I allowed the respondent's motion for

3    respondents to file a sur-reply.  And though it's possible,

4    except for ICE asking for and receiving extensions of time to

5    respond or file a sur-reply, that there would have been a

6    hearing and a decision on this case earlier.

7         So essentially we're in a circumstance where an individual

8    who has not been accused of any crime has been detained for --

9    I think it comes to about six and a half months.  Part of that

03:36 10   is because I've stayed his removal pending the decision on his

11   motion to enjoin removal, but because of accommodations to ICE,

12   that wasn't fully briefed until less than a week ago, and I had

13   been asked to defer to Mr. Lyons' availability, which I did.

14        So for all of those reasons, I'm ordering that the

15   petitioner be released no later than tomorrow, March 26, 2020,

16   on the conditions I articulated and will memorialize in a brief

17   order.

18        I'm ordering counsel for ICE to inform me when he has been

19   released, and if there's some problem with implementing this

03:38 20   order by tomorrow, you'll have to let me know promptly.

21   Petitioners' counsel I'm directing, ordering, to inform the

22   petitioner and his wife of my decision, including the

23   requirements that he live with his wife and that he be on

24   electronic monitoring.  And he'll have to confirm for ICE,

25   he'll have to provide ICE her address if they don't have it and

Case 1:18-cv-10225-MLW   Document 507-1   Filed 03/26/20   Page 7 of 7
Case 8:20-cv-01028-PX   Document 3-2   Filed 04/21/20   Page 140 of 140

7

1   confirm her willingness to have her husband with her for the

2   duration of this case.

3                              *  *  *  *  *