**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

KEITH SETH, *et al*.                          :
                                              :
          **Plaintiffs-Petitioner**           :
                                              :
     **v.**                                   :
                                              :        **Civil Action No. 20-1028 PX**
**MARY LOU MCDONDOUGH**                        :
                                              :
          **Defendant-Respondent.**           :

## DEFENDANT MARY LOU MCDONOUGH'S AMENDED RESPONSE AND OPPOSITION TO TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant, Mary Lou McDonough, by and through counsel, respectfully submits the following amended opposition to the plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction:

### I.  INTRODUCTION

The COVID 19, or "coronavirus" pandemic currently afflicting this country is well-documented. Maryland citizens, like those in most states, are currently under an executive order signed by the Governor to stay home. Residents' ordinary daily lives have been greatly affected – extensive limitations have been placed on access to recreational areas, non-emergency health care, travel, shopping, dinning etc. The response to the virus by public officials has been evolving as the medical community learns more about the virus.  Social distancing and frequent hand washing are the call of the day.

The virus is serious and can result in death. Most cases, however, result in mild symptoms that do not require hospitalization. The most significant aspect of the current virus is its contagiousness. Never before has the country experienced a virus as contagious as COVID 19. Because of this, and despite the national shut-down and social distancing efforts,

1

the virus continues to spread. As of the date (and time) of this writing there have been over 900,000 confirmed cases of COVID 19 infection and over 52,500 deaths in the United States. It is so contagious that it has even found its way into Wyoming, the last state to report a case and the state with the least population and fewest persons per square mile (5.8).[1]

As noted by the plaintiffs, controlling the virus within the confines of a correctional setting is particularly challenging. Indeed, the affidavits submitted by plaintiffs experts concede that "Containing this virus in the community has been difficult and it is almost impossible in correctional health settings give the congregate environment" (Complaint exhibit 32, Benninger Affidavit page 6) (see also complaint exhibit 30, Myer Declaration paragraph 24 – "it will be impossible for prison health systems to contain it"). Despite acknowledging the inevitable, plaintiffs complain that Defendant McDonough, Director of the Prince George's County Correctional Center, has not done enough to prevent or mitigate its spread, so much so that their constitutional rights to safety have been violated.

Plaintiffs purport to report the conditions in the jail through declarations/affidavits, that are of dubious origin (the "standard questions" that were purportedly put to the declarants have not been disclosed, the responses do not reflect standard questions, and the affidavits are unsigned despite the fact that attorneys are still permitted to visit with clients) and which contain numerous contradictions, opinions, and hearsay. The affidavits of the experts submitted, while containing specific information about COVID -19 and the particular issues that face jail communities generally, express opinions about Ms. McDonough's jail that

---

[1] https://www.indexmundi.com/facts/united-states/quick-facts/wyoming/population-density#map

rely on those affidavits.[2] As earlier indicated, the jail's response to the situation has evolved as well, and many statements in the affidavits are dated and erroneous – they do not reflect current conditions in the jail.

The Defendant acknowledges the very challenges identified by the plaintiffs. She further acknowledges her responsibility to meet those challenges in the best way she can given her resources, the available medical advice, and the guidelines promulgated by the CDC. The Defendant, however, has a starkly different view of the conditions in the jail and her efforts to contain COVID 19. She contends that she has complied with almost all of the recommendations of the CDC – and did so even before they were published on March 23, 2020. Her medical unit in the jail has testing, treatment, and isolation capability. Inmates are provided free soap and bleach to clean their cells and the telephones – other cleaning duties formerly performed by inmates are now done by jail staff. Surgical masks have been provided, Food preparation is also now done by jail staff and delivered to the inmates in a responsible manner. Temperatures of every inmate are taken twice per day in an effort to detect infection. A full-time doctor and several nurses are on staff in the jail every day. Contrary to plaintiff's contentions, scanner thermometers are used that do not involve touching the inmate. Further, she has worked with the local Public Defender's Office, State's Attorney's Office, Commissioner's Office, and the Chief Administrative Judges of the Circuit and District Courts to reduce the jail population and release as many prisoners as possible. This has been

