## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KEITH SETH, *et al.*,                                      )
Individually and on behalf of a class                      )
of similarly situated persons,                             )
                                                           )
    Plaintiffs-Petitioners,            )
                                                           )    Case No. 8:20-cv-01028-PHX
    v.                                  )
                                                           )
MARY LOU MCDONOUGH,                                        )
In her official capacity as                                )
Director of the Prince George's County                     )
Department of Corrections.                                 )
                                                           )
                                                           )
    Defendant-Respondent.              )

### REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION
### FOR A TEMPORARY RESTRAINING ORDER
### AND PRELIMINARY INJUNCTION

    Defendant's response to Plaintiffs' Emergency Motion misstates the pertinent law and offers

evidence that alternately confirms key facts alleged by Plaintiffs,[1] avoids those facts, or depicts

supposedly effective policies without demonstrating that those policies are actually followed on

the ground.[2] By contrast, Plaintiffs' evidence demonstrates the lived experiences of those subject

---

[1] *Compare, e.g.* Doc. 37-1 at 28, 29, 30, 31 (pictures of the cohorted isolation unit with trash on the floor), *with* Compl. ¶ 175 ("For fear of contracting COVID-19, jail guards will not remove the trash bags [from the cohorted isolation cell.]"); Doc. 29 at 12 (stating that "[t]ypically," prisoners share a 70-square-foot cell with a cellmate), *with* Compl. ¶ 94 ("The vast majority of prisoners are sharing their roughly 60 square foot cells with a cellmate."). Citations to the Complaint in this reply refer both to the allegations and to any of Plaintiffs' evidence cited in those paragraphs.

[2] *Compare, e.g.*, McDonough Decl. (Doc. 29-3) at 17 ("The Medical Unit always uses an outside cleaning company to clean and disinfect [the medical isolation] rooms between usage."), *with*, *e.g.*, Ex. 11, Decl. 11 ¶ 18 ("The isolation cells have mucus, feces, blood, old food, urine, spit, everything you can name on the walls. . . . Someone should come and take pictures of these cells, they're disgusting."), Ex. 10, Decl. 10 ¶ 11 ("The isolation cell they put me in has mucus and blood

to the grim reality of Defendants actual practices. These practices violate Plaintiffs' constitutional rights on a daily basis. Of particular note given the nature of the relief requested, Defendant appears to have taken virtually no steps specifically aimed at preventing COVID-19 exposure to medically vulnerable inmates. The Emergency Motion should be granted.

## I.    The Evidence Presented Does Not Support Defendant's Claim of an Adequate Response

Overall, Defendant makes many high-level assurances about the Jail's efforts control the spread of COVID-19 and to treat the prisoners who are infected. Defendant's evidence shows that these assurances do not match the Jail's reality.[3]

### A.  Defendant's Evidence Indicates an Uncontrolled Outbreak of COVID-19 at the Jail

Defendants contend that the Jail has successfully managed COVID-19 within its walls. But Defendant's evidence strongly indicates the opposite. The Jail gave its first COVID-19 test on March, 27, 2020.[4] Asresahegn Decl. (Doc. 29-1) ¶ 33. By April 24, 2020, the Jail had given twenty tests. *Id.* Eighteen of them were positive. *Id.[5]*

---

dried all around the walls, 360 degrees. I wish you could come and take pictures of it. When I say mucus and blood on the walls, I mean it – thick yellow, some green, some yellow with red blood in it. I can also tell someone was bleeding in that isolation cell, because there is blood all along the floor under the bed."); McDonough Decl. (Doc. 29-3) at 18 ("Indigent inmates are always treated without charge."), *with* Ex. 1, Seth Decl. (Doc. 2-1 at 5) ¶ 11 (stating that he did not get medical care for symptoms of COVID-19 because he could not afford the $4 for sick call).

[3] In addition to the examples discussed in this section, Plaintiffs would present a more fulsome analysis of Defendant's evidence at an evidentiary hearing and in other future proceedings (including which claims Plaintiffs' evidence contradicts, aspects of Defendant's evidence that support Plaintiffs' claims, and contradictions between Defendant's statements and its evidence).

[4] Prince George's County Executive declared a state of emergency due to COVID-19 on March 16, 2020. Compl. ¶ 51.

[5] The Jail also reports that it currently has twenty tests for COVID-19 available. Doc. 29-1 ¶ 33.

| Date | Number of Tests | Results |
|------|-----------------|---------|
| March 27 | 1 | Positive |
| March 30 | 2 | Both positive |
| March 31 | 1 | Positive |
| April 2 | 2 | Both positive |
| April 3 | 3 | 2 positive, 1 negative |
| April 4 | 2 | Both positive |
| April 6 | 2 | Both positive |
| April 7 | 1 | Positive |
| April 8 | 1 | Negative |
| April 9 | 1 | Positive |
| April 13 | 2 | Both positive |
| April 14 | 1 | Positive |
| April 20 | 1 | Positive |

This rate of positive test results—90 percent—is stunning. Ex. A, Rottnek Decl. ¶ 22. Given this "test positivity rate," it is virtually certain that the Jail is dramatically under-testing and that the unknown cases far exceed confirmed ones. *Id.* ¶ 23.[6]

Defendant's other evidence further confirms that the outbreak is widespread. Twenty-eight Jail staff members have tested positive for COVID-19. Doc. 29-3 at 19. These staff members worked in (for example) the Kitchen, the Medical Unit, Sanitation, Sick Call, "Supply Manager," and Transport. *See* Doc. 37-23. There have been confirmed positive cases in thirteen of the Jail's seventeen housing units. *Id.*

Tellingly, the people responsible for controlling the spread of the virus in the Jail and treatment those who are infected do not see these numbers as a problem. Indeed, they highlight them as a point of pride. For example, Dr. Asresahegn, the Jail's Site Medical Director, boasts that, "[t]hanks to [the Jail's] efforts . . . . as of April 24, 2020, only eighteen (18) prisoners at the Jail had tested

---

[6] Inmates have described how difficult it is to get tested, even when they exhibit symptoms of the virus Ex. A, Rottnek Decl. ¶ 20 (citing inmate declarations). Defendant's inability or unwillingness to broadly test the Jail population belies her assurances that her policies have controlled the outbreak. Defendant cannot possibly know the full extent of the outbreak based on the current state of testing. And given what we know about how quickly and quietly the virus spreads, there is every reason to suspect that Defendant's hollow statements are simply not true. "Comprehensive testing"—which the Jail has not and likely cannot do— "is a critical component of containing the spread of the virus and to ascertaining the severity of the outbreak." *Id.* ¶ 19.

positive for COVID-19 (over a (4) week period)." Asresahegn Decl., Doc. 29-1 ¶ 5. Defendant McDonough, while reciting the numbers of infected prisoners and staff, states, "We have not seen a surge in cases or an exponential increase in numbers. I believe this is partly true because of the care and attention we have given to preparation and mitigation of the virus." Doc. 29-3 at 18-19. (Of course, it is impossible to see exponential spread where—as here—the Jail tests only one or two prisoners each day. Doc. 29-1 ¶ 33.

**B.  Defendant's Evidence Contradicts Its Claims.**

Although Defendant contends it has implemented strong policies to halt infection in the Jail, Defendant's evidence contradicts these claims—or suggests that, whatever the policy may be on paper, it is not actually implemented in practice.

***Ineffective COVID-19 Screening.*** Notably, Defendant touts its policy of taking inmate temperatures. As an initial matter, this screening method is minimally effective and has been only selectively implemented. Typically, COVID-19 positive individuals are asymptomatic for up to fourteen days and some never show symptoms even while contagious. Ex. A, Rottnek Decl. ¶¶ 26-28. A temperature screen for these individuals is meaningless.

