# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| KEITH SETH, et al.,<br>Individually and on behalf of a class of similarly situated persons<br><br>               Plaintiffs-Petitioners,<br><br>v.<br><br>MARY LOU MCDONOUGH,<br>In her official capacity as Director of the Prince George's County Department of Corrections<br><br>            Defendant-Respondent. | Civil Action No.   8:20-cv-01028-PHX<br><br><br>**Joint Status Report** |

On May 12, 2020, the Court ordered the Parties to submit a written joint status report "to apprise the Court of progress made through the meet and confer process and to advise the Court as to whether the . . . lists [described in the Order] have been exchanged."  Letter Order, Doc. No. 66.  Per the Court's Order, the Parties met and conferred on May 15, 2020, and exchanged the lists described in the Order by May 14, 2020.

## I.     CONSENT DECREE/SETTLEMENT

At the May 15 conference, the Parties did not make progress toward a consent decree or settlement.

### A.     Plaintiffs' Position

Based on the Court's May 12 Letter Order and the hearing preceding that Order, Plaintiffs understood the Court to encourage Plaintiffs and Defendant to make efforts towards reaching a consent decree that might provide a basis for settling this case. As a good faith effort toward that end, Plaintiffs provided Defendant with an initial list of twenty areas for discussion

and potential agreement and expressed their intention to provide Defendant with a draft consent decree before the May 20 Hearing.  Plaintiffs still plan to provide this draft consent decree.  At the May 15 conference, counsel for Defendant stated that Defendant is not open to negotiating a consent decree in this case.

> **B.     Defendant's Position**

The Defendant declines to agree to the entry of a Consent Decree in the above-captioned matter for the several reasons.  First, the twenty terms of the proposed Consent Decree, which were extrapolated from Dr. Franco-Paredes's report recommendations, do not require formal agreement with the Court to gain compliance.  Next, Defendant has already implemented and/or will continue to follow the approved procedures as noted in items 1, 4, 5, 6, 7, 11, 12,13, 14,15, and 17.  As for Item 18, mental health treatment for inmates never ceased; only group therapy sessions were discontinued due to social distancing precautions.  Finally, provisions identified in Items 8, 9, 10, and 16 will be implemented with availability of testing kits.

|   | Task |
|---|------|
| 1 | Develop and implement a plan to identify, monitor, and release medically-vulnerable detainees. |
| 2 | Immediately release the six detainees that have been ordered to be released by state court. |
| 3 | Immediately release the 121 detainees authorized for release by state court, but not released by pre-trial services. |
| 4 | Continue adhering to strict hygiene in isolation rooms using professional janitorial assistance. |
| 5 | Continue to provide large soap bars free of charge to detainees. |
| 6 | Continue to provide all units with disinfectant to clean rooms, toilets, and telephones. |
| 7 | Assign staff members to consistent locations to limit movement. |
| 8 | Test all detainees, prioritizing detainees in units 1, 9, 10, and 17. |
| 9 | Test all newly admitted inmates prior to permitting them to access general population. |
| 10 | Test any detainee with one or more symptoms of COVID-19. |
| 11 | Provide training for nurses and correctional officers on expanded list of COVID-19 symptoms. |

12    Develop a plan for and implement monitoring of nurses responding to sick calls, temperature checks, or during med-line when detainees express complaints about COVID-19 symptoms.

13    Develop a plan for and implement social distancing practices during med-line, meal-line, telephone use, courtroom lineup, and courtroom use.

14    Develop a plan for and implement frequent disinfecting of high-touch surfaces.

15    Provide at least washable face cloths free of charge to detainees or provide disposable surgical masks to detainees no less than every 5 days.

16    Release COVID-positive detainees from quarantine to general population only after seven days of no symptoms and two negative tests on successive days.

17    For COVID-positive detainees in medical isolation, develop a plan for and implement responses to intercom requests by medical staff within a time specified by Dr. Franco or the court-appointed monitor.

18    Resume adequate mental healthcare treatment.

19    Agree to meet and confer regarding removing punitive conditions on isolation.

20.   Court-appointed monitor and regular reports to the Court on status.

Finally, there is no need for a court-order monitor or regular status report as the Defendant complies with the CDC Guidelines and will continue to do so.

