```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     SOUTHERN DIVISION

 3
    KEITH SETH, et al.,             )
 4                                  )
              Plaintiffs,           )
 5                                  ) Case Number: 8:20-cv-1028-PX
              vs.                   )
 6                                  ) Telephonic Hearing
    MARY LOU McDONOUGH,             )
 7                                  )
              Defendant.            )
 8  _____  )

 9          TRANSCRIPT OF PROCEEDINGS - TRO HEARING
               BEFORE THE HONORABLE PAULA XINIS
10               UNITED STATES DISTRICT JUDGE
               FRIDAY, MAY 1, 2020; 9:00 A.M.
11                   GREENBELT, MARYLAND

12                   A P P E A R A N C E S

13  FOR THE PLAINTIFF:

14      CIVIL RIGHTS CORPS
             BY:  KATHERINE CHAMBLEE RYAN, ESQUIRE
15                OLEVIA BOYKIN, ESQUIRE
                  RYAN DOWNER, ESQUIRE
16           1601 CONNECTICUT AVENUE, SUITE 800
             WASHINGTON, D.C. 20009
17           (610) 931-7715

18

19  ALSO PRESENT:  Mary Lou McDonough - Defendant

20          ***Proceedings Recorded by Audio Recording***
         Transcript Produced By Computer-Aided Transcription
21  _____

22          MARLENE MARTIN-KERR, RPR, RMR, CRR, FCRR
                 FEDERAL OFFICIAL COURT REPORTER
23               6500 CHERRYWOOD LANE, STE 200
                    GREENBELT, MARYLAND 20770
24                       (301)344-3499

25
```

1                      A P P E A R A N C E S
                              (continued)
2

3   FOR THE DEFENDANT:

4        PRINCE GEORGE'S COUNTY OFFICE OF LAW
         WAYNE K. CURRY ADMINISTRATION BUILDING
5             BY:   SHELLEY LYNN JOHNSON, ESQUIRE
                    ANDREW J. MURRAY, ESQUIRE
6                   ANN ELIZABETH KOSHY, ESQUIRE
              1301 McCORMICK DRIVE, SUITE 4100
7             LARGO, MARYLAND 20774
              (301) 952-5225
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE JUDICIAL ASSISTANT:  The matter now pending

3    before the Court is Civil Action No. 20-1028, Seth, et al.,

4    versus McDonough.  This matter comes before the Court for a

5    recorded telephone conference.

6          Counsel, please identify yourselves for the record

7    starting with the plaintiffs and then moving to the defendant.

8    Thank you.

9              MR. DOWNER:  Ryan Downer for Plaintiffs, Your Honor.

10             THE COURT:  This is the judge.  Any other plaintiffs

11   counsel on the line, please identify yourselves now.

12             MS. BOYKIN:  Olevia Boykin for Plaintiffs.

13             MS. RYAN:  Katie Chamblee Ryan for the Plaintiffs.

14             THE COURT:  Any other plaintiffs counsel?

15         (No response.)

16             THE COURT:  Okay.  Turning to defense counsel.

17             MS. JOHNSON:  Yes.  Shelley Johnson, Associate County

18   Attorney for the Defendant.

19             MR. MURRAY:  Good morning, Your Honor.  Andrew

20   Murray, Deputy County Attorney for Defendant.

21             MS. KOSHY:  Good morning, Your Honor.  Ann Koshy,

22   Associate County Attorney on behalf of the Defendant.

23             THE COURT:  Okay.  Any other defense counsel on the

24   line?

25         (No response.)

1          THE COURT:  All right.  Who will be speaking for

2    Plaintiffs?

3          MR. DOWNER:  Ryan Downer, Your Honor.

4          THE COURT:  Okay.  And is it Donner, D-o-n-n-e-r?  I

5    just can't hear you very clearly.

6          MR. DOWNER:  I'm sorry.  It's Downer, D-o-w-n-e-r.

7          THE COURT:  Great.  Thank you, Mr. Downer.

8       Okay, and for the Defense?

9          MS. JOHNSON:  It will be Shelley Johnson, Your Honor.

10          THE COURT:  Okay.  Thank you, Ms. Johnson.

11       All right, let's begin with some ground rules.  Welcome

12    and good morning, everyone.  This is an official court

13    proceeding, and if we were in the courtroom today, you would --

14    everyone on the line would be expected to follow some very

15    basic rules of decorum, and so I'm going to go through them

16    with you today.

