# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| KEITH SETH, et al.,<br>Individually and on behalf of a class of similarly situated persons<br><br>                    Plaintiffs-Petitioners,<br><br>   v.<br><br>MARY LOU MCDONOUGH,<br>In her official capacity as Director of the Prince George's County Department of Corrections<br><br>                    Defendant-Respondent. | Civil Action No. 8:20-cv-01028-PHX<br><br>**Plaintiffs' Response to Defendant's Motion to Supplement** |

Plaintiffs respectfully submit the following response to Defendant's Motion to Supplement.

## I. Guidance on the Submission of New Evidence Relevant to the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction

Defendant McDonough has submitted a motion to supplement the record, making new arguments and attaching eight new exhibits. As a general matter, Plaintiffs do not oppose supplementation. At this point in the proceedings, however, Plaintiffs believe that the best course is for the Court to determine whether to issue a TRO based on the current record and to subsequently conduct an evidentiary hearing and permit the submission of post-hearing proposed findings of fact. Otherwise, each side will continue to file supplemental pleadings in an *ad hoc* and inefficient manner.

In addition to the new evidence submitted today, in recent weeks, Defendant has made a number of new representations, both to the Independent Inspector and to this Court, about the Jail's conditions. Meanwhile, as part of Plaintiffs' ongoing investigation—which has included records collection, interviews with local criminal defense attorneys, and, for the past three weeks,

approximately three to twelve calls from current detainees each day[1]—Plaintiffs have collected ample evidence that contradicts Defendant's claims. For example, Defendant recently represented that no detainee who tested positive for COVID-19 has a CDC high-risk condition. But Plaintiffs have obtained Jail records demonstrating that a COVID-positive prisoner has asthma.[2] *See* Doc. 73 at 4. Consistent reports from current detainees belie other of Defendant's claims about conditions as well; for example, detainees consistently report that the Jail is offering virtually no mental health services (aside from medication) and that disinfectant wipes are still not available, including by the phones.[3] Plaintiffs seek the opportunity to present evidence to address Defendant's new assertions—both in this latest filing and otherwise.

## II. Plaintiffs' Response to Defendant's New Arguments and Evidence

Defendant urges this Court to consider its new arguments and evidence before ruling on Plaintiffs' claims. Therefore, Plaintiffs briefly address Defendant's supplemental filing below.

### A. The Danger Posed by COVID-19 at the Jail

For the first time, Defendant argues that Plaintiffs cannot satisfy the objective factor of the deliberate indifference test, which requires "a substantial risk of . . . serious harm." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).[4] *See* Doc. 77 § 4(a). Defendant's argument—and its evidence—rests solely on age. Defendant contends that "the risk to inmates between the ages of

---

[1] An investigator working with Plaintiffs' counsel has conducted these calls using a standard set of questions. She has kept detailed documentation of the calls.

[2] These records have been shared with Defendant. At the appropriate time, Plaintiffs would file these records with this Court under seal.

[3] At the appropriate time as established by this Court, Plaintiffs plan to submit declarations attesting to these facts. If this Court wishes to review an account of this evidence now, Plaintiffs can promptly submit a declaration from Plaintiffs' investigator, who conducted these interviews.

[4] *See* Def.'s Br. (Doc. 29) at 7-21 (not addressing the objective factor).

-2-

18-49 (without pre-existing conditions) . . . is extremely small," and that "the vast majority of inmates fall within the 18-49 age range." Doc. 77 at 2.

But even if Defendant's new evidence is accurate (which Plaintiffs do not now address), this does not establish that most people in the Jail are not at risk of severe illness from COVID-19. As Defendant admits, the CDC data it cites for its conclusion only includes individuals "without pre-existing conditions." *Id.* Plaintiffs' undisputed account in the Joint Status Report demonstrates that Defendant has no reliable accounting of how many people fall within the CDC's medically high-risk category. *See* Doc. 73 at 3-9.[5] And the category of "pre-existing conditions" in the cited CDC data appears to be much broader than the CDC's high-risk category; it included "any underlying condition."[6] It is altogether unclear what portion of the Jail is both within the ages of 18 and 49 *and* has no "underlying condition." Additionally, the cited article itself warns that the data it includes "are preliminary and should be interpreted with caution."[7] In sum, Defendant's

---

[5] Among other deficiencies, Plaintiffs noted in the Joint Status Report that Plaintiffs are aware of two detainees who the Jail's own records document as having a high-risk conditions (asthma), but who do not appear on Defendant's list. Doc. 73 at 3-4. This afternoon, Plaintiffs obtained Jail records identifying a third medically vulnerable person who is not on the list. Plaintiffs have alerted Defendant's counsel and sent Defendant's counsel the medical records. If this Court would find it useful, Plaintiffs can file these records under seal at the appropriate time.

