**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| KEITH SETH, *et al.*, | * | |
| Individually and on behalf of a class | | |
| of similarly situated persons, | * | |
| | | |
| Plaintiffs, | * | |
| | | |
| v. | * | Civil Action No. 8:20-cv-01028-PX |
| | | |
| | * | |
| | | |
| MARY LOU MCDONOUGH, | * | |
| In her official capacity as | | |
| Director of the Prince George's County | * | |
| Department of Corrections, | | |
| | * | |
| Defendant. | * | |
| | *** | |

## MEMORANDUM OPINION

This case concerns the health, welfare, and safety of detained individuals housed at the

Prince George's County Correctional Center ("the Facility") during the COVID-19 pandemic.

Plaintiffs, on behalf of themselves and all similarly situated detainees, contend that Director

Mary Lou McDonough, in her official capacity as Director of the Prince George's County

Department of Corrections, has abdicated her function to provide constitutionally adequate care

during the pandemic in violation of the Eighth and Fourteenth Amendments to the United States

Constitution.

The case is in its infancy.  This Opinion addresses the propriety of Plaintiffs' Emergency

Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction (ECF No. 3-1).

For the following reasons, the Court grants in part and denies in part the motion.

I.      **Background**

The Court struggles to put into words the magnitude of COVID-19's devastation.  On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.[1]  At that time, the United States registered 1,267 of the 118,000 confirmed global cases and 38 of the 4,291 deaths.[2]  Since then, the virus has visited greater pain and suffering.  As of today, 329,186 have died globally, 93,558 in the United States, and 2,045 in the state of Maryland.[3]  In Prince George's County, the virus arrived early and spread with a vengeance.  As a result, the County has experienced the highest number of confirmed cases and the second-highest number of deaths in the State.[4]

No cure or vaccine exists for the highly infectious virus.  ECF No. 2-1, Ex. 30 ¶ 8 (Decl. of Dr. Jamie Meyer).  And for those with underlying chronic health conditions or advanced age, the virus poses an even greater risk for a painful and solitary demise.  *Id.* ¶ 9.  Due to these realities, Maryland has been under a state of emergency and Prince George's County a stay-at-home order since March.[5]

It is universally recognized that COVID-19 poses a particularly tough challenge for the

---

[1] *Rolling Updates on Coronavirus Disease (COVID-19)*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen.

[2] *March 11 Coronavirus News*, CNN, March 12, 2020, https://www.cnn.com/world/live-news/coronavirus-outbreak-03-11-20-intl-hnk/index html.

[3] Coronavirus Research Center, COVID-19 Dashboard by the Center for Systems Science and Engineering, Johns Hopkins University, https://coronavirus.jhu.edu/map.html (data as of May 21, 2020); Coronavirus Disease 2019 (COVID-19) Outbreak, Maryland Dept. of Health, https://coronavirus.maryland.gov/ (data as of May 21, 2020).

[4] Coronavirus Disease 2019 (COVID-19) Outbreak, Maryland Dept. of Health, https://coronavirus.maryland.gov/ (data as of May 21, 2020).

[5] Declaration of State of Emergency and Existence of Catastrophic Health Emergency, March 5, 2020, https://governor maryland.gov/wp-content/uploads/2020/03/Proclamation-COVID-19.pdf; Order of the Governor of the State of Maryland § II, No. 20-03-30-01 (Mar. 30, 2020), https://governor maryland.gov/wp-content uploads/2020/03/Gatherings-FOURTH-AMENDED-3.30.20.pdf; Coronavirus (COVID-19): What's New, Prince George's County, https://www.princegeorgescountymd.gov/3397/Coronavirus (last accessed May 9, 2020).

incarcerated citizenry.  Social distancing and rigorous personal hygiene remain important combatants to the virus—but those housed in jails and prisons must eat, sleep, talk, and tend to their every personal need in each other's close physical space.  *See* ECF No. 2-1, Ex. 32 at 9. COVID-19 is especially deadly for the detained population because they are disproportionately more likely to suffer from chronic medical conditions.  *Id.*

In recognition of this stark reality, the Center for Disease Control ("CDC") on March 23, 2020, issued guidance for officials operating detention facilities to help stop the spread of COVID-19.  *See* ECF No. 2-1, Ex. 36 (CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities).  The guidance includes detailed recommendations about proper hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine.  *Id.*  The parties agree that the CDC guidelines provide a useful benchmark in determining whether the Facility's policies and procedures are appropriate.  *See* ECF No. 29 at 9; ECF No. 3-1 at 5.  Their disagreement, however, concerns whether the Facility has followed these basic recommendations.

The Facility, run by Defendant, can typically house over 1,500 men, women, and juveniles.  ECF No. 29-3 at 10.  At the beginning of the COVID-19 pandemic, the Facility held roughly 720 detainees.  ECF No. 29 at 3.  However, through concerted efforts to reduce the population, the Facility now holds 544 detainees, the overwhelming majority of whom are adult males awaiting trial.  ECF No. 81.  The physical footprint of the Facility includes seventeen similarly constructed housing units.  ECF No. 29 at 12–13.  In each unit, 48 double-occupancy cells are equipped with a sink and toilet and open to a common area with a kitchenette, additional sinks, tables and chairs, sitting areas, and phone banks.  *Id.*; ECF No. 29-3 at 6, 10–15.  The Facility also supports an on-site medical unit with twelve negative pressure single-occupancy

cells and a larger cell to care for up to ten detainees at once.  ECF No. 29-3 at 9–10.  The medical unit is staffed with a resident physician, nurses, and mental health providers.  *Id.*

On April 21, 2020, Plaintiffs filed this class action lawsuit and companion motion for temporary injunctive relief arising from Defendant's allegedly inadequate response to the COVID-19 pandemic.  ECF Nos. 2, 3.  Plaintiffs bring claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments based on Defendant's denial of medical care as well as knowing and reckless exposure to serious health risks (Count I).  They also aver that Defendant implemented, and continues to adhere to, an unconstitutional "policy" of detaining COVID-19-positive individuals after they are legally entitled to release (Count II).  For a subset of medically vulnerable detainees whom Plaintiffs contend face imminent peril from COVID-19, Plaintiffs seek a writ of habeas corpus for immediate transfer or release pursuant to 28 U.S.C. § 2241 (Count III).

At the time Plaintiffs filed suit, the public knew that three detainees had tested positive for COVID-19.[6]  The Complaint, however, reflected a far more sizeable outbreak and a systemic lack of response to contain it.  Twenty-seven detainees, or approximately five percent of the Facility's population, swore out detailed declarations cataloguing the lack of cleaning supplies and personal protective equipment ("PPE"), as well as the derisory medical response to those who displayed clear symptoms of COVID-19.  *See generally* ECF No. 2-1.  Detainees described medical staff wholly unfamiliar with how the virus presents, ill-equipped to identify COVID-19 symptoms, and uninformed as to how to conduct proper contact tracing or isolation procedures to stop the spread of this highly infectious virus.  Most disturbing, each detainee either described

---

[6] Laura Wainman, "3 inmates, 1 correctional officer at Prince George's Department of Corrections test positive for coronavirus", WUSA9 (April 2, 2020)**,** https://www.wusa9.com/article/news/health/coronavirus/coronavirus-prince-georges-county-jail-inmates-officer/65-b4e2051e-7b29-41e7-96f3-eb2a9473e038.

himself as having COVID-19 symptoms, being directly exposed to detainees with COVID-19 symptoms, or both.

