Affidavit of Mary Lou McDonough

My name is Mary Lou McDonough. I am over 18 years of age and am competent to testify. The following statements are made based upon my personal knowledge and my knowledge as Director of the Prince George's County, Maryland Department of Corrections (DOC).

I am the Director of the Prince George's County Department of Corrections. I have held this position since June 4, 2008. Prior to becoming Director of the County's Department of Corrections, I held the position of the Deputy Director, Bureau of Administration at the Prince George's County Department of Corrections for three years. Prior to working at the Department of Corrections, I served as Deputy Director for the Prince George's County Department of Housing and Community Development (DHCD). Totally, I spent 25 years working in subsidized and public housing; particularly with the elderly and Section 8 Rental Assistance recipients. My education and training consist of a Bachelor of Science, with Majors in Sociology and Political Science from the University of Maryland, College Park, Maryland and a Master of Public Policy from the School of Public Policy at the University of Maryland, College Park, with a concentration in Public Finance. I have had extensive training in Corrections Administration through many classes, trainings and workshops sponsored by Correctional Professional organizations including the American Correctional Association (ACA), the National Institute of Corrections (NIC), the American Jail Association (AJA) and the Maryland Correctional Administrators Association (MCAA). I participate in the Correctional Chiefs Committee of the Metropolitan Washington Council of Government (MWCOG). I have served as Chair and Vice Chair of this Committee.

Under normal circumstances, and prior to the onset of COVID 19, the County's Correctional Center contagious disease policy was in place and is attached to this Affidavit as **affidavit exhibit number 1.** The policy has been constantly updated this year to reflect the COVID-19 pandemic and health experts' recommendations.

I first became aware of the possible spread of a Coronavirus to the United States in December 2019 and in January 2020 by watching, listening and reading reports in the press and on-line. Knowing that a spread of any contagious disease in a Correctional Center could be dangerous to both inmates and staff, I immediately began preparations to assist in our readiness for potential introduction, spread and mitigation of COVID-19 in the County's Correctional Facility.  As a result, I took the following actions:

On February 6, 2020, the medical staff began a new and additional screening process for all committed persons upon their arrival in Upper Marlboro Processing, which included the completion of a check list asking about possible "flu-like" symptoms and checking the temperatures.  The questions included asking about recent travel outside of the Country. A Copy of the check list used is included Dr. Asresahegn Declaration**.** Information about this new process was brought to the attention of the Office of the County Executive during my monthly briefing of Deputy Chief Administrative Officer for Public Safety (DCAO) Mark Magaw.

At our regular February 2020 Monthly Medical Advisory Committee (MAC) meeting with our Medical Administrator and Physician and Chiefs of DOC Divisions, additional planning steps were taken to include reviewing, revising and updating our Infectious Control Policy. At that time our current infectious disease policy had more to do with contamination from blood and body fluids than it did with airborne illnesses, like COVID-19.  The policy was reviewed and changed to add more specifics in dealing with an airborne disease and has been continuously

2

Case 8:20-cv-01028-PX Document 90-2 Filed 05/27/20 Page 3 of 20

changed regarding social distancing and crowd size and other recommendation by the Health Department, the US Centers for Disease Control and Prevention (CDC) and the County Office Emergency Management (OEM). Also, flu vaccine was only offered and available to staff in October -December, but, since we wanted to be able to better distinguish flu from the coronavirus, flu vaccine was offered free to staff in February and March. Health compromised inmates were already receiving flu vaccine in our Medical Unit. Since COVID-19 testing was not available in February and early March in the US, being able to rule out flu could possibly be a help in diagnosis of COVID-19 cases. I also asked that our Airborne Infection Isolation Rooms (AIIR) rooms be tested to make sure the negative pressure system was working in them. I also asked Maintenance to finish any outstanding repairs, plumbing, electrical, etc. that may have been needed in the Medical Unit. I asked about the cleaning that was being done by an outside Contractor in the Medical unit and was it enough and being performed properly. I was assured by our Medical Contractor that they were satisfied with cleaning protocol. I confirmed that Physicals were being performed on time on all new inmates, within 14 days of arrival. The Medical Administrator spoke highly of the Officers who were assigned to Sick Call and to the Medical Unit and asked if Management could try to use the same Officers in Medical as much as possible on the regular Officers days off. Management agreed to do that as much as possible depending on schedules and leave usage.

