**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | | |
|---|---|---|
| KEITH SETH, | ) | |
| DAVID SMITH, | ) | |
| MARIO BURCH, and | ) | |
| JOHN DOES 1–5, | ) | |
| Individually and on behalf of a class | ) | |
| of similarly situated persons, | ) | |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | Case No. 8:20-cv-01028-PX |
| v. | ) | |
| | ) | |
| MARY LOU MCDONOUGH, | ) | |
| In her official capacity as | ) | |
| Director of the Prince George's County | ) | |
| Department of Corrections, | ) | |
| | ) | |
| | ) | |
| Defendant-Respondent. | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
AND  PETITION FOR WRITS OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241[1]**

**STATEMENT OF THE CASE[2]**

1.      There is an uncontrolled outbreak of COVID-19 at the Prince George's County Jail

("the Jail").[3]

---

[1] The Parties agreed to permit amended pleadings filed no later than July 3, 2020 in their July 1, 2020, Joint Status Report (Doc No. 117) and this Court affirmed that filing deadline at the July 2, 2020 Status Hearing.  *See* Fed. R. Civ. P. 15(a)(2) (permitting amended pleading's with opposing party's consent or court order).

[2] The following allegations in paragraphs 2-186 describe the state of the Prince George's County Jail ("the Jail") at the time Plaintiffs filed their Complaint on April 21, 2020.

[3] Since Defendant McDonough is being sued in her official capacity, "Defendant McDonough" and "the Jail" are used interchangeably in this motion.

2.      The Jail's actions fueled this outbreak, and it has also failed to take appropriate action in response.

3.      The prisoners[4] housed there—predominantly pretrial detainees—are under a constant and substantial threat of contracting the disease, and those already infected receive grossly substandard medical treatment (if they receive treatment at all).

4.      Because jails, prisons, and other detention and correctional facilities are particularly vulnerable to COVID-19, the U.S. Centers for Disease Control and Prevention (CDC) has recommended basic measures these facilities should take to control the spread of the virus and treat infected prisoners—for example, providing prisoners with free access to soap and evaluating prisoners for symptoms.

5.       The Jail has ignored these and other public health recommendations.

6.      As a result, the nearly 600 people now imprisoned at the Jail are denied even the minimal precautions necessary to mitigate against the risks of COVID-19.

7.      The people confined in the Jail do not have adequate soap (the Jail charges money for it). They regularly wait a week or more for medical attention (that costs money too). The spaces they share with other prisoners are not adequately sanitized. They are denied basic hygienic supplies. Symptomatic inmates are regularly turned away by medical staff, returning to general housing where they will surely infect others.

8.      Prisoners who test positive for COVID-19 are confined in filthy isolation cells, where the walls are covered in feces, mucus, and blood. They are barely monitored and receive no real treatment.

_____

[4] For simplicity, the term "prisoner" is used throughout to describe the people who are currently incarcerated at the Prince George's County Jail, both pretrial and post-conviction.

9.     By maintaining these conditions, Defendant McDonough has needlessly exposed the people imprisoned in the Jail to a highly infectious and potentially fatal disease. This violates prisoners' Eighth and Fourteenth Amendment rights.

10.     The Jail also refuses to release COVID-positive prisoners—even when they have no legal basis to detain them—until the Jail deems them non-contagious. This violates prisoners' Fourteenth Amendment rights.

11.     Plaintiffs[5] seek class-wide relief requiring the Jail to take the necessary steps to safeguard prisoners' health and safety. A subset of Plaintiffs also request a writ of habeas corpus pursuant to 28 U.S.C. § 2241 for prisoners whose age or underlying medical conditions make them particularly vulnerable to severe illness and death from COVID-19 (the "Medically Vulnerable Subclass").

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 2241(a). This Court has jurisdiction over Medically Vulnerable Subclass's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this District.

## PARTIES

14.     Plaintiff Keith Seth is detained pretrial in Housing Unit 17 at the Prince George's County Jail. He has chronic bronchitis for which he was hospitalized last year. He is currently experiencing symptoms of COVID-19, including loss of taste, diarrhea, coughing and severe

---

[5] The term "Plaintiff(s)" includes the Medically Vulnerable Subclass members, who are also petitioners seeking habeas relief.

shortness of breath. He cannot afford to pay the money required to request medical assistance. Mr. Seth has bipolar disorder; since the outbreak at the Jail, he has not received needed mental health treatment. *See* Ex. 1, Seth Decl. Mr. Seth filed a bond motion on April 8, 2019. It is still pending.

15.     Plaintiff David Smith is detained pretrial in Housing Unit 9 at the Prince George's County Jail. He suffers from chronic bronchitis. Since the outbreak, the Jail has not provided Mr. Smith with needed mental health treatment. *See* Ex. 2, Smith Decl. Mr. Smith filed a motion for bond reconsideration on April 8, 2020. That motion is scheduled for a hearing on April 24, 2020.

16.     Plaintiff Mario Burch is detained pretrial in Housing Unit 8 at the Prince George's County Jail. He has not seen anyone clean or sanitize any surfaces in his unit. He is "extremely scared of contracting the virus." Ex. 3, Burch Decl. Mr. Burch's bond was originally set at $3000, but he could not afford to purchase his release. On April 9, 2020, the court revoked his bond. He is facing two charges, each of which has a statutory maximum sentence of 90 days.

17.     Plaintiff John Doe No. 1[6] is detained pretrial in Housing Unit 10 at the Prince George's County Jail. He suffers from acute asthma. He has recently experienced symptoms of COVID-19: headaches, nausea, and shortness of breath. His cellmate also has symptoms of COVID-19. *See* Ex. 4, John Doe No. 1 Decl. On March 19, 2020, a court approved Mr. Doe No. 1 be released on home detention with GPS monitoring. The Pretrial Services Agency ("pretrial services"), which is part of the Department of Corrections, has not released him.

18.     Plaintiff John Doe No. 2 is detained post-conviction in Housing Unit 17 (the work unit) at the Prince George's County Jail. He suffers from severe asthma, for which he previously has been hospitalized. He has been spitting up brown mucus and having trouble breathing. Mr. Doe No. 2 has asked for medical attention or a test for COVID-19, but he was refused and told

---

[6] John Doe Nos. 1-5 will seek leave to proceed by pseudonym.

that the Medical Unit is too full. He asked for an inhaler, but his request was denied. On April 9, Mr. Doe No. 2 filed a motion requesting to serve his sentence on home detention. His motion has not been set for a hearing. *See* Ex. 5, John Doe No. 2 Decl.

19.     Plaintiff John Doe No. 3 is detained pretrial in the Prince George's County Jail. He uses a cane to walk and has numerous medical issues. Prior to the outbreak, Mr. Doe was housed in the Medical Unit. In late March, he was transferred to Housing Unit 11-B, which houses medically vulnerable prisoners, but (unlike the Medical Unit) does not have any on-site medical equipment or staff. He is currently experiencing sneezing and a cough. *See* Ex. 6, Decl. John Doe. No. 3 Decl.  On April 9, 2020, a court approved Mr. Doe No. 3 for release to pretrial services. Pretrial services has not released him. Mr. Doe No. 3 is detained on a single count of violating a protective order, which carries a statutory maximum of 90 days.

20.     Plaintiff John Doe No. 4 is detained pretrial in Housing Unit 9 at the Prince George's County Jail. At least four detainees from Housing Unit 9 have been sent to the Medical Unit and not come back. One of them was his cellmate. *See* Ex. 7, John Doe No. 4 Decl. A court has approved Mr. Doe No. 4 for transfer to home detention, but pretrial services has not transferred him to home detention.

21.     Plaintiff John Doe No. 5 is detained in Housing Unit 8 of the Prince George's County Jail. He has asthma, chronic bronchitis, and is obese. Due to the poor circulation in his cell, he has been having difficulty breathing. Many people on his unit seem sick. *See* Ex. 8, John Doe No. 5 Decl. A court set bond for Mr. Doe No. 5 at $3000, with an option to be released upon paying 10 percent of it. Mr. Doe No. 5 cannot afford to purchase his release. The court has also approved Mr. Doe No. 5 for pretrial supervised release. Pretrial services has not released him.

22.     Defendant Mary Lou McDonough is the Director of the Prince George's County Department of Corrections. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.  COVID-19 Is Highly Infectious and Dangerous

23.     On March 11, 2020, the World Health Organization ("WHO") declared the outbreak of COVID-19 a global pandemic.[7]

24.     States and counties across the nation have hurried to take the "urgent and aggressive action" the WHO deems necessary to slow the infection rate of the virus.[8]

25.     Still, to date, more than 750,000 Americans are known have contracted COVID-19 and it has caused at least 35,000 deaths.[9]

26.     D.C., Maryland and Virginia have reported more than 24,000 cases,[10] and Maryland leads the region in both the number of cases and deaths: In the 46 days[11] following Maryland's

---

[7]  World Health Organization, Director-General Opening Remarks (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mediabriefing-on-covid-19---11-march-2020.

[8] *Id.*

[9]  U.S. Map, Johns Hopkins School of Medicine (updated April 20, 2020) https://coronavirus.jhu.edu/us-map.

[10] Jenna Portnoy, Patricia Sullivan, and Antonio Olivo, *Coronavirus in the DMV: What you need to know,* Wash. Post (Apr. 19, 2020) https://www.washingtonpost.com/dc-md-va/2020/03/07/maryland-virginia-dc-coronavirus/?arc404=true#maryland.

[11] Jenna Fulginiti, Tramon Lucas, and Greg Ng, *Timeline: Coronavirus in Maryland,* WBALTV (Apr. 19, 2020) https://www.wbaltv.com/article/timeline-coronavirus-in-maryland/31394971#.

first three confirmed cases, 12,836 people have tested positive for the disease and 544 people have died.[12]

27.     COVID-19 is highly contagious. An infected person can spread the virus through brief, indirect contact with others. Every time an infected person coughs, sneezes, or speaks, she might pass the virus to those in her vicinity.[13]

28.     The virus can survive on inanimate surfaces like cardboard, plastic or steel for up to three days.[14] The respiratory droplets from an infected individual can linger in the air for as many as three hours.[15]

29.     An unknown number of infected people are nearly or entirely asymptomatic. This means a person who has contracted the virus can pass it to others without knowing she is sick. Accordingly, some researchers insist, "Everyone should act as if they are already infected."[16]

30.     For those who contract COVID-19, the results can be dire.

---

[12] Portnoy, *supra* note 7.

[13] Ex. 30, Meyer Decl.  ¶ 8 ("The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces."). *See also* Ex. 31, Meyer Curriculum Vitae.

[14] Neeltje van Doremalen et al., Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Medicine (March 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[15] Ex. 32, Benninger Decl.  ¶ 2(C); *see also* Ex. 33, Benninger Curriculum Vitae.

[16] Nina Bai, *Coronavirus Is Sickening Young Adults and Spreading Through Them, Experts Say*, University of California San Francisco (Mar. 20, 2020) https://www.ucsf.edu/news/2020/03/416961/coronavirus-sickening-young-adults-and-spreading-through-them-experts-say.

31.     An estimated sixteen percent of those who contract it will suffer severe illness. Ex. 30, Meyer Decl. ¶ 9.

32.     In the United States, roughly three percent of those who are infected die. Ex. 32, Benninger Decl. ¶ 2(G)(i).

33.     Twenty percent of those who contract COVID-19 will need hospitalization, and five percent will require intensive care. *Id*. ¶ 2(F).

34.     Those who survive the virus may suffer long-term damage to the heart, liver, and lungs.[17]

35.     These risks of severe illness and death are more acute for people who are over a certain age or who have pre-existing conditions, including asthma, lung disease, heart disease, and diabetes.[18]

36.     Without effective public health measures, the U.S. Centers for Disease Control and Prevention (CDC) has projected that over 200 million people could be infected.[19]

---

[17] Melissa Healy, Coronavirus infection may cause lasting damage throughout the body, doctors fear, *L.A. Times* (April 10, 2020), https://www.latimes.com/science/story/2020-04-10/coronavirus-infection-can-do-lasting-damage-to-the-heart-liver (describing studies finding impaired liver function and heart failure in COVID-19 patients); Panagis Galiatsatos, What Coronavirus Does to the Lungs, Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs (describing potential long-term lung damage from COVID-19).

