```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF MARYLAND

 3                         SOUTHERN DIVISION

 4

 5  KEITH SETH, et al.,           ) CIVIL ACTION
                                  ) NO. PX-20-1028
 6           Plaintiffs,          )
                                  )
 7  v.                            )
                                  )
 8  MARY LOU McDONOUGH,           )
                                  )
 9           Defendant.           )

10                    TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE PAULA XINIS
11                   UNITED STATES DISTRICT JUDGE
                  FRIDAY, APRIL 16, 2021; 10:35 A.M.
12                       GREENBELT, MARYLAND

13  FOR THE PLAINTIFFS:

14           WILMERHALE
             BY:  EDWARD HENDERSON WILLIAMS, II, ESQUIRE
15           1875 Pennsylvania Avenue NW
             Washington, DC  20006
16           (202) 663-6487
                   -and-
17           CIVIL RIGHTS CORPS
             BY:  ELLORA THADANEY ISRANI, ESQUIRE
18           BY:  KATHERINE CHAMBLEE RYAN, ESQUIRE
             1601 Connecticut Avenue
19           Suite 800
             Washington, DC  20009
20           (610) 931-7715

21

22
    OFFICIAL COURT REPORTER:
23  Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

24    ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

25
```

```
 1   APPEARANCES (Continued):

 2   FOR THE DEFENDANT:

 3          PRINCE GEORGE'S COUNTY OFFICE OF LAW
            BY:  SHELLEY LYNN JOHNSON, ESQUIRE
 4          BY:  ANDREW J. MURRAY, ESQUIRE
            1301 McCormick Drive
 5          Suite 4100
            Largo, Maryland  20774
 6          (301) 952-4347
                 -and-
 7          MAYNARD COOPER GALE PC
            BY:  STEPHEN CLARENCE ROGERS, ESQUIRE
 8          BY:  WILLIAM LUNSFORD, ESQUIRE
            655 Gallatin Street
 9          Huntsville, Alabama  35801
            (256) 551-0171
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE DEPUTY CLERK:  Good morning, Your Honor.  Can you

2    hear me all right?

3          THE COURT:  Yes.  Can you hear me?

4          THE DEPUTY CLERK:  Yes, we can.

5      The United States District Court for the District of

6    Maryland is now in session.  The Honorable Paula Xinis

7    presiding.

8      The matter now pending before the Court is Civil Action

9    No. PX-20-1028, *Keith Seth, et al. vs. Mary Lou McDonough*.  The

10   matter comes before this Court for a status conference.

11     Counsel, please identify yourselves for the record.

12         MR. WILLIAMS:  Ed Williams for Plaintiffs, Your

13   Honor.

14         MS. CHAMBLEE RYAN:  Katie Chamblee Ryan for the

15   Plaintiffs, Your Honor.

16         MS. ISRANI:  Ellora Israni also for the Plaintiffs,

17   Your Honor.

18         MR. MURRAY:  Good morning, Your Honor.  Andrew Murray

19   on behalf of the Defendant.

20         MS. JOHNSON:  Good morning, Your Honor.  Shelly

21   Johnson on behalf of the Defendant.

22         MR. LUNSFORD:  Good morning.  Bill Lunsford on behalf

23   of the Defendant.

24         MR. ROGERS:  And, Your Honor, this is Stephen Rogers

25   for the Defendant.  Good morning.

1          THE COURT:  Okay.  Good morning.  And I do see that

2    we have the public access line open.  All are welcome.

3          Anyone on the public access line, I just remind you that

4    we are holding this proceeding as if we were -- are in physical

5    court, so that means mind the same courtroom decorum: no

6    interruptions and absolutely no independent recordings of this

7    proceeding.  There is only one official transcript of today,

8    and that is the one taken by our official court reporter,

9    Ms. Ewing.

10          Ms. Ewing, if, at any point, you cannot hear us or we are

11   misbehaving and talking over one another, just let me know and

12   we will fix the problem.

13          All right.  Counsel, it's my understanding, from

14   Magistrate Judge Sullivan, that, despite months of efforts,

15   this case has not settled, and so it is back to me to discuss

16   next steps.

17          Let me tell you globally, I have concerns about what this

18   case, now ten months after the last time we talked, looks like.

19   The -- I reread the amended complaint, and I think it's

20   probably an understatement that things have probably changed

21   even on some very fundamental levels, like who, among the named

22   plaintiffs, are still detained and how are we to proceed in

23   that regard?

24          I really do caution you all that, for everyone's sake,

25   the detainees, the system, it really does need some hard looks

1    at what is the most efficient way to secure detainees' safety,

2    and I am not convinced you all are doing that.  You know, when

3    I look at other state detention facilities that have managed to

4    go from suit to settlement in record time, I have grave reserve

5    that this case has been -- and I am not looking at anybody in

6    particular so don't think I am casting side eye to one versus

7    the other -- but that this case has not necessarily been

8    litigated efficiently, so I want to talk to you about next

9    steps.

10         What I'd like to start with is actually the facility, the

11   defense counsel, if you could proffer to me some basics about

12   what's going on in the facility regarding COVID, because I have

13   to tell you, you know, I read the New York Times article that I

14   bet all of you did, too, claiming to capture every positive at

15   every detention and prison facility in the United States for

16   the course of the pandemic, and they put the Prince George's

17   County Detention Center at a total of 36, so that's a very low

18   number when you consider the life of the pandemic being, you

19   know, over a year, but I know that that is just a data point

20   and it doesn't necessarily capture what's going on globally.

21         What I'd like the Defense to do is put yourself in the

22   position of your corporate designee deponent, that's how tight

23   I want this information to be, I want it to be as good and as

24   solid as you have it on some of the real safety basics, what

25   does the facility look like right now with regard to testing

1   protocol, positives, vaccinations?  What's your sanitation

2   protocol, housing, as well as individual PPE, as we call it?

3   How are you housing people?

4        There was much made in the beginning of this case, I

5   think I even have a proposed Amici brief on using isolation as

6   a technique, how has the detention center, if at all, dealt

7   with that?

8        Then I will turn to the Plaintiffs to hear about what the

9   status of their individual plaintiffs are and the status of the

10  case.

11       So, with that, who wants to speak on behalf of the

12  Defendants and give me the current state of affairs at the

13  facility?

14            MS. JOHNSON:  I will, Your Honor, Shelley Johnson.

15            THE COURT:  Okay.

16            MS. JOHNSON:  Just to start you out with some basic

17  statistics of where we are today, we have a jail population of

18  741.  We have vaccinated 241 inmates.  We have -- 141 have been

19  vaccinated with the first dose of Moderna.  82 have already

20  received the second dose.  We have 50 inmates who, prior to the

21  re-call or the stoppage, received the Johnson & Johnson

22  medication.  That has not -- we have not used that since we

23  have been alerted about that.

24       The second dose for those who have gotten the Moderna is

25  going to be next week, and we have offered the vaccine to all

1   105 chronic care detainees.  68 of those have elected to be

2   vaccinated.  37 declined.

3          We do testing -- the chronic care inmates are tested,

4   last testing on April 9th, and we had -- the next testing date

5   is April 23rd.

6          We had one positive chronic care.  He exhibited mild

7   symptoms and has recovered.

8          The current --

9          THE COURT:  The one positive, Ms. Johnson, when was

10  that?

11         MS. JOHNSON:  When did he test positive?

12         THE COURT:  Yes.

13         MS. JOHNSON:  He test positive in the March -- the

14  March -- the March chronic care --

15         THE COURT:  Testing?

16         MS. JOHNSON:  -- testing.

17         THE COURT:  Do you test twice a month?

18         MS. JOHNSON:  Twice a month for chronic care, twice a

19  month.  We also test -- we also test all -- because we have

20  resumed work detail --

21         THE COURT:  Okay.

22         MS. JOHNSON: -- and so all those detail workers get

23  tested twice a month as well.

24         THE COURT:  And when you say "detail workers," you

25  mean detainees and inmates who are moving around in the

1  facility to kitchen, laundry, things like that?

2          MS. JOHNSON:  Correct, Your Honor.  We have increased

3  the cohorts to 20, and they are getting out a little bit --

4  they are getting out for two hours now instead of one hour, and

5  that's on a rotating basis.  They do get -- those 20 do get a

6  chance to go outside and use the outside rec., and then they

7  also rec. in the common areas as well.

8          THE COURT:  So, when you say "20 cohorts," you mean

9  in a pod, there are 20 detainees, and there are how many to a

10 cell?

11         MS. JOHNSON:  There are two to a cell.

12         THE COURT:  Okay.  With two hours on a rotating basis

13 of outside time?

14         MS. JOHNSON:  The housing unit populations vary, Your

15 Honor.

16         THE COURT:  Okay.

17         MS. JOHNSON:  Okay?  So in the cohort has been --

18 used to be 10, 10 detainees were released out for one hour on a

19 rotating basis.  They go all the way through for 24 hours.  We

20 have increased our cohort to 20 and we increased the time that

21 they are out of their cell to one to two hours.

22     We have -- currently, we have two detainees that tested

23 positive.  They were detected in intake and they are in

24 quarantine.

25         THE COURT:  When were those?

1          MS. JOHNSON:  That was April 1st.

2          THE COURT:  Okay.

3          MS. JOHNSON:  We have -- we did -- yeah.  And we also

4     test ten percent of all the -- on a monthly basis, ten percent

5     of the jail population to see if we have COVID in the housing

6     units.  All of that came back negative.  That -- the last

7     testing was April 1st.  The last testing of inmate workers was

8     April 8th, and all of those were negative.

9          THE COURT:  Are you -- let me ask you this while we

10    are sort of deep in the weeds on testing:  Do you have a

11    Department of Health consultant that you are working with

12    either at the county or the state level?

13         MS. JOHNSON:  Yes.

14         THE COURT:  Okay.  And how long has that been in

15    place?

16         MS. JOHNSON:  I am not quite sure, Your Honor,

17    exactly how long that's been in place.  I know that we have

18    been working very closely with them, especially trying to get

19    -- make sure that we have a steady supply of vaccine coming to

20    the jail -- coming to the county in all, and, so, now we are,

21    you know, with -- the PPE supplies has been the same.  They are

22    getting masks twice a week.  If a mask is soiled, they get to

23    -- they ask for a new mask and they get that.

24         Cleaning supplies are delivered to the -- to the housing

25    units, adequate supply of hand sanitizer, Spray 9.  Inmates are

1   encouraged and are told to clean their individual cells.  Now

2   that we have detail workers, they clean the main areas and the

3   telephones.  As last reported, all telephones are working.

4   They still get three free phone calls.  That is still in

5   progress.

6        And, oh, I forgot to tell you, to encourage and try to

7   encourage vaccination, we -- the director has given the

8   detainees an incentive of encouraging them to give them $10 in

9   their commissary if they elect to be vaccinated.

10        THE COURT:  Is there any education provided regarding

11   vaccinations in like a Q and A, fact sheets, things like that?

12        MS. JOHNSON:  Well, yes.  All inmates are -- are

13   educated as to what the vaccine is and what the -- what are the

14   possible side effects of the vaccine.  They are encouraged to

15   ask questions.  And that's why some have not -- elected not to

16   take it right now.

17        We are hoping that -- we haven't had any inmates report

18   any, you know, major side effects from the vaccine, so what we

19   are hoping is that the inmates that have elected not to take

20   the vaccine see those inmates that have been vaccinated, seeing

21   that they are okay, they are not suffering any side effects,

22   and then they will change their mind.

23        So, nurses are still doing symptom checks daily, so they

24   go to each housing unit doing symptom checks daily and they ask

25   the inmate if they would like the vaccine.  If they tell them

1   during that symptom check that they would like the vaccine, the

2   nurse notes that on her sheet, and those -- that list -- those

3   list of inmates are gathered and then they are offered the

4   vaccine.  So symptom checks are still happening every day in

5   every housing unit.

6           THE COURT:  Over the course of the last year, the

7   positives that have been detected, have they been detected --

8   like, give me the break down of mostly on intake while they are

9   in the unit, and then what you do once you detect a positive?

10          MS. JOHNSON:  Okay.  Most of the positives have been

11  found in intake.  And immediately upon -- and intake, they are

12  in a separate housing unit.  They are not released from that

13  unit until we get a, you know, results from the COVID test.  So

14  those who are testing positive, one, if they are in a cell with

15  someone, that other person is checked again.  If their test is

16  negative, they get retested to make sure that that's not a

17  false negative, and we still keep that person quarantined

18  because they have been exposed.

19      The one that is positive is immediately transferred to

20  the medical isolation unit and they are put in an isolation

21  cell and they are monitored for their symptoms.

22      We have been very fortunate that none of the detainees

23  have suffered any serious symptoms.  We still have not had to

24  transfer any inmate or detainee out of the facility to a

25  hospital, and we definitely have not had any detainees succumb

1    to any -- to COVID-19.  So we have been very, I say lucky in

2    that point, and the nurses have been very diligent in checking

3    on inmates, so that is -- that is the process.

4          So they are quarantined for 14 days.  Even though the CDC

5    has lowered that time frame, the -- Dr. Meske still would like

6    to make sure, before introducing that inmate into a housing

7    unit, they are re-tested at the end of the quarantine period.

8    Upon a receipt of a negative test, that inmate is then assigned

9    to a housing unit.

10         And testing in the housing unit, if a inmate is found

11   positive in that housing unit, they are -- again, their

12   cellmate is tested, the cellmate is quarantined, the inmate

13   that tests positive is transferred to the medical unit and put

14   into an isolation cell and quarantined.  That cellmate is

15   re-tested to make sure that there isn't -- to make sure if it's

16   negative, to make sure it's not a false negative.  We had

17   sometimes -- sometimes we have had cellmates who did become --

18   who were negative and stayed negative, fortunately, and we have

19   had sometimes where cellmates have been found positive.

20         We also have to test the cohort that those cell -- those

21   inmates are part of, and we test them.