---

[2] The Court should view the "John Doe" affidavits with particular circumspect and perhaps not at all. There is no reason offered why the declarant's identity is not disclosed, should not be disclosed, and defendants are thus precluded from investigating their claims. The unfairness of this obvious. Moreover, there is no reason why any of the affidavits are not signed. Attorneys continue to have in-person, albeit non-contact, access to detained clients. See affidavit of Mary Lou McDonough.

done by identifying incarcerated individuals, who would otherwise remain detained under normal circumstances, and working with local attorneys to petition for bond review hearings. Writs of Habeas Corpus in the Circuit Court have also been utilized. As the Court will see from the attached exhibits, the jail population at the Prince George's County Detention Center has gone from an average daily population ("ADP") of 720 inmates on March 1, 2020 to 560 on April 24, 2020, a reduction of 160 inmates. Only those with serious charges of crimes against persons remain incarcerated. Of course, as the Court knows, Ms. McDonough has no authority of her own to release inmates that the Court has ordered to be detained.

The defendant also acknowledges, as pointed out by the plaintiffs, that the legal standard governing her responsibility to protect her inmates is the "deliberate indifference" standard. Ironically, some of the same evidence that upon which plaintiffs rely, specifically the contagiousness of the disease and difficulty controlling it in a jail setting, is the same that cuts against a finding of liability on behalf of Ms. McDonough – she must maintain custody of prisoners and attempt to control the spread of disease that, by plaintiffs' own concessions, is an almost impossible task. Yet, as of this writing, (April 25, 2020) there have been only 18 confirmed cases of COVID 19 among the jail population, none of which has required a hospitalization, and 10 of whom have fully recovered and sent back to the general population (from the medical isolation unit).. It is against this "catch -22" backdrop that her actions must be judged.

As early as January 29, 2020, Defendant Mary Lou McDonough, as Director of the Prince George's County Correctional Center (PGCCC) for 14 years, appreciated the potential risk COVID-19 presented to the health and welfare of inmates and staff at the facility.  While a majority of the country was still in denial of COVID-19's potential to

impact our country and daily lives, McDonough recognized the threat and took reasonable steps to protect inmates and staff.  Her forward thinking resulted in inmates upon arrival at the Prince George's County Correctional Center having their temperatures checked, questioned about recent travel, and any flu like symptoms they may be experiencing.  These steps were taken more than month and half before the CDC issued its guidelines to jails and prisons for responding to COVID-19 on March 23, 2020.  And that was the just the first step.  She also alerted the County Executive, advise staff of health risk and precautions to be taken, revised the existing infectious disease control policy, increased sanitation efforts, purchased additional supplies of soap, masks, gloves, hand sanitizer, drinking water, food, and protective clothing for medical staff.  She also began efforts to reduce the jail population by reviewing the list of inmates eligible for home release or pre-trial release, established procedures for remote access to inmates by attorneys.

This suit and motion for a temporary restraining order (TRO) brought on behalf of three named Plaintiffs and five John Does assert that Mary Lou McDonough, Director of the Prince George's County Correctional Center, failed to take appropriate and reasonable measures to protect the health and welfare of inmates at the facility.  Plaintiffs also alleged that McDonough failed to develop and implement policies to safeguard inmates from COVID 19, failed to provide reasonable medical care to those infected with COVID-19, and failed protect the vulnerable inmates housed at the facility.

## II.    LEGAL STANDARD

Absent the most extraordinary circumstances, a federal court should not issue an injunction against a State prison concerning prison management. The Supreme Court has repeatedly emphasized that prison administrators, and not the federal courts, must "manage

penal institutions." The Court recognized that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources, all of which are peculiarly within the province of the Legislative and Executive Branches of Government." *Turner v. Safley,* 482 U.S. 78, 84-85 (1987). An essential objective in the administration and management of a prison is "maintaining institutional security and preserving internal order and discipline." *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). Critical to that goal, prison officials must be given "wide ranging deference" in pursuing legitimate penological concerns. *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 (1977); *see also Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994) (no federal injunction against State prisons "absent the most extraordinary circumstances" and federal courts should not immerse themselves in prison management). "A preliminary injunction is an extraordinary remedy never awarded as a right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Because it is an extraordinary remedy, injunctive relief can only be awarded upon "a clear showing" that the plaintiff is entitled to such relief. *Winter*, 555 U.S. at 22. The Supreme Court has provided four requirements that a plaintiff must establish in order to obtain a preliminary injunction: (1) that he is likely to succeed on the merits at trial; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter,* 555 U.S. at 20; *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009) *cert. granted, judgment vacated on other grounds,* 559 U.S. 1089 (2010) and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010) (per curiam) (adopting the requirements of *Winter* and overruling *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977)). The same factors apply to a

temporary restraining order. *Coreas v. Bounds*, 2020 WL 1663133 (2020); *Hollingsworth v. Perry*, 570 U.S. 693,704 (2013).