Moreover, the Jail only regularly conducted these checks in two housing units, presumably leaving the other housing units without regular screening. Doc. 29-1 at ¶ 10.  And while Dr. Asresahegn states that "[t]he selection of temperature-check logs attached to my Declaration as Exhibit Q reflects the thoroughness of the temperature checks in the housing units," Doc. 29-1 ¶ 29, the logs themselves disprove this. Prisoners are frequently marked as having temperatures as low as 90.6, 90.7, and 92.9 degrees, which indicate hypothermia. *Id.* at 38, 12, 13.[7]

---

[7]    *See* Hypothermia, Mayo Clinic (last visited Apr. 28, 2020), https://www.mayoclinic.org/diseases-conditions/hypothermia/symptoms-causes/syc-20352682 ("Hypothermia . . . occurs as your body temperature falls below 95 degrees."). In addition, High

Further still, the Jail's Pandemic Response Plan states: "The thermometer **MUST** be cleaned with an alcohol prep pad between each use." Doc. 37-16 at 74. But Dr. Asresahegn states that, since the nurses use an infrared thermometer, "cleaning the instrument between checks is not necessary." Doc. 29-1 ¶ 29.

***Ineffective Social Distancing Practices.*** Defendant McDonough contends that the Jail has enacted effective social distancing policies. *See* McDonough Decl. (Doc. 29-1) at 11 ("We have implemented social distancing strategies to increase the physical space between inmates in a variety of ways and changed them to reflect the changes in guidance from the CDC and the Governor and the County Executive."). But one such policy that she cites as an example does not—even as written—achieve social distancing. Defendant McDonough explains: "We encourage inmates to maintain spacing of at least 6 feet apart and are only allowing usage to every other telephone to help ensure this spacing. There are 10 to 12 inmate phones in every large housing unit, but they are fastened to the walls 2 – 2 ½ feet apart." Doc. 29-3 at 14–15. According to this description, even if prisoners used every other phone, they would still be less than 4 or 5 feet apart.

Just as significantly, the fact that—pursuant to Defendant's preemptive lockdown policy, which public health experts do not recommend, Compl. ¶¶ 137-40—most inmates share a small, poorly ventilated cell means that effective social distancing is simply not possible, Ex. A, Rottnek Decl. ¶ 38. As Plaintiffs and others have stated in declarations, the combination of shared cells and the Jail's inadequate screening and testing, ensures that otherwise healthy cellmates will be regularly exposed to sick ones. *See, e.g.*, Ex. 23, Decl. 23 (Doc. 2-1 at 111) ¶¶ 4, 6 ("I first began

---

temperatures are sometimes marked with a question mark or crossed out, and then a new (lower) temperature is recorded beside it. *See, e.g.*, *id.* at 7, 67. And while Defendant states that "[t]emperatures of every inmate are taken twice per day," Doc. 29 at 3, a sign in Defendant's evidence lists only nine of the Jail's seventeen units for twice daily temperature checks. Doc. 36-8 at 2.

to experience symptoms of covid-19 on Wednesday, March 28, 2020, when I started to not be able to smell or taste. At that time, I was detained in Housing Unit 9 (H9), with a cellmate.").

Defendant's other evidence further undermines its social distancing claims. Pictures of an April "social distancing farewell party" show Jail staff standing in close proximity at a party. Doc. 37-22 at 53, 55. The pictures are attached to an April 9th email informing staff of eleven positive cases at the Jail. Doc. 37-22 at 50.[8] That staff members charged with educating and enforcing social distancing appear to not take it seriously themselves underscores the ineffectiveness of Defendant's practices. Ex. A, Rottnek Decl. ¶¶ 35-36.

Even with respect to prisoners' access to counsel, the Defendant's representations are belied by the evidence. Defendant McDonough boasts that prisoners' calls to their attorneys are free and that Jail officials made "special arrangements" to ensure that prisoners could contact attorneys who were working from home during the pandemic. Doc. 29-3 at 12. But under the Jail's preemptive lockdown policy, prisoners can only use the phones for one hour a day, and this hour might be any time between 7 am and 3 am. Doc. 37-3 at 24; Ex. K, Rettammel Decl. ¶ 5–6 (noting the difficulties of gaining access to clients).[9] Defendant McDonough contends that prisoners can still meet with their attorneys in the Jail's non-contact room. Doc. 29-3 at 12. But even this policy undermines the CDC's social distancing guidelines. The contact rooms have a partition with holes in it, and in

---

[8] The same email includes a photo of fifteen to twenty Jail staff working shoulder to shoulder in the Jail's kitchen. Doc. 37-22 at 52. Many of them are not wearing masks. *Id.*; *see* (noting that a Jail employee who worked in the Kitchen tested positive for COVID-19). Another photo shows a tightly packed town hall that Director McDonough held for Jail staff about COVID-19. *See* 37-22 at 20. The town hall was held on March 12, 2020—the same day Prince George's County closed its Courthouse. Compl. ¶ 54.

[9] *See* Doc. 37-3 at 4 (Jail staff member stating in an email to a supervisor that "the detainees said that they were also unable to reach their attorney's/public defenders [sic] in the unit, especially when coming out for rec-time after midnight.").

order to hear one another, the attorney and client must speak through the holes, inches away from one another. Ex. K, Rettammel Decl. ¶ 4.

***Ineffective Sick Call and COVID Education Practices.*** Defendant McDonough states, "We have not charged inmates for visits relating to COVID-19." Doc. 29 at 18. But Dr. Asresahegn contradicts this broad claim, explaining that Jail only began offering free care for COVID-19 nine days ago. Doc. 29-1 at 19 ("[O]n Monday, April 20, 2020, Director McDonough directed that patients suspected of being positive with COVID-19 would not be charged a copay for any medical care related to COVID-19.").[10] Moreover, to the extent this new policy exists in practice, it only applies to prisoners "suspected of being positive with COVID-19." *Id.* Unless this includes prisoners' own suspicions that they are infected, this policy is of little use to prisoners whose symptoms of COVID-19 that are disregarded by Jail staff, as Plaintiffs contend is routine.[11]

Defendant McDonough contends that the Jail has current information about COVID-19 posted throughout the Jail. She states: "We have updated the signage [about COVID-19 in the Jail] continuously as new information about the virus has emerged, always using CDC or Health Department signage in English, Spanish, and pictograms. (Copies attached)." Doc. 29-3 at 10. Defendant submitted only two posters that provide any details about COVID-19.[12] One states, "For

---

[10] Plaintiffs' evidence also strongly contradicts Director McDonough's claim. Indeed, Plaintiffs' evidence suggests that many prisoners positive for COVID-19 have paid for sick call—often multiple times, because the medical staff repeatedly returned them to their housing units, and they had to pay for sick call again. *See, e.g.*, Compl. ¶¶ 102-17.

[11] Ex. G, Decl. 29 ¶ 21 ("I don't know that it really matters whether they charge you for sick call or not, if you put in a request and no one comes to see you anyways."); *see also* Compl. ¶¶ 102-17, 124-26.

[12] Aside from the two posters that include information about COVID-19, Defendants submitted two posters that describe social distancing practices (in English and Spanish), but no information about COVID-19. Doc. 37-15 at 1-4. There is also a Spanish-language version of one of the posters with COVID-19 information. Doc. 37-15 at 5. Plaintiffs' evidence contradicts Defendant's claim that information about COVID-19 is posted throughout the Jail. Compl. ¶ 81, 81 n. 53 (citing to Plaintiffs' evidence); *see also* Ex. D, Second Seth Decl. ¶

the general American public, who are unlikely to be exposed to the virus at this time, the immediate health risk from coronavirus is low." Doc. 37-15 at 6. The other says, "Right now, the greatest risk for infection is for people in Wuhan or people who have traveled to Wuhan and less so, other parts of China." Doc. 36-1G.[13]

*Misleading Statements of Policies.* Some of Defendant's claims are patently misleading. For example, Defendant repeatedly contends that prisoners are given free soap. *See, e.g.*, Doc. 29 at 15 ("As to [the] issue of hygiene, [the Jail] reinforced healthy hygiene practices by providing inmates soap free of charge and upon request during this pandemic"); McDonough Decl (Doc. 29-3) at 5 ("Soap was and is distributed FREE OF CHARGE to all detainees in accordance with the later published recommendation of the Centers for Disease Control (CDC)."). But—as Defendant's evidence demonstrates—this is not exactly true. Instead, starting on March 18, the Jail directed that each prisoner would receive one "[s]mall (hotel grade) bar[] of soap" at intake. Doc. 37-3 at 14. Once committed to the Jail, each prisoner receives another bar of soap. Doc. 37-4 at 46. After, this, prisoners "are required to purchase[14] hygiene items from the commissary."