## II.    LIST OF MEDICALLY-VULNERABLE INDIVIDUALS

On May 14, 2020, Defendant provided Plaintiffs with a list of 70 medically vulnerable individuals in the Jail.[1]  As of the filing of this Report, all but two of those individuals remain incarcerated at the Jail.

### A.    Plaintiffs' Position

Plaintiffs have no confidence in the accuracy of Defendant's list of medically-vulnerable individuals detained at the Jail.  *First*, Plaintiffs are aware of two individuals currently in the Jail who are marked as having high-risk conditions in the Jail's own records, but who are not included on this list.  Specifically, in one of Defendant's exhibits, a Jail official notes that detainee JVaughn Privott "was seen by [the Jail's] medical personnel for treatment of his

---

[1] The list includes separate categories for detainees with high-risk medical conditions (59 individuals) and detainees who are over the age of 55 (14 individuals). Three detainees are in both categories.

asthma," that "he was also prescribed medication to use on an as needed basis," and that "he is assigned to [the Jail's] chronic care clinic." Doc. 37-4 at 29.  Mr. Privott is still detained at the Jail,[2] but he does not appear on Defendant's list. The Jail's records also document that another individual, who tested positive for COVID-19, has asthma and that the Jail prescribed him medication for that condition.[3]  This individual is still detained in the Jail, but he also does not appear on Defendant's list.  The omission of these individuals is particularly worrisome because Plaintiffs discovered this issue by random chance.[4]  There is simply no telling how many others have been excluded.

*Second*, in a declaration attached to its response to Plaintiffs' Motion for a Temporary Restraining Order, Defendant identified 23 persons detained at the Jail as medically vulnerable. *See* April 25, 2020, Declaration of Dr. Asresahegn's at ¶ 31, Doc. No. 29-1.  However, nearly *half* of the individuals featured on the initial list provided by Dr. Asresahegn appear to have been omitted from the May 14 list provided by Defendant.  Dr. Asresahegn's declaration identified 23 medically-vulnerable individuals by their initials.  For ten individuals on that list, no one with matching initials and conditions appeared on Defendant's May 14 list.  For example, Dr. Asresahegn's list includes a person with the initials C.M. who has hypertension and congestive heart failure.  Doc. 29-1 at 16.  No one with either these initials or congestive heart failure

---

[2] To determine whether an individual is still detained at the Jail, Plaintiffs used the Jail's "Inmate Lookup" tool. *See* Prince George's County Jail Inmate Lookup, http://inmatelookup.princegeorgescountymd.gov/IML (last visited May 18, 2020).

[3] Plaintiffs obtained this individual's medical records from the Jail as part of their investigation in this case. On May 15, 2020, after realizing that he was omitted from Defendant's list, Plaintiffs provided that individual's name and the relevant portions of those records to Defendant's counsel. If this Court wishes to review this evidence, Plaintiffs will seek to file it under seal.

[4] Indeed, Plaintiffs obtained the second individual's medical records after being contacted by the mother of a detainee who had seen news reports about this lawsuit and had previously obtained her son's medical records from the Jail because of her concerns about his treatment for COVID-19.

appears on the May 14 list.  Dr. Asresahegn's list also includes a detainee with emphysema ("J.L.") and a detainee who is pregnant ("M.E."), but no one with these conditions appears on the May 14 list either.[5]  Again, this suggests that there has not yet been a rigorous review of the persons detained at the Jail to determine who is in fact medically vulnerable.

*Third*, Defendant's May 14 list includes more than double the number of detainees that were on the initial list provided by Dr. Asresahegn.  This is true despite the fact that the May 14 list includes fewer conditions than those that appeared on Dr. Asresahegn's initial list.[6]  No explanation has been offered for this significant discrepancy. This further undermines Plaintiffs' confidence that Defendant has any reliable means of identifying the medically vulnerable individuals who are detained in the Jail.

Plaintiffs raised these concerns with Defendant at a conference on May 15.  Specifically, Plaintiffs suggested that the issues with Defendant's medically-vulnerable list fall along two axes: (1) what conditions or characteristics render a person medically vulnerable to COVID-19, and (2) how to identify detainees who suffer from the medically-vulnerable conditions.  Plaintiffs have proposed solutions on both.