17       This is only -- this hearing is only being held

18    telephonically because of the unusual circumstances we find

19    ourselves in with COVID-19.  So just like in court, everyone on

20    the line who is not counsel and has not already pre-identified

21    as being -- as speaking on behalf of their respective clients

22    will not be permitted to speak.

23       If there is any interruption whatsoever of any kind, we

24    actually have the capability of electronically ejecting the

25    person from the call.  So just as if we were in court and I

1    were conducting this proceeding, we would do it orderly and we

2    would do it in the manner consistent with what I've just laid

3    out, and so we're going to follow this rule here.

4        Similarly, there is no recording permitted of this

5    proceeding.  So anyone on the line, if you are thinking about

6    turning on your cell phone, if you have an audio recorder, you

7    are not permitted to use it.  There is one official report of

8    this proceeding and that is the transcript that will be

9    generated by Ms. Kerr.  She is our court reporter.  She is

10   super and adequately qualified and capable, and she will, with

11   our cooperation, get our -- the hearing we're having today down

12   with perfection.

13       And so with that in mind, Ms. Kerr, are you on the line

14   and can hear us all right?

15            THE COURT REPORTER:  Good morning, Judge.  Yes, I'm

16   here.  Thank you.

17            THE COURT:  Okay, great.  And, Ms. Kerr, if at any

18   point you cannot hear any of us, you are the one permitted to

19   interrupt.  Okay?

20            THE COURT REPORTER:  Thank you very much.

21            THE COURT:  All right.

22       Okay, so the purpose of today's call is to give the

23   parties a recap as to where I see this case after having

24   reviewed all of the pleadings, the near 30 declarations from

25   detainees housed at the Prince George's County Detention

1  Center, the near 1,200 pages of responses, exhibits, and

2  declarations that I have received from the County.

3      I thank all of you in advance.  You have been

4  exceptionally -- responsive is the best word and reactive to my

5  very tight timeline because of the pressing and important

6  issues of public health that this case has brought to bear.  So

7  I thank you for all of that.  I've reviewed all of it, and the

8  purpose of today's call primarily is to give you some guidance

9  as to where I am with appointing an independent inspector and

10  who that may be and what the next steps are.

11      So after reviewing the record, it is my view that I

12  absolutely need an independent inspection, and let me tell you

13  a little bit about why and then I will tell you who I have

14  chosen from the names that you all have provided, where we go

15  from there, and then at some point at the end of that, I will

16  certainly give both sides the opportunity to comment or ask any

17  questions.  Okay?

18      So when I review what has been provided both in support of

19  the Temporary Restraining Order that the Plaintiffs seek, as

20  well as in opposition, some very basic facts just jump right

21  out.  Of greatest concern to the Court is the state of the

22  presence of COVID-19 at the facility.

23      Just some basic numbers:  We've got, as of April 25th, 560

24  detainees.  As of that date, at least nine of whom are

25  juvenile.  And by my numbers, over three percent of that

1  population -- and again, this is just my back-of-the-napkin,

2  but three percent of the population has been infected with the

3  virus.

4      Where do I get that from?  Well, there have been 18

5  detainees who have tested positive and that is out of 20 tests

6  given.  So that means out of the tests administered, there is a

7  90 percent positive rate.  That is a stunning number.

8      And just by way of comparison, in Maryland there have been

9  114,359 tests given, 21,742 positives.  That is a 19, one-nine,

10  positive rate.  The difference between the two is orders of

11  magnitude and quite concerning.

12      And the reason why it's contrary to the Defense's position

13  even though the Defense has really touted that number as we're

14  doing a good job, and you may very well be.  This is -- we're

15  in the beginning stages of this case and of this process, and I

16  don't mean to prejudge it, but that number alone is not

17  necessarily reflective of containing the virus.

18      This virus is, as we all know, highly contagious.  It

19  replicates exponentially, not one plus one plus one but one

20  plus two plus four plus eight plus sixteen -- and I'm probably

21  even getting that wrong.  I went to law school.  I'm not a

22  mathematician.  But we've all read in the media, some of us

23  have done deeper dives than others, that this virus

24  indisputably replicates at a much faster pace than what we have

25  seen in many other kinds of infectious diseases.  It is also

1   lethal in orders of magnitude to certain populations, and I'll

2   get to that in a moment.