[6] *See Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019*, CDC.gov (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm#T1_down (cited in Carter Aff., Doc. 77-1 at 3).

[7] *See Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019*, CDC.gov (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm#T1_down. Indeed, the article states that only 12.1 percent of hospitalized patients reported their conditions, which raises concerns about whether this is a representative sample. *Id.* Plaintiffs would seek to examine this and other issues with Defendant's evidence with expert testimony. Defendant also cites to a CDC chart labeled "[p]reliminary cumulative rates as of May 9, 2020." Doc. 77-2. There is no source provided for the chart, and so Plaintiffs cannot contextualize or assess this data. Indeed, Plaintiffs are unsure precisely what this chart shows.

evidence says nothing about what portion of the Jail faces a significant risk of serious illness or death from COVID-19.

Even if Defendant's evidence were persuasive, Defendant's argument is inconsistent with the law. Courts have found far more remote risks sufficient to satisfy the objective factor of the deliberate indifference test.[8] And in the COVID-19 context, courts have consistently found that the objective factor is satisfied for classes of every person at a prison or jail, whether medically vulnerable or not.[9] Further, Plaintiffs have demonstrated that the risk of serious illness at this Jail is greater than it would be in the community due to (for example) the Jail's poor symptom screening, poor monitoring of infected detainees, and delays in access to medical care. *See* Doc. 3-1 at 20-23.

**B. Defendant's "Plan" to Protect Medically Vulnerable Prisoners**

Four weeks after Plaintiffs' filed their Complaint, Defendant now submits, for the first time, an account of its "plan" to protect medically vulnerable detainees. Doc. 77 at 3. Plaintiffs

---

[8] *See, e.g.*, *Helling*, 509 U.S. at 35 (affirming circuit court's holding that second-hand smoke posed an unreasonable risk of serious harm to a prisoner's future health); *Johnson v. Epps*, 479 Fed. App'x 583, 590-91 (5th Cir. 2012) (finding that prison policy under which prisoners use unsterilized barbering instruments, which could expose them to communicate diseases, posed an unreasonable risk of future harm), *Brown v. Bargery*, 207 F.3d 863, 865, 867-68 (6th Cir. 2000) (finding that improperly installed prison bunks that created a danger that inmates could slide off of them and onto the concrete floor, as well as protruding anchor bolts "which could potentially cause an injury," could constitute a risk to their future health under the objective prong); *DeGidio v. Pung*, 920 F.2d 525, 527, 529 (8th Cir. 1990) (affirming district court's conclusion that a "serious risk to the inmates' health existed where a prison had an inadequate response to a tuberculosis outbreak even though [o]nly a few infected individuals develop active tuberculosis" and the rest are asymptomatic).

[9] *See, e.g.*, *Cameron v. Bouchard*, No. 2:20-cv-10949-LVP-MJH, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020) ("It cannot be disputed that COVID-19 poses a serious health risk to Plaintiffs and the putative class," which included all pretrial detainees at the Oakland County Jail); *Mays v. Dart*, 2020 WL 1987007, at *23 (N.D. Ill. Apr. 27, 2020) (COVID-19 posed a serious risk to plaintiffs and the putative class, which included all detainees at the Cook County Jail).

will seek the opportunity to test the credibility of this evidence and the adequacy of this plan at the appropriate time as determined by this Court. However, as an initial matter, the late introduction of this evidence—even after being asked about this precise issue repeatedly throughout this litigation, including by the Independent Inspector—raises evident concerns. Moreover, even if some plan exists, the record demonstrates that Defendant still has not identified the medically vulnerable inmates at the Jail or devised a reasonable means to do so. Doc. 73 at 3-8. Indeed, in the parties' Joint Status Report, Defendant does not dispute or even attempt to explain the concerns Plaintiffs have raised about its list of medically vulnerable detainees. *Id.* at 9. And Defendant responded to Plaintiffs' suggestions for identifying medically vulnerable inmates with no plan at all. *Id.*