Plaintiffs also included declarations from physicians who carefully documented the now obvious—that detained populations are at exponentially higher risk of contracting COVID-19 by virtue of detainees' reduced ability to socially distance and their lack of access to PPE. *See* ECF No. 2-1, Ex. 30, Ex. 32; ECF No. 44-1, Ex. A. Plaintiffs also submitted the declaration of an assistant state public defender—an officer of the court—who detailed her personal experience with inadequate screening for COVID-19 symptoms as she entered the Facility, limited and ineffective access to her clients and the unclean, dank environs that she personally observed. *See* ECF No. 2-1, Ex. 29.

In recognition of the dire circumstances as described by the detainees, the Court ordered Defendant to respond to the TRO motion within 48 hours. ECF No. 24. The Court provided specific guidance in a three-page attachment to the Order that enumerated the topics on which the Court expected Defendant to respond, including: information on the confirmed number of COVID-19 positive detainees and staff; methods for screening, testing, contact tracing, isolating, and quarantining detainees; provision of PPE and cleaning supplies; provision of medical care; and policies and procedures that Defendant implemented in response to the pandemic. To further streamline the process, the Court directed the parties to submit recommendations for a potential court-appointed expert who could inspect the Facility if deemed necessary.

On April 25, 2020, Defendant responded and supplemented the record as directed. ECF No. 29. Defendant, along with representatives of the Facility's medical subcontractor, Corizon, LLC, executed detailed declarations. *See* ECF Nos. 29-1, 29-2, 29-3. Defendant's declaration addressed the operational steps she had taken since January 2020 to prepare for and execute her

response to COVID-19 in the Facility.  *See* ECF No. 29-3.  Defendant described, for instance, steps taken to improve the Facility's sanitation and detainee personal hygiene, provide PPE to staff and detainees, and prepare the medical unit and medical staff for treating COVID-19 positive detainees.  *Id.*  The medical declarations detailed the training and protocols put in place to identify and treat COVID-19 positive detainees.  *See* ECF Nos. 29-1, 29-2.  The declarations also described screening protocols, which included twice-daily temperature checks in certain housing units.

Defendant also described her sequence of responses when COVID-19 first presented in her staff and the detainees at the end of March.  The Facility first eliminated all programming and inmate work details to reduce movement within the population; next it went to a "half lockdown" schedule (April 3) and then finally "full lockdown" (April 4).  *See* ECF No. 29 at 15; ECF No. 29-3 at 13–14, 16.  The Facility is still on full lockdown, which consists of allowing detainees to cycle out of their cells and to access the common space in groups of ten for an hour at a time.  *See* ECF No. 29 at 15; ECF No. 29-3 at 14; ECF No. 81.  The release continues throughout day and evening, with the exception of count, shift change, meals, and night lockdown.  *Id.*  As much as possible, detainees share the common space with the same ten individuals.  *Id.*  During this time, detainees may shower, watch television, and phone family and counsel.  *Id.*; ECF No. 29-3 at 11–15.  Despite the clear and significant toll such lockdown exacts on the detainees, the measure is deemed necessary to control the spread of the virus at present.

This evidence reflected that Defendant took important and proactive steps to control the spread of COVID-19 but also raised obvious red flags.  To begin, the Facility appeared to have significantly undertested the population of COVID-19 symptomatic detainees.  As of

Defendant's response, only twenty detainees had been tested, eighteen of whom tested positive. ECF No. 29-1 ¶¶ 5, 33. These numbers reflected that the Facility's test-to-positivity ratio was a whopping 90%, compared to the state average at the time of 19%.[7] An additional 28 staff had also tested positive. ECF No. 29-3 at 19. The significant presence of COVID-19 at the Facility, in combination with the scores of detainees who described experiencing distinct COVID-19 symptoms (e.g. fever, chills, shortness of breath, loss of smell and taste) yet were never tested, spoke to substantial undertesting at the Facility. The Defendant, however, hailed "only 18 confirmed cases" as proof of victory in stopping the spread of the virus. *See* ECF No. 29 at 4; ECF No. 29-3 at 18–19.

Defendant, who admits to a hands-on response to the presence of this unprecedented pandemic, certainly knew that the eighteen COVID-19 positive detainees had been housed in four units where roughly 237 detainees live.[8] By extension, Defendant knew the Facility had scores of untested detainees who had been in contact with the confirmed COVID-19 detainees. As of April 24, however, the Facility maintained only 20 additional test kits. ECF No. 29-1 ¶ 33.[9] The Facility also had no plan for how to secure more tests, or how to administer the tests on hand, as recommended by the CDC. *Cf.* ECF No. 2-1, Ex. 36 at 23. Defendant could not, at the time, point to even one request for additional tests from the state government, federal government, or private vendors.

---

[7] *Live tracker: How many coronavirus cases have been reported in each U.S. state?*, POLITICO (data as of May 1, 2020), https://www.politico.com/interactives/2020/coronavirus-testing-by-state-chart-of-new-cases/.

[8] *Compare* ECF No. 65-1 at 6 (housing units with outbreaks) *with* ECF No. 29 at 12 (population in each housing unit).

[9] At least one court has found that a prison's "shockingly limited available [COVID-19] testing" was sufficient to show deliberate indifference—despite the fact that the prison had "implemented health screening measures" and "modified operations to somewhat reduce inmate contact with each other." *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *1–3, *8 (N.D. Ohio Apr. 22, 2020).

To compound the undertesting problem, the evidence did not describe any protocol for contact tracing or quarantining those exposed to COVID-19 positive detainees.  Rather, several detainees, described as actively symptomatic, moved about the Facility several times per day, often between medical and their housing units.  *See e.g.,* ECF No. 2-1, Ex. 12 ¶¶ 2–3, Ex. 9 ¶¶ 4–13, Ex. 11 ¶ 10 ("I went back and forth from the medical unit three times before they finally took my symptoms seriously and put me in isolation"), Ex. 17 ¶ 4 ("I asked to be tested for the virus, but they said they don't have any tests. Last night I went to sick call again. I had a fever and a headache. They told me that my fever wasn't high enough, and that they would only test me if it got higher. They told me to drink water and sent me back to the unit."); Ex. 25 ¶ 5 (same for detainee with asthma).

Other detainees reported chronic lack of timely—or sometimes any—medical care, even when they presented with and complained of COVID-19 symptoms to Facility staff.  *See, e.g.*, ECF No. 2-1, Ex. 19 ¶¶ 4, 6 (noting that despite having asthma, experiencing coughing and sneezing, and filing a sick call request on March 23, he had not, as of April 7, received any response); ECF No. 44-1, Ex. H ¶ 8 ("So in addition to telling the nurses about my symptoms [shortness of breath, pain in chest, need for inhaler because of asthma], I filled out three sick call requests. . . . I never got a response[.]"); ECF No. 44-1, Ex. I ¶ 3 ("I lost my ability to smell and taste completely. I was sweating a lot . . . had shortness of breath, and I couldn't fully breathe . . . [medical] told me as long as I was strong enough to get up and walk around, I didn't have the Coronavirus. So they then sent me back to the housing unit. They didn't send me back with a mask or any sort of protective equipment."); ECF No. 2-1, Ex. 23 ¶¶ 4–6; ECF No. 44-1, Ex. J ¶ 8–9.  Ignored by medical staff, the sick detainees simply waited out their symptoms in their regular housing units and with their assigned cell mates.

Defendant did evidently begin conducting twice daily temperature checks in the housing units where COVID-19 positive detainees had resided.  *See* ECF No. 29-1 ¶ 29; ECF No. 36-17.  However, the temperature-check logs submitted to the Court heightened, rather than allayed, the Court's concerns.  The records were spotty and did not reflect the purported twice daily checks.  ECF No. 36-17.  Even more concerning, the recorded temperatures were consistently and atypically low.  *Id.*  A significant cohort of detainees had temperatures as low as 95 and 96 degrees, with some as low as 90, 92, and 94 (indicative of hypothermia[10]).  *See id.*  And no record reflected—ever—a temperature over 99 degrees, a fact the Court found both curious and alarming in light of both the eighteen confirmed COVID-19 positive detainees and that the singular most frequent symptom of the virus is fever.