On March 3, 2020, I sent a memo to DOC Staff advising them of preliminary actions being taken at the jail and reminding them to wash their hands regularly and often. We also posted a Health Department flyer through the correctional facility describing how to best avoid infectious disease by hand washing often, hand washing etiquette, coughing into the crook of

3

your elbow and using tissues, which are then disposed of for any sneezes. We also reminded staff to stay home if they felt sick and inmates to report and symptoms to staff.

During early March, I attended many meetings, 3/3/20, Meeting with Prince George's County Full Cabinet, led by Chief Administrative Officer Major Riddick, 3/4/20, Meeting with County Executive Angela Alsobrooks, Health Officer Dr. Ernest Carter and Heads of agencies that could be strongly affected by the virus, i.e., Public Safety, Housing, Health and Public Works, 3/5/20 participated in a community roundtable held by Congressman Steny H. Hoyer (D-5th MD) and Congressman Anthony Brown (D-4th MD) representatives for Prince George's County and 3/9/20 Met with Corrections Physician, Medical Director, Chief of Nursing and Corizon Corporate Officials to discuss plans and operations moving forward.,

On March 12, 2020, I stopped our normal group Roll calls, usually held during the 15-minute period prior to an 8-hour Shift start. Post assignments and information is now shared individually with Officers by Command staff and through electronic measures.

During this same time period, early March 2020, increased sanitation efforts began on all Shifts; particularly in common areas. Sanitation in the facility is normally done by inmate work crews supervised by Correctional Officers. These efforts are supplemented by a Contractional Cleaning Company in the Medical Unit and in staff offices. We provided additional disinfectant cleaners and wipes and paper towels to all inmates and staff. Copies of inventories, orders, and invoices for additional cleaning supplies are attached. These additional supplies of disinfectant wipes and diluted bleach and paper towels were made available in Housing Units for Officers and inmates for use on surfaces and equipment, including telephones, doors, door handles and knobs, electronic equipment, tables, seating areas and all other frequently touched surfaces. On March 18, 2020, additional personal bars of soap were provided to detainees at arrival in

Processing for their individual use. Soap was and is distributed FREE OF CHARGE to all detainees in accordance with the later published recommendation of the Centers for Disease Control (CDC) which states that Correctional Agencies stock "liquid soap when possible, if bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing". Our agency finds that "bar" soap is more convenient for detainees to use because it is readily available, can be easily kept with a detainee and does not create the environmental waste and potential for abuse as contraband that liquid soap containers (pumps) may contribute. On April 9, 2020, Officers were reminded to distribute soap freely within the Housing Units to anyone needing or requesting it, and Zone Commanders were instructed to continually monitor and ensure that there were bars of soap available in the Housing Units for consistent distribution.

We have chosen not to use alcohol-based hand sanitizer within proximity of detainees because of the potential for abuse. We have previously had inmates abuse alcohol-based hand sanitizer by drinking it for the alcohol content, which previously caused the admittance of two inmates to the hospital, one who remained in the ICU in critical condition and resulted in the possibility of permanent organ damage. This option is in accordance with CDC guidance which recommends the use of alcohol-based hand sanitizer *if soap and water are not available*, (emphasis added).

Our Housing units are not dormitory style, which may require up to 12 individuals to share bathrooms and sinks as may be seen in other jurisdictions. In our facility, detainees are housed in cells, which are situated around a common day room area. Each cell has its own toilet and sink and holds no more than two occupants, many detainees are single celled and have a private sink and toilet. The common area also contains a Kitchenette area with a sink and running water.

In early March, we met with our food and medical contractors to make sure that their inventories of food and medical supplies were enough for a longer than usual time period in case there were future delays in deliveries.