[18] Centers for Disease Control, At Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed Apr. 15, 2020).

[19] James Glanz, et al., Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say, N.Y. Times (Mar. 20, 2020), available at https://www.nytimes.com/interactive/2020/03/20/us/coronavirus-model-us-outbreak.html.

37.     This would overrun the healthcare system, making it impossible for many critically ill people to receive the care they need to live.[20]

38.     To prevent this, the shape of daily life for most Americans has radically changed: 97 percent of the U.S. population is now subject to some degree of imposed shutdown or stay at-home decree.[21]

39.     On March 30, Maryland Governor Larry Hogan issued a stay-at-home order, mandating that residents may leave their homes only as needed to work essential jobs or complete essential tasks, like purchasing food and medicine.[22]

40.     On the same day, D.C. Mayor Muriel Bowser and Virginia Governor Ralph Northam announced stay-at-home orders that require residents to stay in their homes and cease all non-essential activities until May 15, 2020[23] and June 10, 2020,[24] respectively.

---

[20] Leana Wen, *Hospitals are overwhelmed because of the coronavirus. Here's how to help.,* N.Y. Times (Mar. 15, 2020), https://www.washingtonpost.com/opinions/2020/03/15/hospitals-are-overwhelmed-because-coronavirus-heres-how-help; *see also* Ex. 30, Meyer Decl.  ¶ 10 ("Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.").

[21] *All Your Coronavirus Questions Answered,* Time (Apr. 14, 2020), https://time.com/5820118/coronavirus-questions-answered.

[22] The Office of Governor Larry Hogan, As COVID-19 Crisis Escalates in Capital Region, Governor Hogan Issues Stay at Home Order Effective Tonight (Mar. 30, 2020) https://governor.maryland.gov/2020/03/30/as-covid-19-crisis-escalates-in-capital-region-governor-hogan-issues-stay-at-home-order-effective-tonight.

[23] On April 15, Mayor Bowser announced that the D.C. order would extend until May 15. Marty Johnson, *DC extends stay-at-home order through May 15*, The Hill (Apr. 15, 2020) https://thehill.com/homenews/state-watch/492928-dc-extends-stay-at-home-order-through-may-15.

[24] Executive Order Number 55, Temporary Stay At Home Order Due to Novel Coronavirus (COVID-19) (Mar. 30, 2020) https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf

41.     Even with these extreme measures, which have been replicated across the country, the national infection curve "has not yet flattened,"[25] and data suggests that, for D.C., Maryland and Virginia, the peak of the virus may be weeks or months away.

42.     The University of Pennsylvania Medicine's COVID-19 Hospital Impact Model for Epidemics predicts that the regional peak of COVID-19 infections and deaths will occur in late June or early July.[26]

43.     Though it may be difficult for those who have already spent weeks at home to fathom, the best evidence indicates that D.C., Maryland, and Virginia are at only "the end of the beginning" of this crisis.[27]

---

[25] *All Your Coronavirus Questions Answered, supra* note 19.

[26] Jeffrey Katz and Martin Austermule, *How Close Is The D.C. Region To Flattening 'The Curve' Of The Coronavirus?,* NPR (Apr. 10, 2020) https://www.npr.org/local/305/2020/04/10/831751001/how-close-is-the-d-c-region-to-flattening-the-curve-of-the-coronavirus.

[27] Brad McMillan, *A Coronavirus Milestone: The Flattening Of The Curve*, Forbes (Apr. 14, 2020) https://www.forbes.com/sites/bradmcmillan/2020/04/14/a-coronavirus-milestone-the-flattening-of-the-curve/#71bc0f3e4ba5.

### B.  COVID-19 is Causing a Crisis in Prince George's County

44.     Prince George's County is the "epicenter of [the COVID-19 epidemic in] the state."[28]

45.     As of April 14, the County had 2356 confirmed cases and 72 deaths.[29] Though Prince George's County makes up only 15 percent of the state's population, its COVID-19 deaths have made up nearly 25 percent of the total COVID-19 deaths in the state of Maryland.[30]

46.     The County has high rates of diabetes, heart disease, hypertension and obesity—conditions that make one more vulnerable to complications from the virus.[31] The County has had a shortage of healthcare provider shortage for years. Up to 60 percent of residents travel out-of-county for care.[32]

47.     In addition, in recent weeks, medical professionals across the country have seen racial disparities in COVID-19 infection, hospitalization, and mortality rates.[33] Black people who

---

[28] Rachel Chason, *Hospitals in Prince George's seeing an influx of critically ill coronavirus patients*, Washington Post (Apr. 14, 2020), https://www.washingtonpost.com/local/prince-georges-hospitals-coronavirus-crisis/2020/04/14/2ac05724-7e7f-11ea-9040-68981f488eed_story.html.

[29] *Id.*

[30] Fulguniti,  *supra* note 9.

[31] Regional Primary Care Coalition, The Healthcare Landscape in Prince George's County: Opportunities for Improvement, available at http://www.regionalprimarycare.org/wp-content/uploads/2018/07/The-Healthcare-Landscape-in-Prince-Georges-County.pdf.

[32] *Id.* At 9.

[33] John Eligon, et al., *Black Americans Face Alarming Rates of Coronavirus Infection in Some States,* N.Y. Times (Apr. 7, 2020), https://www.nytimes.com/2020/04/07/us/coronavirus-race.html.

are infected are more likely to suffer severe illness and die.[34] An analysis by the *Washington Post* found that majority-black counties had infection-rates three times that of majority-white counties.[35]

48.     Accordingly, because the majority (64 percent) of Prince George's County is Black, the people of Prince George's County are more susceptible to COVID-19 than other counties across the state.

49.     Area hospitals are "inundated with critically ill patients" and are at or exceeding their capacities.[36]

50.     Beginning April 14, at least two County hospitals—Prince George's Hospital and MedStar Southern Maryland Hospital Center—were forced to send patients to out-of-county hospitals because they had no room in their own critical care units, even though both hospitals have been rapidly adding beds within the facility and in tents outside of the building.[37]

---

[34] Ex. 32, Benninger Decl. ¶ 2(h) ("Preliminary data suggest that African-Americans are suffering from more severe illness related to COVID-19 at higher rates than other races in the United States.").

[35] Reis Thebault, Andrew Ba Tran, and Vanessa Williams, *The coronavirus is infecting and killing black Americans at an alarmingly high rate*, Wash. Post (Apr. 7, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true. These disparities exist because other inequities and disparities do. Black people disproportionately hold jobs in which they are unable or not allowed to work from home, putting them at risk of contracting the virus on their way to or at work. Black people also have higher rates of the underlying medical conditions that CDC says put people at higher risk of severe illness from COVID-19. *Id.*

[36] Chason *supra* note 26.

[37] *Id.*

51.     On March 16, Prince George's County Executive Angela Alsobrooks declared a state of emergency due to COVID-19.[38]

52.     On April 7, Governor Larry Hogan flagged Prince George's County, along with ten others, to the White House as needing "urgent federal attention."[39]

53.     In addition to Maryland's statewide stay-at-home order, the County has instituted a number of efforts to slow the spread of the virus.

54.     As early as March 12, 2020, the County announced that its Courthouse would close to the public until May 1, 2020.[40]

55.     The Circuit Court and District Court issued orders outlining the limited operations courts would continue to perform.

56.     On March 16, County Executive Alsobrooks closed all restaurants, movie theaters, gyms and bars, and closed to the public all government buildings.[41]

---

[38] Office of the Prince George's County Executive Angela D. Alsobrooks, County Executive Alsobrooks Officially Declares A State Of Emergency In Prince George's County Due To Covid-19 (Mar. 16, 2020) https://www.princegeorgescountymd.gov/ArchiveCenter/ViewFile/Item/3171

[39] Andrea Swalec, *White House Designates DC-Baltimore Area as an 'Emerging Hot Spot' for Coronavirus, Hogan Says*, NBC Washington (Apr. 7, 2020) https://www.nbcwashington.com/news/local/white-house-has-designated-dc-baltimore-area-as-emerging-hot-spot-for-virus-hogan-says/2266929.

[40] Prince George's County Courts, The Courthouse is closed to the Public through June 5, 2020, due to the Coronavirus Pandemic (Mar. 12, 2020) https://www.princegeorgescourts.org/AlertCenter.aspx?AID=The-Courthouse-is-closed-to-the-Public-t-22.

[41] County Executive Official Declares A State of Emergency *supra* note 43.

57.     On April 10, the County announced on that it had set up a quarantine site for first responders to "ensure[] they will not take the virus home to their families should they be exposed."[42]

58.     As of April 15, residents have been ordered to cover their faces when they go to the grocery store or the pharmacy, or when they the ride the County's bus system.[43]

**B.  Jails and Prisons Are Exceedingly Vulnerable to COVID-19**

59.     Epidemics pose a heightened risk in jails, prisons, and detention centers.

60.     These "[c]ongregate settings . . . allow for rapid spread of infectious diseases that are transmitted from person to person." Ex. 30, Meyer Decl.  ¶ 16.

61.     Diseases that spread in these facilities imperil the communities around them as well.[44]

62.     At a time when it is imperative that the County flatten its curve, correctional facilities like Prince George's County Jail "drive up the curve."[45]

---

[42] Prince George's County, Community Connections Newsletter: COVID-19 Update (Apr. 10, 2020) https://content.govdelivery.com/accounts/MDPGC/bulletins/285c9ff.

[43] Office Of The Prince George's County Executive Angela D. Alsobrooks, County Executive Alsobrooks To Sign Executive Order Requiring Face Coverings For Patrons In Grocery Stores (Apr. 11, 2020) https://www.princegeorgescountymd.gov/DocumentCenter/View/29817/Press-Release---Face-Coverings.

[44] Ex. 30, Meyer Decl.  ¶ 16 ("Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. . . . Prison health is public health."); *see also* Ex. 34, Haney Decl.  ¶ 17 ("Staff members are at risk of having contracted COVID-19 and then transmitting it to all those inside the institutions, including prisoners and other staff.").

[45] Philip Jackson, *Maryland jails are incubators for the coronavirus and precautions must be taken to avoid an outbreak, experts say,* Baltimore Sun (Mar. 13, 2020) https://www.baltimoresun.com/coronavirus/bs-md-ci-coronavirus-maryland-jails-20200313-zn4k2knuujgvnhqmpm63jib3la-story.html.

63.     Moreover, as a general matter, jails and prisons are often poorly equipped to enact adequate prevention measures and care for incarcerated people who get sick. Ex. 30, Meyer Decl. ¶¶ 17–18.

64.     And because people incarcerated in jails and prisons are more likely to have chronic underlying health conditions, "they are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community." *Id.* ¶ 20.[46]

65.     These concerns multiply in the face of COVID-19, which is both highly communicable and highly dangerous.

66.     "Containing this virus has been difficult in the community and it is almost impossible in correctional health settings given the congregate environment." Ex. 32, Benninger ¶ 3(B).[47]

67.     As a result, "people will die behind bars of coronavirus who would have survived in the community." *Id.*

### C.  There is a COVID-19 Outbreak at the Prince George's County Jail

────────────────────

[46] *See* Ex. 32, Benninger Decl. ¶ 3(c) ("[Prisoners] are higher risk at baseline than the general population for having more severe complications from COVID-19 because they are disproportionately more likely to be afflicted with medical chronic conditions, be obese, and be African-American. In addition, they are more susceptible to mental health complications, especially during this pandemic, because they are more likely to have mental health comorbidities and pandemics and isolation can increase feelings of anxiety and depression.").

[47] *See also* Ex. 30, Meyer Decl. ¶ 24 ("When even the most sophisticated hospital systems in this country have been overwhelmed by the COVID-19 pandemic, it will be impossible for prison health systems to contain it. This is especially true when emergency preparedness plans are underdeveloped.").