22              THE COURT:  And you do that immediately upon --

23              MS. JOHNSON:  We do that.  Yes, we do that.  That's

24   why we keep the cohorts, and we haven't really -- we have been

25   really slow to expand that because we have seen -- and

1    Dr. Meske will tell you that the -- using the cohorts and

2    limiting the movement has been the real success in keeping the

3    infection rate very low in our facility.  And so -- and the

4    inmates understand that.  I mean, they don't like it.  No one

5    likes it, unfortunately, but that's the reality of the

6    situation.  We have to make some really tough choices.

7              THE COURT:  When you say "cohort," I just want to

8    make sure I get it, Ms. Johnson, you mean, in each of the

9    housing units, those detainees who are assigned to that housing

10   unit are considered a cohort?

11             MS. JOHNSON:  Yes.  In the housing unit, there is --

12   it's broken down even to smaller groups.

13             THE COURT:  Okay.

14             MS. JOHNSON:  So, you know, the housing unit may have

15   90 inmates or detainees in the unit.  That unit is then -- at

16   first, it was broken out into groups of ten.  That ten was a

17   cohort.

18             THE COURT:  Okay.

19             MS. JOHNSON:  So now we expanded to 20.  We would

20   like to expand it more, but, right now, we want to maintain the

21   status quo and make sure that we have things under control.

22             THE COURT:  And it is the 20 in the cohort who are

23   allowed to be in the common area two hours on a rotating basis?

24             MS. JOHNSON:  Yes.

25             THE COURT:  20, 20, 20, 20, 20, 20, am I getting that

1   right?

2           MS. JOHNSON:  Yes.  And it just keeps going.

3           THE COURT:  And there is cleaning in between?

4           MS. JOHNSON:  Yes.  There is cleaning in between.

5   You know, we have, you know, with the work -- because each

6   housing unit has their own little work detail assigned to that

7   unit, so in between, that work detail wipes down the tables,

8   wipes down the railings, wipes down the phones.  There is also

9   sanitation wipes or Spray 9 and paper towels by the telephones,

10  so the inmates are encouraged and instructed repeatedly to wipe

11  down the phones in between each use.

12          THE COURT:  Okay.

13          MS. JOHNSON:  And they also have provided any

14  materials they request to clean their cells.

15          THE COURT:  I am getting a better picture.

16      What else, Ms. Johnson, do you think it's important for

17  me to know before I turn to -- in terms of the state of things

18  at the facility before I turn to the Plaintiffs?

19          MS. JOHNSON:  The only thing else I would say is that

20  DOC is still trying to increase inmates' ability to connect

21  with their families.  We are trying to do, you know, iPads,

22  that stuff is in the works.  Of course, with COVID and getting

23  the vaccine and getting testing is the priority, so financing

24  and stuff like that makes some things, you know --

25          THE COURT:  So let me ask you, with regard to that,

1  what is the state of visitation, both attorneys and families?

2          MS. JOHNSON:  Attorneys can visit.  Families, I don't

3  believe -- we have not started that yet, but attorneys can

4  visit their -- their clients.  We also have a -- DOC has a

5  designated person, if that attorney needs to do a video

6  conference with their client and does not feel comfortable

7  coming to the jail, there is a person who is designated to

8  receive that -- that request and to facilitate that to make

9  sure that happens.  So we are constantly doing that.

10         I know Plaintiffs, we had an issue with one of their

11 telephone numbers and we quickly addressed that within a day,

12 not even a full day, and got that cleared up so that they had

13 communication with their clients.  So I think that, you know,

14 all in all, I think the facility has done very well.

15         The numbers of positive has steadily gone down even

16 though, you know, the -- the -- outside in the community,

17 sometimes it hasn't, so I think we have gotten a handle on it.

18 It's not perfect.  Nothing can be perfect with this pandemic,

19 but they are continually trying and resizing and looking at it

20 and trying to respond to the inmates and the CDC and

21 everybody's needs.

22         THE COURT:  So one other follow-up question with

23 regard to connection between detainees and their families or

24 the outside world, now that, you know, knock on wood, we are

25 getting control of the pandemic as a community, what is the

1 next step to get either visitation started back up or virtual

2 visitation, just very concretely so I understand what the

3 facility is planning?

4          MR. LUNSFORD:  Your Honor, this is Bill Lunsford.

5 And I don't mean to have two speakers at one time, but I did

6 want to add this, and I know Ms. Johnson can talk a little bit

7 about a piece of this, but I did want to tell you that one of

8 the things we are looking at is what other systems are doing.

9 So, for example, we know, for a fact, Pennsylvania, I have had

10 communications with a variety of different general counsels of

11 different Departments of Corrections, and so, for example,

12 New Jersey is about to open up visitation.  I know, for

13 example, Colorado is not.

14          There is a lot of discussion going on among correctional

15 systems collaboratively about do we test -- there are some

16 systems that have opened up testing.  I know there is another

17 system in the Northeast that is doing -- that has implemented a

18 virtual visit for certain housing units, and there is a smaller

19 jail that is trying to incentivize vaccination by giving

20 individuals virtual visits once they are vaccinated and then

21 allowing -- that will lead into in-person visits, so they are

22 trying to find creative ways to encourage vaccination rates

23 among the population.

24          The one thing I can tell the Court is that, based on my

25 research on this issue of in-person visitation, is, for

1   example, I mean, Pennsylvania is one of the largest in the

2   system.  New York is in the process of implementing the

3   procedure.  They're estimated, based on my conversations with

4   their general counsel, they are looking to reopen visitation in

5   the summer, and there is not -- I don't believe there is a hard

6   date on that just yet, though they are shooting for as soon as

7   possible.

8         And, so, I think one of the things that we are doing is

9   trying to learn from what other systems are doing, and this is

10  what the director is asking some of the lawyers to help with is

11  to look at what other states are doing, look at how they are

12  implementing visitation, and I know we are trying to look in

13  creative ways to begin that because we know that's certainly

14  important to us just like it is to the detainee population and

15  their families, for that matter.

16        THE COURT:  Thank you.

17        So, in terms of you are doing the sort of informational

18  reconnaissance, anything else with regard to connecting the

19  families?

20        MS. JOHNSON:  Yes.  The director is really pushing,

21  and, actually, I believe that's part of the meeting that's

22  probably going on as we speak on the county executive level

23  about the increase of funds to get these iPads out and going.

24        We were in the process during this whole -- when this

25  pandemic hit of updating our -- our system, our electrical

1  system, our database, our security system, all of that, and so

2  that was being done, and so we wanted to make sure that was

3  done to make sure that whatever we purchased was compatible,

4  and so that is the process that we are in.

5      The director is pushing that.  She believes that that is

6  going to solve a lot of our problems with communication with,

7  you know, with their family members, mail.  All of that could

8  be easily solved with iPads, and she is -- that is her -- her

9  priority that she would like to get done.

10      THE COURT:  These would be iPads in the housing units

11  that are used by the detainees to communicate with the outside

12  world?

13      MS. JOHNSON:  Correct.  It would have a place -- it

14  would have a docking station in a housing unit and they would

15  have -- there would be a certain number of them, so they

16  would -- you know, they would have to be shared, they would

17  have a time limit on that, and that is all being thought of as

18  -- while the process of getting the money straight, but that is

19  -- the director would like to do that because she believes that

20  that will solve a lot of problems not just with just telephone

21  calls and entertainment and everything like that, and

22  education, will help the educational programs as well,

23  religious programs.  So she believes that that will solve a lot

24  of ills and would really alleviate a lot of stress within the

25  housing unit, and she understands that and she is trying her

1  very best.

2         When it comes to in person, one of the things that has

3  come up in discussion is, you know, trying to increase the

4  number of people who are vaccinated not just inside the jail

5  but inside the community to where everybody feels safe to

6  resume these types of things.

7         So I believe the first step would probably be they would

8  definitely -- you know, they would be more of a, you know,

9  behind glass, separate room, having to take temperatures and --

10  and ask for testing and everything before they come in there.

11  And, right now, the director is not comfortable with that since

12  she seems -- she feels comfortable that she has a grasp of the

13  infection in the facility and she does not want to do anything

14  to introduce anything else especially with that second strain

15  that is out there now.  She is very concerned about that.

16           THE COURT:  With regard to, and I understand that

17  applies to visitation, has there been any resumption of

18  programming within the facility?  Mental health treatment?

19  Educational programs?  What's going on with that?  There are a

20  number of, you know, other detention facilities in the country

21  struggling with how to provide those basic requirements to

22  detainees.

23         Where are you with that?

24           MS. JOHNSON:  Again, that comes down to volunteer --

25  I mean, because a lot of these programs, like the religious

1    program -- our religious programs and our educational programs

2    are run by volunteers and people -- outside contractors coming

3    into the facility, so we need to make sure that they are not

4    introducing the virus into our facility.

5         THE COURT:  Does that mean, Ms. Johnson, I just want

6    it very pointedly, does that mean no programming right now?

7         MS. JOHNSON:  No programming at this time.

8         THE COURT:  How about mental health treatment?

9         MS. JOHNSON:  Mental health treatment has been going

10   on.  We do have a psychologist, I believe, on site periodically

11   and that is part of what the nurses -- any detainee request to

12   see him, that is made, that information is forwarded to that

13   person, and they do come in and check on that inmate and have a

14   session with him.  I am not sure -- it all depends on what the

15   detainee needs.

16        THE COURT:  There is no other group counseling or

17   anything like that going on?

18        MS. JOHNSON:  No.

19        THE COURT:  Okay.  All right.  Anything else you wish

20   for me to know before I turn to the Plaintiffs?

21        MS. JOHNSON:  No, Your Honor.

22        THE COURT:  Okay.  All right.  Thank you.

23        Who is going to speak on behalf of the Plaintiffs?  And I

24   will give you a little bit of guidance where I am thinking --

25   where I am concerned is that I have an amended complaint that,

1   in the context of prison litigation, has some age on it, and

2   that I am, again, not sure do I have the same detainees who are

3   still detainees?  Do I have exhaustion issues?  Do I have

4   mootness issues that require some thought?

5        So, with that, if you could start there and then let me

6   know whatever you wish for me to know in addition, that would

7   be great.

8             MR. WILLIAMS:  Ed Williams for Plaintiffs, Your

9   Honor.  Good morning.

10        The first, I think, that we want to address is I think

11  you asked a question about kind of the status of Plaintiffs.

12  With the exception of one John Doe who has been rearrested and

13  is back in the facility, the rest of the named plaintiffs are

14  no longer in the facility.

15        We, for reasons that we stated in our response to the

16  motion to dismiss, we don't believe this poses a mootness issue

17  under Supreme Court doctrine, *Geraghty*, etc., because the

18  motion for class certification was filed at the same time that

19  the original complaint was filed as a relation back exception,

20  more or less kind of specifically for this type of situation,

21  pretrial detainees who are inherently transitory.

22             THE COURT:  How about the conditions, though?  Like,

23  I will give you that if everything stayed status quo, I am not

24  really sure it matters whether you have one detainee or

25  another, like, that's an easier concept.

1          MR. WILLIAMS:  Sure.

2          THE COURT:  But looking at the amended complaint,

3    there was so many issues that now seem to at least be -- as

4    Ms. Johnson said, I don't think it's perfect, but it seems like

5    the concerns may have very well shifted in the last ten months.

6          Can you speak to that?

7          MR. WILLIAMS:  Sure.  We have given a lot of thought

8    to that.  First, there is a pending motion to dismiss, which we

9    read your initial note as a motions hearing so we are prepared

10   to discuss the motion to dismiss if the Court -- if that would

11   be helpful to the Court.

12         THE COURT:  Those motions have serious age on them

13   and they are giving me a lot of -- like, you know, we have got

14   so many issues, as do you, for each of our many, many, many

15   cases, I am not interested in wasting time and I am not --

16         MR. WILLIAMS:  I just wanted to offer it, Your Honor,

17   in case the Court wanted to discuss that further.

18         But our position -- and it may be important to just kind

19   of walk through each of the counts and where we think we are.

20   So, on the conditions claims, we are in a -- a verification

21   phase.  We think that, you know, that we want to continue to

22   pursue discovery process to make sure that we can verify the

23   things that Ms. Johnson has told the Court.

24         THE COURT:  That hasn't happened during the

25   settlement process?

1          MR. WILLIAMS:  Without getting -- without breaking

2   the Local Rules and getting too far into discussing

3   mediation --

4          THE COURT:  You don't have to tell me -- in your

5   view, no?

6          MR. WILLIAMS:  No.  On Count Two, on over detention,

7   we actually would like to voluntarily dismiss the over

8   detention claim, and we can do that either under Rule 41 or

9   Rule 15, whichever the Court prefers.  But we sent a note to

10  opposing counsel earlier this morning notifying them that we

11  would voluntarily dismiss that claim, and that is based on our

12  evaluation that we don't think that that is an issue that

13  continues to be a significant concern, so our -- to the

14  putative class, so we have evaluated that claim and decided

15  that's the best course of action.

16          On the solitary confinement claims, Your Honor,

17  unfortunately, based on Ms. Johnson's colloquy, a 22 and 2 is a

18  solitary confinement by the Department of Justice standards and

19  there are a couple of cases that cite that, so we continue to

20  believe that that is a significant concern, and those claims,

21  unfortunately, remain of deep concern to the putative class

22  members and to us.

23          On the habeas claims, we would -- if the Court were going

24  to pursue that motion to dismiss, we would have asked the Court

25  to reserve decision on the habeas claims because that issue has

1  been heard by the Fourth Circuit and is pending -- pending an

2  opinion and which will, you know, or at least we believe we

3  will know, unless the Fourth Circuit punts, what the status of

4  that particular legal question is.  So we are -- we are holding

5  ourselves to find out what the -- what the status is going to

6  be with respect to the habeas claims.