All four of the *Winter* requirements must be established independently. *See Real Truth About Obama, Inc.*, 575 F.3d at 346; *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013). The establishment of one or two of these factors does not "relax" the remaining requirements; there is no longer a "flexible interplay" among the four factors. *Real Truth About Obama, Inc.*, 575 F.3d at 347. Thus, a plaintiff seeking a preliminary injunction must always "demonstrate that irreparable injury is *likely* in the absence of an injunction" even if he has established a likelihood of succeeding on the merits *Winter*, 555 U.S. at 21 (emphasis in original).

Both the Supreme Court and Fourth Circuit have emphasized that courts must consider the public interest impact of preliminary injunctions. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)); *Real Truth About Obama, Inc.*, 575 F.3d at 347. Indeed, in *Winter*, the Supreme Court reversed the Ninth Circuit because it had "understated" the public interest burden that would occur if a preliminary injunction is granted. *Winter*, 555 U.S. at 24.

Applied presently, the evidence demonstrates that Plaintiffs are not entitled to a TRO.  In compliance with CDC Guidelines, Defendant McDonough implemented reasonable measures to ensure the health and welfare of inmates and staff at the PGCCC and did not act with deliberate indifference.

## III.    ARGUMENT

## A. MARY LOU MCDONOUGH ACTED PROACTIVELY TO PROTECT INMATES AND STAFF.

The Due Process Clause of the Fourteenth Amendment protects the rights of pretrial detainees to receive adequate medical care. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating that "the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care" [to]pretrial detainees "who require it") (citation omitted)); *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992). Pretrial detainee "retain at least those constitutional rights [held] by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). Thus, the Fourth Circuit has held that the Eighth Amendment deliberate indifference standard applies to Fourteenth Amendment claims by pretrial detainees of inadequate medical treatment. *Hill*, 979 F.2d at 991-92 ("[P]rison officials violate detainee's rights to due process when they are deliberately indifferent to serious medical needs." (citations omitted)); *see also Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001) ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (citation omitted) ("Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs."); *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee."). Therefore, a showing that the medical condition is objectively serious, and that, subjectively, the official knew of and disregarded an excessive risk to the inmate's health or safety is

required.  Hence, the standard is something more than mere negligence.

### 1.  Relevant Policies, Practices, Procedures or Guidance Issued to Staff.

Prior to the CDC issuing its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19), PGCCC had in place several policies addressing infectious diseases.  Specifically, PGCCC has policies addressing the Ebola Virus (PGCC Policy and Procedure 12.3.1) and Tuberculosis (PGCCC Policy and Procedure 12.7).  Recognizing the uniqueness of COVID-19, PGCCC created before the CDC Guidelines issuance and implemented a Panademic Response Plan (Ex. 1, PGCCC Policy and Procedure 12.5.) that became effective April 2, 2020.  The outlined procedures for general program management, visitation, tele-working, roll call, ERT preparation, access to the facility, procedures for temperature reading, pre-trial services, inmate communications, infection control officers responsibilities, standard precautions, personal protection equipment, handwashing, food and specimens, fire and sanitation inspections, vehicle and equipment disinfecting procedures, immunization program, management of employees with bloodborne diseases, mandatory equipment requirements, mandatory blood spill kits, education and training, record keeping, and training records.

The CDC recognized that not all jails and detention centers are alike and that the Interim Guidelines are guiding principles that should be adapted to the specific needs of each facility.

### B.  PRINCE GEORGE'S COUNTY CORRECTIONAL CENTER COMPLIES WITH THE CDC GUIDELINES FOR COVID-19.

Comparing the actions taken by PGCCC with the CDC Interim Guidelines clearly shows that PGCCC adapted the guidelines based on PGCCC's unique facility type.