---

[13] Dr. Asresahegn also purportedly cites to additional "informational posters" that were in the health care unit. Doc. 29-1 ¶ 12. The exhibit cited for this claim contains, among other things, pages from what appear to be a stapled information packet, Doc. 36-8 at 11-12; signs for Jail staff, *see, e.g.*, *id.* at 2; two general posters about hand-washing (which do not specifically address COVID-19), *id.* at 3, 5; and a sign that says, "PLEASE MAKE SURE YOU SECURE THIS DOOR BEHIND YOURSELF," *Id.* at 4.

[14] Although the Jail's policy is that "indigent" inmates can obtain hygiene products for free, Doc. 37-4 at 46, the Jail only considers a prisoner "indigent" if "his or her personal finance account balance does not exceed $1.99 at any given time during the thirty (30) day period immediately preceding the day when indigent commissary order forms are distributed to the individual's housing unit." *Id.* at 55. An indigent prisoner can receive "limited" hygiene products once every thirty days. *Id.*

*Id.*[15] This restricted access to even bar soap—which is not as effective as liquid—is a noted COVID-19 risk factor. Ex. A, Rottnek Decl., ¶ 32-33.

***Failure to Enforce Policies That Address the Realities of the Jail.*** These examples reflect a broader trend, documented by Defendant's evidence: Defendant's claims—and even its written policies—do not reflect the reality of the Jail. This is unsurprising, since key officials appear deeply out of touch with that reality. Dr. Asresahegn—the Jail's medical director—believes that "patient (pre-trial and post-trial detainees) at the Jail . . . do not face the same threat posed to the public by COVID-19." Doc. 29-1 ¶ 5. (Defendant McDonough boasts that, "[t]o promote family unification and mental health," the Jail is offering prisoners three free, ten-minute phone calls during the pandemic. Doc. 29-3 at 15. But again, prisoners can only use the phones for one hour a day, and that hour might be at 2 am. *See* Doc. 37-3 at 24; *see also* Ex. 7, John Doe No. 4 Decl. (Doc. 2-1 at 31) ¶ 5 ("You can't really talk to your family at 1 o'clock in the morning, my kids are asleep."). And one of Defendant's three declarants—Corizon, LLC Chief Medical Officer James Powell—admits: "I do not possess detailed information regarding the day-to-day events at the Jail." Doc. 29-2 ¶ 6; *see also* Ex. A, Rottnek Decl. ¶¶ 12, 46.

Even when confronted with concerning evidence about the Jail's conditions, Defendant McDonough failed to address it—substituting polite favors for effective policy. For example, on April 7, 2020, the mother of one prisoner emailed Defendant McDonough, stating that "for one week going on week two," her son had told Jail staff repeatedly that he feels sick, but "they are not giving him medication," and that "the young man that is roomed with him is coughing for every breath." *See, e.g.*, Doc. 37-4 at 14. Defendant McDonough responded to her, and then

---

[15] This is consistent with Plaintiffs' allegations and evidence. *See* Compl. ¶ 85 ("The jail gives prisoners one or two bars of soap when they first arrive. If prisoners want soap after that, they can buy soap from the commissary.").

contacted an employee at the Jail to ask that "the nurse pay[] special attention" to the prisoner. *Id.*
at 12. The employee responded that the prisoner "did not have any symptoms." *Id.* at 11. Days
later, the prisoner tested positive for COVID-19. Ex. P, Email from Phyllis Williams (Apr. 12,
2020 10:35 am). This exchange exemplifies many of the concerns that Plaintiffs raise about the
Jail: symptomatic prisoners are not taken seriously and cannot get care, Compl. ¶¶ 102-03, 105-
18, 125-26, 149, and prisoners are sharing cells with other prisoners who are sick, Compl. ¶¶ 129-
30, 144-45. Although Defendant McDonough helped to address that particular prisoner's problem,
she ignored the systemic inadequacies that caused it.[16]

### C.  Defendant's Evidence Fails to Address Issues Critical to Plaintiffs' Claims.

Defendant's voluminous evidence is also notable for what it does not include. With respect to
numerous issues that are key to Plaintiffs' claims, Defendant's evidence contains only warnings
that the Jail should take action—but no evidence of any actual practice or plan. And since the Jail
has submitted over 1200 pages of exhibits that appear to contain even the most minute of their
policies and procedures, it is fair to infer that these plans do not exist.

Defendant's evidence includes an instruction from Corizon, LLC, the company that runs its
medical care, to "ensure that there is a specific plan in place" for prisoners who are "age 60 and
older, and especially those with underlying medical conditions" to "isolate them from potential

---

[16] When the same prisoner was placed in a medical isolation cell, his mother wrote to Defendant
McDonough again: "[H]e is not being kept hydrated he is forced to drink the water out of the sink,
he only have one set of cloths, has been using the same face mask since april2,2020 [sic], can't
brush his teeth, have to beg for toilet paper, soap and Tylenol." Ex. O, Email from Phyllis Williams
(Apr. 12, 2020 10:35 am). This complaint aligns perfectly with Plaintiffs' allegations about
medical isolation. *See* Compl. ¶¶  170 (stating that prisoners in medical isolation "have no access
to basic personal hygiene products; they have no soap and no toothbrush. . . .  They cannot change
their clothes."). But again, it does not appear that Defendant McDonough addressed why he might
be subject to these conditions. Instead, she told his mother that she would have a nurse check on
him. Ex. O, Email from Phyllis Williams (Apr. 12, 2020 10:35 am).

exposures [to COVID-19] and protect them with preventative measures. They are the highest risk and would need testing guided by the health department directions." Doc. 36-21 at 4. Defendant's evidence includes no such plan. In addition, Plaintiffs specifically requested that Defendant "identify any and all policies, practices, and/or plans to protect medically vulnerable inmates from a COVID-19 infection and to provide them with adequate monitoring and care if they develop symptoms or test positive." Ex. L, Email from Katherine Chamblee Ryan (Apr. 24, 2020 1:27 pm); Ex. M, Email from Katherine Chamblee Ryan (Apr. 24, 2020 5:54 pm) (further explaining that request). But none of Defendant's evidence addresses this issue.

Another memo from Corizon, LLC advises close contacts of people with confirmed cases of COVID-19 are at high risk for infection. Doc. 36-23 at 6. But nothing in Defendant's evidence describes a plan for contact tracing. It is not addressed in the Jail's pandemic plan. Doc. 37-16. No evidence states that the Jail isolates even the cellmates of prisoners who test positive for COVID-19. (Plaintiffs' evidence indicates that it does not do this, *see, e.g.*, Compl. ¶ 129).

Corizon, LLC advises that the COVID-19 pandemic and the changes it brings might adversely impact prisoners' mental health. Doc. 36-27 at 3 (warning that prisoners may have "acute and prolonged reactions."). And it warns that times of crisis bring a higher risk of suicide. Doc. 36-31 at 82. Moreover, on March 26, 2020, before the Jail implemented its preemptive lockdown policies (and the punitive conditions that came with it), officials at the Jail noted in an email to staff that, "[w]ith the existing elevated state of anxiety among inmates and staff, it would be more harmful to isolate inmates." Doc. 37-22, at 39-40. But Defendant's evidence includes no evidence about the current plan for mental health treatment for any prisoners at the Jail, including those with pre-existing mental health conditions who are in solitary-like isolation for weeks at a time.