On the first axis, this Court's May 12 Letter Order provided that Defendant was to "provide to Plaintiffs a list of those detainees who qualify as 'high risk' pursuant to CDC guidelines (found at page 2 of Inspection Report submitted by Dr. Carlos Franco-Paredes)."  In the referenced Inspection Report, Dr. Franco-Paredes used broad categories consistent with the

---

[5] As described below, Plaintiffs have provided Defendant with a memo listing all ten individuals who appear on Dr. Dr. Asresahegn's list, but not on the May 14 list.

[6] *See supra* at 4 (noting that the May 14 list does not include anyone with congestive heart failure, emphysema, or pregnancy).

CDC guidelines, such as "chronic lung disease," "serious heart conditions," and "immunocompromised." Inspection Report at 2, Doc. No. 65. At the May 15 conference, Defendant stated that it compiled its May 14 list by giving the guidance in Dr. Franco-Paredes's report to the Jail's medical staff. However, Dr. Franco-Paredes did not list the specific diagnoses that fall within these categories. *See id.* Plaintiffs suggested that this may be a reason for Defendant's under-inclusive list. Plaintiffs then proposed two solutions.

First, Plaintiffs offered to provide Defendant with a list of all specific diagnosis that the CDC states renders a person high-risk of severe illness and death from COVID-19. On May 15, Plaintiffs provided this list to Defendant's counsel by email. On the list that Plaintiffs provided, Plaintiffs reproduced Dr. Franco-Paredes's list from the Inspection Report and then, within each broad category, Plaintiffs included specific diagnoses recognized as high risk by the CDC. Each diagnosis listed by Plaintiffs is accompanied by a link to the CDC's website identifying it as a high-risk condition. Second, Plaintiffs directed Defendant's attention to a declaration by Dr. Franco-Paredes in *Fraihat v. U.S. Immigration & Customs Enforcement*, No. 19-CV-01546-JGB (SHKx), Doc. No. 81-12. In that declaration, Dr. Franco-Paredes provided a more specific list of diagnoses that fall within the CDC's high-risk categories. On May 15, Plaintiffs provided this declaration to Defendant. At the May 15 conference, Plaintiffs stated that they would be satisfied with either solution (or with any other solution offered by Defendant). As of filing this Report, Defendant has not agreed to use either list of diagnoses, and it has not suggested any solution of its own. Nor has it asked any questions or provided any feedback about Plaintiffs'

more detailed list or Dr. Franco-Paredes's declaration in *Fraihat*.  Indeed, it has not followed up on this issue at all.[7]

On the second axis—determining who suffers from the identified conditions—Defendant's process was insufficient.  At the Parties' meet-and-confer, Defendant stated that its list of detainees with high-risk conditions only includes detainees who are a part of the Jail's chronic care program.  Defendant explained that the chronic care program only includes detainees with a condition that is being actively managed by the Jail, such as by providing medications.  However, it is not clear that all of the conditions in the CDC's high-risk categories require the sort of active management that the Jail's chronic care program involves.  Moreover, even if this process were sufficient, Defendant's own evidence demonstrates that the May 14 list does not actually include all chronic care patients. As noted above, one of Defendant's exhibits states that a detainee named JVaughn Privott has asthma and "is assigned to [the Jail's] chronic care clinic." Doc. 37-4 at 29.  But although Mr. Privott remains at the Jail, he is not included on the May 14 list.

To remedy this issue, Plaintiffs have proposed a series of measures that may give Plaintiffs and the Court some confidence in Defendant's list.  Plaintiffs proposed the use of one or a combination of the following: using medical billing codes in the Jail's records, if available, to identify persons with medically-vulnerable conditions; conducting a full review of the medical records of all persons detained at the Jail (Plaintiffs' counsel offered to conduct this review themselves subject to a HIPAA-qualified protective order); distributing a questionnaire to persons detained at the Jail to be corroborated with external sources, including the Jail's own

---

[7] If this Court requests it, Plaintiffs will submit both Plaintiffs' more specific list of diagnoses and Dr. Franco-Paredes's *Fraihat* declaration to the Court.

records. Plaintiffs also offered to consult with Plaintiffs' expert Dr. Jaimie Meyer (at Plaintiffs' expense) to identify additional possibilities, since Dr. Meyer has assisted several corrections facilities in devising a method to identify medically vulnerable prisoners.  At the May 15 conference, Defendant agreed to consider these options, except for the questionnaire, but it did not commit to a specific approach.