3       But the reason why that's important in this first

4   observation is that when we've got a test rate of 18 out of 20,

5   it indicates to me strongly that this facility may be under

6   testing; and in the evidence that I've seen, there's only 20

7   other tests available.  I don't know what other avenues for

8   getting tests are out there, but that's part of why I do

9   believe we need a boots-on-the-ground inspector, and it will be

10  a medical doctor who can get in there and tell me what is the

11  state of affairs with regard to this infection rate.

12      Now, there's also been 25 correction officer positives,

13  and I don't believe there's been any real contact tracing

14  performed for either the detainees or the positives, meaning no

15  one has really gone back and figured out who within that

16  positive person's universe has the positive person been in

17  contact with, slept with, ate with, played cards with, used the

18  same phone.  There's a, you know, inordinate number of

19  examples, and best as I can tell the procedure is to, once

20  identifying a positive person, isolate that person but then do

21  nothing really to go back and figure out how to quarantine or

22  isolate the close contact individuals.

23      Now, the County may respond that given the footprint of

24  the facility and the way in which the detainees are housed,

25  it's really -- the only option is a quarantine in place.  And

1   that may be but I simply cannot discern that from the records,

2   and the risk of simply letting this continue without some quick

3   boots-on-the-ground expert, that risk is simply too high.  So

4   that's point number one.

5        Point number two:  In conjunction with what I see at least

6   on the current record as under testing is under screening or

7   concerning mechanisms for screening detainees especially.

8        What do I mean by that?  So the County maintains in its

9   pleadings that currently temperatures of every inmate are taken

10  twice per day to detect infection.  And the leading physician,

11  treating physician at the facility actually notes that the log

12  of temperatures that were provided to me, quote, reflects a

13  thoroughness of the temperature checks in the housing units,

14  and it is the temperature that the County has used, that the

15  facility has used to really separate out folks that need

16  perhaps additional attention.

17       Not quite clear how symptoms play into that, but certainly

18  temperatures are the way in which the facility has responded

19  once a positive is identified.  At a minimum, what I understand

20  happens is that the facility goes in twice a day to the units

21  where a positive person had been housed and does temperature

22  checks.

23       Now, I cannot tell from the logs how thorough these have

24  been.  The pleadings suggest, the doctor suggests from the

25  facility that these are twice a day, every day, but the logs

1    don't reflect that.  I have logs that are -- give me

2    temperatures from the 6th, the 16th, the 20th, the 23rd.  As

3    you can see, these are intervals of multiple days, not every

4    day.  They don't reflect every unit and, frankly, equally if

5    not more concerning is what the temperature checks show.  There

6    are many, many, many temperatures that are routinely under

7    97 degrees, 94, 95, 96.  As the Plaintiffs point out, there are

8    some even as low as 90 and 92 and that's hypothermia.

9         So I've got to tell you -- and you all may want to go back

10   in your mental rolodexes and ask yourselves when was the last

11   time you tested -- you took your temperature and it was 95 and

12   you didn't retake it and then re-retake it and then maybe ask

13   the doctor if that's a normal temperature.  This is all by way

14   of saying these temperature logs reflect that there may very

15   well be some thermometer error, some user error, or both, but

16   they don't reflect in my view that there is accuracy.

17        The other piece of this that concerns me is that we have,

18   by the County's count, 18 positives.  By the County's metric --

19   should be identified by fever at a minimum -- but not one

20   record given to me of any temperature check that was done which

21   reflected what the Defendant has viewed as a fever and that's

22   anything over 100.4.

23        So there's been some 99s.  There's little X's next to

24   them.  I don't know what they mean.  But out of 18 positives, I

25   don't have one record that shows the very metric that the

1    facility is using was reflected in those.

2         So this is important because this is what would either

3    give me comfort that a TRO shall not issue or give me great

4    concern that we need to get in there quickly because of the

5    nature of this virus and figure out whether we've got a problem

6    warranting injunctive relief and whether that problem rises to

7    the level of deliberate indifference.  That's not going to be

8    for the expert to decide.  That's for me to decide.

9         But against the backdrop of CDC guidelines, which the

10   Defense embraces as one measure of what should be done when it

11   can be done, the analysis will certainly flow from an expert

12   and an independent inspector getting in there and reviewing

13   some of these issues.

14        Similarly, I have some concerns about the lack of

15   response, medical response to COVID symptoms.  On the one hand,

16   we have the Defendant saying we respond to sick calls generally

17   within 24 hours.  We've got CO's, correction officers' eyes on

18   detainees reporting symptoms and getting symptomatic detainees

19   care.