Separately, Defendant argues that Defendant McDonough "could not be found to have been deliberately indifferent to her inmates' serious medical needs" because "[she] was concerned about and considered protective measures for high risk detainees and relied on the advice of medical professionals." Doc. 77 at 3. Defendant misunderstands the law. Officials who take some positive steps can be (and are) found to be deliberately indifferent if those steps are not a reasonable response to the risk at issue.[10] Indeed, even if Defendant's account of its plan is taken as true,

---

[10] *See De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[I]magine that prison officials prescribe a painkiller to an inmate who has suffered a serious injury from a fall, but that the inmate's symptoms, despite the medication, persist to the point that he now, by all objective measure, requires evaluation for surgery. Would prison officials then be free to deny him consideration for surgery, immunized from constitutional suit by the fact that they were giving him a painkiller? We think not."); *see also Jehovah v. Clarke*, 798 F.3d 169, 181 (4th Cir. 2015) (concluding that an inmate who had received "some treatment" could nonetheless establish that the prison's doctors acted with deliberate indifference); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable.").

in the COVID-19 context, it appears to have similar deficiencies to those a federal court found unreasonable in *Colonel v. Decker*, 20-CV-2472 (AJN), 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020). *Id.* at *5 ("[The Government] has not . . . created special safety or hygiene protocols for [medically vulnerable detainees] or for staff interacting with them to follow. . . . [E]ven the steps the Government has taken do nothing to alleviate the *specific, serious*, and *unmet* medical needs of the high-risk Petitioners in this matter."); *Id.* ("[O]n the record before the Court, [the Government] has no system to even determine which of its detainees face heightened risk from COVID-19.").

### C. Detainees Ordered or Authorized for Release

Defendant characterizes Plaintiffs' evidence about detainees who were ordered or authorized for release as part of Plaintiffs' "claim of over-detained individuals." Doc. 77 at 3. However, this issue does not concern Plaintiffs' overdetention claim (Count II). The over-detention claim alleges that the Jail refuses to release individuals legally entitled to release *because they are COVID-positive*. Doc. 3-1 at 27-29. The Jail's broader conduct in refusing to release detainees when it was ordered or authorized to do so goes instead to Plaintiffs' claim that the Jail's conditions violate their Eighth and Fourteenth Amendment rights (Count I).[11] The fact that the Jail

---

[11] The confusion is understandable. Plaintiffs developed this evidence to demonstrate—in support of the deliberate indifferent inquiry—that the Jail had the *discretion* to release certain individuals, but had not. As part of this investigation, Plaintiffs inadvertently discovered that six people in the Jail had been *ordered* released by a state court, but were nevertheless still detained. One of the six individuals who was ordered released by a court but not released by the Jail was not released because he is COVID-positive. Doc. 61-1 § 9. This is clearly relevant to Plaintiffs' over-detention claim (Count II). However, although the remaining individuals appear to have been over-detained, to Plaintiffs' knowledge, they were not over-detained *because they were COVID-positive*, and they therefore do not fall within the ambit of the over-detention claim that Plaintiffs have pled in Count II.

has refused to reduce its population—including by releasing certain medically vulnerable individuals—when it had the discretion or obligation to do so is an unreasonable response to the serious risks posed by COVID-19. *See Martinez-Brooks v. Easter*, 20-cv-569-MPS, 2020 WL 2405350, at *22-26 (D. Conn. May 12, 2020) (finding that prison's failure to transfer prisoners to home confinement and exercise compassionate release, despite its authority to do so, supported a finding of deliberate indifference).

Plaintiffs have continued to investigate this issue and have submitted additional evidence to Defendant's counsel. *See* Doc. 73 at 16. Plaintiffs' understanding from the hearing on May 11, 2020, was that this Court did not want to receive additional evidence from the parties about this issue at this time. Plaintiffs' note, however, that nothing in the new evidence that Defendant has submitted suggests that the Jail can disregard court orders to release certain individuals. Nor do Defendant's recitations of its own internal policies suggest that it lacks discretion to release detainees when a court has authorized it to do so.

Respectfully submitted May 20, 2020,

By: s/Katherine Chamblee-Ryan
Katherine Chamblee-Ryan (*pro hac vice*)
Olevia Boykin (*pro hac vice*)
Ryan Downer (*pro hac vice*)
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
katie@civilrightscorps.org
Phone: (610) 931-7715

Edward Williams (Bar No. 20944)
Cadene Russell Brooks (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006

ed.williams@wilmerhale.com
Phone: (202) 663-6487

*Attorneys for Plaintiffs*