As for PPE and hygiene products supplied to the inmates, the evidence once again concerned the Court.  The detainee declarations uniformly described access to minimal amounts of free soap, no sanitizer, and few other personal hygiene products critical to combating the virus' spread.  *See, e.g.*, ECF No. 2-1, Ex. 3 ¶ 7, Ex. 4 ¶ 10, Ex. 8 ¶ 17, Ex. 16 ¶ 8.  Most detainees noted that after receiving for free two small bars of soap when first committed to the Facility, soap is available only through purchase at the commissary and is expensive.  In response, Defendant submitted that the Facility planned well in advance for this eventuality by ordering 4,500 bars of soap and distributing the soap freely.  *See* ECF No. 29-3 at 4–5, 8.

These bars appeared inadequate to the Court.  They are small, hotel-sized bars purchased for 12 cents each, and quickly consumed.  ECF No. 37-11 at 7; ECF No. 2-1, Ex. 1 ¶ 7 (detainee noting that a bar of soap lasts at most two or three days).  For a population north of 560 detainees at the time, the Court had no reassurance that even the most basic supply of bar soap had been

---

[10] *See* Hypothermia, Mayo Clinic (last visited May 11, 2020), https://www.mayoclinic.org/diseases-conditions/hypothermia/symptoms-causes/syc-20352682.

secured in sufficient quantities to comply with CDC guidelines as to frequent hand washing.  *Cf.* ECF No. 29-3 at 6; ECF No. 2-1, Ex. 36 at 11.

As for masks, the Facility provided higher grade N-95 masks to its staff and surgical masks to detainees.  *See* ECF No. 29-3 at 10–11.  However, the detainees uniformly complained that the masks were flimsy, became dirty and soiled easily, and were not replaced nearly as often as necessary to maintain detainee safety.  *See, e.g.*, ECF No. 2-1, Ex. 2 ¶ 9, Ex. 3 ¶ 5, Ex. 4 ¶ 6, Ex. 5 ¶ 6, Ex. 7 ¶ 8, Ex. 8 ¶ 16, Ex. 24 ¶ 6.

The detainees also vigorously disputed that the housing units were cleaned, *see, e.g.*, ECF No. 2-1, Ex. 1 ¶ 5, Ex. 3 ¶ 9, Ex. 24 ¶ 10, or that available supplies allowed for frequent sanitizing of high-contact surfaces such as the housing unit phones.  *See, e.g.*, ECF No. 2-1, Ex. 16 ¶ 8 ("There are two spray bottles on the whole unit to share between about 80 people."), Ex. 15 ¶ 7.  The medical units received some of the most damning reports of unclean and unsanitary conditions.  According to several detainee declarations and one assistant public defender, medical isolation cells had "mucus, feces, blood, old food, urine, spit, everything you can name on the walls."  ECF No. 2-1, Ex. 11 ¶ 18; *see also* ECF No. 2-1, Ex. 12 ¶¶ 7–8, Ex. 29 ¶ 15.  The larger ten-person medical cell, although "better," evidently suffered from lack of cleaning supplies, piles of dust, accumulation of trash, and bug problems.  *See* ECF No. 2-1, Ex. 11 ¶ 19, Ex. 9 ¶¶ 19, 21; ECF No. 37-3 at 25 (internal Facility email confirming that the "Male Ward" in the Medical Unit was not cleaned by a professional service because it was "occupied.").

Chief among the Court's lingering concerns was the medically vulnerable population.  Although Defendant sparred about the definition of "medically vulnerable," *see* ECF No. 29-1 ¶ 31, the CDC makes it clear.  The population at higher risk for serious deleterious effects from COVID-19 are those age 65 and older; those with such underlying medical conditions as chronic

lung disease, moderate to severe asthma, serious heart conditions, diabetes, severe obesity, liver disease, chronic kidney disease undergoing dialysis; and the immunocompromised such as cancer patients, those who have received bone marrow or organ transplants, those who are HIV positive or who have AIDS, or those who take regularly corticosteroids and other immunosuppressants.[11]  Corizon bulletins have similarly advised Facility's medical staff of the high-risk conditions.  *See* ECF No. 36-12 at 3–4.  And both the CDC and Corizon explicitly instruct correctional facilities to develop a specific plan for this vulnerable population focused on implementing prophylactic housing and other accommodations in preparation for an outbreak. *See* ECF No. 36-26 at 4 ("For those patient (sic) age 60 or older, and especially those with underlying health issues, please ensure that there is a specific plan in place to isolate them from potential exposures and protect them with preventative measures."); ECF No. 2-1, Ex. 36 at 17, 21 (similar).

Despite this clear guidance, Defendant's submission reflected no plan of any kind for the high-risk detainees.  They remained housed with others who were COVID-19 symptomatic and positive with no special care paid to the heightened risk they face.  *See, e.g.,* ECF No. 2-1, Ex. 26 ¶ 4 ("I am HIV positive. Over the past two weeks, I have had chills and fever, a slight cough, body pain and a sore throat. I requested a "sick call," . . . the week of March 30th and I was finally seen on April 9, 2020."), Ex. 25 ¶ 5 ("I have asthma. . . I felt really bad for two or three days. I had body aches, a runny nose, and what felt like fluid in my chest. . . a nurse took my temperature. It was 101 or 102.  Despite this, I only remained in the medical unit for ten or 15 minutes. I was told to return to my cell and drink fluids. That was all.").

In short, the situation at the Facility appeared grim.  The Court accordingly appointed Dr.

---

[11] *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

Carlos Franco-Paredes, Program Director of the Division of Infectious Diseases at the University of Colorado Denver School of Medicine and an expert in infectious diseases, to inspect the Facility.  ECF No. 48-2; ECF No. 53.[12]  Double-Board certified in internal medicine and infectious diseases, Dr. Franco-Paredes has amassed not only significant clinical experience in direct patient care for infectious diseases, but has also advised and represented the country of Mexico on national health plans for implementing vaccinations, infectious disease protocols, and outbreaks of infections in the jail system.  ECF No. 48-2 at 2.  Dr. Franco-Paredes has also performed other similar inspections since the COVID-19 outbreak.

Dr. Franco-Paredes conducted the site inspection on May 6 and 7.  ECF No. 65-1 at 5. Over the course of two full days, the doctor was given unrestricted access to the Facility and he inspected much of it.  *Id.*  He also interviewed 41 detainees, several corrections officers and command staff, the resident physician, nurses, the resident psychologist, and Defendant.  *Id.*  Dr. Franco-Paredes described Defendant and staff as "helpful" and "cooperative," as well as open to recommendations to reduce the risk to staff and inmates.  *Id.* at 6.  Within 72 hours of the inspection, Dr. Franco-Paredes completed a written report and answered follow-up questions during a recorded hearing held on May 11, 2020.  ECF Nos. 64, 65-1. The following summarizes his findings.

Starting with the good news, the Facility appears at present to be complying with most of the applicable CDC guidelines.  Although this was not always the case,[13] Dr. Franco-Paredes found that the detainees had been given adequate supplies of soap and Spray-9, an FDA-

---

[12] The Court appointed Dr. Franco-Paredes pursuant to Federal Rule of Evidence 706.  The Court and parties appreciate Dr. Franco-Paredes' responsiveness and willingness to bear the entire expense of his appointment.