In mid-March, I met with our Administrative Judges from both Circuit Court and District Court to review both their and our Continuity of Operations Plans (COOP) and test our capacity to hold hearings remotely. We also set up and reviewed existing procedures to provide remote access to detainees by Attorneys, particularly Public Defenders. The Office of Public Defender (ODP) was involved in the development of these procedures. At this time our Average Daily Population (ADP) was over 700 so we began additional daily reviews of our current detainees to explore the possible release to Home Detention or on pre-trial release of additional individuals. We have worked closely with both the OPD and the States Attorney's Office (SAO) to reduce our ADP. During this time period, I had often and regular telephone conversations with Keith Lotridge, Public Defender for Prince George's County, about the possibility of getting inmates released from jail. I asked him about any inmates that he may know of that had serious health issues and asked them to please work on getting these released. I brought to his attention Inmate Chun Oh, who is a 74-year-old female, who I was concerned about. I knew that although she is charged with Murder, I didn't believe her to be a danger to herself or others nor a flight risk. He replied that he didn't believe that she had anywhere else to go. She is still in our custody. Our ADP was routinely in the high 1400's or over in 2008, when I became Director and instituted many programs and processes to release pre-trial individuals. I am a strong believer in criminal justice reform in Maryland and have worked on it with the Governor's Office and the State legislature. Since early March 2020, these efforts have lowered our ADP by more than 20%. Our population on March 1, 2020 was 706 and our population on April 24, 2020 was 560. On

many days in the past two months, our number of releases is substantially more than our intakes. (ADP Reports for March and April 2020)

During the rest of March, these additional steps were taken to prepare for the potential/possible introduction of COVID-19 in the correctional facility.

- I held a Town Hall style meeting for staff with our Physician to discuss COVID-19 preparation and policies and to respond to questions. Session was videotaped and shared with all staff to include staff on all three Shifts. 3/12/20

- Reviewed minimum staffing needs in all Divisions; including Security 3/13/20

- Remind Security Staff temporarily assigned outside of Security that they may be needed to work Security Post and to be prepared to have their Post changed 3/13/20

- Ready Cots and Linens for Staff sleep-overs if necessary 3/13/20
- Push Office of Central Services (OCS) to open all closed cells in Housing Units identified as Consolidation Units - to stay open in case of outbreak, particularly HU 14, 15, 16 & 17, throughout February & March, continuing into April

- Identified Units as "infirmary Units" if sick population is too large to be contained in Medical Unit (HU 6 Males & HU 2 Females)

- Make sure all 12 Airborne Infection Isolation Room (AIIR), or negative pressure cells, are working and ready. 1 remains out of service because of major plumbing issue and back-ordered parts.

- Identify Civilian Staff who may be able to work from Home – week of March 16th

- Ensure Staff who may work from home have access to County network from their homes via County laptops Week of March 16th

- Identify minimum Sworn Staff needed to run the Jail – Week of March 16th

- Identify Civilian Staff who could be excused from Work., Administrative Leave – 3/20/20

7

- All civilian staff eligible for Teleworking were assigned to Telework- 3/25

- Talk to Office of the Sheriff and the Prince George's Police Department (PGPD) about possible need for staffing following posts, in the case that a high percentage of our Security Staff are ill or quarantined at home – Gate, Reception, Transportation and Perimeter Done Mid-March
    - Met with Sheriff Deputy to walk through action Post Duties of Perimeter (K-9) and Gate – April 7

- Talk to Prince George's Fire/EMT about inmate transport requirements for staff (follow along if arrestee/inmate is restrained) Policy in place for COVID-19 patients - Done Mid-March

- Command staff, along with Medical Staff visited every Housing Unit to inform inmates on COVID-19 preparedness and to explain to inmates how to social distance and the importance of cleaning area and washing hands 3/06/20

- Additional Soap was purchased, stocked and distributed as needed (4,500 bars) for inmate use, so that inmates may have enough soap to use for showering and washing hands. 3/18/20

On March 23, 2020, the CDC *finally* issued its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. Keep in mind that all the above had already been done in the Prince George's County DOC. I reviewed the Guidance to see what, if anything I/we, could be doing to prevent and prepare for the potential introduction of COVID-19 in the facility.