68.     The first case of COVID-19 at the Prince George's County Jail was reported on March 30, 2020.[48]

69.     Addressing this case, Defendant DOC Director Mary Lou McDonough told *The Washington Post*, "I expect we'll have more before this is over," and compared jails to "cruise ships without the views or the amenities."[49]

70.     As Defendant McDonough explained, "A jail is a pretty transitory place. People are close together. You're all breathing the same air."[50]

71.     Four days after the first case, on April 3, 2020, a total of three prisoners and one jail guard had tested positive for the virus.[51]

72.     The DOC has not reported the number of COVID-19 cases at the jail since that date.

73.     But the virus continues to spread.

---

[48] Deb Belt, "Female Inmate at Prince George's County Jail Has Coronavirus," Patch.com (Mar. 30, 2020), https://patch.com/maryland/bowie/female-inmate-prince-georges-county-jail-has-coronavirus.

[49] Keith L. Alexander, Dan Morse, and Spencer S. Hsu, "As inmates in D.C., Maryland and Virginia test positive for the coronavirus, jail officials scramble to reduce the risk," *Wash. Post* (Apr. 1, 2020), https://www.washingtonpost.com/local/public-safety/as-inmates-in-dc-maryland-and-virginia-test-positive-for-the-coronavirus-jail-officials-scramble-to-reduce-the-risk/2020/04/01/b0d9cfd8-7363-11ea-85cb-8670579b863d_story.html.

[50] *Id.*

[51] Laura Wainman, "3 Inmates, 1 Correctional Officer at Prince Georges Department of Corrections Test Positive for Coronavirus," WUSA9 (Apr. 3, 2020), https://www.wusa9.com/article/news/health/coronavirus/coronavirus-prince-georges-county-jail-inmates-officer/65-b4e2051e-7b29-41e7-96f3-eb2a9473e038.

74.     Over the last month, prisoners have seen people removed from their housing units or reporting to the Medical Unit because of COVID-19 symptoms.[52]

75.     Some jail guards are missing from their regular shifts.[53]

76.     Many prisoners appear to be sick.[54] From what they have been able to observe from their cells or the Medical Unit, Plaintiffs are aware of at least 14 prisoners with confirmed cases of COVID-19 across at least half of the jail's ten adult housing units.

77.     A jail guard told the prisoners in one housing unit that there are 77 cases of COVID-19 at the jail. Ex. 8, John Doe No. 5 Decl. ¶ 13.

78.     As one prisoner described it, "I feel like everyone in the unit is catching it. . . . [I]t seems like almost everyone is sick." Ex. 21, Decl. 21 ¶12.

**D.  The Jail Has Not Taken Basic Precautions to Prevent the Spread of COVID-19**

79.     On March, 23, the CDC issued explicit recommendations to correctional facilities about how to prevent or slow the spread of COVID-19. *See* Ex. 36, U.S. Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (March 23, 2020).

---

[52] Ex. 5, John Doe No. 2 Decl. ¶5 ("In the last 10 days at least six individuals have been removed from my housing unit because they were experiencing symptoms of the coronavirus, including my bunkmate."); Ex. 25, Decl. 25¶16 ("I would guess at least six people from my unit alone, H-17, have gotten infected."); Ex. 15, Decl. 15 ¶6 (observing "more people going to the medical unit than was typical"); Ex. 24, Dec24 ¶4 ("Four people have left the unit and not returned.").

[53] Ex. 24, Decl. 24 ¶4 ("Two of the regular officers for the evening shift have not been seen for a few weeks.").

[54] Ex. 15, Decl. 15 ¶6 ("I have heard many people coughing on the unit and in the last two weeks"); Ex. 24, Decl. 24 ¶4 ("There seems to be a flu or sickness spreading around the unit, for over 3 weeks now."); Ex. 24, Decl. 24 ¶5 ("There are 82 people in my unit. Many of them are sick or have been sick.").

80.     Many of these measures are basic. For example, corrections facilities should "[c]reate and test communications plans to disseminate critical information to incarcerated/detained persons, staff, etc. as the pandemic progresses." Ex. 36, CDC at 5.

81.     But the jail has not provided prisoners with information about COVID-19, its symptoms, or how to protect themselves from it.[55]

82.     The CDC also provides clear guidelines on cleaning, disinfecting, and hygiene. Several times a day, staff should "clean and disinfect surfaces and objects that are frequently touched in common areas. Ex. 36, CDC at 9. Facilities should provide prisoners with "no-cost access" to "liquid soap" and "tissues." Ex. 36, CDC at 10.

83.     None of this happens at the Prince George's County Jail.

84.     Prisoners do not have liquid soap or hand sanitizer.[56]

---

[55] Ex. 10, Decl. 10 ¶ 8 ("They never gave us any warning or any memorandum in our housing unit saying what was going on, what Coronavirus is, what you can do to protect yourself, what the symptoms are.  We never saw one memorandum in our whole housing block.  We were never told to stay six to ten feet away from people.  Nothing.  Of course, every time there's a change to the phone system or the commissary system, we get a memorandum.  But they never gave us a memorandum about Coronavirus."); Ex. 11, Decl. 11¶ 8 ("They didn't make any announcement or anything telling us about it, and the jail was being locked down more and more at that time."); Ex. 22, Decl. 22 ¶ 5 ("The jail [has not been] specific about the symptoms.").

*See also* Ex. 32, Benninger Decl.¶ 3(I) ("Inmates are not being informed of jail policies regarding COVID-19. They have not received information in writing or verbally regarding COVID-19 or prevention strategies. They have not received guidance regarding social distancing. . . .Inmates are restricted from watching television news related to the nature of solitary confinement. Inmates do not have sufficient source of updated information regarding COVID-19.")

[56] *See* Ex. 36, CDC at 10 (recommending that inmates be provided no-cost access to liquid soap and, if possible, hand sanitizer).

85.     The jail gives prisoners one or two bars of soap when they first arrive.[57] If prisoners want soap after that, they can buy bar soap from the commissary. [58] Prisoners may only buy one bar of soap per week. Ex. 8, John Doe No. 5 ¶ 17.

86.     "If you don't have money, you can't buy soap[.]" Ex. 13, Decl. 13 ¶ 9. Many prisoners who cannot afford it do not have soap at all. Ex. 19, Decl. 19 ¶ 15. They "use only water to try and wash themselves." Ex. 3, Burch Decl. ¶ 7.[59] Some trade food for soap.

87.     Jail staff do not regularly clean and sanitize shared amenities or surfaces in the housing units' common areas.[60]

88.     Phones are not regularly cleaned between uses. On some units, they are never cleaned.[61]

---

[57] Decl. 13 (Ex. 13)  ¶ 9 ("I came in fairly recently, so I have a bar of soap, but many do not have adequate personal cleaning supplies."); Ex. 3, Burch Decl. ¶ 7 ("I currently have one bar of soap that I received from the jail when I came in.").

[58] Ex. 15, Decl. 15  ¶ 9 ("[D]etainees with access to funds can buy soap from the Commissary for approximately $2.50 per bar."). Hygiene kits also contain a bar of soap, along with toothpaste, a toothbrush, and deodorant; they can be purchased at the commissary for $9. Ex. 9, Decl. 9 ¶ 17.

[59] Ex. 32, Benninger Decl.¶ 3(D) ("Inmates in medical isolation are experiencing significant delays, up to a week, in receiving hygiene items and soap. Inability to access soap is inappropriate during a pandemic.")

[60] Ex. 15, Decl. 15 ¶8 ("The only time surfaces and areas are cleaned down is the beginning of each shift.  During the day, as people circulate within the housing unit, no steps are taken to wipe down shared surfaces.  The staff clean their own areas such as their command desks but I have not seen them clean any other areas during shifts."); Ex. 19, Decl. 19  ¶10 ("The unit is no cleaner now than it was before the outbreak."); Ex. 3, Burch Decl.  ¶9 ("I have not seen anyone clean or sanitize any surfaces in my housing unit."); Ex. 18, Decl. 18 ¶16 ("During the day, as people circulate within the housing unit, no steps are taken to wipe down shared surfaces.  I sometimes see staff wiping down surfaces, but these are generally just the desks or other surfaces that the staff regularly use – not the ones we detainees interact with.").

[61] Ex. 15, Decl. 15 ¶7 ("The phones are not cleaned between uses."); Ex. 2, Smith Decl. ¶11 ("The phone is not getting wiped down between people using it."); Ex. 23, Decl. 23 ¶12 ("To my knowledge, detail only cleans the phones once a day."); Ex. 25, Decl. 25  ¶10 ("Generally, phones

89.     The cells of prisoners who have been transferred to the Medical Unit for COVID-19 are left dirty and unsanitized for days, despite the fact that cells are shared.

90.     Prisoners do not have their own cleaning supplies. They can request them—a spray bottle and paper towels (which are rationed)—to clean their own cells during their hour of recreation time.

91.     Even these supplies are limited, and prisoners cannot always get them.[62]

92.     The CDC suggests that correctional facilities implement "social distancing" strategies. "Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic." Ex. 36, CDC at 4.

93.     However, the Jail has not enacted (or explained) effective social distancing measures.

94.     The vast majority of prisoners are sharing their roughly 60 square foot cells with a cellmate, sleeping in bunks directly on top of one another.

95.     Even prisoners in different cells are less than six feet apart.

96.     Jail guards enter prisoners' cells multiple times a day to do count.[63] As one prisoner explained, "I come within six feet of nine guards every day. All three on the shift come in your

---

are not cleaned between uses, though individual inmates will do their best. As I was talking to my lawyer on the phone on April 10, 2020, I observed several guys finish phone calls, and the phones were not cleaned."); Ex. 8, John Doe No. 5 Decl. ¶ 14 ("The phones are not cleaned between uses.").

[62] Ex. 30, Meyer Decl. ¶ 29. ("Inconsistent access to hygiene and disinfection measures will result in widespread infection throughout the facility.")

[63] "Count" refers to the head count that jail guards perform to make sure that no prisoners are missing.

cell when they do count, and that happens three times a day.  There is no way to avoid having them come into your cell." Ex. 16, Decl. 16 ¶ 9. Guards do not wear gloves, and only some of them wear masks.[64]

97.     Jail staff have not explained the concept of social distancing.[65] As a result, some prisoners did not know that they should stay six feet away from others—especially those with symptoms of COVID-19.

98.     Plaintiff Keith Seth learned about the social distancing guidelines for the first time on the phone from his lawyer. On hearing this, Mr. Seth realized that he had been within a foot of a sick prisoner earlier that same day:

> "[Earlier today] the person in the cell next to me had to go to the medical unit because he was sneezing, shaking, and sweating. I was just talking to him yesterday, and when I was talking with him I was within a foot of him. I did not know that I was being unsafe in talking to him so closely because I have not been told by anybody to stay away from other inmates. The only information I received is to stay six feet away from the officer's desk. I have no received no information about how to protect myself from the Coronavirus."[66]

99.     The Jail's limited attempts at social distancing measures are markedly careless. Although recreation time has been staggered in groups of 10, the same group of prisoners does not always take recreation together each day.

---

[64] Ex. 20, Decl. 20 ¶ 18 ("Correctional officers come in to do arm band checks [as part of count] and many times don't have their masks on."); Ex. 5, John Doe No. 2 Decl. ¶ 10 ("Some of the correctional officers wear masks, some don't.  None of them wear gloves."). *See also* Ex. 27, Decl. 27 ¶ 14 ("[W]e know that [the virus] can come in from them. They leave and go out into the world every day. They are putting us in jeopardy if they are not cautious.").

[65] Ex. 8, John Doe No. 5 Decl. ¶ 10 ("Other than the division of recreational time, no efforts [have] been made towards encouraging or ordering social distancing.").

[66] Ex. 1, Seth Decl.  ¶ 9.

100.    Thus, infected prisoners, who may be contagious for up to two weeks before exhibiting symptoms,[67] can infect a new set of other prisoners at recreation each day, and then those prisoners can infect even more. *See* Ex. 30, Meyer Decl. ¶ 30 (noting that while staggered recreation can be an effective social distancing strategy, it is "not useful to prevent the spread of disease if recreation is staggered with different individuals each day (i.e. different groups of 10).").

101.    When prisoners show symptoms of COVID-19, Jail staff do not (as the CDC recommends) place them in medical isolation. *See* Ex. 36, CDC Guidance at 10 ("As soon as an individual shows symptoms of COVID-19, they . . . should be immediately placed under medical isolation in a separate environment from other individuals").[68]

102.    Instead, in late March and early April, when the COVID-19 outbreak at the jail began, jail guards and medical staff routinely disregarded prisoners' COVID-19 symptoms.