7       And then, you know, we are obviously thinking about the

8  voluntary cessation doctrine with respect to the conditions,

9  which kind of goes back to Count One, and we are giving some

10  thought to that and we are, you know, kind of evaluating that,

11  the voluntary cessation issues here.  So that's kind of a

12  status.  I think the --

13       THE COURT:  When you say "voluntary cessation," what

14  do you mean?

15       MR. WILLIAMS:  I'm sorry.  I didn't hear you, Your

16  Honor.

17       THE COURT:  When you say "voluntary cessation," what

18  do you mean?

19       MR. WILLIAMS:  Well, what we mean is that -- is

20  whether or not the changes that the jail have implemented have

21  been changes in response to litigation such that -- such that

22  if the litigation ended, they might not continue, that

23  doctrine, of course, would allow us to continue with this case

24  even if -- or at least our reading of the doctrine would allow

25  us to continue with this case even if there was voluntary

1   cessation.  So we are --

2          THE COURT:  The flip side of that, Mr. Williams, is a

3   mootness doctrine, right, is prudential mootness?

4          MR. WILLIAMS:  That's right, Your Honor.

5          THE COURT:  You know, and this is all by way of

6   saying have you all given any thought to -- you know, one is,

7   you know, spoiler alert, if you want me to defer on questions

8   of law because they are pending before the Fourth Circuit, I am

9   likely going to send you back to Judge Sullivan with the most

10  recent settlement order involving Chesapeake Detention Facility

11  which is a 13-page settlement order involving a state detention

12  facility that we, as the federal government, contract with.

13      I looked at it last night.  Seems like a pretty good

14  roadmap, a good place to start with regard to renewed efforts

15  to get this thing -- and what I mean by "this thing" for

16  anybody who is listening is this very, very important protocol

17  and system to protect the detainees in place by some consent,

18  whether you call it a consent decree or settlement.  That's the

19  best outcome.  And I think you would agree, Mr. Williams?

20         MR. WILLIAMS:  We do agree, Your Honor.  We actually

21  have reviewed the *Catchings* settlement ourselves and actually

22  were preparing to send it over to opposing counsel this

23  afternoon.  We wanted to have a bit of internal discussion

24  about how we would frame that conversation for opposing

25  counsel, but we are fully aware of the *Catchings* settlement.

1  We agree that it provides a good roadmap and we are preparing

2  ourselves to send an email to opposing counsel with our

3  discussion about it.

4       We think that one of the things that -- that might aid

5  the -- that might help the parties get closer is -- is it might

6  be resolution of the class certification motion.  I think that

7  it, one, goes to the -- kind of the Plaintiff mootness

8  inherently transitory problem that we are having, and I think

9  that, you know, it's the type of issue that might aid in --

10          THE COURT:  Can you explain -- explain what the

11  hiccup is.  Is the hiccup with whether this is capable of

12  class-wide resolution under the four prongs, or is the hiccup

13  that the landscape changes as the -- as the science changes, as

14  the conditions of confinement change?  Do you see my question?

15  Because the former, it seems like that's a -- that's a static

16  question, right?  The latter is the fluid one.  And I am just

17  not sure why you all are hung up on whether I am going to

18  certify a class.

19          MR. WILLIAMS:  Your Honor, I don't know if Plaintiffs

20  are in the best position to answer this question.  We have been

21  pursuing --

22          THE COURT:  You think it's Defense?

23          MR. WILLIAMS:  I just don't know if I can give a good

24  answer to you.  I mean, from our perspective, this is a

25  certifiable class as it was -- as stated in the class

1    certification, that it meets the four prongs of Rule 23, and

2    that the class should be certified for resolution.  So, that's

3    our position.  I don't know if that helps actually answer the

4    questions that I think you have.

5         THE COURT:  I just -- I asked it because you raised

6    that this was, it seems to me, a stumbling block, in your view.

7    I don't see it, I really don't.  It sounds -- frankly, you

8    know, I get a little bit jaded when it comes to class

9    litigation that sometimes there is a, you know, there is the

10   need outside of the needs of the case to have something branded

11   as a class certification, and I don't give in to those kinds of

12   concerns because, to me, the front and center should be what's

13   best for the detainees.

14        In that regard, you know, whether I resolve a motion or

15   not shouldn't be an impediment to you all coming to some

16   resolution if you can.  And if not, you know, my thought is we

17   really do need to have an honest conversation about what makes

18   the most sense from an efficiency standpoint?

19        So let me ask a very specific question.  Mr. Williams,

20   if, today, you all -- it doesn't sound like you are here, it

21   doesn't sound like anyone is throwing up hands and saying, "We

22   are done talking to one another about settlement," so -- but

23   assume we did, right, assume you were there, would you be

24   moving to amend the complaint to really focus in on what the

25   issues are in your view of deliberate indifference to the

1   health and safety, mental health, mental safety of the

2   detainees, or would you be going forward on the original -- on

3   the amended complaint that informed me?

4         MR. WILLIAMS:  I want to answer your question

5   directly, but I also want to answer your previous question

6   about class cert. just before we lose the issue, which is that

7   issue for us is about enforcement.  So that's actually --

8   that's the -- it's not extrajudicial outside of court issues,

9   it's a matter of enforcement concerns around the class.

10        THE COURT:  But if you come to a settlement that

11  involves that very issue, you memorialize it in settlement just

12  like they did in the CDF case, then why do you need me to do it

13  on a motion?  Do you see what I'm saying?  That's something you

14  all can negotiate so -- and the enforcement.

15        MR. WILLIAMS:  I agree, Your Honor.  I agree.  I am

16  not disagreeing with that at all.  I think, in certain ways,

17  you know, class certification can be stipulated to, it can be

18  -- there is no -- there is no need for you to make a ruling

19  necessarily if the parties could come together, if we could

20  stipulate to class certification, we could pursue it in

21  settlement.  I don't disagree with that at all, Your Honor.

22        THE COURT:  Okay.

23        MR. WILLIAMS:  And I will leave it there.

24        The -- on the question, Your Honor, about what we would

25  do if we had all thrown up our hands here -- and I agree, we

1   are not in a position where we are unwilling to continue to

2   talk.  In fact, the last statements I believe both sides made

3   was, you know, we are happy to continue talking, and that's why

4   we were going to send the settlement over this afternoon was to

5   continue the conversation.  But I think that where we are and

6   why we have -- you know, are no longer in mediation is because

7   we have been -- spent the last six months in mediation with no

8   opportunity to verify or conduct discovery as to what is

9   actually happening in the facility.

10          So, there are two, kind of, problems.  One is that if we

11   are going to -- how we would proceed if there were -- if we had

12   all thrown up our hands is we would be proceeding to conduct

13   some discovery to verify the things that Ms. Johnson has said

14   today, and then we would be reevaluating our -- whether or not

15   to voluntarily dismiss conditions claims on the basis of that

16   discovery.  That's -- you know, we are kind of in a trust but

17   verify position, at least that's how we view Plaintiffs'

18   position.

19          THE COURT:  Is that verification accomplished

20   informally?

21          MR. WILLIAMS:  We think that it's certainly possible

22   that has not been the case at this point in litigation.

23          THE COURT:  Well, maybe that will be a conversation

24   you all can have with each other and Judge Sullivan because I

25   have to say, the next step may very well be, and I am not

1    saying I am going to do this but it's in my brain, is that I
2    might be asking you all to brief mootness, prudential mootness.
3    Why am I considering an amended complaint that complains about
4    things which have been resolved at the expense of things that
5    maybe haven't?
6            You know, you raise a solitary confinement issue.  If
7    that's where we are right now in terms of the, you know, the
8    real rubber meets the road dispute about deliberate
9    indifference to the health and safety of the inmates, then
10   let's focus on that.  And I -- I have only scratched the
11   surface of how that might look, but it seems like everyone has
12   an incentive to avoid more briefing on a preliminary legal
13   question, but I am trying to avoid, you know, an amended
14   complaint that, in some ways, may be a bit outdated.
15           Ms. Chamblee Ryan, I am going to ask if you are texting
16   on your phone to do it outside of the camera shot because, just
17   like in court, it's really distracting.  No lawyer would have
18   their phones out in court, and I keep seeing it and it's
19   bothersome.  Can you do that offline?
20           MS. CHAMBLEE RYAN:  I apologize, Your Honor.  I was
21   just taking notes.
22           THE COURT:  Well, if you could take notes out of my
23   range, that would be great.
24           MS. CHAMBLEE RYAN:  Absolutely, Your Honor.  I
25   apologize.

1          MR. WILLIAMS:  Your Honor, I don't want to get ahead

2    of my skis on the prudential mootness question.  It's not

3    something I have spent enough time thinking about.

4          THE COURT:  Fair enough.

5          MR. WILLIAMS:  But I have some initial reactions but

6    I -- that you might not be surprised to find by just saying

7    whether or not that doctrine is applicable, but I think that --

8    I think that this is something that -- our view, Your Honor,

9    and we have -- we have made this, I think, as clear as we can,

10   that we are consistently evaluating our claims.  We are trying

11   to evaluate the situation with the facility as best we are or

12   have been able.  You know, and I think that there is -- I don't

13   think there is much more I can say without dipping into --

14         THE COURT:  No worries.

15         MR. WILLIAMS:  I want to be careful.

16         THE COURT:  That's fair.  And I appreciate that.  You

17   have been a very careful lawyer, and that's to your credit, so

18   no worries in that regard.

19        Okay.  Defendants, who can, just very quickly, respond to

20   the criticism that there have been lots of talk but not a lot

21   of demonstration that the things, you know, we have talked

22   about today have actually been accomplished?  I don't want to

23   get in the middle of settlement discussions, but there is a

24   question on the table where, if it comes back to me, what do I

25   do next?  And, at this point, I am going to have very old

1    motions, a request to go to formal discovery.  It seems to me

2    that there has already been a show and tell of some sort, or

3    can be, that would maybe help avoid a lot of heartache down the

4    road.  Who can respond to that?

5              MR. LUNSFORD:  Your Honor, this is Bill Lunsford.

6         And, Your Honor, to Mr. Williams' point and to be fair to

7    him, I think he accurately stated that, in the course of the

8    mediation proceedings, there was not a lot of discovery or

9    exchange of information went on.

10        Looking back on that, Your Honor, I don't think either

11   one of us -- I don't know that the Plaintiffs were necessarily

12   -- we were pushing in that direction, and it wasn't that the

13   County was saying you are not getting the information.

14        In terms of where we are, we certainly understand that

15   Plaintiffs have an obligation to their clients, counsel, they

16   have an obligation to their clients to confirm what we have

17   said, and I think there is a variety of different ways that

18   that can be done, and we are certainly open to that as long as

19   it occurs in an objective and fair way.  And that's been, you

20   know, our ongoing message, I will say, and I think it is today,

21   just like the Court will remember that Dr. Parides came in and

22   did an evaluation, and the Court relied on that.  Certainly, if

23   the plaintiffs want Dr. Parides to come back, I mean, that

24   would be something we would be open to.

25        As it relates to all the other issues, Your Honor, I

1   would say this, and I have to say this, and I really, I don't

2   know, I am convicted about this in this particular case because

3   of the interesting dynamic of COVID, which is, having done

4   correctional litigation for 20 years, I am not sure I have ever

5   seen an instance where a facility like the Prince George's

6   County facility, it demonstrates an incredible amount of

7   collaboration between both the detainees, Plaintiffs' counsel's

8   clients, and our clients.  The reason the infection rates are

9   so low is because everyone involved in that facility, from the

10  mental health staff all the way down to the incoming detainees,

11  have abided by the rules and done what they can to prevent the

12  spread of this.

13          And, so, there is a side of this on the County side which

14  is if we -- we have to be conscientious of the message that any

15  settlement sends to our clients in that they have done an

16  excellent job, in our opinion, and we really want to engage in

17  a process where the Plaintiffs can see that our officers, our

18  staff, even the folks who are on the cleaning -- even the

19  incarcerated individuals who are doing all of this cleaning and

20  working so hard to keep this facility safe, we want them to see

21  that.  And if there is a process by which we can get there, we

22  are certainly open to that because, Your Honor, I can sit here

23  and talk about motions and mootness and class certification and

24  all the fascinating legal issues that we can debate, but, to

25  me, to the Court's point, I don't think that does anything to

1    get us closer to resolving this case.

2         THE COURT:  Okay.  So then it isn't your position

3    that, you know, you don't think that -- Mr. Williams said that

4    part of the -- the holdup has been a formal certification of

5    the class, but, I mean, you would agree, if you come to a

6    decision on the merits, a settlement on the merits, that can be

7    incorporated in terms of enforcement.  And, you know,

8    Plaintiffs raised, as is often warranted -- it may not be

9    warranted in this case, I don't know yet -- how do we make sure

10   that the good collaboration continues when the case is

11   dismissed?  Right?

12        MR. LUNSFORD:  To your point on class certification,

13   first of all, I just say this is not necessarily the County's

14   position, but my position is class certification is

15   unnecessary.  It's complicated in part right now for a variety

16   of different reasons due to vaccinations and refusals, and I

17   don't have to get into why that complicates the certification

18   of class, but I will say this:  I don't think -- I think this

19   case can be settled as without a class and have the same

20   enforcement mechanisms so long as the County agrees to do the

21   things that are necessary for oversight.

22        I don't think the class certification provides any degree

23   of additional robustness in terms of oversight, and I think

24   that class certification could be consented to under the right

25   circumstances.  But I can't, obviously, discuss here what those

1   circumstances would be, but I just think, from our perspective,

2   Your Honor, to, maybe to make this very clear, we don't view a

3   decision on class certification as an impediment or as a

4   launching board towards some kind of resolution.

5           THE COURT:  I hear you on that, and you will all go

6   back and talk about that with Judge Sullivan, but I will say,

7   just from a 30,000-foot view, I am not even sure what the

8   issues are to certify when you think of on day one, there

9   wasn't even a hint of a vaccine, right?  And now we are day 400

10  and there is a whole substantive conversation about

11  vaccinations, right, and how they are being administered and

12  patient education and access, which you all know is part of the

13  CDF settlement package, right?  It's just a highlight to me of

14  where -- where I might confront significant difficulties if you

15  all come back and just say, Judge, let's just stay and resolve

16  the motions that are pending.  They are talking about a

17  different case.