### 1.  Screening and Testing for COVID-19

The CDC recommended Perform re-intake screening and temperature checks for all new entrants.  Screening should take place in sallyport, before beginning intake process.  If individual has symptoms of COVID-19 (fever, cough, shortness of breath):  require the wearing of mask, ensure staff that had direct contact wear recommended PPE, and place individual in medical isolation.  If individual is close contact with known COVID-19 case (but has no COVID-19 symptoms):  Quarantine individual and monitor for symptoms two times per day for 14 days.

On January 29, 2020, PGCCC began screening all inmates upon arrival for flu-like symptoms, inquired about recent travel, completed health check list and checked temperature. (Ex. 2, McDonough Affidavit.)   Housing units were identified that could be used as "infirmary units" if sick population was too large to contained in Medical Unit. (Ex. 2).  If incoming inmate tests positive then PGCCC medical staff would follow the procedure for isolation.  The inmate would be masked and escorted directly the Medical Unit.

For inmates already housed at PGCCC, an inmate initiates the sick call process by placing a sick call requires slip in one of the various sick call boxes located in the housing unit or by submitting it to medical staff.  (Ex.3, Declaration of Meskerem Asresahegn, M.D., ¶ 34.)  To the extent that a patient requires medical care on an urgent basis, an inmate may make an oral request to a member of the medical staff or correctional officer at any time.  Id.  The medical staff will respond to all urgent needs for medical care without

delay.  Id. Generally, there is one registered nurse (RN) on the nursing staff will triage written sick call requests within 24 hours.  A member of the nursing staff will inform the relevant members of the security staff who needs to be seen for sick call, and the security staff will bring those patients to the health care unit.  Id.  Inmates housed in a unit where an inmate was suspected of contracting COVID-19, those inmates had their temperature check twice a day.  Medical staff conducted the temperature checks starting March 30, 2020.  (Ex. 2 and 3).  If inmate tests positive for COVID-19, the inmate is isolated in negative pressure room in Medical Unit.  If the numbers grew and the Medical Unit was full, Housing Units 2 and 6 were designated would be used as infirmary units.

### 2.  Testing

From March 27, 2020 to April 14,2020, 20 COVID-19 tests were administered to inmates.  (Ex. 3, ¶ 33).  Out of the 29 COVID-19 tests18 were positive and 2 negative.  As of April 24, 2020, PGCCC has 20 test kits.  Id.

### 3.  Response to suspected and confirmed COVID-19 for staff and detainees

As stated previously herein, all individual entering PGCCC has their temperature checked.  Staff and detainees are encouraged to report any symptoms of COVID-19 (i.e. coughing, fever, shortness of breath).  If such symptoms are reported will staff are at work, they are instructed to leave the facility immediately, self-isolate, and contact their primary care physician.  If the staff member is home, they are encouraged not to report to work, self-isolate, and contact their primary care physician.  If an inmate reports experiencing symptoms, they are instructed to don their mask, taken to Medical Unit for evaluation, testing, and treatment of the symptoms.  Then all inmates housed in that unit would have their temperature check twice daily.  COVID-19 test results usually return within two days; however, it may take longer.  In the

meantime, the inmate is housed in isolation room.  If the test returns negative, the inmate may

return to their housing unit; however, if the test returns positive, the inmate is quarantined in the

Medical Unit for 14 days with temperature checks and monitoring of the symptoms by Medical

staff.

Those inmates in isolation cells are not permitted to leave the cell for showers; however,

they are provided soap and a cloth for cleaning themselves.  The isolation cells contain a toilet

and a sink.  Inmates are only housed in isolation cells until a test results are received.  Housing 2

and 6 are being used as quarantine units.  Those housed the unit tested positive, but have

experienced no symptoms or have stopped experiencing symptoms.  Inmates are housed in these

housing units for 14-16 days.  Housing Units 2 and 6 are equipped with individual showers and

cells.  All meals are served in the cells and medical staff come to the housing units to assess the

inmates medical condition.

Those inmates that were in the Medical Unit were transferred to another Housing Unit to

ensure that they would not be in contact with a possible COVID-19 inmate.   Maintenance

medications are distributed to inmates in their housing units by Medical staff.