### D. Defendant Offers Misleading Evidence and Representations About Issues that Plaintiffs Requested It Address.

Defendant also provided inadequate evidence (or no evidence at all) in response to Plaintiffs' requests for information on a limited set of topics. Ex. L, Email from Katherine Chamblee Ryan (Apr. 24, 2020 1:27 pm) (listing those requests). Because some of Defendant's evidence and representations about those topics are misleading, Plaintiffs address two of those topics here.

First, although Defendant provided, at Plaintiffs' request, a list of medically vulnerable prisoners, that list includes only twenty-three prisoners. Doc. 29-1 ¶ 31. This is highly implausible. Indeed, six of the eight Plaintiffs are medically vulnerable. Compl. ¶¶ 14, 15, 17, 18, 19, 21. Moreover, Dr. Asresahegn, who compiled this list, claims not to know what Plaintiffs mean by "medically vulnerable." *See* Doc. 29-1 ¶ 31 ("Plaintiffs requested information regarding patients who are 'medically vulnerable.' It remains unclear to me how Plaintiffs define that term."). But Plaintiffs provided a list of conditions fall within the CDC's guidelines for high risk individuals. *See* Ex. N, List of Medical Conditions. In addition, Dr. Asresahegn appears to suggest that this list is incomplete. Doc. 29-1 ¶ 31 ("I identify below certain patients with chronic medical conditions."). As Plaintiffs' expert Dr. Rottnek attests, these and other deficiencies show that the Jail essentially has no plan in place to protect those most vulnerable to COVID-19. Ex. A, Rottnek Decl. ¶¶ 39-47.

Second, Plaintiffs requested a list of pre-trial prisoners who a court has authorized for release on pretrial supervision and post-conviction prisoners who a court has authorized to serve their sentences on home detention or in the Prince George's County Community Release Center, but whom pretrial services (a division of the Department of Corrections) has not released from the Jail. Plaintiffs also requested a list of prisoners who remain in the Jail solely because they cannot afford to pay a monetary bond.

12

Defendant did not provide this information. However, Defendant did contend (without evidence) that "[o]nly those with serious charges of crimes against persons remain incarcerated." Doc. 29 at 4. This is highly misleading. Indeed, several Plaintiffs are detained at the Jail even though a court has approved them for release, either to home detention or on monetary bond. Compl. ¶¶ 17, 19, 20, 21 Some prisoners at the Jail are detained for offenses that carry a statutory maximum of ninety days. *See* Compl. ¶ 19.

### E.  Plaintiffs' Evidence is Current, Credible and Reflects Worsening Conditions

Defendant seeks to discredit Plaintiffs' evidence in two ways. First, Defendant broadly asserts that this evidence is simply not up to date. Doc. 29 at 2-3 ("[T]he jail's response to the situation has evolved . . ., and many statements in the affidavits are dated and erroneous—they do not reflect current conditions in the jail."). To address this concern, Plaintiffs have obtained five new declarations that describe the Jail's conditions now. These declarations confirm that the Jail continues to flout public health guidance, and the conditions in the Jail remain dangerous. Indeed, these new declarations raise additional concerns.

For example, in an updated declaration, Plaintiff Seth, who was released on April 23, 2020, describes problems that persisted until the day he was released one week ago. For instance, although Plaintiff Seth had symptoms of COVID-19, corrections officers never checked on his in his cell. Ex. F, Second Seth Decl. ¶ 4-7, 5 ("They just looked through the slot. They never asked anything. No one ever asked about if I was sick. They just check to make sure you are in your room. It was like this the whole time I was on lockdown and until I was released.").[17] The prisoner

---

[17] *See also* Ex. D, Second Seth Decl. ¶ 7 (When I was sick with symptoms of coronavirus, I told the COs I wasn't feeling good. They said to use a sick call form, but I couldn't afford it. They didn't ask me any more questions about my symptoms. They didn't ever check on me later to see how I was feeling. When they came by my cell to count, I was usually lying in my bed, and they would just leave without saying anything. It was like this for the whole time I was sick, and I had

in the cell next to Mr. Seth had symptoms of COVID-19 and then disappeared to the Medical Unit for weeks; no one ever cleaned the cell, and the sick prisoner's cellmate was still living there when Mr. Seth was released. *Id.* ¶ 10. Although Mr. Seth is has bipolar disorder, he did not receive any mental healthcare from the time that the lockdown began through the day of his release. *Id.* ¶ 15. Because of this, Mr. Seth had suicidal thoughts. *Id.* Mr. Seth also describes recent failures in social distancing. He notes that, during prisoners' hour of out-of-cell time, they routinely spoke to other prisoners through the open slot in the cell door. *Id.* ¶ 16. Jail staff made no effort to stop this. *Id.* At the April 23 hearing that resulted in Mr. Seth's release, approximately twelve prisoners were packed into the Jail's courtroom, about a foot apart. *Id.* ¶ 17. And during the release process, Jail staff told Mr. Seth and six or seven other prisoners to line up in a narrow hallway, standing about a foot apart. *Id.* ¶ 18.

Other recent declarations report similar problems. Prisoners wait days to receive responses to their sick calls, and many never receive a response.[18] The jail continues to ignore symptomatic prisoners who seek evaluation or treatment for anything but a high fever.[19] Pain medication is no longer available through commissary to prisoners who might like to manage their own pain.[20]

---

symptoms of coronavirus all the way up to the day I was released. I feel better now, but I still have some symptoms. I still get headaches and diarrhea.").

[18] Ex. F, Decl. 28 ¶ 8 ("I filled out three sick call requests. . . .I never got a response to any of my sick call requests."); Ex. E, Decl. 11 ¶ 10 ("[T]he nurse tells me, 'sick call is a process with a long, long line.')

[19] Ex. G, Decl. 29 ¶ 4 ("[T]hey told me that because I didn't have a fever, I couldn't have Coronavirus."); Ex. F, Decl. 28 ¶ 7 ("[T]he nurses told me, 'if you don't have a fever, there's nothing we can do for you.'); Ex. E, Second Decl. 11 ¶ 9 ("[T]he nurse just said, 'I will give you a Tylenol, and you can just sign a sick call saying you want medical attention for your symptoms. But if you don't have a temperature, you don't have the Coronavirus.'")

[20] Ex. G, Decl. 29 ¶ 8 ("The nurse told me they're saving Tylenol for people with Coronavirus. So you can't ask the nurse for Tylenol anymore unless you're COVID-positive. They also took Tylenol off the commissary list, so we can't even order Tylenol ourselves anymore.").

Cleaning supplies are scarce. Ex. H, Decl. 30 ¶ 16 ("[E]very week we run out of cleaning supplies.") Many people on the housing units seem sick.[21]

Known COVID-19 cases are being returned to their housing units. Declarant 11, who tested positive for COVID-19 and was isolated first in the ten-man quarantine cell and then on housing unit H6, was moved back to the general population on April 20—without being re-tested to confirm that he is no longer sick. Ex. E, Second Decl. 11 ¶ 5. He is still having symptoms. *Id.* at ¶ 6.

Defendant also contends that Plaintiffs' evidence is not credible. In particular, Defendant notes that many of the prisoners' declarations that describe the Jail's conditions are not signed by those prisoners, "despite the fact that attorneys are still permitted to visit with clients." Doc. 29 at 2. But as described above, the Jail's procedure for non-contact visits is not safe; it requires the attorney and client to speak inches apart from one another, and to do so in the Jail where there is an ongoing outbreak of COVID-19. Regardless, the prisoners' declarations are credible; they are signed by fifteen different public defenders under penalty of perjury, and they provide consistent accounts of the Jail's conditions. Doc. 2-1 at 4-130.