Plaintiffs also noted that some medically vulnerable individuals in the Jail may not be identified as such in the Jail's records. Plaintiffs suggested that some detainees might be impeded from clearly communicating their medical histories because they are intellectually disabled or severely mentally ill, and several appear to be detained for a competency evaluation or competency restoration.  Defendant responded that it is these individuals' responsibility to communicate their conditions to the Jail.  Accordingly, Defendant declined to agree to add persons to the medically vulnerable list if Plaintiffs provide evidence of medically-vulnerable conditions that do not appear in the Jail's records (such as prescriptions, previous medical records, or similar documentation)

Defendant's failure to compile a trustworthy list of medically vulnerable people detained at the Jail and its failure to develop a plan to ensure that they are kept safe amidst the COVID-19 pandemic is deeply troubling.  Based on Defendant's May 14 list alone, at least 51 medically-vulnerable individuals are currently detained in units where there have been confirmed cases of COVID-19.[8] With this in mind, Plaintiffs respectfully request that, if Defendant does not commit to a reasonable plan to identify and protect these individuals by the May 20 Hearing, this Court enter a temporary restraining order mandating that it do so.

---

[8] Plaintiffs compiled a list of these individuals by comparing the May 14 list to Defendant's exhibit showing the housing units where positive cases were identified.  *See* Doc. 37-23.  Plaintiffs can provide this list to the Court if this Court would find it useful.

**B.      Defendant's Position**

As to updating the medical vulnerable list, the option of utilizing medical codes to conduct a search is not possible because the jail's medical provider does not use billing codes. Thus, the only way to obtain a comprehensive list of medically vulnerable inmates is to review each and every medical file.

## III.     LIST OF PERSONS ORDERED RELEASED

On May 12, 2020, Plaintiffs provided Defendant with the list of six individuals ordered released referenced in ECF No. 61-1.  As of the filing of this Report, two of those individuals have been released from the Jail and four remain detained.

**A.      Plaintiffs' Position**

At the May 15 conference, the parties discussed the four individuals who, based on docket information, appear to have been ordered released by a court.  Defendant suggested that the four remaining individuals may have been authorized for release as opposed to ordered released. When Plaintiffs noted their understanding that docket entries specifically stated that release was "ordered," Defendant posited that this might have been a clerk's error.  Defendant also suggested that, per an unwritten understanding between Pretrial Services/the Department of Corrections and the courts,[9] even when a court orders release, Pretrial Services cannot release that person unless they satisfy Pretrial Services' internal criteria.  Plaintiffs responded that it seemed impossible that, even when a court orders release, Defendant need not (and cannot) comply with that order because of some unwritten arrangement.  Moreover, Plaintiffs asked Defendant what legal basis existed for any consequences to be imposed if Pretrial Services were

---

[9] As Defendant's counsel has explained to this Court, Pretrial Services is a division of the Department of Corrections.

to release a person who was ordered released, but who did not satisfy Pretrial Services' own internal policies.  Defendant did not offer any mechanism by which Pretrial Services can be required to follow its own internal criteria, but it again explained that its unwritten obligation is to do so.

The Parties agreed that they would each attempt to obtain the actual orders for these individuals. As Plaintiffs pursued this effort, Plaintiffs learned that only two paper copies of a court order for release or authorization for release are generally available in a case—one that is sent to the Jail and another that is sent to the state court clerk's office.[10]  Due to the COVID-19 pandemic, the state court clerk's office is unavailable to retrieve the orders.  Accordingly, the only copy of the orders readily accessible is the copy at the Jail.  On May 16, 2020, Plaintiffs informed Defendant that the orders are in its possession and requested that Defendant immediately retrieve and produce them.

On May 18, 2020, Defendant produced the requested paper orders to Plaintiffs.  The paper orders confirm that the four individuals were ordered released by a court.  Three of the four should be released immediately.  One of the four was ordered released "if eligible."[11] except for one listed person who was ordered released "if eligible," each of the identified persons have a state court order mandating their release.   This confirms that, when a state court wishes to place any condition on its order, it knows how to do so. Absent any such conditions—and without any law, regulation, standing order, or even written memoranda stating differently— Plaintiffs assume that a court order must be followed, and that at least three of the four

---

[10] The Prince George's County criminal courts are an all-paper system.