20        On the other hand, I have a number of declarations which

21   say to the contrary.  One detainee attests to waiting 11 days

22   for a response to a sick call.  Another detainee attests to

23   being ignored by guards and staff.  And I understand that there

24   is healthy skepticism on both sides of this adversarial

25   process, but I do note that the declarations were sworn under

1   penalties of perjury.  They were executed by attorneys who have

2   licenses to protect.  And what I mean by that is that there has

3   been some conversation about the manner in which the affidavits

4   were sworn out in these difficult times, and I'm not finding

5   them to be as problematic as maybe some of the attorneys on the

6   line pointed out.

7        So I've got this very competing -- two different competing

8   versions of the medical response, and in light of the other

9   information that we've just discussed, this compounds my

10  concern with regard to hygiene.  On the one hand, the County

11  has provided significant documentation that they were ordering

12  -- the Director was ordering supplies sooner rather than later,

13  but those supplies leave me wanting when it comes to the

14  detainees.

15       I'll just take soap.  Okay?  We've got many, many other

16  issues that we can talk about, but for today's purposes, just,

17  again, to provide context for why I'm doing what I'm doing, the

18  County highlights for me that I think contemporaneously with

19  the Governor issuing its -- the state of emergency, the County

20  responded by ordering what appears to be a lot of soap,

21  4,500 bars.  We've got a very large population.  That order was

22  put in 42 days ago.  The bars, as far as I can tell, are not

23  the kind of soap that I think the CDC is thinking about.  I

24  could be wrong.  But the invoice that I found averages out the

25  price, just as one data point, the price for those bars of soap

1   as being $0.12 a bar.  That suggests, as the Plaintiffs

2   highlight, that these bars are very small.  They will go in no

3   time.

4        And so when you do the math, that's just not nearly enough

5   supplies for a population of this kind trying to adhere to the

6   guidelines that we have all heard about for months now, wash

7   wash, wash, wash your hands frequently, wash them for at least

8   20 seconds many times a day as you possibly can.

9        And so I'm not even going to get into the other aspects of

10  hygiene because that's going to be the job of the experts.

11       And then, finally, I note there is really no plan that I

12  see among the documents for the medically vulnerable

13  population.  There's been some back and forth about what does

14  that mean.  What does medically vulnerable population mean?

15       Well, the CDC doesn't necessarily use that term, but they

16  do have a high risk category and they break out -- the CDC

17  breaks out that high risk category in light of COVID.  It is

18  plain, it is clear, and it gives at least this Court in very --

19  in times of emergency, a relatively good framework for figuring

20  out who is in that population.

21       And for the Defendant who has looked to the CDC for

22  guidance, embraced the CDC in its pleadings, that's a good

23  metric for the medically vulnerable high risk population that

24  must be treated with increased care in light of COVID.

25       So I've got COVID in the facility.  COVID has been in the

1   facility.  The first detainee was confirmed positive

2   March 28th, the last April 20th.  The positives are sprinkled

3   throughout that time period and no real plan that I can see to

4   define the at risk population and then provide them additional

5   protection if possible.

6        So given these, again, preliminary observations on a

7   relatively limited record, in a very quick time frame, I do

8   appoint Dr. Carlos Franco-Paredes -- am I saying his name

9   right?  I hope I am.  People butcher my name all the time, and

10  I try to get it right, but he -- to conduct an immediate

11  inspection and serve as the court-appointed expert witness

12  pursuant to Rule 706 of the Federal Rules of Evidence.  And his

13  area of expertise -- at least it's a working area.  I want to

14  hear from the parties -- will be in infectious diseases in the

15  confinement setting.

16       The objective of this is really to ascertain as quickly as

17  we can the problem within the footprint of the facility, and

18  once we identify the problem, if there is one, the magnitude of

19  the problem.  There may not be one, and Dr. Franco-Paredes may

20  come out of this and say, you know what, all clear.  You get

21  the clean bill of health, Prince George's County Detention

22  Center.  You have done as you say you have done.  No more --

23  you know, no more TRO.

24       But if not, I would need from him findings and

25  recommendations so that if there is, as I suspect but I may be

1  wrong, an outbreak of greater magnitude with greater severity

2  than what the current limited record bears out, I need some

3  guidance as to how to effectuate injunctive relief and the

4  parties need it, and I would imagine that the Director would

5  welcome it.