[13] The record, when viewed as a whole, reflects historic insufficient provision of soap, masks, cleaning products, and a lack of social distancing.  *See generally* ECF Nos. 2, 3-1, 29, 36, 37.

approved disinfectant that kills the novel coronavirus.  ECF No. 65-1 at 10.  Further, the

Facility's physical structure, combined with the lockdown measures implemented, worked to

contain the spread of COVID-19 when staff and detainees began testing positive.  *See id.* at 7,

10.  The regular but infrequent provision of masks could be improved, according to the doctor,

but it appears that the Facility is making ongoing changes in that regard.  *See id.* at 10, 14.  As of

the report date, May 11, none of the interviewed detainees reported active COVID-19 symptoms,

although one additional staff member had tested positive on May 6.  *Id.* at 9.

As for the bad news, Dr. Franco-Paredes confirmed that the Facility experienced a "large

outbreak" of COVID-19 between the end of March and mid-April that demanded rapid response

in testing and treatment.  *Id.* at 6. The outbreak began in the Officer Dining Room and spread to

at least four of the housing units that together included approximately 237 detainees.  *Compare*

ECF No. 65-1 at 6 *with* ECF No. 29 at 12.  Consistent with detainees' declarations, Dr. Franco-

Paredes noted that many detainees in those units had experienced active symptoms of COVID-

19.  Yet only twenty COVID-19 tests were administered, and only the eighteen detainees who

tested positive were isolated in the medical unit and treated accordingly.  Those infected with

COVID-19 were "likely a much higher number," and instead remained in their respective

housing units as disease vectors for the other detainees and staff.  ECF No. 65-1 at 7.  It was

good fortune that none, to date, suffered any of the serious, sometimes catastrophic, outcomes of

the virus.  *Id.*

Dr. Franco-Paredes also concluded that certain staff were—and still are—ill-equipped to

handle the outbreak.  *Id.* at 8–9.  Nurses lack a basic understanding of COVID-19 symptoms and

their dereliction was patent.  During the outbreak, sick call requests went ignored and when the

staff did respond, they failed to treat or isolate COVID-19 symptomatic detainees, repeating to

the detainees the well-worn phrase "if you can walk, then you are ok." *Id.* at 9.  This chronic

lack of education and response undoubtedly is an area of "important concern since patients with

COVID-19 may rapidly develop progressive respiratory failure." *Id.* at 8.  This combination of

"viral under-testing" and insufficiently trained or responsive medical staff posed great concern to

the doctor, especially given that certain "medically vulnerable individuals [are] residing in these

units and who, if infected, may develop severe disease and potentially die from this infection."

*Id.* at 9.

As for these high-risk detainees, Dr. Franco-Paredes confirmed they were left wholly

exposed.  *Id.* at 7.  Defendant, although specifically aware through CDC guidance that high-risk

detainees could easily succumb to COVID-19, and knowing that 28 staff and 18 detainees had

already tested positive, implemented no functional plan to afford such detainees any additional

screening, supervision, segregated housing, or any like measure.  Simply put, as of the report

date, Defendant had not demonstrated any plan to address the high-risk detained population.

At the conclusion of the May 11 hearing, the Court ordered the exchange of additional

evidence to facilitate ongoing discussions, as well as supplemental briefing on the application of

the Prison Litigation Reform Act (PLRA), 28 U.S.C. § 3626, to the proposed injunctive relief.

ECF No. 66.  The Court next conducted a second recorded hearing with the parties on May 20.

After careful review of all evidence presented, and for the following reasons, the Court finds

injunctive relief warranted, although on far narrower grounds than originally proposed.

## II.     Analysis

### A.     The Prison Litigation Reform Act (PLRA)

As a preliminary matter, the Court must decide whether the PLRA applies in this case.

The Court concludes it does.  The PLRA, by its plain terms, reaches all "prospective relief in *any*

civil action brought with respect to prison conditions."  18 U.S.C. § 3626(a) (1997) (emphasis

added).  This includes actions brought by pretrial detainees challenging conditions of their

pretrial detention.  *See id.* § 3626(g)(3) (defining "prisoner" to include "any person subject to . . .

detention . . .who is accused of . . .violations of criminal law or the terms and conditions of

parole, probation, pretrial release, or diversionary program."); and (g)(5) ("prison" defined as

"any Federal, State, or local facility that incarcerates or detains juveniles or adults accused of . . .

violations of criminal law").

In the context of proposed injunctive relief, the PLRA mandates that it reach "no further

than necessary to correct the [constitutional] violation."  *Id.* § 3626(a)(1)(A).  When fashioning

the appropriate remedy, the Court must also give "substantial weight to any adverse impact on

public safety or the operation of a criminal justice system caused by the relief."  *Id.*  In this

respect, the PLRA imposes an important backstop against judicial micro-management of prison

and detention facilities, even in the face of public health crises.  *See Brown v. Plata*, 563 U.S.

493, 511 (2011).

Section 3626(a)(3) further circumscribes this Court's power to issue a "prisoner release

order."  18 U.S.C. § 3626(a)(3).  A prisoner release order is defined broadly as "*any* order,

including a temporary restraining order or preliminary injunctive relief, that has the purpose or

effect of reducing or limiting the prison population, *or that directs the release from or non-

admission of prisoners to a prison*."  *Id.* § 3626(g)(4) (emphasis added).  The PLRA directs that

such a release order may issue only by three-judge panel, convened at the request of this Court,

and only after less intrusive relief has failed to remedy the constitutional violation.  *Id.*

§3626(a)(3).

Plaintiffs agree the PLRA applies to their Eighth and Fourteenth Amendment claims (Count I), given that it challenges the conditions of their confinement.[14]  ECF No. 74 at 1 n.1. However, they challenge the PLRA's applicability to the petition for habeas corpus brought on behalf of the medically vulnerable subclass pursuant to 28 U.S.C. § 2241 (Count III).  ECF No. 3-1 at 33 n.55; ECF No 74 at 2.  Plaintiffs assert that because the habeas petition challenges the "fact of confinement" and not the conditions under which they are detained, this claim is beyond the reach of the PLRA.  ECF No. 74 at 2.  The Court, at this juncture, must disagree.

To be sure, section 2241 confers "broad authority" on the court to "hear applications for writs of habeas corpus filed by persons claiming to be held 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Timms v. Johns*, 627 F.3d 525, 530 (4th Cir. 2010) (quoting 28 U.S.C. § 2241).  This authority extends to federal habeas corpus petitions brought by state pre-trial detainees.  *See Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 488–89 (1973); *Robinson v. Thomas*, 855 F.3d 278, 283–84 (4th Cir. 2017); *In re Wright,* 826 F.3d 774, 782 (4th Cir. 2016) (citing with approval *McNeely v. Blanas*, 336 F.3d 822, 824 n.1 (9th Cir. 2003)).  However, petitioners must challenge the "fact or duration" of their confinement and seek relief in the form of immediate release.  *Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at *4 (S.D. Tex. Apr. 17, 2020) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)); *cf. Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020) (concluding that a "claim by an immigration detainee seeking release because of unconstitutional conditions or treatment is cognizable under § 2241").[15]  The subclass'

---

[14] The Court agrees with Plaintiffs that the PLRA does not apply to their over-detention claim (Count II). The Court does not view that claim as challenging the conditions of their confinement, but rather a purported policy of detaining individuals beyond the point at which they are legally entitled to release.