Under the topic of Communication and Coordination, the guidance recommends identifying points of contact with our public health department. Beginning Monday, March 16 and almost every day since, I have personally been in contact with Dr. Ernest Carter, Health Officer for Prince George's County and/or Angela Crankfield-Edmond, Chief, Infectious Diseases at the County Health Department for advice and recommendations on COVID-19 and its affect on the

8

Jail, our inmates and our staff as well as the County community at-large. Together, our Health Provider our Public Information Officer and I created and tested our plan to disseminate critical information to detained/incarcerated persons, staff, contractors, vendors and visitors as the pandemic has progressed. Through my participation in the Maryland Correctional Administrator Association (MCAA) (I am a Former President, Vice-President and current Executive Board Member.) I have communicated regularly with other Maryland local Correctional facilities to share information, including disease surveillance and staff absenteeism patterns. With the Assistance of Judge Barbera, Chief Judge on the Maryland Court of Appeals and Judge Morrissey, Chief Judge District Court of Maryland, the local jails in the State of Maryland working with the State prison system have put a plan in place to prevent inmates from being transferred between facilities in Maryland during the COVID-19 outbreak by allowing local judges to hold hearings on cases outside of their normal geographic locations.

We had already reviewed our existing infectious disease policy, all hazard and disaster plans and have been continuously revising them for COVID-19. Because we are fortunate enough to have a full medical unit within our facility; including 12 Airborne Infection Isolation Rooms (AIIR), a Female ward (6 bed) and a Male Ward (10 bed), plus examination space, a dental room, a pharmacy and full time 24/7 staffing by medical professionals we were able to plan for how suspected and COVID-19 cases are isolated, evaluated and tested and provided all necessary medical care. Our Medical Director and Physician are providing information on the care and treatment of inmates under separate affidavits.

We are one of only three local jails in the state with a full Medical Unit of this size and capacity. We have the equivalency of forty full time positions staffing our Medical Unit, including a full time Physician, a full time Psychologist, 4 Licensed Clinical Social Workers

(LCSW), a 30 hour per week Psychiatrist and a part time Mental Health practitioner and over 20 full time nurses.

As previously stated, we had already coordinated with local law enforcement and Court Officials and are using alternatives to in-court appearances and have worked with the SAO and OPD to reduce our inmate population. Our rated capacity is 1524, but we have two full housing units (96 cells, 48 in each HU) and two half units (48 cells, 24 in each HU) off-line for renovation, reducing our capacity by almost 300 occupants. Our inmate population as of April 23 was 570.

We posted Health Department signage concerning COVID-19 symptoms and hand hygiene throughout the facility, including areas frequented by inmates in English, Spanish and pictograms (for the illiterate). We have updated the signage continuously as new information about the virus has emerged, always using CDC or Health Department signage in English, Spanish and pictograms. (Copies attached)

We reviewed our sick leave policies and worked with the County's Office of Human Resources (OHR) on Sick, Health and Safety Leave, a new type of leave developed for COVID-19 related absences. We have encouraged and commanded sick employees to stay at home. We have planned for staff absences and allowed many more staff to telework. Snce we wer able to return many sworn staff members to Security positions from temporarility closed programs, we have maintained the staff necessary to staff the jail, even with staff absences.

We have ensured stock of hygiene supplies, cleaning supplies, PPE and medical supplies are available and restocked as necessary. (Invoices attached.) We exceeded the CDC recommendations by issuing N-95 masks to all staff starting on March 30, 2020. We replace the

10

masks as needed and will have replaced all of them at least two additional times as of April 27, 2020, We also distributed a video and written instructions on how to use the masks and how to care for them, going as far as giving every staff member a paper bag to store their masks in when not in use. We mandated the use of masks in the facility on April 7, 2020. We issued surgical masks to all inmates on April 5th & 6th, 2020 and require them to wear them when outside of their cells. We also issued paper bags to inmates to store their masks while in their cells and explained how to don and doff the masks safely.

We are performing all prevention practices as outlined in the CDC Guidance; including performing pre-intake screening and temperature checks, which began on January 29, 2020. In early April 2020, we began masking ALL arrestees upon arrival to the facility, if they were not masked by Law Enforcement already. We began taking temperatures and asking about other symptoms on March 17th of all individuals, including arrestees, detainees, staff, police officers, attorneys and arrestees entering the facility.