103.    Prisoners visited the medical unit with fevers, shortness of breath, coughing, chills, headaches, and fluid in the chest, and medical staff sent them back to their housing units with Claritin or Tylenol.[69]

---

[67] *See* Ex. 32, Benninger Dec. ¶ 2(D).

[68] *See* Ex. 30, Meyer Decl. ¶ 27 ("One of the most critical infection control measures in correctional settings is to accurately identify people who are ill and medically isolate them from the general population.").

[69] Ex. 19, Decl. 19 ¶ 5 ("Last week, I felt really bad for two or three days. I had body aches, a runny nose, and what felt like fluid in my chest. . . .Once in Medical, someone I think was a nurse took my temperature. It was 101 or 102. Despite this, I only remained in the medical unit for ten or 15 minutes. I was told to return to my cell and drink fluids. That was all."); Ex. 17, Decl. 17 ¶ 4 ("Two days ago I had a headache and felt like I had a fever, and I was sneezing.  I went to sick call.  They gave me headache medicine and Claritin and sent me back to the unit.  I asked to be tested for the virus, but they said they don't have any tests.").  Ex. 21, Decl. 21 ¶ 5 ("Some people have asked for medication/treatment, medical exams, and have been told that what they have is not serious, or it's a cold."); *see* Ex. 30, Meyer Decl. ¶ 31. ("[P]risoners are given Claritin- a decongestant that is entirely useless for COVID-19.").

104.    The CDC recommends that staff avoid "transporting [symptomatic] individual[s] through the facility." Ex. 36, CDC at 10. Instead, these individuals should be placed in medical isolation[70] and "refer[red] to healthcare staff for further evaluation." Ex. 36, CDC at 10.

105.    But Jail staff shuttled sick prisoners back and forth between the Medical Unit and their cells multiple times—including prisoners who later tested positive for COVID-19.

106.    For example, one pretrial detainee, Declarant 9, who has "asthma, a prior history of bronchitis, and a seizure disease," began to feel sick on Wednesday, March 25, 2020. Ex. 9, Decl. 9 ¶¶ 3–4. By the next day, he "was sweating profusely, vomiting, and [was] too weak to get out of [his] cell." *Id*. ¶ 4.

107.    He asked his cellmate to tell the jail guards that he needed medical attention. Guards responded that he was "playing" and would "be alright." *Id*. So he waited eight hours for the next shift to begin.

108.    After the shift change, the new jail guards were afraid to come near him because of his symptoms. They asked another inmate to put on a glove, enter Declarant 9's cell, and touch his forehead. When the inmate showed the officer the glove, soaked in sweat, the officers sent Declarant 9 to sick call. *Id.* ¶ 5.

109.    A nurse took Declarant 9's temperature. It was 101.2 degrees. Declarant 9 told her about his symptoms and said he believed they were serious. The nurse told him he had "been [at the Jail] too long to catch the virus," gave him Tylenol, and sent him back to his housing unit. *Id*. ¶ 6.

---

[70] "Medical isolation" requires moving a person to "a separate environment from other individuals," and "keep[ing] the individual's movement outside the medical isolation space to an absolute minimum." Ex. 36, CDC at 15.

110.    Over the following two days, Declarant 9 went back and forth between the medical unit and his housing unit four times. Each time he went to the Medical Unit, he had to pay $4. *Id*. ¶ 7.[71]

111.    On Friday, April 3, Declarant 9 tested positive for COVID-19.

112.    Other COVID-positive prisoners experienced similar treatment. Declarant 11, a pretrial detainee, first developed symptoms at the end of March with "headache, fever, chills, runny nose, and heavy sweating." Ex. 11, Decl. 11 ¶ 4.

113.    At a sick call on April 1, his temperature was 103 degrees. Declarant 11 was given Tylenol and a paper mask and returned to his housing unit. *Id.* ¶ 6.

114.    Declarant 11 went back and forth between the Medical Unit and his housing unit three times. During one of his visits to medical, Declarant 11 mentioned that his cellmate had been in the Medical Unit for six days. When the staff realized that Declarant 11's cellmate had tested positive for COVID-19, they tested Declarant 11 too. *Id.* ¶ 10.

115.    He tested positive for COVID-19 on April 5. *Id*. ¶ 11.

116.    Declarant 12, a pretrial detainee, began to feel sick on Thursday, March 26 with "chills, body aches, coughing, and fatigue." Ex. 12, Decl. 12 ¶¶ 3–4. He visited the Medical Unit twice that day, and his temperature was measured at 100, and then 101 degrees. *Id.* Each time, the nurse sent him back to his cell. *Id.*

117.    The next day, Declarant 12 went to the Medical Unit again. His temperature was 104.7 degrees. *Id.*  But the nurse sent Declarant 12 back to his cell. *Id.* ¶¶ 3-5. Ultimately, Declarant 12 went back and forth between his housing unit and the Medical Unit five times before he was

---

[71] Prisoners request medical help by filling out a form for a "sick call." Every "sick call" costs $4. Ex. 3, Burch Decl.  ¶ 11 ("If an inmate puts in a sick call they have to pay money in order to go to the infirmary."); Ex. 26, Decl. 26 ¶ 5 ("It costs $4 to go to a sick call. I can afford this, but not everyone in the jail can.").

transferred to the Medical Unit for COVID-19. *Id.* ¶ 3. Each time, Declarant 12 had to pay $4 for the sick call. *Id.*

118.     When prisoners with symptoms of COVID-19 are sent back to their housing units from medical, they are not isolated, and other prisoners are not warned. As one prisoner described:

> "In some cases, people on the unit have gone to sick call and been sent back, and then they go again and again, and we hear later on that they had the coronavirus. The same people who later left and I heard they had the coronavirus, we had been playing spades with them at the tables just days before.  I have told my family that I love them because I feel sure I am going to get the virus in here."[72]

119.     The CDC also provides that prisoners with symptoms of COVID-19 should be required to wear face masks whenever they are outside of isolation. Ex. 36, CDC at 15.[73] A facility should "[p]rovide clean masks as needed," and "[m]asks should be changed at least daily, and when visibly soiled or wet." Ex. 36, CDC at 15.

120.     This does not happen at the Prince George's County Jail. Jail staff gave each prisoner one thin, single-use paper mask on April 6, 2020. Ex. 14, Decl. 14 ¶ 5. The Jail does not provide replacements—including to symptomatic prisoners who remain in general population. Before this, symptomatic prisoners who remained in general population did not have masks at all.[74]

---

[72] Ex. 17, Decl. 17 ¶ 7.

[73] *See* Ex. 32, Benninger Decl.¶ 2(E) ("CDC has recommended wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain, especially in areas of significant community-based transmission. . . .Cloth face masks should be laundered before each daily use.")

[74] Ex. 5, John Doe No. 2 ¶6 ("The masks that were provided are the disposable paper kind, but we are not being given replacement masks, we have to continue to use the same mask without any way to sanitize the mask."); Ex. 8, John Doe No. 5 Decl. ¶ 6 ("Usually four to six people go to Medical Unit per day—and not always the same people. When people return from the Medical Unit, their masks may be on or off. There is no consistency.").

121.    In the Medical Unit, the jail provides a mask to some prisoners with suspected or confirmed cases of COVID-19, but it does not provide them with replacements. Ex. 10, Decl. 10 ¶ 17 ("All we have are little worn-out paper face masks. I've had the same facemask since [the previous Friday, eight days prior to the declaration], and we're all breathing the same air.").

122.    In early April, medical staff began taking every prisoner's temperature twice a day. But the checks are not conducted in every housing unit. And as implemented, the checks are further opportunities for infection: the temperature reader is not cleaned between uses, Ex. 24, Decl. 24 ¶ 8, and the medical staff do not change their gloves, Ex. 25, Decl. 25 ¶12.

123.    The checks have also been conducted without regard to social distancing guidelines. When they began, prisoners lined up back to front, with no space between them, to have their temperatures taken. Ex. 10, Decl. 10 ¶ 5. In recent days, prisoners have instead been asked to put their heads through the slot in the cell door.

124.    At these temperature checks, some prisoners with fevers are sent to the Medical Unit. Some are returned to their housing unit that same night. Ex. 10, Decl. 10 ¶ 10.

125.    Prisoners with symptoms of COVID-19 who do not have fevers are not taken to medical.[75]

126.    But even some who do have fevers are told to remain in general housing. For example, Declarant 10 is a prisoner with high blood pressure and seizures. Ex. 10, Decl. 10 ¶ 3. Even when Declarant 10 had COVID-19 symptoms and a fever, jail staff did not take him to the Medical Unit:

> "[O]n Friday, April 3, I started to have symptoms.  I could feel aches in my spine and kidneys, and my body had fevers and chills. One minute I would feel like I'm

---

[75] Ex. 18, Decl. 18 ¶5 ("[I]f detainees only display symptoms without a high temperature, they remain on the unit in general population.").

freezing, and the next I'm heating up and my forehead is sweating. I also had diarrhea. And when I would drink liquids, my eye sockets would hurt. I started feeling shortness of breath. My nose was running, and I had a terrible headache. . . . At lunchtime on April 3, when they lined us up to take our temperatures, mine was 100 degrees. I told the nurse I wasn't feeling right. But she told me, "you'll be alright," and left. At around 5:00 p.m. or 6:00 p.m., I started to have real difficulty breathing and my body was really aching and causing me a lot of pain. They told me to hold on and wait until the medical staff returned at 9:00 p.m. So I had no choice but to wait. That evening, when the medical staff came back again to take everyone's temperature, mine was 104 degrees. They made me step to one side, along with four other guys, and then we all went to the medical unit around 11:00 p.m. They kept three of us, and sent two back to the housing unit."[76]

127.    Declarant 10 tested positive for Covid-19. Ex. 10, Decl. 10 ¶ 2.

128.    Once a prisoner has tested positive for COVID-19, the CDC recommends careful attention to that prisoner's contacts. Every person who has been within six feet of that prisoner should be placed in a 14-day quarantine. Ex. 36, CDC at 14.

129.    However, jail staff do not affirmatively quarantine, isolate, or even inform prisoners when a person who lives within six feet of them has COVID-19 symptoms or even tests positive for the virus—even when that person is the prisoner's cellmate.

130.    Nor do they disinfect cells where symptomatic or COVID-positive prisoners have lived.[77]

---

[76] Ex. 10, Decl. 10 ¶¶ 9–10.

[77] Ex. 7, John Doe No. 4 Decl. ¶6 ("My cell mate went to medical at 8 o'clock last night and he hasn't come back. He was not feeling well he had a headache and stomach ache. When my cellie left last night, the staff did not do anything to disinfect my cell. I am waiting to get rec-time because that is the only time I can get cleaning supplies."); *id. (*"I have seen 3 inmates leave on this unit so far, and not come back. … One was across the hall 3 or 4 days ago, he went to medical, his stuff is still in his cell. The guy across the way—his cell was within 5 feet of our cell.").

131.     Indeed, jail staff—including even medical staff—do not appear to know which prisoners have tested positive for the virus.[78]

### E. The Jail's Limited Containment Methods Are Ineffective and Counterproductive

132.     Instead of implementing the CDC's recommendations to prevent COVID-19, at the beginning of April, the Jail implemented a universal, preemptive lockdown of all prisoners.

133.     Under the lockdown policy, prisoners must remain in their cells for 23 hours per day.

134.     Prisoner have one hour (which may be at 1:30 a.m. or some other odd hour) of "recreation," which is prisoners' only chance to shower, go outside, or use the phones to call their attorneys[79] or their families (if they are awake).[80]

135.     Some jail guards also require prisoners to use that hour to clean their cells.

136.     The lockdown appears to have no end date short of the pandemic's end.

137.     The CDC does not recommend preemptive lockdowns of all prisoners.

138.     Instead, it recommends that correctional facilities achieve social distancing by, for example, "[r]earranging seating in the dining hall so that there is more space between individuals,"

---

[78] Ex. 11, Decl. 11 ¶10 ("I told them that my cellmate had been in the medical unit for six days. That's when they looked into things and realized that my cellmate had tested positive, so they had to test me too.").

[79] The prisoners' limited time for phone use has also hindered contact with their attorneys. *See* Ex. 29, Glenn Decl. ¶¶ 16–22. This is particularly challenging given the pandemic-related delays in state court criminal cases. *See generally* Ex. 28, Schneller Decl.