18          And I will caution that that's not -- that I will be of

19  the mind that is not an efficient way of handling this matter.

20  I am not going to prejudge what that looks like because I don't

21  know when -- if you will come back to me.  You may come back

22  next week, you might come back three months from now, or not at

23  all, but just keep that in mind because, to me, that's a very

24  practical problem here.

25          Let me ask one other question about something that might

1    move you all, move the needle.  Sometimes, if the parties

2    agree, I can actually refer the case for discovery to a

3    magistrate judge.  Sometimes that referral can go to the same

4    judge, with all consent, as who is handling the settlement

5    discussions.  You don't have to answer me now.  You may want to

6    discuss that amongst yourselves and you may come to some

7    resolution on that because if the -- if the -- you know, you

8    might get there with the monitoring, you might not.  You know,

9    you might get there with someone going through the facility or

10   you might just get their documents or you might just get there

11   with a very targeted deposition.

12        I mean, I started this with Ms. Johnson, "Tell me what

13   your 30(b)(6) would say," and I did that on purpose because, as

14   a public institution, you have all the incentive in the world

15   to tell me the straight truth, right, and if it would just mean

16   that the Plaintiffs have some reassurance if you also had a

17   representative, who has some very targeted discovery questions,

18   to be deposed, that may be a way to do it.  I am not going to

19   get in the middle of that, but I do suggest you think long and

20   hard about giving Judge Sullivan some of that leeway and to be

21   reasonable, efficient, and get the verification that you all

22   need to -- to come to a resolution if that's -- if you are

23   able.  Right?  Does that make sense to everybody?

24        MR. WILLIAMS:  Yes, Your Honor.  For Plaintiffs, I

25   think that makes sense.  I, again, as the judge cautioned, I

1   just caution Your Honor we would want to discuss that

2   internally before making any statements affirmative or

3   otherwise.

4        I also -- I do think that our position at least with

5   respect to the class cert., I want to just raise it, and, you

6   know, for the record purposes, that we do think this is the

7   type of issue, the motion for class cert. is something that

8   should be resolved.  We don't think that vaccinations or

9   whether or not who has or has not been vaccinated changes the

10  scope of the -- of the -- of the facility, the obligations to

11  all the persons in the facility.  We would -- you know, and we

12  haven't seen anything in our monitoring of COVID cases to

13  suggest that vaccinations would change the who -- how the class

14  would be certified, but -- and we think that --

15            THE COURT:  I just don't understand that argument

16  when I am being told there is virtually, knock on wood, no

17  positives in the facility.  Right?  A couple were caught at

18  intake.  They were quarantined.  There was one in a housing

19  unit.  And, yet, when I read this complaint and where we were

20  at the first TRO that I granted, we had a serious test

21  positivity issue.  We had under testing.  It was -- it was a --

22  it's a remarkable difference in -- in even that basic -- you

23  know, I know you are talking about vaccines, but this whole

24  case started because we were so concerned that this population

25  was going to get COVID and -- and really have some serious

1  deleterious health effects, and we have been fortunate and it
2  sounds like that has not happened.  So how can the case not
3  have changed in some way?
4        MR. WILLIAMS:  I am not suggesting the case hasn't
5  changed, the substantive matter.  I think the question is
6  whether or not the safety elements of Rule 23 are still
7  satisfied with respect to all persons detained at the facility.
8  I think that that's the -- that's the only point I was making.
9        THE COURT:  But the Rule 23 -- but that inquiry
10  accepts that I will have common issues to resolve, they will be
11  typical of the class.  So it begs the question, I have to know
12  what the fundamental issues are that you are saying are
13  typical, and if -- if it's, you know, where it was on day one
14  is under testing and now that's not the deliberate indifference
15  issue at all, it's something else, then we have to resolve that
16  part of the case.  And, so, just marching headlong to class
17  certification on a case that, by the proffer I have heard
18  today, sounds so different than the one that came in doesn't
19  strike me as terribly efficient or fair.
20        MR. WILLIAMS:  There may be efficiency issues, Your
21  Honor, I agree, but I think that I would -- I don't want to --
22  again, I don't want to get too far along.  I think that this
23  may be -- you know, it's probably an issue that's going to be
24  worth briefing, but I do think that it is a challenge, that
25  this is a going-forward challenge, and so it would not surprise

1    me if we find ourselves back here, so I am kind of making the
2    statement for the record that if we find ourselves back on this
3    issue, I would not be surprised.
4              THE COURT:  On what issue, the certification?
5              MR. WILLIAMS:  On the certification issue.
6              THE COURT:  All right.  Well, then, think about what,
7    if anything, happens if I dismiss the amended complaint without
8    prejudice to re-file with direction that you re-file it based
9    on the status and that the parties think about that because
10   that's not a win for the Defendants.  It means, Defendants,
11   maybe you ought to be thinking about providing some discovery,
12   some evidence to the Plaintiffs so that we are not starting
13   this case over from scratch.  But I am not going to, you know,
14   litigate a case that looked very different ten months ago than
15   now and nor am I going to let the Defendants off the hook in
16   that regard, right?
17         So, it sort of makes sense for you all to talk about now
18   getting down and dirty into the discovery, I won't call it
19   discovery because I know that has all kinds of, like, oh, the
20   rules, and it seems like you could do this informally so that
21   the Plaintiffs have satisfaction that you are doing what you
22   are saying you are doing, you have a better sense of what the
23   case is and is not, and if you come back to me saying, "The big
24   sticking point is we need someone to say this is a class," you
25   know what the issues are that you are asking me to certify.

1  Okay?

2       So, with that, is there anything else that anybody else

3  wants to contribute before I keep the case in this posture that

4  it is and send you back to Judge Sullivan with the most recent

5  settlement order in the CDF case as your new jumping off point?

6          MR. WILLIAMS:  Nothing from Plaintiffs, Your Honor.

7  Thank you.

8          MR. LUNSFORD:  Nothing from the County, Your Honor.

9          THE COURT:  All right.  Thank you all for your time.

10  This has been helpful.  I will re-refer the case to Judge

11  Sullivan and let him know that you all will be back for renewed

12  discussions with him.  Okay.

13          MR. LUNSFORD:  Very good.  Thank you, Your Honor.

14       (The proceedings were concluded at 11:32 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Renee A. Ewing, an Official Court Reporter for

4    the United States District Court for the District of Maryland,

5    do hereby certify that the foregoing is a true and correct

6    transcript of the stenographically reported proceedings taken

7    on the date and time previously stated in the above matter;

8    that the testimony of witnesses and statements of the parties

9    were correctly recorded in machine shorthand by me and

10   thereafter transcribed under my supervision with computer-aided

11   transcription to the best of my ability; and that I am neither

12   of counsel nor kin to any party in said action, nor interested

13   in the outcome thereof.

14

15                    Renee A  Ewing
16                    _____

17                    Renee A. Ewing, RPR, RMR, CRR
                       Official Court Reporter
18                    April 21, 2021

19

20

21

22

23

24

25