As to claims of over detention, PGCCC identified those inmates in its custody that may

be eligible for release on Home Detention or Pre-Trial Release in early March.  By mid-March,

Director McDonough began working with the Public Defender's Office and the State's

Attorney's Office to release all non-violent offenses.  She also increased electronic monitoring

equipment by thirty.  On March 27, 2020, Director McDonough met with the Judiciary to

reviewed Continuity of Operations Plan (COOP Plan). (Ex. 3).   There was one inmate who paid

his lowered bond, but release was postponed due to a positive for COVID-19 test. Director

McDonough contacted the inmate's family to notify them that he required quarantine for 14

days.   His family instructed Ms. McDonough that he could not come home. The Office of the

Public Defender attempted to get the inmate's brother to take him in, but was unsuccessful.

During this time of attempting to release him without exposing the public, the inmate completed

the 14 day quarantine with no symptoms and was released.  Other than this one incident that is

now moot, there are no other inmates being held after obtaining an Order for release on Pre-Trial

release or home detention.

### 4.   Detainees Living Conditions during COVID-19

PGCCC consists of 16 housing units, with four temporary closed for renovations. Typical

housing unit cells is approximately 70 sq. feet of which 45 sq. ft. are unencumbered.  The

following is a list of the number of inmates in each housing unit and the housing unit

classification.

| HOUSING UNIT | # OF INMATES |
|---|---|
| H1 -intake. | 18 |
| H2 | 1 |
| H5 -Segregation Unit | 32 |
| H6 -Administrative | |
| H7 - | 27 |
| H8 - medium level | 66 |
| H9 – medium level | 80 |
| H10 – medium level | 70 |
| H11A -juveniles | 9 |
| H11B-mental health | 18 |

| (men) | |
|---|---|
| H14 – min/med. | 66 |
| H15 – min. | 33 |
| H16 med/max | 60 |
| H17 – kitchen, sanitation, barber | 69 |

As to staffing changes, there have been a number of changes.  The CDC recommended that staff assume responsibilities for feeding, cleaning, and laundry in an effort to minimize movement of inmates and the spread of COVID-19 from housing unit to housing unit.  As early as March 10, 2020, Director McDonough mandated increase sanitation efforts on all shifts. (Ex. 2.)  Staff is required to clean equipment several times a day.  Id.  Inmates are also encouraged to clean their cells frequently.  Id.  Disinfectant cleaners and paper towels are available on request in each housing unit.  Disinfectant and paper towels are stationed by the telephones for inmates to clean telephones prior to and after use.

Recognizing that access to counsel is a priority to inmates, on March 17, 2020, Director McDonough instituted procedures for remote access to inmates by attorneys and the Office of the Public Defender. (Ex. 2.)  Although contact visits were suspended, attorneys are still permitted to meet with their client in a non-contact room.  The attorney and the client are in different rooms separated by plexiglass.  If the attorney needs his client to review documents or sign documents, correctional staff will take the documents and provide them to the inmate for review and signature and then return the executed documents.  Phone calls to their attorneys and family are free of charge.  Director McDonough understood that the cessation of visitation could affect the

mental health of inmates; therefore, she mandated that all inmates are permitted 3 ten minute calls per day free of charge, which became effective March 16, 2020.  (Ex. 2.)  Director McDonough also increased the number of books, magazines and newspapers in each housing unit.

On March 13, 2020, Kitchen detail was suspended, along with all other group activities, to limit movement and the potential spread of the virus.  (Ex. 2.)  Kitchen duties, cleaning of common areas in the jail, laundry, and sanitation, were assumed by correctional officers and staff.  On March 13, 2020, Director McDonough contacted PGCCC vendors to stock of food and medications.  She also increased PGCCC's stock of water, masks, hand sanitizer, soap, and protective clothing.  (Ex. 2.)  Community service, weekenders, visitation, and volunteers were suspended until further notice to limit the number of individuals coming into PGCCC and potential exposure staff and inmates to COVID-19.  (Ex. 2.)

Director McDonough also mandated that sanitation efforts be increased on all shifts. Specifically, inmates are also encouraged to clean their cells frequently.  Disinfectant cleaners (Spray Nine) and paper towels are available on request in each housing unit.  Disinfectant and paper towels are stationed by the telephones for inmates to clean telephones prior to and after use, as seating areas, doors, and tables.  Also on March 16, 2020, PGCCC increased its stock of soap by 4,500 bars for inmate use to be distributed free of charge.  (Ex. 2.)   On March 27, 2020, Director McDonough prepared a list of Priority Areas in the jail for "deep" clean by an outside contractor.  Id. On April 1, 2020, Director McDonough updated the list by adding the housing unit common areas to the list of Priority Areas for "deep" clean. From April 10-12, 2020, the Priority Areas of the jail were "deep" cleaned.  Id.  Priority areas were all common areas in the jail, hallways, staff dining hall, visitor waiting area, and lobby.