## I.    Plaintiffs Are Entitled to Relief Under § 1983

### A.  Eighth and Fourteenth Amendment

#### 1.  *Plaintiffs Are Likely to Succeed on Their Eighth and Fourteenth Amendment Claims*

Aside from identifying and stating the deliberate indifference standard, Defendant's argument on Plaintiff's Eighth and Fourteenth Amendment claims includes no law. Instead, it relies entirely on Defendant's evidence. However, as described above, Plaintiffs' evidence contradicts much of

---

[21] Ex. H, Decl. 30 ¶ 23 ("I think it's a really major issue that the jail is hiding the fact that there's a lot more people in here sick than they're claiming to the public.")

this evidence, Defendant's evidence contradicts Defendant's own claims, and Defendant's evidence does not address several important topics at all. This Court should grant Plaintiffs relief.

a.    The Jail's Conditions Create a Substantial Risk of Serious Harm

The objective factor of the deliberate indifference test is satisfied when the challenged conditions create "a substantial risk of . . . serious harm." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). Plaintiffs argue that the Jail's conditions create this risk in two ways: they increase the risk of infection and they make it more likely that those who are infected will suffer serious illness, permanent physical damage, and death. Doc. 3-1 at 18-21; *see also id.* at 18-23 (describing these risks and citing to relevant law).

Defendant does not address these arguments. Indeed, Defendant's brief does not mention the objective factor at all. And Defendant's statements suggest that Defendants agree about the seriousness of the risk prisoners face in the Jail. *See, e.g.*, Doc. 29 at 1 ("The virus is very serious and can result in death."); *id.* ("Never before has the country experienced a virus as contagious as COVID 19); *id.* at 2 (describing the virus's spread within the Jail as "inevitable").

Defendant's evidence confirms these dangers. *See above* (describing evidence suggesting that the Jail's current outbreak is uncontrolled, that the Jail has failed to enforce social distancing, and that it has no plan to protect medically vulnerable prisoners). Moreover, aspects of the Jail's conditions that Defendant does not dispute—the long-term, preemptive lockdown, punitive isolation conditions, and the termination of mental health care—enhance the risk that COVID-19 will cause serious illness.[22] Thus, with no legal dispute from Defendant, and now with additional evidence of the present risks, Plaintiffs satisfy the objective factor.

---

[22] As Dr. Robert Sapolsky, a Professor of Neurology at Stanford University explains in detail, these practices places prisoners "at a considerably heightened risk of contracting COVID-19 and becoming severely ill and even dying if they do." Ex. E, Sapolsky Decl. ¶ 35; *see also id.* 39

b.  Defendant Disregarded the Excessive Risk Posed by COVID-19

The subjective component of deliberate indifference is satisfied where officials "kn[ew] of and disregard[ed] an excessive risk to [the plaintiff's] health and safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Defendant does not contest that it knew of the risk.[23] Thus, "[t]he issue is whether COVID-19 poses an excessive risk that is being disregarded." *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *10 (D. Md. Apr. 3, 2020).

In addressing this issue, Defendant does not engage with Plaintiffs' legal arguments. Instead, Defendant (correctly) recites caselaw stating that the deliberate indifference standard is high, and that accidental, inadvertent, or negligent conduct does not satisfy it. Doc. 29 at 19-20. Defendant then contends that Plaintiffs "cannot demonstrate that Director McDonough was deliberately indifferent to their needs" because "she led the way among correctional facilities in Maryland to prepare for the pandemic." *Id.* at 20. For example, Defendant McDonough personally responded

("[S]everal of the Prince's George's County Jail's current policies are likely to cause the sort of stress that would depress the immune system and make a person more susceptible to COVID-19, particularly in combination with the stress of an ongoing outbreak of COVID-19 at the jail. These include the 23-hour lockdown policy, the isolation policies as currently administered (including punitive conditions and no mental health services), and the termination of mental health services."). *See* Ex. Q, Order (Doc. 13), *Doe v. Barr*, 20-cv-02263-RMI, at 4, 6 (N.D. Cal. Apr. 27, 2020) (finding, based on expert testimony, that a detainee faced an increased risk of COVID-19 because he has experienced prolonged psychological stress and had depression and post-traumatic stress disorder).

[23] Regardless, Plaintiffs note that Defendant's evidence thoroughly demonstrates Defendant's knowledge, not only of the risks posed by COVID-19, but the risks created by the Jail's particular policies. *See, e.g.*,. 37-22, at 39-40 (email from Jail officials stating, "With the existing elevated state of anxiety among inmates and staff, it would be more harmful to isolate inmates."); *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019), *as amended* (May 6, 2019) (finding deliberate indifference where warden testified that "as humans, we don't survive very well without human contact," but nevertheless placed death row prisoners on long-term solitary confinement).

to "parents of inmates and concerned residents of the County,"[24] and provided "free calls" and "soap to inmates." *Id.*

However, as described above, both Plaintiffs' and Defendant's evidence contradict the Jail's claims about its actions. For example, the "free soap" Defendant touts was a small hotel-sized bar at intake, and another upon commitment to the Jail.After that, prisoners must pay for soap. *See* Compl. ¶¶ 85-86. Similarly, although the Jail contends it has implemented public health recommendations like social distancing, its evidence includes pictures of Jail staff standing close together (including at a "social distancing farewell party") and, as recently as last week, the Jail crowded twelve inmates into its courtroom, seated a foot apart. *See above*(describing other purported policies that are undermined by Defendant's evidence).

Defendant also notes that the Jail has lowered its population from "well over 700" to "approximately 550." *Id.* at 21. This is a positive step. But it does not cure the Jail's inadequate response to the risk of COVID-19—particularly alongside the Jail's numerous other problems. As courts have repeatedly found, the fact that an official took some positive action does not preclude a finding of deliberate indifference.[25] Thus, even if, in addition to this population reduction,

---

[24] Defendant McDonough did personally respond to concerned parents of prisoners in the Jail. But these exchanges only help to prove deliberate indifference. Through them, Defendant McDonough was informed of the precise conditions that Plaintiffs address in this lawsuit. And although she followed up on particular cases, she did not address the conditions themselves. *Id.*

[25] *See, e.g.*, *Jehovah v. Clarke*, 798 F.3d 169, 181 (4th Cir. 2015) (concluding that an inmate who had received "some treatment" could nonetheless establish that the prison's doctors acted with deliberate indifference); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (holding that, even if defendants "provided [plaintiff] with some treatment . . . it does not follow that [defendants] have necessarily provided constitutionally adequate treatment"); *see also Alberti v. Sheriff of Harris Cty., Tex.*, 978 F.2d 893, 895-96 (5th Cir. 1992) (affirming that the district court's conclusion that the county was deliberately indifferent to overcrowding in county jails even though "[t]he county [could] point to several things it did to reduce the jail population," such as encouraging local judges to release low-risk pretrial detainees").

Defendant truly did implement some of the policies it touts, its actions still violate the Eighth and Fourteenth Amendments if those actions were inadequate in light of these particular circumstances. *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[I]magine that prison officials prescribe a painkiller to an inmate who has suffered a serious injury from a fall, but that the inmate's symptoms, despite the medication, persist to the point that he now, by all objective measure, requires evaluation for surgery. Would prison officials then be free to deny him consideration for surgery, immunized from constitutional suit by the fact that they were giving him a painkiller? We think not.").[26]

Indeed, in the context of COVID-19, federal courts have found deliberate indifference even where it was undisputed that officials adopted some appropriate measures. For example, in In *Wilson v. Williams*, the court found deliberate indifference even though officials had made "good efforts" to "change[] its operations to try to limit the virus's spread. Ex. X, Order (Doc. 22), *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020). For example, the prison "implemented health screening measures" and "modified operations to somewhat reduce inmate contact with each other." *Id.* at *2, *3. Yet, the court found that prison's "shockingly limited available testing," alone, amounted to deliberate indifference. *Id.* at *1, *8.[27] The court also noted the prison's "[failure] to separate its inmates at least six feet apart, despite

---

[26] *See also McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable.").