[11] Based on conversations with members of the criminal defense bar in Prince George's County, Plaintiffs believe that this means that the person must be released if he meets certain basic criteria (*i.e.* once those criteria are met, release is mandatory). However, Plaintiffs will continue to investigative this question.

individuals are now unlawfully detained. The two individuals who have since been released were also clearly ordered released. One of them was ordered released in January, but not released until May 11, 2020.

### B.     Defendant's Position

The requested Court Orders for the six identified inmates allegedly entitled for immediate release were produced.  The six individuals they claim are being detained against court orders and do not believe that to be the case. All criminal defendants listed by the Plaintiff ("Listed Defendants") were identified utilizing the PGCDOC's computer database known as the Offender Management System (OMS). Each defendant's name was checked to determine the following:

a) Name
b) Case Number(s)
c) Charge(s)
d) Bond Amount(s), if any
e) Warrant(s)-open, pending, and or served
f) "Comments" Field for status updates to include judge's comments, bond hearing or other court docket entries input by PGCDOC Records Paralegals, and Population Management supervisors' coded comments
g) Mental Health and/or Medical Health information
h) Pretrial release status (for all Prince George's County cases for which the defendant is currently committed to PGCDOC)
i) Whether pretrial release was ordered or authorized by the presiding judge.

PGCDOC requires specific information that must be collected in a prescreening interview with a defendant and verified prior to any defendant's release on Pretrial Release Level IV:

a. Non-violent offense (unless otherwise ordered or approved by PGCDOC)
b. Inmate's identity, address and telephone number;
c. Full criminal history check to ensure no open warrants, detainers or pending charges (other than the intake case, and that all pending cases allow pretrial release);
d. Residence in Prince George's County, MD;
e. Employment/school address and schedule;
f. Have and maintain an operable telephone;
g. Ability to reside with a cooperative family member willing to accept program rules;
h. Be employed or willing to participate in full-time employment, education and/or training;

      i.  References to establish community ties;
      j.  Employment history;
      k.  Past and present substance usage and abuse;
      l.  Medical information (for any medication compliance requirements);
      m.  Any other conditions ordered by the court, such as victim contacts, social media information, internet access, .etc.)

This process is outlined in PGCDOC Policy and Procedure 20.3 Pre-Trial Investigation Services. (also provided.) Once PGCDOC determines that a defendant who has been ordered to pretrial release cannot satisfy one or more of these criteria, PGCDOC informs the court that issued the order for pretrial release ("the issuing court") and awaits further instructions. This information is required in order to determine the proper parameters of electronic monitoring for each individual defendant. Without proper home address verification, for example, GPS monitoring of a defendant's location would be meaningless, especially if there are stay-away orders or restrictions on activity. The time it takes to obtain this information can vary for each defendant, as it is based on the amount of time responses are received from external sources and involved individuals, such as employers and alleged victims.

All Listed Defendants were checked for all possible issues that needed to be investigated, mitigated, or reviewed prior to any status being recorded or defendant being released or coded that s/he can't be released at current time. Some of the issues that may affect a defendant's release are:

      n.  Contacting the victim(s);
      o.  Verifying an address;
      p.  Verifying a Prince George's County address of residency. This is important because we have field investigators that check on clients (defendants) released on Level 4 Supervision, either on Electronic Monitoring ("EM") or Home Detention for County-sentenced defendants ("HD"). A home address is essential for both EM and HD.

The courts have entrusted the PGCDOC 's alternative to incarceration programs, as far as EM and HD are concerned, to check on these defendants at least three (3) times per week at their respective Prince George's County residence, school, and/or place of employment. Criminal

defense attorneys have often contacted PGCDOC in order to ask about the status of his/her client's pretrial release. ***Generally, in cases where there is confusion or disagreement with a defendant's criminal defense attorney about a defendant's pretrial release conditions, the attorney would contact the court for clarification or intervention.***

As of the date of this Affidavit, PGCDOC has 151 defendants on EM and HD and 120 defendants being monitored on Levels II and III. Currently, the aggregate is 271. All Listed Defendants were also cross-referenced with the population list being maintained in the Monitoring Service Unit which records statuses for defendants being considered for either EM or HD. It is important to note that the court status of any of these defendants can change from day to day or week to week, month-to month. The Unit attempts to verify all information to work towards releasing a defendant, but there are circumstances the Unit cannot control, such as a victim's reactions to potential release, family members/friends who are hesitant or reluctant to allow a defendant to live with them, stipulations that can't be successfully implemented or monitored (for instance-"Release Defendant but s/he is to have no contact with anyone in the community under the age of 18" or "no access to any Internet device or the Internet," etc.).