6      If there is -- more minds on how to protect the detainees

7  and staff is better than not.  If there is a way to protect

8  within this facility, Dr. Franco-Paredes will hopefully give me

9  that guidance; and if there is not, I need to know why.

10     We're going to move, again, as we have with as much speed

11  as possible.  So when we conclude today, I'm going to ask that

12  counsel jointly contact the doctor or agree to a method of

13  contact.  You all can talk about that on your own, but what I

14  don't want is any concerns later of an ex-parte contact.

15     Dr. Franco-Paredes is a court-appointed expert.  He's not

16  the Plaintiff's, he is not the Defendant's, and he's not going

17  to be subjected to that, which is why I'm thinking it's best if

18  you all get off the line with me, make contact with him

19  jointly, and secure his presence on a follow-up recorded call

20  today at 3 p.m. for us to -- for me to discuss directly with

21  him -- and with your input.  Both sides will certainly have the

22  opportunity to have input -- the next steps.

23     Plaintiffs' counsel, I'm going to ask you within the

24  next -- if possible, tell me if you can't do this, but in the

25  next two hours to make the entire record available to

1    Dr. Franco-Paredes by email, forwarding the ECF filings to him

2    in pdf format.  Can Plaintiffs' counsel accomplish that?

3            MR. DOWNER:  Yes, Your Honor, I believe so.

4            THE COURT:  Okay, great.  And then we will get back

5    on the line for a 3 p.m. call.

6        Now, the other thing I want you all to think about is if

7    there is a possibility I may have the need for an expert or

8    someone who is -- and I use the word "expert," but it could

9    also be -- frankly, there is precedent for using a court

10   advisor, if you will, a special master, someone with particular

11   expertise in the event that Dr. Franco-Paredes identifies a

12   problem of far greater magnitude than -- that I suspect may be

13   going on, but if he does, I may need some assistance in

14   managing this in a corrections facility.

15       I have a healthy appreciation for the Defense and for the

16   Defendant's role in keeping a detained population safe and that

17   is not -- that's its own area of expertise but, frankly, I'm

18   just not prepared to choose among the other record requested

19   experts.  You each raise very good points about why the

20   respective requests should not be honored and so I'm not -- I'm

21   not there, choosing any of the others.

22       I'm going to ask you all to meet and confer to recommend

23   an additional expert in prison healthcare in the event that I

24   need him or her, and the reason why I say that is because I

25   don't know what Dr. Franco-Paredes is going to conclude.  I

1  don't know what his findings are going to be and his

2  recommendations are going to be.  And while I recognize he has

3  done at least three prison inspections of this kind in short

4  order recently, I am not -- his wheelhouse is clearly

5  infectious diseases on a very high level, and I don't doubt

6  that he's going to provide invaluable guidance to all of us in

7  that respect.

8       I am not quite sure yet, though, about the implementation

9  piece, and so I want you all to put your heads back together

10 and think long and hard about an advisor, slash, expert who

11 would be best to help us if I need it implement requested

12 relief.

13      Okay.  Now, let me start with the Plaintiffs.  Any

14 questions, concerns, additions that you wish to make to what

15 I've just laid out?

16           MR. DOWNER:  Not at this time, Your Honor.  I don't

17 believe so.

18           THE COURT:  Okay.

19      Ms. Johnson, then let me turn to you.

20           MS. JOHNSON:  I think I just need some clarification.

21           THE COURT:  Sure.

22           MS. JOHNSON:  With regards to the joint telephone

23 call that you want Plaintiffs' counsel and myself to make to

24 Mr. Franco, what do you want us to accomplish --

25           THE COURT:  It's doctor --

1           MS. JOHNSON:  Dr. Franco --

2           THE COURT:  Dr. Franco-Paredes, yes.

3           MS. JOHNSON:  Paredes, I'm sorry.

4    Dr. Franco-Paredes.

5           What would you-- what are we supposed to accomplish with

6    that telephone call before our 3 o'clock phone call with you?

7           THE COURT:  The only thing is to advise him that the

8    Court has selected him, that the Court, as was represented by

9    the Plaintiffs, expect that this inspection will be done as

10   quickly as possible in concert with an order that I will sign;

11   but the Court wishes to have a brief planning phone call at

12   3 p.m. with him and the parties to discuss next steps.  That's

13   it.