[15] The Fourth Circuit has offered some guidance on this issue, at once holding that challenges to the conditions of confinement cannot be brought as a habeas petition, *see Wilborn v. Mansukhani*, 795 F. App'x 157, 163–64 (4th Cir. 2019), and endorsing that habeas corpus is "primarily a vehicle for attack by a confined person on

challenges to the conditions of confinement are otherwise captured in Count I and brought pursuant to 28 U.S.C. § 1983. *See Lee v. Winston*, 717 F.2d 888, 892 (4th Cir. 1983) (citing *Preiser*, 411 U.S. at 475) (release from confinement unavailable for claims brought pursuant to 42 U.S.C. § 1983).

The PLRA clearly carves out an exception for "habeas corpus proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(g)(2). But that is not this claim. The Complaint, read most favorably to the medically vulnerable subclass, simply does not challenge the "fact" that they are detained. They are not claiming, for example, to be held after acquittal or beyond the time otherwise imposed by law. *Compare Rodriguez v. Ratledge*, 715 F. App'x 261, 266 (4th Cir. 2017) (petitioner's deprivation of good-conduct time was a cognizable habeas claim because it challenged the duration of his confinement); *Brazell v. Boyd*, No. 92-7029, 1993 WL 98778, at *2 (4th Cir. Apr. 5, 1993) (citing *Drayton v. Hayes*, 589 F.2d 117, 120–21 (2d Cir. 1979) (double jeopardy claim properly brought as habeas petition); *and Robinson v. Thomas*, 855 F.3d 278, 283 (2017) (Court's analysis presumes double jeopardy claim properly brought as § 2241 petition) *with Braddy v. Wilson*, 580 F. App'x 172, 173 (4th Cir. 2014) (petitioner's challenge to the conditions of confinement improper habeas action); *Strader v. Troy*, 571 F.2d 1263, 1269 (4th Cir. 1978) (because petitioner did "not assert that he [was] entitled to parole and should be released," the "claim for relief must be treated as a suit under 42 U.S.C. § 1983."); *and Wilborn*, 795 F. App'x at 163–64 (petitioner's request for transfer to another facility was not cognizable under § 2241). Rather, Plaintiffs allege that the current "conditions" at the Facility have resulted in "needless[]" exposure to COVID-19. ECF

---

the legality of his custody and [that] the traditional remedial scope of the writ has been to secure absolute release—either immediate or conditional—from that custody." *Winston*, 717 F.2d at 892.

No. 2 ¶ 9.  Apart from the over-detention claim, Plaintiffs' factual allegations focus almost exclusively on Defendant's failure to provide appropriate PPE, housing, and medical care.  *Id.* ¶¶ 68–182, 198.  Where "Plaintiffs' claims would not exist but for their current conditions of confinement," *Alvarez v. LaRose*, 20cv782-DMS-AHG, 2020 WL 2315807, at *2-4 (S.D. Cal. May 9, 2020), Plaintiffs' habeas claim, at its core, is a challenge to prison conditions.

This Court is also not prepared to conclude that the challenge concerns both the fact and conditions of confinement.  Although this dual designation may make sense in other contexts,[16] the Court cannot plausibly read this Complaint as bringing such a claim.  The Complaint singularly references that "there are presently no options available to mitigate" the risk posed to the subclass "quickly enough to protect them other than immediate release from custody."  ECF No. 2 at ¶ 211.  But the remaining Complaint identifies the very conditions that, if remedied, would mitigate the risk to all detainees, including the subclass.  Put differently, Plaintiffs have not pleaded facts which make plausible that no set of conditions can reduce the risk of COVID-19 exposure to the medically vulnerable subclass to an acceptable level.  *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 755 (2017) ("What matters is the crux . . . of the plaintiff's complaint, setting aside any attempts at artful pleading."); *cf. Davis v. Bell Atl.-W. Va., Inc.*, 110 F.3d 245, 247 (4th Cir. 1997); *Belfiore v. Summit Fed. Credit Union*, 452 F. Supp. 2d 629, 633 n.2 (D. Md. 2006).  Accordingly, the Court finds that the PLRA applies to Counts I and III. [17]

---

[16] *See Nelson v. Campbell*, 541 U.S. 637, 643–44 (2004); *Wilson v. Williams*, No. 20-3447, at 3 (6th Cir. May 4, 2020), ECF No. 62, Ex. A; *but see Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *6 (11th Cir. May 5, 2020); *Martinez v. Brooks*, No. 3:20-cv-00569, 2020 WL 2405350, at *16 (D. Conn. May 12, 2020).

[17] Even if the PLRA did not apply, the Court finds that Plaintiffs have not demonstrated the propriety of *en masse* release for the medically vulnerable subclass. *Cf. Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *13 (E.D. Mich. Apr. 5, 2020) (finding that "no set of possible confinement conditions" could sufficiently protect petitioner's constitutional rights); *Gray v. Cty. of Riverside*, 5:13-cv-0444-VAP-OPx, at 4 (C.D. Cal., Apr. 14, 2020) (stating that if the jail "is unable to implement adequate social distancing within its existing jail facilities and take other necessary steps to decrease the risk of infection, this Court has the authority to order the transfer of prisoners to different facilities.").

### B.      Standard for Injunctive Relief

Emergency injunctive relief remains an extraordinary remedy, warranted only upon "a clear showing that the plaintiff is entitled to relief." *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008)) (internal quotation marks omitted); *Int'l Longshoremen's Ass'n, Local 333 v. Int'l Longshoremen's Ass'n, AFL-CIO*, CCB-15-813, 2015 WL 1402342, at *1 (D. Md. Mar. 25, 2015) (noting that the standards for a temporary restraining order and a preliminary injunction are the same).  Because granting such a motion "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way[,] [t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (quoting *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)) (internal quotation marks omitted).  Accordingly, the Court, in its sound discretion, must exercise caution in granting injunctive relief in advance of trial on the merits.  *See Dewhurst*, 649 F.3d at 290 (citations omitted).

The burden of establishing the propriety of a temporary restraining order rests with the movants who must demonstrate, by a preponderance of the evidence, four well-established factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that issuing the injunction is in the public interest.  *Winter*, 555 U.S. at 20; *Dewhurst*, 649 F.3d at 290.  For each of Plaintiffs' claims, the Court addresses the above factors.

### C.      The Eighth and Fourteenth Amendment Health and Safety Claims

### 1.      Likelihood of Success on Merits

The Court first turns to the likelihood of success as to the Eighth and Fourteenth

Amendment claims. As Plaintiffs correctly point out, Eighth Amendment protections extend to those detainees already found guilty of a criminal offense, whereas similar protections apply to pretrial detainees pursuant to the due process clause of the Fourteenth Amendment.  ECF No. 3-1 at 19; *see Helling v. McKinney*, 509 U.S. 25, 33 (1993) (Eighth Amendment); *City of Revere v. Mass. General Hosp.*, 463 U.S. 239, 244 (1983) (Fourteenth Amendment).  This is because "a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description."  *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992); *Ingraham v. Wright*, 430 U.S. 651, 671–72 n. 40 (1977) ("Eighth Amendment scrutiny is appropriate only after the state has complied with the constitutional guarantees traditionally associated with criminal prosecutions.").  However, the analytical implications largely remain the same because the due process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner."  *City of Revere*, 463 U.S. 239 at 244.

The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Setter*, 501 U.S. 294, 297 (1991)).  Eighth Amendment protections assure "the treatment a prisoner receives in prison and the conditions under which he is confined."  *Id.* (quoting *Helling*, 509 U.S. at 31).

Under the Eighth Amendment, an official is liable if she displays "deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko* v.

*Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks and ellipses omitted).