We have implemented social distancing strategies to increase the physical space between inmates in a variety of ways and changed them to reflect the changes in guidance from the CDC and the Governor and the County Executive. We have also limited group sizes, starting with no larger than 50, then 30 and finally to groups of no more than 10. This has not been easy within the confines of our facility.

We stopped all visiting, except for legal visits, and stopped volunteers from entering the building on March 13, 2020. Detainees were informed that because we were stopping visiting for their protection and for the protection of our staff and that we made arrangements with our inmate phone provider to allow each inmate to make three free 10-minute phone calls to their family and friends each day. This is more free calls than any other jail or prison in Maryland,

11

where two free calls per week is the average being offered. Inmate calls to Attorneys were free prior to the COVID-19 crisis and remain free today. Since the "normal" phone numbers of many law firms are not currently not being answered because the Attorneys are working from home, we have made special arrangements to enable free calls to alternate numbers provided by Attorneys. This is especially true of the Office of Public Defender (OPD), who represents most of our inmates. The OPD has provided us with a complete listing of additional phone numbers to add to the free Attorney call listings. Attorneys may still visit their clients, but for the protection of our inmates we ask them to use a non-contact visiting booth. If the Attorney needs to pass paper to the client or collect signatures from their client, they may give the paperwork to a Correctional Officer who will take the paperwork to the inmate and allow them to read it or sign it in front of the Attorney and return it to the Attorney as needed. We are still providing notary services to our inmates.

On April 6, 2020, after consultation with Dr. Ernest Carter, Prince George's County Health Officer, and Angela Crankfield-Edmond, Prince George's County Chief, Infectious Diseases, Dr. Meskerem, Physician at the Correctional Center and my Command Staff, I decided to change the number of inmates allowed out of their cells at one time to ensure social distancing. We are a Direct Supervision Facility. Direct Supervision combines two key elements—the physical design of a jail and an inmate management strategy—to significantly reduce the problem inmate behavior commonly seen in jails.

Direct Supervision jails focus on actively managing inmate behavior to produce a jail that is safe

and secure for inmates, staff, and visitors. Correctional Officers and Civilian staff interact and communicate continuously with inmates in housing units, actively supervising them to identify problems in their early stages. They use basic management techniques to prevent negative behavior and encourage positive behavior. Staff assume control of the jail and establish a professional supervisory relationship with inmates. There are no physical barriers separating staff and inmates in the housing units.The design of the jail supports the management of inmate behavior by reducing physical barriers that impede staff/inmate interaction, by insuring there are clear sight lines into all areas of the housing units, and by incorporating design elements, fixtures, and furnishings that promote positive inmate behavior.

All services, including medicine, meals, spiritual and educational services, library etc. are normally brought to the inmate in their housing unit. All but our smallest housing units have their own recreation yards available only to the inmates in that housing unit. Our two open smaller size units share a recreation yard with another small size unit. These units take turns using the recreation yard..

Usually, Pre-COVID-19, inmates spent most of their day not locked down. They were only locked down during Shift Change which happens 3 times every 24 hours, and Count, which takes place immediately after Shift Change and overnight, starting at 2200 hours through 700 hours and half the unit, either upstairs or downstairs were locked in while the other half ate and cleaned up following their meals. They also spent many hours going to Court, participating in Programs and Groups and working throughout the facility. All of these activities are now stopped.

Since the common room is not big enough for all the inmates to share the space and remain 6 feet apart from others, we have changed our practice to ensure proper social distancing to only allowing 10 inmates out of their cells at a time. This means that 140 inmates throughout the 14 currently occupied housing units are out of their cells most hours of the day, in groups of 10. Currently Housing Unit 1, which is our Female Unit has 18 occupants. These inmates are out their cells every other hour of the day. In more crowded Units, like HU 17, which had 69 inmates on April 24th; inmates may be only out of their cells for approximately 3 hours per day. When inmates are out of their cells, they are sharing the common space with the same 10 inmates as much as possible. They can shower, make phone calls, watch television, read the newspaper or go outside in the unit's recreation yard. Televisions can be tuned to any station that is provided, including news stations and copies of The Washington Post newspaper is provided to every Housing Unit every day for inmate use. Extra reading materials and work packets were added to the units for use since so many other activities are not taking place.