[80] Ex. 7, John Doe No. 4 Decl. ¶ 14 ("You can't really talk to your family at 1 o'clock in the morning, my kids are asleep.).

and "[c]onsider[ing] alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out." Ex. 36, CDC at 11.

139.    And it only recommends something akin to lockdown—that housing units "quarantine in place"—when there is "contact with a case from the same housing unit" and that all quarantines—including this sort—last for just 14 days. Ex. 36, CDC at 19.

140.    Other public health experts recommend the same: time-limited lockdowns used only as necessary for quarantine and contact tracing.[81]

141.    Experts also warn that preemptive lockdowns like those at the Jail are ineffective and counterproductive in preventing the spread of COVID-19.

142.    Indeed, on lockdown, opportunities for infection abound.

143.    Most prisoners live with cellmates in hot, poorly ventilated cells.[82] Even prisoners in different cells are less than six feet apart.

---

[81] Ex. 30, Meyer Decl.  ¶ 27 ("Lockdown can be important from a public health standpoint to enable social distancing during a pandemic but should be used only as a last resort and in a time-limited way (CDC recommends quarantines last no longer than 14 days) that is communicated clearly to the residents"); David Cloud, Dallas Augustine, and Brie Williams, *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional Settings*, Amend at 3 (Apr. 7, 2020), *available at* https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf [hereinafter "Medical Isolation—Not Solitary"] ("Corrections officials should only require people on an entire housing unit to stay in their cells ("Lockdown") if medical professionals determine a symptomatic persons resides or works on that unit or contract tracing flags a confirmed or suspected case. In this event, time-limitations must be clearly communicated to residents and staff."); Ex. 34, Haney Decl. ¶ 29 ("[T]he Jail should institute … lockdowns only where medically necessary to resolve discrete issues, such as sanitizing dorms or contact tracing of an infected prisoner. If the [Jail] resorts to these lockdowns, it should do so in a reasonably time-limited manner and communicate that time-limit to the prisoners who are affected.").

[82] Ex. 5, John Doe No. 2 Decl. ¶12 ("It's very hot in the cells.  For the 23 hours we are in our cells a day, the cell door is kept closed.  There is no noticeable air circulation, and the rest of the unit is very hot as well.  The staff keeps the door to the recreation yard propped open."); Ex. 1, Seth Decl. ¶ 94 (I am not getting good air circulation in the cell[.]").

144.     Thus, the lockdown policy—especially in combination with the Jail's failure to medically isolate those with symptoms of COVID-19—traps prisoners in close proximity to people who may be sick. *See* Ex. 36, CDC at 19 (warning that quarantining prisoners together "could transmit COVID-19 from those who are infected to those who are uninfected."); Ex. 30, Meyer Decl. ¶ 30 (stating that sustained lockdowns are "particularly problematic when inmates are locked down in poorly ventilated spaces that are shared closely with others, which may contribute to disease transmission from people who are infected with COVID-19 but have not yet reported symptoms.").

145.     For example, Plaintiff John Doe No. 2, who has severe asthma for which he has been hospitalized, is locked down with his cellmate, who has lost his sense of smell and taste (a symptom of COVID-19). Ex. 4, John Doe No. 2 Decl. ¶ 22; *see also* Ex. 7, John Doe No. 4 Decl. ¶ 14 ([I]t's really bad when you can't get come out of a cell for 23 hours I'm really scared now because my cellie has been sick."); Ex. 17, Decl. 17 ¶ 6 ("My cellmate has been coughing and sneezing. They have us locked in 23 hours a day with 1 hour of recreation time. There is no way for my cellmate and I to distance ourselves from each other.").

146.     The Jail's preemptive lockdown is counter-productive in other ways as well. Because prisoners' one hour of out-of-cell time is their only chance to call their attorneys and families, they congregate by the phones (which are close together and rarely, if ever, cleaned).[83]

---

[83] Ex. 30, Meyer Decl.  ¶ 30 (observing that under the Jail's preemptive lockdown policy, "[w]ith only 1 hour per day to use phones, it may be hard to enforce social distancing since prisoners need to congregate to use this precious resource"); Ex. 34, Haney Decl.  ¶ 30 ("During th[e] limited one hour of out-of-cell time [under the Jail's preemptive lockdown policy], prisoners crowd together to use the limited shared resources. . . . As a result, they are unable to maintain the recommended six feet of social distancing.").

147.     The lockdown also "decreases the interactions that prisoners have with correctional and healthcare staff members, compromising the latter's ability to identify symptoms," further ensuring that infected prisoners will remain in general population where they can spread the virus. Ex. 34, Haney Decl.  ¶ 30.[84]

**F.  The Jail's Conditions Increase the Risk of Severe Illness and Death**

148.     In addition to accelerating the COVID-19 outbreak, the Jail has also increased the risk that those who are infected will suffer serious illness, permanent physical damage, and death.

149.     Sick prisoners in general population lack access to medical care.

150.     "Sick call" (a request for medical attention) costs $4, and some cannot afford to pay. Some housing units have run out of sick call slips entirely. Ex. 19, Decl. 19 ¶ 6.

151.     This prevents even prisoners who are medically vulnerable and have symptoms of COVID-19 from seeking care.

152.     For example, Plaintiff Seth explained:

"For about a week or two I have been experiencing shortage of breath and coughing. . . . About four days ago, I asked to get into the medical unit but they make you pay $4 for the form and I don't have money for that.  I am losing my sense of taste, I have hot chips that I eat and do not taste the hotness. It feels like my taste buds are numb.  I have had diarrhea for about a week. . . . About two days ago I decided I should probably go to the medical unit.  But I decided not to ask because I do not have the money for the form."[85]

153.     Mr. Seth was also deterred from seeking care because so many prisoners with symptoms of COVID-19 were unable to get it at the Jail. He explains: "I know one guy who had

---

[84] *See* Medical Isolation—Not Solitary at 2 (warning that "preemptively placing entire units on 'lockdown' for indefinite amounts of time" will likely mean that "interactions with correctional staff an healthcare staff often become less frequent and people with symptoms may go undetected").

[85] Ex. 1, Seth Decl.  ¶¶ 9–11.

a fever and they kept him for three days and sent him back. Another guy I know lost his sense of taste and his stomach hurt, but medical sent him back." Ex. 1, Seth Decl. ¶ 11.

154.    Moreover, as Mr. Seth's experience demonstrates, the Jail has no plan for specially protecting medically vulnerable prisoners from COVID-19 or monitoring them if they become symptomatic.

155.    Many prisoners with symptoms of COVID-19 cannot get medical attention for other reasons.

156.    Jail staff has told prisoners that medical care is limited to emergency cases.[86]

157.    Some prisoners who have made sick calls were seen by medical staff weeks later or not at all. For example, John Doe No. 2, who has previously been hospitalized for his severe asthma, told jail staff that he has asthma, was spitting up brown mucus, and was having trouble breathing. He was not taken to the medical unit for two weeks. Ex. 5, John Doe No. 2 ¶5; *see also* Ex. 19, Decl. 19 ¶ 6 (stating on April 9, 2020: "I first put in for sick call on March 23rd and I haven't heard anything.").

158.    People who need medical care for anything other than COVID-19 generally cannot get it. Jail staff has told prisoners that they cannot receive medical services because the medical unit is locked down. Ex. 2, Smith Decl. ¶ 15.

159.    Prisoners who made a sick call that was not about COVID-19 were told by corrections officers "that if it's nothing relating to Corona not to write to medical." *Id.*

---

[86] Ex. 26, Decl. 26 ¶¶ 6–7 ("I was told my case was not serious enough to have additional care, and that the Medical Unit is only seeing emergency cases."); Ex. 19, Decl. 19 ¶ 6 ("The guards have told me that they're not bringing anyone down unless it's an emergency.").

160.    Prisoners who had lived in the medical unit due to chronic medical concerns have been transferred out.[87]

161.    And many prisoners have been unable to obtain or change their medications—including prisoners with pre-existing conditions like asthma, which make them especially vulnerable to serious illness and death if they do become infected with COVID-19.[88]

162.    Prisoners' mental health is also at great risk.

163.    Dr. Craig Haney, a psychologist and expert on prison isolation,[89] has concluded that the punitive isolation methods that dominate the Jail's approach to COVID-19 "greatly increase the psychological stress under which prisoners live, potentially leading to mental and physical deterioration, interpersonal conflicts, and self-harm and suicidality." Ex. 34, Haney Decl. ¶ 20.[90]

164.    As Dr. Haney explains, "The Prince George's County Jail lockdown units are now being used in ways that are essentially identical to the solitary confinement-type housing that has

---

[87] Ex. 6, John Doe No. 3 Decl. ¶ 4 ("When I first entered the Detention Center, I was placed in the Medical Unit. I have numerous medical issues, including neck and back issues, I walk with a cane, and I am currently having kidney issues, including blood in my urine. I was moved from the Medical Unit about halfway through my thirty-day incarceration, and I do not know why, but it may be because it was getting more crowded in the Medical Unit.").

[88] Ex. 2, Smith Decl. ¶ 15 ("I take medication and they haven't consulted me to change the medication because I don't like the side effects it gives me.").

[89] *See* Ex. 35, Haney Curriculum Vitae.

[90] *See also* Medical Isolation—Not Solitary at 3 ("Research shows that keeping people socially isolated in a closed cell without a meaningful opportunity to communicate with family, friends, and loved ones or to participate in exercise, education, and rehabilitative programming (solitary confinement) causes immense, and often irreparable, psychological harm."); Ex. 32, Benninger Decl. ¶ 3(J) ("I have concern that there has not been sufficient acknowledgement of or attention to the inmates' mental health under the stressors of pandemic and solitary confinement.").

been shown to place prisoners at significant risk of grave harm (including damage that is permanent, even fatal)." *Id.* ¶ 20.[91]

165.    Moreover, the Jail has discontinued mental health services.[92] This places prisoners with mental illness who are isolated "at grave risk of decompensation." *Id.* ¶ 24.[93]

166.    These policies also threaten physical harm; "the extraordinary stress of social isolation under these especially onerous conditions" may "depress prisoners' immune systems and render them even more vulnerable to the COVID-19 virus, and less able to combat it if and when they contract it." Ex. 36, Haney Decl. ¶ 26; *see also* Ex. 30, Meyer Decl. ¶ 36 ("Failure to provide adequate mental health care . . . as appears to be the case at the Prince George's County Jail, will result in poor health outcomes.).

---

[91] Ex. 34, Haney Decl. ¶ 20 ("The fact that prisoners are double-celled during these lockdowns [in the general housing units] does not mitigate the negative effects of their essentially around-the-clock in-cell confinement. In fact, double-celling may exacerbate these effects because of the interpersonal tensions and stressors that such unavoidably close around-the-clock contact generates.").

[92] Ex. 30, Meyer Decl. ¶ 36 ("People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.").

[93] Even in less extreme forms of isolation than those imposed at the Jail, the CDC Guidance recommends efforts to mitigate the mental health consequences of any necessary medical isolation. *See, e.g.*, Ex. 36, CDC Guidance at 12 ("[I]f group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons."); *id.* at 13 ("Consider increasing incarcerated/detained persons' telephone privileges to promote mental health."); *id.* at 14–15 (recommending that, since "visitation is important to maintain mental health," if visitation is suspended, "facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them."). The Jail has done none of this.

### G. The Jail Has Failed to Effectively Manage Positive Cases of COVID-19

167.    In addition to the Jail's failure to implement basic, CDC-recommended protocols to prevent the spread of the virus, the Jail has also failed to provide adequate care to prisoners who have tested positive for the virus.

168.    Prisoners who are transferred to the Medical Unit to be tested for COVID-19 are placed in medical isolation cells. The cells are filthy. The walls are covered in mucus, feces, and blood.[94]

169.    Prisoners are terrified of being placed there, and they downplay their COVID-19 symptoms to avoid it.[95]

---

[94] Ex. 11, Decl. 11 ¶ 18 ("The isolation cells have mucus, feces, blood, old food, urine, spit, everything you can name on the walls. . . . Someone should come and take pictures of these cells, they're disgusting."); Ex. 10, Decl. 10 ¶ 11 ("The isolation cell they put me in has mucus and blood dried all around the walls, 360 degrees. I wish you could come and take pictures of it. When I say mucus and blood on the walls, I mean it – thick yellow, some green, some yellow with red blood in it. I can also tell someone was bleeding in that isolation cell, because there is blood all along the floor under the bed."); Ex. 12, Decl. 12 ¶ 7 ("I was put in isolation cell number [redacted], which was not clean. It has feces and blood on the walls. The sink was stopped up too, so I couldn't really use the water.").