## $

**$10** [1] - 10:8

## 1

**10** [2] - 8:18
**105** [1] - 7:1
**10:35** [1] - 1:11
**11:32** [1] - 40:14
**13-page** [1] - 25:11
**1301** [1] - 2:4
**14** [1] - 12:4
**141** [1] - 6:18
**15** [1] - 23:9
**16** [1] - 1:11
**1601** [1] - 1:18
**1875** [1] - 1:15
**1st** [2] - 9:1, 9:7

## 2

**2** [1] - 23:17
**20** [14] - 8:3, 8:5, 8:8, 8:9, 8:20, 13:19, 13:22, 13:25, 33:4
**20006** [1] - 1:15
**20009** [1] - 1:19
**202** [1] - 1:16
**2021** [2] - 1:11, 41:17
**20774** [1] - 2:5
**21** [1] - 41:17
**22** [1] - 23:17
**23** [3] - 27:1, 38:6, 38:9
**23rd** [1] - 7:5
**24** [1] - 8:19
**241** [1] - 6:18
**256** [1] - 2:9

## 3

**30(b)(6** [1] - 36:13
**30,000-foot** [1] - 35:7
**301** [2] - 1:23, 2:6
**344-3227** [1] - 1:23
**35801** [1] - 2:9
**36** [1] - 5:17
**37** [1] - 7:2

## 4

**400** [1] - 35:9
**41** [1] - 23:8
**4100** [1] - 2:5

## 5

**50** [1] - 6:20
**551-0171** [1] - 2:9

## 6

**610** [1] - 1:20
**655** [1] - 2:8
**663-6487** [1] - 1:16
**68** [1] - 7:1

## 7

**741** [1] - 6:18

## 8

**800** [1] - 1:19
**82** [1] - 6:19
**8th** [1] - 9:8

## 9

**9** [1] - 9:25, 14:9
**90** [1] - 13:15
**931-7715** [1] - 1:20
**952-4347** [1] - 2:6
**9th** [1] - 7:4

## A

**A.M** [1] - 1:11
**a.m** [1] - 40:14
**abided** [1] - 33:11
**ability** [2] - 14:20, 41:11
**able** [2] - 31:12, 36:23
**absolutely** [2] - 4:6, 30:24
**accepts** [1] - 38:10
**access** [3] - 4:2, 4:3, 35:12
**accomplished** [2] - 29:19, 31:22
**accurately** [1] - 32:7
**action** [2] - 23:15, 41:12
**Action** [1] - 3:8
**ACTION** [1] - 1:5
**add** [1] - 16:6
**addition** [1] - 21:6
**additional** [1] - 34:23
**address** [1] - 21:10
**addressed** [1] - 15:11
**adequate** [1] - 9:25
**administered** [1] - 35:11
**affairs** [1] - 6:12
**afternoon** [2] - 25:23, 29:4
**age** [2] - 21:1, 22:12
**ago** [1] - 39:14
**agree** [9] - 25:19, 25:20, 26:1, 28:15, 37:22

**28:25, 34:5, 36:2, 38:21
**agrees** [1] - 34:20
**ahead** [1] - 31:1
**aid** [2] - 26:4, 26:9
**aided** [1] - 41:10
**AIDED** [1] - 1:24
**al** [2] - 1:5, 3:9
**Alabama** [1] - 2:9
**alert** [1] - 25:7
**alerted** [1] - 6:23
**alleviate** [1] - 18:24
**allow** [2] - 24:23, 24:24
**allowed** [1] - 13:23
**allowing** [1] - 16:21
**amend** [1] - 27:24
**amended** [7] - 4:19, 20:25, 22:2, 28:3, 30:3, 30:13, 39:7
**Amici** [1] - 6:5
**amount** [1] - 33:6
**ANDREW** [1] - 2:4
**Andrew** [1] - 3:18
**answer** [6] - 26:20, 26:24, 27:3, 28:4, 28:5, 36:5
**apologize** [2] - 30:20, 30:25
**APPEARANCES** [1] - 2:1
**applicable** [1] - 31:7
**applies** [1] - 19:17
**appreciate** [1] - 31:16
**April** [6] - 7:4, 7:5, 9:1, 9:7, 9:8, 41:17
**APRIL** [1] - 1:11
**area** [1] - 13:23
**areas** [2] - 8:7, 10:2
**argument** [1] - 37:15
**article** [1] - 5:13
**assigned** [3] - 12:8, 13:9, 14:6
**assume** [2] - 27:23
**attorney** [1] - 15:5
**attorneys** [3] - 15:1, 15:2, 15:3
**Avenue** [2] - 1:15, 1:18
**avoid** [3] - 30:12, 30:13, 32:3
**aware** [1] - 25:25

## B

**based** [5] - 16:24, 17:3, 23:11, 23:17, 39:8
**basic** [3] - 6:16, 19:21, 37:22

**basics** [2] - 5:11, 5:24
**basis** [6] - 8:5, 8:12, 8:19, 9:4, 13:23, 29:15
**become** [1] - 12:17
**BEFORE** [1] - 1:10
**begin** [1] - 17:13
**beginning** [1] - 6:4
**begs** [1] - 38:11
**behalf** [5] - 3:19, 3:21, 3:22, 6:11, 20:23
**behind** [1] - 19:9
**believes** [3] - 18:5, 18:19, 18:23
**best** [7] - 19:1, 23:15, 25:19, 26:20, 27:13, 31:11, 41:11
**bet** [1] - 5:14
**better** [2] - 14:15, 39:22
**between** [6] - 14:3, 14:4, 14:7, 14:11, 15:23, 33:7
**big** [1] - 39:23
**Bill** [3] - 3:22, 16:4, 30:14
**bit** [6] - 8:3, 16:6, 20:24, 25:23, 27:8, 30:14
**block** [1] - 27:6
**board** [1] - 35:4
**bothersome** [1] - 30:19
**brain** [1] - 30:1
**branded** [1] - 27:10
**break** [1] - 11:8
**breaking** [1] - 23:1
**brief** [2] - 6:5, 30:2
**briefing** [2] - 30:12, 38:24
**broken** [2] - 13:12, 13:16
**BY** [7] - 1:14, 1:17, 1:18, 2:3, 2:4, 2:7, 2:8

## C

**camera** [1] - 30:16
**cannot** [1] - 4:10
**capable** [1] - 26:11
**capture** [2] - 5:14, 5:20
**care** [5] - 7:1, 7:3, 7:6, 7:14, 7:18
**careful** [2] - 31:15, 31:17
**case** [30] - 4:15, 4:18, 5:5, 5:7, 6:4, 6:10, 22:17, 24:23, 24:25,

**27:10, 28:12, 29:22, 33:2, 34:1, 34:9, 34:10, 34:19, 35:17, 36:2, 37:24, 38:2, 38:4, 38:16, 38:17, 39:13, 39:14, 39:23, 40:3, 40:5, 40:10
**cases** [3] - 22:15, 23:19, 37:12
**casting** [1] - 5:6
**Catchings** [2] - 25:21, 25:25
**caught** [1] - 37:17
**caution** [3] - 4:24, 35:18, 37:1
**cautioned** [1] - 36:25
**CDC** [2] - 12:4, 15:20
**CDF** [3] - 28:12, 35:13, 40:5
**cell** [7] - 8:10, 8:11, 8:21, 11:14, 11:21, 12:14, 12:20
**cellmate** [3] - 12:12, 12:14
**cellmates** [2] - 12:17, 12:19
**cells** [2] - 10:1, 14:14
**Center** [1] - 5:17
**center** [2] - 6:6, 27:12
**cert** [3] - 28:6, 37:5, 37:7
**certain** [3] - 16:18, 18:15, 28:16
**certainly** [6] - 17:13, 29:21, 32:14, 32:18, 32:22, 33:22
**certifiable** [1] - 26:25
**certification** [17] - 21:18, 26:6, 27:1, 27:11, 28:17, 28:20, 33:23, 34:4, 34:12, 34:14, 34:17, 34:22, 34:24, 35:3, 38:17, 39:4, 39:5
**certified** [2] - 27:2, 37:14
**certify** [4] - 26:18, 35:8, 39:25, 41:5
**cessation** [5] - 24:8, 24:11, 24:13, 24:17, 25:1
**challenge** [2] - 38:24, 38:25
**CHAMBLEE** [4] - 1:18, 3:14, 30:20, 30:24
**Chamblee** [2] - 3:14, 30:15
**chance** [1] - 8:6
**change** [3] - 10:22, 26:14, 37:13

2

**changed** [3] - 4:20, 38:3, 38:5
**changes** [5] - 24:20, 24:21, 26:13, 37:9
**check** [2] - 11:1, 20:13
**checked** [1] - 11:15
**checking** [1] - 12:2
**checks** [3] - 10:23, 10:24, 11:4
**Chesapeake** [1] - 25:10
**choices** [1] - 13:6
**chronic** [5] - 7:1, 7:3, 7:6, 7:14, 7:18
**Circuit** [3] - 24:1, 24:3, 25:8
**circumstances** [2] - 34:25, 35:1
**cite** [1] - 23:19
**CIVIL** [2] - 1:5, 1:17
**Civil** [1] - 3:8
**claim** [3] - 23:8, 23:11, 23:14
**claiming** [1] - 5:14
**claims** [8] - 22:20, 23:16, 23:20, 23:23, 23:25, 24:6, 29:15, 31:10
**CLARENCE** [1] - 2:7
**class** [30] - 21:18, 23:14, 23:21, 26:6, 26:12, 26:18, 26:25, 27:2, 27:8, 27:11, 28:6, 28:9, 28:17, 28:20, 33:23, 34:5, 34:12, 34:14, 34:18, 34:19, 34:22, 34:24, 35:3, 37:5, 37:7, 37:13, 38:11, 38:16, 39:24
**class-wide** [1] - 26:12
**clean** [3] - 10:1, 10:2, 14:14
**cleaning** [5] - 9:24, 14:3, 14:4, 33:18, 33:19
**clear** [2] - 31:9, 35:2
**cleared** [1] - 15:12
**CLERK** [2] - 3:1, 3:4
**client** [1] - 15:6
**clients** [7] - 15:4, 15:13, 32:15, 32:16, 33:8, 33:15
**closely** [1] - 9:18
**closer** [2] - 26:5, 34:1
**cohort** [7] - 8:17, 8:20, 12:20, 13:7, 13:10, 13:17, 13:22
**cohorts** [4] - 8:3, 8:8, 12:24, 13:1

**collaboration** [2] - 33:7, 34:10
**collaboratively** [1] - 16:15
**colloquy** [1] - 23:17
**Colorado** [1] - 16:13
**comfortable** [3] - 15:6, 19:11, 19:12
**coming** [4] - 9:19, 9:20, 15:7, 20:2, 27:15
**commissary** [1] - 10:9
**common** [3] - 8:7, 13:23, 38:10
**communicate** [1] - 18:11
**communication** [2] - 15:13, 18:6
**communications** [1] - 16:10
**community** [3] - 15:16, 15:25, 19:5
**compatible** [1] - 18:3
**complains** [1] - 30:3
**complaint** [10] - 4:19, 20:25, 21:19, 22:2, 27:24, 28:3, 30:3, 30:14, 37:19, 39:7
**complicated** [1] - 34:15
**complicates** [1] - 34:17
**computer** [1] - 41:10
**COMPUTER** [1] - 1:24
**computer-aided** [1] - 41:10
**COMPUTER-AIDED** [1] - 1:24
**concept** [1] - 21:25
**concern** [3] - 23:13, 23:20, 23:21
**concerned** [2] - 19:15, 20:25, 37:24
**concerns** [4] - 4:17, 22:5, 27:12, 28:9
**concluded** [1] - 40:14
**concretely** [1] - 16:2
**conditions** [5] - 21:22, 22:20, 24:8, 26:14, 29:15
**conduct** [2] - 29:8, 29:12
**conference** [2] - 3:10, 15:6
**confinement** [4] - 23:16, 23:18, 26:14, 30:6
**confirm** [1] - 32:16
**confront** [1] - 35:14
**connect** [1] - 14:20

**Connecticut** [1] - 1:18
**connecting** [1] - 17:18
**connection** [1] - 15:23
**conscientious** [1] - 33:14
**consent** [3] - 25:17, 25:18, 36:4
**consented** [1] - 34:24
**consider** [1] - 5:18
**considered** [1] - 13:10
**considering** [1] - 30:3
**consistently** [1] - 31:10
**constantly** [1] - 15:9
**consultant** [1] - 9:11
**context** [1] - 21:1
**continually** [1] - 15:19
**continue** [8] - 22:21, 23:19, 24:22, 24:23, 24:25, 29:1, 29:3, 29:5
**Continued** [1] - 2:1
**continues** [2] - 23:13, 34:10
**contract** [1] - 25:12
**contractors** [1] - 20:2
**contribute** [1] - 40:3
**control** [2] - 13:21, 15:25
**conversation** [5] - 25:24, 27:17, 29:5, 29:23, 35:10
**conversations** [1] - 17:3
**convicted** [1] - 33:2
**convinced** [1] - 5:2
**COOPER** [1] - 2:7
**corporate** [1] - 5:22
**CORPS** [1] - 1:17
**correct** [3] - 8:2, 18:13, 41:5
**correctional** [2] - 16:14, 33:4
**Corrections** [1] - 16:11
**correctly** [1] - 41:9
**counsel** [10] - 3:11, 4:13, 5:11, 17:4, 23:10, 25:22, 25:25, 26:2, 32:15, 41:12
**counsel's** [1] - 33:7
**counseling** [1] - 20:16
**counsels** [1] - 16:10
**Count** [2] - 23:6, 24:9
**country** [1] - 19:20
**counts** [1] - 22:19
**COUNTY** [1] - 2:3
**county** [3] - 9:12, 9:20, 17:22

**County** [6] - 5:17, 32:13, 33:6, 33:13, 34:20, 40:8
**County's** [1] - 34:13
**couple** [2] - 23:19, 37:17
**course** [6] - 5:16, 11:6, 14:22, 23:15, 24:23, 32:7
**Court** [17] - 3:5, 3:8, 3:10, 16:24, 21:17, 22:10, 22:11, 22:17, 22:23, 23:9, 23:23, 23:24, 32:21, 32:22, 41:3, 41:4, 41:17
**COURT** [66] - 1:1, 1:22, 3:3, 4:1, 6:15, 7:9, 7:12, 7:15, 7:17, 7:21, 7:24, 8:8, 8:12, 8:16, 8:25, 9:2, 9:9, 9:14, 10:10, 11:6, 12:22, 13:7, 13:13, 13:18, 13:22, 13:25, 14:3, 14:12, 14:15, 14:25, 15:22, 17:16, 18:10, 19:16, 20:5, 20:8, 20:16, 20:19, 20:22, 21:22, 22:2, 22:12, 22:24, 23:4, 24:13, 24:17, 25:2, 25:5, 26:10, 26:22, 27:5, 28:10, 28:22, 29:19, 29:23, 30:22, 31:4, 31:14, 31:16, 34:2, 35:5, 37:15, 38:9, 39:4, 39:6, 40:9
**court** [5] - 4:5, 4:8, 28:8, 30:17, 30:18
**Court's** [1] - 33:25
**courtroom** [1] - 4:5
**COVID** [7] - 5:12, 9:5, 11:13, 14:22, 33:3, 37:12, 37:25
**COVID-19** [1] - 12:1
**creative** [2] - 16:22, 17:13
**credit** [1] - 31:17
**criticism** [1] - 31:20
**CRR** [3] - 1:23, 41:16
**current** [2] - 6:12, 7:8

**D**

**daily** [2] - 10:23, 10:24
**data** [1] - 5:19
**database** [1] - 18:1
**date** [3] - 7:4, 17:6, 41:7
**days** [1] - 12:4

**DC** [2] - 1:15, 1:19
**dealt** [1] - 6:6
**debate** [1] - 33:24
**decided** [1] - 23:14
**decision** [3] - 23:25, 34:6, 35:3
**declined** [1] - 7:2
**decorum** [1] - 4:5
**decree** [1] - 25:18
**deep** [2] - 9:10, 23:21
**DEFENDANT** [1] - 2:2
**Defendant** [5] - 1:9, 3:19, 3:21, 3:23, 3:25
**Defendants** [4] - 6:12, 39:10, 39:15
**defendants** [1] - 31:19
**defense** [1] - 5:11
**Defense** [2] - 5:21, 26:22
**defer** [1] - 25:7
**definitely** [2] - 11:25, 19:8
**degree** [1] - 34:22
**deleterious** [1] - 38:1
**deliberate** [3] - 27:25, 30:8, 38:14
**delivered** [1] - 9:24
**demonstrates** [1] - 33:6
**demonstration** [1] - 31:21
**Department** [2] - 9:11, 23:18
**Departments** [1] - 16:11
**deponent** [1] - 5:22
**deposed** [1] - 36:18
**deposition** [1] - 36:11
**DEPUTY** [2] - 3:1, 3:4
**designated** [2] - 15:5, 15:7
**designee** [1] - 5:22
**despite** [1] - 4:14
**detail** [6] - 7:20, 7:22, 7:24, 10:2, 14:6, 14:7
**detained** [2] - 4:22, 38:7
**detainee** [5] - 11:24, 17:14, 20:11, 20:15, 21:24
**detainees** [22] - 4:25, 7:1, 7:25, 8:9, 8:18, 8:22, 10:8, 11:22, 11:25, 13:9, 13:15, 15:23, 18:11, 19:22, 21:2, 21:3, 21:21, 25:17, 27:13, 28:2, 33:7, 33:10

3