As to issue of hygiene, PGCCC reinforced healthy hygiene practices by providing inmates soap free of charge and upon request during this pandemic. Additional stock of soap, disinfectant, paper towels are available in each housing unit. Id. Each housing unit has showers for inmate use on the first trier and second trier. All showers provide hot water. Also, to adhere to the CDC Guidelines on social distancing, PGCCC placed inmates on half lock down on April 3, 2020. Half lockdown means that the housing units with inmates housed on first floor (first trier) and inmates housed on the second floor (second trier) are not permitted out of their cells at the same time. The first trier would be permitted to released into the common area of the housing unit for one hour. Following their hour, those inmates would be locked in their cells and the second trier would be released for their one hour of recreation time. This routine continued throughout the day, with the exception of count, shift change, meals, and night lockdown.) On April 4, 2020, PGCCC went on full lockdown and inmates in group of ten were permitted out of their cells for one hour. (Id.) This permitted inmates to maintain social distance while providing them with an opportunity to watch television, use the telephone, shower, and interact with other inmates and staff. On April 2, 2020, N-95 mask were distributed to all employees with inmate contact. (Id.) On April 4, 14, and 24, surgical mask were provided to all inmates to wear outside of their cells. (Id.) Inmates were also provided instruction on how to take care of their mask and provided with a bag to keep their mask in when not in use. On April 6, 14, and 25, N-95 mask were distributed to all staff members not teleworking. (Id.)

### 5. Medical Care during COVID-19

Normally, inmates seeking non-urgent medical care at PGCCC must pay $4,00 copay to the extent the inmate is able to pay. (Ex. 3, ¶35). Medical staff will provide medical care to any inmate regardless of their ability to pay. The registered nurse responding to the sick call

determines whether a copay applies with respect to the type of medical treatment sought. Id.  Furthermore, on April 20, 2020, Director McDonough directed that all inmates suspected of being positive with COVID-19 would not be charged with a copay for any medical care related to COVID-19. (Ex. 2 and 3.)

### 6. Medical Records

PGCCC maintains inmates' medical records in electronic format through the support of an outside vendor.  (Ex. 3, ¶36.)

### 7. Grievances

PGCCC has a grievance procedure that permits inmates to file a grievance to report their complaints relating to their confinement.  The grievance procedure is outlined in the Inmate Handbook that is provided to all inmates and a copy is available in each housing unit.  Grievance forms are also available in housing unit.  On April 21 and 22, PGCCC received two grievances from two separate inmates.  On April 21, 2020, Inmate Antwan Green reported that he was being denied his inhaler by Corizon Healthcare workers.  Inmate Green wanted to have possession of his inhaler at all times.  No inmate with asthma is permitted to have possession of their inhaler on their person. The inhaler is kept in a locked medical cart located in each housing unit.  The purpose of an inhaler for emergency use only and the health and safety risk possession of inhaler posed was explained by the medical staff.  On April 22, 2020, Dennis Goss reported that his cellmate fell on April 1st and taken out of the housing unit.  He wanted to know what happened to him and was afraid he may contract COVID-19.  The Zone Commander told the inmate that he could not discuss another inmate's health condition; however, it has been over twenty days since his cellmate left and Mr. Goss had not experienced any symptoms; therefore, it was likely

Mr. Goss would be fine.  Also his request for HAZMAT to come clean is cell was beyond his authority and provided him with cleaning supplies to clean his own cell.

Other than two grievances filed by inmates, PGCCC received six texts and/or emails from parents of inmates and concerned citizens requesting information about PGCCC efforts to combat COVID-19.  Each text and/or email was responded to in a timely manner reporting the efforts outlined in this motion.

## C. ANALYSIS OF THE *WINTER'S* FOUR FACTOR TEST

### 1.    Likelihood of success

One of the claims asserted by plaintiffs, purportedly on behalf of a vulnerable class of inmates, seeks release of the inmates pursuant to 28 U.S.C. §2241. They do not contend that they are being held unconstitutionally, rather, they contend that their conditions of confinement are violating their constitutional rights. Because they do not contest the constitutionality of their detention, this Court respectfully lacks jurisdiction to entertain their claims.