[27] The Jail has also used an unknown number of tests on staff, resulting in 28 positive tests. Doc. 29-1 ¶ 33.

clear CDC guidance for some time that such measures are necessary to stop the spread and save lives." *Id.*[28]

This is particularly true where, as here, the Jail has failed to address critically important issues. Nothing in Defendant's voluminous evidence reveals a plan for the protection of medically vulnerable prisoners. *But see* Doc. 36-21 at 4 (memo from Corizon, LLC, the company that contracts with the Jail for medical care, instructing that the Jail should "ensure that there is a specific plan in place" for medically vulnerable prisoners because they face "the highest risk" from COVID-19). This omission matters. Indeed, in *Coreas v. Bounds*, a court in this district found that petitioners could satisfy the subjective test where detention facilities had taken "steps in the right direction," but left "notable gaps," including a "major deficiency in the lack of any procedures to address the heightened risk to detainees with certain medical conditions." No. CV TDC-20-0780, 2020 WL 1663133, at *11 (D. Md. Apr. 3, 2020).[29] Similarly, in *Coronel v. Decker*, the court found deliberate indifference where "[t]he record contains no evidence that the Government took any specific action to prevent the spread of COVID-19 to high-risk individuals" in civil detention facility, even though the government "ha[d] taken some steps in response to COVID-19,"

---

[28] Both Plaintiffs' and Defendant's evidence demonstrate that, like in *Williams*, the Jail's testing is extremely limited and the Jail has failed to implement social distancing. Indeed, the Jail's testing capacity in this case approaches that which the *Wilson* court found so "shockingly limited" that this alone was sufficient to show deliberate indifference; *Wilson*, No. 4:20-CV-00794, 2020 WL 1940882, at *1, *8. The prison in *Wilson* had seventy-five tests, and it was receiving twenty-five more each week, with a population around 2400, *id.* at *3-4; here, with a population around 600, the Jail has used twenty tests on prisoners, and it has twenty left, Doc. 29-1 ¶ 33.
[29] The Court explained that, in light of these conditions, it would find the subject test satisfied "[i]f any detainee or staff member at [the facilities] were known to have COVID-19." *Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *11.

including "increase[ing] sanitization" and "provid[ing] hand sanitizer to inmates." 20-CV-2472

(AJN), 2020 WL 1487274, at *5, *6 (S.D.N.Y. Mar. 27, 2020).[30]

In sum, although Defendant insists that the Jail has weathered the pandemic in near-perfect

compliance with public health recommendations, the record before the Court tells a different story.

Defendant's claims are contradicted by Plaintiffs' evidence and Defendant's own. Even if

Defendant's representations are taken as true, the Jail has still not taken several obvious, critical

steps to protect prisoners' safety. This constitutes deliberate indifference.[31]

---

[30] *See Coronel*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *5 ("[The Government] has not isolated these high risk individuals. It has not created special safety or hygiene protocols for them or for staff interacting with them to follow. . . . [E]ven the steps the Government has taken do nothing to alleviate the *specific, serious*, and *unmet* medical needs of the high-risk Petitioners in this matter."); *cf. Fraihat v. Wolf*, 19-cv-1546-JGB-SHK (C.D. Cal. Apr. 20, 2020) (finding deliberate indifference in the substantive due process context where, "[w]hile Defendant took some available measures to mitigate the threat of COVID-19," Defendant had failed to "identify individuals most at risk of COVID-19 complications and to require specific protection for those individuals"). Additionally, the court *Coronel* relied on the fact that, "on the record before the Court, [the Government] has no system to even determine which of its detainees face heightened risk from COVID-19." *Coronel*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *5. This appears to be a problem in this case as well. Although the Jail's medical director provided a list of medically vulnerable prisoners at Plaintiffs' request, the list is implausibly short—containing only twenty-three individuals. *See* Doc. 29-1 ¶ 31. More troubling, the director purported not to know that Plaintiffs meant by "medically vulnerable." *See* Doc. 29-1 ¶ 31 ("Plaintiffs requested information regarding patients who are 'medically vulnerable.' It remains unclear to me how Plaintiffs define that term. I identify below certain patients with chronic medical conditions.").

[31] Defendant does not raise exhaustion under the Prison Litigation Reform Act (PLRA), which is an affirmative defense that must be pled. *Jones v. Bock*, 549 U.S. 199, 216 (2007) (failure to exhaust is an affirmative defense); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) ("[I]nmates need not plead exhaustion, nor do they bear the burden of proving it."). However, since this Court requested information on the Jail's grievance procedure, Doc. 24-1, Plaintiffs note that the evidence in the record demonstrates that the grievance procedure is "unavailable," so exhaustion must be excused. *Ross v. Blake*, 136 S. Ct. 1850, 1859, 195 L. Ed. 2d 117 (2016). Prisoners are routinely denied grievance forms when they request them. *See* Ex. 11, Decl. 11 (Doc. 2-1 at 66) ¶ 38; Ex. 14, Decl. 14 (Doc. 2-1 at 78) ¶ 10; Ex. 19, Decl. 19 ¶ 11 (Doc. 2-1 at 108); Ex. 23, Decl. 23 (Doc. 2-1 at 112) ¶ 9; Ex. 24, Decl. 24 (Doc. 2-1 at 116) ¶ 12; Ex. 25, Decl. 25 ¶ 15; *see also* Ex.28,  Decl. 28 ("No grievance forms are available. That whole grievance process is a joke. Basically, you have to ask your housing unit officer to get a grievance form in the first place. But most housing unit officers just want to resolve an issue without actually giving you a grievance form. Sometimes they'll even call in the shift commander to try to talk you out of

**2.  *Plaintiffs Face Irreparable Harm, and the Balance of Equities and the Public Interest Favor Relief.***

Defendant argues that Plaintiffs cannot show irreparable harm because none of the Named Plaintiffs have "suffered any harm" because none has tested positive for COVID-19. Doc. 29 at 21.[32] This argument is foreclosed by precedent. The Eighth Amendment "protects against future harm," *Helling v. McKinney*, 509 U.S. 25, 33 (1993); thus, a prisoner's rights are violated when she is exposed to "a substantial risk of . . . serious harm resulting from [her] unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166. And "the denial of a constitutional right . . . constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987).

Defendant does not address whether relief serves the public interest or whether the balance of equities favors Plaintiffs. Regardless, for the reasons stated in Plaintiffs' brief, Plaintiffs satisfy these factors as well.3-1 at 25-26.

**3.  *If Necessary to Remedy the Eighth and Fourteenth Amendment Violations, This Court May Transfer Prisoners to Home Detention or Another Appropriate Facility.***

The CDC and other public health experts have recognized that the Jail may not be able to protect every prisoner's constitutional rights without transferring at least some prisoners. *See* Doc. 3-1 at 32 n. 53 & accompanying text.[33]

---

getting a grievance form. And if you persist in your request for a grievance form, you're risking getting punished. On multiple occasions, I have seen inmates be punished for insisting that they be given a grievance form."). Tellingly, only one grievance form has apparently been filed about the Jail's handling of COVID-19. Doc. 37-4 at 34-35.

[32] Defendant also asserts that none of the Named Plaintiffs have "reported that they were in close contact with anyone who tested positive for COVID-19." Doc. 29 at 21. Both statements are incompatible with Plaintiffs' allegations: five of the Named Plaintiffs have symptoms of COVID-19, Compl. ¶¶ 14, 15, 17, 18, 19, 21; one alleges that his cellmate went to the Medical Unit and did not return, Compl. ¶ 20.

[33] *See above* (noting that several Plaintiffs are detained at the Jail even though a court has approved them for transfer to home detention because pretrial services, a division of the Department of Corrections, has exercised this option).

Defendant does not dispute that this Court may do so. Therefore, if this Court determines that the Jail's conditions cannot be improved—or perhaps that some prisoners cannot be made safe in them—without making appropriate transfers to home custody, it may transfer prisoners as necessary to protect their rights and the rights of others in the Jail. *See* Doc. 3-1 at 31-33.[34]

### B.  This Court Should Enjoin Defendant's Illegal Detention Policy.

Plaintiffs have alleged—supported by evidence—that Defendant has an unlawful policy of detaining prisoners who are legally entitled to release, solely because those prisoners are COVID-positive. Compl. (Doc. 2) ¶¶ 183-87. Plaintiffs request immediate relief under the Fourteenth Amendment so that the Jail will not illegally detain them. Pls. Br. (Doc. 3-1) at 26-28.