While PGCDOC continuously works to obtain and verify information, screening any defendant for pretrial release can take anywhere from a few days to a few weeks, even with assistance from defense attorneys to find new friends or family to approach or alternate contact information when initial information is not successfully verified. All Listed Defendants who had court statuses that needed updates were cross-referenced with information from OMS, the courts, CAPS (Court Applications Portal), and Maryland Case Search. Only Listed Defendants who had open warrants had their Records Base File reviewed to determine if the warrant is valid,

extraditable, and if the jurisdiction wants to have custody of the defendant once s/he finishes all pending Prince George's County charges.

No Listed Defendants were released due to the Plaintiff's lawsuit or May 13th list.  Any defendants that were released or held in custody were effectuated as a part of the PGCDOC's adherence to court orders, its routine operational policy and procedures governing custody, alternatives to incarceration, and release to either maintain custodial care of all defendants committed to the PCCDOC based on a court officer or other public safety agency, or conversely, a court officer or other public safety agency submitting a "Release" to the PGCDOC, resulting in the PGCDOC relinquishing custody of said defendant.

## IV.    LIST OF PERSONS AUTHORIZED FOR RELEASE

On May 14, 2020, Plaintiffs provided Defendant with a list of 122 individuals authorized for release.  As of the filing of this Report, 113 of those individuals remain detained at the Jail.

### A.    Plaintiffs' Position

There is no legal basis for the Jail's apparent discretion in determining whether to release a person authorized for release by the state court.  Any mandatory conditions of release— including specifications that a defendant may only be released at a particular level of custody, that a defendant may only be released to a verified address, or that a defendant may not be released unless she is compliant with mental health medication—appear in the court's authorization order.  But beyond any specific requirements issued in a particular case by the court,[12] it is the Jail, by operation of Pretrial Services, that apparently determines whether to

---

[12] On the list that Plaintiffs provided to Defendant, Plaintiffs noted any specific requirements that were imposed by the court. As described above, Plaintiffs cannot access the paper orders issued by the court in these cases. Therefore, to compile this list, Plaintiffs referred to the text of the court orders on the docket. However, Plaintiffs' understanding is that this text is normally identical to the printed court orders.

-14-

release the individual.  Defendant contends that it must detain the individuals who are authorized for release but nevertheless remain in the Jail because its own policies require it to do so.  But Defendant has identified no law—not a statute, regulation, or standing order—that prevents Defendant from deviating from or altering its policies and releasing these individuals subject to any restrictions in the court's authorization order.[13]

At the May 15 conference, the Parties agreed that further understanding of the Jail's/Pretrial Services' legal authority to make detention decisions is necessary for the Jail and Plaintiffs to better understand the Jail's ability to release the persons authorized for release during this pandemic emergency.  On May 16, Plaintiff's counsel sent an email to Defendant's counsel explaining that only the Jail currently has access to any paper orders and requesting a sampling of paper orders authorizing release.  Plaintiffs' counsel suggested that reviewing authorization orders with different sorts of conditions might clarify the authorization issue.  Accordingly, Plaintiff's counsel requested six specific orders that, based on Plaintiffs' review, include authorization for the following: (1) release at any level with no additional conditions; (2) release at any level with no additional conditions (but for a mental health court participant): (3) release at level 4 (home detention) only; (4) release to live with defendant's mother (for a mental health court participant); (5) release to a verified address with a medication compliance requirement (for a mental health court participant); and (6) to serve sentence on home detention.

---

[13] According to Plaintiffs' review, as documented in the list provided to the Defendant, at least 30 people now detained at the Jail were authorized for release without any additional restrictions, and at least 47 more were authorized at a specified level with no additional court-ordered restrictions. Thirteen of the individuals authorized for release appear on Defendant's May 14 list of medically vulnerable detainees.

Plaintiffs' counsel provided the name of the defendant and case number for each order. Plaintiffs have not yet received a response.