14          MS. JOHNSON:  Okay.  And the 3 p.m. phone call that

15   we will have with you and with the expert, at that time we will

16   talk about the parameters of the actual inspection?

17          THE COURT:  Yes.  And I will -- sure.  Yes, we will.

18   But I'll give you -- if you'd like, I can give you a preview.

19          MS. JOHNSON:  Please.

20          THE COURT:  Okay.  So I am in large part giving

21   Dr. Paredes access to the facility as he needs it.  He must

22   give advance notice of who he may bring.  He will be permitted

23   to bring all electronic equipment that he may need to document

24   his inspection -- and I'll lay this out in the order -- but

25   cell phone, computer, audio visual, whatever he needs.  He will

1   have access to detainees and staff.  Of course all of this with

2   health and safety in mind.  So he will be either provided PPE

3   or can bring PPE into the facility.  And he will perform that

4   inspection unannounced within reason.  So he's not coming at

5   two in the morning.  He's coming during business hours, but

6   he's also not going to tell you exactly when he's coming, and

7   it will be done in short order.

8        I need to hear from him as to how quickly he can

9   accomplish this.  My aspiration is that within days, meaning if

10  he can do it tomorrow, great, but I'm going to leave it up to

11  him to tell me -- to at least indicate a time frame but not

12  necessarily on what day.

13       But these are the -- that's the working order right now.

14            MS. JOHNSON:  I understand, Your Honor.  Thank you.

15  We'll talk about this more in detail at 3 p.m., correct?

16            THE COURT:  Yes.

17            MS. JOHNSON:  Okay.

18            MR. DOWNER:  Your Honor, if I may, this is Ryan

19  Downer.  I did have one question about the prison health

20  consultant that you mentioned that you might need, the monitor.

21            THE COURT:  I'm sorry?

22            MR. DOWNER:  I have a question about the prison

23  health specialist that you mentioned that you might want to

24  appoint after the inspection.  Would that person be required to

25  enter the jail?  Because that would limit the options of people

1   that we could approach.

2         THE COURT:  Not necessarily, no.

3         MR. DOWNER:  Okay.

4         THE COURT:  So because we have eyes and ears -- I

5   have eyes and ears through Dr. Franco-Paredes, the individual

6   who I am envisioning as a corrections expert in the field of

7   healthcare doesn't necessarily have to come on in because he or

8   she will have the record that you all have provided, as well as

9   access to Dr. Franco-Paredes.  So I think it would just be

10  duplicative.

11        Again, so that advisor, slash, expert may say to me, I

12  need to walk the facility to know X, Y, and Z.  And we can --

13  we'll deal with those issues as they come, but, again, what I'm

14  trying to do here is that we always continue to operate in

15  parallel in the eventuality that Dr. Franco-Paredes recommends

16  injunctive relief and I agree with it what's the next step.

17        We -- again, just so we're clear, we may not get there,

18  because I don't know what Dr. Franco-Paredes is going to find;

19  but to answer your direct question, no, not necessarily someone

20  who needs to have physical -- physically observed the facility.

21        MR. DOWNER:  Thank you, Your Honor.

22        THE COURT:  Okay.

23     Anything else from the Plaintiffs?

24        MR. DOWNER:  No, Your Honor.

25        THE COURT:  Anything else from Defense?

1          MS. JOHNSON:  No, Your Honor.

2          THE COURT:  Okay.  All right, well, I thank you all

3    for your time.  We will talk again at 3 p.m.  Ms. Brown will

4    circulate dialing instructions again.  And in the event that

5    there is any sort of scheduling hiccup, if Counsel would let me

6    know; i.e., Dr. Paredes can do it at 2:30 but he can't do it at

7    3:00, just send us a joint email to chambers and we'll

8    accommodate.  Okay?

9          MR. DOWNER:  Understood.

10         MS. JOHNSON:  Understood, Your Honor.

11         THE COURT:  All right.  Thank you all.  I appreciate

12   it.

13         MS. JOHNSON:  Thank you, Your Honor.

14         THE COURT:  Stay safe.

15

16       I, Marlene Martin-Kerr, FCRR, RPR, CRR, RMR, certify that

17   the foregoing is a correct transcript of the stenographic

18   record of proceedings in the above-entitled matter.

19

20                    Dated this 17th day of May, 2020.

21
                                      /s/
22    _____
                           Marlene Martin-Kerr
23                     Federal Official Court Reporter

24

25