Similarly, an official violates detainees' Eighth Amendment rights if she exposes detainees to

conditions that pose "a substantial risk of serious harm" to their health.  *See Farmer v. Brennan*,

511 U.S. 825, 834 (1994).  This includes confinement conditions that are "very likely to cause

serious illness and needless suffering" to detainees, specifically, "exposure of inmates to [the]

serious, communicable disease" of COVID-19.  *Helling*, 509 U.S. at 33; *see also DeGidio v.*

*Pung*, 920 F.2d 525, 527, 529 (8th Cir. 1990) (holding that serious risk to inmates' health existed

where a prison had an inadequate response to a tuberculosis outbreak even though "[o]nly a few

infected individuals develop active tuberculosis" and the rest are asymptomatic).[18]

    Importantly, "[w]hether one characterizes the treatment received by [the prisoner] as

inhuman conditions of confinement, failure to attend to his medical needs, or a combination of

both, it is appropriate to apply the deliberate indifference standard."  *Helling*, 509 U.S. at 32

(quotation and quotation marks omitted).  To satisfy the deliberate indifference standard,

Plaintiffs must demonstrate first, that the alleged deprivation is, objectively, sufficiently serious,

and second, that subjectively, the prison official acted with a sufficiently culpable state of mind.

*See Cox v. Quinn*, 828 F.3d 227, 235–36 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225

(4th Cir. 2016).  The subjective component requires "subjective recklessness" in the face of the

serious medical condition.  *See Farmer*, 511 U.S. at 839–40.  "True subjective recklessness

requires knowledge both of the general risk, and also that the conduct is inappropriate in light of

that risk."  *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir.1997); *see also Parrish ex rel. Lee v.*

---

[18] Plaintiffs raise a wide array of other alleged constitutional violations concerning access to mental health treatment, interference with access to counsel and family members, and an ineffective grievance process. *See, e.g.*, ECF No. 3-1 at 9, 16, 22; ECF No. 2-1 at 44.  This motion concerns solely the most immediate and pressing healthcare needs to mitigate the emergent COVID-19 crisis at the Facility.  The Court has directed the parties to continue discussions regarding redress of the other areas of identified alleged deficiencies.

*Cleveland*, 372 F.3d 294, 307 (4th Cir. 2004).

An official may avoid liability, however, "if [she] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014).

Whether both prongs of the deliberate indifference standard apply to pretrial detainee claims has been the subject of much debate.  Although the Fourth Circuit has historically required satisfaction of both the objective and subjective prongs in the context of detention claims, *see Gordon v. Kidd,* 971 F.2d 1087, 1094 (4th Cir.1992) (applying the deliberate indifference standard to pretrial detainees under the due process clause of the Fourteenth Amendment); *Hill*, 979 F.2d at 991–92 (same), the United States Supreme Court recently cast doubt on the viability of this rigorous test as applied to those not yet tried or convicted of any crime.  The Court in *Kingsley v. Hendrickson* held that the presumptively innocent plaintiff-detainee need only establish, in his excessive force claim under the due process clause of the Fourteenth Amendment, that the official acts were objectively unreasonable; the plaintiff need not also show the official intended to violate plaintiff's rights or "acted with reckless disregard for his rights." 135 S.Ct. 2466, 2471–72 (2015).  In so holding, the Court relied heavily on its prior decision in *Bell v. Wolfish*[19], in which the Court "did not consider the prison officials' subjective beliefs about the policy." *Id.* at 2473.  "As *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or

---

[19] 441 U.S. 520 (1979).

it is excessive in relation to that purpose." *Id.* The Court further observed that the "objective standard is workable" in that it both protects officials who act in good faith and takes into account the "legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* at 2475.

This Court agrees with several other courts that no meaningful analytical difference exists between the constitutional violations raised in *Kingsley* and those presented here. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 33–35 (2d Cir. 2017); *Banks v. Booth*, No. 20-849(CKK), 2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020); *cf. Coreas*, WL 1663133, at *8. However, for purposes of this motion, the Court defers ultimate decision on this legal question because Plaintiffs have established a likelihood of success on the merits even under the more exacting standard.

### a. The Objective Prong: Substantial Risk of Harm to Health or a Serious Medical Need

Defendant agrees that exposure to COVID-19 objectively presents a substantial risk of harm to detainees' health. *See, e.g.*, ECF No. 29 at 1 ("The virus is serious and can result in death."); *id.* ("Never before has the country experienced a virus as contagious as COVID 19); *id.* at 2 (describing the virus's spread within the Facility as "inevitable"). Further, society has undoubtedly deemed the risk posed by COVID-19 intolerable, as evidenced by the unprecedented changes to American life to avoid it, from months-long stay-at-home orders to the shuttering of schools and businesses. The risk posed in jails and prisons is markedly greater than that facing the general population, "in terms of risk of transmission, exposure, and harm to individuals who become infected." ECF No. 2-1, Ex. 30 at 4; *see also* ECF No. 2-1, Ex. 30 at 4–

6; ECF No. 2-1, Ex. 32 at 8–9.  This risk, in short, is obvious.  *See Valentine v. Collier*, No. 4:20-CV-1115, 2020 WL 1916883, at *10 (S.D. Tex. Apr. 20, 2020) ("The risk of COVID-19 is obvious. One person incarcerated . . . has died from COVID-19 and we are seeing COVID-19 spread like wildfire in prisons, jails, and detention facilities within TDCJ's system, the country, and the world."); *Cameron v. Bouchard*, No. 20-10949, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020) ("It cannot be disputed that COVID-19 poses a serious health risk to Plaintiffs and the putative class.").

Likewise, the parties do not dispute that that highly symptomatic COVID-19 positive detainees suffer from serious medical needs.  *See, e.g.,* ECF No. 2-1, Ex. 1 ¶¶ 9–10 ("I am coughing up mucus, my chest hurts, and I woke up this morning with a bloody nose . . . I am losing my sense of taste . . . For a week I had diarrhea); Ex. 9 ¶¶ 4–13 (registering high temperatures (101.2) and experiencing vomiting and muscle fatigue); Ex. 17 ¶ 4 (fever and headache); ECF No. 44-1, Ex. I ¶ 3 ("I lost my ability to smell and taste completely. I was sweating a lot. I didn't know what was going on. I also had shortness of breath, and I couldn't fully breathe.").  The same holds true for detainees with significant comorbidities such as diabetes, HIV, or moderate to severe asthma, *see* ECF No. 36-12 at 3–4, some of whom have already experienced COVID-19 symptoms.  *See, e.g.,* ECF No. 2-1, Ex. 25 ¶ 5 (asthmatic detainee experiencing "body aches, a runny nose, and what felt like fluid in [his] chest."); Ex. 26 ¶ 4 (HIV-positive detainee experiencing "chills and fever, a slight cough, body pain and a sore throat").  Accordingly, Plaintiffs have demonstrated likelihood of success on the merits as to the objective prong of the deliberate indifference test.

### b.    The Subjective Prong: Reckless Disregard

As for Defendant's actual knowledge, the evidence robustly demonstrates that Defendant,

beginning January of this year, became intimately familiar with the consequences of infection within the Facility's high-risk population and the attendant symptoms of those infected. *Compare* ECF No. 2-1, Ex. 36, ECF No. 36-26 at 4, ECF No. 36-23 at 6, *and* ECF Nos. 36-12 at 3–4, *with Parrish*, 372 F.3d at 303 (noting plaintiff can show knowledge if the risk is well-documented and official had exposure to that information).   Indeed, early in the COVID-19 outbreak, Defendant publicly acknowledged that the Facility is like a "cruise ship[] without the views or the amenities" where "[p]eople are close together" and "breathing the same air[,]"  and so she "expect[ed]" COVID-19 cases in the Facility to rise.   ECF No. 2 at ¶¶ 69–70; *cf. Makdessi v. Fields*, 789 F.3d 126, 141 (4th Cir. 2015) (stating that when a particular danger has been "expressly noted by prison officials," this can prove that official's actual knowledge).   Further, Defendant's constant, daily involvement in tracking the spread of COVID-19 in the Facility made her keenly aware of the grave risks that all detainees faced.  *See* ECF No. 77-1 (Aff. Dr. Earnest L. Carter, MD, Phd, Director of Prince George's County Department of Health,); *id.* at 2 ("Ms. Mary Lou McDonough, has consulted me multiple times over a period of two or more months concerning the appropriate steps to follow to prevent and/or control the spread of the virus within the Detention Center among both staff and the inmates."); *cf. Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019), *as amended* (May 6, 2019) (similar).  Plaintiffs, therefore, have demonstrated that Defendant knew the severity of the risks that COVID-19 visited on the detainees.