We encourage inmates to maintain spacing of at least 6 feet apart and are only allowing usage to every other telephone to help ensure this spacing. There are 10 to 12 inmate phones in every large housing unit, but they are fastened to the walls 2 – 2 ½ feet apart. Housing Units 11 A and 11B which are half the size of the other Units have 8 phones and much smaller populations. 11A is our Juvenile Unit and has only 9 occupants as of April 24, 2020 and HU11B which is our Special Needs Unit had 18 occupants on April 24, 2020.

By only allowing usage of every other phone, we have done our best to keep the callers 6 feet away from the next caller and because only 10 inmates are out at a time do a variety of things, social distancing is maintained as much as physically possible. Initially, we tried taping

14

off every other phone, but found that the inmates would tear the tape away and use the phone anyway.

Meals are served to the inmates in their cells. Units with smaller populations have more space to single cell inmates. A cell that is single celled means that only one occupant is assigned to a cell that can be used for two occupants, using bunk beds. In cells with two occupants, we encourage inmates to sleep on their bunk beds head to foot to assist with the 6-foot distancing.

We have provided up-to-date information on COVID-19 to inmates in both written, see flyers and oral form. Inmates also have access to daily newspapers and television news. They have been encouraged to report COVID-19 symptoms to staff as the first sign of illness. As recommended by our Health Department, Nurses visit all inmates and staff in housing units who may have shared space with a positive COVID-19 patient twice every day and talk about possible symptoms and check temperatures.

To promote family unification and mental health, when we discontinued family and friend visitation in the facility, we negotiated with our inmate phone provider to allow every inmate to make three "free" 10-minute phone calls per day. Additional phone calls may also be made at regular cost.

On March 30, 2020 at approximately 1500 hours inmate work details outside of Housing Units were suspended. Staff immediately began performing all work normally done by inmates. This includes meal preparation, distribution and clean-up, sanitation in all common areas trash collection, laundry collections, washing and drying and folding all inmate clothes and linens, distribution of clean laundry, commissary receiving and delivery, landscaping maintenance including outside trash removal and general grounds sanitation duties.

15

On April 1, 2020, all inmate movement outside of their Housing Units, except for medical purposes, was stopped from within the facility. This has helped with contact tracing and preventing inmate exposure to additional asymptomatic individuals. Inmates are only allowed to move from their assigned housing unit for medical purposes. If an inmate is escorted to the Medical Unit they are masked and kept 6-feet away from staff and other inmates. Unlike in many penal facilities in the Country, in Prince George's County, inmates are never allowed to travel anywhere in the facility outside of their housing unit unless they are escorted by staff.

Unfortunately, we do not have the means to do electronic visiting as of now. It is cost prohibitive, unless the inmate's family pay the fees associated with it and that is a burden we have not wanted to place on families.

We have implemented alternative work arrangements, usually tele-working from home, for all non-essential employees.

We have suspended transfers of inmates to and from other jurisdictions as much as possible. If the transfer is absolutely required, we have a transfer alert package that is sent from our Medical Services to the Medical Services of the receiving agency prior to the transfer to allow the receiving agency to prepare for any possible medical conditions that the detained person may have. We also ask for a transfer Alert including all medical information from any agency transporting inmates to the County.

On March 19, 2020 we set up new procedures for our Initial Housing Units for new intakes. These include keeping inmates in Initial Housing for a minimum of 14 days. A full Physical is completed on every inmate within the first 14 days of their incarceration as required by Maryland Correctional Standards Commission. This physical must be completed prior to any

inmates leaving initial housing. While in the Initial Housing Units the Medical staff monitors the inmate's health twice daily for COVID-19 symptoms and by taking temperatures. Inmates are fed within their cells. Inmate Sanitation Crew cleans and disinfects all hard surfaces twice daily. Inmates are provided with cleaning supplies and encouraged to clean their cells. (**See Housekeeping Policy**) Inmates are encouraged to sleep head to foot on the bunkbeds in the cells. If standing in line for medication, health monitoring and feeding they must stand at least 6 feet apart. If a detainee complains of symptoms or seems sick to the Officer, Medical is contacted immediately. When out of their cells, inmates must wear their masks. Inmates are encouraged to change their clothes and shower regularly. Inmates are encouraged to send their dirty clothes to the laundry and exchanged for clean clothes on a regular basis.