[95] Ex. 12, Decl. 12 ¶ 14 ("I think a lot of guys are having symptoms, but are fearful of being stuck in the medical unit on total lock-down. They're more afraid of how they'll be treated in the medical unit than they are of their symptoms, so they downplay things so they can go back to the housing unit where they have access to showers and phones and stuff like that."); Ex. 10, Decl. 10 ¶ 25 "Some people are trying to hide their symptoms, because they don't want to be punished in the medical unit. … So a lot of people are just trying to tough it out, but it's spreading it. My cellmate was sneezing and coughing when I left him. I've seen people in the kitchen unit sneezing as they prepare food."); Ex. 9, Decl. 9 ¶ 21 ("Some guys on the unit seem to have the virus, but they are scared to get tested, because they don't want to get stuck in the medical unit like I am. They'd rather just let their bodies fight it off."); Ex. 17, Decl. 17 ¶ 8 ("A lot of people in the unit who are coughing and sneezing have said they are trying to suppress it because they don't want to go to the medical unit because of the way people there are being treated.").

170.     Prisoners must remain in these cells until the results of their COVID-19 tests come back. This can take up to five days. During this time, prisoners have no access to basic personal hygiene products: they have no soap and no toothbrush. They are not allowed to shower. They cannot change their clothes, even as they are soaked in sweat.[96]

171.     They have no access to phones, no reading material, and no mental health services.

172.     A nurse visits each prisoner three times per day to take his temperature and deliver medication and food trays. But the prisoners there cannot contact them (or anyone else) on their own, even in a medical emergency. Ex. 12, Decl. 12 ¶ 9 ("In the isolation cell, there was no way for us to notify someone if we were having an emergency, except to get up and bang on the door and hope that someone could hear you.").

173.     Medically vulnerable prisoners suspected of having COVID-19 are held in the same isolation cells in the same abject conditions. There does not appear to be any plan for their care in light of the particular dangers they face if infected.

174.     A prisoner who tests positive for COVID-19 is transferred from the isolation cell to a 10-man cell for COVID-positive prisoners in the medical unit. Starting on April 11, 2020, the Jail also began using isolation units in Housing Unit 6 (H-6). There is no special location, plan, or care for medically vulnerable prisoners who have COVID-19.

---

[96] Ex. 11, Decl. 11 ¶ 12 ("I was still wearing those same clothes I was sweating in, for five days. They didn't give me clean clothes until April 6, and they haven't allowed any of us to take a shower."); Ex. 12, Decl. 12 ¶ 8 ("I was in the isolation cell for five days before I was even given a wash cloth or a toothbrush.").

175.    The 10-man cell is dirty. For fear of contracting COVID-19, jail guards will not remove the trash bags, which are filled with vomit and spit.[97] The floor is covered with tissues, hair balls, spiders, and bugs.[98]

176.    Jail staff will not enter the room to fill the water cooler. The prisoners are told that if they are thirsty, they can drink from the sink.[99] When jail guards do bring something to the prisoners in the cell, they throw it through the door.[100]

177.    Prisoners in the 10-person cell also lack basic hygiene products. Many do not have soap or have to share a single bar with others. Some have not had toothbrushes or toothpaste for over a week. They are still not allowed to shower. All of the sick men share a single, mildewed

---

[97] Ex. 10, Decl. 10 ¶ 23 ("There's also a pile of trash building up inside of our unit, which they won't take away.  There are fumes from guys getting sick in those trash bags, there's spit on top of it and in it, and the trash is just closed in here with us."); Ex. 9, Decl. 9 ¶ 19 ("[O]ur trash is piled up in bags that they won't take away since we've been over here.  The COs refuse to get close to us and they say that anything that goes in, can't come back out.")

[98] Ex. 11, Decl. 11 ¶ 19 ("There's spiders and other bugs.  It's nasty.  There's piles of dust under the beds.  It hasn't been cleaned since god knows when."); Ex. 9, Decl. 9 ¶ 19 ("There's lint balls and tissues and paper towels on the floor.  There are spiders and centipedes, one guy just killed another spider while I'm talking to you on the phone."); Ex. 10, Decl. 10 ¶ 17 ("[T]here's dust and hair balls all around the floor in our cell.").

[99] Ex. 11, Decl. 11 ¶ 20 ("It's supposed to be a water cooler for us, but it's empty.  They're scared to come and refill it, they're scared to even come and get the trash."); Ex. 9, Decl. 9 ¶20 ("There's an orange water cooler in here with us, but it's empty because the COs refuse to fill it with ice and clean water.").

[100] Ex. 10, Decl. 10 ¶ 14 "When we really need something, the staff will open the door, and throw stuff at us through the door.  It makes me feel like an animal."; Ex. 11, Decl. 11 ¶ 21 ("There's a pile of trash right now in the ten-man cell right next to the empty water cooler. It's supposed to be a water cooler for us, but it's empty.  They're scared to come and refill it, they're scared to even come and get the trash.  They treat us like animals, like they're afraid to come near us.  And anything they do give us, they throw to us like we're animals, like we're nothing.").

sink. Prisoners may go five or six days without being able to change their clothes or underwear.
[101] There are no mental health services.

178.    COVID-positive prisoners who are housed on H-6 are held alone in cells. Ex. 11,
Decl. 11 ¶ 35. They have no access to phones and nothing to read. They too have no mental health
services.

179.    There is no jail guard on H-6 with the prisoners. Ex. 9, Decl. 9 ¶ 6. The only time
the prisoners there see anyone is when a guard comes to deliver their food. A nurse comes at the
same time.

180.    The cells in H6 have call buttons that prisoners can use to talk to the corrections
officer in the unit's command center bubble. Ex. 9, Decl. 9 ¶ 31.

181.    Sometimes, either the call button does not work or no one answers it. One prisoner
in H-6 heard another kicking his door because the guards would not answer his call button.  No

---

[101] Ex. 11, Decl. 11 ¶ 20 ("They gave me one bar of soap, but not everyone in here with me even
has a bar of soap.  Some guys don't have toothbrushes or toothpaste either, some say they haven't
had a toothbrush or toothpaste in a week."); *id.* ("We ask for showers, but they say we can't take
a shower. They tell us to wash in the sink, but there's just one sink that all nine of us have to use.");
*id.* ("We've got the same clothes on for five or six days, the same underwear for five or six days.
I'm still wearing the same drawers since Thursday, and they look nasty. They're turning black.");
Ex. 10, Decl. 10 ¶ 15 ("They won't let us shower, either. We have only one working sink, and I'm
sharing it with everyone in here. There are currently ten men in this cell, the maximum. We've all
got to take turns washing up in that one sink. Although they gave me a bar of soap on April 6, I
didn't get a toothbrush or toothpaste until April 9. I requested it and requested it, but I didn't get
it. I didn't have any toothbrush or toothpaste between April 3 and April 9."); Ex. 9, Decl. 9 ¶ 17
("They tell us to be clean with soap and hygiene, but they don't give us any hygiene products.  It
took four or five days before they gave me a hygiene kit in the medical unit.  Before then, I had no
soap, toothbrush, toothpaste, or deodorant to keep myself clean.  I asked them many times, but the
COs would play with us and tell us we didn't need a hygiene kit.  Finally the nurse went to the
Sergeant and told him what was going on, and the Sergeant got us our hygiene kits."); *id.* ¶ 18 ("I
also have not been allowed to use the shower since being moved to the medical unit.  I have not
had a shower in nearly two weeks, not since Thursday, March 26.  Instead, I have been forced to
wash myself as best I can in a dirty, mildewed sink.  In the isolation cell, I had a bar of soap for
myself, but now in the ten-man cell I have to share the sink and bar of soap with the other men in
here."); Ex. 12, Decl. 12 ¶ 12 "I haven't had a shower since Thursday, March 26.").

jail staff checked on the other prisoner. He does not know what happened to the man who was kicking his door. *Id.*

182.     The same prisoner worries that even if the button works, in a medical emergency he might not be able to press it. He explained, "I have a seizure disease.  If I were to have a seizure, I wouldn't be able to push the button.  No COs are in the housing unit, so no one would hear what was going on.  I'm afraid that if I have a seizure in here, no one will hear it and I will die. . . . They're not really doing anything to protect any of us in here." Ex. 9, Decl. 9 ¶¶ 31–32.

**H.  The Jail Maintains an Overdetention Policy for Prisoners with COVID-19**

183.     Although the Jail has failed to control the outbreak within its walls by not following clear public health guidance, it has resorted to unlawful means to control the virus's spread outside of them: the Jail refuses to release COVID-positive prisoners who have paid bail (or are otherwise legally entitled to release) until it deems them non-contagious.

184.     Accordingly, one prisoner who paid his bond on April 3, 2020—but tested positive for COVID-19 on the same day—was illegally imprisoned in the cohorted isolation cell in the Jail for fourteen days. Ex. 29, Glenn Decl. ¶ 24.

185.     He was not released until April 16, 2020. *Id.*

186.     Had he been released when he paid his bond on April 3rd, he would have sought treatment for COVID-19 at a local hospital. *Id.*

**I. The Jail's Continued Use of Indefinite Lockdown**

187.     Since Plaintiffs filed this Complaint on April 21, 2020, the indefinite lockdown has continued at the Jail. This is the fourth month of the lockdown.

188.     Detainees at the Jail continue to be locked down for 22 or, more commonly, 23 hours per days in their cells.

39

189.    In mid-to-late June and early July, more than 80 detainees in ten different housing units reported that they receive only one to two hours out of their cells each day.

190.    Of those, more than 65 reported that they receive only one hour out of their cells and are locked in their cells for 23 hours each day. A smaller portion reported that they receive one to two hours per day, depending on the corrections officers or how crowded the unit is, and a small portion reported that they receive two hours per day.

191.    Of the prisoners who receive two hours out of their cells, many report that the second hour began in the last week of June. They receive the second hour at a different time from the first (potentially in the middle of the night).

192.    However, like detainees who receive only one hour of out-of-cell time, those who receive a second hour out of their cells often receive it inconsistently.

193.    Out-of-cell time may be offered in the middle of the night, at 1 or 2 in the morning. For those who receive only one hour of out-of-cell time, this means that it is impossible to reach counsel or loved ones that day.

194.    At times, prisoners go more than a day without any out-of-cell time at all—48 or 72 hours might pass without it. And in some units, detainees are routinely given less than an hour of time out of their cells. In H6, where the Jail has housed COVID-positive prisoners, an hour of out-of-cell time has been offered only once every other day.

195.    The cells in which detainees in general housing spent 22 to 23 hours per day are approximately 70 square feet.

196.    A prisoner's hour (or maybe two) of out-of-cell is his only opportunity to use the phones to call family or his attorney, to shower, to access cleaning products for his cell, and to spend any time outside.

197.    During prisoners' out-of-cell time, prisoners crowd by the phones, since it is their only opportunity to contact family or counsel.

198.    In most units, there are not enough working phones for everyone to use one, and so prisoners rush or even run to the phones to get to them. While using the phones, prisoners are regularly sitting shoulder to shoulder, inches apart. As one prisoner described it, "The phone area is crowded with bodies."

199.    Although many would prefer to practice social distancing, they do not because their out-of-cell time is their only opportunity to use the phones at all. This amplifies their anxiety about infection, but detainees feel that they have no choice but use the phones in their rare opportunities to do so, despite the risk that comes with it.

200.    The small outdoor recreation area—a very small concrete square with concrete walls and no ceiling—is not always available to prisoners, even during out-of-cell time (and if it were, prisoners often have no time in that hour to use it between using the phones, showering, and accessing cleaning supplies and cleaning their cells). Often, they cannot access it for days at a time. Even so, given its size, it would be impossible for all (or even many) of the 10 detainees the Jail allows out of their cells at any given time to spend time there during their out-of-cell time and also maintain social distancing.