**detainees'** [1] - 5:1
**detect** [1] - 11:9
**detected** [3] - 8:23, 11:7
**detention** [7] - 5:3, 5:15, 6:6, 19:20, 23:6, 23:8, 25:11
**Detention** [2] - 5:17, 25:10
**difference** [1] - 37:22
**different** [7] - 16:10, 16:11, 32:17, 34:16, 35:17, 38:18, 39:14
**difficulties** [1] - 35:14
**diligent** [1] - 12:2
**dipping** [1] - 31:13
**direction** [2] - 32:12, 39:8
**directly** [1] - 28:5
**director** [6] - 10:7, 17:10, 17:20, 18:5, 18:19, 19:11
**dirty** [1] - 39:18
**disagree** [1] - 28:21
**disagreeing** [1] - 28:16
**discovery** [11] - 22:22, 29:8, 29:13, 29:16, 32:1, 32:8, 36:2, 36:17, 39:11, 39:18, 39:19
**discuss** [6] - 4:15, 22:10, 22:17, 34:25, 36:6, 37:1
**discussing** [1] - 23:2
**discussion** [4] - 16:14, 19:3, 25:23, 26:3
**discussions** [3] - 31:23, 36:5, 40:12
**dismiss** [8] - 21:16, 22:8, 22:10, 23:7, 23:11, 23:24, 29:15, 39:7
**dismissed** [1] - 34:11
**dispute** [1] - 30:8
**distracting** [1] - 30:17
**District** [4] - 3:5, 41:4
**DISTRICT** [3] - 1:1, 1:2, 1:11
**DIVISION** [1] - 1:3
**DOC** [2] - 14:20, 15:4
**docking** [1] - 18:14
**doctrine** [6] - 21:17, 24:8, 24:23, 24:24, 25:3, 31:7
**documents** [1] - 36:10
**Doe** [1] - 21:12
**done** [9] - 15:14, 18:2, 18:3, 18:9, 27:22,

32:18, 33:3, 33:11, 33:15
**dose** [3] - 6:19, 6:20, 6:24
**down** [11] - 11:8, 13:12, 14:7, 14:8, 14:11, 15:15, 19:24, 32:3, 33:10, 39:18
**Dr** [4] - 12:5, 13:1, 32:21, 32:23
**Drive** [1] - 2:4
**due** [1] - 34:16
**during** [3] - 11:1, 17:24, 22:24
**dynamic** [1] - 33:3

**E**

**easier** [1] - 21:25
**easily** [1] - 18:8
**Ed** [2] - 3:12, 21:8
**educated** [1] - 10:13
**education** [3] - 10:10, 18:22, 35:12
**educational** [3] - 18:22, 19:19, 20:1
**EDWARD** [1] - 1:14
**effects** [4] - 10:14, 10:18, 10:21, 38:1
**efficiency** [2] - 27:18, 38:20
**efficient** [4] - 5:1, 35:19, 36:21, 38:19
**efficiently** [1] - 5:8
**efforts** [2] - 4:14, 25:14
**either** [4] - 9:12, 16:1, 23:8, 32:10
**elect** [1] - 10:9
**elected** [3] - 7:1, 10:15, 10:19
**electrical** [1] - 17:25
**elements** [1] - 38:6
**ELLORA** [1] - 1:17
**ellora** [1] - 3:16
**email** [1] - 26:2
**encourage** [3] - 10:6, 10:7, 16:22
**encouraged** [3] - 10:1, 10:14, 14:10
**encouraging** [1] - 10:8
**end** [1] - 12:7
**ended** [1] - 24:22
**enforcement** [5] - 28:7, 28:9, 28:14, 34:7, 34:20
**engage** [1] - 33:16
**entertainment** [1] - 18:21

**especially** [2] - 9:18, 19:14
**ESQUIRE** [7] - 1:14, 1:17, 1:18, 2:3, 2:4, 2:7, 2:8
**estimated** [1] - 17:3
**et** [2] - 1:5, 3:9
**etc** [1] - 21:17
**evaluate** [1] - 31:11
**evaluated** [1] - 23:14
**evaluating** [2] - 24:10, 31:10
**evaluation** [2] - 23:12, 32:22
**evidence** [1] - 39:12
**Ewing** [6] - 1:23, 4:9, 4:10, 41:3, 41:15, 41:16
**exactly** [1] - 9:17
**example** [4] - 16:9, 16:11, 16:13, 17:1
**excellent** [1] - 33:16
**exception** [2] - 21:12, 21:19
**exchange** [1] - 32:9
**executive** [1] - 17:22
**exhaustion** [1] - 21:3
**exhibited** [1] - 7:6
**expand** [2] - 12:25, 13:20
**expanded** [1] - 13:19
**expense** [1] - 30:4
**explain** [2] - 26:10
**exposed** [1] - 11:18
**extrajudicial** [1] - 28:8
**eye** [1] - 5:6

**F**

**facilitate** [1] - 15:8
**facilities** [2] - 5:3, 19:20
**Facility** [1] - 25:10
**facility** [29] - 5:10, 5:12, 5:15, 5:25, 6:13, 8:1, 11:24, 13:3, 14:18, 15:14, 16:3, 19:13, 19:18, 20:3, 20:4, 21:13, 21:14, 25:12, 29:9, 31:11, 33:5, 33:6, 33:9, 33:20, 36:9, 37:10, 37:11, 37:17, 38:7
**fact** [3] - 10:11, 16:9, 29:2
**fair** [5] - 31:4, 31:16, 32:6, 32:19, 38:19
**false** [2] - 11:17, 12:16
**families** [6] - 14:21,

15:1, 15:2, 15:23, 17:15, 17:19
**family** [1] - 18:7
**far** [2] - 23:2, 38:22
**fascinating** [1] - 33:24
**federal** [1] - 25:12
**file** [1] - 39:8
**filed** [2] - 21:18, 21:19
**financing** [1] - 14:23
**first** [7] - 6:19, 13:16, 19:7, 21:10, 22:8, 34:13, 37:20
**fix** [1] - 4:12
**flip** [1] - 25:2
**fluid** [1] - 26:16
**focus** [2] - 27:24, 30:10
**folks** [1] - 33:18
**follow** [1] - 15:22
**follow-up** [1] - 15:22
**FOR** [3] - 1:2, 1:13, 2:2
**foregoing** [1] - 41:5
**forgot** [1] - 10:6
**formal** [2] - 32:1, 34:4
**former** [1] - 26:15
**fortunate** [1] - 11:22, 38:1
**fortunately** [1] - 12:18
**forward** [2] - 28:2, 38:25
**forwarded** [1] - 20:12
**four** [2] - 26:12, 27:1
**Fourth** [3] - 24:1, 24:3, 25:8
**frame** [2] - 12:5, 25:24
**frankly** [1] - 27:7
**free** [1] - 10:4
**FRIDAY** [1] - 1:11
**front** [1] - 27:12
**full** [1] - 15:12
**fully** [1] - 25:25
**fundamental** [2] - 4:21, 38:12
**funds** [1] - 17:23

**G**

**GALE** [1] - 2:7
**Gallatin** [1] - 2:8
**gathered** [1] - 11:3
**general** [2] - 16:10, 17:4
**George's** [2] - 5:16, 33:5
**GEORGE'S** [1] - 2:3
**Geraghty** [1] - 21:17
**given** [3] - 10:7, 22:7, 25:6

**glass** [1] - 19:9
**globally** [2] - 4:17, 5:20
**going-forward** [1] - 38:25
**government** [1] - 25:12
**granted** [1] - 37:20
**grasp** [1] - 19:12
**grave** [1] - 5:4
**great** [2] - 21:7, 30:23
**GREENBELT** [1] - 1:12
**group** [1] - 20:16
**groups** [2] - 13:12, 13:16
**guidance** [1] - 20:24

**H**

**habeas** [3] - 23:23, 23:25, 24:6
**hand** [1] - 9:25
**handle** [1] - 15:17
**handling** [2] - 35:19, 36:4
**hands** [3] - 27:21, 28:25, 29:12
**happy** [1] - 29:3
**hard** [4] - 4:25, 17:5, 33:20, 36:20
**headlong** [1] - 38:16
**health** [8] - 19:18, 20:8, 20:9, 28:1, 30:9, 33:10, 38:1
**Health** [1] - 9:11
**hear** [6] - 3:2, 3:3, 4:10, 6:8, 24:15, 35:5
**heard** [2] - 24:1, 38:17
**hearing** [1] - 22:9
**heartache** [1] - 32:3
**help** [4] - 17:10, 18:22, 26:5, 32:3
**helpful** [2] - 22:11, 40:10
**helps** [1] - 27:3
**HENDERSON** [1] - 1:14
**hereby** [1] - 41:5
**hiccup** [3] - 26:11, 26:12
**highlight** [1] - 35:13
**hint** [1] - 35:9
**hit** [1] - 17:25
**holding** [2] - 4:4, 24:4
**holdup** [1] - 34:4
**honest** [1] - 27:17
**Honor** [39] - 3:1, 3:13, 3:15, 3:17, 3:18,

3:20, 3:24, 6:14, 8:2, 8:15, 9:16, 16:4, 20:21, 21:9, 22:16, 23:16, 24:16, 25:4, 25:20, 26:19, 28:15, 28:21, 28:24, 30:20, 30:24, 31:1, 31:8, 32:5, 32:6, 32:10, 32:25, 33:22, 35:2, 36:24, 37:1, 38:21, 40:6, 40:8, 40:13
**HONORABLE** [1] - 1:10
**Honorable** [1] - 3:6
**hook** [1] - 39:15
**hoping** [2] - 10:17, 10:19
**hospital** [1] - 11:25
**hour** [2] - 8:4, 8:18
**hours** [5] - 8:4, 8:12, 8:19, 8:21, 13:23
**housing** [22] - 6:2, 6:3, 8:14, 9:5, 9:24, 10:24, 11:5, 11:12, 12:6, 12:9, 12:10, 12:11, 13:9, 13:11, 13:14, 14:6, 16:18, 18:10, 18:14, 18:25, 37:18
**hung** [1] - 26:17
**Huntsville** [1] - 2:9

**I**

**identify** [1] - 3:11
**II** [1] - 1:14
**ills** [1] - 18:24
**immediately** [3] - 11:11, 11:19, 12:22
**impediment** [2] - 27:15, 35:3
**implemented** [2] - 16:17, 24:20
**implementing** [2] - 17:2, 17:12
**important** [4] - 14:16, 17:14, 22:18, 25:16
**IN** [1] - 1:1
**in-person** [2] - 16:21, 16:25
**incarcerated** [1] - 33:19
**incentive** [3] - 10:8, 30:12, 36:14
**incentivize** [1] - 16:19
**incoming** [1] - 33:10
**incorporated** [1] - 34:7
**increase** [3] - 14:20, 17:23, 19:3

**increased** [3] - 8:2, 8:20
**incredible** [1] - 33:6
**independent** [1] - 4:6
**indifference** [3] - 27:25, 30:9, 38:14
**individual** [3] - 6:2, 6:9, 10:1
**individuals** [2] - 16:20, 33:19
**infection** [3] - 13:3, 19:13, 33:8
**informally** [2] - 29:20, 39:20
**information** [4] - 5:23, 20:12, 32:9, 32:13
**informational** [1] - 17:17
**informed** [1] - 28:3
**inherently** [2] - 21:21, 26:8
**initial** [2] - 22:9, 31:5
**inmate** [8] - 9:7, 10:25, 11:24, 12:6, 12:8, 12:10, 12:12, 20:13
**inmates** [17] - 6:18, 6:20, 7:3, 7:25, 9:25, 10:12, 10:17, 10:19, 10:20, 11:3, 12:3, 12:21, 13:4, 13:15, 14:10, 15:20, 30:9
**inmates'** [1] - 14:20
**inquiry** [1] - 38:9
**inside** [2] - 19:4, 19:5
**instance** [1] - 33:5
**instead** [1] - 8:4
**institution** [1] - 36:14
**instructed** [1] - 14:10
**intake** [5] - 8:23, 11:8, 11:11, 37:18
**interested** [2] - 22:15, 41:12
**interesting** [1] - 33:3
**internal** [1] - 25:23
**internally** [1] - 37:2
**interruptions** [1] - 4:6
**introduce** [1] - 19:14
**introducing** [2] - 12:6, 20:4
**involved** [1] - 33:9
**involves** [1] - 28:11
**involving** [2] - 25:10, 25:11
**iPads** [4] - 14:21, 17:23, 18:8, 18:10
**isolation** [4] - 6:5, 11:20, 12:14
**Israni** [1] - 3:16
**ISRANI** [2] - 1:17, 3:16

**issue** [17] - 15:10, 16:25, 21:16, 23:12, 23:25, 26:9, 28:6, 28:7, 28:11, 30:6, 37:7, 37:21, 38:15, 38:23, 39:3, 39:4, 39:5
**issues** [14] - 21:3, 21:4, 22:3, 22:14, 24:11, 27:25, 28:8, 32:25, 33:24, 35:8, 38:10, 38:12, 38:20, 39:25

**J**

**jaded** [1] - 27:8
**jail** [7] - 6:17, 9:5, 9:20, 15:7, 16:19, 19:4, 24:20
**Jersey** [1] - 16:12
**job** [1] - 33:16
**John** [1] - 21:12
**Johnson** [13] - 3:21, 6:14, 6:21, 7:9, 13:8, 14:16, 16:6, 20:5, 22:4, 22:23, 29:13, 36:12
**JOHNSON** [36] - 2:3, 3:20, 6:14, 6:16, 7:11, 7:13, 7:16, 7:18, 7:22, 8:2, 8:11, 8:14, 8:17, 9:1, 9:3, 9:13, 9:16, 10:12, 11:10, 12:23, 13:11, 13:14, 13:19, 13:24, 14:2, 14:4, 14:13, 14:19, 15:2, 17:20, 18:13, 19:24, 20:7, 20:9, 20:18, 20:21
**Johnson's** [1] - 23:17
**JUDGE** [1] - 1:11
**Judge** [8] - 4:14, 25:9, 29:24, 35:6, 35:15, 36:20, 40:4, 40:10
**judge** [3] - 36:3, 36:4, 36:25
**jumping** [1] - 40:5
**Justice** [1] - 23:18

**K**

**KATHERINE** [1] - 1:18
**Katie** [1] - 3:14
**keep** [6] - 11:17, 12:24, 30:18, 33:20, 35:23, 40:3
**keeping** [1] - 13:2
**keeps** [1] - 14:2
**KEITH** [1] - 1:5

**Keith** [1] - 3:9
**kin** [1] - 41:12
**kind** [11] - 21:11, 21:20, 22:18, 24:9, 24:10, 24:11, 26:7, 29:10, 29:16, 35:4, 39:1
**kinds** [2] - 27:11, 39:19
**kitchen** [1] - 8:1
**knock** [2] - 15:24, 37:16

**L**

**landscape** [1] - 26:13
**largest** [1] - 17:1
**Largo** [1] - 2:5
**last** [10] - 4:18, 7:4, 9:6, 9:7, 10:3, 11:6, 22:5, 25:13, 29:2, 29:7
**latter** [1] - 26:16
**launching** [1] - 35:4
**laundry** [1] - 8:1
**law** [1] - 25:8
**LAW** [1] - 2:3
**lawyer** [2] - 30:17, 31:17
**lawyers** [1] - 17:10
**lead** [1] - 16:21
**learn** [1] - 17:9
**least** [5] - 22:3, 24:2, 24:24, 29:17, 37:4
**leave** [1] - 28:23
**leeway** [1] - 36:20
**legal** [3] - 24:4, 30:12, 33:24
**less** [1] - 21:20
**level** [2] - 9:12, 17:22
**levels** [1] - 4:21
**life** [1] - 5:18
**likely** [1] - 25:9
**limit** [1] - 18:17
**limiting** [1] - 13:2
**line** [2] - 4:2, 4:3
**list** [2] - 11:2, 11:3
**listening** [1] - 25:16
**litigate** [1] - 39:14
**litigated** [1] - 5:8
**litigation** [6] - 21:1, 24:21, 24:22, 27:9, 29:22, 33:4
**Local** [1] - 23:2
**look** [6] - 5:3, 5:25, 17:11, 17:12, 30:11
**looked** [2] - 25:13, 39:14
**looking** [6] - 5:5, 15:19, 16:8, 17:4,

22:2, 32:10