The United States Code, 28 U.S.C. §2241 provides, in pertinent part that

## § 2241. Power to grant writ

**(a)** Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.
**(b)** The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.
**(c)** The writ of habeas corpus shall not extend to a prisoner unless—
**(1)** He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or
**(2)** He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or
**(3)** *He is in custody in violation of the Constitution or laws or treaties of the United States*; or

**(4)** He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or
**(5)** It is necessary to bring him into court to testify or for trial.
**(d)** Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

[emphasis added]. This statute is primarily utilized to challenge confinement based upon federal law. It is no surprise that the vast majority of authority interpreting the statute concerns detainees in federal correctional facilities or those otherwise detained based upon federal law.  In this case, the plaintiffs do not contend that their *detention*, convictions or sentences is in violation of the Constitution. Accordingly, plaintiffs' claims in this regard must fail.

Judge Chuang of this court recently addressed an issue concerning the court's jurisdiction under § 2241 in the context of an immigrant held in a state jail facility on a federal ICE detainer. In <u>Coreas v. Bounds</u>, 2020 WL 1663133 (April 3, 2020)[3],the detainee sought release pursuant to § 2241 based on the conditions in the jail – the unpreparedness of the Howard County Detention Center for the inevitable exposure to COVID-19. In *Bounds*, the Court noted that there was no 4th Circuit precedent addressing whether a *federal detainee* (immigration detainee) could avail himself to § 2241 to challenge the conditions of his

---

[3] As an example of the rapid spread of the virus, Judge Chuang noted at the time of his opinion, April 3, 2020, there were 213,144 confirmed cases and 4,513 deaths in the United States due to COVID-19. Today there is a staggering 946,055 confirmed cases and 53,418 deaths. *See* https://www.bing.com/search?q=covid+19+update&src=IE-SearchBox&FORM=IESR4A

confinement (emphasis added). In the absence of that precedent, the Court looked to other authority that had decided the question in the affirmative. In concluding that the petitioner could contest the constitutional conditions of his confinement the Court relied heavily on the fact that "Second, for *immigration detainees*, if § 2241 is unavailable, Petitioners may have no vehicle by which to seek redress for the constitutional violation they allege" (emphasis added). Thus, the Court limited its analysis to a detainee detained based on federal law and whose remedy existed only by virtue of federal law.

By contrast, here all of the plaintiffs are detained in a County detention facility based upon state criminal charges. Unlike the situation in *Bounds*, the detainees here can challenge their conditions of confinement and seek release by way of Writ of Habeas Corpus in state Circuit Court – and have (see affidavit of Claire Glenn, Plaintiffs' exhibit 29). Thus, this Court lacks jurisdiction to entertain the plaintiffs' claim seeking release from confinement and, accordingly, are not likely to succeed on their claim.

With respect to the conditions of confinement claims that are appropriately before the Court, plaintiffs are still unlikely to succeed. As they have noted, in order to prevail for those detainees subject to 8th Amendment analysis they must demonstrate that the response to the COVID-19 outbreak by Defendant McDonough amounted to a "deliberate indifference to a known risk of substantial harm". *Anderson v. Kingsley*, 877 F.3d 539,543 (4th Cir. 2017). "An accidental or inadvertent response to a known risk is insufficient to create Eighth Amendment liability". *Id* at 544, *quoting Farmer v. Brennan*, 511 U.S. 825, 840-41 (1994). Rather, Eighth Amendment liability "must involve more than ordinary lack of due care for a prisoner for a prisoner's interests or safety …it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel

and Unusual Punishments Clause". *Id* at 543, quoting *Whitley v. Albers*, 475 U.S. 312, 319

(1986).

In the context of pre-trial detainees, it is the 14th Amendment standard that governs

the conduct of Ms. McDonough. Similar to the Eighth Amendment, the applicable standard

is "deliberate indifference". *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999). As noted by

the Court in *Peed,*

> Deliberate indifference is a very high standard- a showing of mere negligence will not
> meet it …the Constitution is designed to deal with deprivations of rights, not errors
> in judgment, even though such errors may have unfortunate consequences. This is
> precisely why the Supreme Court has seen fit to stress that deliberate indifference
> requires 'more than ordinary lack of due care for the prisoner's interests or safety
> (citations omitted). To lower this threshold would thrust federal courts into the daily
> practices of local police departments.