Defendant makes no challenge to Plaintiffs' legal argument on this claim.[35] Instead, Defendant contends (without evidence) that it has only illegally detained one COVID-positive person. Doc. 29 at 12. Defendant explains that his "release was postponed" only because that person's "family instructed Defendant McDonough that he could not come home," and so the Jail could not release him without "exposing him to the public." Doc. 29.[36]

---

[34] For example, Plaintiffs' experts contend that the Jail must not place prisoners with serious mental illness in isolation without access to "enhanced psychological services," Ex. 34, Haney Decl. (Doc. 2-1 at 210) ¶ 24, and that failure to provide these services could depress these prisoners' immune systems and increase the risk of infection and serious illness from COVID-19, Ex. X, Sapolsky Decl. ¶ 39; *id.* ¶¶ 18-31 (describing the means by which psychological stress can increase the risks of COVID-19). If the Jail is largely able to remedy its conditions, but it cannot provide enhanced psychological services to prisoners in medical isolation with serious mental illness, transfer may be necessary to protect these particular prisoners' rights.

[35] Indeed, Defendant makes no reference to this claim in the argument section of its brief. *See* Doc. 29 at 17-21.

[36] The man's criminal defense attorney attests that the man's family "desperately wanted him home," but could not house him because they were medically vulnerable. Ex. 29, Glenn Decl. ¶ 24. However, had he been released when he was legally entitled to be, "he would have sought treatment at a local hospital." *Id.*; *see also* Ex. 9, Decl. 9 ¶ 23 (stating, on April 7, 2020, "On Friday, April 3, my bond was paid. I want to be released. But they won't release me until they decide I'm no longer contagious."). When he was released after being illegally detained for fourteen days, he "rode the bus to a friend's house where he was able to stay." *Id.* Throughout the

Beyond these statements, Defendant does not actually argue that it has no overdetention policy, nor does Defendant contend that it would not resort to illegal detention if these circumstances arose again. *See* Doc. 29 at 11-12. Regardless, Defendant's admission that Director McDonough was involved in the overdetention is sufficient to establish that an official policy exists, even if this had been the only incident. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ("We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.").

However, this was not the only incident; as Plaintiffs' evidence describes, the Jail has illegally detained at least one other person because of his COVID-positive status. *See* Ex. 29, Glenn Decl. ¶ 25; *see also* Ex. 11, Decl. 11 ¶ 22 ("My bond is paid and I want to be released. They say I have warrants, but they won't serve me with the warrants because I have Coronavirus. So I just have to sit here and wait."). Moreover, Plaintiffs have alleged that the Jail has a policy of illegally detaining prisoners who are infected with COVID-19, and that they are therefore in danger of being illegally detained as well. Compl. ¶¶ 183, 204-206; *see also* Ex. 29, Glenn Decl. (Doc. 2-1 at 142) ¶ 24 ("It has also become clear that the jail has adopted a policy of illegally detaining people for no other reason than that they have tested positive for the Coronavirus."). Plaintiffs' evidence and

---

time that he was illegally detained, Ms. Glenn and the head of her office advocated for his release with "multiple jail officials." *Id.* She also filed an emergency petition for habeas corpus in state court, but she was notified by chambers that it would not be heard until a week later (by the time it was set, the illegal detention had ended). *Id.*

allegations show that Plaintiffs can likely prove the existence of a policy, and because this policy is clearly unlawful, this Court should enjoin it, *see* Pls. Br. (Doc. 3-1) at 26-28.

## II.    The Medically Vulnerable Subclass Is Entitled to Relief Under § 2241

Plaintiffs in the Medically Vulnerable Subclass—who are all pretrial detainees—seek release from the Jail under 28 U.S.C. § 2241 because it cannot detain them without exposing them to an unconstitutional risk of harm. *See* Pls.' Br. (Doc. 3-1) at 28-31; Compl. ¶¶ 209-211. Aside from its contentions about Defendant's efforts to contain COVID-19 (which, as described above, are largely contradicted by both Plaintiffs' and Defendant's evidence), Defendant does not specifically address whether the Jail can continue to detain medically vulnerable prisoners without exposing them to an unconstitutionally high risk of infection, serious illness, long-term physical damage, and death. And regardless, federal courts have granted § 2241 relief in cases where, because of the detention facility's efforts and conditions, the risks imposed by COVID-19 were far lower than they are here. *See, e.g.*, Order (Doc. 22), *Wilson v. Williams*, 4:20-cv-00794-JG, at 9-11, 20-21 (N.D. Ohio, Apr. 22, 2020) (granting § 2241 to a subclass of medically vulnerable prisoners even though the prison had made "good efforts" to control the virus, including effective symptom screening for prisoners and staff and education about hygiene and social distancing); *see also Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *10, *11 (D. Md. Apr. 3, 2020) (stating that it would release medically vulnerable detainees if there were any cases of COVID-19 at the facilities holding them, even though the facilities gave detainees "soap, hand sanitizer, and cleaning supplies," encouraged them to seek medical treatment for illness, and had implemented thorough screening measures).

Instead, Defendant contends that § 2241 is not the right vehicle for relief. In addition, Defendant obliquely references exhaustion (without explicitly raising it), suggesting that Plaintiffs could seek a remedy in state court instead. Both arguments are unavailing.

## A.  Section 2241 Is A Proper Vehicle for the Requested Relief.

Defendant contends that the Medically Vulnerable Subclass cannot proceed under § 2241 because they challenge the conditions—rather than the fact—of their confinement. *See* Doc. 29 at 17-19. Defendants primarily rely on the statutory language of § 2241, which states that a writ may be granted when a prisoner "is in custody in violation of the Constitution . . . of the United States." § 2241(c)(3); *see* Doc. 29 (quoting *id.*).

But the subclass members do contend that they are "in custody in violation of the Constitution." § 2241(c)(3). They allege that the Jail's conditions are unacceptably dangerous and cannot be remedied in time to protect their lives. *See* Doc. 3-1, at 28-30. Therefore, although conditions challenges normally proceed under § 1983, in these circumstances, the only way for the subclass members to avoid unconstitutional harm is to "seek[] immediate release or a speedier release from confinement—the heart of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475 (1973).[37] In other

---

[37] The U.S. Supreme Court has left open whether, in some circumstances, a petitioner may challenge the conditions of his confinement through habeas corpus. *See Preiser*, 411 U.S. at 499 (stating, while explaining the traditional differences between civil rights actions and habeas cases, that "[t]his is not to say that habeas corpus may not also be available to challenge such prison conditions"). And the Court has suggested that where, as here, a prisoner cannot avoid unconstitutional conditions without challenging the fact of his confinement, his challenge to those conditions would sound in habeas. *See Nelson v. Campbell*, 541 U.S. 637, 644-45 (2004) (suggesting that, if a death row prisoner alleged that there were *no* set of constitutional conditions under which he could be executed, his claim would sound in habeas because it would amount to a challenge of the execution itself); *see also* Ex. E to Pls.' Br., Doc. 3-1, Order (Doc. 23), *Malam v. Adduci*, No. 20-10829, at 8-9 (E.D. Mich. Apr. 6, 2020) (relying on *Nelson* to conclude that petitioner could seek relief under § 2241 because petitioner contended that release was the only adequate remedy to ensure her safety from the risk of COVID-19 in the correctional facility where she was detained).

words, here, the unconstitutional conditions of confinement render the fact of confinement unconstitutional as well.[38]

Multiple federal courts have found § 2241 the appropriate vehicle for relief where a detention facility could not adequately protect a prisoner from COVID-19. *See, e.g.*, *Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at *4 (S.D. Tex. Apr. 17, 2020) ("Plaintiffs seek immediate release from detention because there are no conditions of confinement that are sufficient to prevent irreparable constitutional injury . . . Where an individual is 'challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release,' the proper remedy is a writ of habeas corpus.") (quoting *Preiser*, 411 U.S. at 500);Order (Doc. 22), *Wilson*, 4:20-cv-00794-JG, at 9-11, 20-21 (granting a subclass of medically vulnerable prisoners relief under § 2241 where the prison's conditions enabled the spread of COVID-19 and rejecting argument that § 2241 was an improper vehicle for their claims); *see also* Pls.' Br. (Doc. 3-1) at 30 n. 51 (citing additional cases).