On May 18, 2020, Plaintiffs sent Defendant more detailed docket information for the six individuals. This docket information demonstrates that the court imposes a variety of conditions on release when it wishes to do so, including conditioning release on a verified address, that the defendant live with a particular person, and that the defendant be compliant with mental health medication. This demonstrates that, when a court wishes to impose conditions on release, it does so, further undermining Defendant's claim that it is somehow bound to impose conditions of its own.

If Defendant does not provide the requested sample authorization orders by the May 20 Hearing, Plaintiffs respectfully request that this Court order Defendant to do so.

### B.      Defendant's Position

I refer this Court to Defendant's previous stated reasons herein.

## V.      TESTING

At the May 15 conference, Defendant provided updates to Plaintiffs regarding its attempts to increase testing at the Jail.

### A.      Plaintiffs' Position

The Jail's lack of sufficient testing continues to present significant danger to the people detained at the Jail, as well as to the Jail's staff. Dr. Franco-Paredes specifically noted that more robust testing was required for, at a minimum, (1) individuals detained in Units 9, 10, and 17; (2) all newly admitted persons; and (3) any person detained at the Jail who exhibits one or more symptoms of COVID-19.  Inspection Report at 12.  Defendant has expressed a willingness to

increase testing if the tests are made available. However, at the May 15 conference, Defendant explained that it had not been able to acquire more tests.

Given the significant need for testing at the Jail and the dangers that persist with inadequate testing at the facility, Plaintiffs respectfully request that this Court issue a temporary restraining order mandating the testing of all persons detained in Units 9, 10, and 17, all newly admitted persons, and any person exhibiting one or more symptoms of COVID-19, as provided in Dr. Franco-Paredes' report.  Additionally, Plaintiffs respectfully request that the Court order Defendant to provide COVID-19 testing data to Plaintiffs and/or the Court as new test results become available.

### B.      Defendant's Position

As of the date of this status report, Prince George's County, Maryland has 5,255 COVID test kits for a population of approximately 900,000.  It is the goal of the County to be in a position to implement Dr. Franco-Paredes's recommendations as they relate to increase testing at the jail.  Until the County's supplies permit the implementation of Dr. Franco-Paredes's recommendations, the County utilizes the CDC Guidelines with regards to the distribution of COVID test kits.   Thus, the distribution is dictated by a priority list that is as follows:

**Priority One**

- Hospitalized patients
- Healthcare facility workers with symptoms

**Priority Two**
- Patients in long term care facilities with symptoms.
- Patients 65 and older with symptoms
- Patients with underlying conditions with symptoms
- First Responders with symptoms

**Priority Three**

- As resources allow, testing individuals in the surrounding community of rapidly increasing hospital cases to decrease community spread.

Finally, the State Health Department has received request from the County for more testing kits; however, the State is operating under the same guidelines and cannot fulfill the County's request at this time.   Corizon, the County's jail medical provider, recently provided the jail with 300 test kits and testing in 4 Housing Units (HU 1, 9, 10 and 17) recommended by Dr. Franco and then add newly committed and Initial Housing (HU 8 and 2).   The jail should be able to test 50-75 inmates per day until complete.  Results should start coming in late Thursday and Friday.   The County Executive is also exploring options of acquiring test kits from other sources, outside the State.

05/18/2020

By:   /s/ Edward Williams
Edward Williams (Bar No. 20944)
Cadene Russell Brooks (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
ed.williams@wilmerhale.com
Phone: (202) 663-6487

Elizabeth Rossi (Bar No. 19616)
Katherine Chamblee-Ryan (*pro hac vice*)
Olevia Boykin (*pro hac vice*)
Ryan Downer (*pro hac vice*)
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
katie@civilrightscorps.org
Phone: (610) 931-7715

*Attorneys for Plaintiffs*

By:   /s/ Shelley Lynn Johnson
      Andrew J. Murray
      Shelley Lynn Johnson
      Ann Elizabeth Koshy
      PRINCE GEORGE'S COUNTY
      OFFICE OF LAW
      Wayne K. Curry
      Administration Building
      1301 McCormick Dr., Suite 4100
      Largo, MD 20774
      sljohnson@co.pg.md.us
      Phone: (301) 952-3071

      *Attorneys for Defendant*