The more difficult question is whether Defendant exhibited, at a minimum, reckless disregard to such medical needs and risks.  In this respect, the Court recognizes that COVID-19 poses a uniquely difficult challenge to detention centers.  Much about the virus is still unknown.

Companies, hospitals, governments, and other institutions across all industries have had to rapidly adapt, often without the appropriate resources to do so optimally.  Defendant is at a similar disadvantage.

But even taking these realities into account, the Court cannot ignore Defendant's evident disregard for the existence of the clear triple-threat: (1) undertesting, <u>and</u> (2) inadequate treatment and isolation of COVID-19 symptomatic detainees, <u>and</u> (3) no plan for those at high risk of COVID-19 complications.  Defendant knew that she had a substantial COVID-19 outbreak in the Facility, and yet had only tested twenty detainees.[20]  The remaining population, many of whom were highly symptomatic, were kept in close quarters with other detainees and staff.  And although Defendant implemented monitoring protocols, they were transparently ineffective.  With sick calls ignored, temperature checks inaccurate, and nurses telling symptomatic detainees "if you can walk, then you are ok," Defendant exhibited a reckless disregard for provision of basic care.  Finally, the high-risk or "medically vulnerable" detainees were left as sitting ducks for COVID-19, with no real plan for their continued safety.[21]

Additionally, although the Court credits that Defendant is responding to a rapidly evolving pandemic and has improved its response in many ways since the filing of this lawsuit,

---

[20] The record reflects that the Facility had approximately 20 additional test kits available that went unused. ECF No. 29-1 ¶ 33. Since this litigation began, and more particularly in the week preceding the publishing of this Opinion, the Facility has procured 300 additional test kits and has begun more systematized screening and testing consistent with this Court's decision.  *See* ECF No. 73 at 18.  The Court is hopeful that the Facility will receive additional tests to make universal testing available to this population. *Cf. Governor Hogan Announces Universal COVID-19 Testing for Maryland's Correctional and Juvenile Facilities*, Office of Governor Larry Hogan, (May 20, 2020) https://governor maryland.gov/2020/05/20/governor-hogan-announces-universal-covid-19-testing-for-marylands-correctional-and-juvenile-facilities/.

[21] Despite several rounds of briefing and this Court's pointed questions regarding the Facility's plan for high risk detainees, Defendant for the first time on May 19 shared that the Facility had "planned" all along to keep those high risk detainees ineligible for release in their housing units during the COVID-19 outbreak, and in single-cells when possible. ECF No. 77-4 at 2–3.  This recent revelation does not convince the Court that the Facility had addressed the risks sufficiently to obviate the need for immediate injunctive relief.

no formal plan exists to continue in some orderly fashion, the provision of PPE, cleaning supplies, and social distancing measures.  The Court on this front does <u>not</u> wish to micromanage the day-to-day operations of the Facility.  Rather, the Court will implement narrowly tailored relief to provide assurance that those essential measures designed to reduce the risk of community spread will remain in place for the life of the pandemic.

The Court thus concludes that, on this record, Defendant at a minimum recklessly disregarded the health and safety of the detainees exposed to COVID-19, particularly those at high-risk of complications if infected.  To be clear, the Court draws this conclusion not on lack of available testing alone, for that is a universal shortcoming.[22]  It is rather the combination of simultaneously undertesting, failing to isolate and provide basic medical attention to COVID-19 symptomatic detainees, and ignoring high-risk detainees—all known to Defendant—that is at the core of this finding.

Defendant maintains that the Facility under her leadership responded reasonably and swiftly to the pandemic, and so she must avoid liability on these constitutional claims.  *See* ECF No. 29 at 3, 20.  Without doubt, Defendant deserves credit for obtaining additional supplies early, suspending inmate work details, and issuing appropriate personal protective equipment to staff.  *See* ECF No. 37-11; ECF No. 29-1 ¶ 33; ECF No. 29-3 at 10–15.  Similarly, Defendant undoubtedly worked to reduce the detainee population and put policies in place specific to COVID-19.  The Court commends these measures.

But as robustly documented by Dr. Franco-Paredes, a combination of critical failings

---

[22] *See* Sheryl Gay Stolberg, Farah Stockman and Sharon LaFraniere, *Testing Remains Scarce as Governors Weigh Reopening States*, N.Y. TIMES (April 25, 2020), https://www.nytimes.com/2020/04/25/us/politics/virus-testing-shortages-states-trump html; Christopher Weaver and Rebecca Ballhaus, *Coronavirus Testing Hampered by Disarray, Shortages, Backlogs*, WALL ST. J. (April 19, 2020), https://www.wsj.com/articles/coronavirus-testing-hampered-by-disarray-shortages-backlogs-11587328441.

nonetheless persisted in isolating and providing basic treatment to COVID-19 symptomatic

detainees and providing protections for high-risk detainees.  The Court thus concludes that,

based on the limited record before it, Plaintiffs are likely to succeed in showing Defendant's

reckless disregard for detainee health and safety. [23]

### 2.    Irreparable Harm

The Court considers next whether Plaintiffs have shown a likelihood of irreparable harm.

To be successful, the movant must demonstrate that the harm requiring immediate action is

"'neither remote nor speculative, but actual and imminent.'"  *Direx Israel, Ltd. v. Breakthrough*

*Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v.*

*Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).  "Issuing a preliminary injunction based only on

a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of

injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that

the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520

U.S. 968, 972 (1997) (per curiam)).

The factor is easily met.  It is uncontroverted that the outbreak puts all detainees, and

particularly high-risk detainees, in serious jeopardy.  The Facility, thankfully, has so far escaped

any catastrophic consequences.  But to address the triple threat now, so as to reduce the risk of

further irreparable harm, warrants narrowly drawn injunctive relief.  The Court is not alone in

this conclusion.  *See Cameron*, 2020 WL 1929876, at *3 (holding that absent injunctive relief,

plaintiffs "face a heightened risk of contracting this life-threatening virus simply as incarcerated

---

[23] Defendant suggests the Court should deny the motion outright because the Facility is *currently* CDC
compliant and has addressed many of Plaintiffs' concerns.  ECF No. 73 at 2–3.  Although the parties continue to
debate this point, the Court finds injunctive relief, drawn narrowly, appropriate because even with improvements
made during this litigation, the risk of future danger remains evident.  *See Porter*, 923 F.3d at 364–65 (affirming
injunctive relief where plaintiffs "satisfied their burden to demonstrate a cognizable danger of recurrent violence.").
No "clear proof" as yet exists that Defendant has abandoned the "unlawful practices" at the heart of the
constitutional violations.  *Id.* at 365.

individuals and even more so without the imposition of these cautionary measures"); *Baxley v. Jividen*, No. 3:18-1436, 2020 WL 1802935, at *6 (S.D.W. Va. Apr. 8, 2020) (likelihood of serious illness and even death accompanying the COVID-19 pandemic, coupled with inadequate mitigation); *Coreas*, 2020 WL 1663133, at *13.