Twice in April 2020, an outside cleaning company has been brought into the jail to deep clean the common areas in all housing units, the medical unit, lobby areas and Officers Dining Room. This process will continue throughout the pandemic and is being done to supplement the regular housekeeping activities and increased cleaning that is encouraged and being done by staff in the kitchen and offices. Diluted bleach spray, Spray 9 and paper towels, as well as the normal mops, and brooms are provided in the housing units for use by inmates and staff. Inmates are provided with cleaning supplies and strongly encouraged to clean their cells daily if not more often. Disinfecting wipes and or diluted bleach in a spray bottle and paper towels are available for inmates to use to clean the telephones between usage. The Medical Unit always uses an outside cleaning company to clean and disinfect the AIIR rooms between usage and provides inmates with cleaning supplies to augment the professional services.

Each inmate receives a medical screening examination, which includes blood pressure, temperature and tuberculosis test upon initial entry to the facility. Within fourteen days they

receive a full physical with either a Physician or a Physician's Assistant. If inmates are diagnosed with a chronic disease, like hypertension, diabetes or heart disease, they are enrolled in a chronic care clinic in which they will see medical professions regularly during their stay in the jail.

Normally, pre-COVID-19, if an inmate was feeling unwell, they may request to see a medical professional by completing a sick call request slip. It is our normal process to charge four dollars for a sick call visit for the initial visit. If the inmate needs to see a doctor for a follow-up visit for the same issue, or if the doctor requests to see the inmate there is no charge for the visit. Indigent inmates are always treated without charge. Part of the reason that there is a charge to the inmate is to attempt to eliminate unnecessary visits that strain the system and could possibly allow contact with other inmates that the Court has ordered to keep separate. Unfortunately, some inmates try to "work the system" in this way.

We have not charged inmates for visits relating to COVID-19. This information may not have been shared with our entire inmate population but will be shared with them on April 27, 2020. Inmates are never charged when a medical professional or staff member make the referral, for example after a fight, accident, emergency or when a staff member thinks that the inmate may be unwell because of actions or symptoms. The inmate handbook clearly states that there is no fee for emergency medical services, and my interpretation of that includes all COVID-19 related visits and care.

As of April 24, 2020, we have had 18 inmates who have tested positive for COVID-19 since the first case on March 30, 2020. Currently no test results are pending. All 18 have relatively minor cases of the virus. Nine of them have completely recovered and have returned to their Housing Units after spending at least 14 days without symptoms in medical isolation. No

cases have been acute or required hospitalization. We have not seen a surge in cases or an exponential increase in numbers. I believe that this is true partly because of the care and attention we have given to preparation and mitigation of the virus.

Twenty-eight (28) staff members have tested positive for COVID-19, 25 Officers and 3 Civilians. Nine of the staff members have fully recovered and returned to work. Several more staff are expected to be cleared by their doctors to return to work in the next week. In consultation with the Health Department we have asked staff to be symptom free for a minimum of fourteen days, prior to returning to work. The CDC guideline recommends symptom free for seven days. No one has been acutely ill. After the first case of COVID-19 was identified in the Jail on March 30, 2020, I sent a memo to all staff explaining what had happened and how our actions would now turn from preparation to mitigation. I also videotaped a message to staff on the same topic, urging them to take additional precautions. Communications staff in the Office of the County Executive issued a press release when the first case was diagnosed and has been completely transparent with the press about the virus and the jail.

I believe that under my leadership the Prince George's County Department of Corrections prepared for the potential introduction, spread and mitigation of COVID-19 in our facility to the best of its ability. The health and safety of the inmates under my custody and the staff under my responsibility is of great importance to me. I believe that we have done everything that we were capable of to prepare and respond to this unprecedented health event.

…………

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND BASED UPON MY PERSONAL KNOWLEDGE AND THE KNOWLEDGE OF THE COUNTY CORRECTIONAL FACILITY.**

_____		April 25, 2020
Mary Lou McDonough				Date