201.    The lockdown policy includes no accommodations for detainees with serious mental health conditions. The Jail detains numerous people who have mental illnesses, including psychotic illness, depression, anxiety, post-traumatic stress disorder, and bipolar disorder. Some detainees are currently part of a special mental health docket for the court, and some are awaiting competency evaluations or have been deemed incompetent. They too are locked in their cells for 22 or 23 hours per day.

202.    Mental health services are limited or nonexistent. Most detainees have received no mental health treatment at all.

203.    Of the detainees who have pre-existing mental health conditions that require medication, the vast majority report that they receive the medication at the front of their cells and may be asked whether the medication is working, but they receive no other mental health services, such as confidential therapeutic services.[102]

204.    Moreover, the Jail does not—and apparently has no plan to—assess or otherwise check on detainees to determine whether they are experiencing the psychological and physiological consequences of solitary confinement, including whether a detainee is at risk of (or already is) decompensating.

205.    Access to reading materials is limited or non-existent. Many detainees cannot access any reading materials at all.

206.    In the units where reading material is available, most share a single newspaper for all prisoners in the unit and may have a small number of books that were taken from the Jail's library before the pandemic began (but have not been changed out since). Detainees often beg corrections officers for reading materials—but receive them only when the officer decides to oblige. Detainees do not have access to the law library. And some are permitted reading materials only during their out-of-cell time

207.    For the exclusively Spanish-speaking detainees at the Jail, even where books are occasionally available, they cannot read them because the books are in English.

---

[102] The Fourth Circuit recently found a substantial risk of serious harm under the Eighth Amendment where detainees under a 23-24 hour lockdown policy were visited by case counselors daily and mental health professionals once per week. *See Porter v. Clarke*, 923 F.3d 348, 354 (4th Cir. 2019).

208.    While in their cells, prisoners are given no audio players, television, tablets, or other materials for entertainment or stimulation.

209.    Because of this, prisoners locked in their cells often have nothing but their thoughts. Even for solitary confinement policies, this deprivation is particularly stark.[103]

210.    Prisoners' social contact is limited to a cellmate (if they have one, which many do not), and very brief, front-of-cell checks a couple of times a day. Other than this, they are alone.[104]

211.    The lockdown's duration remains indefinite.

212.    This indefinite timeline is particularly daunting because most trials have been continued because of the pandemic; as a result, prisoners are spending longer terms in the Jail.

213.    Detainees are suffering the lockdown's effects. Many are increasingly anxious, depressed, and suicidal. Some simply report that they feel like they are going crazy.

214.    These effects are amplified by the restrictions in place during the pandemic, such as the cessation of visitation, the continuance of their trials and other court dates (resulting in more time spent detained pre-trial), greatly reduced access to counsel, and their limited ability to contact their family members by phone—which is particularly stressful as many of detainees' loved ones are suffering the economic consequences of the pandemic or have actually been infected, and all are at risk of infection.

---

[103] *See Porter*, 923 F.3d at 353-54 (4th Cir. 2019) (finding that solitary confinement policy created a substantial risk of serious harm where prisoners were locked down for 23-24 hours per day but, while in their cells, prisoners could keep a television and compact disc player in their cells, could borrow books from the library to request, and could request and use wireless telephones any day of the week between 8 am and 9:30 pm).

[104] *See Porter*, 923 F.3d at 353-54 (4th Cir. 2019) (noting, in assessing solitary confinement conditions, that contact with correctional staff was "limited" where prisoners under solitary confinement were given security checks by corrections officers every thirty minutes, had twice daily visits from medical staff and nurses, daily visits with a case counselor, and a weekly visits from a mental health professional).

215.   Lockdown's psychological effects are also exacerbated in these circumstances given the baseline increase in anxiety prisoners have about the pandemic, including the fear that they will die at the Jail without being able to say goodbye to their families.

216.   In many cases, the lockdown may have the effect of prolonging prisoners' imprisonment at the Jail. For example, many detainees have been authorized for release by a court, but only if they comply with their mental health medications. Placing these detainees under conditions that routinely result in severe psychological symptoms (particularly while failing to provide appropriate mental health treatment) makes compliance—and thus release—less likely. And as a general matter, detainees' reduced access to their attorneys makes it more challenge to press their cases in ways that could lead to release, such as bond reconsideration motions. *See* Rettamel Decl. ¶ 6 (Doc. 44-1 at 123).

217.   A robust body of empirical evidence sets forth the psychological and physical harms that frequently result from solitary confinement conditions like the lockdown at the Jail, in which prisoners are locked down for 22 to 23 hours per day.

218.   This scientific evidence has been repeatedly credited by federal courts, including the Fourth Circuit. *See Porter v. Clarke*, 923 F. 3d 348, 355-57 (4th Cir. 2019) (describing this evidence and multiple court' recognition of it, and relying on it to find that a solitary confinement policy imposed an objective risk of serious harm under the Eighth Amendment).

219.   Specifically, scientific research documents that solitary confinement conditions like those at the Jail under lockdown consistently result in serious psychological and physiological harms. *See* Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Justice 365, 367-68, 370-75 (2018) (collecting studies); Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J. L. & Pol'y 325, 335-38 (2006).

220.   As Dr. Craig Haney[105] explains, the lockdown conditions at the Jail "greatly increase the psychological stress under which prisoners live, potentially leading to mental and physical deterioration, interpersonal conflicts, and self-harm and suicidality." Haney Decl. ¶ 20 (Doc. 2-1 at 209).

221.   Psychological injuries may include cognitive dysfunction, paranoia, panic, severe depression, hallucination, memory loss, insomnia, and stimuli hypersensitivity. *See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325, 335-36, 348, 370-71 (2006).

222.   Prisoners in solitary confinement also frequently engage in life threatening behavior, such as self-mutilation and suicidality. *Id.* at 349; *see also* Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary, 112th Cong. 72, 80-81 (2012) (statement of Craig Haney).

223.   These effects are particularly severe for prisoners with pre-existing mental health conditions, who "are particularly likely to decompensate, suffer worsening depression, and even engage in self-harming and suicidal behavior in response to social isolation." Haney Decl. ¶ 23 (Doc. 2-1 at 209).

224.   Moreover, because they are denied appropriate mental health care while on lockdown, including confidential treatment, psychologically vulnerable prisoners in particular are "at grave risk of decompensation." Haney Decl. ¶ 24 (Doc. 2-1 at 209).

---

[105] Dr. Haney's research on solitary confinement has been cited by numerous federal courts, including, recently, the Fourth Circuit, *see Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019), *as amended* (May 6, 2019).

225.    Physiological injuries also consistently result from solitary confinement conditions like those at the Jail. These may include decreased inflammatory control, a decline in neural activity, hypertension, heart palpitations, gastrointestinal disorders, severe insomnia, and dementia. Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 IND. L.J. 741, 762 (2015); Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 488-90 (2006).

226.    And as neuroendocrinologist and Stanford University Professor Robert Sapolsky explained, the severe stress caused by the Jail's lockdown conditions is also likely to depress immune response and increase the risk of severe illness and death from COVID-19. *See* Sapolsky Decl. ¶¶ 33, 39 (Doc. 41-1 at 83-84, 85); *accord* Haney Decl ¶ 26 (Doc. 2-1 at 209).

227.    For those prisoners who have cellmates, "The fact that prisoners are double-celled during the[] lockdown[] does not mitigate the effects of their essentially around-the-clock-in-cell confinement. In fact, it may exacerbate these effects because of the interpersonal tensions and stressors that such unavoidably close around-the-clock contact generates." Haney Decl. ¶ 20 (Doc. 2-1 at 209).[106]

---

[106] *See also Madrid v. Gomez*, 889 F. Supp. 1146, 1229–30 (N.D. Cal. 1995) ("Roughly two-thirds of the inmates are double celled; however, this does not compensate for the otherwise severe level of social isolation in the SHU. The combination of being in extremely close proximity with one other person, while other avenues for normal social interaction are virtually precluded, often makes any long-term, normal relationship with the cellmate impossible. Instead, two persons housed together in this type of forced, constant intimacy have an enormously high risk of becoming paranoid, hostile, and potentially violent towards each other. The existence of a cellmate is thus unlikely to provide an opportunity for sustained positive or normal social contact.") (citations omitted); Order, *Georgia Advocacy Office v. Jackson*, No. 1:19-CV-1634-WMR-RDC, Doc. 65 (S.D. Ga. July 23, 2019) (granting preliminary injunction to remedy solitary confinement conditions in which prisoners were double celled).

228.    The consequences of solitary confinement manifest after even relatively short time-periods. "Notwithstanding that scholars have conducted dozens of studies on the psychological and emotional effects of solitary and segregated confinement, the leading survey of the literature regarding such confinement found that there is *not a single published study* of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, *that failed to result in negative psychological effects*." *Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019), *as amended* (May 6, 2019) (quotations omitted); *see also Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016) ("After even relatively brief periods of solitary confinement, inmates have exhibited symptoms such as hypersensitivity to stimuli, perceptual distortions and hallucinations, increased anxiety, lack of impulse control, severe and chronic depression, appetite and weight loss, heart palpitations, sleep problems, and depressed brain functioning").

229.    Although short terms of solitary confinement impose high risks of psychological and physiological harm, longer and indefinite terms of solitary confinement conditions have even greater effects. *See, e.g.*, Terry A. Kupers, *Waiting Alone to Die*, in Living on Death Row: The Psychology of Waiting to Die 47, 54 (Hans Toch & James Acker eds., 2018).

230.    Defendant knew that implementing a generalized lockdown procedure—particularly during a pandemic and while visitation is suspended—would harm detainees.

231.    Indeed, on March 26, 2020, just before the lockdown was implemented a Deputy Director of the Department of Corrections said, in an email to all Department staff, "With the existing elevated state of anxiety among inmates and staff, it would be more harmful to isolate inmates." Doc. 37-22 at 39-40.

232.     Moreover, risk of psychological and physiological harms imposed by the Jail's lockdown have been repeatedly and explicitly enumerated by Plaintiffs and by experts during this litigation.

233.     Nevertheless, the lockdown persists.

234.     The indefinite lockdown currently in place at the Jail is not subject to the procedural protections normally afforded to prisoners who are placed on lockdown or other status with limited privileges.

235.     According to the Inmate Handbook, prisoners at the Jail who are assigned to special housing status—including maximum security housing or protective custody—will have their status reviewed by the Special Housing Board every seven days for the first two months and every thirty days thereafter.

236.     The handbook states that prisoners on disciplinary restriction, who are defined as inmates placed on lockdown to maintain control and safety, may appeal their placement there. And as a general matter, prisoners may request a review of their classification status (which determines housing placement) at any time.

237.     However, there is apparently no plan to end the preemptive, generalized lockdown before the pandemic ends.[107]

238.     There is also no plan to, as the CDC Guidance and other public health experts recommend, limit lockdown to prisoners who require quarantine and to the time-period necessary for that quarantine to be effective (the CDC recommends 14 days). *See supra* ¶¶ 139-40.

---

[107] There is no consensus about when or how the COVID-19 pandemic will end, but public health officials note that if an effective vaccine is developed, it may be available, at the earliest, by early 2021.

239.   Despite this, if the Jail wishes to enact social distancing, there are numerous alternatives to lockdown that the Jail can employ, but is not. These alternatives (unlike preemptive, indefinite lockdown) are recommended by the CDC Guidance. *See supra* ¶¶ 137-38 (enumerating options to enact social distancing).

240.   Critically, throughout the pandemic and the lockdown, the Jail has failed—and continues to fail—to enact meaningful social distancing measures. Prisoners remain crowded together in (for examples) the Jail's courtroom, in small rooms and hallways, and by the phones. Indeed, the lockdown exacerbates the problem of social distancing by the phones. Thus, prisoners must suffer the effects of the lockdown without actually benefiting from social distancing.

187.241.   All of the exhibits cited in and attached to this Complaint are incorporated by reference.

## CLASS ACTION ALLEGATIONS

188.242.   Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual named Plaintiffs seek to certify two classes with one subclass as follows:

- The Pretrial Class is defined as "all people detained in the Prince George's County Jail who are not detained pursuant to a judgment of conviction."