**looks** [3] - 4:18, 4:25, 35:20
**lose** [1] - 28:6
**LOU** [1] - 1:8
**Lou** [1] - 3:9
**low** [3] - 5:17, 13:3, 33:9
**lowered** [1] - 12:5
**lucky** [1] - 12:1
**LUNSFORD** [7] - 2:8, 3:22, 16:4, 32:5, 34:12, 40:8, 40:13
**Lunsford** [3] - 3:22, 16:4, 32:5
**LYNN** [1] - 2:3

**M**

**machine** [1] - 41:9
**magistrate** [1] - 36:3
**Magistrate** [1] - 4:14
**mail** [1] - 18:7
**main** [1] - 10:2
**maintain** [1] - 13:20
**major** [1] - 10:18
**managed** [1] - 5:3
**March** [2] - 7:13, 7:14
**marching** [1] - 38:16
**Mary** [1] - 3:9
**MARY** [1] - 1:8
**Maryland** [3] - 2:5, 3:6, 41:4
**MARYLAND** [2] - 1:2, 1:12
**mask** [2] - 9:22, 9:23
**masks** [1] - 9:22
**materials** [1] - 14:14
**matter** [7] - 3:8, 3:10, 17:15, 28:9, 35:19, 38:5, 41:7
**matters** [1] - 21:24
**MAYNARD** [1] - 2:7
**McCormick** [1] - 2:4
**McDonough** [2] - 1:8, 3:9
**mean** [18] - 7:25, 8:8, 13:4, 13:8, 16:5, 17:1, 19:25, 20:5, 20:6, 24:14, 24:18, 24:19, 25:15, 26:24, 32:23, 34:5, 36:12, 36:15
**means** [2] - 4:5, 39:10
**mechanisms** [1] - 34:20
**mediation** [4] - 23:3, 29:6, 29:7, 32:8
**medical** [2] - 11:20, 12:13

**medication** [1] - 6:22
**meeting** [1] - 17:21
**meets** [2] - 27:1, 30:8
**members** [2] - 18:7, 23:22
**memorialize** [1] - 28:11
**mental** [6] - 19:18, 20:8, 20:9, 28:1, 33:10
**merits** [2] - 34:6
**Meske** [2] - 12:5, 13:1
**message** [2] - 32:20, 33:14
**middle** [2] - 31:23, 36:19
**might** [16] - 24:22, 26:4, 26:5, 26:9, 30:2, 30:11, 31:6, 35:14, 35:22, 35:25, 36:8, 36:9, 36:10
**mild** [1] - 7:6
**mind** [4] - 4:5, 10:22, 35:19, 35:23
**misbehaving** [1] - 4:11
**Moderna** [2] - 6:19, 6:24
**money** [1] - 18:18
**monitored** [1] - 11:21
**monitoring** [2] - 36:8, 37:12
**month** [4] - 7:17, 7:18, 7:19, 7:23
**monthly** [1] - 9:4
**months** [6] - 4:14, 4:18, 22:5, 29:7, 35:22, 39:14
**mootness** [9] - 21:4, 21:16, 25:3, 26:7, 30:2, 31:2, 33:23
**morning** [8] - 3:1, 3:18, 3:20, 3:22, 3:25, 4:1, 21:9, 23:10
**most** [5] - 5:1, 11:10, 25:9, 27:18, 40:4
**mostly** [1] - 11:8
**motion** [9] - 21:16, 21:18, 22:8, 22:10, 23:24, 26:6, 27:14, 28:13, 37:7
**motions** [5] - 22:9, 22:12, 32:1, 33:23, 35:16
**move** [2] - 36:1
**movement** [1] - 13:2
**moving** [2] - 7:25, 27:24
**MR** [33] - 3:12, 3:18,

3:22, 3:24, 16:4, 21:8, 22:1, 22:7, 22:16, 23:1, 23:6, 24:15, 24:19, 25:4, 25:20, 26:19, 26:23, 28:4, 28:15, 28:23, 29:21, 31:1, 31:5, 31:15, 32:5, 34:12, 36:24, 38:4, 38:20, 39:5, 40:6, 40:8, 40:13
**MS** [39] - 3:14, 3:16, 3:20, 6:14, 6:16, 7:11, 7:13, 7:16, 7:18, 7:22, 8:2, 8:11, 8:14, 8:17, 9:1, 9:3, 9:13, 9:16, 10:12, 11:10, 12:23, 13:11, 13:14, 13:19, 13:24, 14:2, 14:4, 14:13, 14:19, 15:2, 17:20, 18:13, 19:24, 20:7, 20:9, 20:18, 20:21, 30:20, 30:24
**MURRAY** [2] - 2:4, 3:18
**Murray** [1] - 3:18

**N**

**named** [2] - 4:21, 21:13
**necessarily** [5] - 5:7, 5:20, 28:19, 32:11, 34:13
**necessary** [1] - 34:21
**need** [8] - 4:25, 20:3, 27:10, 27:17, 28:12, 28:18, 36:22, 39:24
**needle** [1] - 36:1
**needs** [4] - 15:5, 15:21, 20:15, 27:10
**negative** [9] - 9:6, 9:8, 11:16, 11:17, 12:8, 12:16, 12:18
**negotiate** [1] - 28:14
**new** [2] - 9:23, 40:5
**New** [3] - 5:13, 16:12, 17:2
**next** [8] - 4:16, 5:8, 6:25, 7:4, 16:1, 29:25, 31:25, 35:22
**night** [1] - 25:13
**NO** [1] - 1:5
**none** [1] - 11:22
**Northeast** [1] - 16:17
**note** [2] - 22:9, 23:9
**NOTES** [1] - 1:24
**notes** [3] - 11:2, 30:21, 30:22

**nothing** [3] - 15:18, 40:6, 40:8
**notifying** [1] - 23:10
**number** [4] - 5:18, 18:15, 19:4, 19:20
**numbers** [2] - 15:11, 15:15
**nurse** [1] - 11:2
**nurses** [3] - 10:23, 12:2, 20:11
**NW** [1] - 1:15

**O**

**objective** [1] - 32:19
**obligation** [2] - 32:15, 32:16
**obligations** [1] - 37:10
**obviously** [2] - 24:7, 34:25
**occurs** [1] - 32:19
**OF** [4] - 1:2, 1:10, 1:24, 2:3
**offer** [1] - 22:16
**offered** [2] - 6:25, 11:3
**OFFICE** [1] - 2:3
**officers** [1] - 33:17
**Official** [1] - 41:3
**official** [3] - 4:7, 4:8, 41:17
**OFFICIAL** [1] - 1:22
**offline** [1] - 30:19
**often** [1] - 34:8
**old** [1] - 31:25
**once** [2] - 11:9, 16:20
**One** [1] - 24:9
**one** [34] - 4:7, 4:8, 4:11, 5:6, 7:6, 7:9, 8:4, 8:18, 8:21, 11:14, 11:19, 13:4, 15:10, 15:22, 16:5, 16:7, 16:24, 17:1, 17:8, 19:2, 21:12, 21:24, 25:6, 26:4, 26:7, 26:16, 27:22, 29:10, 32:11, 35:8, 35:25, 37:18, 38:13, 38:18
**ongoing** [1] - 32:20
**open** [5] - 4:2, 16:12, 32:18, 32:24, 33:22
**opened** [1] - 16:16
**opinion** [1] - 24:2, 33:16
**opportunity** [1] - 29:8
**opposing** [4] - 23:10, 25:22, 25:24, 26:2
**order** [3] - 25:10, 25:11, 40:5
**original** [2] - 21:19,

28:2
**otherwise** [1] - 37:3
**ought** [1] - 39:11
**ourselves** [5] - 24:5, 25:21, 26:2, 39:1, 39:2
**outcome** [2] - 25:19, 41:13
**outdated** [1] - 30:14
**outside** [10] - 8:6, 8:13, 15:16, 15:24, 18:11, 20:2, 27:10, 28:8, 30:16
**oversight** [2] - 34:21, 34:23
**own** [1] - 14:6

**P**

**package** [1] - 35:13
**pandemic** [5] - 5:16, 5:18, 15:18, 15:25, 17:25
**paper** [1] - 14:9
**Parides** [2] - 32:21, 32:23
**part** [7] - 12:21, 17:21, 20:11, 34:4, 34:15, 35:12, 38:16
**particular** [3] - 5:6, 24:4, 33:2
**parties** [5] - 26:5, 28:19, 36:1, 39:9, 41:8
**party** [1] - 41:12
**patient** [1] - 35:12
**PAULA** [1] - 1:10
**Paula** [1] - 3:6
**PC** [1] - 2:7
**pending** [6] - 3:8, 22:8, 24:1, 25:8, 35:16
**Pennsylvania** [3] - 1:15, 16:9, 17:1
**people** [3] - 6:3, 19:4, 20:2
**percent** [1] - 9:4
**perfect** [3] - 15:18, 22:4
**period** [1] - 12:7
**periodically** [1] - 20:10
**person** [8] - 11:15, 11:17, 15:5, 15:7, 16:21, 16:25, 19:2, 20:13
**persons** [2] - 37:11, 38:7
**perspective** [2] - 26:24, 35:1

**phase** [1] - 22:21
**phone** [2] - 10:4, 30:16
**phones** [3] - 14:8, 14:11, 30:18
**physical** [1] - 4:4
**picture** [1] - 14:15
**piece** [1] - 16:7
**place** [5] - 9:15, 9:17, 18:13, 25:14, 25:17
**Plaintiff** [1] - 26:7
**plaintiffs** [4] - 4:22, 6:9, 21:13, 32:23
**Plaintiffs** [21] - 1:6, 3:12, 3:15, 3:16, 6:8, 14:18, 15:10, 20:20, 20:23, 21:8, 21:11, 26:19, 32:11, 32:15, 33:17, 34:8, 36:16, 36:24, 39:12, 39:21, 40:6
**PLAINTIFFS** [1] - 1:13
**Plaintiffs'** [2] - 29:17, 33:7
**planning** [1] - 16:3
**pod** [1] - 8:9
**point** [11] - 4:10, 5:19, 12:2, 29:22, 31:25, 32:6, 33:25, 34:12, 38:8, 39:24, 40:5
**pointedly** [1] - 20:6
**population** [5] - 6:17, 9:5, 16:23, 17:14, 37:24
**populations** [1] - 8:14
**poses** [1] - 21:16
**position** [11] - 5:22, 22:18, 26:20, 27:3, 29:1, 29:17, 29:18, 34:2, 34:14, 37:4
**positive** [13] - 5:14, 7:6, 7:9, 7:11, 7:13, 8:23, 11:9, 11:14, 11:19, 12:11, 12:13, 12:19, 15:15
**positives** [4] - 6:1, 11:7, 11:10, 37:17
**positivity** [1] - 37:21
**possible** [3] - 10:14, 17:7, 29:21
**posture** [1] - 40:3
**PPE** [2] - 6:2, 9:21
**practical** [1] - 35:24
**prefers** [1] - 23:9
**prejudge** [1] - 35:20
**prejudice** [1] - 39:8
**preliminary** [1] - 30:12
**prepared** [1] - 22:9
**preparing** [2] - 25:22, 26:1

presiding [1] - 3:7
pretrial [1] - 21:21
pretty [1] - 25:13
prevent [1] - 33:11
previous [1] - 28:5
previously [1] - 41:7
PRINCE [1] - 2:3
Prince [2] - 5:16, 33:5
priority [2] - 14:23,
  18:9
prison [2] - 5:15, 21:1
problem [3] - 4:12,
  26:8, 35:24
problems [3] - 18:6,
  18:20, 29:10
procedure [1] - 17:3
proceed [2] - 4:22,
  29:11
proceeding [3] - 4:4,
  4:7, 29:12
proceedings [3] -
  32:8, 40:14, 41:6
PROCEEDINGS [1] -
  1:10
process [9] - 12:3,
  17:2, 17:24, 18:4,
  18:18, 22:22, 22:25,
  33:17, 33:21
proffer [2] - 5:11,
  38:17
program [1] - 20:1
programming [3] -
  19:18, 20:6, 20:7
programs [6] - 18:22,
  18:23, 19:19, 19:25,
  20:1
progress [1] - 10:5
prongs [2] - 26:12,
  27:1
proposed [1] - 6:5
protect [1] - 25:17
protocol [3] - 6:1, 6:2,
  25:16
provide [1] - 19:21
provided [2] - 10:10,
  14:13
provides [2] - 26:1,
  34:22
providing [1] - 39:11
prudential [3] - 25:3,
  30:2, 31:2
psychologist [1] -
  20:10
public [3] - 4:2, 4:3,
  36:14
punts [1] - 24:3
purchased [1] - 18:3
purpose [1] - 36:13
purposes [1] - 37:6
pursue [3] - 22:22,

23:24, 28:20
pursuing [1] - 26:21
pushing [3] - 17:20,
  18:5, 32:12
put [4] - 5:16, 5:21,
  11:20, 12:13
putative [1] - 23:14,
  23:21
PX-20-1028 [2] - 1:5,
  3:9

Q

quarantine [1] - 8:24,
  12:7
quarantined [5] -
  11:17, 12:4, 12:12,
  12:14, 37:18
questions [4] - 10:15,
  25:7, 27:4, 36:17
quickly [2] - 15:11,
  31:19
quite [1] - 9:16
quo [2] - 13:21, 21:23

R

railings [1] - 14:8
raise [2] - 30:6, 37:5
raised [2] - 27:5, 34:8
range [1] - 30:23
rate [1] - 13:3
rates [2] - 16:22, 33:8
re [6] - 6:21, 12:7,
  12:15, 39:8, 40:10
re-call [1] - 6:21
re-file [2] - 39:8
re-refer [1] - 40:10
re-tested [2] - 12:7,
  12:15
reactions [1] - 31:5
read [3] - 5:13, 22:9,
  37:19
reading [1] - 24:24
real [3] - 5:24, 13:2,
  30:8
reality [1] - 13:5
really [15] - 4:24, 4:25,
  12:24, 12:25, 13:6,
  17:20, 18:24, 21:24,
  27:7, 27:17, 27:24,
  30:17, 33:1, 33:16,
  37:25
rearrested [1] - 21:12
reason [1] - 33:8
reasonable [1] - 36:21
reasons [2] - 21:15,
  34:16
reassurance [1] -
  36:16

rec [2] - 8:6, 8:7
receipt [1] - 12:8
receive [1] - 15:8
received [2] - 6:20,
  6:21
recent [2] - 25:10,
  40:4
reconnaissance [1] -
  17:18
record [4] - 3:11, 5:4,
  37:6, 39:2
recorded [1] - 41:9
recordings [1] - 4:6
recovered [1] - 7:7
reevaluating [1] -
  29:14
refer [2] - 36:2, 40:10
referral [1] - 36:3
refusals [1] - 34:16
regard [10] - 4:23,
  5:25, 14:25, 15:23,
  17:18, 19:16, 25:14,
  27:14, 31:18, 39:16
regarding [2] - 5:12,
  10:10
relates [1] - 32:25
relation [1] - 21:19
released [2] - 8:18,
  11:12
relied [1] - 32:22
religious [3] - 18:23,
  19:25, 20:1
remain [1] - 23:21
remarkable [1] - 37:22
remember [1] - 32:21
remind [1] - 4:3
Renee [4] - 1:23, 41:3,