*Id*. Regardless of the status of the detainee asserting a claim in this case, he/she cannot

demonstrate that Director McDonough was deliberately indifferent to their needs. On the

contrary, she led the way among correctional facilities in Maryland to prepare for pandemic.

When one considers that actions taken by Defendant McDonough identified above,

there is no evidence that Director McDonough acted with deliberate indifference.  On the

contrary the evidence shows that Director McDonough acted proactively to protect the

health and safety of inmates and staff.  From her personal responses to the parents of

inmates and concerned residents of the County to the free phone calls and soap to inmates,

the evidence shows that Director McDonough made protecting the health and safety of

inmates and staff at PGCCC a priority. Well before the CDC issued its guidelines, Director

McDonough took stock of supplies, ordered more, contacted the judiciary, State's Attorney

and Public Defender's office to start preparing to lower her jail's population.  And she did

just that by lowering the jail population that was well over 700 before the pandemic to

approximately 550 to date.  The defendant respectfully submits that the Court should

consider the entire context of COVID-19 epidemic, and note that in this regard the CDC

guidelines as a matter of law cannot form the Constitutional benchmark or threshold for

liability. Even if it were, as stated before, the Director has met the guidelines.

### 2. Likelihood of irreparable harm in the absence of  preliminary relief.

There is no evidence that any of named Plaintiffs suffered any actual harm.  Neither

of the remaining named Plaintiffs has tested positive for COVID-19,[4] nor has either of them

reported that they were in close contact with anyone who tested positive for COVID-19.

Also, this court cannot provide plaintiffs the relief they seek for reasons previously discussed

herein.  Moreover, the evidence clearly shows that PGCCC is already in compliance with

CDC Interim Guidelines.  Currently, the virus appears to have been contained and plaintiffs

have access to a medical staff 24/7 ready and able to diagnose and treat them in the event

that they contract the virus. If need be they can be sent to the hospital at no expense to

them. They are provided with cleaners, the common areas are wiped down constantly, and

the charges against them are serious crimes against persons.  They will not suffer irreparable

harm. The hold on their liberties, albeit in a jail setting and necessarily more severe, mirror

many of the ones the outside world is currently experiencing.

### 2.  Balance of equities and public interest

When a plaintiff seeks preliminary injunctive relief against the Government, the balance

of equities and public interest factors merge. *Niken v. Holder*, 556 U.S. 418, 435 (2009). Here

is the "catch 22" the in which the defendant finds herself – COVID-19 is present in the

---

[4] The only remaining named plaintiff is David Smith. Plaintiffs Seth and Burch have been
released.

facility and containing it in an institutional setting is "practically impossible". Yet, plaintiffs are either serving sentences or charged with serious criminal offenses. Social distancing, inmate education, frequent cleaning, monitoring and testing of inmate health – all of the measures implemented have not prevented the virus from the entering the jail, although containment measures taken to this point have largely appeared to have been successful. Most, if not all CDC guidelines have been implemented. Certainly it is in the inmate's interests and the public's at large that they stay free from infection. But the Director cannot guarantee safety from an invisible and highly contagious invader. All she can do is follow CDC guidelines and recommendations from the scientific community now and moving forward, and hope for the best. The balance of equities and public interest favor the defendant.

## IV.    CONCLUSION

For the foregoing reasons, Defendants are entitled to dismissal, or in the alternative, judgment as a matter of law on all claims.

Respectfully submitted,

**RHONDA L. WEAVER
COUNTY ATTORNEY**

**ANDREW J. MURRAY
DEPUTY COUNTY ATTORNEY**

*Shelley L. Johnson*

Shelley L. Johnson - Fed Bar No. 15853
Anne E. Koshy - Fed. Bar No. 19333
Associate County Attorneys
**THE PRINCE GEORGE'S COUUNTY
OFFICE OF LAW**
1301 McCormick Drive, Suite 4100
Largo, Maryland 20774
(301) 952-3932 (voice)

23

(301) 952-3071 (facsimile)
sljohnson@co.pg.md.us
AEKoshy@co.pg.md.us

Filed:      04/26/20