In *Coreas v. Bounds*, a federal court in this district concluded the same. No. CV TDC-20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020). In that case, medically vulnerable immigration detainees sought release under § 2241 because the detention facility had not adequately protected them from the risk of COVID-19. As here, Defendants argued that § 2241 was an inappropriate vehicle for petitioners' claims. The court rejected that argument. It explained, "[A]lthough the grounds on which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement." *Id.* at *7. Accordingly, theirs was a request for habeas relief. *Id.*[39]

---

[38] *See* Ex. C, Resnik Decl. ¶¶ 19-21 ("Because COVID-19 can end people's lives unexpectedly and abruptly, COVID-19 claims turn the conditions of being incarcerated into a practice that affects the fact or duration of confinement"); *see also* Ex. C, Resnik Curriculum Vitae.

[39] In its reasoning, the court explained that no binding Fourth Circuit Precedent governs whether and in what circumstances a petitioner may challenge his conditions of confinement under § 2241,

So too here: prisoners in the Medically Vulnerable Subclass contend that the Jail cannot resolve its dangerous conditions in time to protect them—thus, their only remedy is release from the Jail altogether. *See* Pls.' Br., Doc. 3-1 at 31; Compl. ¶¶ 209-211; *id.* at 45 (requesting "immediate release pursuant to a writ or writs of habeas corpus for members of the Medically Vulnerable Subclass").[40] As in *Coreas*, their request for release—the quintessential purpose of habeas relief— is not outside the scope of habeas just because the Jail's conditions form the basis for that request.[41]

### B. This Court Should Use Its Discretion to Excuse the Exhaustion Requirement.

Exhaustion under § 2241 is an affirmative defense, and Defendant has not raised it.[42] However, in the context of a different argument, Defendant does suggest that relief under § 2241 is

---

and it distinguishes prior cases where that court found § 2241 inappropriate. *See Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *6. Regardless, this Court "need not decide today whether conditions-of-confinement cases that do not challenge the 'fact or duration' of detention properly sound in habeas," because, here, subclass members do challenge the fact of their confinement and seek release. *Vazquez Barrera*, No. 4:20-CV-1241, 2020 WL 1904497, at *4; *see* Compl. at 45 (requesting "immediate release pursuant to a writ or writs of habeas corpus for members of the Medically Vulnerable Subclass").

[40] Because a court may "dispose of a [writ application] as law and justice require," § 2243, in Plaintiffs' view, this Court has the discretion to determine how any release it orders should proceed, whether release will include any conditions, and whether prisoners may be returned to the Jail if and when the unconstitutional conditions are resolved. *See also* Resnik Decl. ¶¶ 17, 35.

[41] Defendant argues that *Coreas* (the only case it cites in its argument on this point) is distinguishable because, as a separate basis for its conclusion that petitioners could proceed under § 2241, the court reasoned that immigration detainees had no other mechanism with which to challenge their confinement. Doc. 29 at 19; *see also Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *7. Defendant argues that here, in contrast, Plaintiffs could seek relief in state court. Doc. 29 at 19. But the fact that the court in *Coreas* had a second basis for its conclusion is irrelevant; the court's first, "most fundamental[]" basis for allowing petitioners to proceed under § 2241 (the fact that they sought release) squarely applies to the subclass members in this case. *Coreas*, No. CV TDC-20-0780, 2020 WL 1663133, at *7. Defendant's point seems more appropriately construed as an argument that Plaintiffs have not exhausted their state court remedies. Accordingly, Plaintiffs address it as such.

[42] *Jones v. Bock*, 549 U.S. 199, 216 (2007) (failure to exhaust is an affirmative defense); *Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015) (courts may consider failure to exhaust under 2241 "*if* the respondent properly asserts the defense.") (emphasis added).

inappropriate because "the detainees here can challenge their conditions of confinement and seek release by way of Writ of Habeas Corpus in state Circuit Court." Doc. 29 at 19.[43] Therefore, although this Court should not decide exhaustion at this time, Plaintiffs address it briefly now.

Federal courts apply a judge-made exhaustion doctrine in § 2241 cases. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490 (1973). Because exhaustion is not required by statute, a court may decide, pursuant to sound judicial discretion, whether to exercise jurisdiction in the absence of exhaustion. *See Welch v. Reno*, 101 F.Supp.2d 347, 351 (D.Md.2000) (citing *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). In particular, exhaustion may be excused where petitioners "may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." *McCarthy*, 503 U.S. at 146–47. That is the case here. Subclass members face a high risk of serious illness and death from COVID-19. *See* Doc. 3-1 at 28. Given the outbreak at the Jail, many subclass members are likely infected now, *see also* Doc. 3-1 at 29.

But because of the disruptions that COVID-19 has caused in the Prince George's County criminal court system, Plaintiffs cannot pursue timely relief in state court. Indeed, multiple factors—some specific to this particular state court system—have converged to cause serious delays. For attorneys, reaching clients in the Jail is a cumbersome process with many potential roadblocks that could create further delay. *See* Ex. K, Rettammel Decl. ¶ 4-5 (describing this process); Ex. 29, Glenn Decl. (Doc. 2-1 at 140-41) ¶ 19-22 (same). Prisoners in medical isolation are denied access to their attorneys altogether. *Id.* ¶ 17 (public defender stating, "[O]n Saturday, April 4, I was told that I would only be permitted to communicate with my [COVID-positive] client if I came to the jail and agreed to be locked into his isolation cell with him."); *see also* Ex.

---

[43] Defendant makes this point as part of its argument that the court's conclusion in *Coreas* that petitioners could challenge conditions under § 2241 because they sought release does not apply to the Medically Vulnerable Subclass in this case. Doc. 29 at 19.

K, Rettammel Decl. ¶ 10. In addition, the Courthouse has limited its operations and preliminary hearings are continuously pushed back. *Id.* ¶ 12, 14, 15. Because there are "far fewer opportunities to argue for release, the volume of bond reconsideration motions that are being fied [in state court] has increased exponentially." *Id.* ¶ 15.

Together, the result is significant delay. *Id.*; *see generally* Ex. 28, Schneller Decl. (Doc. 2-1 at 132-35). Since COVID-19 can escalate rapidly, particularly for the medically vulnerable, these delays amplify the risk that subclass members will become seriously ill in a Jail that is unprepared to effectively care for them. Doc. 3-1 at 30. This (as well as the constitutional nature of the detention) constitutes irreparable harm, and exhaustion is inappropriate here. *McCarthy*, 503 U.S. at 146–47.

### C. This Court Should Release the Medically Vulnerable Subclass Members on Non-Monetary Bond Conditions Now.

Defendant does not dispute that, while it considers subclass members' request for habeas relief, this Court may release them on non-monetary bond conditions. *See* Pls.' Br. (Doc. 3-1) at 33-35 (describing this Court's legal authority to do this); *see also* Ex. C, Resnik Decl. ¶¶ 27-51 (same). Nor does Defendant state that it would object to this Court doing so. Therefore, given the urgency of the risks to the Medically Vulnerable Subclass members (who are all detained pre-trial), this Court can and should release them on non-monetary bond conditions now.

### III.    CONCLUSION

Accordingly, Plaintiffs respectfully request that this Court grant the requested relief.


Respectfully submitted on April 29, 2020,


By s/Elizabeth Rossi
Elizabeth Rossi

30

Bar No. 19616
Katherine Chamblee-Ryan
*Pro hac vice*
Olevia Boykin
*Pro hac vice*
Ryan Downer
*Pro hac vice*
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
katie@civilrightscorps.org
610-931-7715

Attorneys for Plaintiffs


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2020 I caused the foregoing document to be electronically transmitted to the Clerk's Office and to Defendant's counsel using the CM/ECF System for filing.


<u>s/Elizabeth Rossi</u>
Elizabeth Rossi