### 3.      Balance of Equities and the Public Interest

Likewise, the balance of equities tips in favor of granting relief.  To be sure, the Court recognizes that Defendant maintains a strong interest in management of the Facility independent of Court involvement.  *See O'Dell v. Netherland*, 112 F.3d 773, 777 (4th Cir. 1997) ("[I]t is not for the federal courts to ... micromanage the Nation's prisons.").  Respecting these boundaries, and in-line with the dictates of the PLRA, the scope of this relief addresses only the shortcomings described above.  The Court aims to "discharge the[] duty to protect constitutional rights" with minimal intrusion on Defendant's daily operations.  *Turner v. Safley*, 482 U.S. 78, 84 (1987) (citation and quotation marks omitted).

As to the public interest, reducing the spread of this deadly virus in communal environments—whether they be assisted living, group homes, detention facilities, or prisons— remains front and center.  *See Booth*, 2020 WL 1914896, at *12.  Every detainee, and every staff member, is loved by someone on the outside, the members of our larger community.  Minimizing risk to the detainees suffering from COVID-19 indisputably remains as high a priority as minimizing the risk for the state and country as a whole.  *Id.*  The public also maintains a broader interest in reaping the collateral benefits of reduced risk, such as conserving precious healthcare resources.  *Id.*; *Valentine*, 2020 WL 1916883, at *15.  The Court thus concludes that the third and fourth factors weigh heavily in favor of granting injunctive relief targeted at the triple threat.

In sum, Plaintiffs have established the propriety of issuing injunctive relief, albeit on far narrower grounds than originally proposed.  As more fully described in the accompanying order, Defendant must develop a comprehensive written plan to address systematic testing and identification of COVID-19 positive detainees; long term provision of PPE; increased training, education, and supervision of medical staff so that COVID-19 symptomatic and positive detainees receive timely and appropriate care; and prophylactic protections for high-risk detainees.

### D.      Medically Vulnerable Subclass § 2241 Petition

As pleaded in Count III, Plaintiffs seek immediate release for the medically vulnerable subclass.  ECF No. 2, ¶ 211; ECF No. 3-1 at 29.  According to Plaintiffs, no set of conditions— even those granted in the accompanying order—can adequately ensure the safety of this subclass or the protection of their constitutional rights.  *Id.*  Plaintiffs therefore argue that this Court must release or place the entire subclass on home confinement immediately.  *Id.*

Plaintiffs' request, at this juncture, fails under the traditional *Winter* factors because they have not shown a likelihood of success on the merits of the claim.  *See Winter*, 555 U.S. at 20; *Dewhurst*, 649 F.3d at 290.  As already discussed, the Court is not convinced that this subclass challenges the "fact of" confinement where the Complaint, read most favorably to the subclass, raises a panoply of conditions that affect all detainees at the Facility and, if remedied, would render release unnecessary.  ECF No. 2 at 42–45.  Thus, the Court cannot conclude that the claim survives as a matter of law.

The Plaintiffs' retort on this point lends to further confusion.  At oral argument, the Plaintiffs pressed that the remedy they seek is not "release" but "transfer" to home confinement.  Without even considering whether this distinction further undermines the legal sufficiency of the

§ 2241 claim, such relief is not supported by the law on which Plaintiffs rely. "Transfer" contemplates moving the prisoner either to another detention facility or to a hospital for necessary medical treatment. *See, e.g., Gray v. Cty. of Riverside*, 5:13-cv-0444-VAP-OPX, at 4 (C.D. Cal., Apr. 14, 2020); *United States v. Wallen*, 177 F. Supp. 2d 455, 458, 459 (D. Md. 2001). Plaintiffs, in contrast, seek *en masse* release to their homes.

Plaintiffs, perhaps seeing the fault lines in this argument, next urge the Court to "release" the entire subclass on non-monetary bond pending the resolution of their petition. ECF No. 3-1 at 31; ECF No. 74 at 2. Plaintiffs argue that the Court maintains inherent authority to impose its own conditions of release pending final resolution of their habeas petition. *See Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Martinez v. DelBalso*, No. CV 19-5606, 2020 WL 1939717, at *1–4 (E.D. Pa. Apr. 22, 2020); *Clark v. Hoffner*, No. 16-11959, 2020 WL 1703870, at *2–5 (E.D. Mich. Apr. 8, 2020). Although rare, courts have ordered release where the "habeas petition raises substantial claims and . . . extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Reno*, 241 F.3d at 226. For a claim to be "substantial," the petitioner must show a "likelihood of success on the merits" or, in other words, a "high probability of success." *Id.* at 224, 226 n.5 (citing nonbinding cases).

Again, the request fails for the same reasons. Even if the Court credits that COVID-19 qualifies as an extraordinary circumstance, the claim is not "substantial" if likely to fail on the merits. Additionally, because relief short of release can adequately address the constitutional harms at present, Plaintiffs have also not demonstrated that release is "necessary to make the habeas remedy effective." *Reno*, 241 F.3d at 226. Thus, the subclass has not convinced this Court that injunctive relief in the form of release is warranted.

### E.      Over-detention Claims

Plaintiffs also seek injunctive relief for a subclass of detainees whom Plaintiffs contend

are currently held without any lawful authority due to their COVID-19 positive status. *See* ECF

No. 3-1 at 17, 27–29.  Defendant responds that the claim is moot because no COVID-19-positive

detainee is currently held in violation of a state-court release order, ECF No. 29 at 12, and further

acknowledged at the hearing that any such case would present a substantive due process

violation. *See generally Steele v. Cicchi*, 855 F.3d 494, 502 (3d Cir. 2017); *Lynch v. City of New

York*, 335 F. Supp. 3d 645, 654 (S.D.N.Y. 2018); *Campbell v. Johnson*, 586 F.3d 835, 840 (11th

Cir. 2009); *Dodds v. Richardson*, 614 F.3d 1185, 1193 (10th Cir. 2010), *cert. denied*, 131 S.Ct.

2150 (2011).

Plaintiffs nonetheless press for injunctive relief, not for "release," they say, but to enjoin

Defendant from implementing a continuing "policy" of holding COVID-19 positive detainees

who have satisfied court-ordered release conditions. *See* ECF No. 3-1 at 17, 27–29.  Plaintiffs

identify three detainees whose "overdetention" represents Defendant's policy.  The Court cannot

agree with Plaintiffs' position.

The evidence reflects that in response to the pandemic, Defendant worked actively with

state prosecutors, public defenders and the courts to reduce the entire detained population, and

maintains such efforts to this day.  Between March 1, 2020 and April 24, 2020—a matter of a

couple months—the jail population at the Facility decreased from 720 inmates to 534

(approximately 26%). *See* ECF No. 29-3 at 10; ECF No. 65-1 at 6.  During yesterday's status

conference, Defendant represented to the Court that the current detained population at the

Facility was 544.  Defendant's actions thus fall in line with the evident policy to expedite the

release detainees who satisfy the conditions of a state-court release order.  Accordingly, the

record does not support a "policy" of detaining COVID-19 positive detainees in contravention to a state-court release order.  Plaintiffs' proposed injunctive relief is denied.

### III.     Conclusion

Plaintiffs have convinced the Court that temporary injunctive relief, narrowly drawn, is proper.  Likewise, Defendant appears willing and able to implement such relief, and the Court is encouraged that critical measures are underway to protect the health and safety of the Facility's detainees.  The ordered relief, which follows separately, will assure continued necessary progress.


_____5/21/2020_____                _____/S/_____
Date                                             Paula Xinis
                                                 United States District Judge