- The Post-Conviction Class is defined as "all people detained in the Prince George's County Jail who *are* detained pursuant to a judgment of conviction."

- The Medically Vulnerable Subclass is defined as "all Pretrial Class members whose medical condition renders them especially vulnerable to the coronavirus as determined by guidelines promulgated by the Centers for Disease Control and Prevention."[108]

~~189.~~243.    The class allegations and law are set forth in more detail in the accompanying motion for class certification.

~~190.~~244.    A class action is the only practicable means by which the individual named Plaintiffs and the class members can challenge Defendant's unconstitutional actions. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

~~191.~~245.    The classes and subclass are so numerous that joinder of all members is impractical. The number of people in custody exceeds 500. Demographic data regarding the health of correctional populations, which is set forth above, indicates that the Medically Vulnerable Subclass consists of at least 50 of people (and likely many more).[109]

~~192.~~246.    There are questions of law and fact common to all class members and the subclass, including, among many others:

    a.  Do the Jail's conditions create a substantial risk that the people in its custody will be infected with COVID-19?

---

[108] *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last reviewed Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[109] A sizeable percentage of the jail population is likely medically vulnerable to COVID-19. According to one study, "asthma prevalence is 30%–60% higher among individuals with a history of incarceration as compared with the general population." Elizabeth M. Vigilanto et al., *Mass Incarceration and Pulmonary Health: Guidance for Clinicians*, 15 Ann. Am. Thoracic Soc. 409, 409 (2019). Another study estimates that up to 15% of people who are in custody have asthma, 10% of people in custody live with a heart condition that requires medical care, 10% live with diabetes, and 30% have hypertension. *See* Laura M. Marushack et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept. of Justice (2014).

    b.   Do the Jail's conditions create a substantial risk that the people in its custody who are infected with COVID-19 will face serious illness, long-term physical damage, or death?

    c.   If Defendant McDonough acting with deliberate indifference to these risks?

    d.   Is the risk of harm posed by the Jail's conditions so severe and so immediate that the only adequate remedy is release?

193.247.    The claims of the class representatives are typical of the claims of the classes and of the subclass.  That typicality stems from their claim that Defendant McDonough has placed them at significant risk of serious harm by failing to take appropriate steps to address the risk of COVID-19 in the Jail.  Every person at the Jail faces a heightened risk of risk of contracting COVID-19 and facing serious illness, physical injury, or death if Defendant does not adequately protected them.

194.248.    The claims of the Medically Vulnerable Subclass representatives are typical of the subclass members as well, as each member is subject to increased risk of substantial harm or death due to their existing medical conditions.

195.249.    The individual named Plaintiffs will fairly and adequately represent the interests of the classes and subclass. The named Plaintiffs have no conflicts with the unnamed members of the proposed classes. In addition, their lawyers are experienced in federal court civil rights class actions, particularly those involving prisons and jails.

196.250.    Defendant McDonough has failed to act in a manner that applies generally to the classes and subclass as a whole, rendering class-wide injunctive and declaratory relief appropriate.

## COUNT I
### 42 U.S.C. § 1983 (on behalf of all Class members)
### Eighth and Fourteenth Amendments: Jail Conditions

197.251.          Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

198.252.          Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendant of their rights under the Eighth and Fourteenth Amendments to reasonably safe living conditions. Defendant McDonough is aware of the substantial risk of harm that COVID-19 poses to all individuals, and she is further aware of the particular risks of severe illness and possible death that Plaintiffs face as a result of the conditions in the Prince George's County Jail.  Despite this knowledge, Defendant has failed to take reasonable measures to mitigate these dangers.

199.253.          As a result of Defendant's actions and inactions, class members face a substantial risk of contracting COVID-19 and sustaining a serious illness that could lead to death.

200.254.          Defendant's failure to take appropriate steps to curb the substantial threat posed by COVID-19 to each person in his custody, as described more fully above, violates Plaintiff's rights to unreasonable risk of death and bodily harm.

201.255.          Consequently, Defendant is in continuous violation of these Plaintiffs' rights and the rights of the members of the subclasses under the Eighth and Fourteenth Amendments to the United States Constitution.

202.256.          Plaintiffs seek injunctive and declaratory relief against Defendant McDonough to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

**COUNT II**
**42 U.S.C. § 1983 (on behalf of all Class members)**
**Fourteenth Amendment: Overdetention**

~~203.~~257.      Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

~~204.~~258.      Defendant's policy of detaining COVID-positive people in the Jail who are legally entitled to release violates the Fourteenth Amendment.

~~205.~~259.      As a result of Defendant's actions and inactions, class members face a substantial risk of harm in the form of unlawful detention.

~~206.~~260.      All members of both classes are actively seeking to be legally entitled to release, whether by paying bail, acquittal, early release, or some other means. All are at imminent risk of contracting COVID-19. If these class members become legally entitled to release and test positive for COVID-19, the Jail may detain them beyond the date at which they are entitled to release.

~~207.~~261.      Plaintiffs seek injunctive and declaratory relief against Defendant McDonough to prevent the violation of the rights of Plaintiffs and the classes they represent.

**COUNT III**
**Petition for Writs of Habeas Corpus Pursuant to 28 U.S.C. § 2241**
**(on behalf of Medically Vulnerable Subclass)**

~~208.~~262.      Medically Vulnerable Petitioners repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

~~209.~~263.      Medically Vulnerable Petitioners are not in custody pursuant to a judgment of conviction of a state court. They are all pretrial detainees, presumed innocent.

210.264.    Respondent McDonough is holding Medically Vulnerable Petitioners in custody in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

211.265.    Due Process forbids exposing Petitioners to a severe risk of death, pain, or permanent severe injury, and there are presently no options available to mitigate that risk quickly enough to protect them other than immediate release from custody.

**COUNT IV**
**42 U.S.C. § 1983 (on behalf of all Class members)**
**Eighth and Fourteenth Amendments: Solitary Confinement**

266.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

267.    Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendant of their rights under the Eighth and Fourteenth Amendments to reasonably safe living conditions.

268.    Defendant McDonough is aware of the substantial risk of psychological and physiological harm that the Jail's indefinite lockdown policy imposes on prisoners but has kept the policy in place for months with no plan to end it. Moreover, Defendant has done so despite the availability of other, more effective means of enacting social distancing.

269.    As a result of Defendant's actions and inactions, class members face a substantial risk of psychological and physiological harm.

270.    Consequently, Defendant is in continuous violation of these Plaintiffs' rights and the rights of the members of the subclasses under the Eighth and Fourteenth Amendments to the United States Constitution.

271.     Plaintiffs seek injunctive and declaratory relief against Defendant McDonough to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

**COUNT V**
**42  U.S.C. § 1983 (on behalf of all Class members)**
**Fourteenth Amendment Due Process: Solitary Confinement**

272.     Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

273.     Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendant of their state-created liberty interests under the Fourteenth Amendment without due process.

274.     Despite the Jail's policies by which a prisoner may normally challenge his placement in solitary confinement conditions, prisoners at the Jail have been placed in such conditions for months and for an indefinite time period.

275.     These conditions constitute an atypical and significant hardship relative to the ordinary incidents of prison life.

276.     The Jail lacks any process for determining whether a particular detainee must be placed in these conditions or when these conditions, as a general matter or in a particular housing unit, may end.

277.     Consequently, Defendant is in continuous violation of these Plaintiffs' rights and the rights of the members of the subclasses under the Fourteenth Amendment to the United States Constitution.

278.     Plaintiffs seek injunctive and declaratory relief against Defendant McDonough to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the classes they seek to represent, request that this Court enter judgment in their favor and against Defendant McDonough and order the following relief:

a.  Issue a temporary restraining order, preliminary injunction, and final judgment for all Class members requiring Defendant McDonough to implement constitutionally sufficient procedures to protect their health and safety that are consistent with CDC guidelines and the expert judgment of correctional health specialists, including but not limited to:

   i.  Effectively communicate to all prisoners, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures to reduce the risk of transmission, and any other information necessary to reasonably ensure that these individuals are aware of what precautions they can take to prevent infection;

   ii.  Ensure that each prisoner receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day; (2) tissues, and (3) adequate access to a supply of cleaning and disinfectant products effective against COVID-19 to allow for cleanings of frequently-touched surfaces several times per day;

   iii.  Clean and disinfect frequently-touched surfaces in common areas several times per day, including phones;

   iv.  Waive all fees for sick call for the duration of this pandemic;

   v.  Provide adequate medical care to prisoners, whether because of COVID-19 symptoms, chronic health conditions, or any other medical issue;

vi.    Create and enact social distancing policies that allow for adequate spacing of six feet or more between prisoners;

vii.    Ensure that prisoners have adequate access to phones to contact counsel and/or family members such that prisoners need not congregate at the phones;

viii.    Provide appropriate Personal Protective Equipment (PPE) to prisoners and Jail staff according to the CDC's recommendations, and receive appropriate instruction about how to don and doff it;

ix.    End preemptive lockdown procedure in general population and instead impose appropriate time-limited quarantines, with that time limit clearly communicated to prisoners, only when necessary due to a known or suspected case of COVID-19, as recommended by medical and public health professionals;

x.    Implement appropriate quarantining and medical isolation procedures as recommended by the CDC Guidance;

xi.    To the extent a prisoner must enter lockdown or isolation to effectuate an appropriate quarantine or medical isolation procedure, provide appropriate mental health services, and, if that prisoner has a mental health condition, provide enhanced psychological services in these circumstances;

xii.    Provide appropriate mental health services to all prisoners;

xiii.    Ensure that isolation, cohorted isolation, and quarantine cells are reasonably clean and sanitary, and that prisoners in them receive adequate medical monitoring, adequate hygiene products, reading material, reasonable access

to phones, a daily change of clothes, and the opportunity to shower once daily;

xiv.   Immediately create and implement a plan that complies with CDC Guidance to minimize transmission to and provide adequate medical monitoring and care to prisoners who are medically vulnerable to COVID-19;

xv.   Immediately end the policy and practice of detaining COVID-positive people in the Jail who are legally entitled to release.

b.   To the extent it is necessary to ensure constitutionally sufficient procedures or to protect certain prisoners' constitutional rights, order Defendant McDonough to transfer prisoners to home detention or another appropriate facility;

c.   Order immediate release pursuant to a writ or writs of habeas corpus for members of the Medically Vulnerable Subclass;

d.   If this Court does not immediately release the Medically Vulnerable Subclass, consider subclass members for release on non-monetary bond pending the outcome of their request for habeas relief;

e.   Issue an order and judgment granting reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 28 U.S.C § 2241; and

f.   Grant such other relief as this Court deems just and proper.

Dated: ~~April 21~~July 3, 2020 ~~———————————, 2020——————~~ Respectfully submitted,

~~By  s/Elizabeth Rossi~~
~~——— Elizabeth Rossi~~

Bar No. 19616
Katherine Chamblee-Ryan
*application to the Bar of this Court pending*
Olevia Boykin
*application forthcoming*
Ryan C. Downer
*application pending*
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
katie@civilrightscorps.org
610-931-7715

Attorneys for Plaintiffs

By:        s/Katherine Chamblee-Ryan
           Katherine Chamblee-Ryan (*pro hac vice*)
           Olevia Boykin (*pro hac vice*)
           Ryan Downer (*pro hac vice*)
           CIVIL RIGHTS CORPS
           1601 Connecticut Ave. NW, Suite 800
           Washington, DC 20009
           katie@civilrightscorps.org
           Phone: (610) 931-7715

           Edward Williams (Bar No. 20944)
           Cadene Russell Brooks (*pro hac vice*)
           WILMER CUTLER PICKERING
           HALE AND DORR LLP
           1875 Pennsylvania Avenue NW
           Washington, DC 20006
           ed.williams@wilmerhale.com
           Phone: (202) 663-6487

           *Attorneys for Plaintiffs*

**Certificate of Service**

I, ~~Elizabeth Rossi~~Katherine Chamblee-Ryan, an attorney, hereby certify that on ~~April 21~~July 3, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system. I further certify that I, or another one of Plaintiffs' attorneys, will promptly serve a copy of the same on General Counsel for the Prince George's County Department of Corrections' Office via email.

~~/s/Elizabeth Rossi~~

/s/Katherine Chamblee-Ryan