  41:15, 41:16
renewed [2] - 25:14,
  40:11
reopen [1] - 17:4
repeatedly [1] - 14:10
report [1] - 10:17
reported [2] - 10:3,
  41:6
reporter [1] - 4:8
Reporter [2] - 41:3,
  41:17
REPORTER [1] - 1:22
representative [1] -
  36:17
request [4] - 14:14,
  15:8, 20:11, 32:1
require [1] - 21:4
requirements [1] -
  19:21
reread [1] - 4:19
research [1] - 16:25
reserve [2] - 5:4,

23:25
resizing [1] - 15:19
resolution [7] - 26:6,
  26:12, 27:2, 27:16,
  35:4, 36:7, 36:22
resolve [4] - 27:14,
  35:15, 38:10, 38:15
resolved [2] - 30:4,
  37:8
resolving [1] - 34:1
respect [4] - 24:6,
  24:8, 37:5, 38:7
respond [3] - 15:20,
  31:19, 32:4
response [2] - 21:15,
  24:21
rest [1] - 21:13
results [1] - 11:13
resume [1] - 19:6
resumed [1] - 7:20
resumption [1] -
  19:17
retested [1] - 11:16
reviewed [1] - 25:21
RIGHTS [1] - 1:17
RMR [2] - 1:23, 41:16
road [2] - 30:8, 32:4
roadmap [2] - 25:14,
  26:1
robustness [1] - 34:23
ROGERS [2] - 2:7,
  3:24
Rogers [1] - 3:24
room [1] - 19:9
rotating [4] - 8:5, 8:12,
  8:19, 13:23
RPR [2] - 1:23, 41:16
rubber [1] - 30:8
Rule [5] - 23:8, 23:9,
  27:1, 38:6, 38:9
rules [2] - 33:11,
  39:20
Rules [1] - 23:2
ruling [1] - 28:18
run [1] - 20:2
Ryan [2] - 3:14, 30:15
RYAN [4] - 1:18, 3:14,
  30:20, 30:24

S

safe [2] - 19:5, 33:20
safety [6] - 5:1, 5:24,
  28:1, 30:9, 38:6
sake [1] - 4:24
sanitation [2] - 6:1,
  14:9
sanitizer [1] - 9:25
satisfaction [1] -
  39:21

satisfied [1] - 38:7
science [1] - 26:13
scope [1] - 37:10
scratch [2] - 39:13
scratched [1] - 30:10
second [2] - 6:20,
  6:24, 19:14
secure [1] - 5:1
security [1] - 18:1
see [9] - 4:1, 9:5,
  10:20, 20:12, 26:14,
  27:7, 28:13, 33:17,
  33:20
seeing [2] - 10:20,
  30:18
seem [1] - 22:3
send [5] - 25:9, 25:22,
  26:2, 29:4, 40:4
sends [1] - 33:15
sense [5] - 27:18,
  36:23, 36:25, 39:17,
  39:22
sent [1] - 23:9
separate [2] - 11:12,
  19:9
serious [4] - 11:23,
  22:12, 37:20, 37:25
session [2] - 3:6,
  20:14
SETH [1] - 1:5
Seth [1] - 3:9
settled [2] - 4:15,
  34:19
settlement [18] - 5:4,
  22:25, 25:10, 25:11,
  25:18, 25:21, 25:25,
  27:22, 28:10, 28:11,
  28:21, 29:4, 31:23,
  33:15, 34:6, 35:13,
  36:4, 40:5
shared [1] - 18:16
sheet [1] - 11:2
sheets [1] - 10:11
Shelley [1] - 6:14
SHELLEY [1] - 2:3
Shelly [1] - 3:20
shifted [2] - 22:5
shooting [1] - 17:6
shorthand [1] - 41:9
shot [1] - 30:16
show [1] - 32:2
side [7] - 5:6, 10:14,
  10:18, 10:21, 25:2,
  33:13
sides [1] - 29:2
significant [3] - 23:13,
  23:20, 35:14
sit [1] - 33:22
site [1] - 20:10
situation [3] - 13:6,

21:20, 31:11
**six** [1] - 29:7
**skis** [1] - 31:2
**slow** [1] - 12:25
**smaller** [2] - 13:12,
16:18
**soiled** [1] - 9:22
**solid** [1] - 5:24
**solitary** [3] - 23:16,
23:18, 30:6
**solve** [3] - 18:6, 18:20,
18:23
**solved** [1] - 18:8
**someone** [3] - 11:15,
36:9, 39:24
**sometimes** [7] -
12:17, 12:19, 15:17,
27:9, 36:1, 36:3
**soon** [1] - 17:6
**sorry** [1] - 24:15
**sort** [4] - 9:10, 17:17,
32:2, 39:17
**sound** [2] - 27:20,
27:21
**sounds** [3] - 27:7,
38:2, 38:18
**SOUTHERN** [1] - 1:3
**speakers** [1] - 16:5
**specific** [1] - 27:19
**specifically** [1] - 21:20
**spent** [2] - 29:7, 31:3
**spoiler** [1] - 25:7
**Spray** [2] - 9:25, 14:9
**spread** [1] - 33:12
**staff** [2] - 33:10, 33:18
**standards** [1] - 23:18
**standpoint** [1] - 27:18
**start** [4] - 5:10, 6:16,
21:5, 25:14
**started** [4] - 15:3,
16:1, 36:12, 37:24
**starting** [1] - 39:12
**state** [6] - 5:3, 6:12,
9:12, 14:17, 15:1,
25:11
**statement** [1] - 39:2
**statements** [3] - 29:2,
37:2, 41:8
**States** [3] - 3:5, 5:15,
41:4
**states** [1] - 17:11
**STATES** [2] - 1:1, 1:11
**static** [1] - 26:15
**station** [1] - 18:14
**statistics** [1] - 6:17
**status** [10] - 3:10, 6:9,
13:21, 21:11, 21:23,
24:3, 24:5, 24:12,
39:9

**stay** [1] - 35:15
**stayed** [2] - 12:18,
21:23
**steadily** [1] - 15:15
**steady** [1] - 9:19
**stenographically** [1] -
41:6
**STENOTYPE** [1] -
1:24
**step** [3] - 16:1, 19:7,
29:25
**STEPHEN** [1] - 2:7
**Stephen** [1] - 3:24
**steps** [2] - 4:16, 5:9
**sticking** [1] - 39:24
**still** [11] - 4:22, 10:4,
10:23, 11:4, 11:17,
11:23, 12:5, 14:20,
21:3, 38:6
**stipulate** [1] - 28:20
**stipulated** [1] - 28:17
**stoppage** [1] - 6:21
**straight** [2] - 18:18,
36:15
**strain** [1] - 19:14
**Street** [1] - 2:8
**stress** [1] - 18:24
**strike** [1] - 38:19
**struggling** [1] - 19:21
**stuff** [2] - 14:22, 14:24
**stumbling** [1] - 27:6
**substantive** [2] -
35:10, 38:5
**success** [1] - 13:2
**succumb** [1] - 11:25
**suffered** [1] - 11:23
**suffering** [1] - 10:21
**suggest** [2] - 36:19,
37:13
**suggesting** [1] - 38:4
**suit** [1] - 5:4
**Suite** [2] - 1:19, 2:5
**Sullivan** [7] - 4:14,
25:9, 29:24, 35:6,
36:20, 40:4, 40:11
**summer** [1] - 17:5
**supervision** [1] -
41:10
**supplies** [2] - 9:21,
9:24
**supply** [2] - 9:19, 9:25
**Supreme** [1] - 21:17
**surface** [1] - 30:11
**surprise** [1] - 38:25
**surprised** [2] - 31:6,
39:3
**symptom** [4] - 10:23,
10:24, 11:1, 11:4
**symptoms** [3] - 7:7,

11:21, 11:23
**system** [7] - 4:25,
16:17, 17:2, 17:25,
18:1, 25:17
**systems** [4] - 16:8,
16:15, 16:16, 17:9

## T

**table** [1] - 31:24
**tables** [1] - 14:7
**targeted** [2] - 36:11,
36:17
**technique** [1] - 6:6
**telephone** [2] - 15:11,
18:20
**telephones** [3] - 10:3,
14:9
**temperatures** [1] -
19:9
**ten** [7] - 4:18, 9:4,
13:16, 22:5, 39:14
**terms** [6] - 14:17,
17:17, 30:7, 32:14,
34:7, 34:23
**terribly** [1] - 38:19
**test** [13] - 7:11, 7:13,
7:17, 7:19, 9:4,
11:13, 11:15, 12:8,
12:20, 12:21, 16:15,
37:20
**tested** [6] - 7:3, 7:23,
8:22, 12:7, 12:12,
12:15
**testimony** [1] - 41:8
**testing** [16] - 5:25, 7:3,
7:4, 7:15, 7:16, 9:7,
9:10, 11:14, 12:10,
14:23, 16:16, 19:10,
37:21, 38:14
**tests** [1] - 12:13
**texting** [1] - 30:15
**THADANEY** [1] - 1:17
**THE** [71] - 1:1, 1:2,
1:10, 1:13, 2:2, 3:1,
3:3, 3:4, 4:1, 6:15,
7:9, 7:12, 7:15, 7:17,
7:21, 7:24, 8:8, 8:12,
8:16, 8:25, 9:2, 9:9,
9:14, 10:10, 11:6,
12:22, 13:7, 13:13,
13:18, 13:22, 13:25,
14:3, 14:12, 14:15,
14:25, 15:22, 17:16,
18:10, 19:16, 20:5,
20:8, 20:16, 20:19,
20:22, 21:22, 22:2,
22:12, 22:24, 23:4,
24:13, 24:17, 25:2,
25:5, 26:10, 26:22,

27:5, 28:10, 28:22,
29:19, 29:23, 30:22,
31:4, 31:14, 31:16,
34:2, 35:5, 37:15,
38:9, 39:4, 39:6,
40:9
**thereafter** [1] - 41:10
**thereof** [1] - 41:13
**thinking** [4] - 20:24,
24:7, 31:3, 39:11
**three** [2] - 10:4, 35:22
**throwing** [1] - 27:21
**thrown** [2] - 28:25,
29:12
**tight** [1] - 5:22
**today** [7] - 4:7, 6:17,
27:20, 29:14, 31:22,
32:20, 38:18
**together** [1] - 28:19
**total** [1] - 5:17
**tough** [1] - 13:6
**towards** [1] - 35:4
**towels** [1] - 14:9
**transcribed** [1] - 41:10
**TRANSCRIPT** [1] -
1:10
**transcript** [2] - 4:7,
41:6
**transcription** [1] -
41:11
**TRANSCRIPTION** [1] -
1:24
**transfer** [1] - 11:24
**transferred** [2] -
11:19, 12:13
**transitory** [2] - 21:21,
26:8
**treatment** [3] - 19:18,
20:8, 20:9
**TRO** [1] - 37:20
**true** [1] - 41:5
**trust** [1] - 29:16
**truth** [1] - 36:15
**try** [1] - 10:6
**trying** [13] - 9:18,
14:20, 14:21, 15:19,
15:20, 16:19, 16:22,
17:9, 17:12, 18:25,
19:3, 30:13, 31:10
**turn** [4] - 6:8, 14:17,
14:18, 20:20
**twice** [5] - 7:17, 7:18,
7:23, 9:22
**Two** [1] - 23:6
**two** [8] - 8:4, 8:11,
8:12, 8:21, 8:22,
13:23, 16:5, 29:10
**type** [3] - 21:20, 26:9,
37:7
**types** [1] - 19:6

**typical** [2] - 38:11,
38:13

## U

**under** [8] - 13:21,
21:17, 23:8, 26:12,
34:24, 37:21, 38:14,
41:10
**understatement** [1] -
4:20
**unfortunately** [3] -
13:5, 23:17, 23:21
**unit** [22] - 8:14, 10:24,
11:5, 11:9, 11:12,
11:13, 11:20, 12:7,
12:9, 12:10, 12:11,
12:13, 13:10, 13:11,
13:14, 13:15, 14:6,
14:7, 18:14, 18:25,
37:19
**United** [3] - 3:5, 5:15,
41:4
**UNITED** [2] - 1:1, 1:11
**units** [5] - 9:6, 9:25,
13:9, 16:18, 18:10
**unless** [1] - 24:3
**unnecessary** [1] -
34:15
**unwilling** [1] - 29:1
**up** [10] - 15:12, 15:22,
16:1, 16:12, 16:16,
19:3, 26:17, 27:21,
28:25, 29:12
**updating** [1] - 17:25

## V

**vaccinated** [8] - 6:18,
6:19, 7:2, 10:9,
10:20, 16:20, 19:4,
37:9
**vaccination** [3] - 10:7,
16:19, 16:22
**vaccinations** [6] - 6:1,
10:11, 34:16, 35:11,
37:8, 37:13
**vaccine** [11] - 6:25,
9:19, 10:13, 10:14,
10:18, 10:20, 10:25,
11:1, 11:4, 14:23,
35:9
**vaccines** [1] - 37:23
**variety** [3] - 16:10,
32:17, 34:15
**vary** [1] - 8:14
**verification** [3] -
22:20, 29:19, 36:21
**verify** [4] - 22:22, 29:8,
29:13, 29:17

8

**versus** [1] - 5:6
**video** [1] - 15:5
**view** [7] - 23:5, 27:6, 27:25, 29:17, 31:8, 35:2, 35:7
**virtual** [3] - 16:1, 16:18, 16:20
**virtually** [1] - 37:16
**virus** [1] - 20:4
**visit** [3] - 15:2, 15:4, 16:18
**visitation** [8] - 15:1, 16:1, 16:2, 16:12, 16:25, 17:4, 17:12, 19:17
**visits** [2] - 16:20, 16:21
**voluntarily** [3] - 23:7, 23:11, 29:15
**voluntary** [5] - 24:8, 24:11, 24:13, 24:17, 24:25
**volunteer** [1] - 19:24
**volunteers** [1] - 20:2
**vs** [1] - 3:9

## W

**walk** [1] - 22:19
**wants** [2] - 6:11, 40:3
**warranted** [2] - 34:8, 34:9
**Washington** [2] - 1:15, 1:19
**wasting** [1] - 22:15
**ways** [5] - 16:22, 17:13, 28:16, 30:14, 32:17
**weeds** [1] - 9:10
**week** [3] - 6:25, 9:22, 35:22
**welcome** [1] - 4:2
**whichever** [1] - 23:9
**whole** [3] - 17:24, 35:10, 37:23
**wide** [1] - 26:12
**WILLIAM** [1] - 2:8
**WILLIAMS** [26] - 1:14, 3:12, 21:8, 22:1, 22:7, 22:16, 23:1, 23:6, 24:15, 24:19, 25:4, 25:20, 26:19, 26:23, 28:4, 28:15, 28:23, 29:21, 31:1, 31:5, 31:15, 36:24, 38:4, 38:20, 39:5, 40:6
**Williams** [5] - 3:12, 21:8, 25:2, 25:19, 34:3

**williams** [1] - 27:19
**Williams'** [1] - 32:6
**WILMERHALE** [1] - 1:14
**win** [1] - 39:10
**wipe** [1] - 14:10
**wipes** [4] - 14:7, 14:8, 14:9
**wish** [2] - 20:19, 21:6
**witnesses** [1] - 41:8
**wood** [2] - 15:24, 37:16
**workers** [4] - 7:22, 7:24, 9:7, 10:2
**works** [1] - 14:22
**world** [3] - 15:24, 18:12, 36:14
**worries** [2] - 31:14, 31:18
**worth** [1] - 38:24

## X

**Xinis** [1] - 3:6
**XINIS** [1] - 1:10

## Y

**year** [2] - 5:19, 11:6
**years** [1] - 33:4
**York** [2] - 5:13, 17:2
**yourself** [1] - 5:21
**yourselves** [2] - 3:11, 36:6